**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RACHEL CRAFTON, as Administratrix of the Estate of CASEY CRAFTON, deceased,<br><br>　　　　　　　Plaintiff,<br><br>　　　　-v.-<br><br>AMERICAN AIRLINES INC.<br>1 Skyview Dr.<br>Fort Worth, TX 76155<br><br>PSA AIRLINES, INC.<br>1 Terminal Dr.<br>Middletown, PA 17057<br><br>UNITED STATES OF AMERICA<br>Pamela Bondi, in her official capacity as U.S. Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue N.W.<br>Washington, D.C. 20530-0001<br><br>　　　　　　　Defendants. | Case No:　　1:25-cv-03382<br><br><br><br>**COMPLAINT** |

Plaintiff RACHEL CRAFTON, as Administratrix of the Estate of CASEY CRAFTON, deceased, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1.　　On January 29, 2025, American Eagle Flight 5342 ("AE 5342"), from Wichita Dwight D. Eisenhower National Airport to Ronald Reagan Washington National Airport, was on final approach to land when it collided with a United States Army Blackhawk helicopter over the Potomac River. This wholly avoidable tragedy took 67 lives, including CASEY CRAFTON's. This Complaint asserts wrongful death and survival claims, jointly and severally, against Defendants, AMERICAN AIRLINES, INC., and PSA AIRLINES, INC., for their acts and

1

omissions in operating AE 5342, and against the UNITED STATES OF AMERICA, for the acts and omissions of the Federal Aviation Administration and United States Army.

2.      As detailed herein, prior to, and on the night of the mid-air collision, the Defendants knew, or should have known, that AE 5342 was transiting one of the busiest airspaces in the United States, and they knew, or should have known, that the airport approaches presented certain safety risks, specifically including the possibility of a mid-air collision.  This knowledge includes, but is not limited to, the fact that there have been a substantial number of "near miss" events in and around Washington, D.C.'s Reagan National Airport ("DCA") which were required to be analyzed to ensure that a mid-air collision does not occur.  As a result, the Defendants were required to exercise extreme vigilance when operating and/or controlling aircraft in the vicinity of Reagan National Airport.  These Defendants, however, utterly failed in their responsibilities to the travelling public, specifically including the passengers on board AE 5342, in that, amongst other things, each aircraft flight crew failed to see and avoid the other; that the airline Defendants failed to implement policies and procedures specifically designed to mitigate the risks associated with a mid-air collision; that the airline Defendants manipulated and abused the arrival rate system at DCA to force in more of their arrivals per hour at the airport despite its knowledge that doing so severely limited the margins for safety; that the United States Army flight crew failed to operate the Blackhawk helicopter at or below the mandatory altitude; and that the Federal Aviation Administration's air traffic controllers failed in their two most important priorities, namely to separate aircraft in airspace and issue Safety Alerts when aircraft are in an unsafe proximity to one another.  The Defendants' collective failures (for which they are jointly and severally liable) caused, and/or contributed, to the mid-air collision complained of herein, resulting in the tragic deaths of 67 individuals, specifically including Plaintiff's decedent, CASEY CRAFTON.

## PARTIES

3.    CASEY CRAFTON resided in Connecticut.  Plaintiff RACHEL CRAFTON is a citizen and resident of Connecticut and was the lawful SPOUSE of CASEY CRAFTON at the time of his death.

4.    On or about March 24, 2025, the Connecticut Court of Probate issued an order appointing RACHEL CRAFTON as Administratrix of the Estate of CASEY CRAFTON. Therefore, she has standing to assert both wrongful death and survival claims on behalf of all beneficiaries of CASEY CRAFTON and brings this lawsuit in her representative capacity.

5.    At all times relevant to this action, AMERICAN AIRLINES, INC. ("American") was a corporation formed under the law of the state of Delaware with its principal place of business in Fort Worth, Texas.

6.    At all times relevant to this Action, PSA AIRLINES, INC. ("PSA") was a corporation formed under the law of the state of Pennsylvania with its principal place of business in Dayton, Ohio.

7.    At all times relevant to this Action, American and PSA were wholly owned subsidiaries of American Airlines Group, Inc., both doing business as American Airlines and with PSA operating flights for American under the brand name "American Eagle."

8.    At all times relevant to this action, the air traffic control personnel Plaintiff alleges to have been negligent were employees of the UNITED STATES OF AMERICA ("USA") under the authority and control of the Federal Aviation Administration ("FAA") acting in their official capacity and within the course and scope of their employment.

9.    At all times relevant to this action, the United States Army (U.S. Army) personnel Plaintiff alleges to have been negligent were employees of the USA under the authority and control

of the United States Army acting in their official capacity and within the course and scope of their employment.

## JURISDICTION AND VENUE

### A. American and PSA

10.    This Court has Subject Matter Jurisdiction over American and PSA based on complete diversity pursuant to 28 U.S.C. § 1332.

11.    This Court also has Subject Matter Jurisdiction over American and PSA pursuant to 28 U.S.C. § 1367 (a) which provides that the District Court has supplemental jurisdiction over said defendants as the claims against these defendants are related to, intertwined with, and are part of the same claims against Defendant USA, as all claims arise from the mid-air collision in which the decedent CASEY CRAFTON was killed.

12.    Plaintiff alleges damages greater than the jurisdictional amount of $75,000.

13.    Venue in this District satisfies the requirements of 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to the claim occurred in this District.  The subject crash and resulting deaths occurred in this District as a result of negligence that occurred in the airspace of this District.

14.    American and PSA are subject to personal jurisdiction in this District because they conduct longstanding and continuous business in the District and operate flights in the District's airspace.  Both American and PSA operate regular, daily flights into and from Ronald Reagan Washington National Airport, including AE 5342 from Wichita Dwight D. Eisenhower National Airport (ICT) to Ronald Reagan Washington National Airport (DCA) on January 29, 2025.

15.    American and PSA are also subject to personal jurisdiction in this District because they operated AE 5342 in the airspace over this District for the purpose of serving the community

4

in this District, which, as a result of the negligence of American and PSA, culminated in the crash and resulting deaths in the District of Columbia.

**B.  The United States of America**

16.    This Court has Subject Matter Jurisdiction over Defendant USA pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and § 2671 *et seq.*, because the United States is the defendant in this civil action to recover monetary damages, and because Plaintiff has complied with all conditions precedent to the filing of this action under the Federal Tort Claims Act ("FTCA").

17.    On or about February 26, 2025, Plaintiff RACHEL CRAFTON, on behalf of the Estate of CASEY CRAFTON, deceased, served her initial administrative claims upon the FAA.

18.    On or about February 18, 2025, Plaintiff RACHEL CRAFTON, on behalf of the Estate of CASEY CRAFTON, deceased, served her initial administrative claims upon the United States Army ("Army").

19.    The FAA indicated in its acknowledgement of receipt of Plaintiff's claims that the FAA would be the lead agency to investigate and decide the merits of these claims pursuant to 28 C.F.R. § 14.2(b)(2).

20.    The USA did not serve any formal response either accepting or denying any of the aforementioned claims within six months of filing, as set forth in 28 U.S.C. § 2675(a).  This therefore constitutes a final denial of the claims entitling Plaintiff to file this complaint pursuant to 28 U.S.C. § 2675(a).

21.    Pursuant to 28 U.S.C. § 1402(b), venue of the claims against the USA is proper in the United States District Court for the District of Columbia because negligent acts and omissions of the FAA, the United States Army and the USA that are alleged to have caused the mid-air

collision of two aircraft, which is the subject of this action (the "Subject Crash"), occurred in this federal District.

## FACTS

### A. Ronald Reagan Washington National Airport

22.     Ronald Reagan Washington National Airport ("DCA") has three (3) runways identified based on their compass orientation.   When the airport is configured for "north operations" with aircraft approaching from the south, Runway 1 is the longest and primary runway for commercial airline traffic, and Runways 33 and 4 are shorter alternate runways.  Figure 1 below is a pictorial diagram of the runways at DCA with Runways 1 and 33 highlighted in "red."



*Figure 1 – Airport Diagram of DCA with Runway 1 and Runway 33 labeled*
(Source: FAA)

23.     DCA Runway 1 is the busiest runway in the United States and operates at full capacity for most of DCA's daily operating hours.  This is particularly true in the evening hours, when dozens of flights regularly depart from and arrive to Runway 1.

24.     Runway 33 is used far less frequently than Runway 1 at DCA when the airport is configured for "north operations."

25.     Runway 33 is used for less than five (5%) percent of DCA's flight operations.

7

**B. Traffic in the Airspace Surrounding DCA**

26.     In addition to commercial aviation traffic such as AE 5342, the airspace around DCA is used by government, military, law enforcement and emergency medical helicopters transiting the busy Washington, D.C., area.

27.     There are multiple published low-level helicopter routes surrounding DCA that direct the flow of helicopter traffic near and around the airport (See Figure 2 below).



*Figure 2 – FAA Helicopter Route Chart for the Area Near DCA*
(Source: FAA)[1]

---

[1] https://aeronav.faa.gov/visual/02-20-2025/PDFs/Balt-Wash_Heli.pdf

28.     These helicopter routes set mean sea level ("MSL") maximum altitude limitations for helicopters operating on the routes.

29.     These helicopter routes, including Helicopter Route 4, which follows the Potomac River, transit approach and takeoff corridors to DCA, including Runway 33.

30.     The aeronautical chart provides that "ATC Authorization to operate along routes, or within zones, constitutes clearance to enter Class B Airspace Incidental to the Authorized Operation, **at altitudes stated in the authorization or as depicted in the route specified.**" (emphasis added).  This required pilots cleared by air traffic control ("ATC") onto the helicopter routes to comply with the routes' restrictions, including, critically, the maximum altitude restrictions set forth in the helicopter chart.

31.     Since the FAA began keeping records, there is a documented history of over 30 near miss events where aircraft landing at DCA came within less than 1,000 feet from colliding with a helicopter transiting the helicopter routes.

32.     The National Transportation Safety Board ("NTSB") also identified 15,214 occurrences involving commercial airplanes and helicopters where there was a lateral separation distance of less than 1 nautical mile ("nm") and vertical separation of less than 400 feet between October 2021 and December 2024.  Among them were 85 events that involved lateral separation of less than 1,500 feet and/or vertical separation of less than 200 feet.

33.     All commercial passenger aircraft with over 30 seats are required by FAA regulation to be equipped with a Traffic Collision Avoidance System ("TCAS"), designed to provide automatic aural and/or visual alerts to pilots of dangerous proximity to and/or an impending collision with another aircraft. 14 C.F.R. § 135.180.

34.     TCAS systems give two types of alerts: Traffic Alerts ("TAs"), which are designed to alert pilots to aircraft that the system calculates will come within approximately 1.1 nm horizontally and 600 to 800 feet vertically of the aircraft, and Resolution Advisories ("RAs"), which are designed to alert pilots to aircraft that will come even closer and direct pilots to take action to avoid those aircraft.



© 2025 Collins Aerospace. | This document does not contain any export-controlled technical data.

*Figure 3 – Depicting the TCAS TA (in purple) and RA (in green) alert envelopes*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

35.     TAs cause the system to issue an aural "TRAFFIC, TRAFFIC" alert and a yellow "TRAFFIC" notification on the cockpit's primary flight displays. (*See* Figure 4, below).



*Figure 4 – Example of how a TA appears to pilots on an aircraft primary flight display*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

36.    For a TA, the TCAS also visually depicts the other aircraft on another display screen (typically the multi-function displays or "MFDs") with a yellow dot indicating an aircraft for which a TA has issued and showing the other aircraft's relative location and relative altitude. (*See* Figure 5 below).



*Figure 5 - Showing an exemplar display of a TA on aircraft instruments*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

37.    Resolution Advisories ("RAs") cause the system to issue numerous alerts, including, an aural "TRAFFIC, TRAFFIC" alert and red "TRAFFIC" warning on the aircraft's primary flight displays. (*See* Figure 6, below). The TCAS RA also aurally directs the flight crew to take a particular action (e.g., "DESCEND" or "INCREASE DESCENT") to avoid the traffic detected.



*Figure 6 – Example of how an RA appears to pilots on an aircraft primary flight display*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

38.    For an RA, the TCAS also visually depicts the other aircraft on the MFDs with a red square indicating an aircraft for which an RA has issued and showing the other aircraft's relative location and relative altitude. (*See* Figure 7, below).  Pilots are generally required by the applicable flight manual to respond to a TCAS RA and follow the directions provided by the system.



*Figure 8 - Showing an exemplar display of an RA on aircraft instruments*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

39.    The design of the TCAS inhibits RAs when the aircraft is below 1000 feet above the ground where it is difficult to safely direct an airplane to avoid traffic without encountering another obstacle. This means that although the TCAS will aurally and visually alert the flight crew to "traffic" with a TA, it will not direct the flight crew to take a particular action to avoid the traffic with an RA when the aircraft is below 1000 feet above the ground.

40.    Under 1000 feet above the ground, such as when an aircraft is on final approach to landing and where most helicopters operate in the airspace around DCA, TAs provide the only TCAS safety notifications to a flight crew advising and/or warning that the system detects nearby oncoming traffic.

41.     Under 400 feet above the ground, aural TAs are also inhibited, and the only TCAS alerts are the visual "TRAFFIC" textual alert on the primary flight displays and the depiction of the other aircraft's position as a yellow filled-in circle and relative altitude on the MFDs.

42.     Using information from voluntary safety reporting programs along with FAA data regarding encounters between helicopters and commercial aircraft near DCA, the NTSB found that at least one TCAS RA was triggered per month from 2011 to 2024 due to proximity to a helicopter.  In over half of these instances, the helicopter may have been above the published, mandatory helicopter route altitude restriction for that portion of the route that the helicopter was on.  Two-thirds of the events occurred at night.

43.     Upon information and belief, American, PSA and the USA (by and through the FAA and U.S. Army) were on notice of the traffic issues surrounding DCA.

44.     The Performance Data Analysis and Reporting System (PDARS) is an FAA system used to collect air traffic data to facilitate operational analysis to improve the function of the National Airspace System (NAS). The PDARS system consists of a dedicated network of computers located at FAA sites that use specialized software for collecting detailed air traffic management system data.

45.     Analysis of PDARS data for instances where commercial passenger aircraft arriving to or departing from DCA came within 500 feet vertically and 1000 feet horizontally of a helicopter transiting the area surrounding DCA showed "hotspots" at multiple locations along helicopter routes passing DCA from north-south (along the Potomac River), including particularly a hotspot indicating many encounters off the end of Runway 33. (*See* Figure 8, below).



*Figure 8 – PDARS heatmap showing encounters between commercial passenger aircraft and helicopters in the airspace surrounding DCA*
(Source: FAA through NTSB)

### C. American and PSA Operations at DCA

46.    American is a large domestic and international airline that conducts flight operations throughout the world, including at DCA.  In addition, it conducts regional flights through smaller regional airlines that operate under the American Eagle brand name.

47.    PSA is one of these smaller regional airlines and is a wholly owned subsidiary of American's parent company, American Airlines Group, Inc., which American uses to operate regional flights under the American Eagle brand name.

48.    American flights operated by PSA under the American Eagle brand are sold by American through its website separately or as part of an itinerary that combines American and American Eagle flights.  American advertises, markets, sells and issues tickets for flights operated by PSA as American flights under the American Eagle brand.

16

49.     The flights PSA operates for American are regularly listed as American flights. Passengers are often unaware they purchased a ticket for an American Eagle flight operated by PSA and not a flight operated by American.

50.     On January 29, 2025, PSA operated AE 5342 for American under the American Eagle brand name.

51.     DCA is an important and profitable hub for American.

52.     American operates far more flights into and out of DCA than any other carrier, accounting for over 50% of flights and carrying over 25% of all passengers flying into and out of DCA.

53.     DCA is one of only five airports in the United States designated as a high-density traffic airport with a limited number of takeoffs and landings, as well as allocation of flight slots, due to the complex nature of air traffic in the area. 14 C.F.R. Subparts K and S; 14 C.F.R. 93.123(a).

54.     Prior to this crash, American knew additional flights in and out of DCA would, and did, result in increased risk to safe flight operations.

55.     Despite this knowledge, American consistently accepted operations that would maintain and/or increase the number of American flights into DCA to maintain its market share.

56.     Upon information and belief, in 2023, air traffic controllers in the DC area asked their supervisors to reduce aircraft arrival rates into DCA because traffic was overloading controllers and reducing the safety margin.

57.     Upon information in belief, in 2023, the FAA contacted airlines, including American and PSA, and advised them about the traffic overload and the request to reduce aircraft arrival rates from controllers.  Rather than simply reducing arrival rates to alleviate the strain on controllers, the airlines, including American and PSA, offered and/or agreed to increase their use

of landings on Runway 33 during northbound operations and to train their pilots to use Runway 33 more often as a way to maintain traffic flow without needing to reduce the arrival rate at DCA.

58.    Despite the airlines' agreement to increase operations on Runway 33, as detailed below, the airlines did not provide their pilots with any specific training or information concerning the helicopter routes in the DCA airspace.

59.    Because DCA is a high-density traffic airport, pursuant to 14 C.F.R. § 93.123, aircraft operations (takeoffs and arrivals) at DCA are restricted to a total of 60 per hour, and arrivals, when using the northbound Runway 1 and Runway 33 configuration, were limited to 36 per hour for each hour of the day (e.g., 8 a.m. to 9 a.m.) in visual meteorological conditions as existed at the time of the Subject Crash.

60.    To maximize the number of flights, American and PSA scheduled more arrivals towards the end of one hour and the beginning of the next hour at peak times, allowing them to pack more arrivals into a one-hour period across two different hours of the day (e.g., 8:30 a.m. to 9:30 a.m.), than are allowed in a single top to bottom one-hour period (e.g., 8:00 a.m. to 9:00 a.m.) by regulation and FAA policy.

61.    In doing so, American and PSA manipulated and abused the system of high density airport regulations and policies at DCA, and put additional stress on ATC resources, particularly at peak travel times of the day: in the morning and evening.

62.    Notably, this collision occurred at approximately 8:48 p.m., toward the bottom of the hour, when PSA and American were scheduling more arrivals and manipulating the high density airport traffic limits for DCA in a manner that they knew, or should have known, would be potentially unsafe.

63. Prior to and on January 29, 2025, as airlines that regularly operated flights into DCA, American and PSA were, or should have been, aware of the published helicopter routes in the vicinity of DCA, particularly near the approach to Runway 33.

64. Prior to and on January 29, 2025, as airlines that regularly operated flights into and from DCA, American and PSA knew or should have known of numerous occurrences involving commercial airplanes and helicopters in the area around DCA in which there was lateral separation distance of less than 1 nm and vertical separation of less than 400 feet, and numerous other encounters classified as near collision or near miss events.

65. Prior to and on January 29, 2025, as airlines that regularly operated flights into and from DCA, American and PSA knew or should have known of occurrences involving commercial airplanes and helicopters in the area around DCA in which there was lateral separation of less than 1,500 feet and vertical separation of less than 200 feet.

66. Analysis of publicly available data by CBS news revealed that PSA flights in particular experienced more "near miss" events where they came within 500 feet of helicopters in the airspace surrounding DCA than any other airline – as many as four a week in a single 52-month period leading up to the Subject Crash.[2]

67. Prior to and on January 29, 2025, as airlines that regularly operated flights into and from DCA, American and PSA knew or should have known of regular occurrences of TCAS alerts (RAs and/or TAs) in its own aircraft in the area surrounding DCA due to proximity to a helicopter between 2011 and 2024.

___

[2] https://www.cbsnews.com/video/close-calls-between-aircrafts-helicopters-happened-near-daily-dca-cbs-news-analysis-finds/

68.     Upon information and belief, prior to and on January 29, 2025, American's own pilots and/or their union, the Allied Pilots' Association (APA), had informed American of the risks associated with the complex approaches to DCA, including the risks posed by helicopter traffic transiting the airspace surrounding DCA.

69.     Upon information and belief, prior to January 29, 2025, PSA's own pilots and/or their union, the Air Line Pilots' Association (ALPA), had informed PSA of the risks associated with the complex approaches to DCA, including the risks posed by helicopter traffic transiting the airspace surrounding DCA.

70.     Prior to January 29, 2025, American and PSA had the ability to monitor both publicly available and internal data regarding near misses and near collision events in the airspace surrounding DCA, and should have monitored and analyzed the data, which would have revealed the unreasonable and unacceptable risk to flight safety during certain operations and circumstances.

71.     Prior to January 29, 2025, American and PSA's own monitoring and analysis of the data regarding near misses in the airspace surrounding DCA should have revealed or did reveal multiple near miss events involving aircraft traveling to DCA and helicopters traveling along helicopter routes in the airspace surrounding DCA.

72.     PSA designated only TCAS RAs as events for which an operation report had to be submitted but did not require any reporting of TCAS TAs.[3]

---

[3] Notwithstanding that only TCAS RAs had to be reported to the airline, PSA policies and procedures required that if a PSA flight crew experienced a TCAS TA, the flight crew must undertake certain action, including, a discussion between crew members concerning the traffic that caused the issuance of the TCAS TA.  As detailed below, the AE 5342 flight crew failed to discuss the TA that they received at least 19 seconds prior to the collision which failure caused or contributed to the mid-air collision.

73.     As a result, PSA failed to systematically collect and analyze information relating to TCAS alerts below 1000 feet, when an aircraft is in the critical landing phase, as TCAS RAs are, by design, inhibited at those altitudes.

74.     As a result, PSA's systems did not provide for any reporting and/or tracking of instances where the only potentially available TCAS alert, a TA, activated below 1000 feet of altitude, as occurred at DCA when AE 5342 encountered the subject helicopter prior to this crash.

75.     As a result, PSA failed to identify, process and account for safety risks posed by its aircraft coming into close proximity with helicopters traveling on published helicopter routes below 1000 feet in the airspace surrounding DCA.

76.     Despite the information available and/or known to PSA and American, neither PSA nor American warned, or even informed, PSA pilots of the presence of the heavily-traveled, published helicopter routes surrounding DCA, including, most critically, Helicopter Route 4.

77.     Despite the information available and/or known to PSA and American, neither PSA nor American provided PSA pilots with training, or even informed flight crews, on the precise location of the heavily-traveled, published helicopter routes in the airspace surrounding DCA.

78.     PSA also provided additional training, information and/or documentation to its pilots concerning DCA.  None of the documents, information, or training materials that PSA provided to its pilots relating to DCA, however, included information related to the published helicopter routes that passed close to DCA, including Helicopter Routes 1 and 4, the existence of any helicopter routes operating near DCA runways, and/or the pervasiveness of helicopter operations in DCA airspace.

79.     The airport special qualification charts PSA provided to its pilots relating to DCA, including but not limited to 19-1 through 19-8 airport qualification charts, did not include any

reference to or warning of the presence of helicopter traffic or published helicopter routes in the area surrounding the airport.

80.     Despite the information available and/or known to PSA and American, PSA did not train or inform its pilots in any way relating to the published helicopter routes in the airspace surrounding DCA, including, most critically, Helicopter Route 4.

81.     The airport charts and information PSA provided to its pilots relating to DCA, including but not limited to 10-7 airport information pages, 10-9 airport diagram, and/or 11-1 instrument approach procedure, did not include any reference to or warning of the presence of helicopter traffic or published helicopter routes in the area surrounding the airport.

82.     Two of four DCA-based PSA pilots interviewed by NTSB said they were unaware that there were published helicopter routes at all, while another said he was aware that there were published routes, but did not know their lateral or vertical boundaries.   The only PSA pilot interviewed by the NTSB who was knowledgeable regarding the published helicopter routes happened to be a former military helicopter pilot in the DC region and his knowledge of the helicopter routes came from his prior military experience, not PSA.

83.      Typically, when selecting an approach procedure to land on an airport runway, a straight-in approach, like the Mount Vernon visual approach to Runway 1, is desirable because, for the pilots flying the route, it is less demanding, more stable, and with minimal maneuvering, all of which reduces the risk to flight safety.

84.     A circling approach, like the approach for Runway 33, is when an aircraft's flight crew deviates from the standard straight-in approach to one runway and turns, navigating visually, to line up and land on a different runway.

85.     A circling approach significantly increases pilot workload, thereby reducing the margin for safety.

86.     A circling approach is often used when landing on the straight-in approach runway is not possible or desirable for some reason, such as wind direction, weather conditions, or when the runway is closed for maintenance or otherwise.

87.     In effect, the circling approach allows the aircraft to conduct a safe, straight-in approach to the airport using a route aligned with a more commonly used runway (often one equipped with navigational aids like an ILS) but then requires maneuvering to another runway for the actual landing, significantly increasing pilot workload.

88.     According to the FAA, "[c]ircling approaches are one of the most challenging flight maneuvers conducted in the National Airspace System, especially for pilots of … turbine-powered, transport category airplanes", which includes the CRJ700.  This is because circling approaches "are conducted at low altitude, day and night, and often with precipitation present affecting visibility, depth perception, and the ability to adequately assess the descent profile to the landing runway."

89.     Air carriers are responsible for establishing their own policies and procedures defining the circumstances when its pilots may accept a circling approach.

90.     Upon information and belief, for the reasons stated above, some airlines restrict their pilots from executing circling approaches under certain conditions, including night landings, marginal weather conditions, challenging airports and/or in high density airspace.

91.     Upon information and belief, prior to January 29, 2025, other air carriers operating at DCA prohibited their crews from accepting circling approaches into DCA at night.

92.     The charts, information, policies and procedures concerning DCA that PSA provided to pilots did not restrict circling approaches to Runway 33 under any conditions, but they did, however, vest in their flight crews discretion as to whether to accept a circling approach to Runway 33, and further, required pilots to pre-brief the visual, circling approach procedure to land on Runway 33 before accepting an ATC request to land on Runway 33.

93.     For instance, the notes PSA provided to its pilots on preparing to land on Runway 1 using the Mount Vernon visual approach procedure (which was the approach initially assigned to AE 5342 on the night of the collision) specifically instructed pilots to "[c]onsider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the maneuver," and states that "[l]ast minute runway or approach changes should only be accepted if pre-briefed." (*See* Figure 9 below).

**MT Vernon Visual Runway 01**

**FMS Setup:**

1. Select ILS 01 or LOC 01, as available, from the FMS database.
2. If arriving via the CAPSS STAR, move the KATRN waypoint from the ILS 01 up to the KATRN STAR waypoint to clear the discontinuity.
3. Verify "PLVIA" is in the FIX page with a 1 nm ring.
4. Select the appropriate minimums for the ILS/LOC 01 approach on the MDA selector.
5. Brief the ILS/LOC 01, MTV 01, and what actions the PM will take during a go around.
6. Select the ILS/LOC 01 missed approach altitude on the flight control panel upon glideslope intercept.

**Flight deck Setup:**

1. Brief the ILS 01 and MTV Runway 01 approach.

   **Note:** Briefing both approaches verifies flight deck setup and allows flexibility to switch to the ILS if needed.

2. Consider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the maneuver.

   **Note:** Last minute runway or approach changes should only be accepted if pre-briefed.

**Flying the Procedure:**

1. Intercept and track the runway 01 LOC and/or GS inbound.
2. Approaching BADDN, maneuver to the center of the Potomac River as depicted on the Jeppesen 19-1 and follow the river to the airport.
3. In the event of an abandoned approach or go-around, continue toward the runway then northwest over the Potomac River. The pilot monitoring will advise ATC, then set the heading bug to 331° and altitude selector to 1,600' until other instructions can be received.

**Caution:** Do not enter P-56A and use caution for departing aircraft.

*Figure 9 – PSA Airlines Notes on the Mount Vernon Visual Approach to Runway 1 at DCA*
(Source: NTSB)

94.     PSA did not have any policies or procedures, nor any other guidance, addressing the factors flight crews should consider when deciding whether to accept a circling approach to Runway 33 at DCA, including, but not limited to, a reference to helicopter traffic, including whether a helicopter was transiting Helicopter Route 4 at the time the decision is made to accept or reject a landing on Runway 33, or the risks of a circling approach in nighttime conditions.

95.     On January 29, 2025, despite what it knew or should have known regarding near misses surrounding DCA, PSA's policies and procedures did not contain any rule and/or policy to mitigate the risks of near miss events associated with helicopter traffic around DCA, including but

not limited to, prohibiting its aircraft from executing a circling approach at DCA in nighttime conditions with helicopter traffic in the area.

96.    PSA could have and, in the interest of flight safety, should have adopted policies and/or procedures that prohibited performing a circling approach when flying into DCA, particularly at night and/or when there was helicopter traffic in the area, but it failed to do so.

97.    American, which booked and sold PSA flights as American flights operated under its American Eagle brand, should have required PSA to establish policies and/or procedures that prohibited a circling approach when flying into DCA, particularly at night and/or when there was helicopter traffic in the area, but it failed to do so.

98.    The flying public, including Plaintiff's decedent(s), when purchasing American flights, could (and did) rightfully expect that all flights would be operated with the same and highest level of safety whether operated by American directly or by PSA as an American flight under the American Eagle brand name.

**D.  DCA Air Traffic Control**

99.    The DCA tower had numerous positions to which air traffic controllers would be assigned to staff during each shift.  Pursuant to the Standard Operating Procedures ("SOP") for the DCA tower contained in FAA Order 7110.2L, effective 6/1/2024, these positions included:

   a.  Local Control ("LC") position, whose responsibilities included, but were not limited to, separating arrivals and departures, and initiating corrective action when it was apparent that a loss of separation may occur;

   b.  Helicopter Control ("HC") position, whose responsibilities included, but were not limited to, separating Visual Flight Rules ("VFR") helicopter traffic from arrivals

and departures, and clearing VFR helicopters on routes depicted in the published helicopter routes; and

c. Operational Supervisor/Controller-in-Charge ("OS/CIC"), whose responsibilities included, but were not limited to, providing operational supervision, and combining and de-combining positions following a process set forth in the SOP.

100. The DCA tower SOP also required that the LC and HC positions normally be separate (i.e., de-combined) from Monday-Friday 1000-2130 local (10:00 a.m. to 9:30 p.m.). This would ensure that two air traffic controllers would be working to ensure airplanes and helicopters remain separated during peak traffic hours.

101. After the crash, FAA air traffic control managers at DCA tower admitted that the LC and HC positions in the DCA tower were combined more often than they were de-combined, despite the SOP requirement that they normally be de-combined for the vast majority of DCA's operating hours.

102. Numerous aviation entities and operators that frequently operated in DCA airspace also have Letters of Agreement ("LOAs") with the DCA tower outlining more specific procedures for their interactions with the DCA tower, including the United States Army 12th Aviation Battalion based at Davison Army Airfield.

**E. United States Army Helicopter Operations**

103. The 12th Aviation Battalion's LOA with the DCA tower stated that the "Routes and altitudes described in the Baltimore-Washington Helicopter Route Chart must apply unless otherwise authorized by ATC."

104.    The 12th Aviation Battalion's LOA with the DCA tower further stated that the DCA tower would, if appropriate, "issue clearances to helicopters to conduct flight via routes and zones described in the Baltimore-Washington Helicopter Route Chart."

105.    Despite its LOA and other requirements to abide by the maximum published altitudes set forth in the helicopter route charts, the United States Army admitted to NTSB investigators after the crash that their pilots were only required to maintain their altitude +/- 100 feet, meaning that an Army helicopter pilot would be within the Army's standard for maintaining a 200 feet altitude restriction even up to 300 feet.

106.    This deviation, however, could, and did, result in an altitude deviation along Helicopter Route 4 which resulted in tragic consequences.

107.    The Army and its 12th Aviation Battalion were also aware that their UH-60L helicopters, including the subject helicopter, were equipped with barometric altimeters that had a significant margin of error.[4]  During its investigation into the mid-air collision, the NTSB found the barometric altimeters on Army UH-60L helicopters displayed altitudes anywhere from 80 to 130 feet lower than the helicopter's actual estimated MSL altitude in testing after the crash.

108.    The Army and 12th Aviation Battalion conducted risk assessments before each mission but did not take into account commercial traffic at DCA, nor whether Runway 33 would be in use when assessing risk for missions utilizing the published helicopter routes near DCA.

109.    The Army and its 12th Aviation Battalion's helicopters almost never broadcast Automatic Dependent Surveillance Broadcast (ADS-B) out during their flights, including on

---

[4] Barometric altimeters provide pilots with their MSL altitude based on barometric pressure and other information, as opposed to radio altimeters, which measure the aircraft's height above ground level ("AGL") by bouncing radio waves off the ground and interpreting how long it took for the radio wave to reflect back.

routine training missions. ADS-B is an aviation surveillance technology where an aircraft will broadcast its position and other data enabling it to be tracked by other aircraft. ADS-B is an important technology in helping pilots avoid mid-air collisions.

110. Despite routinely operating near DCA, including being one of the most frequent users of Helicopter Route 4, the Army and its 12th Aviation Battalion did not train or familiarize its pilots with the commercial flight approach paths into DCA nor with the approach to Runway 33.

**F. The Subject Flights**

111. On January 29, 2025, a CRJ700 aircraft registered with the FAA as N709PS and operating as AE 5342 (sometimes referred to as "the subject airplane" herein) departed Wichita Dwight D. Eisenhower National Airport (ICT) at approximately 5:39 p.m. local time (6:39 p.m. Eastern Standard Time) bound for DCA.

112. There were 64 people on board AE 5342, consisting of 60 passengers and four crew members, including CASEY CRAFTON.

113. The subject airplane was equipped with a TCAS to provide automatic aural and visual alerts to the crew of AE 5342 of dangerous proximity to and/or an impending collision with another aircraft, consisting of aural and visual TAs and RAs above 1000 feet AGL, only aural and visual TAs below 1000 feet AGL, and only visual TAs below approximately 400 feet.

114. The subject airplane was also equipped with a number of lights that were illuminated for landing, including landing lights, taxi/recognition lights, white and red anticollision lights, logo lights, navigation lights, and wing inspection lights. None of these lights used the newest and brightest LED lightbulbs, instead using older incandescent lightbulbs.

115.    LED lights are brighter and more defined, which make them easier for other aircraft to see, particularly for individuals wearing night vision goggles.

116.    On January 29, 2025, at approximately 6:45 p.m. local time,[5] a U.S. Army 12th Aviation Battalion UH-60L Blackhawk helicopter designated as PAT25 (hereinafter referred to as "PAT25" or "the subject helicopter") departed Davison Army Airfield ("DAA") in Fort Belvoir, Virginia.  The helicopter filed a visual flight rules flight plan with DAA base operations.  The flight was a combined annual and Night Vision Goggle ("NVG") proficiency check ride for one of the pilots and the crew is believed to have been wearing NVGs throughout the flight.  In essence, this was a training flight.

117.    At about 8:10 p.m., the cockpit voice recorder on board AE 5342 first captures the pilots' discussion of what approach procedure they would be assigned by air traffic control for landing at DCA, with the captain asking the first officer if they would be flying the instrument landing system ("ILS") approach or the Mount Vernon visual approach, and the first officer confirms "it's gonna be the Mount Vernon."[6]

118.    The captain then responded, "Mount Vernon backed up by the uh ILS[.] I'm not making the left [expletive deleted] turn."  Upon information and belief, the captain's reference to the "left turn" was a reference to the circling approach used to land on Runway 33.

119.    Despite indicating that they would likely fly the Mount Vernon visual approach to Runway 1 at DCA, the captain briefed only the ILS approach to Runway 1 beginning at 8:10:22 p.m. as captured on the cockpit voice recorder:

AE 5342 Cpt:  "um we got uhhh I-L-S runway one

---

[5] All times from here onwards are local time in Washington, D.C. (i.e., Eastern Standard Time).
[6] The Mount Vernon visual approach procedure to Runway 1 is a well-established, straight-in visual approach to Runway 1.

AE 5342 Cpt: "* seventeen February twenty three effective twenty three of February eleven dash one localizer one oh nine nine zero zero seven sixteen hundred M-S-A around the D-C-A V-O-R is twenty six hundred all quadrants missed approach climb four twenty climbing left turn to ** outbound D-C-A V-O-R radial three twenty Georgetown N-D-B D-M-E five point nine DC and hold. highest obstacle * * * forty nine altitude PAPI on the right twenty two hundred is missed approach two twenty eighteen hundred half statute mile visibility uhhhh we got seven thousand one hundred and sixty nine feet of runway available left turn novemberrrr [sic] one into the ramp no specials any questions."

AE 5342 FO: "no questions."

*Cockpit Voice Recorder (Airplane) Factual Report, NTSB, at p. 31 of 61.*

120.    The entire approach brief was only 33 seconds and addressed neither the Mount Vernon visual approach to Runway 1, nor the circling approach to Runway 33.

121.    At no point did the pilots of AE 5342 brief the Mount Vernon visual approach to Runway 1, which the pilots of AE 5342 eventually accepted and flew.

122.    At no point did the pilots of AE 5342 brief the circling approach to Runway 33, which is required by PSA policies and procedures to later accept such an approach, as they did on the night of the collision.

123.    After maneuvering near Laytonsville, Maryland, PAT25 began travelling generally southbound at or about 8:30 p.m.  At or about 8:33 p.m., PAT25 requested clearance from the DCA tower for Helicopter Route 1 to Route 4 and the DCA tower controller issued the clearance.

124.    The controller's authorization to PAT25 did not state any altitude restrictions – the clearance only stated the helicopter routes, which had published maximum altitudes. Thus, the

subject helicopter was required to abide by the altitude restrictions set forth in the applicable helicopter route.

125.    The DCA tower LC and HC positions had been improperly combined since 1540 (3:40 p.m.) on January 29, 2025, and were therefore being worked by one air traffic controller when PAT25 checked in and at all relevant times herein.

126.    PAT25 was equipped to broadcast ADS-B out but was not broadcasting ADS-B at any time during the flight.

127.    At approximately 8:39:10 p.m., Potomac air traffic control cleared AE 5342 for the Mount Vernon visual approach to Runway 1 at DCA.

128.    At approximately 8:39:14 p.m., the pilots of AE 5342 acknowledged and accepted the Mount Vernon visual approach to Runway 1 at DCA without any further discussion, despite not having briefed the Mount Vernon visual approach, nor having considered or briefed the circling approach to Runway 33 as required by PSA policy and procedure if they were going to accept the Runway 33 approach.

129.    At approximately 8:43:06 p.m., AE 5342 was flying the well-established straight-in Mount Vernon visual approach to Runway 1 when ATC at the DCA tower asked if AE 5342 could accept a switch to land on Runway 33 instead.

130.    Approaching to land on Runway 33 would require AE 5342 to bank/turn right over the Eastern shore of the Potomac River and then to bank/turn left back West/Northwest to line up with the centerline of Runway 33 and cross over the Potomac River to land.

131.    As referenced above, PSA did not prohibit its flight crews from accepting a circling approach to land on Runway 33 at DCA, and it allowed pilots to decide whether to accept such an approach if offered by ATC.  Despite allowing its pilots to make this decision, PSA provided no

training or guidance to pilots on when to accept a circling approach to Runway 33 at DCA or criteria to use when considering whether to accept a Runway 33 approach. PSA, however, required flight crews to pre-brief the circling visual approach to Runway 33 at DCA before accepting a "last minute" request by ATC to change to Runway 33. (*See* Figure 9 above).

132.    At no time prior to the crash did the pilots of AE 5342 pre-brief the circling approach to Runway 33 at DCA.

133.    PSA's guidance also recommended that flight crews agree "on what conditions you will accept a clearance" to do a circling approach to Runway 33 during pre-briefing. (*See* Figure 9 above).

134.    Other than the captain indicating that he was not "making the left [expletive deleted] turn" earlier in the flight, the pilots of AE 5342 never briefed or discussed whether they would accept the circling approach to Runway 33 or under what conditions they would accept it.

135.    Only after receiving the request from ATC to take the circling approach to Runway 33 at approximately 8:43 p.m. did the pilots of AE 5342 have any discussion of whether they would accept the switch to Runway 33.

136.    After confirming that it would be permissible to land on Runway 33 given the length of the runway, the captain expressed hesitation, echoing his earlier refusal to make the "left [expletive deleted] turn", but quickly and ultimately decided to accept the change of approach to the more difficult maneuver to Runway 33 that the pilots had not briefed:

> AE 5342 Cpt:  "I really don't want to but I guess uhhh tell 'em—."
>
> AE 5342 FO:  "I mean I can just tell 'em—."
>
> AE 5342 Cpt:  "nah its fine we got the numbers for it yeah tell 'em we're fine we'll do three three we'll do it."

*Cockpit Voice Recorders and Air Traffic Control Combined Transcript, NTSB, at p. 24-25.*

137.    Despite not having pre-briefed the circling approach to Runway 33 at DCA, not having discussed the conditions under which they would accept it, without any discussion of the captain's prior comments about not flying such an approach, and without consideration of any enumerated criteria or factors from PSA, such as the nighttime conditions or potential helicopter traffic, AE 5342 accepted ATC's request that it execute a circling approach to Runway 33 at approximately 8:43:37 p.m.

| | |
|---|---|
| AE 5342: | "yeah we can do uh three three for Bluestreak fifty three forty two." |
| DCA Tower: | "Bluestreak fifty three forty two at the Wilson Bridge change to cir— change to circ(le) runway three three. runway three three cleared to land." |
| AE 5342: | "change to runway three three uh runway three three cleared to land Bluestreak fifty three forty two." |

*Cockpit Voice Recorders and Air Traffic Control Combined Transcript, NTSB, at p. 24-25.*

138.    Upon information and belief, prior to AE 5342's attempted landing, the DCA LC requested other American Airlines aircraft, including a PSA CRJ landing directly ahead of AE 5342, to accept a circling approach to Runway 33, but those other aircraft rejected ATC's request, opting instead to land on the more commonly used Runway 1.

139.    At or about the same time AE 5342 was switching to Runway 33 (approximately 8:43:48 p.m.), PAT25 was traveling South on Helicopter Route 1 about 1.1 nm west of the Key Bridge.  At that time, the helicopter's cockpit voice recorder ("CVR") revealed that the pilot flying ("PF") said the helicopter was at an altitude of 300 feet, but the instructor pilot ("IP") responded

that the helicopter was at 400 feet.[7]  Despite this acknowledged altitude discrepancy, there was no discussion nor resolution by the PAT25 flight crew of why the PF and the IP perceived and commented on different altitudes.

140.    At approximately 8:44:27 p.m., as PAT25 approached the Key Bridge, the IP called out to the pilot flying that PAT25 was at 300 feet descending to 200 feet.

141.    At approximately 8:45:11 p.m., only after performing the before-landing checklist did the pilots of AE 5342 begin searching for the approach information for the circling approach to Runway 33 at DCA, information that surely would have been closer at hand had the approach been briefed before it was accepted, as required by PSA guidance to its pilots.

> AE 5342 Cpt:  "lets see... approaches... approaches... I dunno * *."
>
> AE 5342 Cpt:  "* * visual three three * *."
>
> *Cockpit Voice Recorders and Air Traffic Control Combined Transcript, NTSB, at p. 24-25.*

142.    At approximately 8:45:27 p.m., the captain of AE 5342 disconnected the autopilot and began hand-flying the aircraft.

143.    At approximately 8:45:30 p.m., PAT25 passed over the Memorial Bridge.  The IP told the PF that they were at 300 feet and needed to descend to 200 feet.  The PF acknowledged, but again, there was no discussion or resolution of why the helicopter was still above the 200-foot mandatory maximum altitude restriction for the helicopter route.

144.    Upon information and belief, at approximately 8:45:42 p.m., the pilots of AE 5342 were likely deleting and/or replacing all of the previous navigational inputs they had set for the Mount Vernon visual approach to Runway 1, which caused increased pilot workload in the cockpit.

---

[7] All conversations between the PAT25 crew are based on the transcript of the Cockpit Voice Recorder (CVR) released by the NTSB.

145.    Upon information and belief, the flight crew of AE 5342 likely continued to be preoccupied with reconfiguring the aircraft's instrumentation, last-minute landing checks and working to catch up on procedures for the circling approach to Runway 33, which again, was not previously briefed.

146.    At approximately 8:46:02 p.m., DCA air traffic control advised PAT25 that traffic just south of Wilson Bridge was a CRJ at 1,200 feet circling to Runway 33.  The CRJ was AE 5342.



*Figure 10 Google Earth image with airplane and helicopter preliminary flight tracks overlaid and each aircraft's position shown at 8:46:02 p.m.*

(Source: NTSB)

147.    At approximately 8:46:02 p.m., the cockpit voice recorder inside AE 5342 recorded an audible radio transmission in which ATC informed PAT25 of traffic consisting of a CRJ at 1200 feet altitude crossing over the Wilson Bridge circling to land on Runway 33 at DCA.

148.    Since this transmission was recorded by the AE 5342 CVR, the pilots of AE 5342 could hear this transmission, and thus, knew or should have known that the CRJ referenced by the controller was their aircraft, and that there was a helicopter along their route of flight that they needed to be aware of, and were required to see and avoid.

149.    The DCA air traffic controllers did not at this time or any time prior to the collision inform AE 5342 of PAT25's position, type, direction and intentions.

150.    The pilots of AE 5342, however, should also have seen the presence of another aircraft as a turquoise diamond approaching the Subject Airplane on their TCAS displays, including its relative position and relative altitude. (*See* Figure 11 below).



*Figure 11 – Simulated TCAS Display Showing a Display Similar to What Would have been Displayed in the Subject Airplane approximately 41 Seconds Before the Collision, Showing the Helicopter as well as its relative Position and Altitude Dead Ahead as a Turquoise Diamond*

(Source: NTSB Airplane TCAS Specialist Study, Inv. No. DCA25MA108)

151.    At approximately 8:46:08 p.m., PAT25 radioed the DCA tower that it had traffic in sight and requested "visual separation" from the CRJ.  The DCA tower approved the request.

152.    Moments later, the DCA tower air traffic controller received a conflict alert ("CA") that AE 5342 and PAT25 were on converging flight paths.[8]

153.    At approximately 8:47:39 p.m., the DCA tower air traffic controller radioed PAT25 questioning whether PAT25 had "the CRJ in sight."  A CA from the ATC equipment was audible in the background of this transmission from the DCA tower.

154.    At approximately 8:47:39 p.m., the cockpit voice recorder inside AE 5342 picked up an audible radio transmission in which ATC questioned whether PAT25 had "the CRJ in sight", effectively asking the subject helicopter if it saw AE 5342.

155.    The pilots of AE 5342 could hear this transmission and thus knew, or should have known, that the CRJ referenced by ATC was their aircraft, and accordingly this should have served as a second warning that there was a helicopter in close proximity and alerted the AE 5342 flight crew to see and avoid the helicopter.

156.    At approximately 8:47:40, one second later, the TCAS onboard AE 5342 issued an aural TA alert stating "TRAFFIC, TRAFFIC", warning the pilots of AE 5342 that they were on a dangerous, potential collision course with PAT25.  The TCAS also provided a visual alert of "Traffic" on the pilots' primary flight display.

---

[8] A Conflict Alert or CA is a function of the radar and computer logic that ATC at DCA uses.  The system can predict whether aircraft are on converging flight paths and if so, the Radar Video Screen that the air traffic controller is using will visually alert the air traffic controller to the fact that the aircraft are converging.  The system also provides an "aural alert" to advise air traffic control of an impending possible collision.

157.    This automated aural and visual advisory issued by the airplane's TCAS to the flight crew of AE 5342 should have further alerted the crew that they were approaching traffic, almost certainly the helicopter with which ATC had been communicating, which they needed to see and avoid.

158.    After the TCAS aurally alerted the pilots of AE 5342 to "TRAFFIC TRAFFIC" at 8:47:40, a full 19 seconds prior to impact with PAT25, the TCAS system also continued to visually depict PAT25 on its MFD screens in bright yellow (*see* Figure 12 below) signifying it was a danger to AE 5342, but no evasive action was taken by AE 5342, nor did the AE 5342 flight crew even discuss the TCAS alert.



*Figure 12 – Simulated TCAS Display Showing a Display Similar to What Would have been Displayed in the Subject Airplane approximately 20 Seconds Before the Collision, Showing the Helicopter as well as its relative Position and Altitude in Yellow*
(Source: NTSB Airplane TCAS Specialist Study, Inv. No. DCA25MA108)



*Figure 13 – Google Earth image showing the approximate positions of both aircraft at 8:47:40 p.m., approximately 19 seconds before the collision*
(Source: NTSB Preliminary Report - Figure 3)

159.    The TCAS did not provide an RA at any point between the initial TA and the mid-air collision because AE 5342 was below 1,000 feet in altitude during this time and that function is disabled when the aircraft is below 1,000 feet in altitude.

160.    The TCAS visual TA depiction of the yellow circle on the MFD screens provided altitude, location and proximity information for the subject helicopter and would have continued un-inhibited until the collision.

161.    Contrary to PSA policy and procedure, the AE 5342 flight crew did not even discuss the potential traffic that the TCAS had provided and was continuing to provide (either the aural or visual alert) at any time prior to the mid-air collision complained of herein.

162.    At approximately 8:47:42 p.m., the air traffic controller at the DCA tower radioed PAT25 instructing it to pass behind the CRJ.

163.    At approximately 8:47:42, two seconds after the aural "TRAFFIC, TRAFFIC" TCAS alert, the cockpit voice recorder inside AE 5342 picked up the audible radio transmission in which ATC directed PAT25 to "pass behind the CRJ", meaning pass behind AE 5342.

164.    PSA policies and procedures required the pilots upon receiving a TA to "[a]ttempt to see the reported traffic."  At no point does the AE 5342 cockpit voice recorder record any discussion between the captain and first officer of the TCAS TA alert, the need to check for the traffic being warned of, or any reason why they should or should not be concerned by the alert.

165.    In the context of the prior ATC communications asking PAT25 if the CRJ was in sight and AE 5342's TCAS alert, both only seconds earlier, this radio transmission, which was heard inside the cockpit should have further warned AE 5342 that there was a helicopter in very close proximity, which required the crew to immediately establish visual contact and maneuver to avoid the helicopter. At a minimum, it required the flight crew to discuss and consider the potential traffic.

166.    At approximately 8:47:44 p.m., PAT25 indicated that the traffic was in sight and again requested visual separation, which was approved by the DCA tower.  CVR data from PAT25 indicated that, following this transmission, the IP told the PF that the IP believed ATC was asking for the helicopter to move left toward the east bank of the Potomac River.

167.    At approximately 8:47:58, the cockpit voice recorder inside AE 5342 picked up "a verbal reaction" by the flight crew and the flight data recorder indicates that the aircraft increased its pitch.

168.    This is the first indication that Flight AE 5342 saw PAT25 and that it was taking any action to avoid a collision, despite the prior radio communications between PAT25 and ATC, the TCAS "TRAFFIC, TRAFFIC" alerts that were clearly audible in the cockpit, the "TRAFFIC" TA text on their primary flight display, and the yellow TCAS target depicted on the flight crew's MFD screens.

169.    This collision could have been avoided if AE 5342 executed a go-around or otherwise took evasive action 19 seconds earlier when they received the TCAS audible alert warning them of an impending collision with the Army helicopter.

170.    At approximately 8:47:58 p.m., the cockpit voice recorder inside AE 5342 recorded sounds of the impact with PAT25.

171.    Both aircraft fell into Potomac River, and all 67 individuals on board both aircraft were killed.

172.    PAT25 made no attempts to avoid hitting AE 5342.

173.    The last recorded radio altitude recorded for AE 5342 from 2 seconds before the collision was 313 feet according to the aircraft's Flight Data Recorder ("FDR"). PAT25's FDR indicated that its radio altitude (altitude above ground) at the time of collision was 278 feet and had been steady for the previous 5 seconds. Therefore, PAT25 violated the maximum published 200-foot altitude restriction for that section of Helicopter Route 4.

174.    In executing its circling approach, AE 5342 turned on final with ample time to see and avoid PAT25, which it knew, or should have known, from the prior radio transmissions from ATC and the TCAS alerts was in potentially dangerous proximity and getting closer, but it failed to take any action to see or avoid the other aircraft.

175.    AE 5342 had approximately 19 seconds between when the aircraft issued a TCAS "TRAFFIC TRAFFIC" alert and the eventual collision to take action to avoid an imminent collision, but it failed to take any such action until it was too late to prevent the collision.  At this point 19 seconds before the collision, the aircraft were .95 nautical miles apart.  (Figure 13 above depicts the locations of PAT25 and AE 5342 when the AE 5342 pilots received the TCAS audible "TRAFFIC TRAFFIC" aural alert warning them of the impending collision with the Army helicopter.)

176.    Even the 16-second interval between the last ATC communication heard by AE 5342 and the collision provided ample time for the crew of AE 5342 to have taken evasive action to avoid collision with the helicopter.

177.    Even when being positively controlled by ATC, pilots have a duty to see and avoid other traffic, particularly when navigating visually, as AE 5342 was at the time of this crash.

178.    Upon information and belief, it was well known to commercial pilots flying into DCA, including the crew of AE 5342, that the airspace around the airport is busy, including helicopter traffic.

179.    Upon information and belief, it is well known to pilots that conducting a circling approach where visual navigation is required is a dangerous maneuver that significantly increases pilot workload and that special care must be taken to ensure safe flight during this maneuver, including vigilantly checking nearby airspace for any air traffic that could intersect an aircraft's intended flight path.

180.    As a result, the crew of AE 5342 was required to, and should have maintained situational awareness and continually checked for traffic along and/or intersecting with their intended flight path.

181. The crew of AE 5342 was required to and should have maintained situational awareness to see and avoid PAT25 and realized they were in dangerous proximity to PAT25, and as result should have executed a go-around (a standard safety maneuver wherein pilots abort their landing and circle back around the airport's traffic pattern to attempt the landing again under safer conditions).

182. The crew of PAT25 was also required to and should have maintained situational awareness and continually checked for traffic along and/or intersecting with their intended flight path.

183. The crew of PAT25 was further required to and should have remained below the 200-foot maximum altitude limitation of Helicopter Route 4 and remained within the lateral confines of Helicopter Route 4.

184. The crew of PAT25 was also required to and should have maintained situational awareness to see and avoid AE 5342 and realized they were in dangerous proximity to Flight AE 5342, and as a result should have taken evasive maneuvers and/or were required to see and avoid AE 5342.

185. The air traffic controllers at DCA were required to and should have informed AE 5342 of PAT25's position, type, direction and intentions, including PAT25's relative o'clock position, distance and altitude.

186. The air traffic controllers at DCA were also required to and should have notified PAT25 that it was violating the maximum altitude limitation of Helicopter Route 4 and issued positive control instructions to descend.

187.    The air traffic controllers at DCA were further required to and should have ensured adequate separation of aircraft, and issued Safety Alerts and/or positive control instructions when the aircraft were in unsafe proximity to one another.

188.    The air traffic controllers at DCA were also required to, and should have ensured that helicopter traffic, like PAT25, was held or otherwise not transiting Helicopter Route 4 while commercial traffic, like AE 5342, was cleared for and executing the visual circling approach to land on Runway 33.

189.    The negligent acts and omissions described herein proximately caused, or contributed to, the mid-air collision of PAT25 and AE 5342 that then resulted in both aircraft crashing into the Potomac River and killing CASEY CRAFTON.

190.    As a result of the foregoing negligent actions and omissions that caused the conscious fear of impending death and subsequent death of CASEY CRAFTON, Plaintiff RACHEL CRAFTON, in his/her capacity as Administratrix, is entitled to recover for CASEY CRAFTON's pain and suffering, and any past and future earning capacity of CASEY CRAFTON.

191.    As a result of the foregoing negligent actions and omissions, Plaintiff RACHEL CRAFTON on behalf of herself and CASEY CRAFTON's other wrongful death beneficiaries, their three minor sons, is entitled to recover funeral expenses, loss of monetary support, loss of services, loss of society and comfort, and for profound emotional and psychological loss suffered as a result of CASEY CRAFTON's death, as well as all other damages allowed under applicable law.

**FIRST CAUSE OF ACTION**

**WRONGFUL DEATH BASED UPON COMMON
CARRIER DUTY AGAINST AMERICAN**

192.     Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding paragraphs.

193.     At all relevant times, American, including but not limited to its officers, directors, employees and flight crews, as a common carrier, owed the highest duty of care to passengers like CASEY CRAFTON, to exercise the utmost care and to avoid even the slightest negligence in operating aircraft in the NAS, including in and around DCA; in exercising the highest degree of care in adopting safe policies and procedures for operating its aircraft in the NAS, including in and around DCA; including those aircraft operating under the "American" banner such as under the American Eagle brand name; and/or in exercising oversight of the operations and procedures of its holding company's subsidiary, PSA.

194.     On January 29, 2025, American was negligent and breached its duty as a common carrier to CASEY CRAFTON and Plaintiff as follows:

a.  by allowing PSA to maintain policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

b.  by failing to require PSA to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

c.   by failing to require PSA to adequately evaluate the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, which crosses the approach path to Runway 33, and the known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

d.   by failing to require PSA to adequately inform flight crews operating flights into DCA of the location, including lateral and vertical boundaries of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

e.   by failing to require PSA to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

f.   by failing to require PSA to train flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

g.   by failing to require PSA to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully

aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

h.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4;

i.  by failing to require PSA to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

j.  by otherwise acting in such a manner as to create an environment in which a mid-air collision could occur;

k.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash;

l.  by failing to adequately supervise, monitor, and control PSA as American's contracting carrier and holding company's wholly-owned subsidiary, so as to prevent the aforementioned negligent acts and omissions which led to the subject crash;

m.  by failing to require PSA to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training their

48

employees regarding circling approaches and the circling approach into Runway 33 at DCA in particular;

n.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA within a single clock hour of the day (e.g., 8 pm to 9 pm) set by the FAA, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

o.  by failing to require PSA to adequately train its pilots to safely operate at DCA including by failing to include in any documents or materials specific to DCA any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

p.  by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a study through PSA's own internal safety program(s);

q.  by failing to require PSA to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet;

r.  by otherwise failing to require PSA to abide by and/or allowing PSA to violate FAA rules and/or regulations, and/or PSA's own SOPs, Memoranda of Understanding (MOUs), LOAs, and/or policies and procedures;

s.  by otherwise violating FAA rules and/or regulations, and/or American's own SOPs, MOUs, LOAs, and/or policies and procedures; and

t.  by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

195.    Through the aforementioned negligence, American directly and proximately caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's decedent, CASEY CRAFTON, and the resulting damages to Plaintiff herein.

196.    By reason of the foregoing, Plaintiff, as the Administratrix of the Estate of CASEY CRAFTON, deceased, suffered damages and are entitled to recover the aforesaid damages and any and all other available damages under applicable law from the Defendants in amounts as herein alleged and according to proof at trial, including but not limited to funeral expenses, loss of monetary support, loss of services, loss of society and comfort, grief and bereavement, and for profound emotional and psychological loss suffered as a result of CASEY CRAFTON's death.

## SECOND CAUSE OF ACTION

### SURVIVAL BASED UPON COMMON CARRIER DUTY AGAINST AMERICAN

197.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding Paragraphs.

198.    At all relevant times, American, including but not limited to its officers, directors, employees and flight crews, as a common carrier, owed the highest duty of care to passengers like

CASEY CRAFTON, to exercise the utmost care and to avoid even the slightest negligence in operating the subject aircraft in the NAS, including in and around DCA, and/or in exercising the highest degree of care in adopting safe policies and procedures for operating its aircraft in the NAS, including in and around DCA, including those aircraft operating under the "American" banner including under the American Eagle brand name and in exercising oversight of the operations and procedures of its holding company's subsidiary, PSA.

199.    On January 29, 2025, American was negligent and breached its duty as a common carrier to CASEY CRAFTON and Plaintiff as follows:

   a.    by allowing PSA to maintain policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA and helicopter traffic reported in the area;

   b.    by failing to require PSA to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

   c.    by failing to require PSA to adequately evaluate the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, which crosses the approach path to Runway 33, and the known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

d.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the location, including lateral and vertical boundaries of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

e.  by failing to require PSA to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

f.  by failing to require PSA to train flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

g.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

h.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33

52

and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4;

i.  by failing to require PSA to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

j.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur;

k.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash;

l.  by failing to adequately supervise, monitor, and control PSA as American's contracting carrier and holding company's wholly-owned subsidiary, so as to prevent the aforementioned negligent acts and omissions which led to the subject crash;

m.  by failing to require PSA to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training their employees regarding circling approaches and the circling approach into Runway 33 at DCA in particular;

n.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA to 32 within a single clock hour of the day (e.g., 8 pm to 9

pm) by the FAA when using the northbound configuration of Runway 1 and Runway 33, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

o.  by failing to require PSA to adequately train its pilots to safely operate at DCA, including by failing to include in any documents or materials specific to DCA any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

p.  by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a study through PSA's own internal safety program(s);

q.  by failing to require PSA to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet;

r.  by otherwise failing to require PSA to abide by and/or allowing PSA to violate FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or policies and procedures;

s.   by otherwise violating FAA rules and/or regulations, and/or American's own SOPs, MOUs, LOAs, and/or policies and procedures; and

t.   by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

200.   Through the aforementioned negligence, American directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's decedent, CASEY CRAFTON, and the resulting damages to Plaintiff herein.

201.   By reason of the foregoing, Plaintiff, as the Administratrix of the Estate of CASEY CRAFTON, deceased, suffered damages and are entitled to recover the aforesaid damages and any and all other available damages under applicable law from the Defendants in amounts as herein alleged and according to proof at trial, including but not limited to CASEY CRAFTON's pain and suffering, pre-impact terror and fright, and any past and future earning capacity of CASEY CRAFTON.

### THIRD CAUSE OF ACTION

### WRONGFUL DEATH BASED UPON
### NEGLIGENCE AGAINST AMERICAN

202.   Plaintiff hereby incorporates by reference as though set forth fully herein all the preceding Paragraphs.

203.   At all relevant times, American, including but not limited to its officers, directors and employees, had a duty to the flying public, particularly passengers like CASEY CRAFTON, to exercise reasonable care in adopting safe policies and procedures for those operating aircraft in the NAS, including in and around DCA, including those aircraft operating under the "American"

banner such as under the American Eagle brand name; and/or in exercising oversight of the operations and procedures of its holding company's subsidiary PSA.

204.    American was negligent and breached the duties it owed to CASEY CRAFTON and Plaintiff as follows:

a.   by allowing PSA to maintain policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA and helicopter traffic reported in the area;

b.   by failing to require PSA to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA and helicopter traffic reported in the area;

c.   by failing to require PSA to adequately evaluate the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, which crosses the approach path to Runway 33, and the known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

d.   by failing to require PSA to adequately inform flight crews operating flights into DCA of the location, including lateral and vertical boundaries of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to

maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

e.  by failing to require PSA to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

f.  by failing to require PSA to train or inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

g.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

h.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4;

i.  by failing to require PSA to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and

would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

j.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur;

k.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash;

l.  by failing to adequately supervise, monitor, and control PSA as American's contracting carrier and holding company's wholly-owned subsidiary, so as to prevent the aforementioned negligent acts and omissions which led to the subject crash;

m.  by failing to require PSA to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training and/or otherwise informing their employees regarding circling approaches and the circling approach into Runway 33 at DCA in particular;

n.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA to 32 within a single clock hour of the day (e.g., 8 pm to 9 pm) by the FAA when using the northbound configuration of Runway 1 and Runway 33, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

o.  by failing to require PSA to adequately train or otherwise require its pilots to safely operate at DCA, including by failing to include in any documents or materials specific to DCA any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

p.  by failing to perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or study through PSA's own internal safety program(s);

q.  by failing to require PSA to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet;

r.  by otherwise failing to require PSA to abide by and/or allowing PSA to violate FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or policies and procedures;

s.  by otherwise violating FAA rules and/or regulations, and/or American's own SOPs, MOUs, LOAs, and/or policies and procedures; and

t.  by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

205.    Through the aforementioned negligence, American directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's decedent, CASEY CRAFTON, and the resulting damages to Plaintiff herein.

206.    By reason of the foregoing, Plaintiff, as the Administratrix of the Estate of CASEY CRAFTON, deceased, suffered damages and are entitled to recover the aforesaid damages and any and all other available damages under applicable law from the Defendants in amounts as herein alleged and according to proof at trial, including but not limited to funeral expenses, loss of monetary support, loss of services, loss of society and comfort, grief and bereavement, and for profound emotional and psychological loss suffered as a result of CASEY CRAFTON's death.

## FOURTH CAUSE OF ACTION

## SURVIVAL BASED UPON NEGLIGENCE AGAINST AMERICAN

207.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding Paragraphs.

208.    At all relevant times, American, including but not limited to its officers, directors and employees, had a duty to the flying public, particularly passengers like CASEY CRAFTON, to exercise reasonable care in adopting safe policies and procedures for operating its aircraft in the national airspace, including in and around DCA, including those aircraft operating under the "American" banner such as under the American Eagle brand name; and/or in exercising oversight of the operations and procedures of its holding company's subsidiary PSA.

209.    American was negligent and breached the duties it owed to CASEY CRAFTON and Plaintiff as follows:

    a.    by allowing PSA to maintain policies and procedures that allowed AE 5342 to
        conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime

conditions and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA and helicopter traffic reported in the area;

b.  by failing to require PSA to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

c.  by failing to require PSA to adequately evaluate the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, which crosses the approach path to Runway 33, and the known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

d.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the location, including lateral and vertical boundaries of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic in the established helicopter routes in the vicinity of DCA;

e.  by failing to require PSA to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with

discretion as to whether to accept or reject ATC's request for landing on Runway 33;

f.  by failing to require PSA to train or inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

g.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

h.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4;

i.  by failing to require PSA to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

j.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur;

k.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash;

l.  by failing to adequately supervise, monitor, and control PSA as American's contracting carrier and holding company's wholly-owned subsidiary, so as to prevent the aforementioned negligent acts and omissions which led to the subject crash;

m.  by failing to require PSA to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training and/or otherwise informing their employees regarding circling approaches and the circling approach into Runway 33 at DCA in particular;

n.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA to 32 within a single clock hour of the day (e.g., 8 pm to 9 pm) by the FAA when using the northbound configuration of Runway 1 and Runway 33, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

o.  by failing to require PSA to adequately train or otherwise require its pilots to safely operate at DCA, including by failing to include in any documents or materials specific to DCA any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

p.   by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a study through PSA's own internal safety program(s);

q.   by failing to require PSA to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet;

r.   by otherwise failing to require PSA to abide by and/or allowing PSA to violate FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or policies and procedures;

s.   by otherwise violating FAA rules and/or regulations, and/or American's own SOPs, MOUs, LOAs, and/or policies and procedures; and

t.   by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

210.   Through the aforementioned negligence, American directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's decedent, CASEY CRAFTON, and the resulting damages to Plaintiff herein.

211.    By reason of the foregoing, Plaintiff, as the Administratrix of the Estate of CASEY CRAFTON, deceased, suffered damages and are entitled to recover the aforesaid damages and any and all other available damages under applicable law from the Defendants in amounts as herein alleged and according to proof at trial, including but not limited to CASEY CRAFTON's pain and suffering, pre-impact terror and fright, and any past and future earning capacity of CASEY CRAFTON.

## FIFTH CAUSE OF ACTION

### WRONGFUL DEATH BASED UPON COMMON CARRIER DUTY AGAINST PSA

212.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding Paragraphs.

213.    At all relevant times, PSA, including but not limited to its officers, directors, employees and flight crews, as a common carrier, owed the highest duty of care to passengers like CASEY CRAFTON, to exercise the utmost care and to avoid even the slightest negligence in operating the subject aircraft in the NAS, including in and around DCA, including but not limited to see and avoid other aircraft pursuant to 14 C.F.R. § 91.13(a) and 91.113, and/or in exercising the highest degree of care in adopting safe policies and procedures for operating its aircraft in the NAS, including in and around DCA.

214.    On January 29, 2025, PSA was negligent and breached its duty as a common carrier to CASEY CRAFTON and Plaintiff as follows:

      a.   by failing to see and avoid PAT25, including while on final approach to Runway 33 at DCA, pursuant to 14 C.F.R. § 91.13(a) and 91.113;

      b.   by failing to maintain situational awareness of the operational environment in the airspace around DCA to avoid collision with another aircraft despite a known

history of near miss events where commercial aircraft and helicopters and/or military aircraft almost collided at DCA;

c.  by failing to adequately recognize, respond, and/or take any action upon hearing the TCAS aural "TRAFFIC TRAFFIC" alert, which the flight crew of AE 5342 received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which the AE 5342 flight crew received continuously for 19 seconds prior to impact, including but not limited to by immediately executing a go-around to protect AE 5342 from collision with another aircraft, particularly in light of the additional audible radio transmissions between ATC and PAT25 that did not establish that PAT25 had AE 5342 in sight;

d.  by failing to take any other evasive action after the TCAS "TRAFFIC TRAFFIC" aural alert it received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which the AE 5342 flight crew received continuously for 19 seconds prior to impact with PAT25;

e.  by failing to brief (properly or otherwise) the circling approach to Runway 33 before accepting clearance to land on Runway 33 from ATC;

f.  by failing to adequately discuss the conditions under which the flight crew would accept a circling approach to Runway 33 prior to ATC's request that AE 5342 accept a circling approach to land at Runway 33;

g.  by accepting a more difficult and dangerous circling approach to land at Runway 33 at DCA in nighttime conditions when it had not been pre-briefed (as was required), when there had been no discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial;

h.  by maintaining policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

i.  by failing to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

j.  by failing to evaluate (adequately or otherwise) the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, which crosses the approach path to Runway 33, and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

k.  by failing to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night,

especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

l.  by failing to adequately inform flight crews operating flights into and out of DCA of the location, including lateral and vertical boundaries, of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks of associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

m.  by failing to train or otherwise inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

n.  by failing to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic in the established helicopter routes in the vicinity of DCA;

o.  by failing to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4, which crosses the approach path to Runway 33;

p.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA within a single clock hour of the day (e.g., 8 pm to 9 pm) by the FAA, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

q.  by failing to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

r.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur;

s.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash;

t.  by failing to adequately supervise, monitor, and control their employees, to prevent the aforementioned negligent acts and omissions which led to the subject crash;

u.  by failing to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training and/or properly informing their employees concerning circling approaches and the circling approach into Runway 33 at DCA in particular; and/or

v. by failing to adequately train, qualify and/or otherwise inform its pilots to safely operate at DCA, including by failing to include in any of its training documents or materials specific to DCA any reference to the existence of any established helicopter routes near DCA, especially Helicopter Route 4;

w. by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a traffic study through PSA's internal safety program(s);

x. by failing to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet;

y. by otherwise violating FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or policies and procedures; and

z. by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

215.    Through the aforementioned negligence, PSA directly and proximately caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's decedent, CASEY CRAFTON, and the resulting damages to Plaintiff herein.

216.    By reason of the foregoing, Plaintiff, as the Administratrix of the Estate of CASEY CRAFTON, deceased, suffered damages and are entitled to recover the aforesaid damages and any and all other available damages under applicable law from the Defendants in amounts as herein alleged and according to proof at trial, including but not limited to funeral expenses, loss of monetary support, loss of services, loss of society and comfort, grief and bereavement, and for profound emotional and psychological loss suffered as a result of CASEY CRAFTON's death.

### SIXTH CAUSE OF ACTION

### SURVIVAL BASED UPON COMMON CARRIER DUTY AGAINST PSA

217.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding Paragraphs.

218.    At all relevant times, PSA, including but not limited to its officers, directors, employees and flight crews, as a common carrier, owed the highest duty of care to passengers like CASEY CRAFTON, to exercise the utmost care and to avoid even the slightest negligence in operating the subject aircraft in the NAS, including in and around DCA, including but not limited to see and avoid other aircraft pursuant to 14 C.F.R. § 91.13(a) and 91.113, and/or in exercising the highest degree of care in adopting safe policies and procedures for operating its aircraft in the NAS, including in and around DCA.

219.    On January 29, 2025, PSA was negligent and breached its duty as a common carrier to CASEY CRAFTON and Plaintiff as follows:

a.    by failing to see and avoid PAT25, including while on final approach to Runway 33 at DCA, pursuant to 14 C.F.R. § 91.13(a) and 91.113;

b.    by failing to maintain situational awareness of the operational environment in the airspace around DCA to avoid collision with another aircraft despite a known

history of near miss events where commercial aircraft and helicopters and/or military aircraft almost collided at DCA;

c.  by failing to adequately recognize, respond, and/or take any action upon hearing the TCAS aural "TRAFFIC TRAFFIC" alert, which the flight crew of AE 5342 received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting as a potential danger, which the AE 5342 flight crew received continuously for 19 seconds prior to impact, including but not limited to by immediately executing a go-around to protect AE 5342 from collision with another aircraft, particularly in light of the additional audible radio transmissions between ATC and PAT25 that did not establish that PAT25 had AE 5342 in sight;

d.  by failing to take any other evasive action after the TCAS "TRAFFIC TRAFFIC" aural alert it received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which it received continuously for 19 seconds prior to impact with PAT25;

e.  by failing to properly brief the circling approach to Runway 33 before accepting clearance to land on Runway 33 from ATC;

f.  by failing to adequately discuss the conditions under which the flight crew would accept a circling approach to Runway 33 prior to ATC's request that AE 5342 accept a circling approach to land at Runway 33;

g.  by accepting a more difficult and dangerous circling approach to land at Runway 33 at DCA in nighttime conditions when it had not been pre-briefed, when there had been no discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial;

h.  by maintaining policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

i.  by failing to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area3;

j.  by failing to evaluate (adequately or otherwise) the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, which crosses the approach path to Runway 33, and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

k.  by failing to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night,

especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

l.   by failing to adequately inform flight crews operating flights into and out of DCA of the location, including lateral and vertical boundaries, of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks of associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

m.  by failing to train or otherwise inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

n.   by failing to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic in the established helicopter routes in the vicinity of DCA;

o.   by failing to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4, which crosses the approach path to Runway 33;

p.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA within a single clock hour of the day (e.g., 8 pm to 9 pm) by the FAA, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

q.  by failing to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

r.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur;

s.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash;

t.  by failing to adequately supervise, monitor, and control their employees, to prevent the aforementioned negligent acts and omissions which led to the subject crash;

u.  by failing to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training and/or properly informing their employees concerning circling approaches and the circling approach into Runway 33 at DCA in particular; and/or

v. by failing to adequately train, qualify or otherwise inform its pilots to safely operate at DCA, including by failing to include in any documents or materials any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

w. by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a traffic study through PSA's internal safety program(s);

x. by failing to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet;

y. by otherwise violating FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or policies and procedures; and

z. by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

220. Through the aforementioned negligence, PSA directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's decedent, CASEY CRAFTON, and the resulting damages to Plaintiff herein.

221.    By reason of the foregoing, Plaintiff, as the Administratrix of the Estate of CASEY

CRAFTON, deceased, suffered damages and are entitled to recover the aforesaid damages and any

and all other available damages under applicable law from the Defendants in amounts as herein

alleged and according to proof at trial, including but not limited to CASEY CRAFTON's pain and

suffering, pre-impact terror and fright, and any past and future earning capacity of CASEY

CRAFTON.

**SEVENTH CAUSE OF ACTION**

**WRONGFUL DEATH BASED UPON
NEGLIGENCE AGAINST PSA**

222.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the

preceding paragraphs.

223.    At all relevant times, PSA, including but not limited to its officers, directors,

employees and flight crews, had a duty to the flying public, particularly passengers like CASEY

CRAFTON, to exercise reasonable care and safely operate aircraft in the NAS, including in and

around DCA, including but not limited to see and avoid other aircraft pursuant to 14 C.F.R. §

91.13(a) and 91.113, and/or to exercise reasonable care in adopting safe policies and procedures

for operating its aircraft in the NAS, including in and around DCA.

224.    On January 29, 2025, PSA was negligent and breached the duties it owed to CASEY

CRAFTON and Plaintiff as follows:

a.    by failing to see and avoid PAT25, including while on final approach to Runway 33

at DCA, pursuant to 14 C.F.R. § 91.13(a) and 91.113;

b.    by failing to maintain situational awareness of the operational environment in the

airspace around DCA to avoid collision with another aircraft despite a known

history of near miss events where commercial aircraft and helicopters and/or military aircraft almost collided at DCA;

c.  by failing to adequately recognize, respond, and/or take any action upon hearing the TCAS aural "TRAFFIC TRAFFIC" alert, which the flight crew of AE 5342 received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting as a potential danger, which it received continuously for 19 seconds prior to impact, including but not limited to by immediately executing a go-around to protect AE 5342 from collision with another aircraft, particularly in light of the additional audible radio transmissions between ATC and PAT25 that did not establish that PAT25 had AE 5342 in sight;

d.  by failing to take any other evasive action after the TCAS "TRAFFIC TRAFFIC" aural alert it received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which it received continuously for 19 seconds prior to impact with PAT25;

e.  by failing to properly brief the circling approach to Runway 33 before accepting clearance to land on Runway 33 from ATC;

f.  by failing to adequately discuss the conditions under which the flight crew would accept a circling approach to Runway 33 prior to ATC's request that AE 5342 accept a circling approach to land at Runway 33;

78

g.  by accepting a more difficult and dangerous circling approach to land at Runway 33 at DCA in nighttime conditions when it had not been pre-briefed, when there had been no discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial;

h.  by maintaining policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

i.  by failing to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

j.  by failing to evaluate (adequately or otherwise) the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

k.  by failing to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night,

especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

l.  by failing to adequately inform flight crews operating flights into and out of DCA of the location, including lateral and vertical boundaries, of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

m.  by failing to train or otherwise inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

n.  by failing to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic in the established helicopter routes in the vicinity of DCA;

o.  by failing to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4, which crosses the approach path to Runway 33;

p.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA within a single clock hour of the day (e.g., 8 pm to 9 pm) by the FAA, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

q.  by failing to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

r.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur;

s.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash;

t.  by failing to adequately supervise, monitor, and control their employees, to prevent the aforementioned negligent acts and omissions which led to the subject crash;

u.  by failing to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training and/or properly informing their employees concerning circling approaches and the circling approach into Runway 33 at DCA in particular; and/or

v. by failing to adequately train, qualify or otherwise inform its pilots to safely operate at DCA, including by failing to include in any of its training documents or materials any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

w. by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a traffic study through PSA's internal safety program(s);

x. by failing to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet;

y. by otherwise violating FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or policies and procedures; and

z. by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

225. Through the aforementioned negligence, PSA directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's decedent, CASEY CRAFTON, and the resulting damages to Plaintiff herein.

226.    By reason of the foregoing, Plaintiff, as the Administratrix of the Estate of CASEY CRAFTON, deceased, suffered damages and are entitled to recover the aforesaid damages and any and all other available damages under applicable law from the Defendants in amounts as herein alleged and according to proof at trial, including but not limited to funeral expenses, loss of monetary support, loss of services, loss of society and comfort, and for profound emotional and psychological loss suffered as a result of CASEY CRAFTON's death.

## EIGHTTH CAUSE OF ACTION

## SURVIVAL BASED UPON NEGLIGENCE AGAINST PSA

227.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding paragraphs.

228.    At all relevant times, PSA, including but not limited to its officers, directors, employees and flight crews, had a duty to the flying public, particularly passengers like CASEY CRAFTON, to exercise reasonable care and safely operate aircraft in the national airspace, including in and around DCA, including but not limited to see and avoid other aircraft pursuant to 14 C.F.R. § 91.13(a) and 91.113, and/or to exercise reasonable care in adopting safe policies and procedures for operating its aircraft in the national airspace, including in and around DCA.

229.    On January 29, 2025, the PSA was negligent and breached the duties it owed to CASEY CRAFTON and Plaintiff as follows:

a.    by failing to see and avoid PAT25, including while on final approach to Runway 33 at DCA, pursuant to 14 C.F.R. § 91.13(a) and 91.113;

b.    by failing to maintain situational awareness of the operational environment in the airspace around DCA to avoid collision with another aircraft despite a known

history of near miss events where commercial aircraft and helicopters and/or military aircraft almost collided at DCA;

c.  by failing to adequately recognize, respond, and/or take any action upon hearing the TCAS aural "TRAFFIC TRAFFIC" alert, which the flight crew of AE 5342 received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting as a potential danger, which the AE 5342 flight crew received continuously for 19 seconds prior to impact, including but not limited to by immediately executing a go-around to protect AE 5342 from collision with another aircraft, particularly in light of the additional audible radio transmissions between ATC and PAT25 that did not establish that PAT25 had AE 5342 in sight;

d.  by failing to take any other evasive action after the TCAS "TRAFFIC TRAFFIC" aural alert it received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which it received continuously for 19 seconds prior to impact with PAT25;

e.  by failing to properly brief the circling approach to Runway 33 before accepting clearance to land on Runway 33 from ATC;

f.  by failing to adequately discuss the conditions under which the flight crew would accept a circling approach to Runway 33 prior to ATC's request that AE 5342 accept a circling approach to land at Runway 33;

g.  by accepting a more difficult and dangerous circling approach to land at Runway 33 at DCA in nighttime conditions when it had not been pre-briefed, when there had been no discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial;

h.  by maintaining policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, helicopter traffic reported in the area, and a lack of adequate clearance between Helicopter Route 4 and the approach path to Runway 33;

i.  by failing to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

j.  by failing to evaluate (adequately or otherwise) the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, which crosses the approach path to Runway 33, and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

k.  by failing to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

l.  by failing to adequately inform flight crews operating flights into and out of DCA of the location, including lateral and vertical boundaries, of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic on the established Helicopter Routes in the vicinity of DCA;

m.  by failing to train or otherwise inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

n.  by failing to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic in the established helicopter routes in the vicinity of DCA;

o.  by failing to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be

particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4, which crosses the approach path to Runway 33;

p.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA within a single clock hour of the day (e.g., 8 pm to 9 pm) by the FAA, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses proximity between its aircraft and helicopters operating in the airspace surrounding DCA;

q.  by failing to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

r.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur;

s.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash;

t.  by failing to adequately supervise, monitor, and control their employees, to prevent the aforementioned negligent acts and omissions which led to the subject crash;

u.  by failing to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training and/or properly

informing their employees concerning circling approaches and the circling approach into Runway 33 at DCA in particular; and/or

v.  by failing to adequately train, qualify or otherwise inform its pilots to safely operate at DCA, including by failing to include in any of its training documents or materials any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

w.  by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a traffic study through PSA's internal safety program(s);

x.  by failing to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet;

y.  by otherwise violating FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or policies and procedures; and

z.  by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

230.     Through the aforementioned negligence, PSA directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's decedent, CASEY CRAFTON, and the resulting damages to Plaintiff herein.

231.     By reason of the foregoing, Plaintiff, as the Administratrix of the Estate of CASEY CRAFTON, deceased, suffered damages and are entitled to recover the aforesaid damages and any and all other available damages under applicable law from the Defendants in amounts as herein alleged and according to proof at trial, including but not limited to CASEY CRAFTON's pain and suffering, pre-impact terror and fright, and any past and future earning capacity of CASEY CRAFTON.

## NINTH CAUSE OF ACTION

### WRONGFUL DEATH BASED UPON NEGLIGENCE AGAINST THE UNITED STATES OF AMERICA

232.     Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding Paragraphs.

233.     At all relevant times, air traffic control personnel employed by Defendant the USA, under the immediate authority and control of the FAA, owed a duty to the Plaintiff's decedent, CASEY CRAFTON, and Plaintiff, and all others who were flying in the vicinity of DCA, to exercise reasonable care in maintaining a safe operational environment in the airspace at and around DCA, including but not limited to by taking all actions provided in the applicable Air Traffic Control Manual, FAA JO 7110.65, DCA's Standard Operating Procedures ("SOPs"), and Letters of Agreement ("LOAs") and/or Memoranda of Understanding ("MOUs") between DCA and operators.

234.    On January 29, 2025, Defendant USA, by and through the FAA and its air traffic control personnel, was negligent and breached the duties it owed Plaintiff's decedent, CASEY CRAFTON and Plaintiff as follows:

    a.   The controller(s) negligently failed to give first priority to separating aircraft and issuing safety alerts in violation of FAA Order JO 7110.65AA, ¶ 2-1-2, instead prioritizing a departures push or other non-safety critical duties;

    b.   The controller(s) negligently failed to establish proper and safe separation between AE 5342 and PAT25;

    c.   The controller(s) negligently failed to monitor the altitude of PAT25 to ensure compliance with the mandatory maximum published altitude for Helicopter Route 4;

    d.   The controller(s) negligently failed to notify PAT25 that it was exceeding and in violation of the mandatory maximum published altitude for Helicopter Route 4 and failed to instruct PAT25 to descend until it was at or below 200 feet to comply with mandatory maximum published altitude for Helicopter Route 4;

    e.   The controllers negligently failed to notify AE 5342 of the presence of PAT25;

    f.   The controller(s) negligently violated FAA Order JO 7110.65AE ¶ 7-2-1 by failing to follow the procedures for visual separation therein.  The controller(s) did not follow the mandatory procedures for Pilot-Applied Visual Separation.  More particularly:

        i.   The controller(s) failed to inform PAT25 at numerous critical times of the position, direction, type and intentions of AE 5342 and failed to properly

confirm that PAT25 had AE 5342 in sight as required by JO 7110.65AA ¶ 7-2-1 subsection a.2.(b)(1) and (2);

ii.    The controller(s) failed to inform AE 5342 that it was on a converging course with PAT25 and that visual separation was being applied, as required by JO 7110.65AA subsection a.2.(d);

iii.    The controller(s) failed to advise both pilots of the other aircraft and did not inform either pilot that targets were likely to merge as required by JO 110.65AA ¶ 7-2-1 subsection a.2.(e).

iv.    Additionally, the controller(s) failed to issue positive control instructions to either aircraft when vertical and/or lateral separation standards were not ensured, and failed to use proper, specified phraseology in communicating with the subject helicopter and aircraft.  The controller(s) also never provided AE 5342 with PAT25's position, direction, type, and intentions;

g.    The controller negligently failed to issue a safety or traffic alert to either PAT25 or AE 5342 despite having radar data available in real time that showed the flight tracks, altitudes and distance between PAT25 and AE 5342, and receiving a Conflict Alert (CA) when the aircraft were within approximately 1.5 miles of each other and on converging courses heading directly towards one another.  This was in violation of FAA Orders:

i.    JO 7110.65AE, ¶ 2-1-6, Safety Alerts;

ii.    JO 7110.65AE ¶ 7-6-1, Basic Radar Service to VFR Aircraft Terminal and;

iii.    JO 7110.65AE ¶ 5-1-4, Merging Target Procedures;

h. The controller(s) negligently failed to issue traffic alerts to AE 5342 and/or PAT25 in violation of FAA Orders, including but not limited to JO 7110.65AA, ¶ 2-1-21; JO 7110.65AA ¶ 3-1-6; and JO 7110.65Z ¶ 3-1-6, on at least three separate occasions, including:

    i. Failing to inform AE 5342 of the helicopter traffic after AE 5342 accepted the request to land on Runway 33 at approximately 8:43:06 p.m. The controller should have informed AE 5342 of PAT25's position, direction, type, and intentions;

    ii. Failing to provide AE 5342 specific and timely traffic alerts when it was about 2 miles southeast of the airport, on a left base to Runway 33, with the relative o'clock position, distance and altitude of PAT25 and informing AE 5342 that PAT25 would transit the airspace by crossing the final approach path to Runway 33;

    iii. Failing to provide specific traffic alerts to PAT25 concerning AE 5342 after receiving a "CA" at approximately 8:47:39 p.m., when the controller should have advised PAT25 of AE 5342's "o'clock" position, distance and altitude, and informed PAT25 that its flight path was converging with AE 5342 and the radar targets of both aircraft would merge;

i. The controller(s) failed to exercise continuing vigilance to observe and recognize a situation of unsafe aircraft proximity as required by JO 7110.65AA, ¶¶ 2-1-2 & 2-1-6, as described in Note 1 of ¶ 2-1-6;

j. The controller(s) negligently failed to advise either aircraft that their targets would likely merge;

k.  The controllers failed to properly, timely and/or appropriately resolve the Conflict Alert that was depicted (both visually and aurally) on ATC's radar display;

l.  The controller(s) negligently failed to warn either AE 5342 or PAT25 that they were on a collision course and that their Radar Targets would merge in accordance with FAA Order JO 7110.65AA Par 5-1-4 Merging Target Procedures;

m.  The controller(s) negligently failed to follow merging target procedures in violation of FAA Orders JO 7110.65Z ¶ 5-1-4 and JO 7110.65AA ¶ 7-9-5.  Once it was clear that PAT25 and AE 5342 were on converging courses, and vertical separation of more than 500 feet or lateral separation of more than 1.5 nm would not be maintained per FAA Order JO 7110.65AA ¶ 7-9-4, which was obvious from at least the time of the CA at approximately 8:47:39 p.m., the controller(s) should have advised both aircraft that their targets were likely to merge and/or issue positive control instructions to turn or climb to one or both aircraft to avoid a mid-air collision;

n.  The controller(s) negligently violated FAA Order JO 7110.65AA ¶ 5-6-1 by failing to vector either aircraft to ensure proper separation.  The controller(s) failed to issue a vector so that PAT25 would avoid AE 5342 and failed to issue alerts or advise the aircraft of traffic;

o.  The controller(s) negligently failed to visually scan their areas of responsibility in violation of FAA Order JO 711065AA ¶ 3-1-12, which should have further alerted them of the need to issue traffic and alerts to PAT25 and AE 5342;

p.  The controller(s) providing services to AE 5342 and/or PAT25 failed to comply with air traffic controller duties and responsibilities in that the controller failed to

consult with other controllers and personnel and utilize all available tools and personnel at their disposal, which violated the Air Traffic Control Manual, including but not limited to FAA Order JO 7110.65AA ¶ 2-10-3 Tower Team Position Responsibility;

q. The controller(s) failed to provide AE 5342 and PAT25 with appropriate services as required by the Air Traffic Control Manual, including but not limited to, the reasons set forth above;

r. The FAA controllers-in-charge and operations manager negligently supervised the controllers at the DCA tower and failed to timely take required corrective action to prevent the mid-air collision between PAT25 and AE 5342;

s. The controller(s) at the DCA tower were not properly trained or supervised in providing air traffic control services to AE 5342 and PAT25 concerning traffic practices and procedures for separation and issuing safety alerts for aircraft in close proximity and at risk of collision;

t. The FAA failed to ensure that the controllers monitoring AE 5342 and/or PAT25 were properly trained and supervised and to ensure that they properly executed their air traffic controller responsibilities;

u. The FAA negligently operated the helicopter route structure in and around DCA such that Helicopter Route 4 was allowed to be utilized at the same time as landings on Runway 33 and takeoffs from Runway 19;

v. The FAA, and its supervisors and/or managers at DCA negligently and/or improperly allowed controllers to leave shifts early, commonly known as an "early shove," leaving the DCA tower inadequately and unsafely under-staffed leading up

to this mid-air collision, in violation of FAA rules, regulations, orders, SOPs and/or MOUs;

w.  The FAA, and its supervisors and/or managers at DCA negligently and/or improperly allowed the helicopter control and local control positions to be combined at approximately 3:40 p.m. on January 29, 2025, and to remain combined throughout some of the busiest times of day for helicopter and commercial airliner traffic at DCA, in violation of FAA rules, regulations, orders, SOPs and/or MOUs;

x.  The FAA and its controllers, supervisors, and/or managers at DCA, negligently failed to analyze and respond to the thousands of reported occurrences of minimum separation violations at or near DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

y.  The FAA and its controllers, supervisors, and/or managers otherwise violated FAA rules, regulations, orders, SOPs, MOUs, LOAs, and/or policies and procedures; and

z.  The United States of America, its FAA agents, servants and employees were otherwise negligent in causing the mid-air collision between PAT25 and AE 5342 and/or by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

235.  On January 29, 2025, the crew of PAT25, including but not limited to the instructor pilot ("IP") (as pilot-in-command) and the pilot flying ("PF"), employed by Defendant the USA, under the immediate authority and control of the United States Army, owed a duty to Plaintiff's decedent CASEY CRAFTON, and all others who were flying in the vicinity of DCA, to exercise reasonable care in safely and carefully operating PAT25, including but not limited to, seeing and

avoiding other aircraft pursuant to 14 C.F.R. § 91.13(a) and 91.113, and to comply with all air traffic control clearances and instructions pursuant to 14 C.F.R. § 91.123, including maximum altitude clearances in published helicopter route charts when cleared by air traffic control for said routes.

236.    On January 29, 2025, Defendant the USA, by and through the United States Army, owed a duty to Plaintiff's decedent CASEY CRAFTON, and all others who were flying in the vicinity of DCA, to exercise reasonable care in maintaining, repairing and inspecting Army aircraft, including but not limited to the UH-60L operating as PAT25 on January 29, 2025.

237.    On January 29, 2025, Defendant the USA, by and through the crew of PAT25 and United States Army personnel, was negligent and breached the duties it owed Plaintiff's decedent, CASEY CRAFTON and Plaintiff as follows:

   a.  The Army crew negligently failed to establish and maintain proper and safe visual separation with AE 5342;

   b.  The Army crew negligently requested and accepted visual separation from air traffic control without having AE 5342 in sight;

   c.  The Army crew negligently accepted visual separation responsibility knowing that their ability to visually acquire traffic was compromised by their use of Night Vision Goggles ("NVGs") and despite knowing that the helicopter was not transmitting ADS-B out;

   d.  The Army crew negligently requested and accepted visual separation instructions from air traffic control without receiving sufficient information and/or instructions from air traffic control, including but not limited to AE 5342's position, direction, type and intentions;

e.  The Army crew negligently failed to establish and maintain communication with AE 5342 to ensure visual separation;

f.  The Army crew negligently utilized NVGs during the flight, which unreasonably distracted them, caused object obscuration/blending, and limited their field of vision, depth perception, color differentiation and/or their ability to distinguish oncoming traffic, in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-157;

g.  The Army crew negligently failed to de-goggle or doff their NVGs in the congested, urban environment around DCA in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-2;

h.  The Army crew negligently failed to properly consider the effect NVGs could have on their perception of navigation lights and landing lights from other aircraft operating around DCA, in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-206;

i.  The Army crew negligently failed to properly coordinate amongst themselves and/or negligently failed to utilize proper and safe crew resource management, which is especially important at night, in violation of Army regulations, including but not limited to TC 3-04.4 ¶¶ 4-190 and 4-191.

j.  The Army crew negligently failed to see and avoid AE 5342, in violation of 14 C.F.R. §§ 91.13(a) and 91.113;

k.  The Army crew negligently flew at too high an altitude, despite repeated altitude call outs from the IP to the PF, and violated the published standards and rules for operating within Helicopter Route 1 and Route 4, particularly that all operations in

this section of Route 1 and Route 4, between the Memorial Bridge and the Wilson Bridge, must remain at or below 200 feet MSL;

l.  The failure to adhere to the 200 feet mandatory altitude restriction was careless and reckless, in violation of 14 C.F.R. § 91.13(a).  The failure to maintain a flight altitude beneath the maximum route altitude also violates 14 C.F.R. § 91.119(d)(1) and other mandatory Army and FAA rules and regulations;

m.  The Army crew negligently failed to turn or move sufficiently to the left (or towards the Eastern shore of the Potomac River) despite the IP telling the PF that he believed this was what ATC wanted from the helicopter and that flying in the middle of the river brought the helicopter closer to airplanes landing at DCA;

n.  The Army crew negligently failed to identify that AE 5342 and PAT25 were on a collision course and failed to take evasive action;

o.  The Army crew failed to discuss, analyze, and/or resolve an altitude discrepancy when in the minutes prior to the collision, the IP stated that the aircraft was at 400 feet but the PF stated that the aircraft was at 300 feet and this failure was critical especially since they were transiting airspace that had a specific altitude restriction;

p.  The Army crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, and/or Army regulations in approving and/or directing PAT25 to conduct a training mission transiting Helicopter Route 1 and Route 4 during one of the busiest times of day for arriving and/or departing flights at DCA;

q.  The Army crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, and/or Army regulations, including but not limited

98

to Army TC 3-04.4 ¶ 4-2, in approving or directing PAT25 to conduct a training mission using NVGs during one of the busiest times of day for arriving and/or departing flights at DCA;

r.  The Army crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, Army regulations, including but not limited to AR 95-1, and/or FAA regulations in approving and/or directing PAT25 to conduct a training mission in the congested, Class B Airspace around DCA without their transponder broadcasting ADS-B out despite being equipped with a transponder capable of doing so;

s.  The Army crew, their commanding officers and/or other supervisors negligently failed to conduct adequate risk management in their mission planning and execution of this training flight, which violated SOPs, MOUs, and/or Army regulations, including but not limited to AR 95-1, ¶ 3-15, C 3–04.11, ADP 5–0, ATP 5–19, and DA Pam 385–30, by approving and/or directing PAT25 to conduct a training mission at the time and location, and under the circumstances of the subject flight, including but not limited to operating in the congested, Class B Airspace around DCA, using NVGs, during one of the busiest time periods for commercial traffic at DCA, and without broadcasting ADS-B out despite the subject helicopter being capable of doing so;

t.  The Army, its commanding officers, supervisors, and the crew of PAT25 negligently failed to analyze and respond to the thousands of reported occurrences of minimum separation violations at DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342

u.  The Army crew, their commanding officers and/or other supervisors negligently failed to properly liaise with the FAA and other aviation entities and operators in the Washington Capital Region to analyze and respond to the thousands of reported occurrences of minimum separation violations at or near DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

v.  The Army crew were not properly trained in conducting night training missions at or near DCA;

w.  The Army crew were not properly trained in transiting Helicopter Route 1 and Route 4 near DCA;

x.  The Army crew were not properly trained in safely and properly utilizing NVGs, including but not limited to failing to consider and abide by the above referenced Army Training Circular provisions;

y.  The Army crew negligently failed to comply with applicable FARs for the safe operations of aircraft, as well as any comparable U.S. Army and/or military regulations concerning the safe operations of aircraft, particularly those procedures concerning VFR operations near commercial airports and/or in Class B Airspace;

z.  The Army, its commanders, supervisors, and the Unit operating PAT25 negligently failed to properly inspect and maintain the subject helicopter, including but not limited to the subject helicopter's transponder, the altimeter(s) and other sources of pressure altitude data, and/or other systems on board the aircraft;

aa. The Army crew negligently failed to employ ADS-B on the subject flight;

bb. The Army crew negligently failed to properly set their altimeter(s);

cc. The Army crew negligently failed to resolve the inconsistent altitude readings being reported and/or perceived by the IP and the PF;

dd. The Department of the Army and its agents, servants and employees otherwise violated FAA and Army rules, regulations, including but not limited to AR 95-1, orders, Training Circulars ("TCs"), SOPs, MOUs, LOAs, and/or policies and procedures;

ee. The Defendant USA, its Department of the Army agents, servants and employees were otherwise negligent, and/or by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances, and all the foregoing were contributing causes to the crash of the subject aircraft.

238. Through the aforementioned negligence, Defendant the USA directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's decedent, CASEY CRAFTON, and the resulting damages to Plaintiff herein.

239. By reason of the foregoing, Plaintiff, as the Administratrix of the Estate of CASEY CRAFTON, deceased, suffered damages and are entitled to recover the aforesaid damages and any and all other available damages under applicable law from Defendant the USA in amounts as herein alleged and according to proof at trial, including but not limited to funeral expenses, loss of monetary support, loss of services, loss of society and comfort, and for profound emotional and psychological loss suffered as a result of CASEY CRAFTON's death.

## TENTH CAUSE OF ACTION

## SURVIVAL BASED UPON NEGLIGENCE AGAINST
## THE UNITED STATES OF AMERICA

240.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding Paragraphs.

241.    At all relevant times, air traffic control personnel employed by Defendant the USA, under the immediate authority and control of the FAA owed a duty to the Plaintiff's decedent, CASEY CRAFTON, and Plaintiff, and all others who were flying the vicinity of DCA, to exercise reasonable care in maintaining a safe operational environment in the airspace at and around DCA, including but not limited to by taking all actions provided in the applicable Air Traffic Control Manual, FAA JO 7110.65, DCA's SOPs, LOAs and/or MOUs between DCA and operators.

242.    On January 29, 2025, Defendant the USA, by and through the FAA and its air traffic control personnel, was negligent and breached the duties it owed Plaintiff's decedent, CASEY CRAFTON and Plaintiff as follows:

a.    The controller(s) negligently failed to give first priority to separating aircraft and issuing safety alerts in violation of FAA Order JO 7110.65AA, ¶ 2-1-2, instead prioritizing a departures push or other non-safety critical duties;

b.    The controller(s) negligently failed to establish proper and safe separation between AE 5342 and PAT25;

c.    The controller(s) negligently failed to monitor the altitude of PAT25 to ensure compliance with the mandatory maximum published altitude for Helicopter Route 4;

d.    The controller(s) negligently failed to notify PAT25 that it was exceeding and in violation of the mandatory maximum published altitude for Helicopter Route 4 and failed to instruct PAT25 to descend until it was at or below 200 feet to comply with mandatory maximum published altitude for Helicopter Route 4;

e.   The controllers negligently failed to notify AE 5342 of the presence of PAT25;

f.   The controller(s) negligently violated FAA Order JO 7110.65AE ¶ 7-2-1 by failing to follow the procedures for visual separation therein.  The controller(s) did not follow the mandatory procedures for Pilot-Applied Visual Separation.   More particularly:

    i.   The controller(s) failed to inform PAT25 at numerous critical times of the position, direction, type and intentions of AE 5342 and failed to properly confirm that PAT25 had AE 5342 in sight as required by JO 7110.65AA ¶ 7-2-1 subsection a.2.(b)(1) and (2);

    ii.   The controller(s) failed to inform AE 5342 that it was on a converging course with PAT25 and that visual separation was being applied, as required by JO 7110.65AA subsection a.2.(d);

    iii.   The controller(s) failed to advise both pilots of the other aircraft and did not inform either pilot that targets were likely to merge as required by JO 110.65AA ¶ 7-2-1 subsection a.2.(e).

    iv.   Additionally, the controller(s) failed to issue positive control instructions to either aircraft when vertical and/or lateral separation standards were not ensured, and failed to use proper, specified phraseology in communicating with the subject helicopter and aircraft.  The controller(s) also never provided AE 5342 with PAT25's position, direction, type, and intentions;

g.  The controller negligently failed to issue a safety or traffic alert to either PAT25 or AE 5342 despite having radar data available in real time that showed the flight tracks, altitudes and distance between PAT25 and AE 5342, and receiving a Conflict

Alert (CA) when the aircraft were within approximately 1.5 miles of each other and on converging courses heading directly towards one another.  This was in violation of FAA Orders:

    i.    JO 7110.65AE, ¶ 2-1-6, Safety Alerts;

    ii.    JO 7110.65AE ¶ 7-6-1, Basic Radar Service to VFR Aircraft Terminal and;

    iii.    JO 7110.65AE ¶ 5-1-4, Merging Target Procedures;

h.    The controller(s) negligently failed to issue traffic alerts to AE 5342 and/or PAT25 in violation of FAA Orders, including but not limited to JO 7110.65AA, ¶ 2-1-21; JO 7110.65AA ¶ 3-1-6; and JO 7110.65Z ¶ 3-1-6, on at least three separate occasions, including:

    i.    Failing to inform AE 5342 of the helicopter traffic after AE 5342 accepted the request to land on Runway 33 at approximately 8:43:06 p.m.  The controller should have informed AE 5342 of PAT25's position, direction, type, and intentions;

    ii.    Failing to provide AE 5342 specific and timely traffic alerts when it was about 2 miles southeast of the airport, on a left base to Runway 33, with the relative o'clock position, distance and altitude of PAT25 and informing AE 5342 that PAT25 would transit the airspace by crossing the final approach path to Runway 33;

    iii.    Failing to provide specific traffic alerts to PAT25 concerning AE 5342 after receiving a "CA" at approximately 8:47:39 p.m., when the controller should have advised PAT25 of AE 5342's "o'clock" position, distance and altitude,

and informed PAT25 that its flight path was converging with AE 5342 and the radar targets of both aircraft would merge;

i.  The controller(s) failed to exercise continuing vigilance to observe and recognize a situation of unsafe aircraft proximity as required by JO 7110.65AA, ¶¶ 2-1-2 & 2-1-6, as described in Note 1 of ¶ 2-1-6;

j.  The controller(s) negligently failed to advise either aircraft that their targets would likely merge;

k.  The controllers failed to properly, timely and/or appropriately resolve the Conflict Alert that was depicted (both visually and aurally) on ATC's radar display;

l.  The controller(s) negligently failed to warn either AE 5342 or PAT25 that they were on a collision course and that their Radar Targets would merge in accordance with FAA Order JO 7110.65AA Par 5-1-4 Merging Target Procedures;

m.  The controller(s) negligently failed to follow merging target procedures in violation of FAA Orders JO 7110.65Z ¶ 5-1-4 and JO 7110.65AA ¶ 7-9-5.  Once it was clear that PAT25 and AE 5342 were on converging courses, and vertical separation of more than 500 feet or lateral separation of more than 1.5 nm would not be maintained per FAA Order JO 7110.65AA ¶ 7-9-4, which was obvious from at least the time of the CA at approximately 8:47:39 p.m., the controller(s) should have advised both aircraft that their targets were likely to merge and/or issue positive control instructions to turn or climb to one or both aircraft to avoid a mid-air collision;

n.  The controller(s) negligently violated FAA Order JO 7110.65AA ¶ 5-6-1 by failing to vector either aircraft to ensure proper separation.  The controller(s) failed to issue

a vector so that PAT25 would avoid AE 5342 and failed to issue alerts or advise the aircraft of traffic;

o.  The controller(s) negligently failed to visually scan their areas of responsibility in violation of FAA Order JO 711065AA ¶ 3-1-12, which should have further alerted them of the need to issue traffic and alerts to PAT25 and AE 5342;

p.  The controller(s) providing services to AE 5342 and/or PAT25 failed to comply with air traffic controller duties and responsibilities in that the controller failed to consult with other controllers and personnel and utilize all available tools and personnel at their disposal, which violated the Air Traffic Control Manual, including but not limited to FAA Order JO 7110.65AA ¶ 2-10-3 Tower Team Position Responsibility;

q.  The controller(s) failed to provide AE 5342 and PAT25 with appropriate services as required by the Air Traffic Control Manual, including but not limited to for the reasons set forth above;

r.  The FAA controllers-in-charge and operations manager negligently supervised the controllers at the DCA tower and failed to timely take required corrective action to prevent the mid-air collision between PAT25 and AE 5342;

s.  The controller(s) at the DCA tower were not properly trained or supervised in providing air traffic control services to AE 5342 and PAT25 concerning traffic practices and procedures for separation and issuing safety alerts for aircraft in close proximity and at risk of collision;

t.  The FAA failed to ensure that the controllers monitoring AE 5342 and/or PAT25 were properly trained and supervised and to ensure that they properly executed their air traffic controller responsibilities;

u.  The FAA negligently operated the helicopter route structure in and around DCA such that Helicopter Route 4 was allowed to be utilized at the same time as landings on Runway 33 and takeoffs from Runway 19;

v.  The FAA, and its supervisors and/or managers at DCA negligently and/or improperly allowed controllers to leave shifts early, commonly known as an "early shove," leaving the DCA tower inadequately and unsafely under-staffed leading up to this mid-air collision, in violation of FAA rules, regulations, orders, SOPs and/or MOUs;

w.  The FAA, and its supervisors and/or managers at DCA negligently and/or improperly allowed the helicopter control and local control positions to be combined at approximately 3:40 p.m. on January 29, 2025, and to remain combined throughout some of the busiest times of day for helicopter and commercial airliner traffic at DCA, in violation of FAA rules, regulations, orders, SOPs and/or MOUs;

x.  The FAA and its controllers, supervisors, and/or managers at DCA, negligently failed to analyze and respond to the thousands of reported occurrences of minimum separation violations at or near DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

y.  The FAA and its controllers, supervisors, and/or managers otherwise violated FAA rules, regulations, orders, SOPs, MOUs, LOAs, and/or policies and procedures; and

z. The United States of America, its FAA agents, servants and employees were otherwise negligent in causing the mid-air collision between PAT25 and AE 5342 and/or by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

243. On January 29, 2025, the crew of PAT25, including but not limited to the IP (as pilot-in-command) and the pilot flying, employed by Defendant the USA, under the immediate authority and control of the United States Army, owed a duty to Plaintiff's decedent CASEY CRAFTON, and all others who were flying in the vicinity of DCA, to exercise reasonable care in safely and carefully operating PAT25, including but not limited to see and avoid other aircraft pursuant to 14 C.F.R. § 91.13(a) and 91.113, and to comply with all air traffic control clearances and instructions pursuant to 14 C.F.R. § 91.123, including maximum altitude clearances in published helicopter route charts when cleared by air traffic control for said routes.

244. On January 29, 2025, Defendant the USA, by and through the United States Army, owed a duty to Plaintiff's decedent CASEY CRAFTON, and all others who were flying in the vicinity of DCA, to exercise reasonable care in maintaining, repairing and inspecting Army aircraft, including but not limited to the UH-60L operating as PAT25 on January 29, 2025.

245. On January 29, 2025, Defendant the USA, by and through the crew of PAT25 and United States Army personnel, was negligent and breached the duties it owed Plaintiff's decedent, CASEY CRAFTON and Plaintiff as follows:

a. The Army crew negligently failed to establish and maintain proper and safe visual separation with AE 5342;

b.  The Army crew negligently requested and accepted visual separation from air traffic control without having AE 5342 in sight;

c.  The Army crew negligently accepted visual separation responsibility knowing that their ability to visually acquire traffic was compromised by their use of NVGs and despite knowing that the helicopter was not transmitting ADS-B out;

d.  The Army crew negligently requested and accepted visual separation instructions from air traffic control without receiving sufficient information and/or instructions from air traffic control, including but not limited to AE 5342's position, direction, type and intentions;

e.  The Army crew negligently failed to establish and maintain communication with AE 5342 to ensure visual separation;

f.  The Army crew negligently utilized NVGs during the flight, which unreasonably distracted them, caused object obscuration/blending, and limited their field of vision, depth perception, color differentiation and/or their ability to distinguish oncoming traffic, in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-157;

g.  The Army crew negligently failed to de-goggle or doff their NVGs in the congested, urban environment around DCA in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-2;

h.  The Army crew negligently failed to properly consider the effect NVGs could have on their perception of navigation lights and landing lights from other aircraft operating around DCA, in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-206;

i.  The Army crew negligently failed to properly coordinate amongst themselves and/or negligently failed to utilize proper and safe crew resource management, which is especially important at night, in violation of Army regulations, including but not limited to TC 3-04.4 ¶¶ 4-190 and 4-191.

j.  The Army crew negligently failed to see and avoid AE 5342, in violation of 14 C.F.R. §§ 91.13(a) and 91.113;

k.  The Army crew negligently flew at too high an altitude, despite repeated altitude call outs from the IP to the PF, and violated the published standards and rules for operating within Helicopter Route 1 and Route 4, particularly that all operations in this section of Route 1 and Route 4, between the Memorial Bridge and the Wilson Bridge, must remain at or below 200 feet MSL;

l.  The failure to adhere to the 200 feet mandatory altitude restriction was careless and reckless, in violation of 14 C.F.R. § 91.13(a).  The failure to maintain flight altitude within the maximum route altitude also violates 14 C.F.R. § 91.119(d)(1) and other mandatory Army and FAA rules and regulations;

m.  The Army crew negligently failed to turn or move sufficiently to the left (or towards the Eastern shore of the Potomac River) despite the IP telling the PF that he believed this was what ATC wanted from the helicopter and that flying in the middle of the river brought the helicopter closer to airplanes landing at DCA;

n.  The Army crew negligently failed to identify that AE 5342 and PAT25 were on a collision course and failed to take evasive action;

o.  The Army crew failed to discuss, analyze, and/or resolve an altitude discrepancy when in the minutes prior to the collision, the IP stated that the aircraft was at 400

feet but the PF stated that the aircraft was at 300 feet and this failure was critical especially since they were transiting airspace that had a specific altitude restriction;

p. The Army crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, and/or Army regulations in approving and/or directing PAT25 to conduct a training mission transiting Helicopter Route 1 and Route 4 during one of the busiest times of day for arriving and/or departing flights at DCA;

q. The Army crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, and/or Army regulations, including but not limited to Army TC 3-04.4 ¶ 4-2, in approving or directing PAT25 to conduct a training mission using NVGs during one of the busiest times of day for arriving and/or departing flights at DCA;

r. The Army crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, Army regulations, including but not limited to AR 95-1, and/or FAA regulations in approving and/or directing PAT25 to conduct a training mission in the congested, Class B Airspace around DCA without their transponder broadcasting ADS-B out despite being equipped with a transponder capable of doing so;

s. The Army crew, their commanding officers and/or other supervisors negligently failed to conduct adequate risk management in their mission planning and execution of this training flight, which violated SOPs, MOUs, and/or Army regulations, including but not limited to AR 95-1, ¶ 3-15, C 3–04.11, ADP 5–0, ATP 5–19, and DA Pam 385–30, by approving and/or directing PAT25 to conduct a training

mission at the time and location, and under the circumstances of the subject flight, including but not limited to operating in the congested, Class B Airspace around DCA, using NVGs, during one of the busiest time periods for commercial traffic at DCA, and without broadcasting ADS-B out despite the subject helicopter being capable of doing so;

t.   The Army, its commanding officers, supervisors, and the crew of PAT25 negligently failed to analyze and respond to the thousands of reported occurrences of minimum separation violations at DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342

u.   The Army crew, their commanding officers and/or other supervisors negligently failed to properly liaise with the FAA and other aviation entities and operators in the Washington Capital Region to analyze and respond to the thousands of reported occurrences of minimum separation violations at or near DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

v.   The Army crew were not properly trained in conducting night training missions at or near DCA;

w.   The Army crew were not properly trained in transiting Helicopter Route 1 and Route 4 near DCA;

x.   The Army crew were not properly trained in safely and properly utilizing NVGs, including but not limited to failing to consider and abide by the above referenced Army Training Circular provisions;

y.  The Army crew negligently failed to comply with applicable FARs for the safe operations of aircraft, as well as any comparable U.S. Army and/or military regulations concerning the safe operations of aircraft, particularly those procedures concerning VFR operations near commercial airports and/or in Class B Airspace;

z.  The Army, its commanders, supervisors, and the Unit operating the PAT25 negligently failed to properly inspect and maintain the subject helicopter, including but not limited to the subject helicopter's transponder, the altimeter(s) and other sources of pressure altitude data, and/or other systems on board the aircraft;

aa. The Army crew negligently failed to employ ADS-B on the subject flight;

bb. The Army crew negligently failed to properly set their altimeter(s);

cc. The Army crew negligently failed to resolve the inconsistent altitude readings being reported and/or perceived by the IP and the PF;

dd. The Department of the Army and its agents, servants and employees otherwise violated FAA and Army rules, regulations, including but not limited to AR 95-1, orders, Training Circulars ("TCs"), SOPs, MOUs, LOAs, and/or policies and procedures; and

ee. The defendant USA, its Department of the Army agents, servants and employees were otherwise negligent, and/or by failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances, and all the foregoing were contributing causes to the crash of the subject aircraft.

246.    Through the aforementioned negligence, Defendant the USA directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's decedent, CASEY CRAFTON, and the resulting damages to Plaintiff herein.

247.    By reason of the foregoing, Plaintiff, as the Administratrix of the Estate of CASEY CRAFTON, deceased, suffered damages and are entitled to recover the aforesaid damages and any and all other available damages under applicable law from Defendant the USA in amounts as herein alleged and according to proof at trial, including but not limited to funeral expenses, loss of monetary support, loss of services, loss of society and comfort, and for profound emotional and psychological loss suffered as a result of CASEY CRAFTON's death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff RACHEL CRAFTON, as Administratrix of the Estate of CASEY CRAFTON, deceased, respectfully prays that judgment be entered against the defendants, American Airlines, Inc., PSA Airlines, Inc., and the United States of America, jointly and severally, on their causes of action alleged above as follows:

a.    For all available wrongful death and survival economic and noneconomic damages;

b.    For all other available damages at law;

c.    For prejudgment interest, fees, and costs of suit incurred herein, if available;

d.    For attorneys' fees, if available; and

e.    For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: September 24, 2025

**CLIFFORD LAW OFFICES, P.C.**

By: */s/ Robert A. Clifford*
Robert A. Clifford (Bar ID: IL0135)
Kevin P. Durkin (Bar ID: IL0136)
Tracy A. Brammeier (Bar ID: IL0137)
John V. Kalantzis (applicant *pro hac vice*)
120 N. LaSalle Street Suite 3600
Chicago, Illinois 60602
(312) 899-9090
rac@cliffordlaw.com
kpd@cliffordlaw.com
tab@cliffordlaw.com
jvk@cliffordlaw.com

**KREINDLER & KREINDLER LLP**

Andrew J. Maloney, III (Bar ID: 476030)
Anthony Tarricone, (admission pending)
Brian J. Alexander (applicant *pro hac vice*)
Justin T. Green (applicant *pro hac vice*)
Daniel O. Rose (applicant *pro hac vice*)
Megan Wolfe Benett (applicant *pro hac vice*)
Evan Katin-Borland (admission pending)
Vincent C. Lesch (admission pending)
Erin R. Applebaum (applicant *pro hac vice*)
485 Lexington Avenue, 28th Floor
New York, New York 10017
(212) 687-8181
amaloney@kreindler.com
atarricone@kreindler.com
balexander@kreindler.com
jgreen@kreindler.com
drose@kreindler.com
mbenett@kreindler.com
ekatinborland@kreindler.com
vlesch@kreindler.com
eapplebaum@kreindler.com

**SPEISER KRAUSE PC**

Douglas A. Latto, Esq. (admission pending)
Frank H. Granito, III, Esq. (applicant *pro hac vice*)
Jeanne M. O'Grady, Esq. (admission pending)
Kenneth P. Nolan, Esq. (applicant *pro hac vice*)
800 Westchester Avenue, Suite S-608

Rye Brook, New York 10573
(914) 220-5333
dal@speiserkrause.com
f3g@speiserkrause.com
jog@speiserkrause.com
kpn@speiserkrause.com

*ATTORNEYS FOR PLAINTIFF*