**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: MID-AIR COLLISION IN WASHINGTON, D.C., JAN. 29, 2025 | Lead Case No. 1:25-cv-03382-ACR |
| Plaintiffs, | |
| v. | |
| American Airlines, Inc., PSA Airlines Inc., and United States of America, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
AMERICAN AIRLINES, INC.'S MOTION TO DISMISS THE MASTER COMPLAINT**

William F. Gould (Bar No. 428468)
HOLLAND & KNIGHT LLP
800 17th Street, NW
Washington, DC 20006
(202) 955-3000
william.gould@hklaw.com

Steven Raffaele (Bar No. NY0685)
Robert J. Burns (Bar No. NY0682)
Sarah Korapaty (Bar No. NY0684)
Qian (Sheila) Shen (Bar No. NY0693)
HOLLAND & KNIGHT LLP
787 Seventh Avenue
New York, NY 10019
(212) 513-3200
steven.raffaele@hklaw.com
robert.burns@hklaw.com
sarah.korapaty@hklaw.com
qian.shen@hklaw.com

Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Alex C. Boota (Bar No. 90001014)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com
shogarth@mwe.com
mschnoor@mwe.com
aboota@mwe.com

*Attorneys for Defendants American Airlines, Inc. and PSA Airlines, Inc.*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................ii

Introduction ........................................................................................................... 1

Background ............................................................................................................ 2

    A.    Statutory and regulatory background ..........................................................2

          1.    The Federal Aviation Act ...................................................................3

          2.    Federal aviation regulations .............................................................4

                a.    Flight crew training, certification, and supervision......................4

                b.    Aircraft safety equipment ...........................................................5

                c.    Safety risk management ..............................................................6

                d.    Flight scheduling and traffic control at DCA ..............................6

          3.    The Airline Deregulation Act ............................................................8

    B.    Factual allegations .....................................................................................8

          1.    The parties ........................................................................................8

          2.    The collision .....................................................................................9

    C.    Claims against American ...........................................................................13

Standard of Review................................................................................................15

Argument ..............................................................................................................15

    A.    Plaintiffs fail to state a claim against American because they have not identified any breach of a federal standard of care. ...................................16

          1.    Federal law occupies the field of aviation safety..............................16

          2.    Plaintiffs' claims concern aviation safety..........................................22

          3.    Plaintiffs have not alleged a violation of a federal standard of care....................23

                 a.    Training, instruction, and supervision.........................................24

                 b.    Aircraft equipment .....................................................................27

                 c.    Safety risk management ..............................................................29

                 d.    Flight scheduling .......................................................................29

    B.    Plaintiffs' scheduling claims are expressly preempted by the Airline Deregulation Act. ...................................................................................31

    C.    The negligence claims should also be dismissed because Plaintiffs have not alleged American owed a legal duty to them. .......................................33

    D.    Plaintiffs' common carrier claims against American should be dismissed for additional reasons.................................................................................37

Conclusion ........................................................................................................... 39

# TABLE OF AUTHORITIES[*]

**Cases**

*Abdullah v. Am. Airlines, Inc.*,
181 F.3d 363 (3d Cir. 1999)..........................................................2, 3, 19, 20, 21, 22

*In re Air Crash at Lexington, Aug. 27, 2006*,
2008 WL 2945944 (E.D. Ky. 2008) ...................................................................36

*In re Air Crash Near Clarence Ctr.*,
2013 WL 5964480 (W.D.N.Y. 2013) ..................................................................26

*Air Evac EMS, Inc. v. Robinson*,
486 F. Supp. 2d 713 (M.D. Tenn. 2007).............................................................27

*Am. Airlines, Inc. v. Dep't of Transp.*,
202 F.3d 788 (5th Cir. 2000) .............................................................................33

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
823 F.3d 51 (2d. Cir. 2016)................................................................................28

*Arizona v. United States*,
567 U.S. 387 (2012)...........................................................................................17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................15, 37

*Barnett v. Cass*,
522 F. Supp. 3d 780 (D. Haw. 2021)..................................................................23

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................15

*Bradshaw v. Am. Airlines*,
123 F.4th 1168 (10th Cir. 2024) ........................................................................22

*Burbank v. Lockheed Air Terminal, Inc.*,
411 U.S. 624 (1973)......................................................................................2, 19

*Burgess v. Novictor Aviation LLC*,
2021 WL 3510679 (D. Haw. 2021) ....................................................................22

*Charas v. Trans World Airlines, Inc.*,
160 F.3d 1259 (9th Cir. 1998) (en banc) ......................................................32, 33

*Chicago & S. Air Lines, Inc., v. Waterman S.S. Corp.*,
333 U.S. 103 (1948)...........................................................................................16

*Crout v. Haverfield Int'l, Inc.*,
269 F. Supp. 3d 90 (W.D.N.Y. 2017) ................................................................27

*Deahl v. Air Wis. Airlines Corp.*,
2003 WL 22843073 (N.D. Ill. 2003) ..................................................................27

---

[*]    Authorities marked with an asterisk are those on which we chiefly rely.

## Cases—continued

*Freese v. Cont'l Airlines, Inc.*,
  2009 WL 2232857 (N.D. Ohio 2009) .......................................................... 36, 37, 38

*French v. Pan Am Express, Inc.*,
  869 F.2d 1 (1st Cir. 1989) .......................................................................... 20, 21, 27

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) ......................................................................................... 28

*Gonzalez-Marcano v. US Airways, Inc.*,
  2014 WL 2880283 (E.D. Pa. 2014) ................................................................... 23

*Graham v. HSBC Mortg. Corp.*,
  2019 WL 3066399 (S.D.N.Y. 2019) ................................................................... 34

*Greene v. B.F. Goodrich Avionics Sys., Inc.*,
  409 F.3d 784 (6th Cir. 2005) ............................................................................. 20

*Haley v. United Airlines Inc.*,
  2015 WL 5139638 (N.D. Ill. 2015) .................................................................... 38

*Hart v. Delta Air Lines, Inc.*,
  2018 WL 1087846 (C.D. Cal. 2018) .............................................................. 36, 37

*Hettinga v. United States*,
  677 F.3d 471 (D.C. Cir. 2012) .......................................................................... 15

*Hodges v. Delta Airlines, Inc.*,
  44 F.3d 334 (5th Cir. 1995) .............................................................................. 33

*Jolevare v. Alpha Kappa Alpha Sorority, Inc.*,
  521 F. Supp. 2d 1 (D.D.C. 2007) ...................................................................... 34

*Kropp v. United Airlines, Inc.*,
  2022 WL 2156109 (9th Cir. 2022) .................................................................... 22

*Kurns v. R.R. Friction Prods. Corp.*,
  565 U.S. 625 (2012) ......................................................................................... 18

*Magee v. Am. Inst. of Certified Pub. Accts.*,
  245 F. Supp. 3d 106 (D.D.C. 2017) .................................................................. 33

*Med-Trans Corp. v. Benton*,
  581 F. Supp. 2d 721 (E.D.N.C. 2008) ............................................................... 27

*Montalvo v. Spirit Airlines*,
  508 F.3d 464 (9th Cir. 2007) ............................................................................ 20

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ................................................................... 8, 31, 32, 33

*Nw., Inc. v. Ginsberg*,
  572 U.S. 273 (2014) ......................................................................................... 32

**Cases—continued**

*Nw. Airlines, Inc. v. Minnesota,*
  322 U.S. 292 (1944)................................................................3, 16

*Park v. Hyatt Corp.,*
  436 F. Supp. 2d 60 (D.D.C. 2006) .........................................39

*United States ex rel. PCA Integrity Assocs. v. NCO Fin. Sys., Inc.,*
  2020 WL 686009 (D.D.C. 2020) ............................................35

*Pilkin v. Hogan Lovells US LLP,*
  2021 WL 950082 (D.D.C. 2021) ............................................35

*PLIVA, Inc. v. Mensing,*
  564 U.S. 604 (2011)...........................................................27, 28

*R&M Mixed Beverage Consultants, Inc. v. Safe Harbor Benefits, Inc.,*
  578 S.W.3d 218 (Tex. App. 2019)..........................................35

*Ray v. Atl. Richfield Co.,*
  435 U.S. 151 (1978)..........................................................18, 19

*Sanchez v. Bay Area Rapid Transit Dist.,*
  2013 WL 4764485 (N.D. Cal. 2013) ......................................39

*Schneidewind v. ANR Pipeline Co.,*
  485 U.S. 293 (1988)................................................................17

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
  801 F.3d 412 (4th Cir. 2015).................................................36

*Shay v. Norwalk Taxi, Inc.,*
  2013 WL 1277294 (Conn. Super. Ct. 2013)...........................39

*Shcherb v. Angi Homeservs. Inc.,*
  2020 WL 2571041 (S.D.N.Y. 2020)........................................34

*Sissel v. U.S. Dep't of Health & Hum. Servs.,*
  760 F.3d 1 (D.C. Cir. 2014)......................................................8

*Stewart v. Nat'l Educ. Ass'n,*
  471 F.3d 169 (D.C. Cir. 2006) ...............................................15

*Tweed-New Haven Airport Auth. v. Tong,*
  930 F.3d 65 (2d Cir. 2019).....................................................20

*In re U.S. Off. Prods. Co. Sec. Litig.,*
  251 F. Supp. 2d 77 (D.D.C. 2003) .........................................34

*United States v. Bestfoods,*
  524 U.S. 51 (1998)................................................................34

*United States v. Locke,*
  529 U.S. 89 (2000)................................................................18

**Cases—continued**

*US Airways, Inc. v. O'Donnell,
    627 F.3d 1318 (10th Cir. 2010) ..................................................................20

Ventress v. Japan Airlines,
    747 F.3d 716 (9th Cir. 2014) ....................................................................21

Walker v. King Cnty. Metro,
    109 P.3d 836 (Wash. 2005).......................................................................39

*Witty v. Delta Air Lines, Inc.,
    366 F.3d 380 (5th Cir. 2004) ....................................................................20

**Statutes**

49 U.S.C.
    § 1301 ..............................................................................................................3
    § 40103(a)(1) ................................................................................................16
    § 40120(c) ......................................................................................................21
    § 41712(c) ......................................................................................................36
    § 41713..........................................................................................................31
    § 41713(b)(1) ....................................................................................8, 32, 33
    § 41718..........................................................................................................30
    § 44701(a) ......................................................................................................20
    § 44701(c) ........................................................................................................4
    § 44703............................................................................................................4
    § 44704............................................................................................................6
    § 46301(d)(2) ................................................................................................25
    § 47531..........................................................................................................25

Air Commerce Act of 1926, Pub. L. No. 64-254, 44 Stat. 568 ......................2, 17

Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705 ...........8, 31

Civil Aeronautics Authority Act of 1938, Pub. L. No. 75-706, 52 Stat. 973 ............2, 17

Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731 ...............3, 17, 18, 23

**Regulations and Rules**

14 C.F.R.
    Part 5 ......................................................................................................6, 29
    § 5.1..............................................................................................................29
    Part 13 ..........................................................................................................25
    § 13.16(a) ......................................................................................................25
    Part 21 ....................................................................................................6, 28
    § 21.21............................................................................................................28
    § 21.93(a) ......................................................................................................28
    § 21.95............................................................................................................28

**Regulations and Rules—continued**

14 C.F.R.—continued

§ 21.97 ................................................................................................28
§ 25.1381 ............................................................................................28
§ 60 ......................................................................................................4
§ 61 ..................................................................................................4, 18
Part 91 ..................................................................................................7
§ 91 ......................................................................................................4
§ 91.101 ...........................................................................................7, 18
§ 91.113 ..............................................................................................11
§ 91.113(b) ..........................................................................................12
§ 91.123 ................................................................................................7
§ 91.161 ..............................................................................................26
§ 91.127 ................................................................................................7
§ 91.209 ...........................................................................................5, 28
Part 93 ..............................................................................................6, 30
§ 93.123 ............................................................................................6, 30
§ 93.125 ..............................................................................................31
§ 93.130 ............................................................................................6, 30
§ 119.5(d) ............................................................................................25
Part 121 ............................................................................................4, 25
§ 121 ....................................................................................................4
§ 121.301 ..........................................................................................5, 18
§ 121.305 ..........................................................................................5, 28
§ 121.309 ..............................................................................................4
§ 121.323 ..........................................................................................5, 28
§ 121.346 ..............................................................................................5
§ 121.354 ..............................................................................................5
§ 121.356 ..............................................................................................5
§ 121.357 ..............................................................................................5
§ 121.358 ..............................................................................................5
§ 121.359 ..............................................................................................5
§ 121.383(a) ..........................................................................................4
§ 121.400 ......................................................................................4, 5, 18
§ 121.401(a)(1) ..................................................................................5, 26
§ 121.404 ..............................................................................................5
§ 121.405 ..........................................................................................5, 26
§ 121.417 ..............................................................................................5
§ 121.533 ..........................................................................................9, 25
§ 141 ....................................................................................................4
§ 142 ....................................................................................................4
§ 257.5 ..........................................................................................24, 36

80 Fed. Reg. 1308, 1308 (Jan. 8, 2015) ................................................6

**Other Authorities**

FAA Advisory Circular 90-120 ................................................................12

FAA, Aeronautical Information Manual § 5-4-3 ...........................................7

FAA, *FAA Revokes AMI Jet Charter's Certificate* (Oct. 31, 2007) ............25

FAA, Letter to Paul New, President, Tennessee Aircraft Services, Inc., *Legal Interpretation*, (May 21, 2015) ...........................................................29

FAA Order 7110.2L .................................................................................7

FAA Order 8040.4C ...............................................................................29

FAA Order JO 7110.65AA ........................................................................7

H.R. Rep. No. 85-2360 (1958) ............................................................3, 17

S. Rep. No. 85-1811 (1958) ................................................................4, 17

**INTRODUCTION**

On the night of January 29, 2025, Flight 5342 operated by PSA Airlines, Inc. (PSA) was on a routine, final approach into Ronald Reagan Washington National Airport (DCA), 278 feet above the Potomac River, when PAT25, a U.S. Army Black Hawk helicopter on a training mission, collided into it. Flight 5342 was flying the precise landing approach that air traffic control (ATC) had specifically requested it to use; meanwhile, the Army helicopter was flying at least 78 feet higher than permitted, and ATC—understaffed with one person performing two critical safety jobs at once, in violation of Federal Aviation Administration (FAA) policy—never warned Flight 5342's pilots that another aircraft was converging on its path, again in violation of multiple FAA regulatory orders. The collision tragically killed all 67 people aboard both aircraft—64 individuals on Flight 5342 and 3 members of the military on PAT25.

Plaintiffs, the survivors of deceased passengers on Flight 5342, understandably seek compensation for the tragic deaths of their loved ones. And they are entitled to relief from the party that was responsible for this tragedy—the United States government.

American Airlines, Inc. (American) places the safety of its customers and team members above all else. Because the Master Complaint does not—because it cannot—allege American violated any applicable federal standard or regulation, the Court should dismiss all claims against American.

Instead, the Master Complaint's claims against American all start from the premise that *state* tort law required American to have acted differently to allegedly better mitigate the risks associated with a mid-air collision for Flight 5342, which was operated by an affiliated but separate airline, PSA. Principally, these claims assert that American was required to control and supervise the activities of a sibling (not a subsidiary) company, PSA—including, for example, PSA's training of the pilots PSA employs and the type of lights used on PSA's own aircraft.

But federal law regulates everything from flight-crew training and supervision to aircraft

1

lighting to the rules for flight scheduling at busy airports like DCA.  As the Supreme Court has explained, "if the congressional objectives underlying the Federal Aviation Act are to be fulfilled," "a uniform and *exclusive* system of federal regulation" is necessary.  *Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 639 (1973) (emphasis added).  Accordingly, seven circuits have held that Congress has preempted the entire field of aviation safety—meaning that "federal law establishes the applicable standards of care in the field of air safety."  *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 367 (3d Cir. 1999).

The Master Complaint fails to allege facts that, if proven true, would establish that American violated any federal standard. Because federal law governs aviation safety completely and exclusively—leaving no room for state-law regulation, including through state tort standards—Plaintiffs' state-law claims are preempted and should be dismissed.

American is sympathetic to Plaintiffs' desire to obtain redress for this tragedy.  Its priority since January 29th has been supporting the families and loved ones of Flight 5342's passengers and crew members.  But Plaintiffs' proper legal recourse is not against American.  It is against the United States government, which—unlike American—*is* alleged to have violated federal aviation standards.  The Court should therefore dismiss American from this lawsuit.

## BACKGROUND

### A.    Statutory and regulatory background

Since the dawn of civil aviation, the federal government has actively and exclusively regulated air travel.  *See* Air Commerce Act of 1926, Pub. L. No. 64-254, 44 Stat. 568 (charging Secretary of Commerce with issuing and enforcing air traffic rules, licensing pilots, certifying aircraft, establishing airways, and operating and maintaining aids to air navigation); Civil Aeronautics Authority Act of 1938, Pub. L. No. 75-706, 52 Stat. 973 (creating new independent federal agency to regulate air safety and routes).  These statutes and resulting regulations exclusively govern how air carriers must operate to allow for nationwide uniformity.  As Justice

2

Jackson put it—and it holds true today—"[f]ederal control [over aviation] is intensive and exclusive":

> Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxies onto a runway it is caught up in an elaborate and detailed system of controls.

*Nw. Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303 (1944) (Jackson, J., concurring).

### 1.    *The Federal Aviation Act*

Congress enacted the modern statute governing aviation, the Federal Aviation Act of 1958, "to provide for the regulation and promotion of civil aviation in such manner as to best foster its development and safety, and to provide for the safe and efficient use of the airspace by both civil and military aircraft." Pub. L. No. 85-726, 72 Stat. 731 (codified as amended at 49 U.S.C. § 1301 *et seq.*). The impetus for the Act was "a series of fatal air crashes between civil and military aircraft *operating under separate flight rules*." *Abdullah*, 181 F.3d at 368 (cleaned up).

The Federal Aviation Act established the FAA, whose Administrator has "full responsibility and authority for the advancement and promotion of civil aeronautics generally, including the promulgation and enforcement of safety regulations." H.R. Rep. No. 85-2360 (1958); *see* 72 Stat. at 744, 749-750. In particular, Section 307(b) of the Act authorized and directed the FAA Administrator "to prescribe air traffic rules and regulations governing the flight of aircraft, for the … protection … of aircraft, … and for the efficient utilization of the navigable airspace, including … *rules for the prevention of collision between aircraft*." 72 Stat. at 750 (emphasis added). The legislative history of the Act confirms that Congress understood federal regulation of air safety to be exclusive:

> [A]viation is unique among transportation industries in its relation to the federal government—it is the only one whose operations are conducted almost wholly within federal jurisdiction, and are subject to little or no regulation by States or local authorities. Thus, the

> federal government bears virtually complete responsibility for the
> promotion and supervision of this industry in the public interest.

S. Rep. No. 85-1811, at 5 (1958).

Congress subsequently collected the FAA Administrator's authorities and obligations regarding aviation safety in Chapter 447, Safety Regulation (49 U.S.C. § 44701 *et seq.*), and directed the Administrator to "carry out this chapter in a way that best tends to reduce or eliminate the possibility or recurrence of accidents in air transportation." *Id.* § 44701(c).

### 2. Federal aviation regulations

Federal regulations enacted pursuant to the Federal Aviation Act establish uniform, comprehensive standards for the aviation industry on a wide range of matters bearing on safety, including flight operations, airspace management, aircraft certification, aircraft equipment requirements, and flight-crew training and certification. The FAA regulates commercial airlines, including American and PSA, under 14 C.F.R. Part 121, which requires each such airline (known as a Part 121 operator) to hold an air carrier certificate issued by the FAA. This certificate confirms that the holder meets the stringent safety standards of Part 121, including those described below.

### a. Flight crew training, certification, and supervision

Congress has charged the FAA Administrator with issuing "airman certificate[s]" to individuals qualified and fit to serve as a pilot or other member of the flight crew. *See* 49 U.S.C. § 44703. No person may serve as a pilot without such certification. *See* 14 C.F.R. § 121.383(a). Federal regulations establish detailed rules governing flight-crew training, certification, and hiring. These include: (1) 14 C.F.R. § 60 *et seq.* (requirements for the qualification and use of flight simulator devices); (2) *id.* § 61 *et seq.* (pilot training and certification); (3) *id.* § 91 *et seq.* (pilot operations); (4) *id.* § 121 *et seq.* (domestic carrier operations); (5) *id.* § 141 *et seq.* (pilot schools); and (6) *id.* § 142 *et seq.* (aviation training centers).

In particular, 14 C.F.R. Subpart N, *Training Program*, includes comprehensive requirements for commercial airlines to establish and maintain a training program for their crew

members.  *See* 14 C.F.R. Subpart N, §§ 121.400-429.  Federal regulations also require training relating to crew and dispatcher resource management (*id.* § 121.404), crewmember emergency response training (*id.* § 121.417), and training to ensure crew members are qualified in responding to alerts of potential collision risks (*id.* § 121.354).  Federal law requires certificate holders to "obtain initial and final FAA approval of [their] training program" "[p]rior to implementation," as well as approval for any revision to a training program.  14 C.F.R. § 121.401(a)(1); *id.* § 121.405 (describing how FAA approval is obtained for "a training program, or a revision to an approved training program").

### b.    *Aircraft safety equipment*

Extensive federal regulations govern the design of aircraft and its safety equipment.  For aircraft operated by commercial airlines, many of these requirements are contained in 14 C.F.R. Subpart K, *Instrument and Equipment Requirements*, §§ 121.301-359.  These requirements cover, among other things, flight and navigation equipment (14 C.F.R. § 121.305), emergency equipment (*id.* §§ 121.309-310), flight and cockpit data recorders (*id.* §§ 121.346, 121.359), a terrain awareness and warning system (*id.* § 121.354), a traffic collision avoidance system (*id.* § 121.356), airborne weather radar equipment (*id.* § 121.357), and low-altitude windshear system equipment (*id.* § 121.358).

Relevant here, all commercial aircraft must have a traffic collision avoidance system (TCAS) that satisfies the FAA's specific technical standards.  14 C.F.R. § 121.356.  TCAS automatically alerts pilots when another aircraft comes within a certain distance.  *Id.*; *see also* Compl. ¶¶ 33-39.  By design, however, when the aircraft descends below a certain altitude, some of these alerts are inhibited.  *Id.* ¶¶ 39-41.

Also relevant here, multiple federal safety-equipment regulations govern aircraft lighting.  *See, e.g.*, 14 C.F.R. § 91.209 (aircraft lights); *id.* § 121.323 (instruments and equipment for operations at night); *id.* § 121.305 (flight and navigational equipment).

The Federal Aviation Act establishes a mandatory three-step certification process to ensure that all certified aircraft meet these federal requirements. An aircraft manufacturer must first obtain an FAA "type certificate," which describes the design in detail. 49 U.S.C. § 44704(a); *see* 14 C.F.R. Part 21. The FAA's issuance of a type certificate reflects the agency's determination that the aircraft "is properly designed and manufactured, performs properly, and meets the regulations and minimum [federal] standards prescribed." 49 U.S.C. § 44704(a). Then, to duplicate or mass-produce the aircraft, the manufacturer must obtain an FAA "production certificate." *Id.* § 44704(c). Finally, before an individual aircraft may be placed into service, the owner must obtain an "airworthiness" certificate from FAA, which represents the agency's approval—after inspection—that the aircraft conforms to its type certificate and is safe to operate. *Id.* § 44704(d).

### c.    *Safety risk management*

Federal regulations (at 14 C.F.R. Part 5) also spell out robust and comprehensive requirements for each airline's "safety management system"—a "comprehensive, process-oriented approach to managing safety throughout an organization." Dep't of Transp., FAA, Final Rule: Safety Management Systems for Domestic, Flag, and Supplemental Operations Certificate Holders, 80 Fed. Reg. 1308, 1308 (Jan. 8, 2015).

### d.    *Flight scheduling and traffic control at DCA*

DCA is one of five U.S. airports that the FAA has designated as a "high density traffic airport." *See* 14 C.F.R. § 93.123(a). The FAA has prescribed flight rules for DCA and the other high density traffic airports (*see* 14 C.F.R. Part 93 Subparts K and S), including restrictions on the hourly number of allocated landings and takeoffs. *Id.* § 93.123. The FAA has exclusive authority to adjust the number, timing, and order of operations at DCA to ensure safety and may suspend allocations as necessary for efficient use of the airspace. *See id.* § 93.130.

The FAA directly provides air traffic service for each commercial flight through ground-

based air traffic controllers who are federal employees.  Federal regulations require compliance with air traffic control instructions.  *See, e.g.*, 14 C.F.R. § 91.101 *et seq.*; *id.* § 91.123 (no operations contrary to ATC instruction); *id.* § 91.127 (requiring pilot compliance with airport traffic requirements).[1]

The standard operating procedure for DCA Air Traffic Control (FAA Order 7110.2L) requires a "Local Control" position and "Helicopter Control" position to be on duty from Monday through Friday, from 10:00 a.m. to 9:30 p.m.  Compl. ¶¶ 97-98.  The Local Control's responsibilities include maintaining separation between aircraft, including not only aircraft arriving and departing at DCA but also aircraft passing through the airspace, and initiating corrective action as necessary.  *Id.* ¶ 97(a).  The Helicopter Control's responsibilities include separating helicopter traffic flying under Visual Flight Rules (federal regulations that govern aircraft navigating by visual references, *see* 14 C.F.R. Part 91, Subpart B, § 91.151 *et seq.*) from all other aircraft and clearing helicopters on the published helicopter routes.  *Id.* ¶ 97(b).  This procedure ensures that two air traffic controllers are working to maintain separation of airplanes and helicopters in the congested airspace around DCA during peak traffic hours.  *Id*. ¶ 98.

FAA Air Traffic Orders require ATC to follow specific procedures for "merging target[s]" and issuing traffic alerts with the position, distance, and altitude of nearby aircraft, particularly after receiving a conflict alert warning that two aircraft are on converging flight paths.  Compl. ¶ 250 (citing FAA Order JO 7110.65AA ¶ 7-2-1; JO 7110.65AA, ¶ 2-1-6, Safety Alerts; JO 7110.65AA ¶ 7-6-1, Basic Radar Service to VFR Aircraft Terminal; and JO 7110.65AA ¶ 5-1-4, Merging Target Procedures).

---

[1]    In the Aeronautical Information Manual—the FAA's official guide to ATC procedures—air traffic control is responsible for maintaining separation between aircraft and for controlling all instrument flights operating within its area of responsibility.  In doing so, ATC advises of the runway and detailed instructions for the final approach.  *See* AIM § 5-4-3, Approach Control.

### 3.    The Airline Deregulation Act

The Airline Deregulation Act of 1978 (Pub. L. No. 95-504, 92 Stat. 1705) was enacted "to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services"—that is, to make air transportation no longer subject to economic regulation. 92 Stat. at 1705. To ensure "that the States would not undo federal deregulation with regulation of their own," Congress included in the Airline Deregulation Act an express preemption provision. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). The preemption provision prohibits states from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation." 49 U.S.C. § 41713(b)(1).

### B.    Factual allegations

On a Rule 12(b)(6) motion to dismiss, the court "assumes the truth of all well-pleaded factual allegations in the complaint." *Sissel v. U.S. Dep't of Health & Hum. Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014).[2]

### 1.    The parties

Plaintiffs are the personal representatives or administrators of the estates of passengers on American Eagle Flight 5342. *See* Compl. ¶ 4.

Defendants are American, PSA, and the United States of America. American, a Delaware corporation headquartered in Texas, is a commercial air carrier and a wholly owned subsidiary of American Airlines Group Inc. Compl. ¶¶ 5, 7. PSA, a Pennsylvania corporation headquartered in Ohio, is also a wholly owned subsidiary of American Airlines Group Inc. and operates regional commercial flights under the American Eagle brand. *Id.* ¶¶ 6-7, 45. American and PSA each have

---

[2]    American contests the factual underpinnings of Plaintiffs' claims against American and does not concede the truth of Plaintiffs' allegations.

an independent operating certificate issued by the FAA, and each accordingly is responsible for its own operational control. *See* 14 C.F.R. § 121.533. Both American and PSA operate daily flights into and out of DCA. Compl. ¶ 14. It is undisputed that Flight 5342 was operated solely by PSA, not by American. *See id.* ¶¶ 46-48.

Plaintiffs' claims against the United States of America concern two categories of federal employees: (1) the air traffic controllers in the DCA tower, who were acting under the control and authority of the FAA and within the scope of their employment (Compl. ¶ 8); and (2) the Army personnel operating the Black Hawk helicopter, who were acting under the control and authority of the United States Army and within the scope of their employment (*id.* ¶ 9).

### 2.     *The collision*

On the evening of January 29, 2025, PAT25, an Army Black Hawk helicopter on a training flight, collided in mid-air with Flight 5342, a commercial aircraft that ATC had cleared to land at DCA. Compl. ¶¶ 1, 111-171.

**a.** The airspace surrounding DCA is used by government, military, law enforcement, and emergency medical helicopters, which are required to follow FAA-published helicopter routes with mandatory maximum altitude restrictions. Compl. ¶¶ 24-28. Helicopter Routes 1 and 4 follow the Potomac River, and helicopters on Route 4 between the Memorial and Woodrow Wilson Bridges are restricted to a maximum altitude of 200 feet. *Id.* ¶¶ 25, 27, 143, 253(n), 262(n). Helicopter Route 4 crosses the approach path to Runway 33 at DCA. *Id.* ¶ 208(c).

On January 29, 2025, at approximately 6:45 p.m., PAT25 departed Davison Army Airfield in Fort Belvoir, Virginia, on a training flight, with one flying pilot, one instructor pilot, and a crew chief. Compl. ¶ 116. The Army battalion conducting the flight routinely operated helicopter flights in DCA airspace. *Id.* ¶ 108.

At around 8:33 p.m., PAT25 requested and received ATC clearance to proceed from Helicopter Route 1 to Route 4. Compl. ¶ 123. At that time—and since mid-afternoon that day—

a single air traffic controller was working both the "Local Control" and "Helicopter Control" positions (*id.* ¶ 125), contrary to the FAA's standard operating procedure (*id.* ¶¶ 99-101). *See supra* page 7.

Ten minutes later, at around 8:43 p.m., PAT25 was traveling south on Helicopter Route 1 west of the Key Bridge. Compl. ¶ 139. At that time, the flying pilot stated that the helicopter was at an altitude of 300 feet, but the instructor pilot responded that the helicopter was at 400 feet. *Id.* The PAT25 flight crew did not discuss or resolve this discrepancy. *Id.*

At approximately 8:44 p.m., as PAT25 approached the Key Bridge, the instructor pilot stated that PAT25 was at 300 feet descending to 200 feet. Compl. ¶ 140. About a minute later, PAT25 passed over the Memorial Bridge on Helicopter Route 4. Again, the instructor pilot told the flying pilot that PAT25 was at 300 feet and needed to descend to 200 feet. *Id.* ¶ 143. The flying pilot acknowledged the direction, but there was no further discussion and the helicopter remained above the 200-feet maximum altitude. *Id.*[3]

**b.** Flight 5342 was a regularly scheduled commercial flight from Wichita to DCA on January 29, 2025, operated by PSA and carrying 60 passengers and four crew members aboard an aircraft registered with the FAA. Compl. ¶¶ 111-112. Consistent with federal regulations (*see supra* page 5), the airplane was equipped with a TCAS. *Id.* ¶ 113. Also consistent with federal regulations (*see supra* page 5), the airplane was equipped with several types of lights that were illuminated for landing. *Id.* ¶ 114. Consistent with federal regulations, its lightbulbs were

---

[3]    The Army battalion conducting the flight had an agreement with ATC that the published routes and altitudes "must apply unless otherwise authorized by ATC." Compl. ¶ 101. Nonetheless, the Army took a permissive approach to the altitude requirements, allowing its pilots up to 100 feet of error. *Id*. ¶ 103. Additionally, the Army was aware that helicopters in its fleet, including PAT25, "were equipped with barometric altimeters that had a significant margin of error." *Id*. ¶ 105. The Army battalion conducted risk assessments before each mission, but those risk assessments did not account for commercial traffic at DCA, nor did the Army train its pilots on commercial flight approach paths into DCA. *Id*. ¶¶ 106, 108. The Army battalion also opted not to use a position broadcasting technology called ADS-B, which helps avoid mid-air collisions by enabling an aircraft to be tracked by other aircraft. *Id.* ¶ 107.

incandescent, not LED. *Id.* ¶¶ 114-115.

At around 8:39 p.m., ATC cleared Flight 5342 for an approach to Runway 1 at DCA. Compl. ¶ 127. The pilots acknowledged and accepted that approach. *Id.* ¶ 128.

About four minutes later, at around 8:43 p.m., ATC asked the pilots if Flight 5342 could accept a switch to land on Runway 33 instead. Compl. ¶ 129. The pilots of Flight 5342 accepted the change of approach procedure. *Id.* ¶ 136. ATC cleared Flight 5342's approach to Runway 33, meaning that Flight 5342 had right-of-way over other aircraft. *Id.* ¶ 137; *see* 14 C.F.R. § 91.113. At around 8:45 p.m., after performing the before-landing checklist, the pilots disconnected Flight 5342's autopilot and began hand-flying the aircraft. *Id.* ¶ 142. This happened nearly simultaneously with PAT25 passing south over the Memorial Bridge. *Id.* ¶ 143.

**c.** In the minutes leading up to the collision, which occurred at approximately 8:47:58 p.m. (Compl. ¶ 170), ATC failed to maintain separation between Flight 5342 and PAT25. *Id.* ¶¶ 149, 151-153, 162, 166, 172, 185-188.

At around 8:46 p.m., ATC advised PAT25 that Flight 5342 was flying at an altitude of 1200 feet just south of Wilson Bridge and preparing to land at Runway 33. Compl. ¶¶ 146-147. The pilots on Flight 5342 could hear this transmission. *Id.* ¶ 148. However, ATC—contrary to FAA requirements—never directly informed Flight 5342 of the Army Black Hawk helicopter's location or where it was heading. *Id.* ¶¶ 149, 185. In response to ATC's advisory, PAT25 radioed that it had the traffic "in sight" and requested "visual separation" from the airplane. *Id.* ¶ 151. ATC approved the request. *Id.*

Moments later, approximately one minute before the collision, ATC received a "conflict alert" warning that Flight 5342 and PAT25 were on converging flight paths. Compl. ¶ 152. At around 8:47:39 p.m., ATC radioed the Army helicopter to ask whether it had the "the CRJ"—the PSA airplane operating Flight 5342, a CRJ700 aircraft—"in sight." *Id.* ¶¶ 111, 153. The pilots on Flight 5342 could hear this ATC transmission as well. *Id.* ¶ 155. Around 8:47:40 p.m., they also

heard an aural "traffic, traffic" alert produced by Flight 5342's automated traffic alert and collision avoidance system.  *Id.* ¶¶ 156, 158.[4]

Seconds later at around 8:47:42 p.m., and before PAT25 responded, ATC instructed PAT25 to "pass behind" the airplane.  Compl. ¶¶ 162-163.  The pilots on Flight 5342 could hear this transmission.  *Id.* ¶ 163.  Flight 5342's crew is not alleged to have had any reason to think that the Army helicopter would not give way and pass behind them, as required by federal regulations and as directed by ATC.  Two seconds later, the Army helicopter indicated that it had the airplane "in sight" and again requested "visual separation."  *Id.* ¶ 166.  ATC again approved the request. *Id.*  The instructor pilot then told the flying pilot that he believed ATC was asking the helicopter to move left toward the east bank of the Potomac River, which would have avoided Flight 5342's approach path.  *Id.*

Approximately 14 seconds later, there was "a verbal reaction" by the flight crew of Flight 5342, and they increased the aircraft's pitch.  Compl. ¶ 167.  The next moment the Black Hawk struck Flight 5342.  *Id.* ¶ 170.  Upon impact, which occurred approximately 278 feet above the ground (in violation of Route 4's maximum altitude requirement for helicopters), both aircraft fell into the Potomac River, with no survivors.  *Id.* ¶¶ 171-173.

The Army Black Hawk helicopter—despite twice confirming that it had "visual separation" with the airplane and despite its obligation to "give way" to Flight 5342 on its final approach (14 C.F.R. § 91.113(b))—made no attempts to avoid hitting Flight 5342.  Compl. ¶¶ 169, 172.  Further, despite receiving a conflict alert and knowing Flight 5342's flight path for landing, ATC never warned Flight 5342's pilots that they were on a converging course with PAT25, and—in violation of multiple FAA Orders (*see supra* page 7)—ATC never issued a Safety or Traffic alert or any other instructions.  *Id.* ¶¶ 149, 185, 187, 250(g).

---

[4]    FAA guidance specifies that an aircraft cleared to land should "not deviate from an assigned clearance [to land] based solely on T[raffic] A[dvisory] information."  FAA Advisory Circular 90-120.

### C.    Claims against American

Plaintiffs acknowledge, as they must, that American did not operate Flight 5342, did not own the airplane, and did not employ the flight crew.  Nevertheless, presenting an assortment of alleged errors and omissions, Plaintiffs contend that American caused or contributed to the mid-air collision of the Army helicopter and Flight 5342.  Plaintiffs assert two wrongful-death and two survival actions against American, one of each premised on a simple negligence duty of care and the others repeating the same allegations but premised on a purported heightened "common carrier" duty.

Plaintiffs do not (and could not) proceed against American under a vicarious liability theory for the specific alleged operational acts or omissions of PSA's flight crew on Flight 5342.  Instead, Plaintiffs allege theories of purported direct liability premised, nearly in their entirety, on alleged failures by American to control aspects of the generalized operations of its corporate sibling PSA, a separate airline with its own independent operating certificate and related operating procedures. As detailed below, Plaintiffs do not allege a specific federal standard of care that American allegedly violated or breached.  For the few claims where Plaintiffs reference a federal aviation regulation, they do not adequately describe or explain the specific conduct that resulted in the purported violation of any such federal regulation (or federal standard of care).

Of the nineteen substantive asserted bases of liability as against American, as set forth in the substantively identical first four causes of action in the Master Complaint (*see, e.g.*, ¶ 208(a)-(s); *see also* ¶¶ 194(a)-(s), 201(a)-(s), 215(a)-(s) (same)), sixteen are premised upon a purported duty (and presumed ability) by American to control or supervise the activities of PSA.  These fall into the following categories, which we refer to as the "failure-to-control claims":

> **(1)** *PSA's training of its pilots*: Plaintiffs appear to acknowledge—as they must—that American did not employ or train Flight 5342's crew.  Plaintiffs instead allege that American "fail[ed] to require" PSA to conduct sufficient training, and to adequately inform flight crews, regarding safety risks and dangerous conditions when operating flights in DCA airspace, including specifically with regard

to the approach to Runway 33 at nighttime, intersecting helicopter routes, the history of alleged near-misses, traffic congestion, and altitudes at which TCAS alerts are inhibited (*see, e.g.*, Compl. ¶ 208(a)-(h), (m), (o), (q));

**(2) *Supervision of PSA and its pilots*:** Plaintiffs allege that American failed to "supervise, monitor and control" PSA and its Flight 5342 flight crew with respect to the alleged safety risks and dangers described above (*see, e.g.*, Compl. ¶ 208(k)-(l));

**(3) *PSA's policies and procedures*:** Plaintiffs allege that American "fail[ed] to require" PSA to implement policies and procedures addressing the alleged safety risks and dangers described above (*see, e.g.*, Compl. ¶ 208(a)-(b));

**(4) *Equipment on PSA's aircraft*:** Plaintiffs allege that American "fail[ed] to require" PSA aircraft to be equipped with LED lights, which Plaintiffs allege would have made Flight 5342 more identifiable to PAT25 (*see, e.g.*, Compl. ¶ 208(i)); and

**(5) *Catch-all*:** Plaintiffs allege that American "otherwise act[ed] in such a manner as to create an environment in which a mid-air collision could occur" between PSA's aircraft and another aircraft (*see, e.g.*, Compl. ¶ 208(j)).

Only three of Plaintiffs' pleaded bases of liability against American pertain directly to something American itself allegedly did or failed to do—as opposed to what American allegedly "fail[ed] to require" PSA to do.  Those are:

**(1) *Safety risk management*:** Plaintiffs allege that American failed to perform comprehensive safety risk management or safety reviews regarding DCA and the likelihood of mid-air collisions at DCA, which allegedly caused or contributed to, in an unarticulated manner, the collision (Compl. ¶ 208(p); *see also id.* ¶¶ 194(p), 201(p), 215(p) (same));

**(2) *Scheduling*:** Plaintiffs allege that American scheduled flight arrivals in clusters at the bottoms and tops of hours allegedly to circumvent FAA clock-hour limits on arrivals at DCA, thereby "reducing the already strained safety margins at DCA" (Compl. ¶ 208(n); *see also id.* ¶¶ 194(n), 201(n), 215(n) (same)); and

**(3) *Unspecified violations of regulations, policies, or procedures*:** Plaintiffs allege without any accompanying citations or factual allegations that American violated unspecified "FAA rules and/or regulations, and/or American's own SOPs, MOUs, LOAs, and/or

policies and procedures" (Compl. ¶ 208(s); *see also id.* ¶¶ 194(s), 201(s), 215(s) (same)).

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court "must accept as true all of the allegations contained in a complaint" and draw reasonable inferences in the plaintiff's favor, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* That is, "the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).

In addition to the facts alleged in the complaint, the Court may also consider "documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).

## ARGUMENT

The Court should dismiss American from this case. To start, Plaintiffs' claims against American are preempted because Congress gave the federal government exclusive control in regulating the field of aviation safety. Yet Plaintiffs do not allege that American violated any federal standard—they instead seek to use state law to impose a standard of care different from the comprehensive federal regulations that govern every aspect of aviation. The scheduling claims, moreover, are additionally preempted by the Airline Deregulation Act's express preemption provision because American's schedule necessarily relates to its services and routes.

Even if the claims survived preemption (they do not), the claims against American should still be dismissed because Plaintiffs have not alleged that American owed a duty to Flight 5342's

passengers.  Plaintiffs do not allege any facts to establish that American has a duty to control its corporate sibling, PSA, which operated Flight 5342.  And Plaintiffs' claims based on common carrier liability must be dismissed because American was not the common carrier of Flight 5342, and because "common carrier" liability is not an independent cause of action.

Under any analysis, Plaintiffs have not plausibly alleged a claim against American.

### A.  Plaintiffs fail to state a claim against American because they have not identified any breach of a federal standard of care.

Plaintiffs allege a long list of negligence theories, but all should be dismissed for the same reason: they are preempted by Congress's establishment of an exclusive federal regulatory regime governing aviation safety.

The gravamen of Plaintiffs' negligence theories is that state common-law standards of care required American to act differently in matters related to aviation safety, including pilot training, aircraft equipment, and flight scheduling.  But the Federal Aviation Act preempts the field of aviation safety, necessarily precluding application of any state-law standard of care, and Plaintiffs have not adequately pleaded that American breached any federal standard of care.  The Court accordingly should dismiss the claims against American.

### 1.  *Federal law occupies the field of aviation safety.*

**a.**  Aviation—by its nature—requires federal control.  "The United States Government has exclusive sovereignty of airspace of the United States."  49 U.S.C. § 40103(a)(1).  Unlike other forms of transportation, aviation is "[a] way of travel which quickly escapes the bounds of local regulative competence" and requires "more penetrating, uniform and exclusive regulation by the nation than had been thought appropriate for the more easily controlled commerce of the past."  *Chicago & S. Air Lines, Inc., v. Waterman S.S. Corp.*, 333 U.S. 103, 107 (1948).  As Justice Jackson put it, "[a]ir as an element in which to navigate is even more inevitably federalized by the commerce clause than is navigable water," and "[l]ocal exactions and barriers to free transit in the air would neutralize its indifference to space and its conquest of time."  *Nw. Airlines, Inc.*, 322

U.S. at 303 (Jackson, J., concurring).

Congress has long recognized that aviation demands exclusive federal regulation.  In 1926, when aviation was still in its infancy, Congress enacted the Air Commerce Act, which gave the Secretary of Commerce authority to intricately regulate the burgeoning industry, from issuing and enforcing air traffic rules, licensing pilots, and certifying aircraft, to establishing airways and operating and maintaining aids to air navigation.  *See* Air Commerce Act of 1926, Pub. L. No. 64-254, 44 Stat. 568, 569-572 (1926).  A decade later, Congress created an independent federal agency exclusively to regulate air safety and routes.  *See* Civil Aeronautics Act of 1938, Pub. L. 75-706, 52 Stat. 973 (1938) (creating new independent federal agency to regulate air safety and routes).  And as civil aviation flourished in the following decades, authority over air safety became diffused.  Congress responded by enacting the Federal Aviation Act of 1958, which established the FAA "to provide for the safe and efficient use of the airspace by both civil and military aircraft."  Pub. L. No. 85-726, 72 Stat. 731, 49 U.S.C. § 1301 *et seq.*

In enacting the Federal Aviation Act, Congress recognized that, because the industry's "operations are conducted almost wholly within the Federal jurisdiction," "the Federal Government bears virtually complete responsibility for the … supervision of this industry."  S. Rep. No. 85-1811 at 5.  The Act consolidated in the FAA and vested the FAA Administrator with "full responsibility and authority" for "the promulgation and enforcement of safety regulations."  H.R. Rep. No. 2360; *see* 72 Stat. 744, 749-750.

**b.**  The Federal Aviation Act preempts the field of aviation safety.  Under the Supremacy Clause, federal law displaces state law where Congress has "indicate[d] an intent to occupy a given field to the exclusion of state law."  *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299-300 (1988).  Congress's preemptive intent "may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States [or] where the federal interest in the field is sufficiently dominant."  *Id.* at 300; *see also Arizona v. United States*, 567 U.S. 387, 399 (2012)

("States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."). And because "state regulation can be … effectively exerted through an award of damages," the preempted field also encompasses "state common-law duties and standards of care." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (alteration in original) (internal quotation marks and citation omitted).

In the Federal Aviation Act, Congress pervasively regulated the entire field of aviation safety, preempting any state-law standards of care in the same field. Congress charged the FAA Administrator with overseeing every aspect of aviation safety. The Act directs the Administrator "to prescribe air traffic rules and regulations governing the flight of aircraft, for the … protection … of aircraft, … and for the efficient utilization of the navigable airspace, including … *rules for the prevention of collision between aircraft*." 72 Stat. at 750 (emphasis added). Today, the standards established by the FAA span hundreds of pages in the Code of Federal Regulations and cover everything from air traffic control by federal employees (14 C.F.R. § 91.101 *et seq.*) to the instruments and safety equipment on commercial aircraft (*id.* §§ 121.301-359) to detailed rules governing flight crew training (*id.* §§ 121.400-429) and certification (*e.g.*, *id.* § 61 *et seq.*). This comprehensive regime dictates nearly every aspect of airline and aircraft operations.

Congress's decision to have the FAA exercise complete oversight in aviation safety matters preempts the states from using their law (whether common law or positive law) to impose their own standards of care. The assignment of responsibility to the FAA to create and enforce uniform national standards for aviation safety shows Congress's intention to make those standards a "field reserved for federal regulation" (*United States v. Locke*, 529 U.S. 89, 111 (2000)), that "foreclose[s] the imposition of different or more stringent state requirements" (*Ray v. Atl. Richfield Co.*, 435 U.S. 151, 163 (1978)). If the FAA's judgments were not afforded preemptive force, then the District of Columbia might prescribe aviation safety standards "of one sort, Oregon another,

California another, and so on." *Id.* at 166 n.15. That problem is particularly acute for aircraft today given the multi-jurisdictional nature of air travel.[5] Congress thus would not have anticipated that the controlling safety and other regulatory requirements established by the FAA would nevertheless be deemed insufficient under a particular state's law.

Courts routinely acknowledge the broad preemptive scope of federal regulation in matters of aviation safety. In *Burbank*, the Supreme Court held that the federal government's exclusive regulation of aviation safety impliedly preempted local noise restrictions limiting jet takeoffs during certain hours. 411 U.S. at 633-634. The Court explained that the FAA "has imposed a variety of regulations relating to takeoff and landing procedures and runway preferences," and accordingly, "a uniform and exclusive system of federal regulation [is required] if the congressional objectives underlying the Federal Aviation Act are to be fulfilled." *Id.* at 638-639. If the local noise ordinances were not preempted, "fractionalized control of the timing of takeoffs and landings would severely limit the flexibility of FAA in controlling air traffic flow," causing flight scheduling difficulties and a "decrease in safety." *Id.* at 639.

Courts of appeals have likewise concluded that, in enacting the Federal Aviation Act, Congress intended to preempt the field of aviation safety from state statutory and common law claims. As the Third Circuit has explained, "the Supreme Court held that Congress's consolidation of control of aviation in one agency indicated its intent to federally preempt aviation safety." *Abdullah*, 181 F.3d at 369. *Abdullah* involved a common-law tort claim alleging that American had negligently failed to avoid turbulence and to provide adequate warnings of turbulence. *Id.* at 365. Reviewing the Act's history and structure, the Third Circuit explained that "Congress intended the [FAA] to exercise sole discretion in regulating air safety." *Id.* at 369. Recognizing that the impetus for the Federal Aviation Act's enactment was "a series of fatal air crashes between

---

5    Indeed, Flight 5342 took off from Kansas and flew over Missouri, Illinois, Indiana, Kentucky, West Virginia, Virginia, Maryland, and the District of Columbia. *See* Flight Aware, PSA Airlines 5342 (Jan. 29, 2025), perma.cc/3QP2-FSFL.

civil and military aircraft *operating under separate flight rules*," the court reasoned that the whole purpose of the Act was to create "a single, uniform system of regulation" that would "increas[e] air safety." *Id.* at 368-369 (citation omitted). And that purpose is borne out in the statutory text, which directs the Administrator to "carry out this chapter in a way that best tends to reduce or eliminate the possibility or recurrence of accidents in air transportation." *Id.* (quoting 49 U.S.C. § 44701(c)); *see also* 49 U.S.C. § 44701(a) (directing the Administrator to "prescrib[e]" numerous "standards required in the interest of safety"). Accordingly, the court held that "federal law establishes the applicable standards of care in the field of air safety, generally, thus preempting the entire field from state and territorial regulation." *Abdullah*, 181 F.3d at 367.

Six other courts of appeals have similarly held that the Federal Aviation Act preempts state law in the field of aviation safety. *See Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 74 (2d Cir. 2019) ("[T]he [Federal Aviation Act] impliedly preempts the entire field of air safety." (citation omitted)); *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1327 (10th Cir. 2010) ("We conclude that the comprehensive regulatory scheme promulgated pursuant to the [Federal Aviation Act] evidences the intent for federal law to occupy the field of aviation safety exclusively."); *Montalvo v. Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007) ("[T]he [Federal Aviation Act] preempts the entire field of aviation safety through implied field preemption."); *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 795 (6th Cir. 2005) ("[F]ederal law establishes the standards of care in the field of aviation safety and thus preempts the field from state regulation."); *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 385 (5th Cir. 2004) ("We hold that federal regulatory requirements for passenger safety warnings and instructions are exclusive and preempt all state standards and requirements."); *French v. Pan Am Express, Inc.*, 869 F.2d 1, 4 (1st Cir. 1989) ("Congress intended to occupy the field of pilot regulation related to air safety.").

To hold that Congress did not intend to occupy the field of aviation safety would lead to "a patchwork of state laws in this airspace, some in conflict with each other, [which] would create

a crazyquilt effect." *French*, 869 F.2d at 6. Such a "fragmented patchwork of aviation safety standards under state law" would "undermin[e]" "Congress's goal of ensuring 'a single, uniform system for regulating aviation safety.'" *Ventress v. Japan Airlines*, 747 F.3d 716, 722 (9th Cir. 2014) (quoting *Montalvo*, 508 F.3d at 471). "The regulation of interstate flight—and flyers—must of necessity be monolithic." *French*, 869 F.2d at 6. And based on the "statutory and regulatory mosaic" of federal regulations in aviation, "there can be scant doubt but that Congress intended to fully occupy the relevant field." *Id.* at 5.

As a result, all state law within the aviation safety field, including state tort-law standards of care, is preempted. And that is so regardless of whether the state law actually conflicts with, or is merely additive to, the federal regulation: "[I]n a federally preempted area, the question whether state or territorial law conflicts with federal law is a pointless inquiry. If Congress has preempted a field—whether it be expressly or by implication—state laws attempting to regulate within that field will be invalidated no matter how well they comport with substantive federal policies." *Abdullah*, 181 F.3d at 374 (quotation marks and citation omitted); *accord, e.g.*, *French*, 869 F.2d at 6 ("Congress intended to occupy the field of pilot regulation related to air safety," and state law "must yield to the force of federal law" even where the preempted state law "fit[s] neatly within or alongside the federal scheme.").

**c.** To bring a tort claim arising out of an aviation safety incident, a plaintiff must therefore allege a violation of one of the many relevant federal standards or regulations. While Congress's exclusive regulation of the field of aviation safety preempts substantive state standards of care related to aviation safety, Congress preserved "traditional state and territorial law *remedies*"—*i.e.*, a cause of action in tort—"for violation of those [federal] standards." *Abdullah*, 181 F.3d at 375 (emphasis added); *see also id.* at 376 (individuals "who are injured during a flight as a result of the violation of federal air safety standards, may have a remedy in state or territorial law."); 49 U.S.C. § 40120(c) ("A remedy under this part is in addition to any other remedies provided by

law.").

So while plaintiffs may still bring common law tort causes of action arising out of an aviation incident, the relevant standards of care are defined by federal law, not state law. *See Abdullah*, 181 F.3d at 375-376; *id.* at 372, 374 ("[T]he standard applied in determining if there has been careless or reckless operation of an aircraft" is "federal" and "there is no need to look to state or territorial law to provide standards beyond those established by the Administrator."); *Burgess v. Novictor Aviation LLC,* 2021 WL 3510679, *4 (D. Haw. 2021) ("The standard of care applicable to claims arising from the field of aviation safety may only be found in federal law."). As the Third Circuit explained in *Abdullah*, the relevant "standard" for an alleged failure to warn passengers of severe turbulence was "the regulations on the use of seat belts and on the illumination of the 'fasten seat belt' sign," not state common law liability standards. 181 F.3d at 371-372. The same reasoning applies here.[6]

### 2.    *Plaintiffs' claims concern aviation safety.*

Plaintiffs' claims against American, however framed, all relate directly to aviation safety. That should be obvious: Plaintiffs allege that American's "acts and/or omissions" "directly and proximately caused and/or contributed to" the tragic collision between Flight 5342 and the Army Black Hawk helicopter. *See* Compl. ¶¶ 209, 211. Federal standards of care must therefore apply. Indeed, an express purpose of the Federal Aviation Act was to authorize the Administrator to

---

[6]    In the First and Second counts, Plaintiffs try to impose a heightened state-law "common carrier" duty upon American. These claims should be dismissed for additional reasons—including because it is undisputed that American was not the carrier that operated Flight 5342. *See infra* pages 37-39. Setting that aside, such a duty is wholly inconsistent with federal preemption of the field of aviation safety. As many courts have held, when it comes to aviation safety, federal standards of care preempt state standards, even where a state imposes a heightened negligence standard for common carriers. *See, e.g., Bradshaw v. Am. Airlines*, 123 F.4th 1168, 1176 (10th Cir. 2024) (federal standard of care for operation of an aircraft preempted Oklahoma's common carrier standard); *Kropp v. United Airlines, Inc.*, 2022 WL 2156109, *1-2 (9th Cir. 2022) (affirming district court's application of federal standard instead of state's heightened standard for common carriers).

develop rules to "prevent[] … collision between aircraft."  72 Stat. at 750.

By their own terms, Plaintiffs' theories of liability against American all implicate the field of aviation safety.  Their theories fall into four categories:

- **Training, instruction, and supervision:** Plaintiffs assert a multitude of theories that focus on American's alleged failure to require its affiliate PSA to train, instruct, and inform PSA crew members about: (1) risks when operating flights in DCA airspace; (2) risks of circling approaches, particularly to Runway 33; and (3) awareness of TCAS inhibitors at certain altitudes, specifically when landing.  According to Plaintiffs, these "omissions … led to the subject mid-air collision."  *E.g.*, Compl. ¶ 208(a)-(h), (j)-(m), (o), (q)-(r).

- **Aircraft equipment:** Plaintiffs contend American should have required PSA's aircraft to be equipped with LED lighting.  *E.g.*, Compl. ¶ 208(i).

- **Safety risk management:** Plaintiffs contend that American should have performed comprehensive safety risk management (SRM) or safety reviews regarding DCA and the likelihood of mid-air collisions.  *E.g.*, Compl. ¶ 208(p).

- **Scheduling flights to DCA:** Plaintiffs contend that the American clustered the arrival times for its flights to DCA near the top of each hour, causing stress on ATC and safety risks.  *E.g.*, Compl.  ¶ 208(n).

Because each theory relates to aviation safety, to avoid dismissal, Plaintiffs must allege that American breached a federal standard of care.  *See, e.g.*, *Barnett v. Cass,* 522 F. Supp. 3d 780, 786-787 (D. Haw. 2021) (requiring plaintiffs to "tether each of their allegations to a federal standard of care"); *Gonzalez-Marcano v. US Airways, Inc*., 2014 WL 2880283, *4 (E.D. Pa. 2014) (dismissing complaint because it "does not reference a specific federal regulation that was violated").  The complaint does not contain any such allegations.

### 3.    *Plaintiffs have not alleged a violation of a federal standard of care.*

None of Plaintiffs' negligence theories adequately allege that American violated a federal regulation or standard.  The complaint is largely devoid of any citations to the federal regulations relevant to Plaintiffs' theories.  Even where the complaint does reference a relevant federal regulation, it does not articulate any theory for how American violated any particular regulatory requirement.  In multiple places, in fact, Plaintiffs' theories *conflict* with the FAA's considered judgment on an issue; while such conflict is not necessary to demonstrate federal preemption, it

surely bolsters it. At bottom, the complaint alleges that American should have done things differently than what was required under federal law. The negligence (and corresponding common-carrier) claims against American should therefore be dismissed as preempted.

### a.    Training, instruction, and supervision.

Plaintiffs have not alleged that American violated any federal standard of care as to its alleged failure to oversee and control the safety-related operations of its corporate sibling PSA. These failure-to-control theories fail at the threshold because American and PSA are distinct entities that operate flights on separate and independent operating certificates issued by the FAA. The vast majority of Plaintiffs' claims against American allege that American should have (and, Plaintiffs assume, could have) done more to control the operations of PSA. Yet Plaintiffs nowhere allege that by "failing to require" PSA to do what Plaintiffs contend PSA should have done, American itself breached an applicable federal standard of care. Even on the substance of the allegations, moreover, Plaintiffs still do not identify any federal regulation that PSA, let alone American, violated. These claims should therefore be dismissed.

**i.** Plaintiffs have not pleaded facts explaining how American, as the affiliate of another airline with its own operating certificate, had the duty—or even the ability—to train, provide information to, establish procedures for, or otherwise supervise PSA crew members on safety-related matters. That is because no such federal regulation exists. There is no federal requirement that imposes such a duty on a carrier, like American, that did not employ the crew members in question, did not have any role in training them, and did not possess or maintain the aircraft. This regulatory silence, and Plaintiffs' inability to plead around it, defeats Plaintiffs' failure-to-control claims against American.

The most federal law requires American to do with respect to flights operated by PSA that American markets is to notify passengers that the operator of the aircraft is different from the contracting carrier. *See* 14 C.F.R. § 257.5. But Plaintiffs do not allege that American violated this

regulation.  Beyond that, Plaintiffs cannot point to a single federal regulation that American allegedly violated with respect to its relationship with, or control over, PSA and its aviation operations.

Plaintiffs' theory also runs directly contrary to federal law, which requires carriers to exert operational control over their own flights.  While the allegations blur the lines between American and PSA, federal law treats them as wholly distinct entities for purposes of aviation regulation. American and PSA each possess independent operating certificates issued by the FAA.  Under federal law, each is therefore responsible for its own operational control.  *See* 14 C.F.R. § 121.533(a) ("[E]ach certificate holder conducting domestic operations is responsible for operational control.").  As the FAA has explained in revoking an air carrier's certificate for ceding operational control to another carrier, "Federal Aviation Regulations clearly require that an air carrier maintain operational control of the aircraft and crews on its certificate." FAA, *FAA Revokes AMI Jet Charter's Certificate* (Oct. 31, 2007), perma.cc/K59G-HBFY; *see generally* 14 C.F.R. § 121.533; *id.* § 119.5(d) (each Part 121 carrier shall be issued only one certificate); *id.* Part 13 (describing FAA's investigatory and enforcement powers, including imposition of civil penalties, certificate actions, and seizure of aircraft "for a violation cited in the first sentence of 49 U.S.C. § 46301(d)(2) or in 49 U.S.C. § 47531, or any implementing rule, regulation, or order" (*id.* § 13.16(a)).

American thus *could not* exercise the operational control over PSA that Plaintiffs allege was required.  Because Plaintiffs cannot allege that American breached a federal standard of care in connection with its alleged failure to control certain safety aspects of PSA's operations, those claims should be dismissed as preempted.

**ii.**  Plaintiffs also have not alleged that PSA's crew training and instruction—both topics squarely within the FAA's purview—fell short of any requirement imposed by federal law.  Thus, even if American did have a duty to supervise PSA's operations, Plaintiffs' failure-to-control

claims should still be dismissed.

Plaintiffs' theories based on purported policies, procedures, and information that should have been provided to crew members operating in DCA airspace all fall under the umbrella of training and certification. They allege—without factual basis—that American failed to require PSA to train and instruct its flight crews on how to operate flights in DCA airspace, how to conduct circling approaches, and how to respond to TCAS alerts and Resolution Advisories. But Federal regulations provide an "exhaustive" list of specific training and certification rules that airlines must follow. *In re Air Crash Near Clarence Ctr.,* 2013 WL 5964480, *5 (W.D.N.Y. 2013) ("negligent hiring, training, selection, and supervision claims are subject to the standards of care contained in the specific federal regulations that may apply"). Those rules are comprehensive and govern nearly every aspect of pilot training and certification. *See supra* pages 4-5.

Plaintiffs do not tether any of their generalized allegations to a violation of one of the many applicable federal standards of care. And despite these comprehensive federal regulations governing pilot qualification and training, the FAA conspicuously does not prohibit a "circling approach to Runway 33 at DCA," require training on the "lateral and vertical boundaries of published helicopter routes transiting the airspace surrounding DCA," or require other training on the "risks associated with the complex approaches to DCA." Compl. ¶ 208(d). There is, in fact, one regulation that *does* touch upon specific training for DCA airspace, but Plaintiffs have not alleged that PSA violated this requirement. *See* 14 C.F.R. § 91.161 (requiring Special Awareness Training for pilots flying under Visual Flight Rules within a 60-nautical radius of DCA airspace).

In fact, the elements and content of PSA's training are limited by law to what the FAA has approved. Federal law requires certificate holders to "obtain initial and final FAA approval of [their] training program" "[p]rior to implementation." 14 C.F.R. § 121.401(a)(1); *see also id.* § 121.405 (describing how FAA approval is obtained for "a training program, or a revision to an approved training program"). Because PSA could not "independently do under federal law what"

Plaintiffs allege "state law requires of it," these claims are preempted. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011); *cf. id.* at 618-619 ("If the Manufacturers had independently changed their labels to satisfy their state-law duty, they would have violated federal law. … State law demanded a safer label; it did not instruct the Manufacturers to communicate with the FDA about the possibility of a safer label.").

Because Plaintiffs' negligence-based pilot training, instruction, and supervision claims purport to impose upon American obligations that the comprehensive federal regulatory regime does not, these claims are preempted. *See French*, 869 F.2d at 6-7 & 4 n.4 (affirming judgment on pleadings based on Congress's "unmistakably clear intent" to preempt state law in pilot qualification and training); *Crout v. Haverfield Int'l, Inc.*, 269 F. Supp. 3d 90, 99, 101 (W.D.N.Y. 2017) (dismissing negligent training and hiring claims because the pilot "held the required federal helicopter license and medical certification to fly").

### b.    *Aircraft equipment*

Nor can Plaintiffs allege that American breached a federal standard of care regarding aircraft lighting standards. Again, there can be no question that this claim relates directly to aviation safety and thus is governed exclusively by federal law. Courts thus recognize that "[t]he nature and sufficiency of airplane equipment is for the federal government, not the state courts, to decide." *Deahl v. Air Wis. Airlines Corp.*, 2003 WL 22843073, *4 (N.D. Ill. 2003); *see also Med-Trans Corp. v. Benton*, 581 F. Supp. 2d 721, 740 (E.D.N.C. 2008) (state "regulations governing equipment … related to aviation safety are preempted."); *Air Evac EMS, Inc. v. Robinson*, 486 F. Supp. 2d 713, 724 (M.D. Tenn. 2007) ("[B]ecause Congress has preempted the field of aviation safety, the [state's] rules pertaining to … avionics equipment are invalid.").

Despite Plaintiffs' allegation that LED lighting on the aircraft could have helped prevent this tragic accident, and that American was negligent for "failing to require" PSA to install such equipment on PSA aircraft (e.g., Compl. ¶ 208(i)), there is no federal regulation that requires LED

lighting.  To start, this claim fails for the same reason Plaintiffs' pilot training, certification, and supervision claims as to American fail—federal law does not require American to dictate PSA's equipment decisions.  *See supra* pages 24-25.  But even putting that aside, Plaintiffs do not (and cannot) identify any federal regulation that required PSA to equip its aircraft with LED lighting.

That is not for lack of regulation regarding aircraft lighting—the FAA has considered and implemented comprehensive regulations concerning the lighting requirements for aircraft.  *See, e.g.*, 14 C.F.R. § 91.209 (aircraft lights); *id.* § 121.323 (instruments and equipment for operations at night); *id.* § 121.305 (flight and navigational equipment).  It has opted not to require LED lights. This claim is thus preempted.

Plaintiffs' claim, moreover, second-guesses the FAA's judgment as to the airworthiness of the aircraft for Flight 5342, a technical issue Congress committed to the FAA's expertise.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (holding that a state-imposed duty that conflicts with the "policy judgment" of a federal agency is impliedly preempted); *cf. Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 64 (2d. Cir. 2016) (holding that regulated entities are "rightfully insulate[d] … from liability when they engage in [activity] consistent with the directive of the regulatory body having oversight").[7]

---

[7]  Because the FAA certified this aircraft under 14 C.F.R. Part 21, the agency necessarily determined that the aircraft's design complied with all applicable airworthiness requirements, including the mandatory lighting standards set forth in 14 C.F.R. §§ 25.1381–1403.  Under 14 C.F.R. § 21.21, the FAA cannot issue a type certificate unless the aircraft complies with technical lighting specifications—including minimum light intensities and color requirements—which the FAA evaluates through design review and flight tests.  And FAA will not certify an aircraft if there is any "feature or characteristic [that] makes it unsafe for the category in which certification is requested."  *Id.* § 21.21(b)(2).

For its part, PSA could not have unilaterally modified an aircraft from its original design "in compliance with [a] state tort duty" without FAA approval.  *PLIVA, Inc.*, 564 U.S. at 624.  Even assuming changing lighting from incandescent to LED bulbs would be a "minor" change in aircraft design as defined in 14 C.F.R. § 21.93(a) (one which "has no appreciable effect on the weight, balance, structural strength, reliability, operational characteristics, or other characteristics affecting the airworthiness of the product"), such a change still requires FAA approval.  *See* 14 C.F.R. § 21.95; *see also id.* § 21.97 (process for obtaining FAA approval of "major" changes);

### c.    *Safety risk management*

Plaintiffs do not allege that American's safety risk management (SRM) system violated any federal regulation.  They contend that American failed to perform a comprehensive SRM review regarding DCA and the likelihood of mid-air collisions, and that this alleged failure contributed to the collision involving an aircraft that American did not own or operate, being crewed by pilots that American did not employ or train.  *E.g.*, Compl. ¶ 208(p).

American has SRM procedures consistent with federal requirements (*see* 14 C.F.R. Part 5), which are robust and comprehensive.  Plaintiffs cannot point to any specific provision of these regulations that American allegedly violated.  It is not enough for Plaintiffs to cite generally to regulations requiring airlines to have SRM programs—which American undeniably does—and generally allege that American violated something, somewhere, in these comprehensive regulations. Because Plaintiffs have not tethered this claim to a violation of a specific regulation governing SRM programs, this claim against American—like the others—is impliedly preempted.

Again, Plaintiffs' claim effectively challenges the considered decisionmaking of the FAA. The agency considers and approves an airline's SRM programs when it issues an air operator certificate. 14 C.F.R. § 5.1; *see* FAA Order 8040.4C.  Plaintiffs' claim takes issue with American's SRM programs, even though the FAA has sanctioned them.

### d.    *Flight scheduling*

Nor do Plaintiffs' scheduling claims allege a violation of a federal standard.  Plaintiffs allege that American deliberately scheduled flight arrivals in a cluster at the bottom of one hour and the top of the next, thereby reducing safety at DCA.  *See, e.g.*, Compl. ¶ 208(n).  Although Plaintiffs cite the applicable regulations that govern flight operations at DCA and set the federal

---

FAA, Letter to Paul New, President, Tennessee Aircraft Services, Inc., *Legal Interpretation*, 2015 WL 3451734 at *1 n.4 (May 21, 2015) ("Once an aircraft is produced under a type certificate, the type design of that particular aircraft is fixed in time, absent an FAA requirement to make a retroactive change, or an owner's voluntary change (if it is approved [by FAA]).").

standard here, they do not allege that American violated any of them.

Federal regulations govern the scheduling of flights at high-density airports like DCA.  *See supra* page 6.  Specifically, and among other things, 14 C.F.R. Part 93 Subparts K and S set forth rules for the "slot system," which allows the FAA to manage congestion and ensure safety and efficiency.  FAA applies these regulations in managing DCA, including the frequency and total number of flights allowed in the one-hour periods provided under the slot system.[8]

Despite citing these regulations, the complaint does not identify any specific provision that American's flight scheduling allegedly breached.  Nor could it—American's scheduling of flights into and out of DCA is not a decision it makes unilaterally; rather, it is subject to federal approval and confined by this regulatory scheme.  The FAA decides which airlines receive DCA slots and how many slots are allocated per hour.  *See* Compl. ¶ 51 (citing 14 C.F.R. § 93.123).  The FAA has sole authority to adjust the number, timing, and order of operations at an airport to ensure safety, and it may suspend slot allocations as necessary for efficient use of the airspace.  *See* 14 C.F.R. § 93.130.  American schedules its flights into and out of DCA in accordance with these federal regulations—its flights are scheduled not "to circumvent the limits upon arrivals at DCA" but rather to *comply with* those federal limits.  *E.g.*, Compl. ¶ 208(n).

Had the FAA determined that the hourly number of landings was not spaced properly within the designated one-hour periods at DCA, the FAA could have (as it has for other airports) reduced the number of slots and frequency of the landings, spacing them more strategically and efficiently throughout the hour by considering thirty-minute intervals.  *See* 14 C.F.R. § 93.123(a), n.3 & n.4 (spacing arrivals and takeoffs at O'Hare and La Guardia airports in 30-minute intervals).  Or the FAA could have declined to award additional slot exemptions to airlines. *See* 49 U.S.C. § 41718.  It did neither.

---

[8]    A slot—in technical terms, an instrument flight rules reservation—is required for each takeoff or landing.  A roundtrip flight serving DCA would require two slots, or a "slot pair."

This claim too collaterally attacks FAA's decision.  The agency approves arrival and departure "reservation[s]" for each flight at DCA.  14 C.F.R. § 93.125.  In other words, the FAA decided when it approved American's landing schedule at DCA that its flight schedules comported with appropriate traffic management at DCA.  Plaintiffs actually challenge an FAA decision that Congress exclusively vested with the federal agency.

Regardless of how Plaintiffs characterize American's flight schedules, there is no dispute that American followed the applicable federal requirements.  The scheduling claims are thus preempted.

*       *       *

All of Plaintiffs' claims relate directly to aviation safety—a field that Congress has decided the federal government must exclusively occupy and regulate.  Plaintiffs must therefore allege that American breached a federal standard to state a claim, but they have not.  They have not alleged that American breached any federal standard of care or violated any regulation—to the contrary, Plaintiffs' theories largely seek to challenge determinations the FAA has already made in its expert capacity.  Plaintiffs' claims are therefore preempted.

**B.      Plaintiffs' scheduling claims are expressly preempted by the Airline Deregulation Act.**

Plaintiffs' scheduling claims are also preempted for another reason: they fall within the scope of the Airline Deregulation Act's express preemption provision because the claim "relate[s] to" American's "service[s]" and "route[s]."  49 U.S.C. § 41713.

**1.**  Congress enacted the Airline Deregulation Act in 1978 "to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services."  92 Stat. at 1705.  Before its enactment, Congress had given "the Civil Aeronautics Board (CAB) authority to regulate interstate airfares and to take administrative action against certain deceptive trade practices," while also permitting states to "regulate intrastate airfares (including those offered by interstate air carriers)."  *Morales v. Trans*

*World Airlines, Inc.*, 504 U.S. 374, 378 (1992).  But in enacting the Airline Deregulation Act, Congress determined that "'maximum reliance on competitive market forces' would best further 'efficiency, innovation, and low prices' as well as 'variety [and] quality … of air transportation services.'"  *Id.* (quoting 92 Stat. at 1706-1707).

To "prevent the States from undoing what the Act was meant to accomplish," Congress included in the Airline Deregulation Act an express preemption provision.  *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 283 (2014).  It prohibits states from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation."  49 U.S.C. § 41713(b)(1).  At the same time, the Airline Deregulation Act "retained the CAB's previous enforcement authority regarding deceptive trade practices," thus vesting with the federal government exclusive authority to regulate (in limited fashion) the economics of all air travel within the United States.  *Morales*, 504 U.S. at 379. The Supreme Court has construed the provision's "related to" language to have a "broad pre-emptive purpose," thus encompassing any state law claims "having a connection with or reference to airline 'rates, routes, or services.'"  *Morales*, 504 U.S. at 383-384; *see Northwest, Inc.*, 572 U.S. at 281 ("[S]tate common-law rules fall comfortably within the language of the [Airline Deregulation Act's] pre-emption provision.").

**2.**  Plaintiffs' scheduling claims fall within the scope of this express preemption provision. Plaintiffs allege that American knew of air traffic congestion at DCA and breached a duty by accepting FAA-approved slots for flights to DCA and scheduling its DCA flights in an unsafe manner by clustering flights at the tops and bottoms of peak hours.  *See, e.g.*, Compl. ¶ 208(n).

These claims—which seek to dictate, beyond federal regulation, when and how often American flies to DCA—goes to the core of American's air transportation "service."  49 U.S.C. § 41713(b)(1).  An airline's "service" includes, at a minimum, "the provision of air transportation to and from various markets *at various times*."  *Charas v. Trans World Airlines, Inc.*, 160 F.3d

1259, 1266 (9th Cir. 1998) (en banc) (emphasis added).  Courts have thus held that "the word 'service'" in the preemption provision encompasses an airline's "schedules." *Id.* at 1261; *see also Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 337 (5th Cir. 1995) ("'Air Service' referred at the time of [the Airline Deregulation Act's enactment] to the point-to-point transportation of passengers … and it encompassed … schedules.").

These claims also relate to American's "route[s]."  49 U.S.C. § 41713(b)(1).  If American had to schedule its flights at different intervals, certain routes may become economically unviable.  And that is certainly true if American were forced to operate fewer flights to DCA altogether.  *See* Compl. ¶¶ 52-53; *Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 805-808 (5th Cir. 2000) (affirming DOT finding that the Airline Deregulation Act preempted a city ordinance imposing restrictions on passenger flight services from Dallas Love Field airport, which "operated as limitations relating to routes" (cleaned up)).

These are precisely the kinds of economic issues Congress wanted to ensure states did not regulate.  Because Plaintiffs' scheduling claims allege that American should have offered flights at different times or intervals to DCA, they inherently relate to American's "service[s]" and "route[s]" and run counter to Congress's economic deregulatory purpose.  *See Morales*, 504 U.S. at 378-379.  These claims are thus expressly preempted by the Airline Deregulation Act.

C.    **The negligence claims should also be dismissed because Plaintiffs have not alleged American owed a legal duty to them.**

Even if Plaintiffs' negligence claims against American were not preempted (they are), they would still fail as a matter of law.  The Third and Fourth causes of action do not allege facts that would support an inference that American—which did not operate or control Flight 5342, its aircraft, or its crewmembers—breached a legally imposed duty to Flight 5342's passengers.

"The foundation of modern negligence law is the existence of a duty owed by the defendant to the plaintiff": "if there is no duty, there can be no breach, and hence no negligence." *Magee v. Am. Inst. of Certified Pub. Accts.*, 245 F. Supp. 3d 106, 113 (D.D.C. 2017).  To survive a motion

to dismiss, Plaintiffs "must allege facts which show that the defendant breached some legally imposed duty owed to [them]." *Jolevare v. Alpha Kappa Alpha Sorority, Inc.*, 521 F. Supp. 2d 1, 15 (D.D.C. 2007). "The complaint may not rest on mere 'conclusory assertions' regarding the existence of a duty." *In re U.S. Off. Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 98 (D.D.C. 2003).

Plaintiffs have alleged that American owed a duty to the passengers on Flight 5342 in a single, identical paragraph for each of their negligence claims. Specifically, Plaintiffs allege that American had a duty to (1) oversee "the operations and procedures of its holding company's subsidiary PSA" and (2) "exercise reasonable care in adopting safe policies and procedures for those operating aircraft in the [National Airspace System], including in and around DCA, including those aircraft operating under the 'American' banner such as under the American Eagle brand name." Compl. ¶¶ 207, 214. Both conclusory assertions fail.

**1.** Plaintiffs' assertion that American had a duty to oversee "the operations and procedures of its holding company's subsidiary" (Compl. ¶¶ 193, 200, 207, 214) finds no support in law. Plaintiffs' failure-to-control claims (see *supra* pages 13-14) thus fail because Plaintiffs have not alleged that American does or even could control PSA. Without such allegations, Plaintiffs have not alleged that American breached a legally cognizable duty of care to Flight 5342's passengers.

As a starting point, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation … is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citation omitted). This is the default rule that courts apply: absent certain extraordinary factual circumstances that justify piercing the corporate veil, a corporation does not simply inherit a legal duty of its corporate relative. *See, e.g.*, *Shcherb v. Angi Homeservs. Inc.*, 2020 WL 2571041, *2 (S.D.N.Y. 2020) (it would be "directly contrary to law" to find a "parent, child, sibling, or subsidiary corporation[]" liable for the acts of affiliates "merely by virtue of their corporate relationship"); *Graham v. HSBC Mortg. Corp.*, 2019 WL 3066399, *6 (S.D.N.Y. 2019) (holding that "mere allegation" of "sister" corporate relationship

34

was insufficient to establish liability as related companies are presumed separate); *R&M Mixed Beverage Consultants, Inc. v. Safe Harbor Benefits, Inc.*, 578 S.W.3d 218, 229-230 (Tex. App. 2019) ("Because a parent corporation generally has no duty to control its subsidiaries, courts will not disregard the corporate fiction and hold a parent corporation liable for the torts of its subsidiaries.").

Yet that is precisely what Plaintiffs seek to do here: hold American liable for the alleged acts of its corporate sibling—PSA—for no reason other than that technical relationship. The complaint acknowledges that American and PSA are separate legal entities. And while it repeatedly alleges that American breached duties by "failing to require" PSA to do certain things, it contains no factual allegations that American controlled PSA's operations such that American *could* "require" PSA to take these actions. "A court can pierce the corporate veil and hold a parent company liable for the actions of a subsidiary only where the parent so dominated the subsidiary corporation as to negate its separate personality." *United States ex rel. PCA Integrity Assocs. v. NCO Fin. Sys., Inc.*, 2020 WL 686009, *15 (D.D.C. 2020) (cleaned up) (dismissing action against parent company because plaintiffs failed to sufficiently allege that parent company exercised control over subsidiary). Far from providing any allegations that would support an inference that American "active[ly] and substantial[ly] control[led]" its corporate sibling (*not* subsidiary) PSA (*id.*), the complaint instead pleads the opposite: that American and PSA are separate airlines with independent operating certificates. Compl. ¶¶ 5-6, 44-45, 48; *see id.* ¶ 55 (referring to the FAA "contact[ing] airlines, including American *and* PSA) (emphasis added); *see also id.* ¶¶ 61-63, 65 (similarly referring to American and PSA as separate "airlines"); *id.* ¶¶ 66-67 (separately referring to "American's own pilots" and "PSA's own pilots").

Courts consistently dismiss claims like these where the pleadings assert liability based on mere corporate affiliations without any factual support for piercing the corporate veil. *See, e.g.*, *Pilkin v. Hogan Lovells US LLP*, 2021 WL 950082,  *4-5 (D.D.C. 2021) (dismissing claims where

pleadings failed to demonstrate that law firm should be liable for acts of its international affiliate); *SD3, LLC v. Black & Decker (U.S.) Inc.,* 801 F.3d 412, 422-423 (4th Cir. 2015) (holding that "naked[]" allegation "that all of the corporate subsidiaries are 'dominated by, and [are] alter ego[s] of,' these corporate parents" was insufficient to plead a duty).

**2.**   This analysis does not change simply because a PSA flight operates under the American Eagle brand, particularly where all passengers were put on notice—consistent with federal law— that the flight was not operated by American.  What matters is whether American had "the ability" or "right to control any of the operational aspects of" Flight 5342.  *In re Air Crash at Lexington, Aug. 27, 2006*, 2008 WL 2945944, *6 (E.D. Ky. 2008).  It did not.  Plaintiffs certainly have not alleged facts that would support such an inference.

Nor can Plaintiffs plausibly allege consumer confusion on this point that would alter the analysis.  Although Plaintiffs allege that passengers "are often unaware they purchased a ticket for an American Eagle flight operated by PSA and not a flight operated by American" (Compl. ¶ 47), any alleged consumer confusion is not plausible because Plaintiffs have not alleged that American violated federal disclosure requirements to passengers on Flight 5342 that the flight was operated by PSA d/b/a American Eagle.  *See* 49 U.S.C. § 41712(c); 14 C.F.R. § 257.5(c) (requiring that ticket confirmation contain notice of operator of code-share flight).

Courts have rejected this exact argument in analogous circumstances: "the fact that Delta licensed the Delta Connection brand name and mark to [its regional affiliate] SkyWest is not enough to create a reasonable inference that Delta operated the flight" and thus owed a duty to the flight's passengers. *Hart v. Delta Air Lines, Inc.*, 2018 WL 1087846, *3 (C.D. Cal. 2018); *see also Freese v. Cont'l Airlines, Inc.*, 2009 WL 2232857, *6 (N.D. Ohio 2009) ("The fact that Plaintiff's son purchased her ticket from the Continental website does not create a direct relationship with Continental when the screen shows that the flight purchased by Plaintiff's son was operated by ExpressJet.").  So too here: American "expressly and directly communicated" to passengers that

36

the flight would be operated by PSA "[i]n compliance with federal aviation regulations." *Hart*, 2018 WL 1087846, at *3. The passengers were thus "put on notice that" PSA, not American, "operated" Flight 5342 when they purchased tickets. *Freese*, 2009 WL 2232857, at *6.

Plaintiffs offer no other explanation or allegation as to why American would have a duty to police "those operating aircraft in the [National Airspace System]"—*i.e.*, operators other than itself. Because Plaintiffs have not sufficiently alleged that American owed or breached any legal duty to the passengers of the PSA-operated Flight 5342, the negligence claims against American should be dismissed. *See Iqbal*, 556 U.S. at 678 (dismissing complaint where it tenders naked assertions without further "factual enhancement").

### D. Plaintiffs' common carrier claims against American should be dismissed for additional reasons.

Finally, Plaintiffs' claims based upon a supposed "common carrier duty" owed by American (First and Second causes of action) should be dismissed for two additional reasons. Plaintiffs assert two purportedly independent claims "based upon common carrier duty" against American. *See* Compl. ¶¶ 192-219. These allegations are virtually identical to those in the negligence claims, other than that the common carrier claims assert a higher standard of care. *Compare id.* ¶ 193 (alleging that American "owed the highest duty of care … to avoid even the slightest negligence"), *with id.* ¶ 207 (alleging that American "had a duty to … exercise reasonable care"). To be clear, these claims are preempted for the same reasons Plaintiffs' negligence claims are preempted. *See supra* pages 16-31. But to the extent any of the liability theories survive a preemption analysis, Plaintiffs' First and Second counts should be dismissed because (1) American was not the common carrier of Flight 5342 and (2) there is no independent cause of action for common carrier liability beyond a negligence claim, so these claims are duplicative.

**1.** While American may be *a* common carrier, it was not *the* common carrier of Flight 5342. PSA—not American—was the operator of Flight 5342, the owner of the aircraft, and the employer of the flight crew. *See, e.g.*, Compl. ¶ 48 ("PSA operated [Flight 5342] for American under the

American Eagle brand name."); *id.* ¶ 71 ("PSA had the obligation to provide the highest level of safety to *its* passengers.") (emphasis added); *id.* ¶ 78 ("PSA did not train or inform *its* pilots.") (emphasis added).

American thus cannot be liable under any common carrier theory.  Courts have addressed precisely this scenario and held that the common carrier that "operated" a flight "and exercised control over the passengers" is the common carrier of such passengers, not another corporate affiliate who also happens to be a common carrier of *other* passengers on *different* flights. *Freese*, 2009 WL 2232857, at *6 (holding that only ExpressJet, the regional carrier that operated the flight and employed its crew—not  Continental, the national carrier that marketed and sold the flight— had a common carrier duty to Plaintiff), *aff'd in relevant part*, 412 F. App'x 770 (6th Cir. 2011) ("We agree with the district court that Continental was not Freese's common carrier."); *see also Haley v. United Airlines Inc.*, 2015 WL 5139638, *3 (N.D. Ill. 2015) ("[W]hile [United] may be a common carrier, it neither controlled nor operated United Express Flight No. 4940, and thus is not liable to Plaintiff for his injury.").  Likewise, American's "common carrier status … is irrelevant because [it] was not acting as a common carrier for *Plaintiff*."  *Freese*, 2009 WL 2232857, at *6.

Again, it makes no difference that PSA operated Flight 5342 "under the American Eagle brand name" and that PSA flights "are sold by American through its website."  Compl. ¶¶ 44-48, 95-96.[9]  That marketing relationship does not transform American into the common carrier of a flight it did not operate and had no control over.  *See supra* pages 24-25, 35.

Plaintiffs thus have not sufficiently pleaded (and cannot plead) that American owed a common carrier duty to the passengers on Flight 5342.  The First and Second counts should be dismissed with prejudice.

---

[9]    While paragraph 46 states that "American markets, sells and issues tickets for flights operated by PSA as American flights," the complaint later clarifies that by "American flights" Plaintiffs mean the American Eagle brand name.  *See, e.g.*, Compl. ¶ 193 (stating that American owed a duty in relation to "aircraft operating under the 'American' banner such as under the American Eagle brand name").

**2.** The common carrier claims should also be dismissed because there is no independent cause of action for common carrier liability.

For the reasons explained above, federal law provides the applicable standard of care for all of Plaintiffs' claims.  Thus, resort to state tort law—which is the source from which an alleged "common carrier" theory emanates—is wholly improper.  But even if it were otherwise, there is no independent cause of action for "common carrier" liability.  In the few jurisdictions that articulate a duty for common carriers specifically, that duty applies "*within the framework of an ordinary negligence claim, rather than as a distinct cause of action*."  *Shay v. Norwalk Taxi, Inc.*, 2013 WL 1277294, *4 (Conn. Super. Ct. 2013) (emphasis added); *see also, e.g., Sanchez v. Bay Area Rapid Transit Dist*., 2013 WL 4764485, *7 (N.D. Cal. 2013) (explaining that it is "one element of a general negligence claim, not a claim unto itself"); *Walker v. King Cnty. Metro*, 109 P.3d 836, 837-838 (Wash. 2005) (describing "the duty or standard of care owed by a common carrier" as an "element of negligence").  Plaintiffs' First and Second counts even appear to recognize that they are derivative of a negligence theory.  Compl. ¶¶ 194, 201 (alleging that "American was negligent and breached it[s] duty as a common carrier to DECEDENT").  That is, a "common carrier" theory does not exist as a stand-alone cause of action.

Because common carrier liability is not "an independent cause of action," the First and Second causes of action should be dismissed because they are nonexistent and "duplicative" (*Park v. Hyatt Corp.*, 436 F. Supp. 2d 60, 66 (D.D.C. 2006)), and, like all of Plaintiffs' claims against American, preempted by federal law (*see supra* pages 16-31).

## CONCLUSION

The Court should dismiss all claims against Defendant American Airlines, Inc.

Dated:  December 17, 2025

Respectfully submitted,

/s/ *Robert J. Burns*
William F. Gould (Bar No. 428468)
HOLLAND & KNIGHT LLP
800 17th Street, NW
Washington, DC 20006
(202) 955-3000
william.gould@hklaw.com

Steven Raffaele (Bar No. NY0685)
Robert J. Burns (Bar No. NY0682)
Sarah Korapaty (Bar No. NY0684)
Qian (Sheila) Shen (Bar No. NY0693)
HOLLAND & KNIGHT LLP
787 Seventh Avenue
New York, NY 10019
(212) 513-3200
steven.raffaele@hklaw.com
robert.burns@hklaw.com
sarah.korapaty@hklaw.com
qian.shen@hklaw.com

/s/ *Paul W. Hughes*
Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Alex C. Boota (Bar No. 90001014)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com
shogarth@mwe.com
mschnoor@mwe.com
aboota@mwe.com

*Attorneys for Defendants*
*American Airlines, Inc. and PSA Airlines, Inc.*