## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE: MID-AIR COLLISION IN WASHINGTON, D.C., JAN. 29, 2025 | Lead Case No. 1:25-cv-03382-ACR |
| Plaintiffs, | |
| v. | |
| American Airlines, Inc., PSA Airlines Inc., and United States of America, | |
| Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## PSA AIRLINES, INC.'S MOTION TO DISMISS THE MASTER COMPLAINT

William F. Gould (Bar No. 428468)
HOLLAND & KNIGHT LLP
800 17th Street, NW
Washington, DC 20006
(202) 955-3000
william.gould@hklaw.com

Steven Raffaele (Bar No. NY0685)
Robert J. Burns (Bar No. NY0682)
Sarah Korapaty (Bar No. NY0684)
Qian (Sheila) Shen (Bar No. NY0693)
HOLLAND & KNIGHT LLP
787 Seventh Avenue
New York, NY 10019
(212) 513-3200
steven.raffaele@hklaw.com
robert.burns@hklaw.com
sarah.korapaty@hklaw.com
qian.shen@hklaw.com

Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Alex C. Boota (Bar No. 90001014)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com
shogarth@mwe.com
mschnoor@mwe.com
aboota@mwe.com

*Attorneys for Defendants American Airlines, Inc. and PSA Airlines, Inc.*

## ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

Table of Authorities ...................................................................................................... ii

Introduction .................................................................................................................. 1

Background ................................................................................................................... 2

Standard of review ....................................................................................................... 4

Argument ...................................................................................................................... 5

    A.   Plaintiffs fail to state a claim against PSA because they have not identified any breach of a federal standard of care. ............................................................... 6

        1.   The overlapping claims with American .................................................... 7

        2.   The Flight 5342 operation claims ........................................................... 9

            a.   The circling approach claims .......................................................10

            b.   The see-and-avoid claims ...........................................................13

    B.   Plaintiffs' scheduling claims are expressly preempted by the Airline Deregulation Act. ................................................................................................19

    C.   Plaintiffs' common carrier claims should be dismissed. ...............................20

Conclusion .................................................................................................................. 20

# TABLE OF AUTHORITIES[*]

**Cases**

*In re Air Crash Near Clarence Center*,
   2013 WL 5964480 (W.D.N.Y. 2013) ....................................................................8

*Air Evac EMS Inc. v. Robinson*,
   486 F. Supp. 2d 713 (M.D. Tenn. 2007).............................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................4, 5

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................4

*\*Burbank v. Lockheed Air Terminal, Inc.*,
   411 U.S. 624 (1973)...............................................................................................6

*\*Charas v. Trans World Airlines, Inc.*,
   160 F.3d 1259 (9th Cir. 1998) (en banc) ...........................................................20

*\*Dania Beach v. FAA*,
   628 F.3d 581 (D.C. Cir. 2010)......................................................................10, 12

*Deahl v. Air Wis. Airlines Corp.*,
   2003 WL 22843073 (N.D. Ill. 2003) ....................................................................8

*Garvey v. NTSB*,
   190 F.3d 571 (D.C. Cir. 1999)............................................................................17

*Geier v. Am. Honda Motor Co., Inc.*,
   529 U.S. 861 (2000)...............................................................................................9

*\*Haines v. Dep't of Transp.*,
   449 F.2d 1073 (D.C. Cir. 1971)..........................................................................18

*Hettinga v. United States*,
   677 F.3d 471 (D.C. Cir. 2012)..............................................................................5

*Jackson v. NTSB*,
   114 F.3d 283 (D.C. Cir. 1997)............................................................................17

*Joy v. Bell Helicoter Textron, Inc.*,
   999 F.2d 549 (D.C. Cir. 1993)............................................................................17

*Kurns v. R.R. Friction Prods. Corp.*,
   565 U.S. 625 (2012)...............................................................................................6

*Lindsay v. NTSB*,
   47 F.3d 1209 (D.C. Cir. 1995)............................................................................17

*Med-Trans Corp. v. Benton*,
   581 F. Supp. 2d 721 (E.D.N.C. 2008)..................................................................8

---

[*]    Authorities marked with an asterisk are those on which we chiefly rely.

**Cases—continued**

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ............................................................................20

*\*Nw. Airlines v. Minnesota*,
   322 U.S. 292 (1944) ............................................................................16

*Nw., Inc. v. Ginsberg*,
   572 U.S. 273 (2014) ............................................................................19

*Pac. Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983) ..............................................................................6

*Stewart v. Nat'l Educ. Ass'n*,
   471 F.3d 169 (D.C. Cir. 2006) .............................................................5

*Throckmorton v. NTSB*,
   963 F.2d 441 (D.C. Cir. 1992) ...........................................................17

*\*Tweed-New Haven Airport Auth. v. Tong*,
   930 F.3d 65 (2d Cir. 2019) ..........................................................10, 13

*Van Dyke v. NTSB*,
   286 F.3d 594 (D.C. Cir. 2002) ...........................................................17

**Statutes**

49 U.S.C.
   § 40102(a)(32) ..................................................................................11
   § 40103 ..........................................................................................6, 11
   § 41713 ......................................................................................19, 20

Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705 ...............6, 19, 20

**Regulations**

14 C.F.R.
   Part 5 ...............................................................................................9
   Part 77 ...........................................................................................10
   § 91.13(a) .........................................................................14, 17, 19
   § 91.17(a)(1) ..................................................................................17
   § 91.101 ..........................................................................................11
   § 91.113 .......................................................................11, 15, 16, 18
   § 91.123 .......................................................................12, 15, 16
   § 91.127 .............................................................................12, 15
   § 91.175 ..........................................................................................11
   § 91.209 ............................................................................................8
   Part 93 ...........................................................................................11
   § 93.125 ............................................................................................9
   § 93.339 ..........................................................................................11
   § 93.341 ..........................................................................................11
   § 97.1 .........................................................................................11, 12

**Regulations—continued**

14 C.F.R.—continued

§ 97.20(c) ..............................................................................11, 12
§ 121.531 ....................................................................................11
§ 121.567 ....................................................................................11
Part 139 ................................................................................10, 11
§ 139.305 ....................................................................................10

## Other Authorities

FAA Advisory Circular 90-120 ................................................15, 16, 19

FAA Advisory Circular 90-48E ..................................................18, 19

FAA, Aeronautical Information Manual..................................13, 14, 15

FAA, Baltimore-Washington Helicopter Route Chart........................12

FAA, *Night Operations*..................................................................19

FAA Order 7050.1B............................................................................10

FAA Order 7110.2L............................................................................14

FAA Order JO 7110.65AA..................................................................14

FAA, U.S. Terminal Procedures Publication, Northeast (NE) Vol. 3 .........................12

U.S. Const. art. VI, cl. 2.......................................................................6

**INTRODUCTION**

On the night of January 29, 2025, American Eagle Flight 5342, operated by PSA Airlines, Inc. (PSA), was on its cleared final approach into Ronald Reagan Washington National Airport (DCA), 278 feet above the Potomac River, when PAT25, a U.S. Army Black Hawk helicopter, collided into it. In the minutes preceding the collision, Flight 5342 was operating in one of the most heavily federally regulated and monitored airspaces in the country, correctly navigating an intricate web of federal rules and instructions governed by the Federal Aviation Administration (FAA). The PSA pilots were FAA-certified and trained in accordance with federal regulations. They were operating an FAA-certified aircraft and using an FAA-approved scheduled landing slot to DCA. They were descending to an FAA-approved runway using an approach path that FAA designed and that federal air traffic controllers (ATC) requested them to use. ATC had cleared Flight 5342 for final approach to land on Runway 33, it had "right-of-way" per federal regulation, and it was seconds away from touching down safely.

Meanwhile, PAT25 was flying on an FAA-established helicopter route that crosses the FAA-established approach path to Runway 33, at least 78 feet higher than allowed. ATC—understaffed and with one person performing two critical safety jobs at once, in violation of FAA policy—never warned Flight 5342's pilots that PAT25 was converging on its path, again in violation of multiple FAA regulatory orders.

Nineteen seconds before the collision, Flight 5342's automated traffic alert and collision avoidance system produced an aural "traffic, traffic" alert. But Flight 5342's crew also could hear ATC's instruction—seconds after the alert—that PAT25 was to "pass behind" their aircraft, and FAA guidance specifies that an aircraft cleared to land should not change course based solely on this type of traffic alert.[1] Meanwhile, the Black Hawk helicopter pilots twice confirmed that they

---

[1]    This guidance is critical to aircraft safety, as the plane landing has right-of-way and deviating from its cleared landing path could *introduce* material risk of collision with a nearby aircraft.

had the aircraft "in sight" with "visual separation." Flight 5342's crew thus did precisely what was required of them: proceed to their cleared landing approach.

At approximately 8:47:58 p.m., the Army helicopter collided into Flight 5342, tragically killing all 67 people aboard both aircraft—60 passengers and four PSA flight crew members on Flight 5342, and three members of the military on the helicopter.

The Master Complaint does not—because it cannot—plausibly allege that PSA violated any applicable federal standard or regulation. Instead, its claims against PSA all start from the premise that *state* tort law required PSA to have acted differently to better mitigate the risks associated with a mid-air collision for Flight 5342. But Congress has deemed the federal government the exclusive regulator of aviation safety: federal law regulates everything from flight-crew training to aircraft lighting to the rules for flight scheduling at DCA. And federal rules governed every aspect of flight operations in the minutes preceding the collision: the runway approach Flight 5342 was directed to follow, the altitude restrictions for PAT25's helicopter path, and Flight 5342's right-of-way on its ATC-cleared final approach.

Because federal law governs aviation safety completely and exclusively—leaving no room for state regulation, including through state tort standards—the claims against PSA are preempted and must be dismissed because Plaintiffs have not alleged that PSA breached any federal standard.

PSA empathizes with Plaintiffs' desire to obtain redress for this tragedy. PSA, too, experienced the heartbreaking loss of four of its crew members, and it continues to mourn the lives lost in the tragic accident. Plaintiffs may appropriately obtain relief from the United States government which (unlike PSA) *is* alleged to have violated federal aviation standards. The Court should dismiss PSA.

## BACKGROUND

To avoid repetition, PSA adopts the legal and factual background in American's brief (*see* American Mot. 2-12) and focuses on the facts specific to PSA.

Plaintiffs are the personal representatives or administrators of the estates of passengers on Flight 5342. *See* Compl. ¶ 4. They do not include representatives of the deceased flight crew of Flight 5342.

Defendants are PSA, American Airlines, Inc. (American), and the United States of America. PSA, a Pennsylvania corporation headquartered in Ohio, is a wholly-owned subsidiary of American Airlines Group Inc. and operates regional commercial flights under the American Eagle brand. Compl. ¶¶ 6-7, 46. PSA solely operated Flight 5342. *See id.* ¶¶ 48-50.

Plaintiffs' claims against the United States of America concern two categories of federal employees: (1) the air traffic controllers in the DCA tower, who were acting under the control and authority of the FAA and within the scope of their employment (Compl. ¶ 8); and (2) the Army personnel operating the PAT25 helicopter, who were acting under the control and authority of the United States Army and within the scope of their employment (*id.* ¶ 9).

Plaintiffs assert two wrongful-death and two survival actions against PSA, one of each premised upon a negligence duty of care (Seventh and Eighth causes of action) and the others repeating the same allegations but premised upon a purported heightened "common carrier" duty (Fifth and Sixth causes of action). Each of Plaintiffs' four claims against PSA asserts twenty-seven substantively identical bases of liability against PSA, which can be categorized as follows (*see* Compl. ¶ 222(a)-(aa); *see also id.* ¶¶ 229(a)-(aa), 236(a)-(aa), 243(a)-(aa) (same)):

> **(1)** ***Flight crew training, supervision, and monitoring***: Plaintiffs allege that PSA failed to adequately train, supervise, or monitor (*see, e.g.*, Compl. ¶ 236(r)-(u)) the Flight 5342 crew on safety-related issues when operating flights in DCA airspace, including accepting a circling approach on Runway 33 at night (*id.* ¶ 236(h)-(k), (o), (u)); helicopter routes around DCA (*id.* ¶ 236(l)-(o), (v)); and the traffic collision avoidance system (TCAS) (*id.* ¶ 236(x)-(y));

> **(2)** ***Aircraft safety equipment***: Plaintiffs allege that PSA failed to equip its aircraft with LED lights, which allegedly would have made Flight 5342 more identifiable to PAT25 (*see, e.g.*, Compl. ¶ 236(q));

(3) **Safety risk management**:  Plaintiffs allege that PSA failed to perform comprehensive safety risk management (SRM) or safety reviews regarding DCA and the likelihood of mid-air collisions at DCA, which allegedly contributed, in an unarticulated manner, to the collision (*see, e.g.*, Compl. ¶ 236(w));

(4) **Scheduling**:  Plaintiffs allege that PSA scheduled flight arrivals in clusters at the bottoms and tops of hours to allegedly circumvent FAA clock-hour limits on arrivals at DCA, thereby "reducing the already strained safety margins at DCA" (*see, e.g.*, Compl. ¶ 236(p));

(5) **Unspecified violations of regulations, policies, or procedures**:  Plaintiffs allege without any accompanying citations or factual allegations that PSA violated unspecified "FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or policies and procedures" (*see, e.g.*, Compl. ¶ 236(z)-(aa));

(6) **Flight 5342 operation**:  Plaintiffs allege that PSA's pilots were negligent in failing to prevent the Army helicopter from colliding into Flight 5342 by accepting ATC's request to land on Runway 33 using a circling approach (*see, e.g.*, Compl. ¶ 236(e)-(g)) and by not seeing-and-avoiding PAT25 (*id.* ¶ 222 (a)-(d)).

Of the twenty-seven substantive asserted bases of liability against PSA, twenty are substantively identical to those asserted against American.  Only those in the final category above—concerning PSA's operation of Flight 5342—are unique to PSA.

The list of negligence theories related to PSA's safety-related pilot training and supervision, its safety-related policies and procedures, its aircraft lighting, and its scheduling of flights to DCA are alleged—in essentially verbatim form—to also form the basis of negligence claims against American under a theory that American "failed to require" PSA to remedy these same alleged deficiencies.  *See* Compl. ¶¶ 194, 201, 208, 215.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable."  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). Although the Court "must accept as true all of the allegations contained in a complaint" and draw reasonable inferences in the plaintiff's favor, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*[2] That is, "the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).

In addition to the facts alleged in the complaint, the Court may consider "documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).

## ARGUMENT

All of Plaintiffs' claims against PSA are preempted. Congress intended the federal government to have comprehensive and exclusive control in regulating the field of aviation safety. Federal rules govern every aspect of PSA's operations, including and especially the final moments of Flight 5342's approach into DCA. Yet Plaintiffs do not allege that PSA violated any federal standard. They instead seek to impose a standard of care beyond—and in some cases contrary to—the comprehensive federal regulations that govern every aspect of aviation. This deficiency requires dismissal. The scheduling claims, moreover, are additionally preempted by the Airline Deregulation Act's express preemption provision because PSA's schedule necessarily relates to its services and routes. Finally, Plaintiffs' identical claims based on common carrier liability should also be dismissed because there is no independent cause of action for common carrier liability beyond a negligence claim premised on violations of federal standards, which Plaintiffs have not adequately alleged.

In its concurrently filed motion to dismiss, American explains that Plaintiffs' claims are

---

[2]  PSA contests the factual underpinnings of Plaintiffs' claims against it and does not concede the truth of Plaintiffs' allegations.

preempted by the extensive body of federal statutes and regulations that cover the field of aviation safety (American Mot. 16-31), that the scheduling claims are also expressly preempted by the Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705 (*id.* at 31-33), and that the independent formulation of these claims under a common carrier theory is duplicative because there is no such independent cause of action (*id.* at 39).  American's arguments apply with equal force to Plaintiffs' identical claims against PSA, and PSA incorporates these aspects of American's motion to dismiss.  To avoid repetition, PSA briefly summarizes these arguments and focuses on the few claims specific to PSA—those concerning Flight 5342's operation.  As we will demonstrate, the Court should dismiss all claims against PSA.

### A. Plaintiffs fail to state a claim against PSA because they have not identified any breach of a federal standard of care.

All of Plaintiffs' liability theories should be dismissed for the same reason: they are preempted by Congress's establishment of an exclusive federal regulatory regime governing aviation safety.  Congress necessarily intended to occupy the field of aviation safety regulation, thus "preclud[ing] enforcement of state laws on the same subject," including common-law duties and standards of care.  *Pac. Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983); *see* U.S. Const. art. VI, cl. 2; *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012).  Congress created the FAA and directed its Administrator to regulate virtually every topic that touches upon aviation safety, and it did so because creating a unified system of aviation rules is essential to achieve safety in federal airspace, where the federal interest "domina[tes]."  *Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 633 (1973); *see generally* 49 U.S.C. § 40103.

For Plaintiffs to state a claim against PSA relating to aviation safety, Plaintiffs must therefore allege that PSA breached a *federal* standard of care—but they have not done so.  Federal rules govern every aspect of Flight 5342's final approach into DCA.  But Plaintiffs do not plausibly allege that PSA or Flight 5342's crew violated a single federal rule, instruction, or standard.  To

the contrary, Plaintiffs allege that it was the United States—through ATC and PAT25's flight crew—that violated federal rules and standards. The Court should therefore dismiss the negligence claims against PSA.

### 1.  *The overlapping claims with American*

Most of Plaintiffs' claims against PSA overlap entirely with their claims against American. They allege that PSA did not sufficiently train and supervise pilots regarding matters of aviation safety, that PSA's aircraft was equipped with insufficient lighting, that PSA's safety management systems were inadequate, and that the scheduling of PSA's flights to DCA was unsafe. But Plaintiffs do not allege that *any* of these alleged shortcomings by PSA violated a federal law or standard. That is because Plaintiffs cannot make such an allegation: PSA was flying an FAA-certified plane compliant with federal safety requirements; its pilots were federally-certified and trained with the requisite federally mandated training; its safety management systems were in accord with federal requirements; and Flight 5342 was operating under a federally granted landing slot pursuant to an FAA-approved schedule.

At bottom, the complaint alleges that PSA should have operated differently than what was required under federal law. Plaintiffs' inability to plead that PSA breached a federal standard of care means that the claims should be dismissed. American's arguments as to why "the underlying substance" of Plaintiffs' claims are preempted apply equally to the identical claims against PSA.[3] PSA briefly summarizes those arguments here:

***Pilot training, instruction, and supervision***: Plaintiffs fail to allege that PSA breached any federal standard related to its training, instruction, and supervision of its pilots. They allege that

---

[3]  Plaintiffs allege that American "failed to require" PSA to have taken actions differently than required under federal law. American thus additionally contends that Plaintiffs have not pleaded, as required, that American breached a federal standard of care in failing to require PSA to take certain actions. *See* American Mot. 24-25. Though that argument applies to American only, American's arguments that Plaintiffs have not alleged that PSA's alleged underlying actions or inactions breached a federal standard of care apply with equal force to PSA's motion to dismiss.

PSA failed to adequately train, supervise, or monitor the Flight 5342 crew on safety-related issues, such as whether it was appropriate to accept a circling approach on Runway 33 at night (*e.g.*, Compl. ¶¶ 236(h)-(k), (o), (u)); helicopter routes around DCA (*e.g.*, *id.* ¶¶ 236(l)-(o), (v)); and the TCAS system (*id.* ¶¶ 236(x)-(y)). Courts recognize there is an "exhaustive list" of specific federal training and certification rules, and thus "negligent hiring, training, selection, and supervision claims are subject to the standards of care contained in th[ose] specific federal regulations." *In re Air Crash Near Clarence Ctr.,* 2013 WL 5964480, *5 (W.D.N.Y. 2013). Plaintiffs do identify any federal rule that PSA allegedly violated, nor do they allege facts that would plausibly support violation of any federal standard. Because Plaintiffs' negligence-based pilot training, instruction, and supervision claims purport to impose upon PSA obligations that the comprehensive federal regulatory regime does not, these claims are preempted. *See* American Mot. 25-27.

**Aircraft lighting**: Plaintiffs cannot allege that PSA breached a federal standard by not using LED lightbulbs on its aircraft. They allege that LED lighting on the aircraft would have prevented this tragic accident and that PSA was negligent for failing to install such lighting. *See, e.g.*, Compl. ¶ 236(q). Federal law regulates every aspect of aircraft safety equipment—including lighting. *See, e.g.*, 14 C.F.R. § 91.209. It does not require aircraft to use LED lighting. Because Plaintiffs cannot allege that PSA violated any federal regulation with respect to its aircraft lighting—and because the FAA certified Flight 5342's aircraft as safe and airworthy—these claims are preempted. *See* American Mot. 27-28; *Med-Trans Corp. v. Benton*, 581 F. Supp. 2d 721, 740 (E.D.N.C. 2008) (holding that state "regulations governing equipment … related to aviation safety are preempted"); *Air Evac EMS Inc. v. Robinson*, 486 F. Supp. 2d 713, 722 (M.D. Tenn. 2007) (same); *Deahl v. Air Wis. Airlines Corp.*, 2003 WL 22843073, *4 (N.D. Ill. 2003) (same).

**Safety Risk Management system**: Plaintiffs do not allege that PSA's safety risk management (SRM) system violated any federal regulation. They allege that PSA failed to perform comprehensive SRM review regarding DCA and the likelihood of mid-air collisions, and

that this alleged failure contributed to the collision. *See, e.g.*, Compl. ¶ 236(w). But Plaintiffs do not allege that PSA's SRM is inconsistent with any of the detailed federal requirements for such systems imposed by 14 C.F.R. Part 5. *See* American Mot. 29. These claims are thus preempted.

**Scheduling claims**: Plaintiffs do not allege that PSA's flight scheduling at DCA violated a federal standard. They allege that PSA's scheduling of flight arrivals at DCA in a cluster at the bottom of one hour and the top of the next one reduces safety. *See, e.g.*, Compl. ¶ 236(p). But Plaintiffs do not allege that PSA's flight schedule violated any of the applicable federal rules that govern flight operations and scheduling at DCA. *See* American Mot. 29-31. Flight 5342 operated on a federally approved slot and approached DCA pursuant to an FAA-approved "reservation." 14 C.F.R. § 93.125. These claims are thus preempted as they challenge an FAA decision that Congress exclusively vested with the federal agency. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (holding that a state-imposed duty that conflicts with the "policy judgment" of a federal agency is impliedly preempted).

The Court should dismiss all of these claims against PSA for the same reasons explained in American's brief: there are no allegations that PSA breached any federal standard of care.

### 2.    The Flight 5342 operation claims

The claims addressing the actions of the PSA flight crew are preempted for the same reason: Plaintiffs have not alleged that the crew violated any federal standard. Plaintiffs allege that the PSA flight crew erred in accepting a circling approach to Runway 33 (*e.g.*, Compl. ¶ 236(e)-(g)), and thereafter failed to take "evasive action" to prevent the Black Hawk from colliding into their aircraft while Flight 5342 was on an ATC-cleared final approach and had right-of-way under federal law (*e.g.*, *id.* ¶ 236(a)-(d)). Because these claims relate directly to aviation safety, federal standards of care apply. *See* American Mot. 22-23.

A comprehensive body of federal regulations governed the actions of PSA's pilots during Flight 5342's approach to DCA. In the unique airspace surrounding Washington, D.C., Congress

has vested the FAA with exclusive authority to devise an array of rules that govern the flow of air traffic. FAA has promulgated numerous special rules for aircraft flying around DCA, including designing with technical specifications precisely the routes that Flight 5342 and PAT25 were taking. Yet Plaintiffs do not allege that Flight 5342's crew violated any one of these many rules or specifications; instead, they allege that the Army helicopter's crew and ATC violated these carefully crafted rules. Because PSA's crew is not alleged to have violated any of these federal standards, the claims against PSA should be dismissed.

### a. *The circling approach claims*

Although Plaintiffs take issue with Flight 5342's pilots accepting a circling approach to Runway 33, this approach was designed by FAA, ATC requested Flight 5342 to take this approach, and Flight 5342 conducted the approach precisely as ATC directed. Plaintiffs do not allege that PSA's flight crew violated any federal regulation or breached any federal standard of care in accepting and executing this approach. These claims are thus preempted.

**1.** Federal law governs all aspects of runways, including safety considerations related to how aircraft will use them. *See* 14 C.F.R. Part 139; *id.* § 139.305 (paved areas); *id.* Part 77 (addressing potential objects and construction that may affect navigable airspace); FAA Order 7050.1B (Runway Safety Program); *see also Dania Beach v. FAA,* 628 F.3d 581, 583 (D.C. Cir. 2010) (runway design subject to FAA standards, approvals, and certification). As courts of appeals—including the D.C. Circuit—have recognized, the FAA necessarily evaluates the "safety hazards associated with" the location and layout of a runway. *Dania Beach*, 628 F.3d at 584. The FAA "approve[s]" an "Airport Layout Plan," which includes all aspects of its runways, and "[t]his level of federal interest and involvement" shows that the federal government "occup[ies] the entire field of air safety[,] including" the safety features of a "runway." *Tweed-New Haven Airport Auth. v. Tong,* 930 F.3d 65, 75 (2d Cir. 2019). This is true for DCA too. DCA is "classified by the FAA as a primary commercial service airport and is required to hold an operating certificate under …

10

14 C.F.R. Part 139," which includes a "Master Plan" that must have been "approved by the FAA." *Id.*

The FAA also exclusively controls air traffic through "navigable airspace," which includes "airspace needed to ensure safety in the takeoff and landing of aircraft." 49 U.S.C. § 40102(a)(32). It has promulgated a comprehensive regulatory regime, codified in federal regulations and explained in voluminous FAA orders, that dictates how pilots must navigate aircraft within federal airspace. *See, e.g.*, 14 C.F.R. § 91.101 *et seq.*; *id.* § 91.113 (right-of-way rules); *id.* § 91.175 (takeoff and landing under Instrument Flight Rules); *id.* §§ 121.531 *et seq.* (Subpart T – Flight Operations); *id.* § 121.567 (Instrument Approach Procedures and Instrument Flight Rules landing minimums); *id.* § 97.1 *et seq.* (prescribing standard instrument approach procedures, takeoff minimums, and obstacle departure procedures); *id.* § 97.20(c) (providing that "approach procedures … are depicted on aeronautical charts published by the FAA").

The FAA's authority to regulate flight operations is at its apex in the navigable airspace around DCA. Congress specifically directed the FAA to "establish security provisions that will encourage and allow maximum use of the navigable airspace by civil aircraft consistent with national security" by creating specific flight rules for "areas in the airspace the Administrator decides are necessary in the interest of national defense." 49 U.S.C. § 40103(b)(3). The FAA thus has promulgated many restrictive flight rules for the airspace surrounding the nation's capital. *See* 14 C.F.R. Part 93 (Subpart V – Washington, DC Metropolitan Area Special Flight Rules Area). These rules require, among other things, that pilots use a discrete transponder code with ATC (*id.* § 93.339(a)(4)), receive specific authorization from ATC to operate in certain airspace (*id.* §§ 93.339(a)(7), 93.341(a), (d)), file and communicate a flight plan with ATC (*id.* § 93.339(c)(1)-(2)), and otherwise maintain direct communications with ATC while within the airspace (*id.* §§ 93.339(d), 93.341(a)-(b)).

Putting this all together, it follows that the FAA is responsible for designing established

11

approach routes to airport runways—including Runway 33 at DCA—and helicopter routes around DCA. *See* 14 C.F.R. § 97.1 *et seq.* (prescribing standard instrument approach procedures, takeoff minimums, and obstacle departure procedures); *id.* § 97.20(c) (providing that "approach procedures … are depicted on aeronautical charts published by the FAA"). The FAA has intricately designed DCA runway approach routes and helicopter routes with technical specifications to facilitate its control over this unique airspace. *See* FAA, U.S. Terminal Procedures Publication, Northeast (NE) Vol. 3, perma.cc/L5B8-UAF8 (published approach procedures for DCA); FAA, Baltimore-Washington Helicopter Route Chart, perma.cc/A8YJ-YA3P (published helicopter routes around DCA). The FAA thus designed—and approved—an approach path to Runway 33 at DCA that intersected with Helicopter Route 4 (albeit at a different altitude) over the Potomac River after weighing the "safety hazards associated with that option," including from air traffic congestion in this special airspace. *Dania Beach*, 628 F.3d at 583-584, 591 (deferring to the FAA's determination regarding the "safety drawbacks" of one runway design).

**2.** Despite FAA's control over virtually every aspect of flight traffic operations in the airspace surrounding DCA, Plaintiffs allege that Flight 5342's pilots were negligent in "accept[ing] a circling approach to Runway 33," an approach that the FAA had beforehand designed and approved and which ATC had requested Flight 5342's pilots to accept. Compl. ¶ 90. Plaintiffs further allege that Flight 5342's pilots did not "brief the circling approach to Runway 33." *Id.* ¶ 122; *see also id.* ¶¶ 90-91, 120, 132.

But Plaintiffs do not allege that Flight 5342's pilots breached any federal regulation or federal standard of care in accepting and executing a circling approach to Runway 33. To the contrary, federal regulations require that pilots comply with "any traffic patterns established for that airport" (14 C.F.R. § 91.127) and comply with "ATC instruction[s]" (*id.* § 91.123(b)). That is precisely what the pilots of Flight 5342 did: they executed the approach to Runway 33 that was

designed by FAA, cleared by ATC, and consistent with the federal government's standards for when it is acceptable for pilots to accept a circling approach.  *See* Compl. ¶ 188; FAA, Aeronautical Information Manual, § 5-4-5(f) "Instrument Approach Procedure (IAP) Charts" "Circling" ("Pilots may safely perform the circling maneuver at the circling published line of minima if the approach and circling maneuver is properly performed according to aircraft category and operational limitations."); *id.* § 5-4-20(f) (Circling Approach and Landing Minimums).  Plaintiffs have not alleged otherwise.

Plaintiffs' circling approach claims are thus preempted.  Plaintiffs cannot invoke state common-law tort duties to challenge the FAA's determination that it is generally safe to take a "circling approach to land at Runway 33 at DCA in nighttime conditions."  Compl. ¶¶ 222(g), 229(g), 236(g), 243(g); *see Tweed-New Haven Airport Auth.*, 930 F.3d at 75 (holding that "Congress intended the [Federal Aviation Act]," and the authority it vested to the FAA, "to occupy the entire field of air safety including runway length").  Without allegations that Flight 5342's pilots breached a federal standard in accepting and executing ATC's approach and clearance instruction for Runway 33, Plaintiffs' circling-approach claims should be dismissed.

### b.    The see-and-avoid claims

In the final minutes before the collision, Flight 5342's flight crew was complying with a complex web of federal regulation and instruction.  They were following the instructions of federal ATC personnel, as required by federal regulation.  They accepted ATC's request to conduct a circling approach to Runway 33.  Compl. ¶¶ 129-130.  And they were seconds away from safely landing Flight 5342 on an ATC-cleared final approach when they were struck by an Army Black Hawk helicopter.  *Id.* ¶¶ 169-171.

Plaintiffs contend that the Flight 5342 crew should have done something differently, but in these final moments under exclusive federal instruction, Plaintiffs do not identify a specific federal regulation that the flight crew violated.  And although Plaintiffs rely on the catch-all regulation

that prohibits "careless or reckless" operation of an aircraft, they do not plausibly allege that any of the PSA flight crew's actions—which complied with all of the specific federal rules and regulations that governed Flight 5342's approach—could meet this standard. 14 C.F.R. § 91.13(a). The Court should thus dismiss these claims.

    **1.** Extensive federal regulations govern aircraft landing approaches and the management of intersecting air traffic, including the respective roles and responsibilities of ATC and pilots.

    To start, the Aeronautical Information Manual contains an entire section governing ATC's handling of arriving flights. *See generally* FAA, Aeronautical Information Manual, Ch. 5, § 4 "Arrival Procedures" (setting detailed protocols requiring pilots to follow instructions from approach control, identifying what types of approaches are permitted at which airports, and addressing spacing of aircraft that are simultaneously approaching neighboring runways). ATC is also responsible for managing air traffic in situations of "visual separation." *See* FAA Order JO 7110.65AA ¶ 7-2-1 (procedures for Pilot-Applied Visual Separation). And FAA rules require ATC to follow specific procedures for "merging target[s]," which include issuing traffic alerts with the position, distance, and altitude of nearby aircraft, particularly after receiving a conflict alert warning that two aircraft are on converging flight paths. Compl. ¶¶ 250(f)-(g), 259(f)-(g) (citing FAA Order JO 7110.65AA ¶ 7-2-1; JO 7110.65AA, ¶ 2-1-6, Safety Alerts; JO 7110.65AA ¶ 7-6-1, Basic Radar Service to VFR Aircraft Terminal; and JO 7110.65AA ¶ 5-1-4, Merging Target Procedures).

    At DCA, FAA has specified two distinct ATC positions ("Local Control" and "Helicopter Control") to separately manage aircraft separation for aircraft arriving and departing DCA and helicopter traffic. The standard operating procedure for DCA Air Traffic Control (FAA Order 7110.2L) ensures that two air traffic controllers are working to maintain separation of airplanes and helicopters in the congested airspace around DCA during peak traffic hours. *Id*. ¶ 100; American Mot. 7.

Federal regulations dictate the distinct roles and responsibilities of pilots and air traffic controllers in managing air traffic. *See generally* FAA, Aeronautical Information Manual ch. 5, § 5 "Pilot/Controller Roles and Responsibilities." Pilots must comply with ATC instructions. *See, e.g.*, 14 C.F.R. § 91.127 (requiring compliance with airport traffic requirements); 14 C.F.R. § 91.123(b) (prohibiting "operat[ing] an aircraft contrary to an ATC instruction in an area in which air traffic control is exercised"). And pilots must comply with FAA traffic patterns. *See id.* § 91.127(2).

Federal rules also govern the implementation of ATC landing instructions. Aircraft that ATC has cleared for final approach "have the right-of-way over other aircraft in flight or operating on the surface." 14 C.F.R. § 91.113(g). A pilot must "give way" to another aircraft that has the right-of-way and "not pass over, under, or ahead of it unless well clear." *Id.* § 91.113(b). And "[w]hen an ATC clearance has been obtained, no pilot in command may deviate from that clearance unless an amended clearance is obtained, an emergency exists, or the deviation is in response to a traffic alert and collision avoidance system resolution advisory." 14 C.F.R. § 91.123. In particular, the FAA has clarified that an aircraft cleared to land should "not deviate from an assigned clearance [to land] based solely on T[raffic] A[dvisory] information." FAA Advisory Circular 90-120, ¶ 3.2.

**2.** Plaintiffs do not allege that PSA's pilots violated a single one of the many federal rules that governed Flight 5342's approach to DCA. That deficiency requires dismissal.

Under the facts alleged, the Flight 5342 crew did everything that applicable federal regulations directed. They were following ATC instructions and executing a circling approach to Runway 33, as designed by the FAA and cleared by ATC. *See* 14 C.F.R. §§ 91.123(b), 91.127. They were cleared for final approach and had right-of-way, such that any aircraft nearby were obligated to "give way" as required under 14 C.F.R. § 91.113(g). Indeed, the only information they heard from ATC was that a nearby aircraft, PAT25, had their aircraft in sight and would "pass

behind." Compl. ¶¶ 154-155, 162-163. They did not receive a modified instruction from ATC or an alert from ATC that PAT25 was converging on their glidepath, such as would have allowed for a deviation from their final landing approach under 14 C.F.R. § 91.123 and FAA Advisory Circular 90-120. And Plaintiffs' allegations are that, when it finally became apparent—too late—to the Flight 5342 crew that PAT25 was on a collision course to its aircraft, the crew "t[ook] … action to avoid a collision" and "increased [Flight 5342's] pitch." Compl. ¶¶ 167-168. PAT25, however, in violation of federal regulations, "made no attempts to avoid hitting" Flight 5342 on its ATC-cleared final approach. *Id.* ¶ 169.

Indeed, the only violations of specific federal rules and standards that Plaintiffs allege are those of the United States government, not PSA:

- Plaintiffs allege that the DCA tower Local Control and Helicopter Control positions, contrary to DCA standard operating procedures, "had been improperly combined since 1540 (3:40 p.m.) on January 29, 2025, and were therefore being worked by one air traffic controller" (Compl. ¶ 125; *see id.* ¶¶ 97-98);

- Plaintiffs allege that ATC, upon receiving a conflict alert warning that the two aircraft were on converging flight paths, did not advise Flight 5342 of PAT25's location and flight path in violation of FAA Orders (Compl. ¶¶ 152, 185; *see id.* ¶¶ 97(b), 250(g), (l), 259(g), (l));

- Plaintiffs allege that PAT25 was flying at approximately 278 feet at the time of collision, in violation of FAA altitude restrictions (Compl. ¶¶ 28, 124, 143, 173, 253(o), (q), (v), 262(o), (q), (v)); and

- Plaintiffs allege that PAT25 twice confirmed to ATC it had the aircraft "in sight" with "visual separation," and was instructed by ATC to "pass behind" Flight 5342, but PAT25 never deviated from its path and did not yield the right-of-way to Flight 5342, in violation of 14 C.F.R. § 91.113(g) (Compl. ¶¶ 151, 166, 169).

Because Plaintiffs do not allege that Flight 5342's crew breached any federal rule or standard governing Flight 5342's approach to DCA, the claims against PSA are preempted. These final moments were governed by an "elaborate and detailed system of controls" imposed by the federal government. *Nw. Airlines v. Minnesota*, 322 U.S. 292, 303 (1944) (Jackson, J., concurring). Flight 5342's crew complied with them; ATC and the helicopter's crew did not.

16

**3.**    This analysis does not change simply because Plaintiffs invoke a general catch-all regulation that prohibits "careless or reckless" operation of an aircraft.  *See, e.g.*, Compl. ¶ 236(a) (citing 14 C.F.R. § 91.13(a)).  Violations of this catch-all regulation are typically derivative of violations of other specific federal regulations, which Plaintiffs have not alleged.  *See Garvey v. NTSB*, 190 F.3d 571, 586 n.23 (D.C. Cir. 1999) (collecting cases where the violation of 14 C.F.R. § 91.13(a) was "wholly derivative of" violations of other federal regulations).

Accordingly, in virtually every case where a court has upheld an agency finding of careless or reckless operation of an aircraft, the pilot acted contrary to either federal regulation or ATC instruction.  *See, e.g.*, *Jackson v. NTSB*, 114 F.3d 283, 284 (D.C. Cir. 1997) (pilot acted carelessly when he failed "to attentively monitor ATC communications" and "misinterpreted" an ATC "traffic advisory as a clearance instruction, causing his aircraft to ascend about 900 feet above its authorized clearance"); *Lindsay v. NTSB*, 47 F.3d 1209, 1211 (D.C. Cir. 1995) (pilot operated aircraft recklessly by flying after drinking heavily in violation of 14 C.F.R. § 91.17(a)(1)); *Throckmorton v. NTSB*, 963 F.2d 441, 444 (D.C. Cir. 1992) (upholding agency finding that pilot acted carelessly when his "flight path deviated from the literal terms of his ATC clearance").  And where such facts are lacking, the D.C. Circuit has vacated agency orders for lack of substantial evidence.  *See Van Dyke v. NTSB*, 286 F.3d 594, 598 (D.C. Cir. 2002) (vacating agency finding that the pilot operated aircraft carelessly because there was no substantial evidence that pilot made left turns in his landing pattern contrary to specific federal regulations).

Under the circumstances alleged, Flight 5342's crew could not plausibly have been operating the aircraft carelessly or recklessly in violation of 14 C.F.R. § 91.13(a) while *complying* with the numerous federal dictates and ATC instructions on its approach.  *See Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 561 (D.C. Cir. 1993) (assessing the reasonableness of pilot's actions in light of "FAA restrictions governing the flight").  This regulation "is designed to promote safety and *uniformity* in commercial flight and to induce *compliance with traffic*

17

*controls.*"  *Haines v. Dep't of Transp.*, 449 F.2d 1073, 1076 (D.C. Cir. 1971) (emphasis added).

But Plaintiffs never allege that Flight 5342's crew "deviat[ed] from instructions."  *Id.*

The upshot of Plaintiffs' allegations is a requirement that PSA's flight crew should have taken actions that *depart* from the "uniform[]" air traffic rules and the reasonable expectation that other aircraft will follow those rules, a proposition that would upend the objective of FAA's extensive regulation of air traffic control in DCA airspace.  *Haines*, 449 F.2d at 1076.  Flight 5342 had the right-of-way on its cleared final approach.  *See* 14 C.F.R. § 91.113(g).  And when ATC uses "visual separation" to manage air traffic, as PAT25 requested and ATC approved (Compl. ¶¶ 151, 166), such a pilot "upon instructions from the controller provides their own separation by maneuvering their aircraft as necessary to avoid it."  FAA Advisory Circular 90-48E, Pilots' Role in Collision Avoidance 2 (Oct. 20, 2022).  Put simply, Plaintiffs' see-and-avoid claim against PSA gets it backwards—under the circumstances as alleged, the PSA crew did not breach an obligation under federal rules to see-and-avoid PAT25; rather, PAT25's crew tragically breached their obligation to see-and-avoid Flight 5342.  *See* FAA Advisory Circular 90-48E at 2 (requiring pilots to "refer to [the] right-of-way rules" in discussing a pilot's obligation "to observe and maneuver to avoid other aircraft").

Plaintiffs nonetheless allege that the Flight 5342 crew should have "immediately execut[ed] a go-around to protect [Flight] 5342 from collision" upon receiving "the TCAS aural … alert … 19 seconds prior to impact."  *E.g.*, Compl. ¶ 236(c).  But Plaintiffs do not (and cannot) allege facts to plausibly support such a theory.  This TCAS Traffic Alert was triggered because the "the system calculate[d]" that PAT25 would "come within approximately 1.1 nm horizontally and 600 to 800 feet vertically of the aircraft."  *Id.* ¶ 32.[4]  But the FAA has specified that an aircraft

---

[4]    Because of Flight 5342's low altitude, the Flight 5342 crew did not receive a TCAS Resolution Advisory alert, which alerts pilots when the "aircraft will come even closer and direct [them] to take action to avoid those aircraft."  Compl. ¶ 32.  Without such direction, Plaintiffs' theory is apparently that Flight 5342's crew had to independently assess the situation and manually maneuver the aircraft in only 19 seconds—a task that takes at least 40 seconds per FAA safety

cleared to land should "not deviate from an assigned clearance [to land] based solely on" the TCAS "T[raffic] A[dvisory]" alert Flight 5342's pilots received. FAA Advisory Circular 90-120 ¶ 3.2. Because a flight cleared to land has right-of-way and other aircraft have a duty to avoid hitting it (indeed, here, PAT25 acknowledged "visual separation"), the FAA guidance confirms that, in congested airspace like that around DCA, *deviating* from the cleared landing path introduces risk—it does not mitigate it. Plaintiffs thus cannot allege facts that would establish the flight crew breached a duty to see-and-avoid PAT25.

Finally, Plaintiffs allege that, upon realizing that PAT25 was on a collision course to their aircraft despite ATC's instructions—mere seconds earlier—that PAT25 should pass behind them, the PSA crew took action to increase the aircraft's pitch to try and avoid collision. Compl. ¶¶ 167-168. Given how little time Flight 5342's crew had to "recognize and evaluate" this "sudden emergency not of [their] own making," and given that they did take action—unlike PAT25's crew (*id.* ¶ 169)—there are no plausible allegations the PSA crew's actions breached any federal standard of care. *See* 14 C.F.R. § 91.13(a).

## B. Plaintiffs' scheduling claims are expressly preempted by the Airline Deregulation Act.

Plaintiffs' scheduling claims are also preempted because they fall within the scope of the Airline Deregulation Act's express preemption provision. *See* 49 U.S.C. § 41713; *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 283 (2014). Plaintiffs' scheduling claims "relate to" PSA's "service[s]" and "route[s]." 49 U.S.C. § 41713; American Mot. 31-33. Plaintiffs allege that PSA breached a duty by scheduling its DCA flights in clusters at the tops and bottoms of peak hours. *See, e.g.*,

---

guidance documents. That is, the FAA recognizes that it takes at least 28 seconds to scan a particular area at night for collision avoidance. FAA, *Night Operations*, Figure 13-6, perma.cc/KW8B-SQJ3. After locating PAT25 and its path, it would take an additional 12.5 seconds for the aircraft to move. FAA Advisory Circular 90-48E, Pilots' Role in Collision Avoidance 6 (Oct. 20, 2022). Plaintiffs have no basis to allege that any alleged conduct of the Flight 5342 crew—who had placed their aircraft *exactly* where ATC and federal law directed it to be—somehow caused the tragic collision.

Compl. ¶ 236(p).  These claims seek to dictate—beyond federal regulation—when and how often PSA flies to DCA, which goes to the core of PSA's air transportation "service."  49 U.S.C. § 41713(b)(1); *see Charas v. Trans World Airlines, Inc*., 160 F.3d 1259, 1261, 1266 (9th Cir. 1998) (en banc) (holding that "the word 'service'" in the preemption provision encompasses an airline's "schedules").  These claims also relate to PSA's "route[s]" because if PSA had to schedule its flights at different intervals, certain routes may no longer be viable.  49 U.S.C. § 41713(b)(1).  Because Plaintiffs' scheduling claims allege that PSA should have offered flights at different times or intervals to DCA, they inherently relate to PSA's "service[s]" and "route[s]" and run counter to Congress's purpose in enacting the Airline Deregulation Act.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992).  These claims are thus expressly preempted by the Airline Deregulation Act.  *See* American Mot. 31-33.

### C.    Plaintiffs' common carrier claims should be dismissed.

Plaintiffs' claims based upon a supposed "common carrier duty" owed by PSA (Fifth and Sixth causes of action) should be dismissed.  As described, there is no role for state tort law to play—the standard of care is exclusively defined by federal law.  But, additionally, there is no independent cause of action for a "common carrier" claim apart from negligence.  American Mot. 39.  Further, because these claims merely repeat the same allegations as the negligence claims, they should be dismissed as duplicative. *Id*.; *compare* Compl. ¶ 228 (alleging that PSA "owed the highest duty of care to passengers" as a common carrier), *with id.* ¶ 235 (alleging that PSA "had a duty … to exercise reasonable care").

### CONCLUSION

The Court should dismiss Plaintiffs' claims against Defendant PSA Airlines, Inc.

Dated:  December 17, 2025

Respectfully submitted,

/s/ *Robert J. Burns*
William F. Gould (Bar No. 428468)
HOLLAND & KNIGHT LLP
800 17th Street, NW
Washington, DC 20006
(202) 955-3000
william.gould@hklaw.com

Steven Raffaele (Bar No. NY0685)
Robert J. Burns (Bar No. NY0682)
Sarah Korapaty (Bar No. NY0684)
Qian (Sheila) Shen (Bar No. NY0693)
HOLLAND & KNIGHT LLP
787 Seventh Avenue
New York, NY 10019
(212) 513-3200
steven.raffaele@hklaw.com
robert.burns@hklaw.com
sarah.korapaty@hklaw.com
qian.shen@hklaw.com

/s/ *Paul W. Hughes*
Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Alex C. Boota (Bar No. 90001014)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com
shogarth@mwe.com
mschnoor@mwe.com
aboota@mwe.com

*Attorneys for Defendants American Airlines,*
*Inc. and PSA Airlines, Inc*