## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RACHEL CRAFTON, as Administratrix of the Estate of CASEY CRAFTON, deceased, | |
| Plaintiff, | Case No: 1:25-cv-03382-ACR |
| -v.- | Hon. Ana C. Reyes |
| AMERICAN AIRLINES INC., PSA AIRLINES, INC., AND THE UNITED STATES OF AMERICA, | **UNITED STATES' ANSWER TO [ECF 28] MASTER COMPLAINT** |
| Defendants. | |

The United States of America answers Plaintiffs' Master Complaint, ECF No. 28, as follows:

### GENERAL ADMISSION OF LIABILITY

The United States admits that it owed a duty of care to Plaintiffs, which it breached, thereby proximately causing the tragic accident on January 29, 2025, as specifically set forth below. The United States admits that it, among other tortfeasors, is liable to a Plaintiff who is legally eligible to recover monetary damages, as permitted by the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80, in an amount yet to be determined and apportioned among other tortfeasors.

### PRELIMINARY STATEMENT

1.     On January 29, 2025, American Eagle Flight 5342 ("AE 5342"), from Wichita Dwight D. Eisenhower National Airport to Ronald Reagan Washington National Airport, was on final approach to land when it collided with a United States Army Black Hawk helicopter over the Potomac River. This wholly avoidable tragedy took 67 lives. This Master Complaint asserts wrongful death and survival claims, jointly and severally, against Defendants, AMERICAN

1

AIRLINES, INC., and PSA AIRLINES, INC., (sometimes referred to collectively as the "Airline Defendants") for their acts and omissions in operating AE 5342, and against Defendant the UNITED STATES OF AMERICA, for the acts and omissions of the Federal Aviation Administration and United States Army.

**ANSWER:** The United States admits that on January 29, 2025, AE5342 departed Wichita's Dwight D. Eisenhower National Airport (ICT) for Ronald Reagan Washington National Airport (DCA) and was on final approach to land when it collided with Priority Air Transport 25 (PAT25) over the Potomac River. The United States further admits that 67 people died in the accident, and this Master Complaint asserts wrongful death and survival claims, jointly and severally, against Defendants American Airlines, Inc., PSA Airlines, Inc., for their alleged acts and omissions in operating AE5342, and against the United States, for the alleged acts and omissions of the Federal Aviation Administration (FAA) and the United States Army (Army). The United States denies the remaining allegations in paragraph 1.

2.      As detailed herein, the Defendants' collective failures caused the mid-air collision that resulted in the senseless and tragic deaths of 67 individuals. Prior to, and on the night of the mid-air collision, the Defendants knew, or should have known, that AE5342 was transiting one of the busiest airspaces in the United States, and they knew, or should have known, that the airport approaches, and the airspace in the vicinity of Washington D.C.'s Reagan National Airport ("DCA"), presented certain safety risks, specifically including the possibility of a mid-air collision. This knowledge includes, but is not limited to, that there have been a substantial number of "near miss" events in and around DCA, which were required to be analyzed to ensure that a mid-air collision did not occur and required Defendants to exercise vigilance when operating and/or controlling aircraft in the vicinity of DCA. Because of Defendants' collective

failure to analyze the data and information at their disposal, and due to their failure to operate and/or control aircraft with the highest degree of safety, this mid-air collision was, tragically, an accident waiting to happen.

**ANSWER:** To the extent the allegations in paragraph 2 are directed or can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence and therefore denies the same. With respect to the second sentence in paragraph 2, the United States admits that the airspace near DCA is busy at times and the risk of midair collision cannot be reduced to zero in the National Airspace System, generally, and specifically during approaches to DCA, but as directed to the United States, the United States denies the remaining allegations in the second sentence. With respect to the allegations in the third sentence in paragraph 2, the United States admits that pilots have reported, and radar and other data confirms, that aircraft have come into close proximity to other aircraft within the Class B airspace near DCA on certain occasions, and that an appropriate standard of care applies to pilots and controllers who are controlling traffic or operating aircraft in the vicinity of DCA, but denies the remaining allegations in the third sentence. With respect to the allegations in the fourth sentence in paragraph 2, the United States admits that the PAT25 and AE5342 pilots failed to maintain vigilance so as to see and avoid each other, but denies the remaining allegations in the fourth sentence. The United States denies the remaining allegations in paragraph 2 that are directed or can be construed as directed to the United States.

3.     These Defendants utterly failed in their responsibilities to the travelling public, specifically including the passengers on board AE5342, in that, amongst other things, each aircraft flight crew failed to see and avoid the other despite each having the obligation to do so;

that the Airline Defendants failed to implement policies and procedures specifically designed to mitigate the risks associated with a mid-air collision; that the Airline Defendants failed to provide their flight crews with the necessary training and familiarization to evaluate whether to accept, during the final stages of flight, a request by air traffic control to switch to land on Runway 33 (a much shorter and far-less-frequently used runway at DCA), including but not limited to, their failure to advise their flight crews as to the existence of helicopter routes in the immediate vicinity of DCA; that the Airline Defendants manipulated and abused the arrival rate system at DCA to force in more of their arrivals per hour at the airport despite knowledge that doing so severely limited the margins for safety; that the flight crew of AE5342 violated numerous policies and procedures requiring them to discuss, evaluate and/or consider the alerts coming from their on-board collision-avoidance technology approximately 19 seconds prior to the collision, including their failure to look for intruding traffic or take corrective (or any) action until it was too late; that the United States Army flight crew failed to properly and adequately operate the Black Hawk helicopter, including their failure to see and avoid AE 5342 and their failure to properly transit the helicopter route, including failing to abide by a mandatory altitude restriction and improperly flying towards the center of the Potomac River instead of along its eastern bank as required; that the Black Hawk flight crew critically failed to resolve a known and discussed altitude discrepancy despite transiting airspace that the Black Hawk flight crew knew, or should have known, had a mandatory altitude restriction; that the Black Hawk flight crew failed to adjust their flight path to the eastern bank of the Potomac River, despite recognition that they were further west than the charted route; and that the Federal Aviation Administration's air traffic controllers failed in their two most important priorities, namely to separate aircraft in airspace and issue Safety Alerts when aircraft are in an unsafe proximity to one another; that the

air traffic controllers on duty failed to abide by numerous other policies and procedures, including that air traffic control failed to provide traffic advisories to both aircraft and air traffic control failed to resolve an aural and visual Conflict Alert that advised air traffic control that the two aircraft were on an unsafe and converging collision course; and that the air traffic controllers failed in their duties concerning the "tower team concept" within an air traffic control facility so that all controllers assist each other to prevent, amongst other things, a mid-air collision.  The Defendants' collective failures (for which they are jointly and severally liable) caused, and/or contributed to this senseless and entirely avoidable tragedy.

      **ANSWER:**  To the extent the allegations in paragraph 3 are directed or can be construed as directed to the United States, the United States answers as follows: the United States admits that the PAT25 and AE5342 pilots failed to maintain vigilance so as to see and avoid each other; the DCA local controller did not comply with ¶ 7-2-1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5, 2024); and because of the PAT25 pilots' failure to maintain vigilance so as to see and avoid AE5342, the United States is liable to a Plaintiff who is legally eligible to recover certain monetary damages, as permitted by the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–80, in an amount yet to be determined and apportioned among other tortfeasors.  The United States lacks knowledge or information sufficient to form a belief as to whether the United States will ultimately be jointly and severally liable to Plaintiff. The United States denies any remaining allegations in paragraph 3 that are directed or can be construed as directed to the United States.

## PARTIES

### A. **Plaintiffs**

4.      DECEDENTS were passengers and cabin crew on board AE 5342 when it collided with the Black Hawk helicopter and crashed on January 29, 2025.  Plaintiffs are the personal representatives, special representatives, executors, and/or administrators of DECEDENTS' estates as well as the next of kin, heirs, beneficiaries and survivors of DECEDENTS.  Plaintiffs bring this action for their own injuries as well as the injuries of DECEDENTS which accrued and existed before death.

**ANSWER:** The United States admits AE5342 collided with a Black Hawk helicopter and crashed on January 29, 2025.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4 and therefore denies the same.

### B. **Defendants**

5.      At all times relevant to this action, AMERICAN AIRLINES, INC. ("American") was a corporation formed under the law of the state of Delaware with its principal place of business in Fort Worth, Texas.

**ANSWER:** The allegations in paragraph 5 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that on the accident date through today, American Airlines was/is a corporation formed under the laws of the State of Delaware.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 5 and therefore denies the same.

6.      At all times prior to this Action, PSA AIRLINES, INC. ("PSA") was a corporation formed under the laws of the state of Pennsylvania with its principal place of business in Dayton, Ohio.  Prior to January 29, 2025, PSA announced that, effective January of 2026, PSA's principal place of business will be located in Charlotte, North Carolina.

**ANSWER:** The allegations in paragraph 6 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that on the accident date through today, PSA was/is a corporation formed under the law of the Commonwealth of Pennsylvania. The United States further admits that PSA has previously announced plans to move its headquarters to Charlotte, North Carolina.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 6 and therefore denies the same.

7.      At all times relevant to this Action, American and PSA were both wholly owned subsidiaries of American Airlines Group, Inc., and both doing business as American Airlines – with PSA operating flights for American under the brand name "American Eagle."

**ANSWER:** The allegations in paragraph 7 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that on the accident date through today, American Airlines and PSA were/are wholly owned subsidiaries of American Airlines Group, Inc., both doing business as American Airlines with PSA operating flights for American Airlines under the brand name "American Eagle."  The United States denies the remaining allegations in paragraph 7.

8.      At all times relevant to this action, the air traffic control personnel Plaintiffs allege to have been negligent were employees of the UNITED STATES OF AMERICA ("USA")

under the authority and control of the Federal Aviation Administration ("FAA") acting in their official capacity and within the course and scope of their employment.

**ANSWER:** The United States admits that federal employees of the FAA that Plaintiff alleges to have been negligent were acting within the course and scope of their employment and/or their official capacity at all relevant times.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 8 and therefore denies the same.

9.      At all times relevant to this action, the United States Army personnel Plaintiffs allege to have been negligent were employees of the USA under the authority and control of the United States Army acting in their official capacity and within the course and scope of their employment.

**ANSWER:** The United States admits that federal employees of the U.S. Army that Plaintiff alleges to have been negligent were acting within the course and scope of their employment and/or their official capacity at all relevant times.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9 and therefore denies the same.

## JURISDICTION AND VENUE

**A. American and PSA**

10.      This Court has Subject Matter Jurisdiction over American and PSA based on complete diversity pursuant to 28 U.S.C. § 1332.

**ANSWER:** The allegations in paragraph 10 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 10 and therefore denies the same.

11.      This Court also has Subject Matter Jurisdiction over American and PSA pursuant

to 28 U.S.C. § 1367 (a) which provides that the District Court has supplemental jurisdiction over

said defendants as the claims against these defendants are related to, intertwined with, and are

part of the same claims against Defendant USA, as all claims arise from the mid-air collision in

which the DECEDENTS were killed.

**ANSWER:** The allegations in paragraph 11 are not directed to the United States.  To the

extent the allegations can be construed as directed to the United States, the United States admits

that the Court could exercise supplemental jurisdiction over the airline Defendants under 28

U.S.C. § 1367 and that all claims arise from the midair collision near DCA.  The United States

lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 11 and therefore denies the same.

12.      Plaintiffs allege damages greater than the jurisdictional amount of $75,000.

**ANSWER:** The allegations in paragraph 12 are not directed to the United States.  To the

extent the allegations can be construed as directed to the United States, the United States admits

that Plaintiff alleges damages greater than the jurisdictional amount of $75,000.

13.      Venue in this District as to American and PSA satisfies the requirements of 28

U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to the claim

occurred in this District.  The subject crash and resulting deaths occurred in this District as a

result of negligence that occurred in the airspace of this District.

**ANSWER:** The allegations in paragraph 13 are not directed to the United States.  To the

extent the allegations can be construed as directed to the United States, the United States admits

that venue is proper as to the United States.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 13 and therefore denies the same.

14.    American and PSA are subject to personal jurisdiction in this District because they conduct longstanding and continuous business in the District and operate flights in the District's airspace.  Both American and PSA operate regular, daily flights into and from DCA, including AE 5342 from Wichita Dwight D. Eisenhower National Airport ("ICT") to DCA on January 29, 2025.

**ANSWER:** The allegations in paragraph 14 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that the airline Defendants operate daily flights into and from DCA, including AE5342 on January 29, 2025, from ICT.  The United States admits that the airline Defendants operate flights in the National Airspace System's airspace above territory belonging to the District of Columbia but denies that it can properly be referred to as "the District's airspace."  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 14 and therefore denies the same.

15.    American and PSA are also subject to personal jurisdiction in this District because they operated AE 5342 in the airspace over this District for the purpose of serving the community in this District, which, as a result of the negligence of American and PSA, culminated in the crash and resulting deaths in the District of Columbia.

**ANSWER:** The allegations in paragraph 15 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that AE5342 flew in the National Airspace System, in part over the territory belonging to the

District of Columbia, and following the midair collision, AE5342 came to rest and the deaths occurred in the District of Columbia.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 15 and therefore denies the same.

**B.  <u>The United States of America</u>**

16.     This Court has Subject Matter Jurisdiction over Defendant USA pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and § 2671 *et seq.*, because the United States is a defendant in this civil action to recover monetary damages, and because Plaintiff, individually, as personal representative of DECEDENT, and on behalf of all wrongful death beneficiaries, has complied with all conditions precedent to the filing of this action under the Federal Tort Claims Act ("FTCA").

**ANSWER:**  The United States admits that the FTCA, 28 U.S.C. §§ 1346(b), 2671–80, may serve as a basis for a court to exercise subject-matter jurisdiction over the United States, and this case is a civil action to recover certain monetary damages.  The United States denies that the Court has subject-matter jurisdiction over all of Plaintiff's negligence allegations against the United States.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 16 and therefore denies the same.

17.     The FAA advised that it is the lead agency to investigate and decide the merits of these claims pursuant to 28 C.F.R. § 14.2(b)(2).

**ANSWER:** The United States admits the allegations in paragraph 17.

18.     Each Plaintiff will individually allege the details of the submission and denial of their administrative claims to the FAA and United States Army ("Army") in their Short Form Complaint and/or Notice of Adoption.

**ANSWER:** The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 and therefore denies the same.

19.    Pursuant to 28 U.S.C. § 1402(b), venue of the claims against the USA is proper in the United States District Court for the District of Columbia because negligent acts and omissions of the FAA, the United States Army and the USA that are alleged to have caused, or contributed to, the mid-air collision of two aircraft, which is the subject of this action (the "Subject Crash" or "Subject mid-air collision"), occurred in this federal district.

**ANSWER:** The United States admits that some of the alleged negligent acts and omissions of the federal employees occurred over the District of Columbia, and that venue under 28 U.S.C. § 1402(b) is proper.  The United States denies that the alleged negligence of federally employed tower controllers at DCA occurred in the District of Columbia.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 19 and therefore denies the same.

FACTS

**A.  <u>Ronald Reagan Washington National Airport - DCA</u>**

20.    DCA has three (3) runways identified based on their compass orientation.  When the airport is configured for "north operations" with aircraft approaching from the south, Runway 1 is the longest and primary runway for commercial airline traffic, and Runways 33 and 4 are shorter alternate runways.  Figure 1 below is a pictorial diagram of the runways at DCA with Runways 1 and 33 highlighted in "red."

12



*Figure 1 – Airport Diagram of DCA with Runway 1 and Runway 33 labeled*
(Source: FAA)

**ANSWER:** The United States admits that DCA has the following runways: Runway 1-19, Runway 15-33, and Runway 4-22, which are named numerically after their magnetic heading. The United States further admits that when DCA is in a "north operation," with aircraft approaching from the south, Runway 1 is the longest available, and therefore, most utilized for commercial airline traffic; during a north operation, Runways 33 and 4 serve as shorter but possible alternative runways for certain aircraft. With respect to figure 1, the United States

admits that it is an FAA-published Airport Diagram effective until September 8, 2022, which has been altered by the addition of red lines with arrows along Runways 1-19 and 15-33, and black boxes containing red letters that state "Runway 33" and "Runway 1." The United States denies the remaining allegations in paragraph 20 and figure 1.

21.     DCA Runway 1 is the busiest runway in the United States and operates at full capacity for most of DCA's daily operating hours. This is particularly true in the evening hours, when dozens of flights regularly depart from and arrive to Runway 1.

**ANSWER:** The United States admits that under certain circumstances, Runway 1 at DCA may have more departures and arrivals than other runways in the United States including during evening hour operations when dozens of flights can regularly depart and arrive on Runway 1. The United States denies the remaining allegations in paragraph 21.

22.     Runway 33 is used far less frequently than Runway 1 at DCA when the airport is configured for "north operations."

**ANSWER:** The United States admits that Runway 33 is typically utilized less often than Runway 1 when DCA is in a "north operation." The United States denies the remaining allegations in paragraph 22.

23.     Runway 33 is used for less than five (5%) percent of DCA's flight operations.

**ANSWER:** The United States admits that Runway 33 is typically utilized for less than 5% of DCA's flight operations. The United States denies the remaining allegations in paragraph 23.

B. **Traffic in the Airspace Surrounding DCA**

24.    In addition to commercial aviation traffic such as AE 5342, the airspace around DCA is used by government, military, law enforcement and emergency medical helicopters transiting the busy Washington, D.C., area airspace.

**ANSWER:** The United States admits that government, military, law enforcement, emergency medical helicopters, and commercial aviation traffic such as AE5342 operate within the Washington Tri-Area Class B airspace. The United States denies the remaining allegations in paragraph 24.

25.    There are multiple published low-level helicopter routes surrounding DCA that direct the flow of helicopter traffic near and around the airport (See Figure 2 below).



*Figure 2 – FAA Helicopter Route Chart for the Area Near DCA*

(Source: FAA)[1]

**ANSWER:** The United States admits there are published helicopter routes surrounding DCA, which include altitudes to assist in organizing the flow of helicopter traffic near and around DCA. With respect to figure 2 and footnote 1, the United States admits that the website https://aeronav.faa.gov/visual/02-20-2025/PDFs/Balt-Wash_Heli.pdf once contained a pdf image of what appears to be an FAA-published Baltimore-Washington helicopter route chart effective at 0901z on February 20, 2025, until 0901z April 17, 2025, with figure 2 depicting what appears to be an excerpt from the chart that is altered by a black box shaded in blue-gray and a red arrow pointing to a red box with a blown-up view of the chart excerpt. The United States denies the remaining allegations in paragraph 25, figure 2, and footnote 1.

26.     These helicopter routes set mean sea level ("MSL") maximum altitude limitations for helicopters operating on the routes.  Notably, along Helicopter Route 4 over the Washington Channel and Potomac River, the height above ground level ("AGL") is essentially the same (typically within 10-15 feet) as the MSL altitude.

**ANSWER:** The United States admits that the helicopter routes near and around DCA contain recommended maximum altitude limitations for helicopters operating on the depicted routes in mean sea level (MSL).  The United States further admits that along Helicopter Route 4 over the Washington Channel and Potomac River, the height above ground level (AGL) is essentially the same (typically within 10-15 feet) as the MSL altitude.  The United States denies the remaining allegations in paragraph 26.

27.     These helicopter routes, including Helicopter Route 4, which follows the based bank Potomac River, transit the approach and takeoff corridors to DCA, including Runway 33.

---

[1] https://aeronav.faa.gov/visual/02-20-2025/PDFs/Balt-Wash_Heli.pdf

**ANSWER:** The United States admits that on the accident date, Helicopter Route 4 generally followed the Potomac River from its confluence with the Anacostia River, and Route 4 generally tracked the area of the Potomac River adjacent to its left descending bank moving north to south along Joint Base Anacostia-Bolling, passing underneath the Precision Approach Path Indicator (PAPI) glidepath for Runway 33 at DCA. The United States denies the remaining allegations in paragraph 27.

28.    The FAA aeronautical chart of these helicopter routes provides that "ATC Authorization to operate along routes, or within zones, constitutes clearance to enter Class B Airspace Incidental to the Authorized Operation, at altitudes stated in the authorization or as depicted in the route specified." This required pilots cleared by air traffic control ("ATC") onto the helicopter routes to continue to see and avoid all air traffic in the corridor and accurately report traffic "in sight" to ATC as well as comply with the routes' restrictions, including, critically, the maximum altitude restrictions set forth in the helicopter chart.

**ANSWER:** The United States admits the chart depicted in paragraph 25, figure 2 contains the following quote, "ATC AUTHORIZATION TO OPERATE ALONG ROUTES, OR WITHIN ZONES, CONSTITUTES CLEARANCE TO ENTER CLASS B AIRSPACE INCIDENTAL TO THE AUTHORIZED OPERATION, AT ALTITUDES STATED IN AUTHORIZATION OR AS DEPICTED FOR THE ROUTE SPECIFIED," and this quoted language requires pilots to comply with the "routes' restrictions." The United States further admits that pilots are required to maintain vigilance so as to see and avoid other aircraft. The United States denies the remaining allegations in paragraph 28.

29.    Since the FAA began keeping records, there is a documented history of over 30 near miss events where aircraft landing at DCA came within less than 1,000 feet from colliding with a helicopter transiting the helicopter routes.

**ANSWER:** The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 and therefore denies the same.

30.    The National Transportation Safety Board ("NTSB") also identified 15,214 occurrences involving commercial airplanes and helicopters in the airspace surrounding DCA where there was a lateral separation distance of less than 1 nautical mile ("nm") and vertical separation of less than 400 feet between October 2021 and December 2024.  Among them were 85 events that involved lateral separation of less than 1,500 feet and/or vertical separation of less than 200 feet.

**ANSWER:** The United States admits the NTSB Preliminary Report states, "there were 15,214 occurrences between commercial airplanes and helicopters in which there was a lateral separation distance of less than 1 nm and vertical separation of less than 400 ft.  There were 85 recorded events that involved a lateral separation less than 1,500 ft and vertical separation less than 200 ft."  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 30 and therefore denies the same.

31.    All commercial passenger aircraft with over 30 seats are required by FAA regulation to be equipped with a Traffic Collision Avoidance System ("TCAS"), designed to provide automatic aural and/or visual alerts to pilots of dangerous proximity to and/or an impending collision with another aircraft. 14 C.F.R. § 121.356.

**ANSWER:** The United States admits that according to 14 C.F.R. § 121.356, effective January 1, 2005, any airplane operated under this regulation must be equipped and operated with

a certain type of Traffic Collision Avoidance System (TCAS) if the airplane is a turbine-powered airplane of more than 33,000 pounds maximum certificated takeoff weight.  The United States further admits that certain TCAS systems can be capable in certain circumstances of providing automated aural and visual alerts to a pilot when another aircraft is in proximity to his/her aircraft.  The United States denies the remaining allegations in paragraph 31.

32.    TCAS systems give two types of alerts: (1) Traffic Alerts ("TAs"), which are designed to alert pilots to aircraft that the system calculates will come within approximately 1.1 nm horizontally and 600 to 800 feet vertically of the aircraft, and (2) Resolution Advisories ("RAs"), which are designed to alert pilots to aircraft that will come even closer and direct pilots to take action to avoid those aircraft.



© 2025 Collins Aerospace. | This document does not contain any export-controlled technical data.

*Figure 3 – Depicting the TCAS TA (in purple) and RA (in green) alert envelopes*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

**ANSWER:** The United States admits certain TCAS systems can give two types of alerts: Traffic Alerts (TAs), which can alert pilots to the presence of aircraft nearby, and Resolution Advisories (RAs), which can advise pilots to take a recommended course of action to avoid

aircraft nearby, and, according to NTSB Hearing Exhibit 9-AIR-G, TCAS protects an area 0.2 to 1.1 nm laterally around, and 600 to 800 feet above and below the pilot's aircraft. The United States further admits figure 3 is depicted in NTSB Hearing Exhibit 9-AIR-G. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 32 and figure 3 and therefore denies the same.

33.     TAs cause the system to issue an aural "TRAFFIC, TRAFFIC" alert and a yellow "TRAFFIC" notification on the cockpit's primary flight displays. (*See* Figure 4, below).



*Figure 4 – Example of how a TA appears to pilots on an aircraft primary flight display*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

**ANSWER:** The United States admits that certain TCAS systems can annunciate an aural "TRAFFIC TRAFFIC" alert and may depict "TRAFFIC" in yellow text on certain cockpit displays. The United States further admits that figure 4 is depicted in NTSB Hearing Exhibit 9-AIR-G and is an example of how a TA can appear in the cockpit of an aircraft that is equipped

with a Primary Flight Display (PFD).  The United States denies the remaining allegations in paragraph 33 and figure 4.

34.    For a TA, the TCAS also visually depicts the other aircraft on another display screen (typically the multi-function displays or "MFDs") with a yellow dot indicating an aircraft for which a TA has issued and showing the other aircraft's relative location and relative altitude. (*See* Figure 5 below).



*Figure 5 - Showing an exemplar display of a TA on aircraft instruments*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

**ANSWER:**  The United States admits that certain TCAS systems can visually depict a TA for other aircraft represented by a yellow dot along with relative location and relative altitude of the other aircraft on certain cockpit displays.  The United States further admits that figure 5 is depicted in NTSB Hearing Exhibit 9-AIR-G but has been altered by the inclusion of a white rectangular box with an en dash, a yellow circle inside a black box, and the text "Traffic

Advisory (TA)."  The United States denies the remaining allegations in paragraph 34 and figure 5.

35.    Resolution Advisories ("RAs") cause the system to issue visual and aural alerts, including, an aural "TRAFFIC, TRAFFIC" alert and red "TRAFFIC" warning on the aircraft's primary flight displays. (*See* Figure 6, below).  The TCAS RA also aurally directs the flight crew to take a particular action (e.g., "DESCEND" or "INCREASE DESCENT") to avoid the traffic detected.



*Figure 6 – Example of how an RA appears to pilots on an aircraft primary flight display*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

**ANSWER:** The United States admits that RAs can cause certain TCAS systems to annunciate an aural "TRAFFIC TRAFFIC" alert and a red "TRAFFIC" alert on certain cockpit displays, and an RA can recommend a particular action to the pilot(s) including recommendations such as "DESCEND" or "INCREASE DESCENT" to avoid other aircraft. The United States further admits that figure 6 is depicted in NTSB Hearing Exhibit 9-AIR-G and

contains a representative example of how an RA can appear on a PFD.  The United States denies the remaining allegations paragraph 35 and figure 6.

36.     For an RA, the TCAS also visually depicts the other aircraft on the MFDs with a red square indicating an aircraft for which an RA has issued and showing the other aircraft's relative location and relative altitude. (*See* Figure 7, below).  Pilots are generally required by the applicable flight manual to respond to a TCAS RA and follow the directions provided by the system.



*Figure 7 - Showing an exemplar display of an RA on aircraft instruments*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

**ANSWER:** The United States admits that certain TCAS systems can visually depict an RA for other aircraft represented by a red square along with relative location and relative altitude of the other aircraft on certain cockpit displays.  The United States further admits that certain flight manuals may require a pilot to respond to a TCAS RA by following the recommendations provided by the TCAS system and figure 7 is depicted in NTSB Hearing Exhibit 9-AIR-G, and

contains a representative example of how an RA can appear on a certain cockpit display but has been altered by the inclusion of a white rectangular box with an en dash, a red square outlined in black, and the text "Resolution Advisory (RA)."  The United States denies the remaining allegations in paragraph 36 and figure 7.

37.    The design of the TCAS inhibits RAs when the aircraft is below 1000 feet above the ground where it is difficult to safely direct an airplane to avoid traffic without encountering another obstacle. This means that below 1000 feet above the ground, although the TCAS will aurally and visually alert the flight crew to "traffic" with a TA, it will not direct the flight crew to take a particular action to avoid the traffic as the TCAS does with an RA when the aircraft is more than 1000 feet above the ground.

**ANSWER:** The United States admits that, according to NTSB Hearing Exhibit 9-AIR-G, certain TCAS systems may inhibit RAs when an aircraft is at or below 1,000 feet (plus or minus 100 feet) above the ground but may provide an aural and visual TA for traffic; however, aural TA annunciations may be inhibited if the aircraft is at or below 500 feet (plus or minus 100 feet) above the ground.  The United States further admits that certain TCAS systems may not provide pilots with a recommendation to take a particular action to avoid traffic when the aircraft is at or below 1,000 feet (plus or minus 100 feet) above the ground.  The United States denies the remaining allegations in paragraph 37.

38.    Under 1000 feet above the ground, such as when an aircraft is on final approach to landing and where most helicopters operate in the airspace around DCA, TAs provide the only TCAS safety notifications to a flight crew advising and/or warning that the system detects nearby conflicting traffic.

**ANSWER:** The United States admits that, according to NTSB Hearing Exhibit 9-AIR-G, at or below 1,000 feet (plus or minus 100 feet) above the ground, a TA can provide the only kind of TCAS safety notification to a flight crew about traffic in proximity to the pilot's aircraft.  The United States further admits that an aircraft can be on final approach to landing under 1,000 feet above the ground and that helicopters can operate below 1,000 feet in the airspace around DCA.  The United States denies the remaining allegations in paragraph 38.

39.    Under 400 feet above the ground, aural TAs are also inhibited, and the only TCAS alerts are the visual "TRAFFIC" textual alert on the primary flight displays and the depiction of the other aircraft's position as a yellow filled-in circle and relative altitude on the MFDs.

**ANSWER:** The United States admits that, according to NTSB Hearing Exhibit 9-AIR-G, at or below 500 feet (plus or minus 100 feet) above the ground, TCAS aural TA annunciations can be inhibited.  The United States further admits that a visual "TRAFFIC" textual alert can be the only TCAS alert depicted on certain cockpit flight displays, and, provided that bearing information for the other aircraft is available, certain TCAS systems may depict the position of another aircraft as a yellow filled-in circle and relative altitude on certain cockpit flight displays.  The United States denies the remaining allegations in paragraph 39.

40.    Using information from voluntary safety reporting programs along with FAA data regarding encounters between helicopters and commercial aircraft near DCA, the NTSB found that at least one TCAS RA was triggered per month from 2011 to 2024 due to proximity to a helicopter.  In over half of these instances, the helicopter may have been above the published, mandatory helicopter route altitude restriction for that portion of the route that the helicopter was on.  Two-thirds of the events occurred at night.

**ANSWER:** The United States admits that the NTSB Preliminary Report states, "[r]eview of information gathered from voluntary safety reporting programs along with FAA data regarding encounters between helicopters and commercial aircraft near DCA from 2011 through 2024 . . . found that at least one TCAS resolution advisory (RA) was triggered per month due to proximity to a helicopter," "[i]n over half of these instances, the helicopter may have been above the route altitude restriction," and "[t]wo-thirds of the events occurred at night." The United States denies the remaining allegations in paragraph 40.

41.    Upon information and belief, American, PSA and the USA (by and through the FAA and U.S. Army) were on notice of the traffic issues surrounding DCA, including but not limited to, the numerous near miss events, and that the airspace was heavily congested with both fixed and rotary wing aircraft.

**ANSWER:** To the extent the allegations in paragraph 41 are directed or can be construed as directed to the United States, the United States admits that the FAA and the Army had access to data and reports containing information concerning the relative proximity of aircraft to helicopters flying near DCA, and the data can include near miss events and reveal airspace congestion under certain circumstances. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 41 and therefore denies the same.

42.    The Performance Data Analysis and Reporting System ("PDARS") is an FAA system used to collect air traffic data to facilitate operational analysis to improve the function of the National Airspace System ("NAS"). The PDARS system consists of a dedicated network of computers located at FAA sites that use specialized software for collecting detailed air traffic management system data.

**ANSWER:** The United States admits that, as of today, according to the FAA website https://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/systemops/ perf_analysis/perf_tools, "[t]he Performance Data Analysis and Reporting System (PDARS) is an FAA [National Airspace System] system designed as an integrated performance measurement tool that facilitates operational analysis to improve the NAS. The system consists of a dedicated network of [FAA] computers located at FAA sites that use specialized software for collecting detailed air traffic management system data." The United States denies the remaining allegations in paragraph 42.

43.     Analysis of PDARS data for instances where commercial passenger aircraft arriving to or departing from DCA came within 500 feet vertically and 1000 feet horizontally of a helicopter transiting the area surrounding DCA showed "hotspots" at multiple locations along helicopter routes passing DCA from north-south (along the Potomac River), including particularly a hotspot indicating many encounters off the end of Runway 33. (*See* Figure 8, below).



*Figure 8 – PDARS heatmap showing encounters between commercial passenger aircraft and helicopters in the airspace surrounding DCA*
(Source: FAA through NTSB)

**ANSWER:** The United States admits that, according to NTSB Hearing Exhibit 3-G, figure 8 is an "Encounter Heat Map" depiction with PDARS data from a distance bin of "Arr\Dep 500'-1,000'." The United States further admits that figure 8 depicts encounters based on 3D (straight line) distance of 500 feet to 1,000 feet between arriving or departing fixed-wing aircraft and a transitioning helicopter, and the numerical density of encounters is represented by colors with areas of fewer encounters appearing in green and more dense encounters appearing in red. The United States further admits that figure 8 depicts areas of red along the approach path to Runway 33 and over the Potomac River north of DCA airport. The United States denies the remaining allegations in paragraph 43 and figure 8.

## C.  American and PSA Operations at DCA

44.     American is a large domestic and international airline that conducts flight operations throughout the world, including at DCA.  In addition, it conducts regional flights through smaller regional airlines that operate under the American Eagle brand name.

**ANSWER:** The allegations in paragraph 44 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits the allegations in paragraph 44.

45.     PSA is one of these smaller regional airlines and is a wholly owned subsidiary of American's parent company, American Airlines Group, Inc., which American uses to operate regional flights under the American Eagle brand name.

**ANSWER:** The allegations in paragraph 45 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits the allegations in paragraph 45.

46.     American flights operated by PSA under the American Eagle brand are sold by American through its website separately or as part of an itinerary that combines American and American Eagle flights.  American advertises, markets, sells and issues tickets for flights operated by PSA as American flights.

**ANSWER:** The allegations in paragraph 46 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits the allegations in paragraph 46.

47.     The flights PSA operates for American are regularly listed as American flights.  Passengers are often unaware they purchased a ticket for an American Eagle flight operated by PSA and not a flight operated by American.

29

**ANSWER:** The allegations in paragraph 47 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that PSA-operated flights can be referred to as operating with an American Airlines flight number. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 47 and therefore denies the same.

48.    On January 29, 2025, PSA operated AE 5342 for American under the American Eagle brand name.

**ANSWER:** The allegations in paragraph 48 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that PSA may have operated AE5342 under the American Eagle brand name. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 48 and therefore denies the same.

49.    DCA is an important and profitable hub for American.

**ANSWER:** The allegations in paragraph 49 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 49 and therefore denies the same.

50.    American operates far more flights into and out of DCA than any other air carrier, accounting for over 50% of flights and carrying over 25% of all passengers flying into and out of DCA.

**ANSWER:** The allegations in paragraph 50 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that under certain circumstances, American and its affiliated air carriers including PSA can

30

operate more flights in and out of DCA than any other carrier at times accounting for over 50%
of flights and carrying more than 25% of all passengers flying in and out of DCA. The United
States denies the remaining allegations in paragraph 50.

51.     DCA is one of only five airports in the United States designated as a high-density
traffic airport with a limited number of takeoffs and landings, as well as allocation of flight slots,
due to the complex nature of air traffic in the area. 14 C.F.R. Subparts K and S; 14 C.F.R. §
93.123(a).

**ANSWER:** The United States admits that DCA is one of five airports designated as a
high-density airport under 14 C.F.R. § 93.123(a), which, with exceptions, limits "the hourly
number of allocated [Instrument Flight Rules] operations (takeoffs and landings) that may be
reserved for the specified classes of users for" DCA. The United States further admits that 14
C.F.R. part 93, subpart S concerns the allocation slots for commuter and air carrier Instrument
Flight Rules operations at high density traffic airports including DCA. The United States denies
the remaining allegations in paragraph 51.

52.     Prior to this crash, American knew additional flights in and out of DCA would,
and did, result in increased risk to safe flight operations.

**ANSWER:** The allegations in paragraph 52 are not directed to the United States. To the
extent the allegations can be construed as directed to the United States, the United States lacks
knowledge or information sufficient to form a belief as to the truth of the allegations in
paragraph 52 and therefore denies the same.

53.     Despite this knowledge, American consistently accepted operations that would
maintain and/or increase the number of American flights into DCA to maintain its market share.

**ANSWER:** The allegations in paragraph 53 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53 and therefore denies the same.

54.    Upon information and belief, in 2023, air traffic controllers in the DC area asked their supervisors to reduce aircraft arrival rates into DCA because traffic was overloading controllers and reducing the safety margin.

**ANSWER:** The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54 and therefore denies the same.

55.    Upon information and belief, in 2023, the FAA contacted airlines, including American and PSA, and advised them about the traffic overload and the request by DCA ATC to reduce aircraft arrival rates. Rather than simply reducing arrival rates to alleviate the strain on controllers, the airlines, including American and PSA, offered and/or agreed to increase their use of landings on Runway 33 during northbound operations and to train their pilots to use Runway 33 more often as a way to maintain traffic flow without needing to reduce the arrival rate at DCA.

**ANSWER:** The United States admits that according to the testimony by Ms. Njuen M. Chendi during the NTSB hearing on the subject accident, FAA contacted the airlines about Runway 33 because the runway had available capacity, and, in general, the airlines agreed to utilize Runway 33's available capacity, provided their pilots received training. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 55 and therefore denies the same.

56.    Despite the airlines' agreement to increase operations on Runway 33, as detailed below, the airlines did not provide their pilots with any specific training or information concerning the helicopter routes in the DCA airspace, specifically including the fact that Helicopter Route 4 intersects the approach path to Runway 33.

**ANSWER:** The allegations in paragraph 56 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States denies that, on the accident date, Helicopter Route 4 intersected the approach path to Runway 33.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 56 and therefore denies the same.

57.    Because DCA is a high-density traffic airport, pursuant to 14 C.F.R. § 93.123, aircraft operations (takeoffs and arrivals) at DCA are restricted to a total of 60 per hour, and arrivals, when using the northbound Runway 1 and Runway 33 configuration, were limited to 36 per hour for each hour of the day (e.g., 8 a.m. to 9 a.m.) in visual meteorological conditions as existed at the time of the Subject mid-air collision.

**ANSWER:** The United States admits that DCA is one of five airports designated as a high-density airport under 14 C.F.R. § 93.123(a), which, with exceptions, limits "the hourly number of allocated IFR operations (takeoffs and landings) that may be reserved for the specified classes of users for" DCA, and visual meteorological conditions prevailed at the time of the accident.  The United States denies the remaining allegations in paragraph 57.

58.    To maximize the number of flights at in-demand times, American and PSA scheduled more arrivals towards the end of one hour and the beginning of the next hour at peak travel times, allowing them to pack more arrivals into a one-hour period across two different

hours of the day (e.g., 8:30 a.m. to 9:30 a.m.), than are allowed in a single top to bottom one-

hour period (e.g., 8:00 a.m. to 9:00 a.m.) by regulation and FAA policy.

 **ANSWER:** The allegations in paragraph 58 are not directed to the United States.  To the

extent the allegations can be construed as directed to the United States, the United States admits

that according to NTSB Hearing Exhibit 3-Y, the Potomac TRACON Air Traffic Manager

testified:

> But there is a CFR, FAR, I'm not exactly sure which one it is.  I've seen it
> before, but you can only have I think it's 60 airplanes in an hour at DCA,
> right, as departures and arrivals.  Have you heard about this?  So what - -
> but in that document, it's by the hour, 8 to 9, 9 to 10.  So, American, what
> do they do?  They do - - everything happens from 8:30 to 9:30, 9:30 to
> 10:30.  No one will stop them.  So, I don't know how American has this
> much pull and how - - but it's a wink, wink, that people know what's
> going on.

The United States lacks knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in paragraph 58 and therefore denies the same.

 59. By engaging in this conduct, American and PSA manipulated and abused the

system of high density airport regulations and policies at DCA, and put additional stress on ATC

resources, particularly at peak travel times of the day: in the morning and evening.

 **ANSWER:** The allegations in paragraph 59 are not directed to the United States.  To the

extent the allegations can be construed as directed to the United States, the United States lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 59 and therefore denies the same.

 60. Notably, this collision occurred at approximately 8:48 p.m., toward the bottom of

the hour, when PSA and American were scheduling more arrivals and manipulating the high

density airport traffic limits for DCA in a manner that they knew, or should have known, would be potentially unsafe.

**ANSWER:** The allegations in paragraph 60 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that the accident occurred at approximately 8:48 p.m. The United States denies that 8:48 p.m. is the bottom of the hour. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 60 and therefore denies the same.

61. Prior to and on January 29, 2025, as airlines that regularly operated flights into DCA, American and PSA were, or should have been, aware of the published helicopter routes in the vicinity of DCA, particularly near the approach to Runway 33.

**ANSWER:** The allegations in paragraph 61 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that the DCA helicopter routes in the vicinity of DCA, particularly near the approach to Runway 33, were publicly available prior to and on January 29, 2025. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 61 and therefore denies the same.

62. Prior to and on January 29, 2025, as airlines that regularly operated flights into and from DCA, American and PSA knew or should have known of numerous occurrences involving commercial airplanes and helicopters in the area around DCA in which there was lateral separation distance of less than 1 nm and vertical separation of less than 400 feet, and numerous other encounters classified as near collision or near miss events.

**ANSWER:** The allegations in paragraph 62 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits

that American and PSA regularly operated flights into DCA and at some point prior to and on January 29, 2025, had access to data and reports that may have revealed when a lateral separation distance of less than 1 nm and vertical separation of less than 400 feet occurred between American or PSA aircraft and other aircraft, or other encounters between American or PSA aircraft and other aircraft that could be classified as a near midair collision or near miss event. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 62 and therefore denies the same.

63.    Prior to and on January 29, 2025, as airlines that regularly operated flights into and from DCA, American and PSA knew or should have known of occurrences involving commercial airplanes and helicopters in the area around DCA in which there was lateral separation of less than 1,500 feet and vertical separation of less than 200 feet.

**ANSWER:** The allegations in paragraph 63 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that American and PSA regularly operated flights into DCA, at some point prior to and on January 29, 2025, may have had access to data and reports that may have revealed when a lateral separation distance of less than 1,500 feet nm and vertical separation of less than 200 feet occurred between American or PSA aircraft and other aircraft, or other encounters between American or PSA aircraft. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 63 and therefore denies the same.

64.    Analysis of publicly available data by CBS news revealed that PSA flights in particular, experienced more "near miss" events where they came within 500 feet of helicopters

in the airspace surrounding DCA than any other airline – as many as four a week in a single 52-month period leading up to the Subject Crash.[2]

**ANSWER:** The allegations in paragraph 65 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that according to a video available today at the website: https://www.cbsnews.com/video/close-calls-between-aircrafts-helicopters-happened-near-daily-dca-cbs-news-analysis-finds/, PSA aircraft had close encounters with helicopters, on average, at least four times per week over a 52-month period. The United States denies the remaining allegations in paragraph 64 and footnote 2.

65.    Prior to and on January 29, 2025, as airlines that regularly operated flights into and from DCA, American and PSA knew or should have known of regular occurrences of TCAS alerts (RAs and/or TAs) in its own aircraft in the area surrounding DCA due their aircraft's proximity to a helicopter between 2011 and 2024.

**ANSWER:** The allegations in paragraph 65 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that prior to and on January 29, 2025, American and PSA had access to data and reports that may have revealed when TCAS alerts (RAs and/or TAs) were triggered in aircraft operating near helicopters in proximity to DCA. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 65 and therefore denies the same.

66.    Upon information and belief, prior to and on January 29, 2025, American's own pilots and/or their union, the Allied Pilots' Association ("APA"), had informed American of the

---

[2] https://www.cbsnews.com/video/close-calls-between-aircrafts-helicopters-happened-near-daily-dca-cbs-news-analysis-finds/

risks associated with the complex approaches to DCA, including the risks posed by helicopter traffic transiting the airspace surrounding DCA.

**ANSWER:** The allegations in paragraph 66 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 66 and therefore denies the same.

67.    Upon information and belief, prior to January 29, 2025, PSA's own pilots and/or their union, the Air Line Pilots' Association ("ALPA"), had informed PSA of the risks associated with the complex approaches to DCA, including the risks posed by helicopter traffic transiting the airspace surrounding DCA.

**ANSWER:** The allegations in paragraph 67 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 67 and therefore denies the same.

68.    Prior to January 29, 2025, American and PSA had the ability to monitor both publicly available and internal data regarding near misses and near collision events in the airspace surrounding DCA, and should have monitored and analyzed the data, which would have revealed the unreasonable and unacceptable risk to flight safety during certain operations and circumstances, including circling to land on Runway 33.

**ANSWER:** The allegations in paragraph 68 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that, prior to January 29, 2025, American and PSA had access to publicly available and internal data and reports concerning near misses and near collision events that may have revealed

unreasonable and unacceptable risks to flight safety in the airspace surrounding DCA during certain operations under certain circumstances. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 68 and therefore denies the same.

69.    Prior to January 29, 2025, American and PSA's own monitoring and analysis of the data regarding near misses and near collision events in the airspace surrounding DCA should have revealed or did reveal multiple near miss events involving aircraft approaching DCA for landing and helicopters traveling along helicopter routes in the airspace surrounding DCA.

**ANSWER:** The allegations in paragraph 69 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that, prior to January 29, 2025, American and PSA had access to data that may have revealed multiple near miss and near collision events involving American or PSA aircraft traveling to DCA and helicopters operating along helicopter routes in the airspace surrounding DCA. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 69 and therefore denies the same.

70.    PSA designated only TCAS RAs as events for which an operation report had to be submitted to the airline, and did not require their flight crews to report TCAS TAs.[3]

**ANSWER:** The allegations in paragraph 70 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits

---

[3] Notwithstanding that only TCAS RAs had to be reported to the airline, PSA policies and procedures required that if a PSA flight crew experienced a TCAS TA, the flight crew must undertake certain action, including, a discussion between crew members concerning the traffic that caused the issuance of the TCAS TA. As detailed below, the AE 5342 flight crew failed to discuss the TA that they received at least 19 seconds prior to the collision which failure caused or contributed to the mid-air collision.

that according to NTSB Hearing Exhibit 17-A, PSA crews were required to report TCAS RA events, and according to NTSB Hearing Exhibit 2-AIR-A, PSA's Flight Operations Manual advised PSA pilots, "[i]f receiving a TA . . . [d]o not maneuver based on a TA alone . . . [a]ttempt to see the reported traffic."  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 70 and footnote 3 and therefore denies the same.

71.    As a result, despite that PSA had the obligation to provide the highest level of safety to its passengers, PSA failed to systematically collect and analyze information relating to TCAS alerts below 1000 feet, when an aircraft is in the critical landing phase, as TCAS RAs are, by design, inhibited at those altitudes.

**ANSWER:** The allegations in paragraph 71 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that according to NTSB Hearing Exhibit 9-AIR-G, by TSO, certain TCAS systems may inhibit RAs when an aircraft is at or below 1,000 feet (plus or minus 100 feet) above the ground.  The United States further admits that an aircraft can be in a critical landing phase at or below 1,000 feet depending on the circumstances. The United States further admits that PSA has a duty to operate at the appropriate standard of care under the law.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 71 and therefore denies the same.

72.    As a result, PSA's systems did not provide for any reporting and/or tracking of instances where the only potentially available TCAS alert, a TA, activated below 1000 feet of altitude, as occurred at DCA when AE 5342 encountered the subject helicopter prior to this mid-air collision.

**ANSWER:** The allegations in paragraph 72 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72 and therefore denies the same.

73. As a result, PSA failed to identify, process and account for safety risks posed by its aircraft coming into close proximity with helicopters traveling on published helicopter routes below 1000 feet in the airspace surrounding DCA.

**ANSWER:** The allegations in paragraph 73 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 73 and therefore denies the same.

74. Despite the information available and/or known to PSA and American, neither PSA nor American warned, or even informed, PSA pilots of the presence of the heavily-traveled, published helicopter routes surrounding DCA, including, most critically, Helicopter Route 4.

**ANSWER:** The allegations in paragraph 74 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74 and therefore denies the same.

75. Despite the information available and/or known to PSA and American, neither PSA nor American provided PSA pilots with training, or even informed flight crews, on the precise location of the heavily-traveled, published helicopter routes in the airspace surrounding DCA.

**ANSWER:** The allegations in paragraph 75 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75 and therefore denies the same.

76.    PSA also provided additional training, information and/or documentation to its pilots concerning DCA. None of the documents, information, or training materials that PSA provided to its pilots relating to DCA, however, included information related to the published helicopter routes that passed close to DCA, including Helicopter Routes 1 and 4, the existence of any helicopter routes operating near DCA runways, and/or the pervasiveness of helicopter operations in DCA airspace.

**ANSWER:** The allegations in paragraph 76 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 76 and therefore denies the same.

77.    The airport special qualification charts PSA provided to its pilots relating to DCA, including but not limited to 19-1 through 19-8 airport qualification charts, did not include any reference to or warning of the presence of helicopter traffic or published helicopter routes in the area surrounding the airport. This is especially egregious since Helicopter Route 4 directly intersects the final approach path to Runway 33.

**ANSWER:** The allegations in paragraph 77 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that the airport special qualification charts contained in NTSB Hearing Exhibit 2-AIR-H, do not include or reference any published helicopter routes. The United States denies that, at the time

of the accident, Helicopter Route 4 directly intersected the final approach path to Runway 33. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 77 and therefore denies the same.

78.    Despite the information available and/or known to PSA and American, PSA did not train or inform its pilots in any way relating to the published helicopter routes in the airspace surrounding DCA, including, most critically, Helicopter Route 4.

**ANSWER:** The allegations in paragraph 78 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78 and therefore denies the same.

79.    The airport charts and information PSA provided to its pilots relating to DCA, including but not limited to 10-7 airport information pages, 10-9 airport diagram, and/or 11-1 instrument approach procedure, did not include any reference to or warning of the presence of helicopter traffic or the published helicopter routes in the area surrounding the airport.

**ANSWER:** The allegations in paragraph 79 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that figures 3 and 7 in NTSB Hearing Exhibit 2-AIR-A do not include any published helicopter routes in proximity to DCA.  The United States denies that figures 3 and 7 in NTSB Hearing Exhibit 2-AIR-A do not contain any reference to helicopter traffic.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 79 and therefore denies the same.

80.    Two of four DCA-based PSA pilots interviewed by the NTSB said they were unaware that there were published helicopter routes at all, while another said he was aware that

there were published routes, but did not know their lateral or vertical boundaries.  The only PSA

pilot interviewed by the NTSB who was knowledgeable regarding the published helicopter

routes happened to be a former military helicopter pilot in the DC region and his knowledge of

the helicopter routes came from his prior military experience, not PSA.

**ANSWER:** The United States admits that the NTSB Hearing Exhibit 2-AIR-A, Airplane

Operational Factors and Human Performance Group Chairman's Factual Report states:

> Three DCA based captains and one DCA based first officer were asked
> about their knowledge of published helicopter routes in the DCA area.
> Only one PSA captain interviewed, who was a former military helicopter
> pilot in the DCA region, had knowledge of the published helicopter routes
> prior to the accident. This captain knew the specifics of the route numbers
> and their locations. He was aware that helicopter routes did not have
> lateral boundaries, and he knew the published maximum altitude of 200
> feet along Routes 1 and Route 4 near DCA. This individual had seven
> years of military helicopter experience in the DCA area before becoming a
> captain at PSA Airlines. Another PSA captain was aware helicopters had
> published routes but did not know about their lateral or vertical
> boundaries. The other two PSA pilots did not know the published
> helicopter routes existed.

The United States denies the remaining allegations in paragraph 80.

81.    Typically, when selecting an approach procedure to land on an airport runway, a

straight-in approach, like the Mount Vernon visual approach to Runway 1, is desirable because,

for the pilots flying the route, it is less demanding, more stable, and with minimal maneuvering,

all of which reduces the risk to flight safety.

**ANSWER:** The United States admits that under certain circumstances pilots flying into

DCA could find the Mount Vernon visual approach to Runway 1 more desirable than other

approaches because the Mount Vernon visual approach to Runway 1 can be less demanding,

more stable, and result in minimal maneuvering, which might reduce risks to flight safety.  The

United States denies the remaining allegations in paragraph 81.

82.     A circling approach, like the approach for Runway 33, is when an aircraft's flight crew deviates from the standard straight-in approach to one runway and turns, navigating visually, to line up and land on a different runway.

**ANSWER:** The United States admits that according to the Pilot/Controller Glossary, a circling approach, which is defined as a circle-to-land maneuver, is "[a] maneuver initiated by the pilot to align the aircraft with a runway for landing when a straight-in landing from an instrument approach is not possible or is not desirable. At tower controlled airports, this maneuver is made only after ATC authorization has been obtained and the pilot has established required visual reference to the airport."  The United States further admits that pilots could fly a circling approach to Runway 33 under certain circumstances.  The United States denies the remaining allegations in paragraph 82.

83.     A circling approach significantly increases pilot workload, thereby reducing the margin for safety.

**ANSWER:** The United States admits that a circling approach under certain circumstances could increase pilot workload and reduce the safety margin.  The United States denies the remaining allegations in paragraph 83.

84.     A circling approach is often used when landing on the straight-in approach runway is not possible or desirable for some reason, such as wind direction, weather conditions, or when the runway is closed for maintenance or otherwise.

**ANSWER:** The United States admits that a circling approach can be used under certain circumstances when landing on the straight-in runway is not possible or desirable for reasons including but not limited to wind direction, weather conditions, or runway closures.  The United States denies the remaining allegations in paragraph 84.

45

85.    In effect, the circling approach allows the aircraft to conduct a safe, straight-in approach to the airport using a route aligned with a more commonly used runway (often one equipped with navigational aids like an instrument landing system ("ILS")) but then requires maneuvering to another runway for the actual landing, significantly increasing pilot workload.

**ANSWER:** The United States admits that under certain circumstances, a circling approach allows an aircraft to conduct a safe, straight-in instrument approach to the airport using a route aligned with a commonly used runway equipped with navigational aids like an ILS but then maneuver to another runway for landing, and could significantly increase pilot workload. The United States denies the remaining allegations in paragraph 85.

86.    According to the FAA, "[c]ircling approaches are one of the most challenging flight maneuvers conducted in the National Airspace System, especially for pilots of … turbine-powered, transport category airplanes", which includes CRJ700s, like AE 5342.  This is because circling approaches "are conducted at low altitude, day and night, and often with precipitation present affecting visibility, depth perception, and the ability to adequately assess the descent profile to the landing runway."

**ANSWER:** The United States admits that FAA-H-8083-16B, Instrument Procedures Handbook, Federal Aviation Administration, ch. 4, Approaches, at 4-8 (Sept. 14, 2017) states, "[c]ircling approaches are one of the most challenging flight maneuvers conducted in the [National Airspace System], especially for pilots of . . . turbine-powered, transport category airplanes" and circling approaches "are conducted at low altitude, day and night, and often with precipitation present affecting visibility, depth perception, and the ability to adequately assess the descent profile to the landing runway."  The United States further admits that the CRJ-700

46

including the one operated as flight AE5342 is a transport category turbine-powered aircraft. The United States denies the remaining allegations in paragraph 86.

87.    Air carriers are responsible for establishing their own policies and procedures defining the circumstances when its pilots may accept a circling approach.

**ANSWER:** The United States admits that air carriers can establish their own policies and procedures defining the circumstances when its pilots may accept a circling approach.  The United States denies the remaining allegations in paragraph 87.

88.    Upon information and belief, for the reasons stated above, some airlines restrict their pilots from executing circling approaches under certain conditions, including night landings, marginal weather conditions, challenging airports and/or in high density airspace.

**ANSWER:** The United States admits the allegations in paragraph 88.

89.    Upon information and belief, prior to January 29, 2025, other air carriers operating at DCA prohibited their pilots from accepting circling approaches into DCA at night.

**ANSWER:** The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89 and therefore denies the same.

90.    The charts, information, policies and procedures concerning DCA that PSA provided to pilots did not restrict circling approaches to Runway 33 under any conditions, but they did, however, vest in their flight crews discretion as to whether to accept a circling approach to Runway 33, and further, required pilots to pre-brief the visual, circling approach procedure to land on Runway 33 before accepting an ATC request to land on Runway 33.

**ANSWER:** The allegations in paragraph 90 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that according to NTSB Hearing Exhibit 2-AIR-A, the below figure 9, which has been altered by

47

the addition of a red rectangular box that does not appear in the original NTSB hearing exhibit, consists of PSA guidance to its pilots flying the Mt. Vernon Visual Approach to Runway 1 at DCA and that figure 9 states, "[c]onsider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the maneuver," and "[l]ast minute runway or approach changes should only be accepted if pre-briefed."  The United States denies the remaining allegations in paragraph 90.

91.    For instance, the written guidance PSA provided to its pilots on preparing to land on Runway 1 using the Mount Vernon visual approach procedure (which was the approach initially assigned to AE 5342 on the night of the collision) specifically instructed pilots to "[c]onsider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the maneuver," and states that "[l]ast minute runway or approach changes should only be accepted if pre-briefed." (*See* Figure 9 below).

---

**MT Vernon Visual Runway 01**

**FMS Setup:**

1. Select ILS 01 or LOC 01, as available, from the FMS database.
2. If arriving via the CAPSS STAR, move the KATRN waypoint from the ILS 01 up to the KATRN STAR waypoint to clear the discontinuity.
3. Verify "PLVIA" is in the FIX page with a 1 nm ring.
4. Select the appropriate minimums for the ILS/LOC 01 approach on the MDA selector.
5. Brief the ILS/LOC 01, MTV 01, and what actions the PM will take during a go around.
6. Select the ILS/LOC 01 missed approach altitude on the flight control panel upon glideslope intercept.

**Flight deck Setup:**

1. Brief the ILS 01 and MTV Runway 01 approach.

   **Note:** Briefing both approaches verifies flight deck setup and allows flexibility to switch to the ILS if needed.

2. Consider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the maneuver.

   **Note:** Last minute runway or approach changes should only be accepted if pre-briefed.

**Flying the Procedure:**

1. Intercept and track the runway 01 LOC and/or GS inbound.
2. Approaching BADDN, maneuver to the center of the Potomac River as depicted on the Jeppesen 19-1 and follow the river to the airport.
3. In the event of an abandoned approach or go-around, continue toward the runway then northwest over the Potomac River. The pilot monitoring will advise ATC, then set the heading bug to 331° and altitude selector to 1,600' until other instructions can be received.

**Caution:** Do not enter P-56A and use caution for departing aircraft.

---

*Figure 9 – PSA Airlines Notes on the Mount Vernon Visual Approach to Runway 1 at DCA*
(Source: NTSB)

**ANSWER:** The allegations in paragraph 91 are not directed to the United States  To the extent the allegations can be construed as directed to the United States, the United States admits that according to NTSB Hearing Exhibit 2-AIR-A, the above figure 9, which has been altered by the addition of a red rectangular box that does not appear in the original NTSB hearing exhibit, consists of PSA guidance to its pilots flying the Mt. Vernon Visual Approach to Runway 1 at DCA and that figure 9 states, "[c]onsider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the maneuver," and "[l]ast minute runway or approach changes should only be accepted if pre-briefed."  The United States denies the remaining allegations in paragraph 91 and figure 9.

92.     PSA did not have any policies or procedures, nor any other guidance, addressing the factors flight crews should consider when deciding whether to accept a circling approach to Runway 33 at DCA, including, but not limited to, a reference to helicopter traffic, whether a helicopter was transiting Helicopter Route 4 at the time the decision is made to accept or reject a landing on Runway 33, or the risks of a circling approach in nighttime conditions.

**ANSWER:** The allegations in paragraph 92 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 92 and therefore denies the same.

93.     On January 29, 2025, despite what it knew or should have known regarding near misses surrounding DCA, PSA's policies and procedures did not contain any rule and/or policy to mitigate the risks of near miss events associated with helicopter traffic around DCA, including but not limited to, prohibiting its aircraft from executing a circling approach at DCA in nighttime conditions with helicopter traffic in the area.

**ANSWER:** The allegations in paragraph 93 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that according to NTSB Hearing Exhibit 2-AIR-A, PSA did not specifically prohibit its pilots on approach to Runway 1 from accepting Runway 33 at night with helicopter traffic in the area except the runway change should only be accepted last minute if the pilots pre-briefed. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 93 and therefore denies the same.

94.    PSA could have and, in the interest of flight safety, should have adopted policies and/or procedures that prohibited performing a circling approach when flying into DCA, at night and/or when there was helicopter traffic operating on Helicopter Route 4, but it failed to do so.

**ANSWER:** The allegations in paragraph 94 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that PSA could have adopted policies and/or procedures that prohibited its pilots from flying a circling approach into DCA at night and/or when there was known helicopter traffic in the area. The United States denies the remaining allegations in paragraph 94.

95.    American, which booked and sold PSA flights as American flights operated under its American Eagle brand, should have required PSA to establish policies and/or procedures that prohibited a circling approach when flying into DCA at night and/or when there was helicopter traffic operating on Helicopter Route 4, but it failed to do so.

**ANSWER:** The allegations in paragraph 95 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that American booked and sold tickets for PSA-operated flights operated but denies the remaining allegations in paragraph 95.

96.    The flying public, including DECEDENT, when purchasing American flights, could (and did) rightfully expect that all flights would be operated with the same and highest level of safety whether operated by American directly or by PSA as an American flight under the American Eagle brand name.

**ANSWER:** The allegations in paragraph 96 are not directed to the United States, to the extent the allegations can be construed as directed to the United States, the United States admits that American and PSA must operate at the appropriate standard of care under the law.  The

United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 96 and therefore denies the same.

**D.  DCA Air Traffic Control**

97.    The DCA tower had numerous positions to which air traffic controllers would be assigned to staff during each shift.  Pursuant to the Standard Operating Procedures ("SOP") for the DCA tower contained in FAA Order 7110.2L, effective 6/1/2024, these positions included:

    a.  Local Control ("LC") position, whose responsibilities included, but were not limited to, separating arrivals and departures, and initiating corrective action when it was apparent that a loss of separation may occur;

    b.  Assistant Local Controller ("ALC"), whose responsibilities included, but were not limited to alerting the LC of any unusual situations or traffic conflicts, maintaining surveillance of the local traffic pattern, assisting the LC with monitoring aircraft on final approach using the tower radar displays, and assisting with all other local controller duties, including but not limited to, being an extra set of eyes to maintain traffic separation and to identify converging traffic based on visual and/or radar observations and/or conflict alert notifications;

    c.  Helicopter Control ("HC") position, whose responsibilities included, but were not limited to, separating Visual Flight Rules ("VFR") helicopter traffic from arrivals and departures, and clearing VFR helicopters on routes depicted in the published helicopter routes; and

    d.  Operational Supervisor/Controller-in-Charge ("OS/CIC"), whose responsibilities included, but were not limited to, providing operational supervision, and combining and de-combining positions following a process set forth in the SOP.

**ANSWER:** The United States admits that the Washington Tower had seven operational positions to which air traffic controllers could be assigned to staff under certain circumstances. Under the Standard Operating Procedures (SOP) for the Washington Tower contained in FAA Order 7110.2L, effective 6/1/2024, those positions included:

a. Local Control (LC) - responsibilities included, but were not limited to, providing separation between arrivals and departures, and initiating corrective action when it becomes apparent that a loss of standard separation may occur within the tower's airspace.

b. Assistant Local Controller (ALC), whose responsibilities included, but were not limited to, alerting the LC of any unusual situations or traffic conflicts, maintaining surveillance of the local traffic pattern, and assisting the LC with monitoring aircraft on final via CTRD;

c. Helicopter Control (HC) - responsibilities included, but were not limited to, separating Visual Flight Rules (VFR) traffic from DCA arrivals and departures, and clearing VFR aircraft on routes or into zones as depicted on the Baltimore-Washington Helicopter Route Chart; and

d. Operational Supervisor/Controller-in-Charge (OS/CIC) - responsibilities included, but were not limited to, providing operational supervision, and combining and de-combining positions according to procedures set forth in the SOP.

The United States denies the remaining allegations in paragraph 97 and all subparts.

98.    The DCA tower SOP also required that the LC and HC positions normally be separate (i.e., de-combined) from Monday-Friday 1000-2130 local (10:00 a.m. to 9:30 p.m.).

This provided that two air traffic controllers would be working to ensure airplanes and helicopters remain separated during peak traffic hours.

**ANSWER:** The United States admits that according to the Standard Operating Procedures for the Washington Tower contained in FAA Order 7110.2L, effective 6/1/2024, the LC and HC operational positions at Washington Tower should normally be de-combined Monday through Friday from 10:00 a.m. to 9:30 p.m. local time, however the Operational Supervisor/Controller-in-Charge has the discretion to combine/de-combine HC after considering several factors set forth in the SOP.  The United States denies the remaining allegations in paragraph 98.

99.    After the crash, FAA air traffic control managers at DCA tower admitted that the LC and HC positions in the DCA tower were combined more often than they were de-combined, despite the SOP requirement that they normally be de-combined for the vast majority of DCA's operating hours.

**ANSWER:** The United States admits that during the NTSB Hearing, Clarke Allen, who was the DCA Operations Manager on the accident date, testified that the DCA HC position was historically combined more than de-combined.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 99 and therefore denies the same.

100.    Numerous aviation entities and operators that frequently operated in DCA airspace also have Letters of Agreement ("LOAs") with the DCA tower outlining more specific procedures for their interactions with the DCA tower, including the United States Army 12th Aviation Battalion based at Davison Army Airfield.

**ANSWER:** The United States admits the allegations in paragraph 100.

E. **United States Army Helicopter Operations**

101.    The 12th Aviation Battalion's LOA with the DCA tower stated that the "Routes and altitudes described in the Baltimore-Washington Helicopter Route Chart must apply unless otherwise authorized by ATC."

**ANSWER:** The United States admits that the Letter of Agreement between Washington Tower, Andrews Tower, Dulles Tower, Baltimore Tower, Air Force 1st Squadron, Army 12th Aviation Battalion and the DC Army National Guard, effective September 30, 2007 (LOA), states in paragraph 4.a "[r]outes and altitudes described in the Baltimore-Washington Helicopter Route Chart must apply unless otherwise authorized by ATC."  The United States denies the remaining allegations in paragraph 101.

102.    The 12th Aviation Battalion's LOA with the DCA tower further stated that the DCA tower would, if appropriate, "issue clearances to helicopters to conduct flight via routes and zones described in the Baltimore-Washington Helicopter Route Chart."

**ANSWER:** The United States admits that the LOA states in paragraph 4.d(1) that "Washington ATCT, Baltimore ATCT, Andrew ATCT and Dulles ATCT must:  issue clearances to helicopters to conduct flight via routes and zones described in the Baltimore-Washington Helicopter Route Chart."  The United States denies the remaining allegations in paragraph 102.

103.    Despite its LOA and other requirements to abide by the maximum published altitudes set forth in the helicopter route charts, the United States Army admitted to NTSB investigators after the crash that their pilots were only required to maintain their altitude +/- 100 feet, meaning that an Army helicopter pilot would be within the Army's standard for maintaining a 200 feet altitude restriction even up to 300 feet.

**ANSWER:** The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 and therefore denies the same.

104.    This altitude deviation, however, in combination with the failure to maintain the charted path of Helicopter Route 4 over the east bank of the Potomac River and failure to see and avoid the CRJ resulted in tragic consequences.

**ANSWER:** The United States admits that the PAT25 pilots failed to maintain vigilance so as to see and avoid the CRJ and their failure to do so was a cause-in-fact and a proximate cause of the accident. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 104 and therefore denies the same.

105.    The Army and its 12th Aviation Battalion were also aware that their UH-60L helicopters, including the subject helicopter, were equipped with barometric altimeters that had a significant margin of error.[4]

**ANSWER:** The United States admits that the barometric altimeters on board UH-60L helicopters, including on PAT25 on January 29, 2025, have performance tolerances as specified by military specifications. The United States further admits that the NTSB Hearing Exhibit 13-HELO-A, states that during a routine training formation flight of three UH-60L helicopters on May 15, 2025, the barometric altimeters reported altitudes between 80 and 130 feet lower than their radio altimeters while flying over the tidal portion of the Potomac River. The United States denies that the barometric altimeters on board UH-60L helicopters had a "significant margin for error." The United States further admits that along Helicopter Route 4 over the Washington

---

[4] Barometric altimeters provide pilots with their MSL altitude based on barometric pressure and other information, as opposed to radio altimeters, which measure the aircraft's height AGL by bouncing radio waves off the ground and interpreting how long it took for the radio wave to reflect back. Notably, along this stretch of Helicopter Route 4 the altitude MSL is essentially the same as the altitude AGL (typically 10-15 feet).

Channel and Potomac River, the height above ground level (AGL) is essentially the same (typically within 10-15 feet) as the MSL altitude. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 105 and footnote 4 and therefore denies the same.

106.    The Army and 12th Aviation Battalion conducted risk assessments before each mission but did not take into account commercial traffic at DCA, or whether Runway 33 would be in use when assessing risk for missions utilizing the published helicopter routes near DCA.

**ANSWER:** The United States admits that the 12th Aviation Battalion conducts a risk assessment before each mission. The United States denies the remaining allegations in paragraph 106.

107.    The Army and its 12th Aviation Battalion's helicopters almost never broadcast Automatic Dependent Surveillance Broadcast (ADS-B) out during their flights, including on routine training missions. ADS-B is an aviation surveillance technology where an aircraft will broadcast its position and other data enabling it to be tracked by other aircraft. ADS-B is an important technology in helping pilots avoid mid-air collisions.

**ANSWER:** The United States admits that ADS-B Out is a technology that broadcasts an aircraft's position, altitude, velocity, and identification from a GPS system to ground stations and other aircraft. The United States further admits that ADS-B Out can play a role in air traffic management. The United States also admits that prior to the collision, helicopters from the 12th Aviation Battalion did not broadcast ADS-B Out on mission rehearsal flights such as the night of January 29, 2025, for operational security reasons. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 107 and therefore denies the same.

108.    Despite routinely operating near DCA, including being one of the most frequent users of Helicopter Route 4, the Army and its 12th Aviation Battalion did not train or familiarize its pilots with the commercial flight approach paths into DCA nor with the approach to Runway 33.

**ANSWER:** The United States denies the allegations in paragraph 108.

109.    The 12th Aviation Battalion was on notice of near miss events between its Black Hawk helicopters and aircraft traffic transiting in and around Helicopter Routes 1 and 4.  For example, in 2017, a safety report involving a near miss between two 12th Aviation Battalion helicopters was filed, and, in 2021, a member of the local Helicopter Working Group met with the FAA and the Battalion Commander to discuss near miss events involving 12th Aviation Battalion helicopters.

**ANSWER:** The United States admits it was on notice of certain near-miss events between its Army-operated Black Hawk helicopters and aircraft traffic transiting in and around Helicopter Routes 1 and 4.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 109 and therefore denies the same.

110.    The 12th Aviation Battalion was also on notice of near miss events involving its helicopters flying underneath other aircraft on approach to DCA.

**ANSWER:** The United States denies the allegations in paragraph 110.

**F.  The Subject Flights**

111.    On January 29, 2025, a CRJ700 aircraft registered with the FAA as N709PS and operating as AE 5342 (sometimes referred to as "the subject airplane" herein) departed Wichita

Dwight D. Eisenhower National Airport (ICT) at approximately 5:39 p.m. local time (6:39 p.m. Eastern Standard Time) bound for DCA.

**ANSWER:** The United States admits that on January 29, 2025, a CRJ700 aircraft with FAA registration number N709PS operating as AE5342 departed Wichita Dwight D. Eisenhower National Airport (ICT) at approximately 5:38 p.m. local time (6:38 p.m. Eastern Standard Time) bound for DCA. The United States denies the remaining allegations in paragraph 111.

112.    There were 64 people on board AE 5342, consisting of 60 passengers and four crew members.

**ANSWER:** The United States admits the allegations in paragraph 112.

113.    The subject airplane was equipped with TCAS to provide automatic aural and visual alerts to the crew of AE 5342 of dangerous proximity to and/or an impending collision with another aircraft, consisting of aural and visual TAs and RAs above 1000 feet AGL, only aural and visual TAs below 1000 feet AGL, and only visual TAs below approximately 400 feet.

**ANSWER:** The United States admits that AE5342 was equipped with a certain TCAS system that can provide aural and visual traffic alerts to the pilots of AE5342 for traffic that could be in a dangerous proximity or on a collision course and according to NTSB Hearing Exhibit 9-AIR-G, certain TCAS systems may provide aural and visual TAs and RAs at or above 1,000 feet (plus or minus 100 feet) above the ground; however, RAs may be inhibited when an aircraft is at or below 1,000 feet (plus or minus 100 feet) above the ground; certain TCAS systems may provide an aural and visual TA for traffic, except aural TA annunciations may be inhibited if the aircraft is at or below 500 feet (plus or minus 100 feet) above the ground. The United States denies the remaining allegations in paragraph 113.

114.    The subject airplane was also equipped with a number of lights that were illuminated for landing, including landing lights, taxi/recognition lights, white and red anticollision lights, logo lights, navigation lights, and wing inspection lights.  None of these lights used the newest and brightest LED lightbulbs, instead using older incandescent lightbulbs.

**ANSWER:** The United States admits that AE5342 was equipped with a number of exterior lights including landing lights, taxi/recognition lights, white and red anticollision lights, logo lights, navigation lights, and wing inspection lights, and according to a video that captured the accident, many of the exterior lights were illuminated.  The United States further admits that some of the exterior lights were incandescent lightbulbs. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 114 and therefore denies the same.

115.    LED lights are brighter and more defined, which make them easier for other aircraft to see, particularly for individuals wearing night vision goggles.

**ANSWER:** The United States denies the allegations in paragraph 115.

116.    On January 29, 2025, at approximately 6:45 p.m. local time,[5] a U.S. Army 12th Aviation Battalion UH-60L Black Hawk helicopter designated as PAT25 (hereinafter referred to as "PAT25" or "the subject helicopter") departed Davison Army Airfield ("DAA") in Fort Belvoir, Virginia.  The helicopter filed a visual flight rules flight plan with DAA base operations. The flight was a combined annual and Night Vision Goggle ("NVG") proficiency check ride for one of the pilots and the crew is believed to have been wearing NVGs throughout the flight.  In essence, this was a training flight.

---

[5] All times from here onwards are local time in Washington, D.C. (i.e., Eastern Standard Time).

**ANSWER:** The United States admits that PAT25 departed Davison Army Airfield at approximately 18:45 local time. The United States further admits that PAT25 was a UH-60L Black Hawk helicopter assigned to the Army 12th Aviation Battalion located at Fort Belvoir, Virginia. The United States further admits that the crew of PAT25 filed a visual flight rules flight plan prior to departure, and the flight included an Annual Proficiency and Readiness Test for one of the crew members. The United States further admits that the crew was wearing their night vision goggles throughout the flight. The United States denies the remaining allegations in paragraph 116.

117.    At about 8:10 p.m., the cockpit voice recorder ("CVR") on board AE 5342 first captures the pilots' discussion of what approach procedure they would be assigned by air traffic control for landing at DCA. The captain asked the first officer if they would be flying the ILS approach or the Mount Vernon visual approach, and the first officer confirmed "it's gonna be the Mount Vernon."[6]

**ANSWER:** The United States admits that according to the NTSB Hearing Exhibit 12-AIR-A, at 20:10:10.8, HOT-1, believed to be the Captain, states, "they doing the I-L-Ss or the Mount Vernons," and at 20:10:13.5, HOT-2, believed to be the First Officer, states "its gonna be the Mount Vernon." The United States further admits the Mount Vernon visual approach procedure to Runway 1 is a well-established visual approach to Runway 1. The United States denies the remaining allegations in paragraph 117 and footnote 6.

118.    The captain then responded, "Mount Vernon backed up by the uh ILS[.] I'm not making the left [expletive deleted] turn." Upon information and belief, the captain's reference to

_____

[6] The Mount Vernon visual approach procedure to Runway 1 is a well-established, straight-in visual approach to Runway 1.

the "left [expletive deleted] turn" was a reference to the circling approach used to land on Runway 33.

      **ANSWER:** The United States admits that according to the NTSB Hearing Exhibit 12-AIR-A, at 20:10:17.1, HOT-1, believed to be the Captain, states, "Mount Vernon backed up by the uh I-L-S I'm not making the left # turn," with # indicating a deleted expletive. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 118 and therefore denies the same.

      119.    Despite indicating that they would likely fly the Mount Vernon visual approach to Runway 1 at DCA, the captain briefed only the ILS approach to Runway 1 beginning at 8:10:22 p.m. as captured on the CVR:

> AE 5342 Cpt: "um we got uhhh I-L-S runway one
>
> AE 5342 Cpt: "* seventeen February twenty three effective twenty three of February eleven dash one localizer one oh nine nine zero zero seven sixteen hundred M-S-A around the D-C-A V-O-R is twenty six hundred all quadrants missed approach climb four twenty climbing left turn to ** outbound D-C-A V-O-R radial three twenty Georgetown N-D-B D-M-E five point nine DC and hold. highest obstacle * * * forty nine altitude PAPI on the right twenty two hundred is missed approach two twenty eighteen hundred half statute mile visibility uhhhh we got seven thousand one hundred and sixty nine feet of runway available left turn novemberrrr [sic] one into the ramp no specials any questions."
>
> AE 5342 FO: "no questions."
>
> *Cockpit Voice Recorder (Airplane) Factual Report, NTSB, at p. 31 of 61.*

**ANSWER:** The United States admits that according to the NTSB Hearing Exhibit 12-AIR-A, at 20:10:22.0, HOT-1, believed to be the Captain, states, "um we got uhhh I-L-S runway one," and at 20:10:25.6, HOT-1 states:

> * seventeen February twenty three effective twenty three of February
> eleven dash one localizer one oh nine nine zero zero seven sixteen
> hundred M-S-A around the D-C-A V-O-R is twenty six hundred all
> quadrants missed approach climb four twenty climbing left turn to **
> outbound D-C-A V-O-R radial three twenty Georgetown N-D-B D-M-E
> five point nine DC and hold. highest obstacle * * * forty nine altitude
> PAPI on the right twenty two hundred is missed approach two twenty
> eighteen hundred half statute mile visibility uhhhh we got seven thousand
> one hundred and sixty nine feet of runway available left turn novemberrrr
> one into the ramp no specials any questions.

At 20:10:58.4, HOT-2, believed to be the First Officer, states, "no questions," and the transcript reveals no further briefings about DCA approaches by the pilots. The United States denies the remaining allegations in paragraph 119.

120.    The entire approach brief was only 33 seconds and failed to address either the Mount Vernon visual approach to Runway 1, or the circling approach to Runway 33.

**ANSWER:** The United States admits that NTSB Hearing Exhibit 12-AIR-A reveals no discussion between the pilots of AE5342 about the Mt. Vernon Visual Approach to Runway 1 or a visual approach to Runway 33 occurred during the approach briefing and the Captain's approach brief was 32.8 seconds in duration. The United States denies the remaining allegations in paragraph 120.

121.    At no point did the pilots of AE 5342 brief the Mount Vernon visual approach to Runway 1, which the pilots of AE 5342 eventually accepted.

**ANSWER:** The United States admits that NTSB Hearing Exhibit 12-AIR-A reveals no pre-briefing between the pilots about the Mt. Vernon Visual Approach that the pilots of AE5342

later accepted and partially flew.  The United States denies the remaining allegations in paragraph 121.

122.    At no point did the pilots of AE 5342 brief the circling approach to Runway 33, which is required by PSA policies and procedures to later accept such an approach, as they did on the night of the collision.

**ANSWER:** The United States admits that NTSB Hearing Exhibit 12-AIR-A reveals the pilots of AE5342 did not brief the approach to Runway 33, and that NTSB Hearing Exhibit 2-AIR-A, contains guidance from PSA Airlines to its pilots flying the Mt. Vernon Visual Approach to Runway 1 at DCA which states, "[c]onsider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the maneuver," and "[l]ast minute runway or approach changes should only be accepted if pre-briefed."  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 122 and therefore denies the same.

123.    After maneuvering near Laytonsville, Maryland, PAT25 began travelling generally southbound at or about 8:30 p.m.  At or about 8:33 p.m., PAT25 requested clearance from the DCA tower for Helicopter Route 1 to Route 4 and the DCA tower controller issued the clearance.

**ANSWER:**  The United States admits that according to NTSB Hearing Exhibit 13-A, PAT25 maneuvered near Laytonsville, Maryland around 20:25 and proceeded to fly generally southbound.  The United States further admits that according to NTSB Exhibit 12-HELO-A, at 20:33:41.1, PAT25 requested, "PAT two five is looking for Cabin John route one to route four to Davison," and the Washington Tower local controller responded, "PAT two five approved."  The United States denies the remaining allegations in paragraph 123.

124.    The controller's authorization to PAT25 did not state any restrictions – the clearance only stated that PAT25 was cleared to the helicopter routes, which had published flight paths and maximum altitudes. Thus, the subject helicopter was required to abide by the course and altitude restrictions set forth in the applicable helicopter route chart and to see and avoid all traffic on the routes.

**ANSWER:** The United States admits that NTSB Hearing Exhibit 12-HELO-A revealed the Washington Tower local controller did not issue an altitude restriction to PAT25 when PAT25's route request was approved.  The United States further admits that the PAT25 pilots were required to comply with applicable route restrictions published on the Baltimore-Washington Helicopter Route Chart.  The United States denies the remaining allegations in paragraph 124.

125.    The DCA tower LC and HC positions, contrary to DCA SOPs, had been improperly combined since 1540 (3:40 p.m.) on January 29, 2025, and were therefore being worked by one air traffic controller when PAT25 checked in and at all relevant times herein.

**ANSWER:** The United States admits that during the time Washington Tower was providing services to PAT25 on the night of the accident, one air traffic controller was staffing the helicopter and local control positions with assistance by an assistant local controller.  The United States denies the remaining allegations in paragraph 125.

126.    PAT25 was equipped to broadcast ADS-B out but was not broadcasting ADS-B at any time during the flight.

**ANSWER:** The United States admits that PAT25 was equipped with ADS-B Out, but for operational security it was not broadcasting data on January 29, 2025.  The United States denies the remaining allegations in paragraph 126.

127.    At approximately 8:39:10 p.m., Potomac air traffic control cleared AE 5342 for the Mount Vernon visual approach to Runway 1 at DCA.

**ANSWER:** The United States admits the allegations in paragraph 127.

128.    At approximately 8:39:14 p.m., the pilots of AE 5342 acknowledged and accepted the Mount Vernon visual approach to Runway 1 at DCA without any further discussion, despite not having briefed the Mount Vernon visual approach, nor having considered or briefed the circling approach to Runway 33 as required by PSA policy and procedure if they were going to later accept the Runway 33 approach.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 12-AIR-A, at 20:39:14.3, RDO-2, a pilot in the cockpit of AE5342 gave a read back stating, "cleared Mount Vernon Visual runway one approach Bluestreak fifty three forty two," and the transcript revealed no pre-briefing took place between the pilots of AE5342 about the Mount Vernon Visual approach or a visual approach to Runway 33 before the pilots read back the ATC clearance.  The United States further admits that NTSB Hearing Exhibit 2-AIR contains PSA airlines guidance to its pilots flying the Mt. Vernon Visual Approach to Runway 1 at DCA and that guidance states, "[c]onsider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the maneuver," and "[l]ast minute runway or approach changes should only be accepted if pre-briefed."  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 128 and therefore denies the same.

129.    At approximately 8:43:06 p.m., AE 5342 was flying the well-established straight-in Mount Vernon visual approach to Runway 1 when ATC at the DCA tower asked if AE 5342 could accept a switch to land on Runway 33 instead.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 12-AIR-A, at 20:43:09.3, the Washington Tower local controller stated, "Bluestreak fifty three forty two Washington Tower winds are three two zero at one seven gusts two five can you take runway three three?"  The United States further admits that AE5342 was flying straight-in on the Mt. Vernon Visual Approach at the time the local controller made his request.  The United States denies the remaining allegations in paragraph 129.

130.    Approaching to land on Runway 33 would require AE 5342 to bank/turn right over the Eastern shore of the Potomac River and then to bank/turn left back West/Northwest to line up with the centerline of Runway 33 and cross over the Potomac River to land.

**ANSWER:** The United States admits the allegations in paragraph 130.

131.    As referenced above, PSA did not prohibit its flight crews from accepting a circling approach to land on Runway 33 at DCA, and it allowed pilots to decide for themselves whether to accept such an approach if offered by ATC.  Despite allowing its pilots to make this decision, PSA provided no training or guidance to pilots on when to accept a circling approach to Runway 33 at DCA, or criteria to use when considering whether to accept a Runway 33 approach.  PSA, however, required flight crews to pre-brief the circling visual approach to Runway 33 at DCA before accepting a "last minute" request by ATC to change to Runway 33.  (*See* Figure 9 above).

**ANSWER**: The allegations in paragraph 131 are not directed to the United States.  To the extent the allegations could be construed as directed to the United States, the United States admits that NTSB Hearing Exhibit 2-AIR-A contains PSA airlines guidance to its pilots flying the Mt. Vernon Visual Approach to Runway 1 at DCA and that guidance states, "[c]onsider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance

for the maneuver," and "[l]ast minute runway or approach changes should only be accepted if pre-briefed." The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 131 and therefore denies the same.

132. At no time prior to the crash did the pilots of AE 5342 pre-brief the circling approach to Runway 33 at DCA.

**ANSWER:** The United States admits that NTSB Hearing Exhibit 12-AIR-A reveals that the pilots of AE5342 did not brief a visual approach to Runway 33. The United States denies the remaining allegations in paragraph 132.

133. PSA's guidance also recommended that flight crews agree "on what conditions you will accept a clearance" to do a circling approach to Runway 33 during pre-briefing. (*See* Figure 9 above).

**ANSWER:** The allegations in paragraph 133 are not directed to the United States. To the extent the allegations could be construed as directed to the United States, the United States admits that NTSB Hearing Exhibit 2-AIR-A contains PSA airlines guidance to its pilots flying the Mt. Vernon Visual Approach to Runway 1 at DCA and that guidance states, "[c]onsider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the maneuver." The United States denies the remaining allegations in paragraph 133.

134. Other than the captain indicating that he was not "making the left [expletive deleted] turn" earlier in the flight, the pilots of AE 5342, prior to being asked by ATC to land on Runway 33, never briefed or discussed whether they would accept the circling approach to Runway 33 or under what conditions they would accept it.

**ANSWER:** The United States admits that NTSB Hearing Exhibit 12-AIR-A reveals the pilots of AE5342 did not brief a visual approach to Runway 33. The United States lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 134 and therefore denies the same.

135.    Only after receiving the request from ATC to take the circling approach to Runway 33 at approximately 8:43 p.m. did the pilots of AE 5342 have any discussion of whether they would accept the switch to Runway 33.

**ANSWER:** The United States admits that NTSB Hearing Exhibit 12-AIR-A, revealed no discussion, other than the Captain possibly referencing the approach to Runway 33 when stating that he didn't want to make the left turn, about the approach to Runway 33 until after receiving a request from ATC to change runways at approximately 8:43 p.m.  The United States denies the remaining allegations in paragraph 135.

136.    After confirming that it would be permissible to land on Runway 33 given the length of the runway, the captain expressed hesitation, echoing his earlier refusal to make the "left [expletive deleted] turn", but quickly and ultimately decided to accept the change of approach to the more difficult maneuver to Runway 33 that the pilots had not briefed:

> AE 5342 Cpt:  "I really don't want to but I guess uhhh tell 'em—."
>
> AE 5342 FO:  "I mean I can just tell 'em—."
>
> AE 5342 Cpt:   "nah its fine we got the numbers for it yeah tell 'em we're fine we'll do three three we'll do it."

> *Cockpit Voice Recorders and Air Traffic Control Combined Transcript, NTSB, at p. 24-25.*

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 12-AIR-A, at 20:10:17.1, HOT-1, believed to be the Captain, states, "Mount Vernon backed up by the uh I-L-S I'm not making the left # turn," with # indicating a deleted expletive, at 20:43:29.1, HOT-1, states, "I really don't want to but I guess uhhh tell 'em—," at 20:43:31.4, HOT-2, believed to be the First Officer, states, "I mean I can just tell 'em —," and at 20:43:33.2, HOT-1, states, "nah

it's fine we got the numbers for it yeah tell 'em we're fine we'll do three three we'll do it."  The United States further admits that according to NTSB Hearing Exhibit 23-A, prior to accepting the switch to Runway 33, the Captain and First Officer stated they had the "numbers," meaning landing distance calculations, and prior to stating that they had the "numbers," the Captain and First Officer didn't brief on accepting Runway 33.  The United States further admits that under certain circumstances, a visual approach to Runway 33 can be a more difficult maneuver than the Mt. Vernon visual approach to Runway 1.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 136 and therefore denies the same.

137.    Despite not having pre-briefed the circling approach to Runway 33 at DCA, not having discussed the conditions under which they would accept it, without any discussion of the captain's prior comments about not flying such an approach, and without any enumerated criteria or factors from PSA to consider, such as the nighttime conditions or potential helicopter traffic on Helicopter Route 4,  AE 5342 accepted ATC's request that it execute a circling approach to Runway 33 at approximately 8:43:37 p.m.

| | |
|---|---|
| AE 5342: | "yeah we can do uh three three for Bluestreak fifty three forty two." |
| DCA Tower: | "Bluestreak fifty three forty two at the Wilson Bridge change to cir— change to circ(le) runway three three. runway three three cleared to land." |
| AE 5342: | "change to runway three three uh runway three three cleared to land Bluestreak fifty three forty two." |

*Cockpit Voice Recorders and Air Traffic Control Combined Transcript, NTSB, at p. 24-25.*

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 23-A, at 20:43:37.0, RDO-2, believed to be the First Officer of AE5342, states, "yeah we can do uh three three for Bluestreak fifty three forty two," at 20:43:39.6, the Washington Tower local controller stated, "Bluestreak fifty three forty two at the Wilson Bridge change to cir—* change to circ —* runway three three. [R]unway three three cleared to land," and at 20:43:46.3, RDO-2 states, "change to runway three three uh runway three three cleared to land Bluestreak fifty three forty two." The United States further admits that according to NTSB Hearing Exhibit 23-A, prior to accepting the switch to Runway 33, the Captain and First Officer of AE5342 didn't brief on accepting Runway 33, including under what conditions they would accept Runway 33, such as nighttime conditions, potential helicopter traffic, with the exception of stating that they had "the numbers." The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 137 and therefore denies the same.

138.    Upon information and belief, prior to AE 5342's attempted landing, the DCA controller requested other American Airlines aircraft, including a PSA CRJ landing directly ahead of AE 5342, to accept a circling approach to Runway 33, but those other aircraft rejected ATC's request, opting instead to land on the more commonly used Runway 1.

**ANSWER:** The United States admits that NTSB Hearing Exhibit 23-A, at 20:42:48.0, Bluestreak 5307 responded to the Washington Tower local controller's request to accept Runway 33 with "unable tonight" and continued to land on Runway 1. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 138 and therefore denies the same.

139.    At or about the same time AE 5342 was switching to Runway 33 (approximately 8:43:48 p.m.), PAT25 was traveling South on Helicopter Route 1 about 1.1 nm west of the Key

Bridge.  At that time, the helicopter's CVR revealed that the pilot flying ("PF") said the helicopter was at an altitude of 300 feet, but the instructor pilot ("IP") responded that the helicopter was at 400 feet.[7]  Despite this acknowledged altitude discrepancy, there was no discussion nor resolution by the PAT25 flight crew of why the PF and the IP perceived and commented on different altitudes.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 23-A, at 20:43:47.7, INT-2, believed to be the pilot flying PAT25, stated, "we're at three hundred," and at 20:43:49.8, INT-1, believed to be the instructor pilot in PAT25, stated, "roger got you at four looking for *"; and the transcript revealed no further discussion about altitude discrepancies between the pilots of PAT25.  The United States further admits that according to NTSB Hearing Exhibit 13-A, PAT25 crossed the Key Bridge at 20:44:34 heading generally downriver.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 139 and footnote 7 and therefore denies the same.

140.    At approximately 8:44:27 p.m., as PAT25 approached the Key Bridge, the IP called out to the PF that PAT25 was at 300 feet descending to 200 feet.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 23-A, at 20:44:27.7, INT-1, believed to be the instructor pilot in PAT25, stated, "alright there's three hundred for two hundred."  The United States further admits that according to NTSB Hearing Exhibit 13-A, at this time, PAT25 was approaching the Key Bridge.  The United States denies the remaining allegations in paragraph 140.

---

[7] All conversations between the PAT25 crew are based on the transcript of the CVR released by the NTSB.

141.     At approximately 8:45:11 p.m., only after performing the before-landing checklist, the pilots of AE5342 began searching for the approach information for the circling approach to Runway 33 at DCA, information that surely would have been closer at hand had the approach been briefed before it was accepted, as required by PSA procedure to its pilots.

>     AE 5342 Cpt:  "lets see... approaches... approaches... I dunno * *."

>     AE 5342 Cpt:  "* * visual three three * *."

>     *Cockpit Voice Recorders and Air Traffic Control Combined Transcript, NTSB, at p. 24-25.*

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 23-A, at 20:44:58:5, HOT-2, believed to be the First Officer of AE5342, stated, "before landing checklist is complete," and at 20:45:11.3, HOT-1, believed to be the Captain of AE5342, stated "lets see . . . approaches . . . approaches i dunno **."  The United States further admits that NTSB Hearing Exhibit 2-AIR-A contains PSA guidance to its pilots flying the Mt. Vernon Visual Approach to Runway 1 at DCA and that guidance states, "[c]onsider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the maneuver."  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 141 and therefore denies the same.

142.     At approximately 8:45:27 p.m., the captain of AE 5342 disconnected the autopilot and began hand-flying the aircraft.

**ANSWER:** The United States admits that according to the NTSB Preliminary Report, the autopilot was disconnected at 8:45:27 p.m.  The United States further admits that the Captain was likely hand flying AE5342 after the autopilot was disconnected.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 142 and therefore denies the same.

143.    At approximately 8:45:30 p.m., PAT25 passed over the Memorial Bridge.  The IP told the PF that they were at 300 feet and needed to descend to 200 feet.  The PF acknowledged, but again, there was no discussion or resolution of why the helicopter was still above the 200-foot mandatory maximum altitude restriction for the helicopter route.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 23-A, at 20:45:32.4, INT-1, believed to be the instructor pilot in PAT25, stated, "you're at three hundred feet. come down for me," and at 20:45:33.9, INT-2, believed to be the pilot flying PAT25, stated, "yeah," followed by "go down two hundred," and the transcript reveals no discussion between the pilots flying PAT25 about being above 200 feet on the helicopter route.  The United States further admits that according to NTSB Hearing Exhibit 13-A, PAT25 was about to cross over the Memorial Bridge.  The United States denies the remaining allegations in paragraph 143.

144.    Upon information and belief, at approximately 8:45:42 p.m., the pilots of AE 5342 were likely deleting and/or replacing all of the previous navigational inputs they had set for the Mount Vernon visual approach to Runway 1, which caused even more increased pilot workload in the cockpit.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 23-A, at 20:45:42.0, HOT-2, believed to be the First Officer for AE5342, stated, "yeah we are configured. [Y]ou want me to uh clear the flight director and everything," and at 20:45:44.8, HOT-1, believed to be the Captain of AE5342, stated, "uhhh sure why not," and at 20:45:46.4, HOT-2 stated, "all right." The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 144 and therefore denies the same.

145.    Upon information and belief, the flight crew of AE 5342 likely continued to be preoccupied with reconfiguring the aircraft's instrumentation, last-minute landing checks and

working to catch up on procedures for the circling approach to Runway 33, which again, was not previously briefed.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 12-AIR-A, the pilots of AE5342 didn't brief the Runway 33 approach. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 145 and therefore denies the same.

146. At approximately 8:46:02 p.m., DCA air traffic control advised PAT25 that traffic just south of Wilson Bridge was a CRJ at 1,200 feet circling to Runway 33. The CRJ was AE 5342.



*Figure 10 Google Earth image with airplane and helicopter preliminary flight tracks overlaid and each aircraft's position shown at 8:46:02 p.m.*

(Source: NTSB)

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 12-AIR-A, at 20:46:01.7, the Washington Tower local controller stated, "PAT two five traffic just south of Wilson Bridge is a C-R-J at one thousand two hundred feet circling to runway three three." The United States further admits the aircraft referenced by the local controller was AE5342, and paragraph 146 figure 10 appears as figure 2 in the NTSB Preliminary Report and the caption states, "Google Earth image with airplane and helicopter preliminary flight tracks overlaid, and each aircraft's approximate position shown at 2046:02." The United States denies the remaining allegations in paragraph 146 and figure 10.

147.    At approximately 8:46:02 p.m., the CVR inside AE 5342 recorded an audible radio transmission in which ATC informed PAT25 of traffic consisting of a CRJ at 1200 feet altitude crossing over the Wilson Bridge circling to land on Runway 33 at DCA.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 12-AIR-A, at 20:46:01.7, the CVR in the cockpit of AE5342 recorded the Washington Tower local controller transmitting, "PAT two five traffic just south of the Wilson Bridge is a C-R-J at one thousand two hundred feet circling to runway three three." The United States denies the remaining allegations in paragraph 147.

148.    Since this transmission was recorded by the AE 5342 CVR, the pilots of AE 5342 could hear this transmission, and thus, knew or should have known that the CRJ referenced by the controller was their aircraft, and that there was a helicopter along their route of flight that they needed to be aware of, and were required to see and avoid.

**ANSWER:** The United States admits the Federal Aviation Regulations required the Captain and First Officer of AE5342 to maintain vigilance so as to see and avoid other aircraft.

76

The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 148 and therefore denies the same.

149.    The DCA air traffic controllers did not at this time or any time prior to the collision issue a traffic advisory informing AE 5342 of PAT25's position, type, direction and intentions.

**ANSWER:** The United States admits the allegations in paragraph 149.

150.    The pilots of AE 5342, however, should also have seen the presence of another aircraft as a turquoise diamond approaching their aircraft on their TCAS displays, including its relative position and relative altitude. (*See* Figure 11 below).



*Figure 11 – Simulated TCAS Display Showing a Display Similar to What Would have been Displayed in the Subject Airplane approximately 41 Seconds Before the Collision, Showing the Helicopter as well as its relative Position and Altitude Dead Ahead as a Turquoise Diamond*

(Source: NTSB Airplane TCAS Specialist Study, Inv. No. DCA25MA108)

**ANSWER:** The United States admits that certain TCAS systems can visually depict a turquoise diamond to represent another aircraft including its relative position and altitude. The

United States further admits that figure 11 appears in NTSB Hearing Exhibit 9-AIR-B as figure 7 and is a screenshot of a TCAS model display, which is not an actual representation, and the screenshot in figure 7 corresponds to approximately 41 seconds before the collision.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 150 and figure 11 and therefore denies the same.

151.    At approximately 8:46:08 p.m., PAT25 radioed the DCA tower that it had traffic in sight and requested "visual separation" from the CRJ.  The DCA tower approved the request.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 23-A, at 20:46:08.0, a crewmember of PAT25, likely the instructor pilot, stated, "PAT two five has the traffic in sight request visual separation," and at 20:46:10.5, the Washington Tower local controller stated, "vis separation approved."  The United States denies the remaining allegations in paragraph 151.

152.    Moments later, the DCA tower air traffic controller received a conflict alert ("CA") that AE 5342 and PAT25 were on converging and unsafe flight paths.[8]

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 23-A, at 20:47:39.1, the transcript states, "sounds of rapid beeping consistent with a conflict alert audible in [the] background" and the conflict alert involved AE5342 and PAT25, which were on converging flight paths.  The United States further admits that according to The Pilot/Controller Glossary, a Conflict Alert (CA) is "a function of certain air traffic control automated systems

---

[8] A Conflict Alert or CA is a function of the radar and computer logic that ATC at DCA uses. The system can predict whether aircraft are on converging flight paths and if so, the Certified tower Radar Display that the air traffic controller is using will visually alert the air traffic controller to the fact that the aircraft are converging by displaying a red flashing "CA" next to both aircraft.  The system also provides an "aural alert" over a speaker to the entire control tower cab to advise air traffic control of an impending possible collision.

designed to alert radar controllers to existing or pending situations between tracked aircraft

targets (known IFR or VFR aircraft) that require his/her immediate attention/action."  The United

States further admits that a conflict alert has a visual and aural alert component, with the visual

component consisting of a red flashing "CA" appearing in the data blocks for the aircraft that

radar automation has determined may be in an unsafe proximity to each other, and the aural alert

component is broadcast over a speaker in the tower cab.  The United States lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph

152 and footnote 8 and therefore denies the same.

153.    At approximately 8:47:39 p.m., the DCA tower air traffic controller radioed

PAT25 questioning whether PAT25 had "the CRJ in sight."  A CA from the ATC equipment was

audible in the background of this transmission from the DCA tower.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 23-A, at

20:47:39.1, the Washington Tower local controller stated, "PAT two five you have the C-R-J in

sight," and the transcript states, "sounds of rapid beeping consistent with a conflict alert audible

in [the] background."  The United States further admits that the rapid beeping sounds audible on

the transcript were produced by air traffic control radar automation.  The United States denies the

remaining allegations in paragraph 153.

154.    At approximately 8:47:39 p.m., the CVR inside AE 5342 picked up an audible

radio transmission in which ATC questioned whether PAT25 had "the CRJ in sight", effectively

asking the subject helicopter if it saw AE 5342.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 23-A, at

20:47:39.1, the transcript for AE5342's CVR states, "PAT two five you got the C-R-J in sight."

The United States further admits that local controller's transmission was asking the pilots of

PAT25 if they could see AE5342.  The United States denies the remaining allegations in paragraph 154.

155.    The pilots of AE 5342 could hear this transmission and thus knew, or should have known, that the CRJ referenced by ATC was their aircraft, and accordingly this should have served as a second warning that there was a helicopter in close proximity and alerted the AE 5342 flight crew to see and avoid the helicopter.

**ANSWER:** The United States admits that the transmission at 20:47:39.1 would have been audible in the AE5342 cockpit and the AE5342 pilots failed to maintain vigilance so as to see and avoid PAT25.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 155 and therefore denies the same.

156.    At approximately 8:47:40 p.m., one second later, the TCAS onboard AE 5342 issued an aural TA alert stating "TRAFFIC, TRAFFIC", warning the pilots of AE 5342 that they were on a dangerous, potential collision course with PAT25.  The TCAS also provided a visual alert of "Traffic" on the pilots' primary flight display.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 12-AIR-A, at 20:47:40.3, the transcript states "traffic. traffic. [automated voice]."  The United States further admits that the audible traffic alert in the cockpit is designed to advise pilots of potential traffic and certain cockpit displays may visually depict the text "TRAFFIC" under certain circumstances.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 156 and therefore denies the same.

157.    This aural and visual advisory issued by the airplane's TCAS to the flight crew of AE 5342 should have further alerted the crew that they were approaching traffic, almost certainly the helicopter with which ATC had been communicating, which they needed to see and avoid.

**ANSWER:** The United States admits that an aural and visual traffic alert should have alerted the pilots of AE5342 that they were near potential traffic and the AE5342 pilots failed to maintain vigilance so as to see and avoid PAT25. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 157 and therefore denies the same.

158.    After the TCAS aurally alerted the pilots of AE 5342 to "TRAFFIC TRAFFIC" at 8:47:40 p.m., a full 19 seconds prior to impact with PAT25, the TCAS system also continued to visually depict PAT25 on the pilots' MFD screens in bright yellow (*see* Figure 12 below) signifying it was a danger to AE 5342, but no evasive action was taken by AE 5342, nor did the AE 5342 flight crew even discuss the TCAS alert or any potentially unsafe traffic in the vicinity of the aircraft.



*Figure 12 – Simulated TCAS Display Showing a Display Similar to What Would have been Displayed in the Subject Airplane approximately 20 Seconds Before the Collision, Showing the Helicopter as well as its relative Position and Altitude in Yellow*
(Source: NTSB Airplane TCAS Specialist Study, Inv. No. DCA25MA108)



*Figure 13 – Google Earth image showing the approximate positions of both aircraft at 8:47:40 p.m., approximately 19 seconds before the collision*
(Source: NTSB Preliminary Report - Figure 3)

**ANSWER:** The United States admits that certain TCAS systems can visually depict a yellow circle to represent another aircraft including its relative position and altitude on certain cockpit flight displays.  The United States further admits that according to NTSB Hearing Exhibit 12-AIR-A, at 20:47:40.3, the transcript states "traffic. traffic. [automated voice]," and the transcript revealed no communication about the TCAS alert between the pilots of AE5342 from the time the automated voice annunciated "traffic traffic" until the collision.  The United States further admits that according to NTSB Hearing Exhibit 9-AIR-B, the TA occurred approximately 20 seconds before the collision, and figure 12 appears in the TCAS Specialist Study as figure 8 but with a different caption, and is a screenshot of a TCAS model display, which is not an actual

representation, and the screenshot in figure 12 corresponds to approximately 20 seconds before the collision. The United States further admits that figure 13 appears as figure 3 in the NTSB Preliminary Report and contains a caption stating, "Google Earth image showing the approximate positions of both aircraft at 2047:40." The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 158, figures 12 and 13, and therefore denies the same.

159.    The TCAS did not provide an RA at any point between the initial TA and the Subject mid-air collision because AE 5342 was below 1,000 feet in altitude during this time and that function is disabled when the aircraft is below 1,000 feet in altitude.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 9-AIR-B, "[t]he TCAS was in TA Only mode because the aircraft was below 900 ft and therefore no resolution advisories (RAs) would occur." The United States further admits that, according to NTSB Hearing Exhibit 9-AIR-G, certain TCAS systems may inhibit RAs when an aircraft is at or below 1,000 feet (plus or minus 100 feet) above the ground. The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 159 and therefore denies the same.

160.    The TCAS visual TA depiction of the yellow circle on the MFD screens provided altitude, location and proximity information for the subject helicopter and would have continued un-inhibited until the collision.

**ANSWER:** The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 160 and therefore denies the same.

161.    Contrary to PSA policy and procedure, the AE 5342 flight crew did not even discuss the potential traffic that the TCAS had provided and was continuing to provide (either the aural or visual alert) at any time prior to the Subject mid-air collision complained of herein.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 12-AIR-A, the transcript revealed no communication about the TCAS alert between the pilots of AE5342 from the time the automated voice annunciated "traffic. traffic" until the collision. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 161 and therefore denies the same.

162.    At approximately 8:47:42 p.m., the air traffic controller at the DCA tower radioed PAT25 instructing it to pass behind the CRJ.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 23-A, at 20:47:41.9, on the tower voice recording, the local controller stated, "PAT two five pass behind the C-R-J," and at 20:47:41.9, on the Helicopter CVR, the local controller stated, "PAT [transmission interrupted by 0.8 second mic key from PAT-25] C-R-J." The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 162 and therefore denies the same.

163.    At approximately 8:47:42 p.m., two seconds after the aural "TRAFFIC, TRAFFIC" TCAS alert, the CVR inside AE 5342 picked up the audible radio transmission in which ATC directed PAT25 to "pass behind the CRJ", meaning pass behind AE 5342.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 12-AIR-A, at 20:47:40.3, the transcript states, "traffic. traffic. [automated voice]," and at 20:47:42.0, the local controller stated, "PAT two five pass behind the C-R-J." The United States further admits that the Washington Tower local controller's transmission to "pass behind the C-R-J" was in

84

reference to AE5342.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 163 and therefore denies the same.

164.     PSA policies and procedures required the pilots upon receiving a TA to "[a]ttempt to see the reported traffic."  At no point does the AE 5342 CVR record any discussion between the captain and first officer of the TCAS TA alert, the need to check for the traffic being warned of, or any reason why they should or should not be concerned by the alert.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 2-AIR-A, figure 15, PSA had a policy for its pilots who receive a TA that stated, "[a]ttempt to see the reported traffic," and the transcript revealed no communication about the TCAS alert between the pilots of AE5342 from the time the automated voice annunciated "traffic. traffic" until the collision.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 164 and therefore denies the same.

165.     In the context of the prior ATC communications asking PAT25 if the CRJ was in sight and AE 5342's TCAS alert, both only seconds earlier, this radio transmission, which was heard inside the cockpit should have further warned AE 5342 that there was a helicopter in very close proximity that required the crew to immediately establish visual contact and maneuver to avoid the helicopter.  At a minimum, it required the flight crew to discuss and consider the potential traffic.

**ANSWER:** The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 165 and therefore denies the same.

166.     At approximately 8:47:44 p.m., PAT25 indicated that the traffic was in sight and again requested visual separation, which was approved by the DCA tower.  CVR data from

PAT25 indicated that, following this transmission, the IP told the PF that the IP believed ATC was asking for the helicopter to move left toward the east bank of the Potomac River.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 12-HELO-A, at 20:47:44.1, PAT25 responded to the Washington Tower local controller, stating, "PAT two five has uh— aircraft in sight request visual separation, " and at 20:47:52.5, INT-1, believed to be the instructor pilot, stated to the pilot flying "alright kinda come left for me ma'am I think that's why he's asking." The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 166 and therefore denies the same.

167.    At approximately 8:47:58, the CVR inside AE 5342 picked up "a verbal reaction" by the flight crew and the flight data recorder indicates that the aircraft increased its pitch.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 12-AIR-A, at 20:47:58.6, HOT-1, believed to be the Captain of AE5342, states "oh #" with # representing a deleted expletive. The United States further admits that according to NTSB Hearing Exhibit 13-A, when the collision occurred at 20:47:59, AE5372 was in a slight left roll and elevators were deflected to near their maximum nose up travel. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 167 and therefore denies the same.

168.    This is the first indication that Flight AE 5342 saw PAT25 and that it was taking any action to avoid a collision, despite the prior radio communications between PAT25 and ATC, the TCAS "TRAFFIC, TRAFFIC" alerts that were clearly audible in the cockpit, the "TRAFFIC" TA text on their primary flight display, and the yellow TCAS target depicted on the flight crew's MFD screens.

**ANSWER:** The United States admits that AE5342 being in a slight left roll with elevators deflected to near their maximum nose up travel when the collision occurred at 20:47:59, according to NTSB Hearing Exhibit 13-A, could be indicative of an evasive maneuver. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 168 and therefore denies the same.

169.    PAT 25 made no attempts to avoid hitting AE 5342.

**ANSWER:** The United States admits that PAT25 made no evasive maneuvers in the final seconds of flight that would indicate the pilots attempted to avoid hitting any other aircraft. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 169 and therefore denies the same.

170.    At approximately 8:47:58 p.m., the CVR inside AE 5342 recorded sounds of the impact with PAT25.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 12-AIR-A, at 20:47:59.5, the transcript states, "[sounds consistent with impact.]" The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 170 and therefore denies the same.

171.    Both aircraft fell into Potomac River, and all 67 individuals on board both aircraft were killed.

**ANSWER:** The United States admits the allegations in paragraph 171.

172.    This collision could have been avoided if: (1) the flight crew of AE 5342 executed a go-around or otherwise took evasive action 19 seconds earlier when they received the TCAS audible alert warning them of an impending collision with the Army helicopter; (2) if the flight crew of PAT25 had maintained visual separation by seeing and avoiding AE 5342, and by staying

on the charted course and within the charted altitude of Helicopter Route 4; and/or (3) if ATC had maintained traffic separation and issued traffic safety alerts as required.

**ANSWER:** The United States admits that the accident could have been avoided if PAT25 had maintained visual separation by seeing and avoiding AE5342. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 172 and therefore denies the same.

173. The last recorded radio altitude recorded for AE 5342 from 2 seconds before the collision was 313 feet according to the aircraft's Flight Data Recorder ("FDR"). PAT25's FDR indicated that its radio altitude (altitude above ground) at the time of collision was 278 feet and had been steady for the previous 5 seconds. Therefore, PAT25 violated the maximum published 200-foot altitude restriction for that section of Helicopter Route 4.

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 13-A, just before impact, the last recorded radio altitude for AE5342 was 313 feet, and PAT25's final recorded radio altitude was 278 feet above the river or MSL at the time of the accident. The United States further admits that according to the NTSB Preliminary Report, PAT25's altitude had been steady for the previous five seconds. The United States denies the remaining allegations in paragraph 173.

174. In executing its circling approach, AE 5342 turned on final with ample time to see and avoid PAT25, which it knew, or should have known, from the prior radio transmissions from ATC and the TCAS alerts was in potentially dangerous proximity and getting closer, but it failed to take any action to see or avoid the other aircraft.

**ANSWER:** The United States admits that the AE5342 pilots failed to maintain vigilance so as to see and avoid PAT25. The United States lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 174 and therefore denies the same.

175.    AE 5342 had approximately 19 seconds between when the aircraft issued a TCAS "TRAFFIC TRAFFIC" alert and the eventual collision to take action to avoid an imminent collision, but it failed to take any such action until it was too late.  19 seconds before the collision, the aircraft were .95 nautical miles apart.  (Figure 13 above depicts the locations of PAT25 and AE 5342 when the AE 5342 pilots received the TCAS audible "TRAFFIC TRAFFIC" aural alert warning them of the impending collision with the Army helicopter.)

**ANSWER:** The United States admits that according to NTSB Hearing Exhibit 9-AIR-B, the TA occurred approximately 20 seconds before the collision.  The United States further admits that figure 13 in paragraph 158 states that AE5342 and PAT25 were .95 nautical miles apart 19 seconds prior to the accident and depicts the relative location of AE5342 and PAT25, and according to NTSB Hearing Exhibit 12-AIR-A, at 20:47:40.3, the transcript states, "traffic. traffic [automated voice]."  The United States further admits that the automated "traffic traffic" alerts pilots to traffic that may be a factor for their aircraft.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 175 and figure 13 and therefore denies the same.

176.    Even the 16-second interval between the last ATC communication heard by AE 5342 and the collision provided ample time for the crew of AE 5342 to see and avoid PAT25 and/or to have taken evasive action to avoid the collision with the helicopter.

**ANSWER:** The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 176 and therefore denies the same.

177.    Even when being positively controlled by ATC, pilots have a duty to see and avoid other traffic, particularly when navigating visually, as AE 5342 was at the time of this crash.

**ANSWER:** The United States admits that even when being positively controlled by ATC, pilots have a duty to maintain vigilance so as to see and avoid other traffic.  The United States denies the remaining allegations in paragraph 177.

178.    Upon information and belief, it was well known to commercial pilots flying into DCA, including the crew of AE 5342, that the airspace around the airport is busy, including helicopter traffic.

**ANSWER:** The United States admits that certain pilots could characterize the DCA airport as busy at certain times, and the airport's traffic includes helicopters. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 178 and therefore denies the same.

179.    Upon information and belief, it is well known to pilots that conducting a circling approach where visual navigation is required is a dangerous maneuver that significantly increases pilot workload and that special care must be taken to ensure safe flight during this maneuver, including vigilantly checking nearby airspace for any air traffic that could intersect an aircraft's intended flight path.

**ANSWER:** The United States admits that certain pilots could hold the belief that in certain circumstances conducting a circling approach where visual navigation is required is a dangerous maneuver that significantly increases pilot workload and that special care must be taken to ensure safe flight during this maneuver, including vigilantly checking nearby airspace for any air traffic that could intersect an aircraft's intended flight path.  The United States lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 179 and therefore denies the same.

180.    As a result, the crew of AE 5342 was required to, and should have maintained situational awareness and continually checked for traffic along and/or intersecting with their intended flight path.

**ANSWER:** The allegations in paragraph 180 are not directed to the United States. To the extent the allegations could be construed as directed to the United States, the United States admits that the pilots in AE5342 are expected to maintain situational awareness and scan for traffic including traffic along and/or intersecting their airplane's intended flight path. The United States denies the remaining allegations in paragraph 180.

181.    The crew of AE 5342 was required to and should have maintained situational awareness to see and avoid PAT25 and realized they were in dangerous proximity to PAT25, and as result should have executed a go-around (a standard safety maneuver wherein pilots abort their landing and circle back around the airport's traffic pattern to attempt the landing again under safer conditions).

**ANSWER:** The allegations in paragraph 181 are not directed to the United States. To the extent the allegations could be construed as directed to the United States, the United States admits that the pilots of AE5342 are expected to maintain situational awareness and were required to and should have maintained vigilance so as to see and avoid other aircraft. The United States further admits that a "go-around" is a standard maneuver for pilots that involves aborting a landing to potentially attempt another landing at the same airport depending on the circumstances and can involve circling back in an airport traffic pattern to land on the same or

different runway.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 181 and therefore denies the same.

182.    The crew of PAT25 was also required to and should have maintained situational awareness and continually checked for traffic along and/or intersecting with their intended flight path.

**ANSWER:**  The United States admits that the crew of PAT25 should have maintained situational awareness and scanned for traffic including traffic along and/or intersecting their intended flight path. The United States denies the remaining allegations in paragraph 182.

183.    The crew of PAT25 was further required to and should have remained below the 200-foot maximum altitude limitation of Helicopter Route 4 and remained within the lateral confines of Helicopter Route 4.

**ANSWER:** The United States admits that the PAT25 pilots should have complied with the Letter of Agreement between Washington Tower, Andrews Tower, Dulles Tower, Baltimore Tower, Air Force 1st Squadron, Army 12th Aviation Battalion and the DC Army National Guard, effective September 30, 2007 (LOA), states in paragraph 4.a "[r]outes and altitudes described in the Baltimore-Washington Helicopter Route Chart must apply unless otherwise authorized by ATC."  The United States denies the remaining allegations in paragraph 183.

184.    The crew of PAT25 was also required to and should have maintained situational awareness to see and avoid AE 5342 and realized they were in dangerous proximity to Flight AE 5342, and as a result should have taken evasive maneuvers and/or were required to see and avoid AE 5342.

**ANSWER:**  The United States admits that the crew of PAT25 were required to maintain vigilance so as to see and avoid other aircraft including AE5342 and maintain situational

awareness, including along its intended path of flight.  The United States further admits that the PAT25 pilots should have maneuvered to avoid colliding with AE5342.  The United States denies the remaining allegations in paragraph 184.

185.    The air traffic controllers at DCA were required to and should have issued a traffic advisory informing AE 5342 of PAT25's position, type, direction and intentions, including PAT25's relative o'clock position, distance and altitude.

**ANSWER:** The United States admits that the DCA local controller did not comply with ¶ 7-2-1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5, 2024), which states, "[i]f aircraft are on converging courses, inform the other aircraft of the traffic and that visual separation is being applied."  The United States denies the remaining allegations in paragraph 185.

186.    Upon information and belief, the radar display screen that the DCA LC was using (referred to as a "Radar Video Map" or "RVM") depicted PAT25's altitude at 300 feet as it was transiting Helicopter Route 4.  Thus, the air traffic controllers at DCA were required to and should have notified PAT25 that it was violating the maximum altitude limitation of Helicopter Route 4 and issued positive control instructions to descend.

**ANSWER:** The United States admits that a Tower Display Workstation available to the local controller can depict many Radar Video Maps; a digitized beacon target for PAT25 was available for display at certain times when the DCA local controller was providing services to PAT25 depending on the local controller's personalized settings.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegation that the altitude for PAT25 available for display to the local controller indicated 300 feet as it transited Helicopter Route 4.  The United States denies the remaining allegations in paragraph 186.

187.    The air traffic controllers at DCA were further required to and should have ensured adequate separation of aircraft and issued Safety Alerts and/or positive control instructions when the aircraft were in unsafe proximity to one another.

**ANSWER:** The United States admits the DCA local controller did not comply with ¶ 7-2-1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5, 2024), which states, "[i]f aircraft are on converging courses, inform the other aircraft of the traffic and that visual separation is being applied." The United States denies the remaining allegations in paragraph 187.

188.    The air traffic controllers at DCA were also required to, and should have ensured that helicopter traffic, like PAT25, was held or otherwise not transiting Helicopter Route 4 while commercial traffic, like AE 5342, was cleared for and executing the visual circling approach to land on Runway 33.

**ANSWER:** The United States denies the allegations in paragraph 188.

189.    The negligent acts and omissions described herein proximately caused, or contributed to, the Subject mid-air collision of PAT25 and AE 5342 that then resulted in both aircraft crashing into the Potomac River and killing DECEDENT.

**ANSWER:** To the extent the allegations in paragraph 189 are directed or can be construed as directed to the United States, the United States admits that the AE5342 and PAT25 pilots failed to maintain vigilance so as to see and avoid other aircraft. The United States denies that any alleged negligence of the air traffic controllers on position in Washington Tower during the accident was a cause-in-fact and a proximate cause of the accident and the death of DECEDENT. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 189 and therefore denies the same.

190.    As a result of the foregoing negligent actions and omissions that caused the conscious fear of impending death and subsequent death of DECEDENT, PLAINTIFF, in his/her capacity as personal representative, is entitled to recover compensation for DECEDENT's mental and physical pain and suffering, any past and future earning capacity of DECEDENT, and/or any other damage allowed under applicable law.

**ANSWER:** The United States admits that the AE5342 and PAT25 pilots failed to maintain vigilance so as to see and avoid other aircraft, and as a result of government employee negligence, PLAINTIFF, if legally eligible, may recover certain monetary damages from the United States as permitted under the FTCA, 28 U.S.C. §§ 1346(b), 2671–80, in an amount yet to be determined and apportioned among other tortfeasors. The United States denies that any alleged negligence of air traffic controllers on position in the Washington Tower during the accident was a cause-in-fact and a proximate cause of the accident and the death of DECEDENT. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 190 and therefore denies the same.

191.    As a result of the foregoing negligent actions and omissions, PLAINTIFF, both individually and on behalf of DECEDENT's other wrongful death beneficiaries, is/are entitled to compensation for funeral expenses, loss of monetary support, loss of services, loss of society and comfort, and for profound emotional and psychological loss suffered as a result of DECEDENT's death, as well as all other damages allowed under applicable law.

**ANSWER:** The United States admits that the AE5342 and PAT25 pilots failed to maintain vigilance so as to see and avoid other aircraft and, as a result of government employee negligence, PLAINTIFF, if legally eligible, may recover certain monetary damages, on behalf of PLAINTIFF and other beneficiaries, from the United States as permitted under the Federal Tort

Claims Act, 28 U.S.C. §§ 1346(b), 2671–80, in an amount yet to be determined and apportioned among other tortfeasors. The United States denies that any alleged negligence of air traffic controllers on position in the Washington Tower during the accident was a cause-in-fact and a proximate cause of the accident and the death of DECEDENT. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 191 and therefore denies the same.

**FIRST CAUSE OF ACTION**
**WRONGFUL DEATH BASED UPON COMMON**
**CARRIER DUTY AGAINST AMERICAN**

192.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding paragraphs.

**ANSWER:** The United States incorporates by reference all of its answers to the preceding paragraphs as if fully stated in this answer to paragraph 192.

193.    At all relevant times, American, including but not limited to its officers, directors, employees and flight crews, as a common carrier, owed the highest duty of care to passengers like DECEDENT, to exercise the utmost care and to avoid even the slightest negligence in operating aircraft in the NAS, including in and around DCA; in exercising the highest degree of care in adopting safe policies and procedures for operating its aircraft in the NAS, including in and around DCA; including those aircraft operating under the "American" banner such as under the American Eagle brand name; and/or in exercising oversight of the operations and procedures of its holding company's subsidiary, PSA.

**ANSWER:** The allegations in paragraph 193 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that American must operate at the appropriate standard of care under the law. The United States

lacks knowledge or information sufficient to form a belief as to the truth of the remaining
allegations in paragraph 193 and therefore denies the same.

194.    On January 29, 2025, American was negligent and breached its duty as a common
carrier to DECEDENT and Plaintiff as follows:

a.  by allowing PSA to maintain policies and procedures that allowed AE 5342 to
conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime
conditions, a known history of near miss events where commercial aircraft and
helicopters came within dangerous proximity of each other at or nearby DCA, and
helicopter traffic reported in the area;

b.  by failing to require PSA to adopt policies and procedures that prohibited AE
5342 from conducting a dangerous circling approach to Runway 33 at DCA,
despite nighttime conditions, a known history of near miss events where
commercial aircraft and helicopters came within dangerous proximity of each
other at or nearby DCA, and helicopter traffic reported in the area;

c.  by failing to require PSA to adequately evaluate the safety of a circling approach
to land on Runway 33 in light of the information available, including the location
of Helicopter Route 4, which crosses the approach path to Runway 33, and the
known history of near miss events where commercial aircraft and helicopters
came within dangerous proximity of each other at or nearby DCA;

d.  by failing to require PSA to adequately inform flight crews operating flights into
DCA of the location, including lateral and vertical boundaries of published
helicopter routes transiting the airspace surrounding DCA, to ensure that they
were fully aware of the risks associated with the complex approaches to DCA,

and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

e.   by failing to require PSA to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

f.   by failing to require PSA to train flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

g.   by failing to require PSA to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

h.   by failing to require PSA to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4;

i.   by failing to require PSA to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and

would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

j.   by otherwise acting in such a manner as to create an environment in which a mid-air collision could occur;

k.   by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject mid-air collision;

l.   by failing to adequately supervise, monitor, and control PSA as American's contracting carrier and holding company's wholly-owned subsidiary, so as to prevent the aforementioned negligent acts and omissions which led to the subject mid-air collision;

m.   by failing to require PSA to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training their employees regarding circling approaches and the circling approach into Runway 33 at DCA in particular;

n.   by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA within a single clock hour of the day (e.g., 8 pm to 9 pm) set by the FAA, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

o.  by failing to require PSA to adequately train its pilots to safely operate at DCA including by failing to include in any documents or materials specific to DCA any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

p.  by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a study through PSA's own internal safety program(s);

q.  by failing to require PSA to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet;

r.  by otherwise failing to require PSA to abide by and/or allowing PSA to violate FAA rules and/or regulations, and/or PSA's own SOPs, Memoranda of Understanding (MOUs), LOAs, and/or policies and procedures;

s.  by otherwise violating FAA rules and/or regulations, and/or American's own SOPs, MOUs, LOAs, and/or policies and procedures; and

t.    by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

**ANSWER:** The allegations in paragraph 194 and all subparts are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 194 and therefore denies the same.

195.    Through the aforementioned negligence, American directly and proximately caused and/or contributed to the Subject mid-air collision and thereby the injuries and death of Plaintiff's DECEDENT, and the resulting damages to Plaintiff herein.

**ANSWER:** The allegations in paragraph 195 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 195 and therefore denies the same.

196.    In addition to being negligent, the acts and omissions set forth herein were made in willful disregard for the rights of the DECEDENT and were reckless toward the safety of the DECEDENT.

**ANSWER:** The allegations in paragraph 196 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 196 and therefore denies the same.

197.    As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of American, there was a measurable and significant period of time prior to the death

of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

      **ANSWER:** The allegations in paragraph 197 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 197 and therefore denies the same.

      198.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by Plaintiff, seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and suffering that the heirs, beneficiaries and distributees of the DECEDENT's Estate were caused to incur other; and necessary and reasonable expenses as a result of the DECEDENT's death.

      **ANSWER:** The allegations in paragraph 198 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 198 and therefore denies the same.

**SECOND CAUSE OF ACTION**
**SURVIVAL BASED UPON COMMON**
**CARRIER DUTY AGAINST AMERICAN**

199.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding Paragraphs.

**ANSWER:** The United States incorporates by reference all of its answers to the preceding paragraphs as if fully stated in this answer to paragraph 199.

200.    At all relevant times, American, including but not limited to its officers, directors, employees and flight crews, as a common carrier, owed the highest duty of care to passengers like DECEDENT, to exercise the utmost care and to avoid even the slightest negligence in operating the subject aircraft in the NAS, including in and around DCA, and/or in exercising the highest degree of care in adopting safe policies and procedures for operating its aircraft in the NAS, including in and around DCA, including those aircraft operating under the "American" banner including under the American Eagle brand name and in exercising oversight of the operations and procedures of its holding company's subsidiary, PSA.

**ANSWER:** The allegations in paragraph 200 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that American must operate at the appropriate standard of care under the law. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 200 and therefore denies the same.

201.    On January 29, 2025, American was negligent and breached its duty as a common carrier to DECEDENT and Plaintiff as follows:

a.  by allowing PSA to maintain policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA and helicopter traffic reported in the area;

b.  by failing to require PSA to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

c.  by failing to require PSA to adequately evaluate the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, which crosses the approach path to Runway 33, and the known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

d.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the location, including lateral and vertical boundaries of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

e.  by failing to require PSA to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling

approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

f.  by failing to require PSA to train flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

g.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

h.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4;

i.  by failing to require PSA to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

j.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur;

k.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject mid-air collision;

l.  by failing to adequately supervise, monitor, and control PSA as American's contracting carrier and holding company's wholly-owned subsidiary, so as to prevent the aforementioned negligent acts and omissions which led to the subject mid-air collision;

m.  by failing to require PSA to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training their employees regarding circling approaches and the circling approach into Runway 33 at DCA in particular;

n.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA to 32 within a single clock hour of the day (e.g., 8 pm to 9 pm) by the FAA when using the northbound configuration of Runway 1 and Runway 33, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

o.  by failing to require PSA to adequately train its pilots to safely operate at DCA, including by failing to include in any documents or materials specific to DCA any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

p.  by failing to properly perform comprehensive safety risk management ("SRM")

and/or a safety review of DCA operations concerning the likelihood of a mid-air

collision between commercial airplanes and helicopters prior to January 29, 2025,

which would have revealed the deficient training, policies and procedures

described above, including but not limited to a safety study through the ASIAS

(Aviation Safety Information Analysis and Sharing) program, in which American

and PSA were stakeholders, or a study through PSA's own internal safety

program(s);

q.  by failing to require PSA to adequately train its flight crews or otherwise ensure

flight crews understood the altitudes at which TCAS alerts are inhibited, including

specifically that RAs were inhibited below 1000 feet and that aural TAs were

inhibited below 400 feet;

r.  by otherwise failing to require PSA to abide by and/or allowing PSA to violate

FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or

policies and procedures;

s.  by otherwise violating FAA rules and/or regulations, and/or American's own

SOPs, MOUs, LOAs, and/or policies and procedures; and

t.  by taking and/or failing to take other actions to be proven through discovery or at

the trial in this matter, which were in contravention of the exercise of due care,

and reasonable prudence under the circumstances.

**ANSWER:** The allegations in paragraph 201 are not directed to the United States.  To the

extent the allegations can be construed as directed to the United States, the United States lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in
paragraph 201 and all subparts and therefore denies the same.

202.    Through the aforementioned negligence, American directly and proximately,
caused and/or contributed to the Subject Crash and thereby the injuries and death of Plaintiff's
DECEDENT and the resulting damages to Plaintiff herein.

**ANSWER:** The allegations in paragraph 202 are not directed to the United States.  To the
extent the allegations can be construed as directed to the United States, the United States lacks
knowledge or information sufficient to form a belief as to the truth of the allegations in
paragraph 202 and therefore denies the same.

203.    In addition to being negligent, the acts and omissions set forth herein were made
in willful disregard for the rights of the DECEDENT and was reckless toward the safety of the
DECEDENT.

**ANSWER:** The allegations in paragraph 203 are not directed to the United States.  To the
extent the allegations can be construed as directed to the United States, the United States lacks
knowledge or information sufficient to form a belief as to the truth of the allegations in
paragraph 203 and therefore denies the same.

204.    As a result of the foregoing and as a direct and proximate result of the acts and/or
omissions of American, there was a measurable and significant period of time prior to the death
of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain
and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and
damages that ultimately caused his/her death.

**ANSWER:** The allegations in paragraph 204 are not directed to the United States.  To the
extent the allegations can be construed as directed to the United States, the United States lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 204 and therefore denies the same.

205.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and suffering; and the heirs, beneficiaries and distributees of the DECEDENT's estate were caused to incur other necessary and reasonable expenses as a result of the DECEDENT's death and are entitled to all such damages, and were otherwise damaged.

**ANSWER:** The allegations in paragraph 205 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 205 and therefore denies the same.

### THIRD CAUSE OF ACTION
### WRONGFUL DEATH BASED UPON
### NEGLIGENCE AGAINST AMERICAN

206.    Plaintiff hereby incorporates by reference as though set forth fully herein all the preceding Paragraphs.

**ANSWER:** The United States incorporates by reference all of its answers to the preceding paragraphs as if fully stated in this answer to paragraph 206.

207.    At all relevant times, American, including but not limited to its officers, directors and employees, had a duty to the flying public, particularly passengers like DECEDENT, to exercise reasonable care in adopting safe policies and procedures for those operating aircraft in the NAS, including in and around DCA, including those aircraft operating under the "American" banner such as under the American Eagle brand name; and/or in exercising oversight of the operations and procedures of its holding company's subsidiary PSA.

**ANSWER:** The allegations in paragraph 207 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States admits that American must operate at the appropriate standard of care under the law. The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 207 and therefore denies the same.

208.    American was negligent and breached the duties it owed to DECEDENT and Plaintiff as follows:

      a.    by allowing PSA to maintain policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions and a known history of near miss events where commercial aircraft and

helicopters came within dangerous proximity of each other at or nearby DCA and helicopter traffic reported in the area;

b.  by failing to require PSA to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA and helicopter traffic reported in the area;

c.  by failing to require PSA to adequately evaluate the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, which crosses the approach path to Runway 33, and the known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

d.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the location, including lateral and vertical boundaries of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

e.  by failing to require PSA to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

f.  by failing to require PSA to train or inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

g.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

h.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4;

i.  by failing to require PSA to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

j.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur;

k.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject mid-air collision;

112

l.   by failing to adequately supervise, monitor, and control PSA as American's contracting carrier and holding company's wholly-owned subsidiary, so as to prevent the aforementioned negligent acts and omissions which led to the subject mid-air collision;

m.  by failing to require PSA to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject mid-air collision, including but not limited to training and/or otherwise informing their employees regarding circling approaches and the circling approach into Runway 33 at DCA in particular;

n.   by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA to 32 within a single clock hour of the day (e.g., 8 pm to 9 pm) by the FAA when using the northbound configuration of Runway 1 and Runway 33, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

o.   by failing to require PSA to adequately train or otherwise require its pilots to safely operate at DCA, including by failing to include in any documents or materials specific to DCA any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

p.   by failing to perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision

between commercial airplanes and helicopters prior to January 29, 2025, which

would have revealed the deficient training, policies and procedures described

above, including but not limited to a safety study through the ASIAS (Aviation

Safety Information Analysis and Sharing) program, in which American and PSA

were stakeholders, or study through PSA's own internal safety program(s);

q.   by failing to require PSA to adequately train its flight crews or otherwise ensure

flight crews understood the altitudes at which TCAS alerts are inhibited, including

specifically that RAs were inhibited below 1000 feet and that aural TAs were

inhibited below 400 feet;

r.   by otherwise failing to require PSA to abide by and/or allowing PSA to violate

FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or

policies and procedures;

s.   by otherwise violating FAA rules and/or regulations, and/or American's own

SOPs, MOUs, LOAs, and/or policies and procedures; and

t.   by taking and/or failing to take other actions to be proven through discovery or at

the trial in this matter, which were in contravention of the exercise of due care,

and reasonable prudence under the circumstances.

**ANSWER:** The allegations in paragraph 208 are not directed to the United States.  To the

extent the allegations can be construed as directed to the United States, the United States lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 208 and therefore denies the same.

114

209.    Through the aforementioned negligence, American directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's DECEDENT, and the resulting damages to Plaintiff herein.

**ANSWER:** The allegations in paragraph 209 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 209 and therefore denies the same.

210.    In addition to being negligent, the acts and omissions set forth herein were made in willful disregard for the rights of the DECEDENT and was reckless toward the safety of the DECEDENT.

**ANSWER:** The allegations in paragraph 210 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 210 and therefore denies the same.

211.    As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of American, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER:** The allegations in paragraph 211 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 211 and therefore denies the same.

212.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by Plaintiff, seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and suffering that the heirs, beneficiaries and distributees of the DECEDENT's Estate were caused to incur other; and necessary and reasonable expenses as a result of the DECEDENT's death.

**ANSWER:** The allegations in paragraph 212 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 212 and therefore denies the same.

**FOURTH CAUSE OF ACTION**
**SURVIVAL BASED UPON**
**NEGLIGENCE AGAINST AMERICAN**

213.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding Paragraphs.

116

**ANSWER:** The United States incorporates by reference all of its answers to the preceding paragraphs as if fully stated in this answer to paragraph 213.

214.    At all relevant times, American, including but not limited to its officers, directors and employees, had a duty to the flying public, particularly passengers like DECEDENT, to exercise reasonable care in adopting safe policies and procedures for operating its aircraft in the national airspace, including in and around DCA, including those aircraft operating under the "American" banner such as under the American Eagle brand name; and/or in exercising oversight of the operations and procedures of its holding company's subsidiary PSA.

**ANSWER:** The allegations in paragraph 214 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that American must operate at the appropriate standard of care under the law.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 214 and therefore denies the same.

215.    American was negligent and breached the duties it owed to DECEDENT and Plaintiff as follows:

a.    by allowing PSA to maintain policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA and helicopter traffic reported in the area;

b.    by failing to require PSA to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where

commercial aircraft and helicopters came within dangerous proximity of each

other at or nearby DCA, and helicopter traffic reported in the area;

c.  by failing to require PSA to adequately evaluate the safety of a circling approach

to land on Runway 33 in light of the information available, including the location

of Helicopter Route 4, which crosses the approach path to Runway 33, and the

known history of near miss events where commercial aircraft and helicopters

came within dangerous proximity of each other at or nearby DCA;

d.  by failing to require PSA to adequately inform flight crews operating flights into

DCA of the location, including lateral and vertical boundaries of published

helicopter routes transiting the airspace surrounding DCA, to ensure that they

were fully aware of the risks associated with the complex approaches to DCA,

and to maintain particular vigilance to see and avoid low level helicopter traffic in

the established helicopter routes in the vicinity of DCA;

e.  by failing to require PSA to provide adequate, sufficient and/or appropriate

information to its flight crews regarding whether or not to accept a circling

approach to Runway 33 at night, especially since PSA flight crews were vested

with discretion as to whether to accept or reject ATC's request for landing on

Runway 33;

f.  by failing to require PSA to train or inform flight crews operating flights into

DCA of how to respond to the risk of dangerous proximity to helicopters

transiting the airspace surrounding DCA along published helicopter routes,

including but not limited to by informing them of the location and vertical and

lateral boundaries of the published helicopter routes surrounding DCA;

118

g.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

h.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4;

i.  by failing to require PSA to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

j.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur;

k.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject mid-air collision;

l.  by failing to adequately supervise, monitor, and control PSA as American's contracting carrier and holding company's wholly-owned subsidiary, so as to prevent the aforementioned negligent acts and omissions which led to the subject mid-air collision;

m.  by failing to require PSA to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject mid-air collision, including but not limited to training and/or otherwise informing their employees regarding circling approaches and the circling approach into Runway 33 at DCA in particular;

n.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA to 32 within a single clock hour of the day (e.g., 8 pm to 9 pm) by the FAA when using the northbound configuration of Runway 1 and Runway 33, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

o.  by failing to require PSA to adequately train or otherwise require its pilots to safely operate at DCA, including by failing to include in any documents or materials specific to DCA any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

p.  by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American

and PSA were stakeholders, or a study through PSA's own internal safety

program(s);

q.  by failing to require PSA to adequately train its flight crews or otherwise ensure

flight crews understood the altitudes at which TCAS alerts are inhibited, including

specifically that RAs were inhibited below 1000 feet and that aural TAs were

inhibited below 400 feet;

r.  by otherwise failing to require PSA to abide by and/or allowing PSA to violate

FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or

policies and procedures;

s.  by otherwise violating FAA rules and/or regulations, and/or American's own

SOPs, MOUs, LOAs, and/or policies and procedures; and

t.  by taking and/or failing to take other actions to be proven through discovery or at

the trial in this matter, which were in contravention of the exercise of due care,

and reasonable prudence under the circumstances.

**ANSWER:** The allegations in paragraph 215 and all subparts are not directed to the

United States.  To the extent the allegations can be construed as directed to the United States, the

United States lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 215 and all subparts and therefore denies the same.

216.    Through the aforementioned negligence, American directly and proximately,

caused and/or contributed to the Subject Crash and thereby the injuries and death of Plaintiff's

DECEDENT, and the resulting damages to Plaintiff herein.

**ANSWER:** The allegations in paragraph 216 are not directed to the United States.  To the

extent the allegations can be construed as directed to the United States, the United States lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 216 and therefore denies the same.

217. In addition to being negligent, the acts and omissions set forth herein were made in willful disregard for the rights of the DECEDENT and was reckless toward the safety of the DECEDENT.

**ANSWER:** The allegations in paragraph 217 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 217 and therefore denies the same.

218. As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of American, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER:** The allegations in paragraph 218 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 218 and therefore denies the same.

219. As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full

value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and suffering; and the heirs, beneficiaries and distributees of the DECEDENT's estate were caused to incur other necessary and reasonable expenses as a result of the DECEDENT's death and are entitled to all such damages, and were otherwise damaged.

**ANSWER:** The allegations in paragraph 219 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 219 and therefore denies the same.

**FIFTH CAUSE OF ACTION**
**WRONGFUL DEATH BASED UPON**
**COMMON CARRIER DUTY AGAINST PSA**

220.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding Paragraphs.

**ANSWER:** The United States incorporates by reference all of its answers to the preceding paragraphs as if fully stated in this answer to paragraph 220.

221.    At all relevant times, PSA, including but not limited to its officers, directors, employees and flight crews, as a common carrier, owed the highest duty of care to passengers like DECEDENT, to exercise the utmost care and to avoid even the slightest negligence in operating the subject aircraft in the NAS, including in and around DCA, including but not

limited to see and avoid other aircraft pursuant to 14 C.F.R. § 91.13(a) and 91.113, and/or in
exercising the highest degree of care in adopting safe policies and procedures for operating its
aircraft in the NAS, including in and around DCA.

**ANSWER:** The allegations in paragraph 221 are not directed to the United States.  To the
extent the allegations can be construed as directed to the United States, the United States admits
that PSA has a duty to operate at the appropriate standard of care under the law, and the AE5342
pilots were required to maintain vigilance so as to see and avoid other aircraft to comply with 14
C.F.R. § 91.113.  The United States lacks knowledge or information sufficient to form a belief as
to the truth of the remaining allegations in paragraph 221 and therefore denies the same.

222.    On January 29, 2025, PSA was negligent and breached its duty as a common
carrier to DECEDENT and Plaintiff as follows:

a.   by failing to see and avoid PAT25, including while on final approach to Runway
33 at DCA, pursuant to 14 C.F.R. § 91.13(a) and 91.113;

b.   by failing to maintain situational awareness of the operational environment in the
airspace around DCA to avoid collision with another aircraft despite a known
history of near miss events where commercial aircraft and helicopters and/or
military aircraft almost collided at DCA;

c.   by failing to adequately recognize, respond, and/or take any action upon hearing
the TCAS aural "TRAFFIC TRAFFIC" alert, which the flight crew of AE 5342
received a full 19 seconds prior to impact, the visual yellow traffic depiction on its
primary flight display, and/or the yellow diamond indication on the multi-function
display showing the relative direction and altitude of PAT25 and highlighting it as
a potential danger, which the AE 5342 flight crew received continuously for 19

seconds prior to impact, including but not limited to by immediately executing a go-around to protect AE 5342 from collision with another aircraft, particularly in light of the additional audible radio transmissions between ATC and PAT25 that did not establish that PAT25 had AE 5342 in sight;

d.  by failing to take any other evasive action after the TCAS "TRAFFIC TRAFFIC" aural alert it received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which the AE 5342 flight crew received continuously for 19 seconds prior to impact with PAT25;

e.  by failing to brief (properly or otherwise) the circling approach to Runway 33 before accepting clearance to land on Runway 33 from ATC;

f.  by failing to adequately discuss the conditions under which the flight crew would accept a circling approach to Runway 33 prior to ATC's request that AE 5342 accept a circling approach to land at Runway 33;

g.  by accepting a more difficult and dangerous circling approach to land at Runway 33 at DCA in nighttime conditions when it had not been pre-briefed (as was required), when there had been no discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial;

h.  by maintaining policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions,

a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

i.  by failing to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

j.  by failing to evaluate (adequately or otherwise) the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, which crosses the approach path to Runway 33, and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

k.  by failing to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

l.  by failing to adequately inform flight crews operating flights into and out of DCA of the location, including lateral and vertical boundaries, of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks of associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

126

m.  by failing to train or otherwise inform flight crews operating flights into DCA of
    how to respond to the risk of dangerous proximity to helicopters transiting the
    airspace surrounding DCA along published helicopter routes, including but not
    limited to by informing them of the location and vertical and lateral boundaries of
    the published helicopter routes surrounding DCA;

n.  by failing to adequately inform flight crews operating flights into DCA of the
    history of near misses at DCA in order to ensure that they were fully aware of the
    risks associated with the complex approaches to DCA, and to ensure they
    maintained particular vigilance to see and avoid low level helicopter traffic in the
    established helicopter routes in the vicinity of DCA;

o.  by failing to adequately inform flight crews operating flights into DCA of the
    particular hazards associated with nighttime approaches to Runway 33 and to be
    particularly vigilant in exercising their duty to see and avoid helicopter traffic
    operating on Helicopter Route 4, which crosses the approach path to Runway 33;

p.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342,
    in a cluster at the bottom of one hour and the top of the next to circumvent the
    limits upon arrivals at DCA within a single clock hour of the day (e.g., 8 pm to 9
    pm) by the FAA, and thereby reducing the already strained safety margins at DCA
    when it knew, or should have known, of the history of near misses between its
    aircraft and helicopters operating in the airspace surrounding DCA;

q.  by failing to equip the subject airplane with LED lights, which would have been
    brighter and more defined than the incandescent lightbulbs and would have made

the aircraft more easily identifiable and tracked at night, particularly by those

wearing night vision goggles like the flight crew of PAT25;

r.   by otherwise acting and/or failing to act in such a manner as to create an

environment in which a mid-air collision could occur;

s.   by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from

engaging in the aforementioned negligent acts and omissions which led to the

subject crash;

t.   by failing to adequately supervise, monitor, and control their employees, to

prevent the aforementioned negligent acts and omissions which led to the subject

crash;

u.   by failing to adequately train, instruct and evaluate their employees, including

their flight crews so as to prevent the aforementioned negligent acts and

omissions which led to the subject crash, including but not limited to training

and/or properly informing their employees concerning circling approaches and the

circling approach into Runway 33 at DCA in particular;

v.   by failing to adequately train, qualify and/or otherwise inform its pilots to safely

operate at DCA, including by failing to include in any of its training documents or

materials specific to DCA any reference to the existence of any established

helicopter routes near DCA, especially Helicopter Route 4;

w.  by failing to properly perform comprehensive safety risk management ("SRM")

and/or a safety review of DCA operations concerning the likelihood of a mid-air

collision between commercial airplanes and helicopters prior to January 29, 2025,

which would have revealed the deficient training, policies and procedures

described above, including but not limited to a safety study through the ASIAS
(Aviation Safety Information Analysis and Sharing) program, in which American
and PSA were stakeholders, or a traffic study through PSA's internal safety
program(s);

x.  by failing to adequately train its flight crews or otherwise ensure flight crews
    understood the altitudes at which TCAS alerts are inhibited, including specifically
    that RAs were inhibited below 1000 feet and that aural TAs were inhibited below
    400 feet;

y.  by failing to adequately train and/or otherwise inform its flight crews how to
    properly react to a TA at or below 1000 feet, particularly when approaching to
    land in the airport traffic area, including but not limited to specifically
    immediately searching for and identifying the intruding traffic and if unable to
    acquire the target take all necessary actions to ensure collision avoidance;

z.  by otherwise violating FAA rules and/or regulations, and/or PSA's own SOPs,
    MOUs, LOAs, and/or policies and procedures; and

aa. by taking and/or failing to take other actions to be proven through discovery or at
    the trial in this matter, which were in contravention of the exercise of due care,
    and reasonable prudence under the circumstances.

**ANSWER:** The allegations in paragraph 222 and all subparts are not directed to the
United States.  To the extent the allegations can be construed as directed to the United States, the
United States admits that PSA has a duty to operate at the appropriate standard of care under the
law, and the AE5342 pilots breached that duty by failing to maintain vigilance so as to see and
avoid PAT25.  The United States lacks knowledge or information sufficient to form a belief as to

129

the truth of the remaining allegations in paragraph 222 and all subparts and therefore denies the same.

223.    Through the aforementioned negligence, PSA directly and proximately caused and/or contributed to the Subject mid-air collision and thereby the injuries and death of DECEDENT, and the resulting damages to Plaintiff herein.

**ANSWER:** The allegations in paragraph 223 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that the AE5342 pilots failed to maintain vigilance so as to see and avoid PAT25.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 223 and therefore denies the same.

224.    In addition to being negligent, the acts and omissions set forth herein were made in willful disregard for the rights of the DECEDENT and was reckless toward the safety of the DECEDENT.

**ANSWER:** The allegations in paragraph 224 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 224 and therefore denies the same.

225.    As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of PSA, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER:** The allegations in paragraph 225 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 225 and therefore denies the same.

226.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by Plaintiff, seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and suffering that the heirs, beneficiaries and distributees of the DECEDENT's Estate were caused to incur other; and necessary and reasonable expenses as a result of the DECEDENT's death.

**ANSWER:** The allegations in paragraph 226 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 226 and therefore denies the same.

## SIXTH CAUSE OF ACTION
## SURVIVAL BASED UPON
## COMMON CARRIER DUTY AGAINST PSA

227.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the

preceding Paragraphs.

**ANSWER:** The United States incorporates by reference all of its answers to the

preceding paragraphs as if fully stated in this answer to paragraph 227.

228.    At all relevant times, PSA, including but not limited to its officers, directors,

employees and flight crews, as a common carrier, owed the highest duty of care to passengers

like DECEDENT, to exercise the utmost care and to avoid even the slightest negligence in

operating the subject aircraft in the NAS, including in and around DCA, including but not

limited to see and avoid other aircraft pursuant to 14 C.F.R. § 91.13(a) and 91.113, and/or in

exercising the highest degree of care in adopting safe policies and procedures for operating its

aircraft in the NAS, including in and around DCA.

**ANSWER:** The allegations in paragraph 228 are not directed to the United States.  To the

extent the allegations can be construed as directed to the United States, the United States admits

that PSA has a duty to operate at the appropriate standard of care under the law, and the AE5342

pilots had a duty to maintain vigilance so as to see and avoid other aircraft to comply with 14

C.F.R. § 91.113.  The United States lacks knowledge or information sufficient to form a belief as

to the truth of the remaining allegations in paragraph 228 and therefore denies the same.

229.    On January 29, 2025, PSA was negligent and breached its duty as a common

carrier to DECEDENT and Plaintiff as follows:

      a.    by failing to see and avoid PAT25, including while on final approach to Runway

         33 at DCA, pursuant to 14 C.F.R. § 91.13(a) and 91.113;

b.  by failing to maintain situational awareness of the operational environment in the airspace around DCA to avoid collision with another aircraft despite a known history of near miss events where commercial aircraft and helicopters and/or military aircraft almost collided at DCA;

c.  by failing to adequately recognize, respond, and/or take any action upon hearing the TCAS aural "TRAFFIC TRAFFIC" alert, which the flight crew of AE 5342 received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which the AE 5342 flight crew received continuously for 19 seconds prior to impact, including but not limited to by immediately executing a go-around to protect AE 5342 from collision with another aircraft, particularly in light of the additional audible radio transmissions between ATC and PAT25 that did not establish that PAT25 had AE 5342 in sight;

d.  by failing to take any other evasive action after the TCAS "TRAFFIC TRAFFIC" aural alert it received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which the AE 5342 flight crew received continuously for 19 seconds prior to impact with PAT25;

e.  by failing to brief (properly or otherwise) the circling approach to Runway 33 before accepting clearance to land on Runway 33 from ATC;

f.  by failing to adequately discuss the conditions under which the flight crew would accept a circling approach to Runway 33 prior to ATC's request that AE 5342 accept a circling approach to land at Runway 33;

g.  by accepting a more difficult and dangerous circling approach to land at Runway 33 at DCA in nighttime conditions when it had not been pre-briefed (as required), when there had been no discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial;

h.  by maintaining policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

i.  by failing to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

j.  by failing to evaluate (adequately or otherwise) the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, which crosses the approach path to Runway 33, and a

known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

k.  by failing to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

l.  by failing to adequately inform flight crews operating flights into and out of DCA of the location, including lateral and vertical boundaries, of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks of associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

m.  by failing to train or otherwise inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

n.  by failing to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic in the established helicopter routes in the vicinity of DCA;

o.  by failing to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4, which crosses the approach path to Runway 33;

p.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA within a single clock hour of the day (e.g., 8 pm to 9 pm) by the FAA, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

q.  by failing to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

r.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur;

s.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash;

t.  by failing to adequately supervise, monitor, and control their employees, to prevent the aforementioned negligent acts and omissions which led to the subject crash;

u.  by failing to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training and/or properly informing their employees concerning circling approaches and the circling approach into Runway 33 at DCA in particular;

v.  by failing to adequately train, qualify and/or otherwise inform its pilots to safely operate at DCA, including by failing to include in any of its training documents or other materials specific to DCA any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

w.  by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a traffic study through PSA's internal safety program(s);

x.  by failing to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet;

y.  by failing to adequately train or otherwise inform its flight crews how to properly react to a TA at or below 1000 feet, particularly when approaching to land in the

airport traffic area, including but not limited to specifically immediately searching for and identifying the intruding traffic and if unable to acquire the target take all necessary actions to ensure collision avoidance;

z.   by otherwise violating FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or policies and procedures; and

aa.  by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

**ANSWER:** The allegations in paragraph 229 and all subparts are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that PSA has duty to operate at the appropriate standard of care under the law, and the AE5342 pilots breached that duty by failing to maintain vigilance so as to see and avoid PAT25.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 229 and all subparts and therefore denies the same.

230.    Through the aforementioned negligence, PSA directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's DECEDENT, and the resulting damages to Plaintiff herein.

**ANSWER:** The allegations in paragraph 230 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that the AE5342 pilots failed to maintain vigilance so as to see and avoid PAT25.   The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 230 and therefore denies the same.

231.    In addition to being negligent, the acts and omissions set forth herein were made in willful disregard for the rights of the DECEDENT and was reckless toward the safety of the DECEDENT.

**ANSWER:** The allegations in paragraph 231 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 231 and therefore denies the same.

232.    As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of PSA, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER:** The allegations in paragraph 232 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 232 and therefore denies the same.

233.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT;

loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the

DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium,

services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's

pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and

mental pain and suffering; and the heirs, beneficiaries and distributees of the DECEDENT's

estate were caused to incur other necessary and reasonable expenses as a result of the

DECEDENT's death and are entitled to all such damages, and were otherwise damaged.

**ANSWER:** The allegations in paragraph 233 are not directed to the United States. To

the extent the allegations can be construed as directed to the United States, the United States

lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 233 and therefore denies the same.

## SEVENTH CAUSE OF ACTION
## WRONGFUL DEATH BASED UPON
## NEGLIGENCE AGAINST PSA

234.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the

preceding paragraphs.

**ANSWER:** The United States incorporates by reference all of its answers to the

preceding paragraphs as if fully stated in this answer to paragraph 234.

235.    At all relevant times, PSA, including but not limited to its officers, directors,

employees and flight crews, had a duty to the flying public, particularly passengers like

DECEDENT, to exercise reasonable care and safely operate aircraft in the NAS, including in and

around DCA, including but not limited to see and avoid other aircraft pursuant to 14 C.F.R. §

91.13(a) and 91.113, and/or to exercise reasonable care in adopting safe policies and procedures

for operating its aircraft in the NAS, including in and around DCA.

**ANSWER:** The allegations in paragraph 235 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits the United States admits that PSA has a duty to operate at the appropriate standard of care under the law and the AE5342 pilots were required to maintain vigilance so as to see and avoid other aircraft to comply with 14 C.F.R. § 91.113.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 235 and therefore denies the same.

236.    On January 29, 2025, PSA was negligent and breached the duties it owed to DECEDENT and Plaintiff as follows:

a.    by failing to see and avoid PAT25, including while on final approach to Runway 33 at DCA, pursuant to 14 C.F.R. § 91.13(a) and 91.113;

b.    by failing to maintain situational awareness of the operational environment in the airspace around DCA to avoid collision with another aircraft despite a known history of near miss events where commercial aircraft and helicopters and/or military aircraft almost collided at DCA;

c.    by failing to adequately recognize, respond, and/or take any action upon hearing the TCAS aural "TRAFFIC TRAFFIC" alert, which the flight crew of AE 5342 received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which the flight crew of AE 5342 received continuously for 19 seconds prior to impact, including but not limited to by immediately executing a go-around to protect AE 5342 from collision with another aircraft, particularly in

light of the additional audible radio transmissions between ATC and PAT25 that did not establish that PAT25 had AE 5342 in sight;

d.  by failing to take any other evasive action after the TCAS "TRAFFIC TRAFFIC" aural alert it received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which it received continuously for 19 seconds prior to impact with PAT25;

e.  by failing to brief (properly or otherwise) the circling approach to Runway 33 before accepting clearance to land on Runway 33 from ATC;

f.  by failing to adequately discuss the conditions under which the flight crew would accept a circling approach to Runway 33 prior to ATC's request that AE 5342 accept a circling approach to land at Runway 33;

g.  by accepting a more difficult and dangerous circling approach to land at Runway 33 at DCA in nighttime conditions when it had not been pre-briefed, when there had been no discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial;

h.  by maintaining policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters

came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

i. by failing to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

j. by failing to evaluate (adequately or otherwise) the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

k. by failing to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

l. by failing to adequately inform flight crews operating flights into and out of DCA of the location, including lateral and vertical boundaries, of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA;

m.  by failing to train or otherwise inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

n.  by failing to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic in the established helicopter routes in the vicinity of DCA;

o.  by failing to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4, which crosses the approach path to Runway 33;

p.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA within a single clock hour of the day (e.g., 8 pm to 9 pm) by the FAA, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses between its aircraft and helicopters operating in the airspace surrounding DCA;

q.  by failing to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made

the aircraft more easily identifiable and tracked at night, particularly by those

wearing night vision goggles like the flight crew of PAT25;

r.   by otherwise acting and/or failing to act in such a manner as to create an

environment in which a mid-air collision could occur;

s.   by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from

engaging in the aforementioned negligent acts and omissions which led to the

subject crash;

t.   by failing to adequately supervise, monitor, and control their employees, to

prevent the aforementioned negligent acts and omissions which led to the subject

crash;

u.   by failing to adequately train, instruct and evaluate their employees, including

their flight crews so as to prevent the aforementioned negligent acts and

omissions which led to the subject crash, including but not limited to training

and/or properly informing their employees concerning circling approaches and the

circling approach into Runway 33 at DCA in particular;

v.   by failing to adequately train, qualify or otherwise inform its pilots to safely

operate at DCA, including by failing to include in any of its training documents or

materials any reference to the existence of any established helicopter routes near

DCA runways, especially Helicopter Route 4;

w.   by failing to properly perform comprehensive safety risk management ("SRM")

and/or a safety review of DCA operations concerning the likelihood of a mid-air

collision between commercial airplanes and helicopters prior to January 29, 2025,

which would have revealed the deficient training, policies and procedures

described above, including but not limited to a safety study through the ASIAS

(Aviation Safety Information Analysis and Sharing) program, in which American

and PSA were stakeholders, or a traffic study through PSA's internal safety

program(s);

x.  by failing to adequately train its flight crews or otherwise ensure flight crews

understood the altitudes at which TCAS alerts are inhibited, including specifically

that RAs were inhibited below 1000 feet and that aural TAs were inhibited below

400 feet;

y.  by failing to adequately train and/or otherwise inform its flight crews how to

properly react to a TA at or below 1000 feet, particularly when approaching to

land in the airport traffic area, including but not limited to specifically

immediately searching for and identifying the intruding traffic and if unable to

acquire the target take all necessary actions to ensure collision avoidance;

z.  by otherwise violating FAA rules and/or regulations, and/or PSA's own SOPs,

MOUs, LOAs, and/or policies and procedures; and

aa. by taking and/or failing to take other actions to be proven through discovery or at

the trial in this matter, which were in contravention of the exercise of due care,

and reasonable prudence under the circumstances.

**ANSWER:** The allegations in paragraph 236 and all subparts are not directed to the

United States.  To the extent the allegations can be construed as directed to the United States, the

United States admits that PSA has a duty to operate at the appropriate standard of care under the

law, and the AE5342 pilots breached that duty by failing to maintain vigilance so as to see and

avoid PAT25.  The United States lacks knowledge or information sufficient to form a belief as to

146

the truth of the remaining allegations in paragraph 236 and all subparts and therefore denies the same.

237.    Through the aforementioned negligence, PSA directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of DECEDENT, and the resulting damages to Plaintiff herein.

**ANSWER:** The allegations in paragraph 237 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that the AE5342 pilots failed to maintain vigilance so as to see and avoid PAT25.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 237 and therefore denies the same.

238.    In addition to being negligent, the acts and omissions set forth herein were made in willful disregard for the rights of the DECEDENT and was reckless toward the safety of the DECEDENT.

**ANSWER:** The allegations in paragraph 238 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 238 and therefore denies the same.

239.    As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of PSA, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER:** The allegations in paragraph 239 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 239 and therefore denies the same.

240.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by Plaintiff, seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and suffering that the heirs, beneficiaries and distributees of the DECEDENT's Estate were caused to incur other; and necessary and reasonable expenses as a result of the DECEDENT's death.

**ANSWER:** The allegations in paragraph 240 are not directed to the United States. To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 240 and therefore denies the same.

**EIGHTH CAUSE OF ACTION**
**SURVIVAL BASED UPON**
**NEGLIGENCE AGAINST PSA**

241.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the preceding paragraphs.

**ANSWER:** The United States incorporates by reference all of its answers to the preceding paragraphs as if fully stated in this answer to paragraph 241.

242.    At all relevant times, PSA, including but not limited to its officers, directors, employees and flight crews, had a duty to the flying public, particularly passengers like DECEDENT, to exercise reasonable care and safely operate aircraft in the national airspace, including in and around DCA, including but not limited to see and avoid other aircraft pursuant to 14 C.F.R. § 91.13(a) and 91.113, and/or to exercise reasonable care in adopting safe policies and procedures for operating its aircraft in the national airspace, including in and around DCA.

**ANSWER:** The allegations in paragraph 242 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States admits that PSA has a duty to operate at the appropriate standard of care under the law, and the AE5342 pilots were required to maintain vigilance so as to see and avoid other aircraft to comply with 14 C.F.R. § 91.113.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 242 and therefore denies the same.

243.    On January 29, 2025, the PSA was negligent and breached the duties it owed to DECEDENT and Plaintiff as follows:

     a.    by failing to see and avoid PAT25, including while on final approach to Runway 33 at DCA, pursuant to 14 C.F.R. § 91.13(a) and 91.113;

b.  by failing to maintain situational awareness of the operational environment in the airspace around DCA to avoid collision with another aircraft despite a known history of near miss events where commercial aircraft and helicopters and/or military aircraft almost collided at DCA;

c.  by failing to adequately recognize, respond, and/or take any action upon hearing the TCAS aural "TRAFFIC TRAFFIC" alert, which the flight crew of AE 5342 received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which the AE 5342 flight crew received continuously for 19 seconds prior to impact, including but not limited to by immediately executing a go-around to protect AE 5342 from collision with another aircraft, particularly in light of the additional audible radio transmissions between ATC and PAT25 that did not establish that PAT25 had AE 5342 in sight;

d.  by failing to take any other evasive action after the TCAS "TRAFFIC TRAFFIC" aural alert it received a full 19 seconds prior to impact, the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which it received continuously for 19 seconds prior to impact with PAT25;

e.  by failing to brief (properly or otherwise) the circling approach to Runway 33 before accepting clearance to land on Runway 33 from ATC;

f.  by failing to adequately discuss the conditions under which the flight crew would accept a circling approach to Runway 33 prior to ATC's request that AE 5342 accept a circling approach to land at Runway 33;

g.  by accepting a more difficult and dangerous circling approach to land at Runway 33 at DCA in nighttime conditions when it had not been pre-briefed, when there had been no discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial;

h.  by maintaining policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, helicopter traffic reported in the area;

i.  by failing to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area;

j.  by failing to evaluate (adequately or otherwise) the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, and a known history of near miss events where commercial

aircraft and helicopters came within dangerous proximity of each other at or nearby DCA;

k.   by failing to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33;

l.   by failing to adequately inform flight crews operating flights into and out of DCA of the location, including lateral and vertical boundaries, of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic on the established Helicopter Routes in the vicinity of DCA;

m.  by failing to train or otherwise inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA;

n.   by failing to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic in the established helicopter routes in the vicinity of DCA;

o.  by failing to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4, which crosses the approach path to Runway 33;

p.  by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA within a single clock hour of the day (e.g., 8 pm to 9 pm) by the FAA, and thereby reducing the already strained safety margins at DCA when it knew, or should have known, of the history of near misses proximity between its aircraft and helicopters operating in the airspace surrounding DCA;

q.  by failing to equip the subject airplane with LED lights, which would have been brighter and more defined than the incandescent lightbulbs and would have made the aircraft more easily identifiable and tracked at night, particularly by those wearing night vision goggles like the flight crew of PAT25;

r.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur;

s.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash;

t.  by failing to adequately supervise, monitor, and control their employees, to prevent the aforementioned negligent acts and omissions which led to the subject crash;

153

u.  by failing to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training and/or properly informing their employees concerning circling approaches and the circling approach into Runway 33 at DCA in particular;

v.  by failing to adequately train, qualify or otherwise inform its pilots to safely operate at DCA, including by failing to include in any of its training documents or materials any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4;

w.  by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a traffic study through PSA's internal safety program(s);

x.  by failing to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet;

y.  by failing to adequately train and/or otherwise inform its flight crews how to properly react to a TA at or below 1000 feet, particularly when approaching to

land in the airport traffic area, including but not limited to specifically

immediately searching for and identifying the intruding traffic and if unable to

acquire the target take all necessary actions to ensure collision avoidance;

z.  by otherwise violating FAA rules and/or regulations, and/or PSA's own SOPs,

MOUs, LOAs, and/or policies and procedures; and

aa.  by taking and/or failing to take other actions to be proven through discovery or at

the trial in this matter, which were in contravention of the exercise of due care,

and reasonable prudence under the circumstances.

**ANSWER:** The allegations in paragraph 243 and all subparts are not directed to the

United States.  To the extent the allegations can be construed as directed to the United States, the

United States admits that PSA has a duty to operate at the appropriate standard of care under the

law, and the AE5342 pilots breached that duty by failing to maintain vigilance so as to see and

avoid PAT25.  The United States lacks knowledge or information sufficient to form a belief as to

the truth of the remaining allegations in paragraph 243 and all subparts and therefore denies the

same.

244.    Through the aforementioned negligence, PSA directly and proximately, caused

and/or contributed to the subject crash and thereby the injuries and death of DECEDENTS, and

the resulting damages to Plaintiff herein.

**ANSWER:** The allegations in paragraph 244 are not directed to the United States.  To the

extent the allegations can be construed as directed to the United States, the United States admits

that the AE5342 pilots failed to maintain vigilance so as to see and avoid PAT25.  The United

States lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 244 and therefore denies the same.

245.    In addition to being negligent, the acts and omissions set forth herein were made in willful disregard for the rights of the DECEDENT and was reckless toward the safety of the DECEDENT.

**ANSWER:** The allegations in paragraph 245 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 245 and therefore denies the same.

246.    As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of PSA, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER:** The allegations in paragraph 246 are not directed to the United States.  To the extent the allegations can be construed as directed to the United States, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 246 and therefore denies the same.

247.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by Plaintiff, seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the

DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of

the DECEDENT; loss of past and future income, support, society, love, grief, consortium,

solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's

pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and

mental pain and suffering that the heirs, beneficiaries and distributees of the DECEDENT's

Estate were caused to incur other; and necessary and reasonable expenses as a result of the

DECEDENT's death.

**ANSWER:** The allegations in paragraph 247 are not directed to the United States.  To the

extent the allegations can be construed as directed to the United States, the United States lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in paragraph 247 and therefore denies the same.

## NINTH CAUSE OF ACTION
## WRONGFUL DEATH BASED UPON
## NEGLIGENCE AGAINST THE UNITED STATES OF AMERICA

248.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the

preceding Paragraphs.

**ANSWER:** The United States incorporates by reference all of its answers to the

preceding paragraphs as if fully stated in this answer to paragraph 248.

249.    At all relevant times, air traffic control personnel employed by Defendant USA,

under the immediate authority and control of the FAA, owed a duty to the Plaintiff's

DECEDENT, and Plaintiff, and all others who were flying in the vicinity of DCA, to exercise

reasonable care in maintaining a safe operational environment in the airspace at and around

DCA, including but not limited to by taking all actions provided in the applicable Air Traffic

Control Manual, FAA JO 7110.65, DCA's Standard Operating Procedures ("SOPs"), and Letters

of Agreement ("LOAs") and/or Memoranda of Understanding ("MOUs") between DCA and

operators.

**ANSWER:** The United States admits that when air traffic control personnel employed by

the FAA have a duty to persons who travel in aircraft receiving air traffic control services, their

duty is to exercise reasonable care under certain circumstances.  The United States admits that

under the FTCA state law provides the legal source of duty and the standard of care applicable to

FAA employees, and any FAA employee alleged to have been negligent was acting in their

official capacity and within the course and scope of their employment at all times relevant to this

action.  The United States further admits that FAA Order JO 7110.65AA chg. 3, Air Traffic

Control (Sept. 5, 2024) is evidence of the standard of care.  The United States denies the

remaining allegations in paragraph 249.

250.    On January 29, 2025, Defendant USA, by and through the FAA and its air traffic

control personnel, was negligent and breached the duties it owed Plaintiff's DECEDENT and

Plaintiff as follows:

a.    The controller(s) negligently failed to give first priority to separating aircraft and

issuing safety alerts in violation of FAA Order JO 7110.65AA, ¶ 2-1-2, instead

prioritizing a departures push or other non-safety critical duties;

b.    The controller(s) negligently failed to establish proper and safe separation

between AE 5342 and PAT25;

c.    The controller(s) negligently failed to monitor the course and altitude of PAT25 to

ensure compliance with the published route and mandatory maximum published

altitude for Helicopter Route 4;

d.  The controller(s) negligently failed to notify PAT25 that it was off course and above the mandatory maximum altitude for Helicopter Route 4 and failed to instruct PAT25 to immediately turn left to and descend until it was at or below 200 feet and remain clear of AE 5342;

e.  The controllers negligently failed to notify AE 5342 of the presence of PAT25;

f.  The controller(s) negligently violated FAA Order JO 7110.65AA ¶ 7-2-1 by failing to follow the procedures for visual separation therein.  The controller(s) did not follow the mandatory procedures for Pilot-Applied Visual Separation. More particularly:

  i.  The controller(s) failed to inform PAT25 at numerous critical times of the position, direction, type and intentions of AE 5342 and failed to properly confirm that PAT25 had AE 5342 in sight as required by JO 7110.65AA ¶ 7-2-1 subsection a.2.(b)(1) and (2);

  ii.  The controller(s) failed to inform AE 5342 that it was on a converging course with PAT25 and that visual separation was being applied, as required by JO 7110.65AA subsection a.2.(d);

  iii.  The controller(s) failed to advise both pilots of the other aircraft and did not inform either pilot that targets were likely to merge as required by JO 7110.65AA ¶ 7-2-1 subsection a.2.(e);

  iv.  Additionally, the controller(s) failed to issue positive control instructions to either aircraft when vertical and/or lateral separation standards were not ensured, and failed to use proper, specified phraseology in communicating

with the subject helicopter and aircraft.  The controller(s) also never
provided AE 5342 with PAT25's position, direction, type, and intentions;

g. The controller negligently failed to issue a safety or traffic alert to either PAT25 or
AE 5342 despite having radar data available in real time that showed the flight
tracks, altitudes and distance between PAT25 and AE 5342, and receiving a
Conflict Alert (CA) when the aircraft were within approximately 1.5 miles of each
other and on converging courses heading directly towards one another.  This was
in violation of FAA Orders:

    i.    JO 7110.65AA, ¶ 2-1-6, Safety Alerts;

    ii.    JO 7110.65AA ¶ 7-6-1, Basic Radar Service to VFR Aircraft Terminal
and;

    iii.    JO 7110.65AA ¶ 5-1-4, Merging Target Procedures;

h. The controller(s) negligently failed to issue traffic alerts to AE 5342 and/or PAT25
in violation of FAA Orders, including but not limited to JO 7110.65AA, ¶ 2-1-21;
JO 7110.65AA ¶ 3-1-6; and JO 7110.65AA ¶ 3-1-6, on at least three separate
occasions, including:

    i.    Failing to inform AE 5342 of the helicopter traffic after AE 5342 accepted
the request to land on Runway 33 at approximately 8:43:06 p.m.  The
controller should have informed AE 5342 of PAT25's position, direction,
type, and intentions;

    ii.    Failing to provide AE 5342 specific and timely traffic alerts when it was
about 2 miles southeast of the airport, on a left base to Runway 33, with
the relative o'clock position, distance and altitude of PAT25 and informing

AE 5342 that PAT25 would transit the airspace by crossing the final

approach path to Runway 33;

iii.    Failing to provide specific traffic alerts to PAT25 concerning AE 5342

after receiving a "CA" at approximately 8:47:39 p.m., when the controller

should have advised PAT25 of AE 5342's "o'clock" position, distance and

altitude, and informed PAT25 that its flight path was converging with AE

5342 and the radar targets of both aircraft would merge;

i.    The controller(s) failed to exercise continuing vigilance to observe and recognize

a situation of unsafe aircraft proximity as required by JO 7110.65AA, ¶¶ 2-1-2 &

2-1-6, as described in Note 1 of ¶ 2-1-6;

j.    The controller(s) negligently failed to follow SOP and/or well-established custom

and practice to hold PAT25 at Hains Point when other aircraft were landing on

Runway 33 so as to prevent PAT25 from crossing the approach to Runway 33 as

AE 5342 was landing on Runway 33;

k.    The controller(s) negligently failed to advise either aircraft that their targets would

likely merge;

l.    The controllers failed to properly, timely and/or appropriately resolve the Conflict

Alert that was depicted (both visually and aurally) on ATC's radar display;

m.    The controller(s) negligently failed to warn either AE 5342 or PAT25 that they

were on a collision course and that their Radar Targets would merge in

accordance with FAA Order JO 7110.65AA ¶ 5-1-4 Merging Target Procedures;

n.    The controller(s) negligently failed to follow merging target procedures in

violation of FAA Orders JO 7110.65AA ¶ 5-1-4 and JO 7110.65AA ¶ 7-9-5.  Once

it was clear that PAT25 and AE 5342 were on converging courses, and vertical separation of more than 500 feet or lateral separation of more than 1.5 nm would not be maintained per FAA Order JO 7110.65AA ¶ 7-9-4, which was obvious from at least the time of the CA at approximately 8:47:39 p.m., the controller(s) should have advised both aircraft that their targets were likely to merge and/or issue positive control instructions to turn or climb to one or both aircraft to avoid the mid-air collision;

o.  The controller(s) negligently violated FAA Order JO 7110.65AA ¶ 5-6-1 by failing to vector either aircraft to ensure proper separation.  The controller(s) failed to issue a vector so that PAT25 would avoid AE 5342 and failed to issue alerts or advise the aircraft of traffic;

p.  The controller(s) negligently failed to visually scan their areas of responsibility in violation of FAA Order JO 711065AA ¶ 3-1-12, which should have further alerted them of the need to issue traffic and alerts to PAT25 and AE 5342;

q.  The controller(s) providing services to AE 5342 and/or PAT25 failed to comply with air traffic controller duties and responsibilities in that the controller failed to consult with other controllers and personnel and utilize all available tools and personnel at their disposal, which violated the Air Traffic Control Manual, including but not limited to FAA Order JO 7110.65AA ¶ 2-10-3 Tower Team Position Responsibility;

r.  The controller(s) failed to provide AE 5342 and PAT25 with appropriate services as required by the Air Traffic Control Manual, including but not limited to for the reasons set forth above;

s.  The FAA controllers-in-charge and operations manager negligently supervised the controllers at the DCA tower and failed to timely take required corrective action to prevent the mid-air collision between PAT25 and AE 5342;

t.  The controller(s) at the DCA tower were not properly trained or supervised in providing air traffic control services to AE 5342 and PAT25 concerning traffic practices and procedures for separation and issuing safety alerts for aircraft in close proximity and at risk of collision;

u.  The controller(s) at the DCA tower were not properly trained or supervised and/or failed to maintain positive control over helicopters operating on the Helicopter Routes near DCA by providing altitude, heading or such other instructions to ensure adequate separation and avoid a collision;

v.  The FAA failed to ensure that the controllers monitoring AE 5342 and/or PAT25 were properly trained and supervised and to ensure that they properly executed their air traffic controller responsibilities;

w.  The FAA negligently operated the helicopter route structure in and around DCA such that Helicopter Route 4 was allowed to be utilized at the same time as landings on Runway 33 and takeoffs from Runway 19;

x.  The FAA negligently failed to establish SOP and/or train its controllers on the well-established custom and practice to hold PAT25 at Hains Point when other aircraft were landing on Runway 33;

y.  The FAA, and its supervisors and/or managers at DCA negligently and/or improperly allowed controllers to leave shifts early, commonly known as an "early shove," leaving the DCA tower inadequately and unsafely under-staffed

163

leading up to this mid-air collision, in violation of FAA rules, regulations, orders, SOPs and/or MOUs;

z.  The FAA, and its supervisors and/or managers at DCA negligently and/or improperly allowed the helicopter control and local control positions to be combined at approximately 3:40 p.m. on January 29, 2025, and to remain combined throughout some of the busiest times of day for helicopter and commercial airliner traffic at DCA, in violation of FAA rules, regulations, orders, SOPs and/or MOUs;

aa. The FAA and its controllers, supervisors, and/or managers at DCA, negligently failed to analyze and respond to the thousands of reported occurrences of minimum separation violations at or near DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

bb. The FAA and its controllers, supervisors, and/or managers otherwise violated FAA rules, regulations, orders, SOPs, MOUs, LOAs, and/or policies and procedures; and

cc. The United States of America, its FAA agents, servants and employees were otherwise negligent in causing the mid-air collision between PAT25 and AE 5342 and/or by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

**ANSWER:** The United States addresses each subpart contained in paragraph 250 as follows:

a.  The United States denies the allegations in subpart (a).

b.  The United States admits the DCA local controller did not comply with ¶ 7-2-1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5, 2024). The United States denies the remaining allegations in subpart (b).

c.  The United States denies the allegations in subpart (c).

d.  The United States denies the allegations in subpart (d).

e.  The United States admits the DCA local controller did not comply with ¶ 7-2-1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5, 2024). The United States denies the remaining allegations in subpart (e).

f.  The United States admits the DCA local controller did not comply with ¶ 7-2-1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5, 2024). The United States addresses each additional subpart contained in paragraph 234(f) as follows:

    i.  The United States denies the allegations in subpart (i).

    ii.  The United States admits the DCA local controller did not comply with ¶ 7-2-1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5, 2024). The United States denies the remaining allegations in subpart (ii).

    iii.  The United States denies the allegations in subpart (iii).

    iv.  The United States admits the DCA local controller did not comply with ¶ 7-2-1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5, 2024). The United States denies the remaining allegations in subpart (iv).

165

g.  The United States denies the allegations in subpart (g) and all subparts.

h.  The United States denies the allegations in subpart (h) and all subparts.

i.  The United States denies the allegations in subpart (i).

j.  The United States denies the allegations in subpart (j).

k.  The United States denies the allegations in subpart (k).

l.  The United States denies the allegations in subpart (l).

m.  The United States denies the allegations in subpart (m).

n.  The United States denies the allegations in subpart (n).

o.  The United States denies the allegations in subpart (o).

p.  The United States denies the allegations in subpart (p).

q.  The United States denies the allegations in subpart (q).

r.  The United States admits the DCA local controller did not comply with ¶ 7-2-
    1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5, 2024).
    The United States denies the remaining allegations in subpart (r).

s.  The United States denies the allegations in subpart (s).

t.  The United States denies the allegations in subpart (t).

u.  The United States denies the allegations in subpart (u).

v.  The United States denies the allegations in subpart (v).

w.  The United States denies the allegations in subpart (w).

x.  The United States denies the allegations in subpart (x).

y.  The United States denies the allegations in subpart (y).

z.  The United States denies the allegations in subpart (z).

aa. The United States denies the allegations in subpart (aa).

bb. The United States admits the DCA local controller did not comply with ¶ 7-2-

1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5, 2024).

The United States denies the remaining allegations in subpart (bb).

cc. The United States denies the allegations in subpart (cc).

The United States denies the remaining allegations in paragraph 250 and all subparts.

251.    On January 29, 2025, the crew of PAT25, including but not limited to the IP (as

pilot-in-command) and the PF, employed by Defendant USA, under the immediate authority and

control of the United States Army, owed a duty to Plaintiff's DECEDENT, and all others who

were flying in the vicinity of DCA, to exercise reasonable care in safely and carefully operating

PAT25 including but not limited to see and avoid other aircraft pursuant to 14 C.F.R. § 91.13(a)

and 91.113, and to comply with all air traffic control clearances and instructions pursuant to 14

C.F.R. § 91.123, including flight routes and maximum altitude clearances in published helicopter

route charts when cleared by air traffic control for said routes.

**ANSWER:** The United States admits that when the PAT25 pilots had a duty to persons

travelling in aircraft, their duty was to exercise reasonable care under certain circumstances.  The

United States admits that on January 29, 2025, the crew of PAT25 were employees of the United

States acting in their official capacity and within in the course and scope of their employment at

all times relevant to this action, and the instructor pilot was the pilot-in-command of PAT25 at

the time of the collision. The United States further admits that under the FTCA state law

provides the legal source of duty and the standard of care applicable to the crew PAT25, and that

the applicable Federal Aviation Regulations, Army Regulations, and published aeronautical

charts are evidence of the standard of care.  The United States denies the remaining allegations in

paragraph 251.

252.    On January 29, 2025, Defendant USA, by and through the United States Army, owed a duty to Plaintiff's DECEDENT, and all others who were flying in the vicinity of DCA, to exercise reasonable care in maintaining, repairing and inspecting Army aircraft, including but not limited to the UH-60L operating as PAT25 on January 29, 2025.

**ANSWER:** The United States admits that when federal employees who maintain, repair, and inspect Army aircraft, including but not limited to the UH-60L operating as PAT25 on January 29, 2025, have a duty to persons traveling in aircraft, their duty is to exercise reasonable care under certain circumstances. The United States admits that under the FTCA state law provides the legal source of duty and standard of care applicable to the federal employees acting in the course and scope of employment and whose job responsibilities included maintaining, repairing, and inspecting PAT25. The United States denies the remaining allegations in paragraph 252.

253.    On January 29, 2025, Defendant USA, by and through the crew of PAT25 and United States Army personnel, was negligent and breached the duties it owed Plaintiff's DECEDENT and Plaintiff as follows:

a.    The Army crew negligently failed to establish and maintain proper and safe visual separation with AE 5342;

b.    The Army crew negligently requested and accepted visual separation from air traffic control without actually having AE 5342 identified and in sight;

c.    The Army crew negligently failed to see and acquire AE 5342 when initially requesting and accepting visual separation from air traffic control, despite its altitude and location being provided by air traffic control at or about 8:46 p.m.;

d.  The Army crew negligently requested and accepted visual separation knowing that their ability to visually acquire traffic was compromised by their use of Night Vision Goggles ("NVGs") and despite knowing that the helicopter was not transmitting ADS-B out;

e.  The Army crew negligently requested and accepted visual separation instructions from air traffic control without receiving sufficient information and/or instructions from air traffic control, including but not limited to AE 5342's altitude, position, direction, type and intentions;

f.  The Army crew negligently failed to maintain vigilant visual surveillance as required to maintain adequate and safe visual separation from aircraft along Helicopter Routes 1 and 4;

g.  The Army crew negligently failed to establish and maintain communication with AE 5342, through ATC, to ensure visual separation;

h.  The Army crew negligently utilized NVGs during the flight, which unreasonably distracted them, caused object obscuration/blending, and limited their field of vision, depth perception, color differentiation and/or their ability to distinguish oncoming traffic, in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-157;

i.  The Army crew negligently failed to recognize that the cultural lighting and over saturated bright lights along Helicopter Routes 1 and 4 in the vicinity of DCA reduced the effectiveness of their NVGs and negligently failed to de-goggle or doff their NVGs when transiting Helicopter Routes 1 and 4 to improve their ability to identify AE 5342;

j.  The Army crew negligently failed to de-goggle or doff their NVGs in the congested, urban environment around DCA in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-2;

k.  The Army crew negligently failed to properly consider the effect NVGs could have on their ability to perceive navigation lights and landing lights from other aircraft operating around DCA, in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-206;

l.  The Army crew negligently failed to properly coordinate amongst themselves and/or negligently failed to utilize proper and safe crew resource management, which is especially important at night, in violation of Army regulations, including but not limited to TC 3-04.4 ¶¶ 4-190 and 4-191.

m.  The Army crew negligently failed to see and avoid AE 5342, in violation of 14 C.F.R. §§ 91.13(a) and 91.113;

n.  The Army crew negligently flew off the flight route towards the center of the Potomac River at too high an altitude, despite repeated altitude call outs from the IP to the PF, and violated the published standards and rules for operating within Helicopter Route 1 and Route 4, particularly that all operations in this section of Helicopter Route 1 and Route 4, between the Memorial Bridge and the Wilson Bridge, must remain above the east bank of the Potomac River at or below 200 feet MSL;

o.  Failed to stay on the charted route and adhere to the 200 feet mandatory altitude restriction was careless and reckless, in violation of 14 C.F.R. § 91.13(a).

p.  The failure to maintain the charted flight route and altitude beneath the maximum route altitude also violates 14 C.F.R. § 91.119(d)(1), the Army's own SOP, and other mandatory Army and FAA rules and regulations;

q.  The Army crew negligently failed to properly cross reference their instruments, including but not limited to their radar altimeters, and visual references along Helicopter Routes 1 and 4 to ensure they remained on the charted route and at or below the mandatory 200 feet altitude restriction;

r.  The Army crew negligently failed to navigate sufficiently to the left (or towards the Eastern shore of the Potomac River) despite the IP telling the PF that he believed this was what ATC wanted from the helicopter and that flying in the middle of the river brought the helicopter dangerously closer to airplanes landing at DCA;

s.  The Army crew negligently failed to follow Helicopter Route 4 as visually depicted by the lines set forth on the Baltimore-Washington Helicopter Route Chart;

t.  The Army crew negligently failed to follow Helicopter Route 4 close to the Eastern shore of the Potomac as described in the Helicopter Route Chart;

u.  The Army crew negligently failed to identify that AE 5342 and PAT25 were on a collision course and failed to take evasive action;

v.  The Army crew failed to maintain course on the charted route, and failed to discuss, analyze, and/or resolve an altitude discrepancy when in the minutes prior to the collision, the IP stated that the aircraft was at 400 feet but the PF stated that

the aircraft was at 300 feet and this failure was critical especially since they were transiting airspace that had a 200-foot altitude restriction;

w. The IP, who was the pilot in command of PAT25, negligently failed to take timely and appropriate action to correct the helicopter's altitude and course, despite knowing that the helicopter was too high and off course;

x. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, and/or Army regulations in approving and/or directing PAT25 to conduct a training mission transiting Helicopter Route 1 and Route 4 during one of the busiest times of day for arriving and/or departing flights at DCA;

y. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, and/or Army regulations, including but not limited to Army TC 3-04.4 ¶ 4-2, in approving or directing PAT25 to conduct a training mission using NVGs during one of the busiest times of day for arriving and/or departing flights at DCA;

z. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, Army regulations, including but not limited to AR 95-1, and/or FAA regulations in approving and/or directing PAT25 to conduct a training mission in the congested, Class B Airspace around DCA without their transponder broadcasting ADS-B out despite being equipped with a transponder capable of doing so;

aa. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to conduct adequate risk management in their

mission planning and execution of this training flight, which violated SOPs, MOUs, and/or Army regulations, including but not limited to AR 95-1, ¶ 3-15, C 3–04.11, ADP 5–0, ATP 5–19, and DA Pam 385–30, by approving and/or directing PAT25 to conduct a training mission at the time and location, and under the circumstances of the subject flight, including but not limited to operating in the congested, Class B Airspace around DCA, using NVGs, during one of the busiest time periods for commercial traffic at DCA, and without broadcasting ADS-B out despite the subject helicopter being capable of doing so;

bb. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to establish adequate and safe procedures in their SOP for flight operations along Helicopter Routes 1 and 4 near DCA when aircraft traffic is landing on Runway 33;

cc. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to train its helicopter crews to hold at Hains Point when aircraft traffic was landing on Runway 33;

dd. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to establish adequate and safe procedures in their SOP to prohibit the unsafe practice of allowing their helicopters to pass underneath other aircraft on approach to or departing from DCA, despite being on notice of such events in and around DCA;

ee. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to correct for, or warn flight crews about, known barometric altimeter errors and allowed its Black Hawk helicopters,

including PAT25, to operate on Helicopter Routes 1 and 4, which require strict adherence to the 200 feet MSL maximum altitude, knowing that the helicopters' barometric altimeters were allowed to be operated with a +/- 70 feet variance and knowing that additional barometric altimeter errors, particularly for helicopters like PAT25 that are equipped with external stores (ESSS), could further increase the variance in flight when at or around 200 feet altitude;

ff. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to adopt appropriate barometric altimeter correction factors, especially for high drag configuration helicopters utilizing external stores (ESSS);

gg. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to establish an SOP that pilots must cross check their barometric altimeters with their radar altimeters when over water on Helicopter Routes 1 and 4 near DCA, so that they can assure flying at or below 200 feet MSL as was required;

hh. The Army, including but not limited to its commanding officers, supervisors, and the crew of PAT25 negligently failed to analyze and respond to the thousands of reported occurrences of minimum separation violations at DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

ii. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to properly liaise with the FAA and other aviation entities and operators in the Washington Capital Region to analyze and

respond to the thousands of reported occurrences of minimum separation

violations at or near DCA to address the obvious and imminent risk of a mid-air

collision precisely like the one between PAT25 and AE 5342;

jj. The Army crew was not properly trained in conducting night training missions at

or near DCA;

kk. The Army crew was not properly trained in transiting Helicopter Route 1 and

Route 4 near DCA;

ll. The Army crew was not properly trained in safely and properly utilizing NVGs,

including but not limited to failing to consider and abide by the above referenced

Army Training Circular provisions;

mm.    The Army crew negligently failed to comply with applicable FARs for the

safe operations of aircraft, as well as any comparable U.S. Army and/or military

regulations concerning the safe operations of aircraft, particularly those

procedures concerning VFR operations near commercial airports and/or in Class

B Airspace;

nn. The Army, including but not limited to the crew, its commanders, supervisors, and

the 12th Aviation Battalion operating PAT25 negligently failed to properly inspect

and maintain the subject helicopter, including but not limited to the subject

helicopter's transponder, the altimeter(s) and other sources of pressure altitude

data, and/or other systems on board the aircraft;

oo. The Army crew negligently failed to employ ADS-B on the subject flight;

pp. The Army crew negligently failed to properly set their altimeter(s) and/or failed to

use other tools at their disposal, including altimeter bugs which would have

further assisted the Army crew in complying with the altitude restriction as it

transited Helicopter Route 4;

qq. The Army crew negligently failed to resolve the inconsistent altitude readings

being reported and/or perceived by the IP and the PF;

rr. The Department of the Army and its agents, servants and employees otherwise

violated FAA and Army rules, regulations, including but not limited to AR 95-1,

orders, Training Circulars ("TCs"), SOPs, MOUs, LOAs, and/or policies and

procedures;

ss. The Defendant USA, its Department of the Army agents, servants and employees

were otherwise negligent, and/or by taking and/or failing to take other actions to

be proven through discovery or at the trial in this matter, which were in

contravention of the exercise of due care, and reasonable prudence under the

circumstances, and all the foregoing were contributing causes to the mid-air

collision complained of herein.

**ANSWER:** The United States admits that on January 29, 2025, the pilots flying PAT25

failed to maintain vigilance so as to see and avoid other aircraft and their failure was a cause-in-

fact and proximate cause of the accident. The United States addresses each subpart in paragraph

253 as follows:

a. The United States admits pilots flying PAT25 failed to maintain proper and safe visual

separation from AE5342. The United States lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in subpart (a)

and therefore denies the same.

b.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in subpart (b) and therefore denies the same.

c.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subpart (c) and therefore denies the same.

d.  The United States denies the allegations in subpart (d).

e.  The United States denies the allegations in subpart (e).

f.  The United States admits that the PAT25 pilots failed to maintain visual separation. The United States denies the remaining allegations in subpart (f).

g.  The United States denies the allegations in subpart (g).

h.  The United States denies the allegations in subpart (h).

i.  The United States denies the allegations in subpart (i).

j.  The United States denies the allegations in subpart (j).

k.  The United States denies the allegations in subpart (k).

l.  The United States denies the allegations in subpart (l).

m.  The United States admits that the PAT25 pilots negligently failed to maintain vigilance so as to see and avoid AE5342 and their failure was not in compliance with 14 C.F.R. § 91.113.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subpart (m) and therefore denies the same.

n.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in subpart (n) and therefore denies the same.

o.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in subpart (o) and therefore denies the same.

177

p.  The United States denies the allegations in subpart (p).

q.  The United States denies the allegations in subpart (q).

r.  The United States denies the allegations in subpart (r).

s.  The United States denies the allegations in subpart (s).

t.  The United States denies the allegations in subpart (t).

u.  The United States admits the PAT25 pilots failed to maintain vigilance so as to see and avoid AE5342.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subpart (u) and therefore denies the same.

v.  The United States denies the allegations in subpart (v).

w.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in subpart (w) and therefore denies the same.

x.  The United States denies the allegations in subpart (x).

y.  The United States denies the allegations in subpart (y).

z.  The United States denies the allegations in subpart (z).

aa. The United States denies the allegations in subpart (aa).

bb. The United States denies the allegations in subpart (bb).

cc. The United States denies the allegations in subpart (cc).

dd. The United States denies the allegations in subpart (dd).

ee. The United States denies the allegations in subpart (ee).

ff.  The United States denies the allegations in subpart (ff).

gg. The United States denies the allegations in subpart (gg).

hh. The United States denies the allegations in subpart (hh).

ii.  The United States denies the allegations in subpart (ii)

jj.  The United States denies the allegations in subpart (jj).

kk. The United States denies the allegations in subpart (kk).

ll.  The United States denies the allegations in subpart (ll).

mm.    The United States admits that the PAT25 pilots did not comply with 14 C.F.R.

§ 91.113 by failing to maintain vigilance so as to see and avoid AE 5342. The United

States lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in subpart (mm) and therefore denies the same.

nn. The United States denies the allegations in subpart (nn).

oo. The United States denies the allegations in subpart (oo).

pp. The United States denies the allegations in subpart (pp).

qq. The United States denies the allegations in subpart (qq).

rr.  The United States admits that the PAT25 pilots did not comply with 14 C.F.R.

§ 91.113 by failing to maintain vigilance so as to see and avoid AE5342. The United

States lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in subpart (rr) and therefore denies the same.

ss.  The United States denies the allegations in subpart (ss).

The United States denies the remaining allegations in paragraph 253 and all subparts.

254.    Through the aforementioned negligence, Defendant USA directly and

proximately, caused and/or contributed to the subject crash and thereby the injuries and death of

Plaintiff's DECEDENT, and the resulting damages to Plaintiff herein.

**ANSWER:** The United States admits that the PAT25 pilots' failure to maintain vigilance

so as to see and avoid AE5342 was a cause-in-fact and proximate cause of the subject crash and

the death of Plaintiff's DECEDENT; therefore, a legally eligible Plaintiff may recover certain monetary damages from the United States. The United States denies the remaining allegations in paragraph 254.

255.    As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of the USA, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER:** The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 255 and therefore denies the same.

256.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by Plaintiff, seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and suffering that the heirs, beneficiaries and distributees of the DECEDENT's

Estate were caused to incur other; and necessary and reasonable expenses as a result of the

DECEDENT's death.

**ANSWER:** The United States admits that the PAT25 pilots' failure to maintain vigilance

so as to see and avoid AE5342 was a cause-in-fact and a proximate cause of the accident and the

death of DECEDENT and, as a result, the United States is liable to a Plaintiff who is legally

eligible to recover certain monetary damages, as permitted by the FTCA, 28 U.S.C. §§ 1346(b),

2671–80, in an amount yet to be determined and apportioned among other tortfeasors.  The

United States denies that any alleged negligence of the air traffic controllers on position in the

Washington Tower during the accident was a cause-in-fact and a proximate cause of the accident

and the death of DECEDENT.  The United States lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 256 and therefore denies

the same.

**TENTH CAUSE OF ACTION**
**SURVIVAL BASED UPON**
**NEGLIGENCE AGAINST THE UNITED STATES OF AMERICA**

257.    Plaintiff hereby incorporates by reference as though set forth fully herein all of the

preceding Paragraphs.

**ANSWER:** The United States incorporates by reference all of its answers to the

preceding paragraphs as if fully stated in this answer to paragraph 257.

258.    At all relevant times, air traffic control personnel employed by Defendant USA,

under the immediate authority and control of the FAA, owed a duty to the Plaintiff's

DECEDENT, and Plaintiff, and all others who were flying the vicinity of DCA, to exercise

reasonable care in maintaining a safe operational environment in the airspace at and around

DCA, including but not limited to by taking all actions provided in the applicable Air Traffic

181

Control Manual, FAA JO 7110.65, DCA's SOPs, LOAs, and/or MOUs between DCA and operators.

      **ANSWER:** The United States admits that when air traffic control personnel employed by the FAA have a duty to persons who travel in aircraft receiving air traffic control services, their duty is to exercise reasonable care under certain circumstances. The United States admits that under the FTCA state law provides the legal source of duty and the standard of care applicable to FAA employees, and any FAA employee alleged to have been negligent was acting in their official capacity and within the course and scope of their employment at all times relevant to this action. The United States further admits that FAA Order JO 7110.65AA chg. 3, Air Traffic Control (Sept. 5, 2024) is evidence of the standard of care. The United States denies the remaining allegations in paragraph 258.

      259.    On January 29, 2025, Defendant USA, by and through the FAA and its air traffic control personnel, was negligent and breached the duties it owed Plaintiff's DECEDENT, and Plaintiff as follows:

     a.   The controller(s) negligently failed to give first priority to separating aircraft and issuing safety alerts in violation of FAA Order JO 7110.65AA, ¶ 2-1-2, instead prioritizing a departures push or other non-safety critical duties;

     b.   The controller(s) negligently failed to establish proper and safe separation between AE 5342 and PAT25;

     c.   The controller(s) negligently failed to monitor the course and altitude of PAT25 to ensure compliance with the published route and mandatory maximum published altitude for Helicopter Route 4;

d.  The controller(s) negligently failed to notify PAT25 that it was off course and above the mandatory maximum altitude for Helicopter Route 4 and failed to instruct PAT25 to immediately turn left to and descend until it was at or below 200 feet and remain clear of AE 5342;

e.  The controllers negligently failed to notify AE 5342 of the presence of PAT25;

f.  The controller(s) negligently violated FAA Order JO 7110.65AA ¶ 7-2-1 by failing to follow the procedures for visual separation therein.  The controller(s) did not follow the mandatory procedures for Pilot-Applied Visual Separation. More particularly:

    v.  The controller(s) failed to inform PAT25 at numerous critical times of the position, direction, type and intentions of AE 5342 and failed to properly confirm that PAT25 had AE 5342 in sight as required by JO 7110.65AA ¶ 7-2-1 subsection a.2.(b)(1) and (2);

    vi.  The controller(s) failed to inform AE 5342 that it was on a converging course with PAT25 and that visual separation was being applied, as required by JO 7110.65AA subsection a.2.(d);

    vii.  The controller(s) failed to advise both pilots of the other aircraft and did not inform either pilot that targets were likely to merge as required by JO 7110.65AA ¶ 7-2-1 subsection a.2.(e);

    viii.  Additionally, the controller(s) failed to issue positive control instructions to either aircraft when vertical and/or lateral separation standards were not ensured, and failed to use proper, specified phraseology in communicating with the subject helicopter and

183

aircraft.  The controller(s) also never provided AE 5342 with PAT25's position, direction, type, and intentions;

g.  The controller negligently failed to issue a safety or traffic alert to either PAT25 or AE 5342 despite having radar data available in real time that showed the flight tracks, altitudes and distance between PAT25 and AE 5342, and receiving a Conflict Alert (CA) when the aircraft were within approximately 1.5 miles of each other and on converging courses heading directly towards one another.  This was in violation of FAA Orders:

    iv.  JO 7110.65AA, ¶ 2-1-6, Safety Alerts;

    v.  JO 7110.65AA ¶ 7-6-1, Basic Radar Service to VFR Aircraft Terminal and;

    vi.  JO 7110.65AA ¶ 5-1-4, Merging Target Procedures;

h.  The controller(s) negligently failed to issue traffic alerts to AE 5342 and/or PAT25 in violation of FAA Orders, including but not limited to JO 7110.65AA, ¶ 2-1-21; JO 7110.65AA ¶ 3-1-6; and JO 7110.65AA ¶ 3-1-6, on at least three separate occasions, including:

    iv.  Failing to inform AE 5342 of the helicopter traffic after AE 5342 accepted the request to land on Runway 33 at approximately 8:43:06 p.m.  The controller should have informed AE 5342 of PAT25's position, direction, type, and intentions;

    v.  Failing to provide AE 5342 specific and timely traffic alerts when it was about 2 miles southeast of the airport, on a left base to Runway 33, with the relative o'clock position, distance and altitude of PAT25

and informing AE 5342 that PAT25 would transit the airspace by

crossing the final approach path to Runway 33;

vi. Failing to provide specific traffic alerts to PAT25 concerning AE

5342 after receiving a "CA" at approximately 8:47:39 p.m., when the

controller should have advised PAT25 of AE 5342's "o'clock"

position, distance and altitude, and informed PAT25 that its flight

path was converging with AE 5342 and the radar targets of both

aircraft would merge;

i. The controller(s) failed to exercise continuing vigilance to observe and recognize

a situation of unsafe aircraft proximity as required by JO 7110.65AA, ¶¶ 2-1-2 &

2-1-6, as described in Note 1 of ¶ 2-1-6;

j. The controller(s) negligently failed to follow SOP and/or well-established custom

and practice to hold PAT25 at Hains Point when other aircraft were landing on

Runway 33 so as to prevent PAT25 from crossing the approach to Runway 33 as

AE 5342 was landing on Runway 33;

k. The controller(s) negligently failed to advise either aircraft that their targets would

likely merge;

l. The controllers failed to properly, timely and/or appropriately resolve the Conflict

Alert that was depicted (both visually and aurally) on ATC's radar display;

m. The controller(s) negligently failed to warn either AE 5342 or PAT25 that they

were on a collision course and that their Radar Targets would merge in

accordance with FAA Order JO 7110.65AA ¶ 5-1-4 Merging Target Procedures;

n.  The controller(s) negligently failed to follow merging target procedures in violation of FAA Orders JO 7110.65AA ¶ 5-1-4 and JO 7110.65AA ¶ 7-9-5.  Once it was clear that PAT25 and AE 5342 were on converging courses, and vertical separation of more than 500 feet or lateral separation of more than 1.5 nm would not be maintained per FAA Order JO 7110.65AA ¶ 7-9-4, which was obvious from at least the time of the CA at approximately 8:47:39 p.m., the controller(s) should have advised both aircraft that their targets were likely to merge and/or issue positive control instructions to turn or climb to one or both aircraft to avoid the mid-air collision;

o.  The controller(s) negligently violated FAA Order JO 7110.65AA ¶ 5-6-1 by failing to vector either aircraft to ensure proper separation.  The controller(s) failed to issue a vector so that PAT25 would avoid AE 5342 and failed to issue alerts or advise the aircraft of traffic;

p.  The controller(s) negligently failed to visually scan their areas of responsibility in violation of FAA Order JO 711065AA ¶ 3-1-12, which should have further alerted them of the need to issue traffic and alerts to PAT25 and AE 5342;

q.  The controller(s) providing services to AE 5342 and/or PAT25 failed to comply with air traffic controller duties and responsibilities in that the controller failed to consult with other controllers and personnel and utilize all available tools and personnel at their disposal, which violated the Air Traffic Control Manual, including but not limited to FAA Order JO 7110.65AA ¶ 2-10-3 Tower Team Position Responsibility;

r.   The controller(s) failed to provide AE 5342 and PAT25 with appropriate services as required by the Air Traffic Control Manual, including but not limited to for the reasons set forth above;

s.   The FAA controllers-in-charge and operations manager negligently supervised the controllers at the DCA tower and failed to timely take required corrective action to prevent the mid-air collision between PAT25 and AE 5342;

t.   The controller(s) at the DCA tower were not properly trained or supervised in providing air traffic control services to AE 5342 and PAT25 concerning traffic practices and procedures for separation and issuing safety alerts for aircraft in close proximity and at risk of collision;

u.   The controller(s) at the DCA tower were not properly trained or supervised and/or failed to maintain positive control over helicopters operating on the Helicopter Routes near DCA by providing altitude, heading or such other instructions to ensure adequate separation and avoid a collision;

v.   The FAA failed to ensure that the controllers monitoring AE 5342 and/or PAT25 were properly trained and supervised and to ensure that they properly executed their air traffic controller responsibilities;

w.   The FAA negligently operated the helicopter route structure in and around DCA such that Helicopter Route 4 was allowed to be utilized at the same time as landings on Runway 33 and takeoffs from Runway 19;

x.   The FAA negligently failed to establish SOP and/or train its controllers on the well-established custom and practice to hold PAT25 at Hains Point when other aircraft were landing on Runway 33;

y.  The FAA, and its supervisors and/or managers at DCA negligently and/or improperly allowed controllers to leave shifts early, commonly known as an "early shove," leaving the DCA tower inadequately and unsafely under-staffed leading up to this mid-air collision, in violation of FAA rules, regulations, orders, SOPs and/or MOUs;

z.  The FAA, and its supervisors and/or managers at DCA negligently and/or improperly allowed the helicopter control and local control positions to be combined at approximately 3:40 p.m. on January 29, 2025, and to remain combined throughout some of the busiest times of day for helicopter and commercial airliner traffic at DCA, in violation of FAA rules, regulations, orders, SOPs and/or MOUs;

aa. The FAA and its controllers, supervisors, and/or managers at DCA, negligently failed to analyze and respond to the thousands of reported occurrences of minimum separation violations at or near DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

bb. The FAA and its controllers, supervisors, and/or managers otherwise violated FAA rules, regulations, orders, SOPs, MOUs, LOAs, and/or policies and procedures; and

cc. The United States of America, its FAA agents, servants and employees were otherwise negligent in causing the mid-air collision between PAT25 and AE 5342 and/or by taking and/or failing to take other actions to be proven through

discovery or at the trial in this matter, which were in contravention of the exercise

of due care, and reasonable prudence under the circumstances.

**ANSWER:** The United States addresses each subpart contained in paragraph 259 as

follows:

a.  The United States denies the allegations in subpart (a).

b.  The United States admits the DCA local controller did not comply with ¶ 7-2-
1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5,
2024). The United States denies the remaining allegations in subpart (b).

c.  The United States denies the allegations in subpart (c).

d.  The United States denies the allegations in subpart (d).

e.  The United States admits the DCA local controller did not comply with ¶ 7-2-
1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5,
2024). The United States denies the remaining allegations in subpart (e).

f.  The United States admits the DCA local controller did not comply with ¶ 7-2-
1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5,
2024).  The United States addresses each additional subpart contained in
subpart (f) as follows:

  v.  The United States denies the allegations in subpart (v).

  vi.  The United States admits the DCA local controller did not comply
with ¶ 7-2-1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air
Traffic Control (Sept. 5, 2024). The United States denies the
remaining allegations in subpart (vi).

  vii.  The United States denies the allegations in subpart (vii).

        viii.    The United States admits the DCA local controller did not comply with ¶ 7-2-1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5, 2024).  The United States denies the remaining allegations in subpart (viii).

g.  The United States denies the allegations in subpart (g) and all subparts.

h.  The United States denies the allegations in subpart (h) and all subparts.

i.  The United States denies the allegations in subpart (i).

j.  The United States denies the allegations in subpart (j).

k.  The United States denies the allegations in subpart (k).

l.  The United States denies the allegations in subpart (l).

m.  The United States denies the allegations in subpart (m).

n.  The United States denies the allegations in subpart (n)

o.  The United States denies the allegations in subpart (o).

p.  The United States denies the allegations in subpart (p).

q.  The United States denies the allegations in subpart (q).

r.  The United States admits the DCA local controller did not comply with ¶ 7-2-1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5, 2024).  The United States denies the remaining allegations in subpart (r).

s.  The United States denies the allegations in subpart (s).

t.  The United States denies the allegations in subpart (t).

u.  The United States denies the allegations in subpart (u)

v.  The United States denies the allegations in subpart (v).

w.  The United States denies the allegations in subpart (w).

x.   The United States denies the allegations in subpart (x).

y.   The United States denies the allegations in subpart (y).

z.   The United States denies the allegations in subpart (z).

aa. The United States denies the allegations in subpart (aa).

bb. The United States admits the DCA local controller did not comply with ¶ 7-2-

    1(a)(2)(d) of FAA Order JO 7110.65AA, chg. 3, Air Traffic Control (Sept. 5,

    2024).  The United States denies the remaining allegations in subpart (bb).

cc. The United States denies the allegations in subpart (cc).

The United States denies the remaining allegations in paragraph 259 and all subparts.

260.    On January 29, 2025, the crew of PAT25, including but not limited to the IP (as
pilot-in-command) and the pilot flying, employed by Defendant USA, under the immediate
authority and control of the United States Army, owed a duty to Plaintiff's DECEDENT, and all
others who were flying in the vicinity of DCA, to exercise reasonable care in safely and carefully
operating PAT25, including but not limited to see and avoid other aircraft pursuant to 14 C.F.R. §
91.13(a) and 91.113, and to comply with all air traffic control clearances and instructions
pursuant to 14 C.F.R. § 91.123, including maximum altitude clearances in published helicopter
route charts when cleared by air traffic control for said routes.

**ANSWER:** The United States admits that when the PAT25 pilots had a duty to persons
traveling in aircraft, their duty was to exercise reasonable care under certain circumstances.  The
United States admits that on January 29, 2025, the crew of PAT25 were employees of the United
States acting in their official capacity and within in the course and scope of their employment at
all times relevant to this action, and the instructor pilot was the pilot-in-command of PAT25 at
the time of the collision. The United States further admits that under the FTCA state law

provides the legal source of duty and the standard of care applicable to the crew PAT25, and the Federal Aviation Regulations and published aeronautical charts are evidence of the standard of care.  The United States denies the remaining allegations in paragraph 260.

261.    On January 29, 2025, Defendant USA, by and through the United States Army, owed a duty to Plaintiff's DECEDENT, and all others who were flying in the vicinity of DCA, to exercise reasonable care in maintaining, repairing and inspecting Army aircraft, including but not limited to the UH-60L operating as PAT25 on January 29, 2025.

**ANSWER:** The United States admits that when federal employees who maintain, repair, and inspect Army aircraft, including but not limited to the UH-60L operating as PAT25 on January 29, 2025, have a duty to persons traveling in aircraft, their duty is to exercise reasonable care under certain circumstances.  The United States admits that under the FTCA state law provides the legal source of duty and standard of care applicable to the federal employees acting in the course and scope of employment and whose job responsibilities included maintaining, repairing, and inspecting PAT25. The United States denies the remaining allegations in paragraph 261.

262.    On January 29, 2025, Defendant USA, by and through the crew of PAT25 and United States Army personnel, was negligent and breached the duties it owed Plaintiff's DECEDENT and Plaintiff as follows:

a.    The Army crew negligently failed to establish and maintain proper and safe visual separation with AE 5342;

b.    The Army crew negligently requested and accepted visual separation from air traffic control without actually having AE 5342 identified and in sight;

c.  The Army crew negligently failed to see and acquire AE 5342 when initially requesting and accepting visual separation from air traffic control, despite its altitude and location being provided by air traffic control at or about 8:46 p.m.;

d.  The Army crew negligently requested and accepted visual separation knowing that their ability to visually acquire traffic was compromised by their use of Night Vision Goggles ("NVGs") and despite knowing that the helicopter was not transmitting ADS-B out;

e.  The Army crew negligently requested and accepted visual separation instructions from air traffic control without receiving sufficient information and/or instructions from air traffic control, including but not limited to AE 5342's altitude, position, direction, type and intentions;

f.  The Army crew negligently failed to maintain vigilant visual surveillance as required to maintain adequate and safe visual separation from aircraft along Helicopter Routes 1 and 4;

g.  The Army crew negligently failed to establish and maintain communication with AE 5342, through ATC, to ensure visual separation;

h.  The Army crew negligently utilized NVGs during the flight, which unreasonably distracted them, caused object obscuration/blending, and limited their field of vision, depth perception, color differentiation and/or their ability to distinguish oncoming traffic, in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-157;

i.  The Army crew negligently failed to recognize that the cultural lighting and over saturated bright lights along Helicopter Routes 1 and 4 in the vicinity of DCA

193

reduced the effectiveness of their NVGs and negligently failed to de-goggle or doff their NVGs when transiting Helicopter Routes 1 and 4 to improve their ability to identify AE 5342;

j.   The Army crew negligently failed to de-goggle or doff their NVGs in the congested, urban environment around DCA in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-2;

k.   The Army crew negligently failed to properly consider the effect NVGs could have on their ability to perceive navigation lights and landing lights from other aircraft operating around DCA, in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-206;

l.   The Army crew negligently failed to properly coordinate amongst themselves and/or negligently failed to utilize proper and safe crew resource management, which is especially important at night, in violation of Army regulations, including but not limited to TC 3-04.4 ¶¶ 4-190 and 4-191.

m.   The Army crew negligently failed to see and avoid AE 5342, in violation of 14 C.F.R. §§ 91.13(a) and 91.113;

n.   The Army crew negligently flew off the flight route towards the center of the Potomac River at too high an altitude, despite repeated altitude call outs from the IP to the PF, and violated the published standards and rules for operating within Helicopter Route 1 and Route 4, particularly that all operations in this section of Helicopter Route 1 and Route 4, between the Memorial Bridge and the Wilson Bridge, must remain above the east bank of the Potomac River at or below 200 feet MSL;

o. Failed to stay on the charted route and adhere to the 200 feet Failed to stay on the charted route and adhere to the 200 feet mandatory altitude restriction was careless and reckless, in violation of 14 C.F.R. § 91.13(a).

p. The failure to maintain the charted flight route and altitude beneath the maximum route altitude also violates 14 C.F.R. § 91.119(d)(1), the Army's own SOP, and other mandatory Army and FAA rules and regulations;

q. The Army crew negligently failed to properly cross reference their instruments, including but not limited to their radar altimeters, and visual references along Helicopter Routes 1 and 4 to ensure they remained on the charted route and at or below the mandatory 200 feet altitude restriction;

r. The Army crew negligently failed to navigate sufficiently to the left (or towards the Eastern shore of the Potomac River) despite the IP telling the PF that he believed this was what ATC wanted from the helicopter and that flying in the middle of the river brought the helicopter dangerously closer to airplanes landing at DCA;

s. The Army crew negligently failed to follow Helicopter Route 4 as visually depicted by the lines set forth on the Baltimore-Washington Helicopter Route Chart;

t. The Army crew negligently failed to follow Helicopter Route 4 close to the Eastern shore of the Potomac as described in the Helicopter Route Chart;

u. The Army crew negligently failed to identify that AE 5342 and PAT25 were on a collision course and failed to take evasive action;

v.   The Army crew failed maintain course on the charted route, and failed to discuss, analyze, and/or resolve an altitude discrepancy when in the minutes prior to the collision, the IP stated that the aircraft was at 400 feet but the PF stated that the aircraft was at 300 feet and this failure was critical especially since they were transiting airspace that had a 200-foot altitude restriction;

w.   The IP, who was the pilot in command of PAT25, negligently failed to take timely and appropriate action to correct the helicopter's altitude and course, despite knowing that the helicopter was too high and off course;

x.   The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, and/or Army regulations in approving and/or directing PAT25 to conduct a training mission transiting Helicopter Route 1 and Route 4 during one of the busiest times of day for arriving and/or departing flights at DCA;

y.   The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, and/or Army regulations, including but not limited to Army TC 3-04.4 ¶ 4-2, in approving or directing PAT25 to conduct a training mission using NVGs during one of the busiest times of day for arriving and/or departing flights at DCA;

z.   The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, Army regulations, including but not limited to AR 95-1, and/or FAA regulations in approving and/or directing PAT25 to conduct a training mission in the congested, Class B Airspace

around DCA without their transponder broadcasting ADS-B out despite being equipped with a transponder capable of doing so;

aa. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to conduct adequate risk management in their mission planning and execution of this training flight, which violated SOPs, MOUs, and/or Army regulations, including but not limited to AR 95-1, ¶ 3-15, C 3–04.11, ADP 5–0, ATP 5–19, and DA Pam 385–30, by approving and/or directing PAT25 to conduct a training mission at the time and location, and under the circumstances of the subject flight, including but not limited to operating in the congested, Class B Airspace around DCA, using NVGs, during one of the busiest time periods for commercial traffic at DCA, and without broadcasting ADS-B out despite the subject helicopter being capable of doing so;

bb. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to establish adequate and safe procedures in their SOP for flight operations along Helicopter Routes 1 and 4 near DCA when aircraft traffic is landing on Runway 33;

cc. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to train its helicopter crews to hold at Hains Point when aircraft traffic was landing on Runway 33;

dd. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to establish adequate and safe procedures in their SOP to prohibit the unsafe practice of allowing their helicopters to pass

197

underneath other aircraft on approach to or departing from DCA, despite being on notice of such events in and around DCA;

ee. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to correct for, or warn flight crews about, known barometric altimeter errors and allowed its Black Hawk helicopters, including PAT25, to operate on Helicopter Routes 1 and 4, which require strict adherence to the 200 feet MSL maximum altitude, knowing that the helicopters' barometric altimeters were allowed to be operated with a +/- 70 feet variance and knowing that additional barometric altimeter errors, particularly for helicopters like PAT25 that are equipped with external stores (ESSS), could further increase the variance in flight when at or around 200 feet altitude;

ff. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to adopt appropriate barometric altimeter correction factors, especially for high drag configuration helicopters utilizing external stores (ESSS);

gg. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to establish an SOP that pilots must cross check their barometric altimeters with their radar altimeters when over water on Helicopter Routes 1 and 4 near DCA, so that they can assure flying at or below 200 feet MSL as was required;

hh. The Army, including but not limited to its commanding officers, supervisors, and the crew of PAT25 negligently failed to analyze and respond to the thousands of reported occurrences of minimum separation violations at DCA to address the

obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

ii.   The Army , including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to properly liaise with the FAA and other aviation entities and operators in the Washington Capital Region to analyze and respond to the thousands of reported occurrences of minimum separation violations at or near DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

jj.   The Army crew was not properly trained in conducting night training missions at or near DCA;

kk. The Army crew was not properly trained in transiting Helicopter Route 1 and Route 4 near DCA;

ll.   The Army crew was not properly trained in safely and properly utilizing NVGs, including but not limited to failing to consider and abide by the above referenced Army Training Circular provisions;

mm.      The Army crew negligently failed to comply with applicable FARs for the safe operations of aircraft, as well as any comparable U.S. Army and/or military regulations concerning the safe operations of aircraft, particularly those procedures concerning VFR operations near commercial airports and/or in Class B Airspace;

nn. The Army, including but not limited to the crew, its commanders, supervisors, and the 12th Aviation Battalion operating PAT25 negligently failed to properly inspect and maintain the subject helicopter, including but not limited to the subject

helicopter's transponder, the altimeter(s) and other sources of pressure altitude data, and/or other systems on board the aircraft;

oo. The Army crew negligently failed to employ ADS-B on the subject flight;

pp. The Army crew negligently failed to properly set their altimeter(s) and/or failed to use other tools at their disposal, including altimeter bugs which would have further assisted the Army crew in complying with the altitude restriction as it transited Helicopter Route 4;

qq. The Army crew negligently failed to resolve the inconsistent altitude readings being reported and/or perceived by the IP and the PF;

rr. The Department of the Army and its agents, servants and employees otherwise violated FAA and Army rules, regulations, including but not limited to AR 95-1, orders, Training Circulars ("TCs"), SOPs, MOUs, LOAs, and/or policies and procedures;

ss. The Defendant USA, its Department of the Army agents, servants and employees were otherwise negligent, and/or by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances, and all the foregoing were contributing causes to the mid-air collision complained of herein.

**ANSWER:** The United States admits that on January 29, 2025, the pilots flying PAT25 failed to maintain vigilance so as to see and avoid other aircraft and their failure was a cause-in-fact and proximate cause of the accident. The United States addresses each subpart in paragraph 262 as follows:

201 of 209

a.  The United States admits the PAT25 pilots failed to maintain proper and safe visual separation from AE 5342.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subpart (a) and therefore denies the same.

b.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in subpart (b) and therefore denies the same.

c.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subpart (c) and therefore denies the same.

d.  The United States denies the allegations in subpart (d).

e.  The United States denies the allegations in subpart (e).

f.  The United States denies the allegations in subpart (f).

g.  The United States denies the allegations in subpart (g).

h.  The United States denies the allegations in subpart (h).

i.  The United States denies the allegations in subpart (i).

j.  The United States denies the allegations in subpart (j).

k.  The United States denies the allegations in subpart (k).

l.  The United States denies the allegations in subpart (l).

m.  The United States admits that the PAT25 pilots negligently failed to maintain vigilance so as to see and avoid AE5342 and their failure was not in compliance with 14 C.F.R. § 91.113.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subpart (m) and therefore denies the same.

n.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in subpart (n) and therefore denies the same.

o.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in subpart (o) and therefore denies the same.

p.  The United States denies the allegations in subpart (p).

q.  The United States denies the allegations in subpart (q).

r.  The United States denies the allegations in subpart (r).

s.  The United States denies the allegations in subpart (s).

t.  The United States denies the allegations in subpart (t).

u.  The United States admits the PAT25 pilots failed to maintain vigilance so as to see and avoid AE5342.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subpart (u) and therefore denies the same.

v.  The United States denies the allegations in subpart (v).

w.  The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in subpart (w) and therefore denies the same.

x.  The United States denies the allegations in subpart (x).

y.  The United States denies the allegations in subpart (y).

z.  The United States denies the allegations in subpart (z).

aa.  The United States denies the allegations in subpart (aa).

bb.  The United States denies the allegations in subpart (bb).

cc.  The United States denies the allegations in subpart (cc).

dd.  The United States denies the allegations in subpart (dd).

ee. The United States denies the allegations in subpart (ee).

ff. The United States denies the allegations in subpart (ff).

gg. The United States denies the allegations in subpart (gg).

hh. The United States denies the allegations in subpart (hh).

ii. The United States denies the allegations in subpart (ii).

jj. The United States denies the allegations in subpart (jj).

kk. The United States denies the allegations in subpart (kk).

ll. The United States denies the allegations in subpart (ll).

mm.      The United States admits that the PAT25 pilots did not comply with 14
C.F.R. § 91.113 by failing to maintain vigilance so as to see and avoid AE5342.
The United States lacks k knowledge or information  sufficient  to form a belief as
to the truth of the remaining allegations in subpart (mm) and therefore denies the
same.

nn. The United States denies the allegations in subpart (nn).

oo. The United States denies the allegations in subpart (oo).

pp. The United States denies the allegations in subpart (pp).

qq. The United States denies the allegations in subpart (qq).

rr. The United States admits that the PAT25 pilots did not comply with 14 C.F.R. §
91.113 by failing to maintain vigilance so as to see and avoid AE 5342. The
United States lacks knowledge or information sufficient to form a belief as to the
truth of the remaining allegations in subpart (rr) and therefore denies the same.

ss. The United States denies the allegations in subpart (ss).

The United States denies the remaining allegations in paragraph 262 and all subparts.

263.    Through the aforementioned negligence, Defendant USA directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's DECEDENT, and the resulting damages to Plaintiff herein.

**ANSWER:** The United States admits that the PAT25 pilots' failure to maintain vigilance so as to see and avoid AE5342 was a cause-in-fact and proximate cause of the subject crash and the death of Plaintiff's DECEDENT; therefore, a legally eligible Plaintiff may recover certain monetary damages from the United States. The United States denies the remaining allegations in paragraph 263.

264.    As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of the USA, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER:** The United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 264 and therefore denies the same.

265.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by Plaintiff, seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of

the DECEDENT; loss of past and future income, support, society, love, grief, consortium,

solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's

pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and

mental pain and suffering that the heirs, beneficiaries and distributees of the DECEDENT's

Estate were caused to incur other; and necessary and reasonable expenses as a result of the

DECEDENT's death.

> **ANSWER:** The United States admits that the PAT25 pilot's failure to maintain vigilance
>
> so as to see and avoid AE5342 was a cause-in-fact and a proximate cause of the accident and the
>
> death of DECEDENT and, as a result, the United States is liable to a Plaintiff who is legally
>
> eligible to recover certain monetary damages, as permitted by the FTCA, 28 U.S.C. §§ 1346(b),
>
> 2671–80, in an amount yet to be determined and apportioned among other tortfeasors.  The
>
> United States denies that any alleged negligence of the air traffic controllers on position in the
>
> Washington Tower during the accident was a cause-in-fact and a proximate cause of the accident
>
> and the death of DECEDENT.  The United States lacks knowledge or information sufficient to
>
> form a belief as to the truth of the remaining allegations in paragraph 265 and therefore denies
>
> the same.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Individually, and as DECEDENT's personal representative,

respectfully prays that judgment be entered against the Defendants, AMERICAN AIRLINES,

INC., PSA AIRLINES, INC., and the UNITED STATES OF AMERICA, jointly and severally,

on their causes of action alleged above as follows:

  a. For all available wrongful death and survival economic and non-economic

  damages, including but not limited to: DECEDENT's physical injuries, conscious

pain and suffering, mental anguish, emotional distress, and fear of impending

death; the loss of the gross earning power of the DECEDENT; the loss of the full

value of the life of the DECEDENT; loss of the parental and/or familial

relationship arising from the death of the DECEDENT; the loss of financial

support and contribution of the DECEDENT; loss of services; loss of inheritance;

loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and

future income, support, society, love, grief, consortium, solatium, services,

guidance, care, comfort, and companionship of the DECEDENT; loss of life's

pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental

anguish and mental pain and suffering the heirs, beneficiaries and distributees of

the DECEDENT's estate were caused to incur, and other necessary and

reasonable expenses as a result of the DECEDENT's death;

b.   For all other available damages at law, including punitive damages against

AMERICAN AIRLINES, INC. and PSA AIRLINES, INC.;

c.   For prejudgment interest, fees, and costs of suit incurred herein, if available;

d.   For attorneys' fees, if available; and

e.   For such other and further relief as the Court may deem just and proper.

**ANSWER:** Plaintiff's WHEREFORE clause does not require a response.  To the extent a

response is required, the United States admits that it is liable to a Plaintiff who is legally eligible

to recover certain monetary damages, as permitted by the FTCA, 28 U.S.C. §§ 1346(b), 2671–

80, in an amount yet to be determined and apportioned among other tortfeasors.  The United

States denies the remaining allegations in Plaintiff's WHEREFORE clause including all

subparts.

## DEFENSES AND AFFIRMATIVE DEFENSES

1.      With respect to certain allegations, the Master Complaint fails to state a claim upon which relief can be granted.

2.      With regard to allegations concerning the conduct of the air traffic controllers in the Washington Tower, the United States cannot be held liable for their conduct because the alleged negligent acts or omissions were not a cause-in-fact or a proximate cause of the accident.

3.      The Court lacks subject-matter jurisdiction over some of Plaintiff's allegations of negligent conduct under exceptions to the waiver of sovereign immunity set forth in the FTCA, 28 U.S.C. §§ 1346(b), 2671–80.

4.      Certain claims against the United States are barred, in whole or in part, to the extent they are based on the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the United States. 28 U.S.C. § 2680(a).

5.      Certain claims against the United States are barred, in whole or in part, to the extent they allege nonjusticiable political questions.

6.      A proximate and legal cause of this accident is attributable to the conduct of persons or entities over whom the United States had no control, and for which the United States was not legally responsible.

7.      The liability of the United States to Plaintiff must be reduced because of contributory negligence (excluding passenger and flight attendant cases), comparative negligence (excluding passenger and flight attendant cases), the fault of other tortfeasors, and/or equal shares apportionment among all parties found to be tortfeasors.

8.      Plaintiff's recovery against the United States is limited to the amount specified in their administrative claims presented to the FAA and/or U.S. Army under 28 U.S.C. § 2675(b).

9.      Plaintiff may not recover pre-judgment interest against the United States. 28 U.S.C. § 2674.

10.     Plaintiff is not entitled to a jury trial against the United States.  28 U.S.C. § 2402.

11.     The United States is liable only to a Plaintiff who is legally eligible to recover certain monetary damages as permitted by the FTCA, 28 U.S.C. §§ 1346(b), 2671–80,

12.     The United States denies all allegations in the Master Complaint that were not specifically admitted

December 17, 2025

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
*Civil Division*

JONATHAN D. GUYNN
*Deputy Assistant Attorney General*
*Torts Branch*

*Of Counsel:*

  */s/ Bradley J. Preamble*
BRADLEY J. PREAMBLE
   (D.C. Bar No. 493969)
*Senior Aviation Counsel*
DEBRA D. FOWLER
*Senior Aviation Counsel*
ROBERT KELLY
*Senior Admiralty & Aviation Counsel*
   (D.C. Bar No. 1719750)
U.S. Department of Justice
Civil Division, Torts Branch
Aviation, Space & Admiralty Litigation
P.O. Box 14271
Washington, DC 20044-1471
Tel. (202) 616-4100
Fax (202) 616-4002
Emails:  debra.fowler@usdoj.gov
         bradley.j.preamble@usdoj.gov

LTC JA STEVEN C. HIGGINS
*Chief*
Tort Litigation Branch
Litigation Division
U.S. Army Legal Services Agency
Ft. Belvoir, VA 22060

CHRIS STEVENSON
*Manager*
REBECCA A. LIPE
*Attorney*
Aviation Litigation Division
Office of the Chief Counsel
Federal Aviation Administration
Washington, DC 20591

*Attorneys for Defendant*
*United States of America*