## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE: MID-AIR COLLISION IN WASHINGTON, D.C., JAN. 29, 2025** | Lead Case No: 1:25-cv-03382-ACR |
| Plaintiffs, | **Oral Argument Requested** |
| -v.- | |
| AMERICAN AIRLINES INC., et al. | |
| Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PSA AIRLINES, INC.'S AND AMERICAN AIRLINES, INC.'S MOTIONS TO DISMISS THE MASTER COMPLAINT ON THE GROUNDS OF FEDERAL PREEMPTION

Brian J. Alexander (Bar ID: NY0679)
Justin T. Green (Bar ID: NY0692)
Anthony Tarricone (Bar ID: 492480)
Daniel O. Rose (Applicant *pro hac vice*)
Vincent C. Lesch (Bar ID: NY0675)
Evan Katin-Borland (Bar ID: NY0674)
Erin R. Applebaum (Applicant *pro hac vice*)
KREINDLER & KREINDLER LLP
485 Lexington Avenue, 28th Floor
New York, New York 10017
(212) 687-8181
balexander@kreindler.com
jgreen@kreindler.com
atarricone@kreindler.com
drose@kreindler.com
vlesch@kreindler.com
ekatinborland@kreindler.com
eapplebaum@kreindler.com

Robert A. Clifford (Bar ID: IL0135)
Kevin P. Durkin (Bar ID: IL0136)
Tracy Brammeier (Bar ID: IL0137)
John V. Kalantzis (Applicant *pro hac vice*)
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street Suite 3600
Chicago, Illinois 60602
(312) 899-9090
rac@cliffordlaw.com
kpd@cliffordlaw.com
tab@cliffordlaw.com
jvk@cliffordlaw.com

Douglas A. Latto (Bar ID: NY0672)
Kenneth P. Nolan (Applicant *pro hac vice*)
Jeanne M. O'Grady (Bar ID: NY0673)
Frank H. Granito, III (Applicant *pro hac vice*)
SPEISER KRAUSE, P.C.
800 Westchester Avenue, Suite S-608
Rye Brook, New York 10573
(914) 220-5333
dal@speiserkrause.com
f3g@speiserkrause.com
jog@speiserkrause.com
kpn@speiserkrause.com

*Plaintiffs Steering Committee*

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 4

I.      DCA Airspace Configuration and Traffic ............................................................. 5

II.     Traffic Alert and Collision Avoidance System ("TCAS") .................................... 6

III.    Defendants' Flight Operations at DCA ................................................................. 6

IV.     The Crash ................................................................................................................ 7

V.      Plaintiffs Have Alleged Violations of Federal Standards ................................... 10

STANDARD OF REVIEW ........................................................................................... 11

ARGUMENT ................................................................................................................. 12

I.      Plaintiffs' State Law Tort Claims Should Not be Dismissed on the Basis of
        Implied Field Preemption .................................................................................... 12

II.     Implied Conflict Preemption, Not Field Preemption, Governs Plaintiffs'
        Aviation Safety-Related State Tort Claims ......................................................... 12

        A.    Congress Did Not Intend to Broadly Preempt the Entire Field of
              Aviation Safety .......................................................................................... 13

        B.    A Strong Presumption Against Preemption Applies to State Common
              Law Physical Injury Torts .......................................................................... 16

        C.    The Supreme Court Would Likely Reject Implied Field Preemption in
              the Aviation Safety Context ....................................................................... 17

        D.    Plaintiffs' State Law Claims Are Not Preempted Because They Do Not
              Impliedly Conflict with Federal Regulation ............................................. 20

III.    If Implied Field Preemption Applies, it is Limited to "In-Flight
        Operations," but Does Not Apply to Claims Relating to Other Conduct ........... 20

        A.    The *Sikkelee I* Framework Limits Implied Field Preemption in
              Aviation to "In-Flight Operations" ........................................................... 22

              1.    Defendants Over-Read *Abdullah* ................................................... 23

              2.    The *Sikkelee I* Functional Approach to Implied Field Preemption is
                    Consistent with the Majority of Circuit Courts of Appeals .............. 24

        B.    Plaintiffs' Claims Survive the Narrowed Implied Field Preemption
              Established by *Sikkelee I* ......................................................................... 31

              1.    Plaintiffs' Allegations Relating to In-Flight Operations Allege
                    Violation of Federal Standards of Care ........................................... 31

              2.    Plaintiffs' Allegations Outside the Realm of In-Flight Operations
                    are Governed by the District of Columbia's Negligence Standards
                    of Care ............................................................................................... 34

IV.    The Airline Deregulation Act Does Not Expressly Preempt Plaintiffs'
       Allegations that Defendants Negligence Included Unsafely Clustering
       Flights .................................................................................................................39

CONCLUSION.........................................................................................................42

## **TABLE OF AUTHORITIES**

Page(s)

### US SUPREME COURT CASES

*Altria Group, Inc. v. Good*,
    555 U.S. 70 (2008) ................................................................ 16

*Am. Airlines, Inc. v. Wolens*,
    513 U.S. 219 (1995) ........................................................ 15, 40

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................ 11

*Bates v. Dow Agrosciences LLC*,
    544 U.S. 431 (2005) ................................................................ 14

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................ 11

*Beneficial Nat'l Bank v. Anderson*,
    539 U.S. 1 (2003) ................................................................ 19

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
    489 U.S. 141 (1989) ........................................................ 14, 20

*Campos-Chavez v. Garland*,
    602 U.S. 447 (2024) ................................................................ 17

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504 (1992) ................................................ 16, 18, 20

*City of Burbank v. Lockheed Air Terminal, Inc.*,
    411 U.S. 624 (1973) ........................................ 18, 18, 29

*CSX Transp., Inc. v. Easterwood*,
    507 U.S. 658 (1993) ................................................................ 20

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990) ........................................................ 14, 16

*Freightliner Corp. v. Myrick*,
    514 U.S. 280 (1995) ................................................................ 18

*Geier v. American Honda Motor Co.*,
    529 U.S. 861 (2000)........................................................................................ 12

*Hillsborough City v. Automated Medical Laboratories, Inc.*,
    471 U.S. 707 (1985)........................................................................................ 14

*Johnson v. City of Shelby, Miss.*,
    574 U.S. 10 (2014).......................................................................................... 32

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)................................................................................. 12, 16

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)......................................................................... 13, 40, 41

*Oklahoma v. Castro-Huerta*,
    597 U.S. 629 (2022).......................................................................................... 2

*Silkwood v. Kerr-McGee Corp.*,
    464 U.S. 238 (1984)........................................................................................ 20

*Sprietsma v. Mercury Marine*,
    537 U.S. 51 (2002)............................................................................................ 3

*Virginia Uranium, Inc. v. Warren*,
    587 U.S. 761 (2019)........................................................................................ 13

*Wyeth v. Levine*,
    555 U.S. 555 (2009)............................................................. 13, 16, 17, 19, 20

## FEDERAL CASES

*Abdullah v. Am. Airlines, Inc.*,
    181 F.3d 363 (3d Cir. 1999) ................................................. 3, 21, 23,24, 33,37

*AirEvac EMS v. Robinson*,
    486 F. Supp. 2d 713 (M.D. Tenn. 2007) .......................................................... 38

*Bradshaw v. American Airlines, Inc.*,
    123 F.4th 1168 (10th Cir. 2024) ...................................................................... 30

*Charas v. Trans World Airlines, Inc.*,
    160 F.3d 1259 (9th Cir. 1998) .................................................................... 11, 40

*Cleveland v. Piper Aircraft Corp.*,
    985 F.2d 1438 (10th Cir. 1993) ........................................................................30

*Cook v. Rockwell Intern. Corp.*,
618 F.3d 1127 (10th Cir. 2010) ................................................... 11

*Davidson v. Fairchild Controls Corp., No.*,
CV H-15-0827, 2016 WL 5539982 (S.D. Tex. Sept. 28, 2016)...................................... 22

*\*Day v. SkyWest Airlines*,
45 F.4th 1181 (10th Cir. 2022) ...................................... 11, 40, 41, 42

*Deahl v. Air Wis. Airlines Corp.*,
03-C5150, 2003 WL 22843073 (N.D. Ill. 2003)................................ 38

*Desiano v. Warner-Lambert & Co.*,
467 F.3d 85 (2d Cir. 2006) ...................................... 16

*Elassaad v. Independence Air, Inc.*,
613 F.3d 119 (3d Cir. 2010) ...................................... 21

*Fawemimo v. American Airlines, Inc.*,
751 Fed. Appx. 16 (2d Cir. 2018) ...................................... 26

*Federal Trade Comm'n v. Endo Pharmaceuticals, Inc.*,
82 F.2d 1196 (D.C. Cir. 2024)...................................... 11

*French v. Pan Am Exp., Inc.*,
869 F.2d 1 (1st Cir. 1989) ...................................... 25

*Garvey v. NTSB*,
190 F.3d 571 (D.C. Cir. 1999) ...................................... 32

*Greene v. B.F. Goodrich Avionics System*,
409 F.3d 784 (6th Cir. 2005)...................................... 28

*Goodspeed Airport LLC v. East Haddam Inland Wetlands & Watercourses Comm'n*,
634 F.3d 206 (2d Cir. 2011) ...................................... 26

*Gustafson v. City of Lake Angelus, the Sixth Circuit*,
76 F.3d 778 (6th Cir. 1996)...................................... 28, 29

*Hodges v. Delta Airlines, Inc.*,
44 F.3d 334 (5th Cir. 1995)...................................... 40, 41, 42

*Hughes v. Att'y Gen. of Fla.*,
377 F.3d 1258 (11th Cir. 2004) ...................................... 18

*In re Air Crash Near Clarence Ctr.,*
    09-MD-2085, 2013 WL 5964480 (W.D.N.Y. Nov. 8, 2013).............................36

*Jackson v. NTSB,*
    114 F.3d 283 (D.C. Cir. 1997)........................................................................32

*Jones v. Goodrich Pump & Engine Control Systems, Inc.,*
    86 F.4th 1010 (2d Cir. 2023)..................................................................26, 27

*Lindsay v. NTSB,*
    47 F.3d 1209 (D.C. Cir. 1995).......................................................................32

*Martin ex rel. Heckman v. Midwest Express Holdings, Inc.,*
    555 F.3d 806 (9th Cir. 2009)..................................................................20, 29

*Med-TransCorp. v. Benton,*
    581 F. Supp. 2d 721 (E.D.N.C. 2008)..........................................................38

*Monroe v. Cessna Aircraft Co.,*
    417 F. Supp. 2d 824 (E.D. Tex. 2006)....................................................27, 28

*Montalvo v. Spirit Airlines,*
    508 F.3d 464 (9th Cir. 2007).........................................................................23

*Mosure v. Sw. Airlines, Co.,*
    No. 3:23-CV-2126-S, 2024 WL 3625673 (N.D. Tex. July 31, 2024)..............28

*Public Health Trust of Dade Cnty. v. Lake Aircraft, Inc.,*
    992 F.2d 291 (11th Cir. 1993).......................................................................18

*\*Sikkelee v. Precision Airmotive Corp.,*
    822 F.3d 680 (3d Cir. 2016)....................................................................passim

*\*Sikkelee v. Precision Airmotive Corp.,*
    907 F.3d 701 (3d Cir. 2018)....................................................................passim

*Smith v. Bank of America N.A.,*
    615 F. App'x 830 (5th Cir. 2015)..................................................................32

*Taj Mahal Travel, Inc. v. Delta Airlines, Inc.,*
    164 F.3d 186 (3d Cir. 1998)..........................................................................40

*Throckmorton v. NTSB,*
    963 F.2d 441 (D.C. Cir. 1992).......................................................................32

*Tweed–New Haven Airport Authority v. Tong*,
    930 F.3d 65 (2d Cir. 2019) ........................................................................ 26, 27

*U.S. Airways v. O'Donnell*,
    627 F.3d 1318 (10th Cir. 2010) ........................................................................ 30

*Van Dyke v. NTSB*,
    286 F.3d 594 (D.C. Cir. 2002) ........................................................................ 32

*Ventress v. Japan Airlines*,
    747 F.3d 716 (9th Cir. 2014) ........................................................................ 29

*Witty v. Delta Air Lines, Inc.*,
    366 F.3d 380 (5th Cir. 2004) ........................................................................ 27

**STATE CASES**

*Becker v. Avco Corp.*,
    387 P.3d 1066 (Wash. 2017) ........................................................................ 21

**US CONSTITUTIONAL PROVISIONS**

Article VI ........................................................................ 12

**FEDERAL STATUTES**

Title 49 U.S.C.
    § 40101 ........................................................................ 15
    § 40101(a)(1) ........................................................................ 24
    § 40120(c) ........................................................................ 13
    § 41112(a) ........................................................................ 15, 41
    § 41713 ........................................................................ 15
    § 41713(b)(1) ........................................................................ 41, 42
    § 44701(b) ........................................................................ 15

**REGULATIONS**

Title 14 C.F.R
    Part 5 ........................................................................ 37
    § 25 ........................................................................ 38
    § 91.13(a) ........................................................................ *passim*
    § 91.113(b) ........................................................................ 2, 10, 31, 34
    § 91.123 ........................................................................ 32
    § 121.135 ........................................................................ 35
    Part 121, Subpart N ........................................................................ 36
    § 121.323 ........................................................................ 38

§ 121.575..................................................................................................................... 30

## OTHER AUTHORITIES

H.R. Rep. No. 103-525(II) (1994) .............................................................................15
AC 90-120.................................................................................................................9

## <u>INTRODUCTION</u>

The motions to dismiss Plaintiffs' Master Complaint by American Airlines, Inc. (hereinafter "American") and PSA Airlines, Inc. (hereinafter "PSA") (collectively "Defendants") rest on the untenable legal position that "[f]ederal law occupies the field of aviation safety" such that "all state law within the aviation safety field" is preempted.  American Moving Brief, ECF 51-1, pp. 16, 21; PSA Moving Brief, ECF 52-1, pp. 6-7.  Both the plain language of the Federal Aviation Act of 1958 (hereinafter "FAAct") and its implementing regulations, as well as the primary precedent relied upon heavily by Defendants, refute that extravagant claim.

*First*, the FAAct contains a savings clause that evinces congressional intent to allow state common law to stand side-by-side with the system of federal regulations the Federal Aviation Administration (hereinafter "FAA") develops.  The Supreme Court (and thus the D.C. Circuit Court of Appeals)[1] would likely recognize implied *conflict* preemption, but not implied *field* preemption of negligence standards under the FAAct and its implementing regulations.  In other words, the Court would find preemption only if state and federal law conflict.  Where state law is compatible with federal law or parallels federal law, as here, it would hold that Congress did not intend for the federal law to preempt state law, and Defendants are subject to state negligence standards of care.  Defendants do not contest that the Master Complaint sufficiently alleges they failed to comply with state negligence standards of care.  Their Motions to Dismiss should be denied.[2]

---

[1] Neither the Supreme Court nor the D.C. Circuit have addressed whether preemption (conflict, field, or otherwise) applies to aviation safety under the FAAct.

[2] This brief addresses Defendants' preemption-based arguments for dismissal of the Master Complaint, namely, all of PSA Moving Brief, ECF 52-1, and American Moving Brief, ECF 51-1, sec. A and B, pp. 15-33.  Plaintiffs submit a separate brief addressing American's argument that that it owed no duty to Plaintiffs and Defendants' arguments that they are not subject to common

*Second*, even if implied field preemption exists in aviation, it is limited to "in-flight" operations, for which a comprehensive federal standard of care—which prohibits "operat[ing] an aircraft in a careless or reckless manner," 14 C.F.R. § 91.13(a)—substitutes for the state law negligence standard.  It would not bar claims using that standard or reach the other claims Plaintiffs have advanced not touching upon in-flight operations.  Federal law does not preempt the state standard of care relating to Plaintiffs' other allegations that Defendants were negligent in establishing safety management policies and procedures, providing information to pilots, choosing aircraft lighting, and scheduling of flights in high-risk environments.

Plaintiffs' claims survive any legal formulation of implied preemption.  The Master Complaint contains detailed allegations that demonstrate violations of Defendants' duties under harmonious District of Columbia and federal law.  These allegations include specific violations of federal regulations relating to in-flight operations, including the federal prohibition against the "careless or reckless" operation of an aircraft, 14 C.F.R. § 91.13(a), and the duty to "see and avoid other aircraft."  14 C.F.R. § 91.113(b).

Defendants' motions lack support for their sweeping preemption argument that they do not need to comply with any state law standards of care.  *First*, Defendants pay insufficient attention to Congressional intent, as embodied in the text of the FAAct, including the absence of any express preemption provision applicable to aviation safety claims and the presence of an express savings clause.  *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("Congress expresses its intentions through statutory text.").  The FAAct does not include an express preemption provision applicable

---

carrier claims, American Moving Brief, ECF 51-1, sec. C and D; PSA Moving Brief, ECF 52-1, sec. C, concurrently herewith.  *See* Pls. Opp'n to American Mot. to Dismiss.

to aviation safety claims. But it *does* include an express "savings clause" that preserves state law remedies, suggesting that state law was not intended to be preempted.

Congress plainly did not intend for the FAAct to foreclose liability or reduce aviation safety standards. Its clear goal was to improve aviation safety. Interpreting the FAAct to reduce aviation safety standards so that airlines need only comply with "minimum standards" that the FAA might establish, or even no standards at all where gaps exist in the federal standards, is inconsistent with Congress's goal and unsupported by the law. *See Sikkelee v. Precision Airmotive Corp.*, 907 F.3d 701, 715 (3d Cir. 2018) (hereinafter *Sikkelee II)* (FAAct's "goal of fostering aviation safety" is inconsistent with "'providing immunity to aviation manufacturers for defective design.'"); *see also Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002) ("[H]istory teaches us that a [federal] decision not to regulate a particular aspect of [transportation] safety is fully consistent with an intent to preserve state regulatory authority pending the adoption of specific federal standards."). The United States admitted in this case that the duties of its helicopter pilots were to "exercise reasonable care under certain circumstances," and that the source of that duty is state law. U.S. Answer to Master Compl., ECF 53, ¶¶ 251, 260. This same standard applies to the airline Defendants.

Defendants' argument is unsupported by case law. To support their implied field preemption argument, Defendants rely heavily on *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999). But *Abdullah* addressed the pervasive federal regulation of in-flight operations, without consideration of how other aspects of aviation are regulated, or whether a broad formulation of implied field preemption made sense outside the context of in-flight operations. Moreover, Defendants fail to mention the Third Circuit's more recent clarifying 2016 decision, which not only significantly narrowed *Abdullah*'s reach, but also set forth a functional framework

3

for implied field preemption in aviation tort cases, limiting its scope to pervasively regulated "in-flight operations" for which the FAA established a comprehensive federal standard—14 C.F.R. § 91.13(a). *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 708-09 (3d Cir. 2016) (hereinafter *Sikkelee I*). *Sikkelee I* represents the dominant majority position among the Courts of Appeals. Defendants' decision to ignore *Sikkelee I* and their near-exclusive reliance on pre-*Sikkelee I* cases is telling, given that this landmark decision harmonizes almost all the other Courts of Appeals decisions upon which Defendants rely into its functional framework.

Defendants' preemption motions are, accordingly, without a proper foundation in either Congressional intent (the touchstone of preemption analysis), the applicable text, or in judicial precedent. Moreover, Plaintiffs *have* alleged that Defendants violated federal standards of care with respect to their in-flight operations. Defendants' Motions to Dismiss should be denied.

## FACTUAL BACKGROUND

On the night of January 29, 2025, American Eagle Flight 5342 (hereinafter "AE 5342"), with 64 people on board, was on approach to Runway 1 at Reagan Washington National Airport (hereinafter "DCA") when air traffic control (hereinafter "ATC") asked AE 5342's pilots whether they would accept a revised clearance to land on Runway 33 instead. The pilots accepted the revised clearance despite not having briefed for a Runway 33 landing, which required flying a circling approach at night and significantly reduced safety margins.

As AE 5342's pilots began the circling approach, they heard ATC communicating with an Army helicopter (call sign "PAT 25") operating close to their airplane. AE 5342's pilots knew that the helicopter was nearby, but they did not know of the existence of longstanding helicopter traffic routes intersecting the approach path to Runway 33 or the well-documented risk of mid-air collisions in the DCA airspace between commercial airplanes and military helicopters because PSA had failed to train, brief, or otherwise provide them with that critical safety information.

4

Plaintiffs allege that the PSA's failure to train or inform their pilots about the helicopter routes and known mid-air collision hazards, and American's failure to require PSA to do so, constituted negligence. Had Defendants properly informed the pilots of these risks; the fatal mid-air collision would not have occurred.

As AE 5342 approached Runway 33, the pilots received urgent visual and aural traffic alerts that their airplane was dangerously close to PAT 25. Yet Plaintiffs allege that for the ensuing 19 seconds the pilots did nothing to avoid the impending collision. The cockpit voice recorder (hereinafter "CVR") reflects that the pilots did not acknowledge, discuss, or evaluate the alert or the helicopter traffic. The flight data recorder further shows that the pilots made no control inputs to avoid the collision until it was too late to prevent impact. Plaintiffs allege that the pilots breached their duties under District of Columbia negligence and federal regulatory standards in how they conducted the approach and in failing to respond to the traffic alert.

## I.    DCA Airspace Configuration and Traffic

Runway 1 at DCA, the busiest runway in the United States, is the primary runway when the airport is configured for "north operations." Master Compl., ECF 28, ¶¶ 20, 21. Runway 33 is a shorter alternate runway used to reduce traffic on Runway 1. *Id.* ¶¶ 21-23.

In addition to commercial air traffic, such as AE 5342, the busy DCA airspace is used by government, military, law enforcement, and emergency medical helicopters, operating along published, low-level helicopter routes. *Id.* ¶¶ 24-25. Helicopter Route 4 follows the east bank of the Potomac River and intersects with the approach and takeoff corridors to DCA, including the approach path to Runway 33. *Id.* ¶¶ 24-27. Between October 2021 and December 2024, the National Transportation Safety Board (hereinafter "NTSB") identified 15,214 close calls involving commercial airplanes and helicopters in the DCA airspace. *Id.* ¶ 30.

## II.     Traffic Alert and Collision Avoidance System ("TCAS")

To assist pilots in avoiding collision with other air traffic, the FAA requires that all commercial passenger planes be equipped with a Traffic Alert and Collision Avoidance System (hereinafter "TCAS"), which provides automatic aural and visual alerts when other aircraft are dangerously close or on a collision course.  *Id*. ¶¶ 31, 35.  TCAS issues two types of alerts: (1) traffic advisories (hereinafter "TAs") that provide pilots a "TRAFFIC, TRAFFIC" aural alert along with visual alerts on the aircraft's displays; and (2) resolution advisories (hereinafter "RAs") that provide pilots an aural direction to take an evasive maneuver along with visual warnings on the aircraft's displays.  *Id.* ¶¶ 32-36.  When an aircraft is below 1000 feet above ground, RAs are inhibited and TCAS provides only TAs.  *Id*. ¶¶ 38-39.  Between 2011 and 2024, the NTSB found that at least one TCAS RA triggered every month due to the close proximity of a helicopter and a commercial airplane in the DCA airspace.  *Id*. ¶ 40.  Two-thirds of these events occurred at night and in more than half of these events the helicopter may have been above the published mandatory helicopter route altitude restrictions.  *Id*.  As airlines that regularly operated flights into and out of DCA, Defendants were, at a minimum, aware of recurring TCAS alerts involving their own airplanes in the DCA airspace.  *Id*. ¶ 65.

## III.     Defendants' Flight Operations at DCA

DCA is one of only five airports in the United States designated as a high-density traffic airport with a limited number of takeoffs and landings per hour due to the complex nature of air traffic in the area.  *Id*. ¶ 51.  Despite knowing that additional arrivals would, and did, elevate risks to safe flight operations, American accepted additional operations into DCA to maintain its market share, even after the FAA requested that it reduce aircraft arrival rates to alleviate strain on DCA air traffic controllers.  *Id*. ¶¶ 52-55.  Rather than agreeing to reduce the arrival rates, Defendants proposed increasing their use of Runway 33 during northbound operations and to train their pilots

for its use. *Id*. ¶ 55. Despite expanding operations on Runway 33, neither airline warned its pilots or provided specific training or information to alert them that Helicopter Route 4 intersected the approach path to Runway 33. *Id*. ¶ 56. Instead, Defendants scheduled arrivals towards the end of one hour and the beginning of the next hour during peak travel times, allowing them to pack more arrivals into a rolling one-hour window (e.g., 8:30 a.m. to 9:30 a.m.), than are permitted within a single top to bottom one-hour period (e.g., 8:00 a.m. to 9:00 a.m.) under FAA regulations and policies. *Id*. ¶¶ 57-58. In doing so, Defendants manipulated and abused the system of high-density airport arrival slot control at DCA and put additional stress on ATC resources at peak travel times, including in the evening. *Id*. ¶¶ 57-60.

The approach to Runway 1 at DCA is a straight-in approach, which is more stable and requires minimal maneuvering, all of which increase flight safety. *Id*. ¶ 81. By contrast, the approach for Runway 33 involves a circling maneuver where pilots must deviate from the straight-in approach and perform a turn, navigating visually, to align with a different runway, significantly increasing pilot workload, and reducing safety margins. *Id*. ¶¶ 82-83. The FAA has found that circling approaches are among the most challenging flight maneuvers, especially for pilots of passenger jet airplanes, like the CRJ700. *Id*. ¶ 86.

## IV.    The Crash

On January 29, 2025, AE 5342 departed Wichita, Kansas, at approximately 5:39 p.m. local time (6:39 p.m. ET) with an intended destination of DCA. *Id*. ¶ 111. There were 60 passengers and four crew members on board. *Id*. ¶ 112. The airplane was equipped with a TCAS and fitted with older incandescent exterior lighting rather than the newer, brighter LED lighting that would have made the airplane more visible to other aircraft. *Id*. ¶¶ 113-15. PAT 25, a UH-60L Black Hawk helicopter, departed Davison Army Airfield in Fort Belvoir, Virginia at 6:45 p.m. to conduct a training flight including the use of night vision goggles. *Id*. ¶ 116.

At approximately 8:10 p.m. the AE 5342 CVR captured the captain stating he was not going to make the "left {expletive deleted} turn," a reference to the circling approach required to land on Runway 33. *Id.* ¶¶ 117-18. Despite planning to fly a visual approach to Runway 1, the captain briefed only the instrument landing system approach ("ILS") to Runway 1. *Id.* ¶¶ 119-20. ATC then cleared AE 5342 for the visual approach to Runway 1, which the pilots accepted despite not having briefed it. *Id.* ¶ 128.

At 8:43:06 p.m., ATC asked the AE 5342 pilots to accept a runway change to land on Runway 33. *Id.* ¶ 129. The captain expressed hesitation to the first officer stating, "I really don't want to but I guess uhhh tell 'em." *Id.* ¶¶ 121-22. Without briefing or discussing the circling approach to Runway 33, the pilots accepted the switch, in violation of PSA's policies and procedures. *Id.* ¶¶ 128-29, 136-37. Those policies and procedures directed pilots to "[c]onsider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the [circling] maneuver," and that "[l]ast minute runway or approach changes should only be accepted if pre-briefed." *Id.* ¶ 91, Fig. 9. The same PSA procedures, however, offered no guidance to pilots on what criteria to use or what factors to weigh in deciding whether to accept a Runway 33 landing. *Id.* ¶ 131.

At 8:45:11 p.m., the AE 5342 pilots began searching for the information for the circling approach to Runway 33 – information that would have been readily available had the pilots briefed the approach before accepting it, as required by PSA's procedures. *Id.* ¶ 141. At 8:45:30 p.m., the captain disconnected the autopilot and began hand flying the aircraft, substantially increasing the pilots' workload due to the last-minute runway switch. *Id.* ¶¶ 142-45.

At 8:46:02 p.m., the AE 5342 CVR recorded ATC advising PAT 25 of traffic consisting of AE 5342 circling to land on Runway 33, thus confirming that the AE 5342 pilots knew of the

helicopter along their route that they were required to see and avoid, and which would have been displayed on their TCAS traffic display.  *Id*. ¶¶ 147-48, 150.  At 8:47:39 p.m., the AE 5342 CVR recorded ATC checking with PAT 25 if it had AE 5342 in sight, a second alert to the AE 5342 crew that the helicopter was nearby.  *Id*. ¶¶ 153-55.  One second later, and 19 seconds before impact with PAT 25, the airplane's TCAS issued a TA including an aural "TRAFFIC, TRAFFIC" alert, visual alerts on the pilots' primary flight display and a depiction of traffic on the multi-function display, warning the pilots that the airplane was on a dangerous potential collision course with PAT 25.  *Id*. ¶¶ 156-58.  During the entire 19-second period leading to the crash, AE 5342's TCAS would have continued to visually depict PAT 25 in bright yellow, along with its relative altitude and location, on the pilots' multi-function display screen, indicating a collision threat.  *Id*. ¶¶ 158-61.  FAA Advisory Circular AC 90-120, cited by Defendants, tells pilots how to respond to TAs.

> Respond to TAs by attempting to **establish visual contact with the intruder aircraft and other aircraft which may be in the vicinity**. **Coordinate to the degree possible with other crewmembers to assist in searching for traffic**. Do not deviate from an assigned clearance based only on TA information. For any intruder acquired visually, **continue to maintain safe separation in accordance with current regulations and good operating practices.**

AC 90-120, ¶ 3.2 (emphasis added).[3]

Despite repeated notifications of the approaching helicopter in radio communications, the TCAS TA, and the PSA and FAA guidance on how to respond, the AE 5342 pilots never discussed the alert, attempted to locate approaching traffic, or took evasive action to avoid PAT 25.  Master Compl., ECF 28, ¶¶ 158-61.  The AE 5342 pilots' only response occurred nearly simultaneous to

---

[3] FAA Advisory Circulars are not regulatory documents and do not have the force of law. They provide best practices recommended by the FAA and are often used by airlines as a basis for their own policies.

the impact at approximately 8:47:58 p.m. when they increased the airplane's pitch – far too little and too late to avoid the collision, killing all 64 individuals on board.  *Id*. ¶¶ 168-70.

## V.    Plaintiffs Have Alleged Violations of Federal Standards

Defendants argue that the Master Complaint does not allege violations of any federal standards of care, but Plaintiffs have adequately alleged facts that establish violations of federal standards to survive the motions to dismiss regardless of the legal position on implied preemption this Court adopts.

Plaintiffs allege violations of 14 C.F.R. § 91.13(a), the comprehensive federal standard of care for in-flight operations, stating that "no person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."  Plaintiffs also allege violations of 14 C.F.R. § 91.113(b), which requires that "vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft."  Plaintiffs' Master Complaint specifically alleges the following: (1) the AE 5342 pilots failed to see and avoid PAT 25, despite FAA regulations and PSA policies requiring it to do so, *id.* ¶¶ 161, 222(a), 229(a), 236(a), 243(a); (2) the pilots negligently failed to maintain situational awareness of traffic in the airspace around DCA to avoid collision with PAT 25 despite a known history of near miss events between commercial aircraft and helicopters in the DCA airspace, *id.* ¶¶ 222(b), 229(b), 236(b), 243(b); (3) the pilots failed to adequately respond or take any action in response to the TCAS TA and associated aural and visual alerts received a full 19 seconds prior to impact, particularly considering the audible radio transmissions indicating that PAT 25 may not have had AE 5342 in sight, *id.* ¶¶ 154-55, 163, 165, 222(c), 229(c), 236(c), 243(c); (4) the pilots failed to take any evasive action at all in the 19 seconds after they received the TCAS TA aural and visual alerts highlighting potential danger, *id.* ¶¶ 222(d), 229(d), 236(d), 243(d); (5) the pilots failed to brief the circling approach to Runway 33 before accepting clearance to land on Runway 33 from ATC, *id.* ¶¶ 222(e), 229(e), 236(e), 243(e);

(6) the pilots failed to adequately discuss the conditions under which they would accept a circling approach to Runway 33 prior to ATC's request that AE 5342 land on Runway 33, *id.* ¶¶ 222(f), 229(f), 236(f), 243(f); and (7) the pilots accepted a more difficult and dangerous circling approach to Runway 33 in nighttime conditions when it had not been pre-briefed (as was required by PSA), without discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial, *id.* ¶¶ 222(g), 229(g), 236(g), 243(g).

## <u>STANDARD OF REVIEW</u>

In addressing Defendants' motions to dismiss, the Court must accept all Plaintiffs' factual allegations in the Master Complaint as true. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 565-566 (2007). The Court must construe the Master Complaint in Plaintiffs' favor and grant Plaintiffs "the benefits of all inferences that can be derived from the facts alleged." *Federal Trade Comm'n v. Endo Pharmaceuticals, Inc.* 82 F.2d 1196, 1203 (D.C. Cir. 2024).[4] To survive a motion to dismiss, Plaintiffs must allege sufficient facts, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). To meet the standard here, Plaintiffs' allegations must support a reasonable inference that Defendants are liable for the mid-air collision. *Id.*

Defendants bear the burden of showing with specificity that Congress intended to preempt state tort law in the FAAct and that the applicable federal and state law conflict. *Day v. SkyWest Airlines*, 45 F.4th 1181, 1184 (10th Cir. 2022); *Cook v. Rockwell Intern. Corp.* 618 F.3d 1127, 1143 (10th Cir. 2010); *Charas v. Trans World Airlines*, 160 F.3d 1259, 1265 (9th Cir. 1998).

---

[4] The Court does not need to accept inferences not supported by the facts alleged or accept allegations that are legal conclusions. *Id.*

## ARGUMENT

**I.    Plaintiffs' State Law Tort Claims Should Not be Dismissed on the Basis of Implied Field Preemption**

The basis for federal preemption comes from the Supremacy Clause of the Constitution. *See* U.S. CONST. Art. VI, cl.2.  The "ultimate touchstone" in every federal preemption inquiry is Congress's intent. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

The Supreme Court has identified three types of preemption: (1) express preemption, (2) implied field preemption, and (3) implied conflict preemption.  Express preemption occurs when Congress states that a federal statute supersedes conflicting state law.  Implied preemption is when a court infers that Congress so intended, despite not including preemption language in the federal law.  Implied preemption encompasses field preemption and conflict preemption.  In field preemption, a court may construe that a federal statute or regulation preempts an entire field of state law.  Implied field preemption of state law is disfavored.  As a general matter, it does not exist unless federal regulations evidence a desire to occupy a field completely.  Where federal regulations, while detailed, appear to contemplate concurrent state regulation, there is no implied field preemption, but instead courts look to implied conflict preemption.  Implied conflict preemption has two prongs.  The first is impossibility preemption, where a state tort law in irreconcilable conflict with a federal statute, is preempted because compliance with both laws is impossible.  The second is obstacle preemption, which, more broadly, invalidates state laws whose enforcement would interfere with the "purposes and objectives" of federal law.  *Geier v. American Honda Motor Co*., 529 U.S. 861, 873 (2000).

**II.    Implied Conflict Preemption, Not Field Preemption, Governs Plaintiffs' Aviation Safety-Related State Tort Claims**

Neither the Supreme Court nor the D.C. Circuit has addressed the scope of implied preemption in the aviation safety context.  As in any statutory interpretation case, this Court's

federal preemption inquiry must begin with "the language employed by Congress" in the statute. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992); *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion) (stating that the Court's preemption jurisprudence "examine[s] . . . arguments about [a statute's] preemptive effect much as we would any other about statutory meaning, looking to the text and context of the law in question and guided by the traditional tools of statutory interpretation."). Using traditional statutory interpretation tools, the Supreme Court would likely find that Plaintiffs' claims here are not impliedly preempted. Instead, the Court would likely find that conflict preemption applies in the aviation safety context under the FAAct, and because Plaintiffs' claims do not conflict with any federal law or regulation, they are not preempted. Defendants' motions to dismiss on the basis of failure to state a violation of a federal standard of care therefore fail.

### A. Congress Did Not Intend to Broadly Preempt the Entire Field of Aviation Safety

Two key features of the FAAct establish that Congress did not intend FAA oversight to be the exclusive means of ensuring aviation safety. *First*, the FAAct contains no express preemption provision applicable to aviation safety claims. *Second*, it contains an explicit "savings clause" that provides: "[a] remedy under this part is *in addition* to any other remedies provided by law any other remedies provided by law. 49 U.S.C. § 40120(c) (emphasis added). Defendants give short shrift to the savings clause, which does not appear in their FAAct summary. But Defendants' reading of the FAAct to eliminate common law standards of care would not be "in addition to any other remedies provided by law." *Id.* While the Supreme Court has recognized that implied *conflict* preemption principles can still apply despite the existence of a statutory savings clause, the inclusion of such language is powerful evidence that Congress did not intend to occupy the entire field. *See Wyeth v. Levine*, 555 U.S. 555, 575 (2009).

13

For Defendants to succeed on their implied field preemption argument, the Court must find that federal law leaves *no room* for state regulation, and that Congress had a clear and manifest intent to supersede state law in the field of aviation safety. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (implied field preemption occurs in rare circumstances where the "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress *left no room* for the States to supplement it") (emphasis added); *Sikkelee I*, 822 F.3d at 687-688. That is not the case here.

The Supreme Court has expressed more reluctance to infer preemption from the comprehensiveness of regulation than from the comprehensiveness of statutes. "To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field its regulations will be exclusive." *Hillsborough City v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 717 (1985). The Court found that such a "rule" would be "inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence." *Id.*

"The case for federal pre-emption is particularly weak" where Congress recognizes the "operation of state law in a field of federal interest, and has nonetheless decided to 'stand by both concepts and to tolerate whatever tension [exists] between them.'" *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989) (citations omitted).

The FAAct includes multiple provisions that support the continued applicability of state law tort standards in claims against airlines. It did not create a federal cause of action. *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) ("If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly."). It authorized the FAA to issue only "minimum safety standards" to air carriers. 49

U.S.C. §44701(b).  The FAAct also includes an insurance clause requiring air carriers to maintain insurance policies to cover bodily injury or death resulting from the "operation or maintenance" of an aircraft.  *See* 49 U.S.C. § 41112(a).  Because the FAAct did not provide a federal cause of action for such injuries, the insurance clause was always understood to require insurance against state law personal injury actions.  *See American Airlines v. Wolens*, 513 U.S. 219, 231 n.7 (1995).

Congress has twice amended the FAAct, to include narrowly tailored express preemption clauses, indicating Congressional intent to *not* displace state laws excluded from those express provisions.  In 1978, Congress amended the FAAct when it passed the Airline Deregulation Act (hereinafter "ADA"), Pub. L. 95-504 (1978), which introduced an express preemption provision that provides that the states "may not enact or enforce" laws "related to a price, route, or service of an air carrier. . . ."  49 U.S.C. § 41713.  Then in 1994, Congress addressed potential aviation tort liability when it enacted the General Aviation Revitalization Act (hereinafter "GARA"), which expressly established an 18-year statute of repose for allegedly defective general aviation aircraft, and preempted "any State law to the extent that it permits a civil action beyond that limitation period.  Pub. L. 103-298 (1994), *reprinted in* 49 U.S.C. § 40101 note.

The House Report accompanying GARA provides further support for rejecting Defendants' sweeping argument.  That Report explains that "[t]he liability of general aviation aircraft manufacturers is governed by tort law . . . .  While the specific contours have ebbed and flowed, the public's right to sue for damages is ultimately grounded in the experiences of the legal system and values of the citizens of a particular State."  H.R. Rep. No. 103-525(II), at 3-4 (1994).  Respect for federalism and common law tradition had caused Congress "to tread very carefully when considering proposals . . . that would preempt State liability law."  *Id*. at 4.  Thus, whereas prior legislative efforts had sought "to revise substantially a number of substantive and procedural

matters relating to State tort law," GARA "is limited to creating a statute of repose." *Id*. at 6. After considering the costs of tort liability, as well as the substantial federal regulatory oversight of the industry, "the Committee voted to permit, in this exceptional instance, a very limited Federal preemption of State law." *Id*. Under GARA, "in cases where the statute of repose has not expired, State law will continue to govern fully, unfettered by Federal interference." *Id*. at 7.

### B. A Strong Presumption Against Preemption Applies to State Common Law Physical Injury Torts

This Court's analysis must begin with a strong presumption against finding implied field preemption, namely an "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (quoting *Lohr*, 518 U.S. at 471). In other words, courts should not infer field preemption in areas that have been traditionally occupied by the States, absent a clear and manifest intent from Congress to preempt state law standards. And "[h]istorically, common law liability has formed the bedrock of state regulation, and common law tort claims have been described as a 'critical component of the States' traditional ability to protect the health and safety of their citizens.'" *Desiano v. Warner-Lambert & Co*., 467 F.3d 85, 86 (2d Cir. 2006) (quoting *Cipollone v. Liggett Group, Inc*., 505 U.S. 504, 544 (1992) (Blackmun, J., concurring in part and dissenting in part)).

The Supreme Court has consistently emphasized that where Congress legislates in fields traditionally occupied by the States, congressional intent to supersede state laws must be "clear and manifest." *English*, 496 U.S. at 79. In *English*, the Court stated that "although this Court has not hesitated to draw an inference of field pre-emption where it is supported by the federal statutory and regulatory schemes, it has emphasized" in traditional state areas, the presumption against preemption applies with powerful force. *Id.*; *see also Altria Group, Inc. v. Good,* 555 U.S. 70-77

16

(2008) ("on questions of express or implied preemption of state law, there is assumption that historic police powers of states are not to be superseded by federal statute unless that was clear and manifest purpose of Congress."); *Wyeth,* 555 U.S. at 565.

Lower federal courts have invoked the presumption against preemption in the aviation context to reject implied field preemption and instead apply implied conflict preemption.  *See, e.g., Sikkelee I*, 822 F.3d at 695 ("In light of the presumption against preemption, absent clear evidence that Congress intended the mere issuance of a type certificate to foreclose all design defect claims, state tort suits using state standards of care may proceed subject only to traditional conflict preemption principles.").

### C.  The Supreme Court Would Likely Reject Implied Field Preemption in the Aviation Safety Context

Neither the Supreme Court nor the D.C. Circuit has addressed the scope of implied preemption in the aviation safety context.  In recent years, the Supreme Court has consistently approached federal preemption from a textualist perspective.  *See Campos-Chavez v. Garland*, 602 U.S. 447, 457 (2024) ("As always, we start with the text.").  Starting with the statutory text, the Supreme Court would read the absence of a relevant express preemption provision in the FAAct and the presence of an express savings clause as strikes against inferring congressional intent to preempt the field of aviation safety.  *See, e.g.*, *Wyeth*, 555 U.S. at 574 (considering the failure of Congress to enact an express preemption provision as evidence that Congress did not see the persistence of state lawsuits as at odds with the goals of Congress in the comprehensive federal drug regulatory scheme at issue).

Moreover, as described above, Congress has twice revisited the FAAct in its 67-year history and has purposefully enacted only limited express preemption provisions.  The Supreme Court has suggested that such express preemption provisions may limit the scope of implied field

preemption.  In *Cipollone*, Justice Scalia argued in partial dissent that "the existence of an express pre-emption provision tends to contradict any inference that Congress intended to occupy a field broader than the statute's express language defines."  505 U.S. at 547.  And, while the majority in *Freightliner Corp. v. Myrick* clarified that express preemption clauses do not categorically foreclose implied preemption, the Court acknowledged that such provisions support "a reasonable inference" against broader preemption.  514 U.S. 280, 288 (1995).

Following this textualist approach, the Eleventh Circuit has refused to recognize implied field preemption of aviation safety-related state tort claims.  In *Public Health Trust of Dade Cnty. v. Lake Aircraft, Inc.*, the court paid heed to the FAAct's savings clause and reasoned that aviation-related matters that fell outside the narrow scope of ADA's express preemption provision were not field-preempted.  992 F.2d 291-295 (11th Cir. 1993).  Moreover, even in the face of subsequent broad dicta from *Abdullah* that Congress intended to impliedly preempt the entire field of aviation safety (which, as detailed below, was then picked up by several Courts of Appeals), the Eleventh Circuit has never retracted *Public Health Trust*, nor retreated from its textualist approach.  In *Hughes v. Att'y Gen. of Fla.*, the court, after closely examining the FAAct's text and concluding that Congress did not intend to exclusively regulate pilot safety, reversed the lower court's decision that federal regulations regarding pilot qualifications conclusively field-preempted pilots from being prosecuted under Florida criminal statutes that ban pilots from operating an aircraft while intoxicated.  377 F.3d 1258, 1271 (11th Cir. 2004).

Defendants cite the Supreme Court's decision in *City of Burbank v. Lockheed Air Terminal, Inc.*, American Moving Brief, ECF 51-1, p. 19, which held that a city ordinance prohibiting jet aircraft takeoff between 11 p.m. and 7 a.m. was invalid because "the pervasive nature of the scheme of federal regulation of aircraft noise. . . leads us to conclude that there is pre-emption."  411 U.S.

624, 633 (1973). *Burbank* did not involve tort claims, but rather whether states or municipalities could enact positive laws that would affect the flight of airplanes in the national airspace, where "federal control is intensive and conclusive." *Id.* at 634. The Third Circuit subsequently noted that *Burbank* held "only that Congress had preempted the field of aircraft noise regulation;" it by no means endorsed the broad, limitless view of implied field preemption in the aviation context that Defendants advocate. *Sikkelee I*, 822 F.3d at 699.

*Burbank*, moreover, is more than 50 years old and does not reflect the Supreme Court's robust recent preemption jurisprudence, which weighs strongly against finding broad implied field preemption over all aviation safety, and would instead apply implied conflict preemption in areas where complying with duties under state law would be impossible because they conflict with federal duties. The Court has expressed increasing skepticism toward implied field preemption in recent decades and has adopted more restrictive approaches to finding that federal law occupies an entire regulatory field. In his concurrence in *Wyeth*, Justice Thomas expressed concern that "purposes and objectives" preemption and related implied preemption doctrines are "inconsistent with the Constitution" because they allow courts to invalidate state laws "based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law." 555 U.S. at 583 (Thomas, J., concurring). Justice Thomas further noted that field preemption "is itself suspect, at least as applied in the absence of a congressional command that a particular field be pre-empted." *Id*. Similarly, the Court has noted that the "unusually 'powerful'" express preemption Congress has enacted in the past usually provides a separate remedy for any plaintiff's claim to the exclusion of state remedies. *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 7 (2003) (citations omitted).

This trend reflects concerns about federalism and the need for clear congressional intent in statutory text before displacing state authority.

### D. Plaintiffs' State Law Claims Are Not Preempted Because They Do Not Impliedly Conflict with Federal Regulation

State common law standards and federal regulations can coexist.  Congress has often decided "to stand by both"—state tort litigation and federal regulation—"and to tolerate whatever tension there [is] between them." *Wyeth*, 555 U.S. at 575 (quoting *Bonito Boats* 489 U.S. at 166-67).  "There is no general, inherent conflict between federal preemption" of warning requirements "and the continued vitality of State common-law damages actions."  *Cipollone*, 505 U.S. at 518. Instead, "negligence liability could just as easily complement" federal safety regulations. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 668 (1993).

Given that "Congress has not entirely displaced state regulation over the matter in question," state law could only be preempted if "it is impossible to comply with both state and federal law," or "where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984). Neither of those situations is present here.  Defendants do not—nor could they—argue that Plaintiffs' allegations conflict with any federal regulation.  Defendants can comply with their duties under federal law and the duty of care under District of Columbia law.

### III.    If Implied Field Preemption Applies, it is Limited to "In-Flight Operations," but Does Not Apply to Claims Relating to Other Conduct

To evaluate implied field preemption, this Court must conduct a claim-specific analysis, considering "the pervasiveness of federal regulations in the specific area covered by the tort claim or state law at issue." *Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*, 555 F.3d 806, 809 (9th Cir. 2009) ("[T]he pervasiveness of federal regulations in the specific area covered by the tort claim or state law at issue.").  Moreover, "although the term 'field preemption' suggests a broad

scope, the scope of a field deemed preempted by federal law may be narrowly defined." *Abdullah*, 181 F.3d at 367.

Defendants rely heavily on the Third Circuit's 1999 *Abdullah* decision. But they fail to address or even cite Third Circuit decisions that clarified that the scope of the preempted field is only "in-flight operations," where 14 C.F.R. § 91.13(a) provided a comprehensive federal standard of care. *Sikkelee I*, 822 F.3d at 688. The Third Circuit revisited the question of aviation preemption first in *Elassaad v. Independence Air, Inc.*, where it clarified that "[o]ur use of the term 'aviation safety' in *Abdullah* to describe the field preempted by federal law was . . . *limited to in-air safety*" and thus held that "[t]he supervision of the disembarkation process by a flight crew therefore falls outside the bounds" of implied field preemption. 613 F.3d 119, 121, 127 (3d Cir. 2010) (emphasis added).

The Third Circuit articulated the prevailing framework for limiting the scope of implied field preemption most clearly in *Sikkelee I*. 822 F.3d at 695-96. *Sikkelee I* confines implied field preemption to discrete areas of aviation safety that are subject to pervasive federal regulation as well as a federal standard of care, which it found to be "in-flight operations." *Id.* The Third Circuit held that claims outside of in-flight operations, such as the products liability claims at issue, could proceed under state law standards. *Id.* at 709.

The Third Circuit has thus articulated a functional approach to implied field preemption—namely, comprehensive regulation (coupled with existence of a comprehensive federal standard of care) signals displacement of state law standard of care, while regulatory gaps (i.e., areas falling outside implied field preemption) preserve room for state law standards (subject to implied conflict analysis). *Sikkelee I* has been highly influential in cases alleging broad field preemption in the field of aviation safety. *See, e.g.*, *Becker v. Avco Corp.*, 387 P.3d 1066, 1071-72 (Wash. 2017)

(FAAct and regulations promulgated under it not so pervasive to rebut the presumption against preemption); *Davidson v. Fairchild Controls Corp.*, No. CV H-15-0827, 2016 WL 5539982 at *8 (S.D. Tex. Sept. 28, 2016) (minimum standards or baseline requirements are not sufficient to preempt state products liability standards).  The *Sikkelee I* functional approach to implied field preemption, moreover, is consistent with most of Circuit Courts of Appeals' decisions regarding FAAct implied preemption.

Under *Sikkelee I*'s framework, (1) Plaintiffs' claims arising from "in-flight" operations are subject to the federal "careless or reckless" standard of 14 C.F.R. § 91.13(a); and (2) Plaintiffs' claims falling outside the core of in-flight operational control, are, like products liability claims, subject to District of Columbia standards of care.  Plaintiffs have sufficiently alleged that Defendants breached that federal "careless or reckless" standard of care with respect to their in-flight operation of AE 5342, which resulted in the horrific death of all of its passengers.  And Plaintiffs have also sufficiently alleged that Defendants breached state law standards of care with respect to their other conduct that contributed to the crash, including their negligent policies and training.

### A. The Sikkelee I Framework Limits Implied Field Preemption in Aviation to "In-Flight Operations"

*Sikkelee I* held that A*bdullah*'s broad "field preemption" ruling did not apply to aviation-related products liability claims because "products liability claims are not subject to the same *catch-all standard of care* that motivated our field preemption decision in *Abdullah*."  822 F.3d at 689 (emphasis added).  The court noted that federal regulations governing the manufacture and design of airplanes did not include an analogous provision to 14 C.F.R. § 91.13(a) governing the aircraft manufacture or design and that neither the FAAct nor the federal aviation regulations intended to create a federal standard of care for aircraft manufacture or design.  *Id.* at 694-95.

### 1.  Defendants Over-Read *Abdullah*

In *Abdullah*—as Defendants repeatedly highlight—the Third Circuit stated that federal law preempts the "entire field" of aviation safety from state and territorial regulation.  181 F.3rd at 367. *Sikkelee I* clarified, however, that, despite its use of broad language, the *Abdullah* court actually limited the application of field preemption to claims regarding "in-air operations" which included specific requirements and a general federal standard of care.  822 F.3d at 689.   *Abdullah* itself emphasized the pervasiveness of regulation at issue, namely that the FAA had established complete standards covering the in-flight operation of aircraft, which included specific requirements and a general standard of care:

> Moreover, our move from specific to general regulation is not without support in FAA regulations themselves. For example,14 C.F.R. § 91.13(a), which governs "Careless or Reckless Operation," supplies a comprehensive standard of care to be exercised by pilots and flight crew.  It provides, "No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." **In a case then where there is no specific provision or regulation governing air safety, § 91.13(a) provides a general description of the standard required for the safe operation of aircraft.**

181 F.3d at 371 (emphasis added).

The existence of a complete, comprehensive federal standard for the in-flight seatbelt warnings at issue was crucial to *Abdullah*: "the applicable standard of care is not limited to a particular regulation of a specific area; it expands to encompass the issue of whether the overall operation or conduct in question was careless or reckless."  *Id.*; *see also Montalvo v. Spirit Airlines*, 508 F.3d 464, 473 (9th Cir. 2007) (following *Abdullah* and describing 14 C.F.R. § 91.13(a) as a "general federal standard of care for aircraft operators").

At most, therefore, *Abdullah* would only support preempting an alternative state law standard concerning Plaintiffs' claims involving in-flight conduct of the AE 5342 pilots to the extent that state law differed from the federal standard articulated in 14 C.F.R. § 91.13(a).

*Abdullah,* 181 F.3d. at 374 (stating that 14 C.F.R. § 91.13(a) "occupies the void beyond the specified 'minimum' standards"). It certainly would not govern the Plaintiffs' claim that Defendants were negligent in policy decisions made on the ground. Plaintiffs allege, for instance, that Defendants failed to train their pilots regarding DCA helicopter traffic and routes. Defendants' overly broad implied field preemption argument would hold that the mere lack of *specific* federal minimum standards dictating the content of airport-specific safety training or the instruction and warnings to its pilots allows Defendants to evade liability under state standards of care even if the failure to train and inform regarding the midair collision risks at DCA is dangerous, careless, or reckless. This is at odds with the intent of the FAAct to "maintain[] safety as the highest priority" in aviation. 49 U.S.C. § 40101(a)(1).

### 2. The *Sikkelee I* Functional Approach to Implied Field Preemption is Consistent with the Majority of Circuit Courts of Appeals

Defendants cite several Circuit Court decisions that purportedly support the assertion that a circuit majority holds that a blanket "broad field preemption" applies to state tort claims regarding aviation safety, without consideration of the pervasiveness of federal regulation over the implicated issues. To do so, Defendants selectively quote expansive language from the decisions while ignoring the fundamental analytical frameworks that the courts employed.

In fact, *Sikkelee I* itself notes that most of the decisions cited by Defendants are consistent with its functional framework for implied field preemption. *Sikkelee I* specifies that the Second, Ninth, and Tenth Circuits, which Defendants characterize as supporting broad implied field preemption, in fact assess field preemption by examining the pervasiveness of federal regulations at issue rather than blindly and categorically finding that all claims that implicate "air safety" are preempted. 822 F.3d at 705. *Sikkelee I* also found that Fifth and Sixth Circuits focused on the extent of federal regulation over the specific issue before imposing field preemption. *Id.* at 706-

07.    Further, *Sikkelee I* cites a First Circuit decision cited by Defendants as finding broad preemption of aviation safety, as an example of a court finding federal preemption for discrete matters of in-flight operations consistent with the Third Circuit's framework. *Id.* at 688-89. Indeed, as elaborated below, no Circuit has contradicted the crux of the court's reasoning in *Sikkelee I*.

*First Circuit*: Notwithstanding the fact that the First Circuit has used broad language to characterize implied field preemption, there are several factors that limit the scope of field preemption in the First Circuit decision upon which Defendants rely, *French v. Pan Am Exp., Inc.,* 869 F.2d 1 (1st Cir. 1989). The decision did not involve tort liability claims. *French* was decided in the specific context of whether the FAAct field preempts a Rhode Island statute that limited the circumstances under which a pilot's employer could drug test him. *French* includes expansive characterizations of field preemption. 869 F.2d at 6 ("A patchwork of state laws in this airspace, some in conflict with each other, would create a crazyquilt effect."). However, it does so while consistently limiting its scope to apply to "pilot qualifications," not the entire field of aviation safety. *See e.g.*, *French,* 869 F.2d at 3, 5, 6 ("In the area of pilot qualification, the Act specifies the Secretary's role in great detail. . . . Local restrictions on pilot qualification would make impossible . . . the centralized control and uniformity of design so plainly coveted by the Congress. . . . In our view, the pervasiveness of the federal web is as apparent in the matter of pilot qualification as in the matter of aircraft noise."). Indeed, the Third Circuit in *Sikkelee I* notes that *French*'s finding of implied field preemption for pilot regulation is consistent with its framework. *Sikkelee I*, 822 F.3d at 689. The First Circuit has not revisited the concept of implied federal preemption in aviation since 1989 and has not engaged with the specific reasoning advanced in later cases such as *Abdullah*, and later *Sikkelee I*, which more carefully confine field preemption.

*Second Circuit*: Prior to *Sikkelee I* and relying on *Abdullah*, the Second Circuit issued a broad implied field preemption ruling in *Goodspeed Airport LLC v. East Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206 (2d Cir. 2011). *Goodspeed* did not involve a tort action, but rather the question whether an airport authority could cut down trees that were "obstructions to air navigation" under the federal regulations. With scant analysis, the court announced that "Congress intended to occupy the field of air safety," but found that in occupying the field, Congress did not intend to preempt the operation of state statutes or regulations like the ones at issue in the case. *Id.* at 211-212. *Goodspeed*, accordingly, concluded that the FAAct did not preempt Connecticut's environmental regulations.

The Second Circuit has issued three aviation preemption decisions since *Sikkelee I* that resist categorical application of broad field preemption of state claims related to aviation safety: *Fawemimo v. American Airlines, Inc.,* 751 Fed. Appx. 16 (2d Cir. 2018); *Tweed–New Haven Airport Authority v. Tong,* 930 F.3d 65 (2d Cir. 2019); and *Jones v. Goodrich Pump & Engine Control Systems, Inc.*, 86 F.4th 1010 (2d Cir. 2023). None reject the Third Circuit's reasoning in *Sikkelee I.* Instead, they reflect *Sikkelee I*'s core principle in application: preemption turns on the presence and intensity of federal regulation in the relevant area. *Fawemimo* involved a passenger who hit her head on the television monitor above her seat while boarding, and while the Second Circuit relied mostly on ADA preemption, it concluded that claims related to the positioning of the monitor would conflict with requirements by the FAA and are therefore subject to preemption. 751 Fed. Appx. at 19-20. *Tweed-New Haven* involved a state law limiting an airport's runway to 5,600 feet. 930 F.3d at 69. The decision includes expansive language about field preemption, but it also states that "[t]he key question is thus at what point the state regulation sufficiently interferes with federal regulation that it should be deemed pre-empted[.]" *Id.* at 74. The Second Circuit

further considered the inflexibility of the limit at issue and the level of direct FAA oversight on the airport in question before concluding that field preemption applies. *Id. Jones* confirmed that absent statutory or regulatory authority, field preemption cannot apply, finding that the preempted field does not extend to military aircraft design because the FAAct only applies to civilian aircraft. 86 F.4th at 1021. While these opinions do not cite *Sikkelee I*, they are consistent with its functional framework. None of these decisions support an argument that the FAAct could preempt state law standards here in the absence of a comprehensive federal standard of care.

*Fifth Circuit*: The Fifth Circuit has rejected the proposition that the entire field of safety is preempted. In *Witty v. Delta Air Lines, Inc*., 366 F.3d 380 (5th Cir. 2004), a passenger who developed deep vein thrombosis ("DVT") during a flight sued the airline for negligence due to its failure to warn passengers about risk of DVT. The Fifth Circuit concluded that, based upon the federal regulations governing warnings and instructions to passengers, "federal regulatory requirements for passenger safety warnings and instructions are exclusive and preempt all state standards and requirements." *Id*. at 385. The ruling was "narrow" and "addressed the precise issues before the court"—namely, the failure to warn claim. *Id*. In *Sikkelee I*, the Third Circuit cited the Fifth Circuit's narrow approach to aviation-related field preemption. 822 F.3d at 707 ("And the Fifth Circuit has found field preemption only of the narrower field of passenger safety warnings, and otherwise has applied state law to aviation products liability claims, e.g., *McLennan*, 245 F.3d at 425–26") (internal citations omitted). Contrary to Defendants' claims, the Fifth Circuit represents one of the narrowest formulations of field preemption in the aviation context among the Circuits.

Federal district courts within the Fifth Circuit have likewise narrowly interpreted *Witty*'s holding on implied field preemption. A federal district court in Texas, in *Monroe v. Cessna*

*Aircraft Co.*, held that "the field of aviation safety is not preempted by the [FAAct]" and found insufficient "evidence of a clear intent by Congress to preempt, either through a pervasive scheme of federal regulations set forth by the FAA or within the Act's text and legislative history." 417 F. Supp.2d 824, 830 (E.D. Tex. 2006). Importantly, the court distinguished the preempted claim at issue in *Witty*, involving safety warnings over which there existed a "'pervasive' regulatory scheme," from the negligence and products liability claims before it, which were not preempted. *Id.* at 829. Another federal district court in Texas likewise highlighted that "*Witty* concerned a tort claim about a subject—aircraft-related warnings—that had a significant number of regulations concerning it, thus creating a pervasive scheme." *Mosure v. Sw. Airlines, Co*., No. 3:23-CV-2126-S, 2024 WL 3625673, *5 (N.D. Tex. July 31, 2024). In that case, the court distinguished the preempted claim at issue in *Witty* ("[s]afety warnings from flight crew are within the sole province of the Act and FAA regulations, and therefore Plaintiffs' failure to warn claim is preempted") from the remaining claims before it, which were not preempted ("a tort claim about duties the airline has to its passengers"). *Id.* at *4, 5.

*Sixth Circuit*: In *Greene v. B.F. Goodrich Avionics System,* the Sixth Circuit found field preemption as to failure-to-warn claims but analyzed manufacturing claims under state law. 409 F.3d 784 (6th Cir. 2005). As the *Sikkelee I* court observed, *Greene* does not preempt all aviation products liability claims, or its state-law analysis of the manufacturing claims would be superfluous. 822 F.3d at 706.

Additional Sixth Circuit precedent reinforces this understanding. In *Gustafson v. City of Lake Angelus*, the Sixth Circuit acknowledges that "[the FAAct] indicates that the FAA has exclusive authority in regulating the airspace over the United States," but aircraft landing site designations were not pervasively regulated and therefore remained subject to local control. 76

F.3d 778, 783 (6th Cir. 1996). *Gustafson* found insufficient evidence of pervasive regulation in the lack of "any language in the Act, the regulations promulgated pursuant to the Act, or the legislative history of the Act, which by implication preempts enforcement of the City's ordinances prohibiting the operation of seaplanes on Lake Angelus." *Id.* at 784. *Gustafson* cautioned against reading *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624 (1973), so broadly as to apply field preemption of aviation-safety claims without assessing pervasiveness of regulation. *Id.* at 787. Together, *Greene* and *Gustafson* suggest that the Sixth Circuit, like the Third, considers regulatory density the primary indicator of field preemption.

*Ninth Circuit*: The Ninth Circuit has approached preemption by examining the pervasiveness of the federal standards, finding no preemption where the standards are not comprehensive. In *Martin ex rel. Heckman v. Midwest Express Holdings, Inc.*, the Ninth Circuit explained that courts must look to "the pervasiveness of federal regulations in the specific area covered by the tort claim or state law at issue" rather than applying blanket preemption to all aviation-related claims. 555 F.3d 806, 809 (9th Cir. 2009). *Martin* involved tort claims by a pregnant woman who fell from an airplane's stairs injuring herself and her unborn baby. She sued the airline and airplane manufacturer claiming that stairs were defective. The court rejected the notion that there is a federal standard of care for all personal injury cases and found that "[i]n areas without pervasive regulations or other grounds for preemption, the state standard of care remains applicable." *Id.* at 811. Further, while *Ventress v. Japan Airlines* did apply field preemption, it confirmed that field preemption turns on whether a field is pervasively regulated, as found in *Sikkelee I.* 747 F.3d 716, 721-23 (9th Cir. 2014) ("holding state law claims implicating pilot qualifications and medical standards fall within the preempted field of aviation safety because "unlike aircraft stairs, [they] are pervasively regulated").

*Tenth Circuit*: In *Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438 (10th Cir. 1993), the Tenth Circuit staked out a position rejecting implied preemption over products liability claims. The court noted that the FAAct authorized the FAA to issue "minimum standards," and that its savings clause demonstrated that "Congress has intended to allow state common law to stand side by side with the system of federal regulation. . . ." *Id.* at 1444.

In *U.S. Airways v. O'Donnell*, the Tenth Circuit recognized that *Cleveland*'s position that "implied preemption is generally inapplicable to a federal statute that contains an express preemption provision" had been "called into question based on subsequent Supreme Court opinions." 627 F.3d 1318, 1326 (10th Cir. 2010). *O'Donnell* nonetheless declined to categorically apply field preemption to aviation safety claims, opting instead to examine the pervasiveness of federal regulation over the New Mexico legislature's attempt to regulate alcohol service on flights after a drunk passenger caused a fatal car crash on the way home from the airport after a flight, before deciding in favor of field preemption. *Id.* at 1322. The court noted that the FAA had issued a specific regulation governing the drinking and servicing of alcoholic beverages on airplanes. *Id.* (discussing 14 C.F.R. § 121.575). Another distinguishing factor is that *O'Donnell*, unlike the state tort claims in the instant case, involved specific state regulation of airlines and the court addressed the pervasive nature of FAA regulations addressing alcohol service, which the court noted that the FAA issued to promote aviation safety. *Id.* at 1327-28. So not only did the FAA issue a specific standard of care—preventing the service of alcohol to someone who appears intoxicated—but in so doing expressed a policy rationale, grounded in safety considerations, for the rule. *Id.* at 1328.

The most recent Tenth Circuit decision, *Bradshaw v. American Airlines, Inc.*, 123 F.4th 1168 (10th Cir. 2024), applies implied field preemption, but only to in-air operations, consistent with *Sikkelee I*. In *Bradshaw*, the plaintiffs alleged that the airline was negligent in responding to

an emergency. *Bradshaw* holds that "[14 C.F.R.] § 91.13's federal standard of care ('careless or reckless manner' for the operation of aircraft) impliedly field preempts Oklahoma's 'common carrier' standard of care." *Id.* at 1178. In so holding, the court repeatedly circumscribes the application of the federal standard to "aircraft operation" in the manner of *Sikkelee I. See id.* at 1176.

### B. Plaintiffs' Claims Survive the Narrowed Implied Field Preemption Established by Sikkelee I

#### 1. Plaintiffs' Allegations Relating to In-Flight Operations Allege Violation of Federal Standards of Care

Defendants contend that Plaintiffs fail to identify any breach of a federal standard of care. American Moving Brief, ECF 51-1, p. 16. Defendants are wrong. Even if the court accepts Defendants' view of preemption law, the Master Complaint should not be dismissed.

Plaintiffs' Master Complaint contains allegations that the AE 5342 pilots violated the careless or reckless standard of 14 C.F.R. § 91.13(a) and the duty to see and avoid of 14 C.F.R. § 91.113(b). Plaintiffs allege that the pilots (1) failed to see and avoid PAT 25, Master Compl., ECF 28, ¶¶ 161, 222(a), 229(a), 236(a), 243(a); (2) failed to maintain situational awareness of traffic, *id.* ¶¶ 222(b), 229(b), 236(b), 243(b); (3) failed to respond at all to the TCAS TA received 19 seconds prior to the collision, *id.* ¶¶ 222(c), 229(c), 236(c), 243(c); (4) failed to take evasive action to avoid PAT 25, *id.* ¶¶ 222(d), 229(d), 236(d), 243(d); (5) failed to brief the circling approach to Runway 33 before accepting it from ATC, *id.* ¶¶ 222(e), 229(e), 236(e), 243(e); (6) failed to discuss the conditions under which they would accept a circling approach to Runway 33 prior to ATC's request, *id.* ¶¶ 222(f), 229(f), 236(f), 243(f); and (7) accepted the difficult and, under the circumstances, dangerous circling approach they had not pre-briefed, *id.* ¶¶ 222(g), 229(g), 236(g), 243(g).

Defendants might argue that not all these factual allegations specifically refer to federal standards Plaintiffs allege Defendants breached, and as a result only those that make explicit reference to a federal regulation should survive their motions to dismiss. That argument misconstrues federal pleading requirements. Plaintiffs need not state the regulation at issue, so long as they factually allege conduct that violates the applicable federal standards, which they have. *See Smith v. Bank of America N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (quoting *Johnson v. City of Shelby, Miss.*, 574 U.S. 10,10 (2014) (per curiam)) ("The Supreme Court had made clear that a Rule 12(b)(6) motion turns on the sufficiency of the *factual* allegations' in the complaint" and "need not cite a specific statutory provision or articulate a perfect 'statement of the legal theory supporting the claim asserted.'") (emphasis in original).

To avoid this obvious point that Plaintiffs *have* alleged Defendants violated federal standards of care with respect to their in-flight operations, Defendants make the extraordinary argument that 14 C.F.R. § 91.13(a)'s prohibition against the careless or reckless operation of an aircraft is not a stand-alone regulation but is somehow only derivative of other federal regulation violations. PSA Moving Brief, ECF 52-1, p. 17. According to the logic of this argument, a pilot can be careless or reckless, cause an aviation disaster, and not violate § 91.13(a) unless the pilot also violates another federal regulation. They qualify this argument, noting that violations of the "catch-all regulation are **typically *derivative***" of other violations and that in "**virtually** every case" courts have found violations of other federal standards. PSA Moving Brief, ECF 52-1, at 17 (emphasis added).[5] Their argument is unfounded because § 91.13(a) is a stand-alone regulation

---

[5] Defendants have not cited—nor have Plaintiffs found—a single civil liability decision to support this position. Defendants cite *Garvey v. NTSB*, 190 F.3d 571, 586 n.23 (D.C. Cir. 1999), an administrative action against the NTSB in which the court simply notes that the pilot "apparently assum[ed]...that a § 91.13(a) violation can be wholly derivative of a § 91.123 violation." The relevant question was whether a violation of § 91.123 could independently demonstrate a violation

that promotes the safe operation of aircraft.  Indeed, it would not be the "catch all" standard that

Defendants describe if it only applied when other regulations were also violated.  Defendants'

baseless argument regarding § 91.13(a) is, moreover, inconsistent with the foremost importance

that the courts, upon whose decisions Defendants rely, viewed the regulation.  If, as Defendants

seem to suggest, the FAA has not established § 91.13(a) as a stand-alone general standard of care,

there is no argument for preempting the District of Columbia negligence standard.

*Abdullah* explicitly recognized that § 91.13(a) acts as a general standard of care for in-

flight operations, where more specific federal regulations do not address a particular aviation

safety issue.  181 F.3d at 371 ("In a case then where there is no specific provision or resolution

governing all safety, § 91.13(a) provides a general description of the standard required for the safe

operation of aircraft.").  There is no support for implied field preemption of state standards of care

without the substitution of § 91.13(a) as a stand-alone general standard of care.  *Sikkelee 1* found

that the preempted field does not extend to products liability in the absence of a workable general

federal standard of care like § 91.13(a).  822 F.3d at 695.

Even if this Court were to accept Defendants' nonsensical argument that the implied field

preemption built upon the existence of the comprehensive standard set forth in 14 C.F.R. § 91.13(a)

requires a plaintiff to allege violation of another aviation regulation in order to have a claim,

Plaintiffs have satisfied such a requirement.  Plaintiffs have alleged that the pilots of AE 5342

---

of § 91.13(a), not whether it must.  Nor do any of the other decisions cited by Defendants (*Jackson v. NTSB*, 114 F.3d 283, 284 (D.C. Cir. 1997); *Lindsay v. NTSB*, 47 F.3d 1209, 1211 (D.C. Cir. 1995); *Throckmorton v. NTSB*, 963 F.2d 441, 444 (D.C. Cir. 1992); *Van Dyke v. NTSB*, 286 F.3d 594, 598 (D.C. Cir. 2002)) offer support.  Each of these cases involves a challenge to an NTSB decision reviewing an FAA finding that a pilot violated a federal aviation regulation.  In this context, § 91.13(a) violations may be derivative of other operational violations and do not require independent factual allegations of carelessness or recklessness if the operational violations are proven.  None of these decisions has any bearing whatsoever on whether a plaintiff may pursue a tort claim based on an independent violation of § 91.13(a).

violated the requirement set forth in 14 C.F.R. § 91.113(b) that pilots maintain vigilance "to see and avoid other aircraft," by failing to see and avoid PAT 25. Master Complaint, ECF 28, ¶¶ 222(a)-(b) 229(a)-(b) 236(a), 243(a)-(b).

### 2.  Plaintiffs' Allegations Outside the Realm of In-Flight Operations are Governed by the District of Columbia's Negligence Standards of Care

Implied field preemption, at most, would be limited to in-flight operations. Plaintiffs' claims outside the "field" of in-flight operations should not be preempted because the allegations address topics over which the FAA has not established a comprehensive standard of care and where the airlines have discretion to decide their own policies, even if their decisions are subject to FAA review and approval. *See Sikkelee II*, 907 F.3d at 714 (holding that an aviation manufacturer was not entitled to preemption when it was free under federal regulations to determine and to change its design, even though any such change was subject to FAA review and approval). Plaintiffs allege that American negligently failed to require PSA to adopt, and PSA negligently failed to adopt, policies in the PSA operations manual that would have prevented circling approaches to Runway 33 in nighttime conditions at DCA; that American negligently failed to require PSA to train its pilots, and PSA negligently trained PSA's pilots; that PSA negligently failed to equip the subject aircraft with LED lighting and that American failed to require PSA to do so; and that Defendants negligently failed to adequately analyze the risks of midair collisions in the airspace around DCA and adjust American Eagle operations accordingly. For each group of allegations, federal aviation regulations impose certain duties on the Defendants, but do not specifically dictate a duty of care on how Defendants must perform the duties, do not prevent Defendants from making safer decisions, and do not provide a comprehensive general standard of care. The regulations leave ample room for District of Columbia standards of care to complement federal regulations under

the framework set forth in *Sikkelee I*. *See Sikkelee II*, 907 F.3d at 714 ("[A]llowing state-law claims to proceed in this context complements, rather than conflicts with, the federal scheme.").

*Plaintiffs' Policies and Procedures Allegations*: Plaintiffs allege that American failed to require PSA to adopt policies and procedures and PSA failed to adopt policies and procedures, that prohibited a circling approach to Runway 33 at DCA in nighttime conditions given the known helicopter traffic and history of near miss encounters in the area surrounding the airport. Master Compl., ECF 28, ¶¶ 194(a)-(b), 201(a)-(b), 208(a)-(b), 215(a)-(b), 222(h)-(i), 229(h)-(i), 236(h)-(i), 243(h)-(i). While there are federal regulations that require PSA to have an Operations Manual and stipulate the matters that must be addressed in the manual, *see, e.g.*, 14 C.F.R. § 121.135, none of those regulations dictate what PSA's policy must be relating to circling approaches and the conditions when they are allowed. Indeed, the Master Complaint alleges that airlines can choose their own policies dictating when pilots may conduct a circling approach, and other airlines choose to restrict the conditions under which pilots may conduct a circling approach. Master Compl., ECF 28, ¶¶ 87-88. Moreover, there is no general federal standard requiring airlines to use reasonable care in deciding what policies to adopt, or to avoid carelessness or recklessness in making those decisions. PSA chose its own policy relating to circling approaches and, in the interest of safety, could have chosen to change its policy and the FAA would have approved that change. This small safety related requirement would have resulted in AE 5342 safely landing on Runway 1 – it would never have encountered PAT 25.

The airplane manufacturer in *Sikkelee* chose the screw attachment system claimed to be defective because there was no federal regulation requiring a particular design, and the products liability claim against it was not preempted because it could have changed its design and the FAA would likely have approved it. *Sikkelee II*, 907 F.3d at 714. The same is true of PSA's operations

manual "design" regarding circling approaches.  There can be no preemption because the decision was made by PSA, it could have changed policy at any time, and the FAA would have approved such a change.

*Plaintiffs' Training and Guidance Allegations*: Plaintiffs allege that PSA failed to adequately train its pilots and provide them adequate information relating to operating in the airspace around DCA by failing to inform them of the published helicopter routes and the history of near-miss events near the airport or to provide them training or guidance materials that prepared them for how to respond to a traffic proximity hazards, Master Complaint, ECF 28, ¶¶ 222(k)-(o), 229(k)-(o), 236(k)-(o), 243(k)-(o), and that American negligently failed to require PSA to do so. *Id.* ¶¶ 194(d)-(h), 201(d)-(h), 208(d)-(h), 215(d)-(h).  While there are regulations that address pilot training, including certain areas in which pilots must be trained, none of those regulations dictate the content of airport-specific training as to whether to address nearby helicopter traffic.  *See* 14 C.F.R., Part 121, Subpart N.  PSA could have but did not train PSA's pilots regarding the helicopter routes near DCA or the history of near-miss events between airplanes and helicopters near the airport.  American could have required PSA to conduct the training but did not.  As a result, preemption does not apply because no comprehensive standard of care exists and room exists for the airlines to decide precisely what they put in their airport-specific training materials and for state standards of care to regulate that conduct.  *See Sikkelee II*, 907 F.3d at 714.

Defendants cite a New York federal district court decision, *In re Air Crash Near Clarence Ctr.*, which found negligent training claims preempted.  No. 09-MD-2085, 2013 WL 5964480, *5 (W.D.N.Y. 2013).  That case, however, premised its holding on the broad language in *Goodspeed* and *Abdullah* relating to preemption of the entire field of aviation safety.  *Id.*  Notably, that case was decided before the landmark holding in *Sikkelee I*, where the Third Circuit limited the

preemptive scope of its earlier holding in *Abdullah*. This Court has the benefit of the reasoning of *Sikkelee I*, which (as described above) set forth a functional framework for implied field preemption that is consistent with most Circuit Courts, and should not be persuaded by an unpublished federal district court decision decided before *Sikkelee I* whose cursory reasoning is sharply at odds with the prevailing *Sikkelee I* framework that requires pervasive regulation of in-flight operations, governed by a "comprehensive standard of care" in order to find implied field preemption. *Sikkelee I*, 822 F.3d at 695 (citing *Abdullah*, 181 F.3d at 374).

*Plaintiffs' Safety Risk Management Allegations*: Plaintiffs allege that Defendants negligently failed to conduct comprehensive safety risk management of operations at DCA relating to the likelihood of a midair collision or the safety of a circling approach to Runway 33. Master Complaint, ECF 28, ¶¶ 222(w), 229(w), 236(w), 243(w). While there are federal regulations relating to aviation safety risk management programs, those regulations ensure that such a program exists, but do not specify what an airline's safety policies must be or how actual safety decisions must be made based on the information available. *See* 14 C.F.R., Part 5. That is left up to the airline to decide, and, as a result, a poor safety policy or a poor safety decision is not subject to preemption. *Sikkelee II*, 907 F.3d at 714. It cannot be that safety regulations requiring airlines to create safety risk management systems would immunize airlines from liability for conducting those assessments carelessly or recklessly and not adequately considering factors like helicopter routes that intersect with approach paths, or a history of near misses in the airspace around DCA.

*Plaintiffs' LED Lighting Allegations*: Plaintiffs allege that PSA failed to equip the subject aircraft with LED lights which would have been brighter and more defined than the incandescent lightbulbs and would have made the airplane more easily identifiable and tracked at night, and that American failed to require PSA to do so. Master Complaint, ECF 28, ¶194(p), 208(p), 215(p),

222(q), 229(q), 236(q), 243(q).  As Defendants note, there are indeed regulations requiring lights on aircraft.  *See, e.g.*, 14 C.F.R. Part 25, Subpart F; 14 C.F.R. § 121.323.  While these regulations dictate the number and position of the lights required, they are silent as to the type of bulb that must be used.  *Id.*  That decision is up to the airlines to decide, and they are free to change the type of bulb, and the FAA would be unlikely to refuse such a change.  *See Sikkelee II*, 907 F.3d at 714. As a result, Plaintiffs' claims relating to the failure to use LED lights are not preempted.  *See id.*

While Defendants cite multiple cases holding that claims relating to failure to include equipment are preempted, PSA Moving Brief, ECF 52-1, at p. 8; American Moving Brief, ECF 51-1, pp. 27-28, just as with the training claims, all of the decisions Defendants rely upon are district court decisions that predate the landmark decision in *Sikkelee I*, which is in opposition to their holdings.  One of those decisions is directly at odds with *Sikkelee I* in that it found that a claim for failure to include a handrail was preempted by a regulation requiring only that stairs "not impair the effectiveness of emergency egress" but leaving to the airline how to achieve that goal preempted state law claims.  *Deahl v. Air Wis. Airlines Corp.*, No. 03-C-5150, 2003 WL 22843073, *4 (N.D. Ill. 2003).  The remaining cases are not injury claims but efforts by air ambulance operators to avoid state regulations requiring certain equipment that have limited relevance to this case.  *See Med-TransCorp. v. Benton,* 581 F. Supp. 2d 721, 740 (E.D.N.C. 2008); *AirEvac EMS v. Robinson,* 486 F. Supp. 2d 713, 722 (M.D. Tenn. 2007).

Even if the Supreme Court were to adopt implied field preemption here, the District of Columbia's standard of care applies to Plaintiffs' allegations related to Defendants' negligence that occurred outside of the in-flight operation of AE 5342, and Plaintiffs' negligence causes of action against Defendants should not be dismissed.

IV.    **The Airline Deregulation Act Does Not Expressly Preempt Plaintiffs' Allegations that Defendants Negligence Included Unsafely Clustering Flights**

Defendants also argue that Plaintiffs' allegations that Defendants were negligent because they deliberately scheduled more flights at the bottom and top of the hour, thereby reducing the safety margins at DCA when they knew or should have known of the history of near misses at DCA, *e.g.*, Master Comp. ¶ 208(n)—what they refer to as Plaintiffs' "scheduling claims"—are expressly preempted by the Airline Deregulation Act (ADA).  PSA Moving Brief, ECF 52-1, pp. 19-20; American Moving Brief, ECF 51-1, pp. 31-33.  This argument fails.  Plaintiffs' allegations are not preempted by the ADA; they fall well outside the scope of the anti-competitive and economic protective actions that Congress intended to preempt when it enacted the ADA.  Courts have consistently held that the ADA does not preempt safety-related tort claims for personal injuries caused by negligent airline operations.

To be clear, Plaintiffs do not bring any separate scheduling "claims."  The Master Complaint asserts negligence claims.  The allegation Defendants take issue with is just one sub-paragraph within a list of over 20 sub-paragraphs in each cause of action describing the ways in which Defendants were negligent and their negligence contributed to Plaintiffs' family members' wrongful deaths. Master Compl. ¶¶ 194(n), 201(n), 208(n), 215(n), 222(p), 229(p), 236(p), 243(p). Plaintiffs' claims are based on Defendants' negligent flight operations.  Defendants' choices about scheduling given the other information in their possession speak directly to a required component of any negligence claim: foreseeability.  Simply put, Plaintiffs have alleged Defendants were on notice about the increased threat posed to the safety of passengers by clustering their flights yet still failed to exercise due care. *Id.*

The ADA does not preempt wrongful death claims arising from unsafe operations.  Indeed, no federal appellate court has found a safety-related tort claim for personal injuries caused by

negligent airline operations preempted under the ADA.  To the contrary, the Courts of Appeals have uniformly concluded that personal injury claims that impose common law tort standards constitute safety enforcement actions and thus do not fall under the scope of economic regulation Congress sought to preempt with the passage of the ADA.  *See, e.g.*, *Day v. SkyWest Airlines*, 45 F.4th 1181, 1182, 1184-91 (10th Cir. 2022) ("We agree with our sister circuits that personal-injury claims arising out of an airline employee's failure to exercise due care are not 'related to' a deregulated price, route, or service.");[6] *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1261, 1265-66 (9th Cir. 1998) (*en banc*) (ADA did not "immunize the airlines from liability for personal injuries caused by their tortious conduct"); *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 335, 338 (5th Cir. 1995) (*en banc*) ("[N]either the ADA nor its legislative history indicates that Congress intended to displace the application of state tort law to personal physical injury inflicted by aircraft operations, or that Congress even considered such preemption."); *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 194 (3d Cir. 1998).

These courts have reached this conclusion because the clear and manifest purpose of the ADA was to achieve *economic* deregulation of the aviation industry, not safety deregulation. *Charas*, 160 F.3d at 1265.  The Supreme Court has specifically stated that the ADA was passed to "promote maximum reliance on competitive market forces."  *See Wolens*, 513 U.S. at 230.  To "ensure that the States would not undo federal deregulation" by imposing state economic regulations of their own on airlines, *Morales v. Trans World Airlines*, 504 U.S. 374, 378 (1992),

---

[6] Notably, Defendants' current interpretation of the ADA's intent is directly contrary to American's past position on this issue.  As American has admitted, the ADA does not preempt wrongful death claims arising from unsafe operations.  *See Day*, 45 F.4th at 1189 (10th Cir. 2022), citing *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 231 n.7 (1995) (noting that American "had agreed that the ADA was unlikely to preempt safety-related personal-injury claims").

Congress included an express preemption clause in the ADA that preempts any state laws "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).

But "[u]nsurprisingly, airlines do not compete on the basis of likelihood of personal injury, i.e. onboard safety, and as such it does not undermine the pro-competitive purpose of the ADA. . . to permit states to regulate this aspect of air carrier operations." *Day*, 45 F.4th at 1189-90. As explained in the enacted statutory text, the ADA was designed to result in "no diminution of the high standard of safety in air transportation," and the "assignment and maintenance of safety" remained "the highest priority in air commerce." ADA §§ 3(a), 5(a), 92 Stat. at 1706, 1709.

Nothing in the ADA or its legislative history supports the view that Congress intended to immunize airlines from liability for violations of generally applicable negligence laws. *Day*, 45 F.4th at 1189. Indeed, as courts have recognized, if Congress had intended to preempt personal injury claims against airlines, it would not have required them to carry insurance for "bodily injury to, or death," 49 U.S.C. § 41112(a), as a complete pre-emption of state law "would have rendered any requirement of insurance coverage nugatory." *Id.* at 1187.

Defendants argue that Plaintiffs' allegations regarding Defendants' negligent scheduling of flights are "related to" "services" and "routes," and are therefore preempted under the ADA. American Moving Brief, ECF 51-1, p. 31. But the Supreme Court has recognized that some state actions may affect airline services in "too tenuous, remote, or peripheral a manner" to have pre-emptive effect. *Morales*, 504 U.S. 374, 390 (1992). An "overly literal interpretation of this broad and indeterminate phrase" ("related to") would mean that "for all practical purposes pre-emption would never run its course." *Day*, 45 F. 4th at 1185. Indeed, *Hodges v. Delta Airlines*, 44 F.3d 334, 338 (5th Cir. 1994), relied upon by Defendants, addressed the irrationality of Defendants' exact linguistic argument here: it recognized that "[t]aken to its logical extreme," an overly broad

construction of 49 U.S.C. § 41713(b)(1) "would suggest that a lawsuit following a fatal airplane crash could relate to 'services'" and be preempted.  The court recognized that "neither the ADA nor its legislative history indicates that Congress intended to displace the application of state tort law to personal physical injury inflicted by airplane operations, or that Congress even considered such preemption." *Id.* at 338.  A state law is not preempted if it has only a "tenuous remote, or peripheral connection" with airline prices, routes, or services, as is the case with many laws of general applicability like negligence common law. *Day*, 45 F. 4th at 1186.

Plaintiffs do not "seek to dictate" "when and how often American flies into DCA" American Moving Brief, ECF 51-1, p. 32.  They seek only to force Defendants to exercise due care in their operations.  The history of near misses detailed in the Master Complaint does not serve to impose a duty to reschedule these dangerously clustered flights, but rather to show that Defendants had knowledge of unsafe conditions and ignored the risks associated with such clustering.  Master Compl., ECF 28, ¶¶ 20, 53-54.  Defendants knew of many near misses, and that concerns had been raised to PSA and American by their pilots' unions.  That Defendants still increased flights to DCA during peak traffic hours is an indictment of Defendants' failure to exercise due care, one that goes beyond mere negligence.  Should this Court conclude otherwise, it would be endorsing Defendants' proposition that they can choose to ignore risks to the lives and safety of the flying public until the FAA says they cannot, a proposition surely not intended by Congress when it enacted the ADA.

## CONCLUSION

Defendants' motions to dismiss are premised on an overbroad and unsupported theory of implied field preemption that is inconsistent with congressional intent to promote safety.  The FAAct does not evince an intent to occupy the entire field of aviation safety or preempt traditional state law negligence standards wholesale.  The text and structure of the FAAct supports the view

that federal law preempts state standards only where they *conflict* with specific federal requirements. But even courts that recognize implied field preemption limit it to narrowly defined in-flight operations governed by a comprehensive federal standard of care.

Under either framework, the Plaintiffs' claims survive. The Master Complaint alleges duties imposed by both District of Columbia law and federal aviation regulations, including violations of the federal prohibition against careless or reckless operation and the duty to see and avoid other aircraft. Defendants have neither supported their broad implied field preemption arguments nor demonstrated conflicts between obligations under District of Columbia law and federal law.

Because Defendants have failed to demonstrate that Plaintiffs' claims are preempted as a matter of law, and because the Master Complaint adequately pleads negligence under applicable state and federal standards, the motions to dismiss should be denied.

Dated: January 16, 2026

**KREINDLER & KREINDLER LLP**

By:___*/s/ Brian J. Alexander*_____
Brian J. Alexander (Bar ID: NY0679)
Justin T. Green (Bar ID: NY0692)
Anthony Tarricone (Bar ID: 492480)
Daniel O. Rose (Applicant *pro hac vice*)
Vincent C. Lesch (Bar ID: NY0675)
Evan Katin-Borland (Bar ID: NY0674)
Erin R. Applebaum (Applicant *pro hac vice*)
485 Lexington Avenue, 28th Floor
New York, New York 10017
(212) 687-8181
balexander@kreindler.com
jgreen@kreindler.com
atarricone@kreindler.com
drose@kreindler.com
vlesch@kreindler.com
ekatinborland@kreindler.com
eapplebaum@kreindler.com

**CLIFFORD LAW OFFICES, P.C.**

By:___*/s/ Robert A. Clifford*_____
Robert A. Clifford (Bar ID: IL0135)
Kevin P. Durkin (Bar ID: IL0136)
Tracy Brammeier (Bar ID: IL0137)
John V. Kalantzis (Applicant *pro hac vice*)
120 N. LaSalle Street Suite 3600
Chicago, Illinois 60602
(312) 899-9090
rac@cliffordlaw.com
kpd@cliffordlaw.com
tab@cliffordlaw.com
jvk@cliffordlaw.com

**SPEISER KRAUSE, P.C.**

By:  /s/ Douglas A. Latto
Douglas A. Latto (Bar ID: NY0672)
Kenneth P. Nolan (Applicant *pro hac vice*)
Jeanne M. O'Grady (Bar ID: NY0673)
Frank H. Granito, III (Applicant *pro hac vice*)
800 Westchester Avenue, Suite S-608
Rye Brook, New York 10573
(914) 220-5333
dal@speiserkrause.com
f3g@speiserkrause.com
jog@speiserkrause.com
kpn@speiserkrause.com

*Plaintiffs Steering Committee*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 16th day of January 2026, the foregoing document was served by electronic filing on all counsel of record through the Court's ECF system.

<u>/s/ *Vincent C. Lesch*          </u>
Vincent C. Lesch