**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE: MID-AIR COLLISION IN WASHINGTON, D.C., JAN. 29, 2025**<br><br>Plaintiffs,<br><br>-v.-<br><br>AMERICAN AIRLINES INC., et al.<br><br>Defendants. | Lead Case No: 1:25-cv-03382-ACR<br><br>**Oral Argument Requested** |

# MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO AMERICAN AIRLINES, INC.'S MOTION TO DISMISS THE MASTER COMPLAINT

Brian J. Alexander (Bar ID: NY0679)
Justin T. Green (Bar ID: NY0692)
Anthony Tarricone (Bar ID: 492480)
Daniel O. Rose (Applicant *pro hac vice*)
Vincent C. Lesch (Bar ID: NY0675)
Evan Katin-Borland (Bar ID: NY0674)
Erin R. Applebaum (Applicant *pro hac vice*)
KREINDLER & KREINDLER LLP
485 Lexington Avenue, 28th Floor
New York, New York 10017
(212) 687-8181
balexander@kreindler.com
jgreen@kreindler.com
atarricone@kreindler.com
drose@kreindler.com
vlesch@kreindler.com
ekatinborland@kreindler.com
eapplebaum@kreindler.com

Robert A. Clifford (Bar ID: IL0135)
Kevin P. Durkin (Bar ID: IL0136)
Tracy Brammeier (Bar ID: IL0137)
John V. Kalantzis (Applicant *pro hac vice*)
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street Suite 3600
Chicago, Illinois 60602
(312) 899-9090
rac@cliffordlaw.com
kpd@cliffordlaw.com
tab@cliffordlaw.com
jvk@cliffordlaw.com

Douglas A. Latto (Bar ID: NY0672)
Kenneth P. Nolan (Applicant *pro hac vice*)
Jeanne M. O'Grady (Bar ID: NY0673)
Frank H. Granito, III (Applicant *pro hac vice*)
SPEISER KRAUSE, P.C.
800 Westchester Avenue, Suite S-608
Rye Brook, New York 10573
(914) 220-5333
dal@speiserkrause.com
f3g@speiserkrause.com
jog@speiserkrause.com
kpn@speiserkrause.com

***Plaintiffs Steering Committee***

# TABLE OF CONTENTS

INTRODUCTION ..... 1
FACTUAL BACKGROUND ..... 3
STANDARD OF REVIEW ..... 5
ARGUMENT ..... 5
I. American Owed A Duty To Flight AE 5342's Passengers ..... 7
II. Alternatively, Plaintiffs Plausibly Allege that American Is Liable for PSA's Conduct Under Established Agency Principles. ..... 13
A. Plaintiffs Plausibly Allege an Agency Relationship Between American and PSA ..... 13
B. Plaintiffs Plausibly Allege That PSA Acted with American's Apparent Authority. 15
III. Plaintiffs' Common Carrier Causes of Action Are Sufficiently Pled ..... 19
CONCLUSION ..... 23

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A-J Marine, Inc. v. Corfu Contractors, Inc.*,
660 F. Supp. 2d 84 (D.D.C. 2009) ....................16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2009) ....................5

*Caldwell v. Bechtel, Inc.*,
631 F.2d 989 (D.C. Cir. 1980) ....................8

**Colmenares Vivas v. Sun All. Ins. Co.*,
807 F.2d 1102 (1st Cir. 1986) ....................22

*Cunningham v. Foresters Fin. Servs., Inc.*,
300 F. Supp. 3d 1004 (N.D. Ind. 2018) ....................15

*Flytenow, Inc. v. F.A.A.*,
808 F.3d 882 (D.C. Cir. 2015) ....................19

*Freese v. Continental Airlines, Inc.*,
2009 WL 2232857 (N.D. Ohio 2009) ....................18

*Hart v. Delta Air Lines, Inc.*,
2018 WL 1087846 (C.D. Cal. 2008) ....................15, 18

*Haley v. United Airlines Inc.*,
2015 WL 5139638 (N.D. Ill. 2015) ....................21

*Heinrich v. Goodyear Tire & Rubber Co.*,
532 F. Supp. 1348 (D. Md. 1982) ....................11

*In re Air Crash at Lexington, Kentucky*,
2008 WL 2945944 (E.D. Ky. 2008) ....................12, 15

*In re Uber Techs., Inc., Passenger Sexual Assault Litig.*,
745 F. Supp. 3d 869 (N.D. Cal. 2024) ....................23

*Johnson v. City of Shelby, Miss.*,
574 U.S. 10 (2014) ....................3

**Johnson v. University of Chicago Hospitals*,
982 F.2d 230 (7th Cir. 1991) ....................8, 9

**Kelley v. United Airlines, Inc.*,
986 F. Supp. 684 (D. Mass. 1997) ....................22

*Kuhn Constr. Co. v. Ocean & Coastal Consultants, Inc.*,
723 F. Supp. 2d 676 (D. Del. 2010) ....................15

*Lake v. Neal*,
585 F.3d 1059 (7th Cir. 2009) ....................16

**Long v. District of Columbia*,
820 F.2d 409 (D.C. Cir. 1987) ....................6, 7, 9

**Momen v. United States*,
946 F. Supp. 196 (N.D.N.Y. 1996) ....................18

*Naqvi v. Saudi Arabian Airlines, Inc.*,
123 F. Supp. 3d 129 (D.D.C. 2016) ....................19

*S. Y. v. Wyndham Hotels & Resorts, Inc.*,
519 F. Supp. 3d 1069 (M.D. Fla. 2021) ....................15

*Schuler v. United States*,
617 F.2d 605 (D.C. Cir. 1979) ....................5

*Search v. Uber Technologies*,
128 F. Supp. 3d 222 (D.D.C. 2015) ....................16

**Shaw v. Delta Airlines, Inc.*,
798 F. Supp. 1453 (D. Nev. 1992) ....................17, 18

*Smith v. Bank of Am., N.A.*,
615 F. App'x 830 (5th Cir. 2015) (per curiam) ....................2

*Sparrow v. United Air Lines, Inc.*,
216 F.3d 1111 (D.C. Cir. 2000) ....................5

*Wilson v. Good Humor Corp.*,
757 F.2d 1293 (D.C. Cir. 1985) ....................16

**STATE CASES**

*Alaska Airlines, Inc. v. Sweat*,
568 P.2d 916 (Alaska 1977) ....................22

*Beegle v. Rest. Mgmt., Inc.*,
679 A.2d 480 (D.C. 1996) ....................14

*Bolger v. Amazon.com, LLC,*
267 Cal. Rptr. 3d 601 (Cal. Ct. App. 2020) ....................23

*District of Columbia Transit Sys., Inc. v. Carney,*
254 A.2d 402 (D.C. 1969) ....................19

*Haynesworth v. D.H. Stevens Co.,*
645 A.2d 1095 (D.C. 1994) ....................10

*LeGrand v. Ins. Co. of N. Am.,*
241 A.2d 734 (D.C. 1968) ....................14

**Little v. Delta Steel, Inc.,*
409 S.W.3d 704 (Tex. App. 2013) ....................11

*Makins v. District of Columbia,*
861 A.2d 590 (D.C. 2004) (en banc) ....................16

**Missile Cab Ass'n v. Rogers,*
184 A.2d 845 (D.C. 1962) ....................19, 20

*Root v. Stahl Scott Fetzer Co.,*
88 N.E.3d 980 (Ohio Ct. App. 2017) ....................11

*Safeway Stores, Inc. v. Kelly,*
448 A.2d 856 (D.C. 1982) ....................13, 14

**Sebastian v. D.C.,*
636 A.2d 958 (D.C. 1994) ....................19, 20, 22

**FEDERAL STATUTES**

14 C.F.R. § 91.13(a) ....................20

**OTHER AUTHORITIES**

14 Am. Jur. 2d Carriers § 905 (1964) ....................22

Fed. R. Civ. P. 12 ....................1, 2, 3, 14, 18

Fed. R. Civ. P. 26 ....................12

Restatement (Second) of Torts § 324A ....................6, 7, 8, 11, 12

Restatement (Third) of Agency § 1.03 (A.L.I. 2006) ....................16

Restatement (Third) of Agency § 3.03 (A.L.I. 2006) ....................16

Restatement (Third) of Agency § 7.06 (A.L.I. 2006) ....................22

## INTRODUCTION

On January 29, 2025, passengers boarded American Eagle Flight 5342 from Wichita, Kansas to Washington, D.C. Defendant American Airlines Inc. ("American") scheduled the flight and assigned the flight number. American sold the tickets to the 60 passengers. The plane was branded "American Eagle." American set the timetable for the flight's landing into Ronald Reagan Washington National Airport ("DCA"), a uniquely complex airspace. American did so applying its system-wide safety and risk-management policies to the flight—all under the unified American/American Eagle brand. Having orchestrated the trip and held itself out as responsible, American now insists that as a matter of law, it owed no duty of reasonable care to the very passengers it solicited because it did not physically operate the plane. Thankfully for the traveling public, though, that is not the law.

The ticketing/branding carrier-operating carrier arrangement is commonplace in the airline industry. Tellingly, American does not cite—nor have Plaintiffs found—a single case in which a ticketing carrier was found to have no duty as a matter of law to the passengers of an operating carrier such that the ticketing carrier was dismissed from a personal injury or wrongful death lawsuit under Rule 12(b)(6). The Master Complaint plausibly alleges duties arising from at least three different sources: *one*, American's own voluntary undertakings in its relationship with PSA; *two*, PSA's role as American's actual agent; and *three*, American's apparent-agency relationship with PSA. Courts faced with similar ticketing-carrier airline arrangements allow fact-intensive issues of undertaking, control, branding, and public representations to proceed to discovery and even trial. These decisions recognize that a ticketing carrier's actions can support duties to passengers of the operating carrier sounding in direct negligence and agency.

Most of American's arguments for dismissal of the Master Complaint apply equally to PSA, and are addressed in Plaintiffs' main opposition brief filed concurrently herewith. *See* Pls.' Opp'n to PSA Mot. Dismiss. This brief addresses American's individual argument that the negligence claims against it (but not PSA) should be dismissed because American purportedly owed no legal duty to the passengers of Flight AE 5342. *See, e.g.*, American Moving Brief, ECF 51-1, pp. 33–37. It also addresses Defendants' arguments that they are not subject to a common carrier duty or standard of care. *See id.* pp. 37–39; PSA Moving Brief, ECF 52-1, pp. 20.

Plaintiffs do not seek to impose liability on American simply because it is a corporate affiliate of PSA. The Complaint alleges that American's own conduct—including its scheduling practices, policy decisions, and failure to address known operational hazards at DCA—created or increased the risk of harm to the passengers on Flight AE 5342. American, like any tortfeasor, has a duty to exercise reasonable care in its actions to protect against harm to foreseeable victims. In the alternative, Plaintiffs allege facts supporting the inference that PSA acted as American's agent with respect to safety-relevant aspects of the flight, based on American's control over the framework governing American-branded flights and American's representations to the traveling public. Those questions are fact-intensive and not amenable to resolution on a motion to dismiss.

At this early stage, Plaintiffs have sufficiently pled that American owed a duty of reasonable care to the passengers of Flight AE 5342, whether that duty is based upon American's voluntary undertaking, actual agency, or apparent agency. American may argue that the Complaint does not name these various legal theories as the basis of its duty, but the Supreme Court has made clear that a Rule 12(b)(6) motion turns on the sufficiency of the *factual* allegations in the complaint; a complaint need not cite a specific legal provision or articulate a perfect statement of the legal theory supporting the claim asserted. *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833

(5th Cir. 2015) (per curiam) (quoting *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014)). Here, Plaintiffs' factual allegations must be accepted as true and are sufficient to survive a Rule 12(b)(6) motion. Plaintiffs need only plausibly allege a basis for a legal duty. They have done so here. American's Motion To Dismiss should be denied.

**FACTUAL BACKGROUND**

American argues that the Master Complaint does not allege that American had a duty to the passengers of Flight AE 5342 or that it breached that duty. But Plaintiffs have adequately alleged sufficient facts that American had a duty that it breached. These include the following:

American marketed, sold, ticketed, and issued boarding documentation for Flight AE 5342 as an American flight, whether purchased alone or as part of a broader American itinerary. Master Compl., ECF 28, ¶¶ 46–48. On the date of the collision, Flight AE 5342 was operated by PSA for American under the American Eagle brand. *Id.* ¶ 48.

PSA-operated flights were regularly presented to the public as American flights, and passengers were often unaware that their transportation was operated by a separate regional carrier rather than by American itself. *Id.* ¶ 47. The flying public reasonably expected that flights sold as American flights would be operated with the same level of safety whether flown by American directly or by PSA under the American Eagle brand. *Id.* ¶ 96.

At the time of the collision, American was the dominant carrier at DCA, operating more flights into and out of the airport than any other airline and carrying a substantial share of passenger traffic. *Id.* ¶ 50. DCA is a uniquely constrained, high-density airport subject to strict arrival limits and operating in complex, congested airspace. *Id.* ¶¶ 2, 51–52.

Well before January 29, 2025, American knew or should have known of persistent, location-specific hazards associated with operations into DCA—including the convergence of

commercial aircraft approaches with heavily traveled helicopter routes and a documented history of near-midair encounters involving dangerously close lateral and vertical separation. *Id.* ¶¶ 50–66. Publicly available data, internal airline information, pilot reports, and air traffic control concerns reflected repeated near-miss events involving commercial aircraft and helicopters in the airspace surrounding DCA. *Id.* ¶¶ 62–69.

Despite this known risk environment, American continued to structure its DCA operations to maximize throughput. Plaintiffs allege that American scheduled clustered arrivals toward the end of one clock hour and the beginning of the next, a practice that compressed arrivals into peak periods and reduced already strained safety margins. *Id.* ¶¶ 58–60. Flight AE 5342 was scheduled to arrive during one of these peak, bottom-of-the-hour windows. *Id.* ¶ 60.

Air carriers establish policies governing whether and under what conditions pilots may accept circling approaches—that is, a maneuver requiring the crew to break off a standard straight-in approach and reposition for a different runway—and some carriers restrict such approaches in nighttime operations, congested airspace, or at challenging airports. *Id.* ¶¶ 87–89. Notwithstanding its knowledge of the hazards associated with nighttime operations into DCA and the intersection of helicopter routes with the Runway 33 approach path used by Flight AE 5342, American did not require PSA to adopt policies or procedures prohibiting circling approaches under those circumstances when helicopter traffic was present, for flights sold and presented as American flights. *Id.* ¶ 95. Plaintiffs further allege that American retained authority over safety-relevant policies, training, and operational practices applicable to flights sold under its brand, including those operated by PSA. *Id.* ¶¶ 74–75, 87–88, 95, 194–95, 207–09, 214–16.

American failed to require PSA to provide its pilots with adequate information relating to operating in the airspace around DCA, including information about the published helicopter routes

and the history of near-miss events near DCA. *Id.* ¶¶ 208(d), (f), (g), 215 (d), (f), (g). And American negligently failed to conduct comprehensive safety risk management of operations at DCA relating to the likelihood of a midair collision or the safety of a circling approach to Runway 33. *Id.* ¶¶ 208(p), 215(p).

## STANDARD OF REVIEW

In evaluating a motion to dismiss, the Court "must treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (citation omitted)). A complaint need not plead "detailed factual allegations," but it must contain "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2009). To withstand dismissal, plaintiffs must allege sufficient factual matter, assumed to be true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is plausible when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## ARGUMENT

To the extent American seeks dismissal of the negligence causes of action on no-duty grounds, American Moving Brief, ECF 51-1, pp. 33–37, its motion fails for multiple, independent reasons. Indeed, American's argument rests on an unduly narrow reading of the Master Complaint and ignores the core principle that American owed a duty to exercise reasonable care in its own conduct.

First, American asserts that it owed no duty to the passengers of Flight AE 5342 because it did not physically operate the aircraft. American Moving Brief, ECF 51-1, p. 33. It is wrong. Plaintiffs plausibly allege that American voluntarily undertook responsibilities that directly

affected passenger safety—including how American Eagle-branded flights were scheduled, routed, and managed in known hazardous operating conditions—and therefore owed a duty of reasonable care in carrying out those responsibilities.

A company that contracts with another to render services owes a duty to perform those services with reasonable care and may be liable for injuries to foreseeable third parties caused by its failure to do so. *See Long v. District of Columbia*, 820 F.2d 409, 418–19 (D.C. Cir. 1987); Restatement (Second) of Torts § 324A (A.L.I. 1965). The full scope of the services American undertook—and the extent to which it could (and did) control or require PSA to take certain actions—is a factual question that requires discovery, including production of the governing agreements between the two airlines. That is why courts do not resolve these issues on the pleadings: American's liability turns on the nature and extent of its undertakings and the extent to which it did not act with reasonable care (*i.e.*, breached its duty), a record-dependent inquiry not suited to a motion to dismiss.

Second, even if American did not owe its own duty to exercise reasonable care to the passengers of Flight AE 5342 (it did), Plaintiffs plausibly allege that PSA acted as American's agent, rendering American liable for PSA's negligence under settled agency principles. The Complaint alleges facts supporting agency based on both American's retained right to control aspects of PSA's American-branded operations (actual agency), and American's manifestations to the traveling public—through branding, marketing, ticketing, and presentation—that PSA-operated flights were American flights (apparent agency). The existence or non-existence of an agency relationship is a question of fact for the jury. At this motion to dismiss stage, each theory independently defeats American's contention that it owed no duty as a matter of law.

In addition, the common-carrier claims should not be dismissed. Under D.C. law, airlines are common carriers and therefore owe the highest degree of care. The Master Complaint plausibly alleges that American retained authority over safety-critical policies, scheduling, and operational parameters for flights sold and presented as American flights, including Flight AE 5342. Those allegations comfortably support applying common-carrier standards to American.

## I. American Owed A Duty To Flight AE 5342's Passengers.

American cannot avoid a duty of care merely by pointing to the fact that it did not physically operate Flight AE 5342. American Moving Brief, ECF 51-1, p. 33. Having voluntarily agreed to render services and assume responsibilities related to Flight AE 5342, American owed a duty to exercise reasonable care in carrying out those undertakings.

A legal duty to a third party arises when a party undertakes "to render services to another which he should recognize as necessary for the protection of a third person or his things." *Long*, 820 F.2d at 419 (citation omitted). That principle is reflected in Section 324A of the Restatement (Second) of Torts – Liability to Third Person for Negligent Performance of Undertaking:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A.

In *Long*, for example, the D.C. Circuit held that an electric company, by contracting with the District of Columbia to perform maintenance services on traffic signals, assumed a duty to the traveling public to perform that contractual commitment with reasonable care. 820 F.2d at 418–19. PEPCO argued that while it had a contractual duty to the District to perform certain services,

it owed no duty to the public in tort. *Id.* at 417. The court rejected that argument. *Id.* at 418. It recognized that under D.C. law, by undertaking to provide services, the company "placed itself in the position of assuming a duty . . . in tort," given its "superior skills and position" and its "resultant ability to foresee the harm that might reasonably be expected" from its negligence. *Id.* at 418 (quoting *Caldwell v. Bechtel, Inc.*, 631 F.2d 989, 997 (D.C. Cir. 1980)). Accordingly, the court held that the company acquired a duty to foreseeable members of the traveling public to perform those maintenance services with reasonable care and could be held liable for injuries to plaintiff motorists caused by its failure to do so. *Id.* at 418–19.

Courts outside the District of Columbia have similarly recognized the negligent-undertaking duty reflected in § 324A, whereby a defendant may be liable to foreseeable third parties injured by a defendant's negligent performance in rendering services to another. For example, in *Johnson v. University of Chicago Hospitals*, the Seventh Circuit held that a hospital could owe a duty to a patient it never treated or received because it voluntarily provided directions to the patient's ambulance, and "thus became subject to the usual obligations in tort." 982 F.2d 230, 231–32 (7th Cir. 1992) (per curiam). There, the court explained that liability flowed from "the negligent performance of a voluntary undertaking," namely, the hospital's operation of a telemetry system to direct ambulances to hospitals in the area. *Id.* at 232. *See also* Restatement (Second) of Torts § 324A cmt. c (negligent train dispatching can increase risk of harm, supporting liability to injured passengers).

Those principles govern this case: the duty inquiry turns on whether American voluntarily undertook responsibilities, the negligent performance of which foreseeably endangered the passengers of AE 5342. The Complaint plausibly alleges that it did. Nothing more is required at this stage.

American's role began with the way it held itself out to the traveling public. American marketed, sold, ticketed, and listed Flight AE 5342 as an American flight, notwithstanding that it was operated by PSA under the American Eagle brand. Master Compl., ECF 28, ¶¶ 46–48. The flight was sold through American's website, ticketed in American's name, and presented as an American flight, such that American undertook responsibilities the negligent performance of which could foreseeably affect passenger safety. *Id.* ¶¶ 46–47, 96.

American's role did not stop with branding. The Complaint alleges that American affirmatively shaped the environment in which AE 5342 operated, particularly at DCA—an airport American knew presented heightened and well-documented safety risks. American controlled flight scheduling, the timing of arrivals, and the approach-to-landing procedures at DCA, including decisions to maintain dense arrival banks and to increase reliance on Runway 33 despite warnings that congestion was eroding safety margins. *Id.* ¶¶ 49–60, 95, 208(n), 215(n).

The Complaint further alleges that American managed the safety risks created by those decisions through its control over policies, restrictions, and training applicable to those operations. American knew of repeated near-miss events and the intersection of published helicopter routes with the Runway 33 approach path, yet continued to structure and sell American-branded flights without requiring corresponding policies, restrictions, or training responsive to those risks. *See, e.g.*, *id.* ¶¶ 61–69, 74–75, 88–95, 207–08 (d), (g), (n), 214 – 215(d), (g), (n).

Having assumed these responsibilities that directly affected safety for Flight AE 5342's passengers, American owed a duty to exercise reasonable care in carrying out that undertaking. *Long*, 820 F.2d at 418–19; *Johnson*, 982 F.2d at 231–32. It is black-letter law that actors have a duty to exercise reasonable care in their actions. American does not outwardly dispute this premise, but instead seems to suggest that while it generally has a duty to exercise reasonable care

in its actions, it did not owe a duty to the particular passengers of Flight AE 5342. But the predominant analytical approach in determining an actor's scope of duty is "foreseeability." *See, e.g.*, *Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1098 (D.C. 1994). Woven into consideration of whether a duty was owed by the alleged tortfeasor to the person claiming injury is whether the injury to that individual was reasonably foreseeable to the defendant. *Id.* American cannot reasonably claim—and certainly not as a matter of law—that passengers to whom American sold tickets to board an American-branded flight were not reasonably foreseeable victims of its negligence.[1]

Faced with these allegations, American attempts to reframe the Complaint as seeking to "hold American liable for the alleged acts of its corporate sibling—PSA—for no reason other than that technical relationship." American Moving Brief, ECF 51-1, p. 35. That argument mischaracterizes the Complaint. Plaintiffs do not premise American's liability on corporate status, nor do they allege a general obligation to police PSA by virtue of corporate affiliation alone. Thus, American's anti-veil-piercing cases (*id.* pp. 34–36) are inapposite.

Rather, Plaintiffs allege that American itself assumed safety-related responsibilities and retained control over key aspects of flights it marketed and sold as American flights. The allegations concerning training, operational policies, supervision, equipment requirements, and safety risk management, *see* Master Compl., ECF 28, ¶ 208(a)–(l), (p), flow from American's

[1] American's suggestion that Plaintiffs seek to impose a generalized duty to "police" other operators in the National Airspace System, American Moving Brief, ECF 51-1, p. 37, misstates the Complaint. Plaintiffs do not allege that American owed a duty to regulate third-party airlines writ large. American was in a contractual relationship with PSA for it to transport American's passengers. Through and because of that contractual relationship, Plaintiffs allege that American undertook—and negligently performed—specific safety-related functions for flights it marketed, sold, and held out as American flights, including AE 5342.

alleged undertaking to structure and manage certain aspects of American-branded flights. Where American allegedly controlled how the flight was scheduled, routed, and positioned to land at DCA in known hazardous conditions, it plausibly bore a corresponding obligation to exercise reasonable care in addressing the risks those choices created.

Indeed, numerous courts have rejected similar arguments by corporate affiliates attempting to avoid liability, particularly in the employment context. For example, in *Little v. Delta Steel, Inc.*, 409 S.W.3d 704 (Tex. App. 2013), a deceased employee's estate brought a wrongful death action against the worker's employer and the employer's parent company when he died during a crane accident at work. *Id.* at 706–08. The court found that while the parent company was not the worker's employer and was not responsible for operating the facility in which the worker was killed, the parent company voluntarily undertook a duty of reasonable care to workers foreseeably injured at the facility by imposing safety policies, requiring inspections and audits, and mandating corrective action. *Id.* at 720–23. *Root v. Stahl Scott Fetzer Co.*, 88 N.E.3d 980 (Ohio Ct. App. 2017), reached a similar finding for a sibling company. *Id.* at 989–93 (company owed a duty of reasonable care to employees of its sister company under § 324A where it controlled certain aspects of workplace safety by managing audits and inspections, even though the employer handled daily operations and employee supervision).

Corporate separateness does not foreclose tort liability for a party's *own* conduct. *Id.* "Corporations cannot expect to receive the benefits of the corporate veil without subjecting themselves to liability in tort for their own negligent conduct." *Heinrich v. Goodyear Tire & Rubber Co.*, 532 F. Supp. 1348, 1356 (D. Md. 1982). Consequently, when for economic gain a parent or sibling corporation undertakes to render services to a subsidiary or affiliate, the

corporation is subject to liability under § 324A like any other entity, if the requirements of that provision are met. *Id.*

At this stage, Plaintiffs are not required to plead the full contours of American's undertaking, particularly where the governing agreements and internal oversight protocols are largely in American's possession. Indeed, the corporate and contractual relationship between American and its regional carriers—including PSA—is itself a subject of ongoing discovery. In response to Plaintiffs' document requests, American has acknowledged that such agreements exist and will be produced. *See* Ex. A (American's Objs. and Resps. to PSC's First Set of Liability Reqs. for Produc. Nos. 14 & 16) at 18–20. American has likewise represented in its initial disclosures that it will identify an individual with discoverable information regarding the corporate and contractual relationships between American and its regional carriers. *See* Ex. B (American's Rule 26(a)(1) Initial Disclosures) at 2. That identification has not yet occurred.

American claims that "[i]t did not" have "'the ability' or 'right to control any of the operational aspects of Flight [AE] 5342.'" American Moving Brief, ECF 51-1, p. 36. Putting aside that American could still be liable here even if it did not control "operational" aspects of Flight AE 5342, the claim itself is a (disputed) factual assertion. Discovery is required to ascertain its truth. Indeed, the very case American quotes—*In re Air Crash at Lexington, Kentucky*, 2008 WL 2945944 (E.D. Ky. 2008)—was decided at summary judgment, where the court determined that based upon *the evidence in the record*, Delta Airlines "had neither the ability nor the right to control any of the operational aspects" of the Comair Flight that crashed (and the court acknowledged that the major carrier Delta's own scheduling or routing decisions could give rise to direct negligence, even where flight was operated by regional carrier Comair). *Id.* at *3–4, *6. American has not identified a single case—and Plaintiffs have found none—in which a major

carrier escaped the case at the pleading stage on the ground that a related regional carrier operated an aircraft while flown and sold under the major carrier's brand. The cases American relies on were decided at summary judgment, on fully developed records following discovery into the relationships, agreements, and operational practices between affiliated carriers.

The limited discovery conducted to date reinforces the plausibility of Plaintiffs' allegations. Documents produced thus far indicate that, under PSA's Safety Management System, American required PSA to report near-miss events to American's Integrated Operations Center. That reporting requirement supports a reasonable inference that American positioned itself to receive and monitor information bearing on operational risk affecting PSA-operated flights, even though the extent to which American acted on that information has not yet been developed—underscoring why discovery is warranted here.

## II. Alternatively, Plaintiffs Plausibly Allege that American Is Liable for PSA's Conduct Under Established Agency Principles.

Setting aside American's duty to exercise reasonable care in its own conduct, American's motion to dismiss should also be denied because the Complaint plausibly alleges that PSA acted as American's agent, rendering American liable for PSA's negligence under settled agency principles. The Complaint sets out facts supporting both actual authority—based on American's retained right to control key aspects of PSA's American-branded operations—and apparent authority—based on how American held out Flight AE 5342 to the traveling public.

### A. Plaintiffs Plausibly Allege an Agency Relationship Between American and PSA.

Whether a principal-agent relationship exists "depends upon the particular facts of each case." *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 (D.C. 1982). In assessing agency, courts consider five non-exclusive factors: "(1) the selection and engagement of the [agent], (2) the payment of wages, (3) the power to discharge, (4) the power to control the [agent]'s conduct, (5)

and whether the work is part of the regular business of the [principal]." *Id.* (quoting *LeGrand v. Ins. Co. of N. Am.*, 241 A.2d 734, 735 (D.C. 1968) (citation omitted)). No single factor is dispositive. Instead, the decisive inquiry "is whether the [principal] has the right to control and direct the [agent] in the performance of his work and the manner in which the work is to be done." *Beegle v. Rest. Mgmt., Inc.*, 679 A.2d 480, 485 (D.C. 1996) (quoting *Kelly*, 448 A.2d at 860 (emphasis and citation omitted)). In this context, "control" refers to the "right to control . . . in the performance of a task and in its result, and not the actual exercise of control or supervision." *Kelly*, 448 A.2d at 860. Courts therefore examine the substance of the parties' relationship, including the terms of any governing agreement, rather than formal labels. *Beegle*, 679 A.2d at 485.

The Complaint alleges that American retained authority over certain conditions under which PSA operated Flight AE 5342. For example, Plaintiffs allege that American retained authority to determine when the flight would be scheduled into DCA and how arrivals were timed and sequenced in congested airspace, *see* Master Compl., ECF 28, ¶¶ 49–60, 201(n); American retained authority to require or prohibit operational policies governing the conduct of the flight, including whether circling approaches were permitted at DCA under nighttime or high-traffic conditions, *id.* ¶¶ 87–88, 95; and American retained authority to determine what safety information, training, and operational guidance would be required for PSA flight crews operating into DCA, including warnings and training concerning helicopter routes, nighttime operations, and collision-avoidance limitations, *id.* ¶¶ 74–75, 87–88, 95, 208(d)–(h), (m), (o), (q), 215(d)–(h), (m), (o), (q). These allegations suffice to plead the right to control for agency purposes, rendering dismissal under Rule 12(b)(6) inappropriate.

Determining the extent of American's allocation and exercise of authority over PSA requires discovery into its contracts and oversight practices and cannot be resolved on a motion to

dismiss. *See Kuhn Constr. Co. v. Ocean & Coastal Consultants, Inc.*, 723 F. Supp. 2d 676, 690 (D. Del. 2010) ("[A]n agency relationship is determinable only after appropriate discovery and, thus, is not appropriate for a motion to dismiss."); *Cunningham v. Foresters Fin. Servs., Inc.*, 300 F. Supp. 3d 1004, 1016 (N.D. Ind. 2018) (concluding that plaintiff could not reasonably be expected, prior to discovery, to plead detailed facts regarding defendants' interrelationships and roles). *See also S. Y. v. Wyndham Hotels & Resorts, Inc.*, 519 F. Supp. 3d 1069, 1085 n.6 (M.D. Fla. 2021) (explaining that where agency is based on parties' interactions rather than solely on contract interpretation, existence of agency is "question of fact" not suitable for resolution on motion to dismiss (citations omitted)).

The agency cases American relies on—*In re Air Crash at Lexington, Kentucky*, 2008 WL 2945944 (E.D. Ky. 2008) and *Hart v. Delta Air Lines, Inc.*, 2018 WL 1087846 (C.D. Cal. 2008), American Moving Brief, ECF 51-1, pp. 36–37—reinforce rather than undermine Plaintiffs' position. Both were decided at summary judgment, where the court granted summary judgment to Delta Airlines only after a fully developed evidentiary record, including depositions and extensive documentary discovery, established Delta's lack of control over its regional carrier's flight. 2008 WL 2945944, at *6; 2018 WL 1087846, at *2.

Accepting the allegations as true, the Complaint supports an inference that American retained the right to control how the flight was conducted such that PSA was American's actual agent and thus could be held liable for PSA's actions—an issue that cannot be resolved on a motion to dismiss.

### B. Plaintiffs Plausibly Allege That PSA Acted with American's Apparent Authority.

Apparent authority arises from a principal's own manifestations—through words or conduct—that reasonably cause a third party to believe another is authorized to act on the

principal's behalf, where that belief is traceable to the principal's manifestations. Restatement (Third) of Agency §§ 1.03, 3.03 (A.L.I. 2006); *Makins v. District of Columbia*, 861 A.2d 590, 594 (D.C. 2004) (en banc) ("apparent authority depends upon the principal's manifestations to the third party"). The relevant inquiry focuses on the perspective of the third party who "observes or otherwise learns of the manifestation." Restatement (Third) of Agency § 1.03 cmt. b. Critically, "[w]hether an agent had apparent authority is a question of fact." *A-J Marine, Inc. v. Corfu Contractors, Inc.*, 660 F. Supp. 2d 84, 89 (D.D.C. 2009) (quoting *Makins*, 861 A.2d at 594).

In *Search v. Uber Technologies*, 128 F. Supp. 3d 222 (D.D.C. 2015), this court discussed what it referred to as the "duck test" in recognizing "apparent authority" as a basis for rejecting Uber's motion to dismiss on the basis that it did not owe a duty of care to its passengers to protect against the intentional tort of one of its independent contractor drivers:

> An inquiry into the existence of such authority operates something like the hoary legal principle known as the "duck test": "[I]f it walks like a duck, swims like a duck, and quacks like a duck, it's a duck." *Lake v. Neal*, 585 F.3d 1059, 1059 (7th Cir. 2009). The doctrine, at bottom, "prevents [Defendant] from denying any liability for the torts of its independent contractors while it profits from the image and good will created by the company's general business reputation." *Wilson v. Good Humor Corp.*, 757 F.2d 1293, 1302 (D.C. Cir. 1985).

*Id.* at 235.

Here, the Master Complaint pleads sufficient facts regarding PSA's apparent authority to survive a motion to dismiss. Plaintiffs allege that American affirmatively held out PSA-operated flights as American flights. American used PSA to operate regional flights under the American Eagle brand. Master Compl., ECF 28, ¶ 45. American advertised, marketed, sold, ticketed, and issued boarding documents for PSA-operated flights as American flights, whether purchased individually or as part of an American itinerary. *Id.* ¶¶ 46–48. Plaintiffs further allege that PSA-operated flights were regularly listed as American flights, and that passengers were often unaware that they had purchased transportation operated by a separate carrier rather than by American itself.

*Id.* ¶ 47. On January 29, 2025, Flight AE 5342 was operated by PSA for American and under the American Eagle brand. *Id.* ¶ 48.

Consistent with those representations, Plaintiffs allege that members of the flying public reasonably expected that flights sold and presented as American flights would be operated with the same level of safety and subject to the same oversight, whether flown by American directly or by PSA under the American Eagle banner. *Id.* ¶ 96. Those allegations go to the heart of apparent authority. They describe affirmative conduct by American—branding, marketing, ticketing, and presentation—capable of inducing a reasonable passenger to believe that PSA was acting on American's behalf in providing the air transportation purchased. At the pleading stage, nothing more is required.

The decision in *Shaw v. Delta Airlines, Inc.*, 798 F. Supp. 1453 (D. Nev. 1992), is instructive. The case arose out of the crash of an airplane operated by SkyWest Airlines, where Delta Airlines served as the ticketing and marketing carrier, like American here. The court denied Delta's motion for summary judgment, finding that while regional carrier SkyWest operated the flight, material facts existed from which a reasonable jury could find apparent authority based on evidence that Delta marketed SkyWest flights as the "Delta Connection," published SkyWest flights in Delta timetables, issued SkyWest tickets on Delta ticket stock, assigned Delta flight numbers, and used Delta trademarks and insignia in advertising that "effectively managed to equate SkyWest with Delta in the minds of the travelling public." *Id.* at 1458–59. On that record, the court concluded that "material facts [were] in dispute which must be resolved by the jury,"

specifically whether SkyWest acted with Delta's apparent authority to carry passengers. *Id.* at 1459.[2]

Similarly, in *Momen v. United States*, 946 F. Supp. 196 (N.D.N.Y. 1996), the court denied summary judgment to USAir where a commuter carrier operated the flight, but USAir issued the ticket on its own stock, used its logos and insignia on the aircraft, coordinated routes and timetables, and marketed the service under the "USAir Express" name. *Id.* at 203–04. The court explained that the dispositive inquiry was whether USAir's own conduct "created the impression, in the minds of travelers," that the regional carrier was acting as its agent. *Id.* at 203. Emphasizing that "the existence of apparent authority is a question of fact," the court held that a reasonable jury could find agency based on USAir's branding, ticketing, and scheduling practices, notwithstanding the absence of cockpit-level control. *Id.* at 203–05 (alteration and citation omitted).

American's reliance on *Hart v. Delta Air Lines, Inc.*, 2018 WL 1087846 (C.D. Cal. 2008) and *Freese v. Continental Airlines, Inc.*, 2009 WL 2232857 (N.D. Ohio 2009), American Moving Brief, ECF 51-1, pp. 36–37—both of which were decided on summary judgment with a fully developed evidentiary record including depositions, affidavits, and discovery of the agreements between the major carrier and its regional operator—is misplaced. Again, American has not cited a single analogous Rule 12(b)(6) decision, nor have Plaintiffs found one.

---

[2] American contends that consumer confusion about the operator of a flight is "implausible" absent allegations of a violation of federal disclosure regulations. American Moving Brief, ECF 51-1, p. 36. *Shaw* shows that argument is wrong. Apparent authority does not turn on regulatory noncompliance or the presence or absence of formal notices, but on whether the principal's overall course of conduct could reasonably induce reliance. *See Shaw*, 798 F. Supp. at 1457–58. Plaintiffs allege that American affirmatively held out PSA-operated flights as American flights through branding, marketing, ticketing, and itinerary integration, and that passengers reasonably relied on those representations in purchasing and boarding American-branded flights. At the pleading stage, Plaintiffs are not required to plead around potential disclosures or to prove that no notice was ever provided; those are factual issues not resolvable on a motion to dismiss.

Plaintiffs plausibly allege that American affirmatively held out PSA-operated flights as American flights through branding, marketing, ticketing, and presentation; that passengers were often unaware they were flying on a separate carrier; and that the flying public reasonably relied on American's representations in purchasing and boarding American-branded flights. At the pleading stage, those allegations must be accepted as true and are sufficient to render apparent authority plausible.

## III. Plaintiffs' Common Carrier Causes of Action Are Sufficiently Pled

Defendants argue that Plaintiffs' common carrier causes of action—counts 1, 2, 5 and 6—are not only preempted, but should be dismissed because there is no independent cause of action for common carrier liability, and therefore the causes of action are duplicative, and because American was not the common carrier of AE 5342. American Moving Brief, ECF 51-1, pp. 37-39; PSA Moving Brief, ECF 52-1, p. 20. These arguments should be rejected.

*First*, under District of Columbia law, airlines are "common carriers." *Flytenow, Inc. v. F.A.A.*, 808 F.3d 882, 892 (D.C. Cir. 2015). Under D.C. law, "'a common carrier [is] held to the highest degree of care[.]'" *Sebastian v. D.C.*, 636 A.2d 958, 962 (D.C. 1994) (quoting *District of Columbia Transit Sys., Inc. v. Carney*, 254 A.2d 402, 403 (D.C. 1969)); *see also Naqvi v. Saudi Arabian Airlines, Inc.,* 123 F. Supp. 3d 129, 134 (D.D.C. 2016) (addressing common carrier liability with regard to an air carrier under Virginia law, which holds common carriers to the same "highest degree of care" as D.C.). In negligence claims against a common carrier: (1) failure to perform duties can be inferred from the fact that the accident occurred; (2) a prima facie case need only show proof of the accident, the injury, and the plaintiff's status as a passenger; (3) the plaintiff can raise *res ipsa loquitor* to prove negligence; and (4) "[i]t is only when the facts have become so completely elucidated that no inference of negligence can be drawn, that *res ipsa* becomes inapplicable." *Missile Cab Ass'n v. Rogers*, 184 A.2d 845, 847 (D.C. 1962). In short, the standard

of care is heightened, and the standard of proof is relaxed in claims against common carriers. While Plaintiffs must still show negligence, "[n]o rule is better established than that which holds a common carrier to the highest degree of care toward its passengers for hire and creates liability upon proof of even slight negligence." *Sebastian*, 636 A.2d at 962 (quoting *Missile*, 184 A.2d at 847). This is different from the traditional negligence standard.

Plaintiffs bring their claims against American and PSA both under the common carrier standards of care and proof and under the normal negligence standards of care and proof. *Compare* Master Compl. ¶¶ 193–94, 200–201, 221–22, 228–29 *with id*. ¶¶ 207–08, 214–15, 235–36, 242–43. If this Court applies implied conflict preemption analysis, as addressed in Plaintiffs' Opposition to PSA's Motion to Dismiss filed concurrently herewith, Plaintiffs' claims based on common carrier standards of care and proof would not be preempted. If the Court applies implied field preemption—namely that federal law preempts the standard of care in relation to in-flight operations because there is the comprehensive standard of care set forth in 14 C.F.R. § 91.13(a)—Plaintiffs concede that the D.C. heightened common carrier standard of care would be preempted for their claims alleging in-flight negligence. If, as addressed in Plaintiffs' Opposition to PSA's Motion to Dismiss, D.C. standards of care are not preempted for Plaintiffs' claims of negligence other than in-flight operations—including negligent adoption of operational policies and procedures, negligent training and guidance of pilots, negligent safety risk management decision, and negligent failure to equip the airplane with LED lighting—then D.C. standards of care and proof, including those appliable to common carriers should apply to those remaining claims.

*Second*, American insists that because it did not actually operate Flight 5342, it cannot be subject to common carrier liability. American Moving Brief, ECF 51-1, p. 37. It cites cases it claims hold that only the carrier that "operated" a flight and "exercised control of the passengers"

can be liable as a common carrier. American Moving Brief, ECF 51-1, p. 38. One of the cases it cites, however, belies that claim. In *Haley v. United Airlines Inc.*, the Northern District of Illinois noted that "[c]ommon carriers [] are ***generally*** not liable for injuries that result from a cause beyond their control," but also stated clearly that "[a] contract [] may be able to alter that outcome." 2015 WL 5139638, at *2 (N.D. Ill. Aug. 31, 2015) (emphasis added). Indeed, the decision in that case, dismissing national carrier United Airlines on summary judgement and finding its regional subsidiary Colgan Air to be the common carrier, was premised heavily on the fact that the Capacity Purchase Agreement between the two entities did not give United Airlines any control over Colgan operations of the flight and explicitly left all safety matters to Colgan. *Id.* at *4.

Plaintiffs' Master Complaint in this case directly alleges in its common carrier causes of action that American retained control of safety-related matters relating to this flight. Master Compl., ECF 28, ¶¶ 50–69, 74–75, 87–88, 95, 193–95, 200–201. Unlike in *Haley*, we are not at the summary judgment stage here. Plaintiffs do not have the benefit of having reviewed any capacity purchase agreement between American and PSA, or to depose witnesses with knowledge of the interaction between the two companies relating to safety matters. At this juncture, all that matters is whether Plaintiffs have alleged facts sufficient to state a claim that American was a common carrier, and based on the very caselaw American cites, Plaintiffs have done so.

Moreover, the tort common law nondelegable duty rule does not allow American to evade tort liability by contracting away its rightful responsibilities. Quintessential nondelegable duties include those imposed by the relationship of carrier and passenger, as well as that of hotel and guest and landowner and invitee. "These examples demonstrate a general tort law policy not to allow an entity to shift by contract its responsibility for keeping an area used by the public in a safe condition. It would be contrary to this policy to allow the owner and operator of an airport

terminal to delegate its duty to keep its facility safe." *Colmenares Vivas v. Sun All. Ins. Co.*, 807 F.2d 1102, 1107 (1st Cir. 1986) (noting that owners have a non-delegable duty to keep business premises safe for invitees.) The common thread in determining whether a duty is nondelegable is the presence of a responsibility so important to the public that it cannot be delegated. The duty of an airline to transport its passengers in safety is the archetype.

Courts have recognized that "[t]here are no set criteria for determining whether a duty is nondelegable; the critical question is whether the responsibility is so important to the community that it should not be transferred to another." *Colmenares*, 807 F.2d at 1106; *Alaska Airlines, Inc. v. Sweat*, 568 P.2d 916, 925–26 (Alaska 1977); *see also* Restatement (Third) of Agency § 7.06 (A.L.I. 2006) ("A principal required by contract or otherwise by law to protect another cannot avoid liability by delegating performance of the duty, whether or not the delegate is an agent.").

District of Columbia courts have suggested that the heightened common carrier duty for foreseeable harms is nondelegable in light of the "special relationship" that exists between passengers and common carriers. *Sebastian*, 636 A.2d at 963, 964. Other courts have applied similar reasoning in the aviation context. In *Kelley v. United Airlines, Inc.*, the District of Massachusetts noted that under Massachusetts and Alaska law, the duty of a common carrier to those it agrees to transport is nondelegable, and predicted that Colorado's courts would reach the same conclusion that "a passenger who sustains injuries because of the fact that such degree of care was not exercised is entitled to hold the carrier responsible, notwithstanding the injuries were directly attributable to the negligence" of a third party with whom that carrier has contracted. 986 F. Supp. 684, 686 (D. Mass. 1997) (quoting 14 Am. Jur. 2d Carriers § 905 (1964) and citing *Alaska.*, 568 P.2d at 926).

Furthermore, similar principles have guided courts in refusing to allow ride-sharing services and online marketplaces to evade tort liability by contracting away their rightful responsibilities. *See, e.g.*, *In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 745 F. Supp. 3d 869 (N.D. Cal. 2024) (when a driver assaults a passenger, there is no question that driver has failed to discharge the common carrier's nondelegable duty to safely transport a passenger) (applying California law); *Bolger v. Amazon.com, LLC*, 267 Cal. Rptr. 3d 601 (Cal. Ct. App. 2020) (holding Amazon liable for a physical injury resulting from a third-party product sale, rejecting Amazon's argument that it was not the seller because it lacked control, and that the seller was instead the third-party merchant that Amazon merely connected to the consumer.)

Here, Plaintiffs have pled sufficient facts to allege their common carrier causes of action against both PSA and American at this stage.

## CONCLUSION

For these reasons and the reasons articulated in Plaintiffs' Opposition to PSA's Motion to Dismiss, American's Motion to Dismiss should be denied. In the alternative, Plaintiffs respectfully request leave to amend should the Court determine that any aspect of the Complaint is insufficiently pleaded.

Dated: January 16, 2026

Respectfully submitted,

**KREINDLER & KREINDLER LLP**

By: *<u>/s/ Brian J. Alexander</u>*
Brian J. Alexander (Bar ID: NY0679)
Justin T. Green (Bar ID: NY0692)
Anthony Tarricone (Bar ID: 492480)
Daniel O. Rose (Applicant *pro hac vice*)
Vincent C. Lesch (Bar ID: NY0675)
Evan Katin-Borland (Bar ID: NY0674)
Erin R. Applebaum (Applicant *pro hac vice*)

**CLIFFORD LAW OFFICES, P.C.**

By: *<u>/s/ Robert A. Clifford</u>*
Robert A. Clifford (Bar ID: IL0135)
Kevin P. Durkin (Bar ID: IL0136)
Tracy Brammeier (Bar ID: IL0137)
John V. Kalantzis (Applicant *pro hac vice*)
120 N. LaSalle Street Suite 3600
Chicago, Illinois 60602
(312) 899-9090

485 Lexington Avenue, 28th Floor
New York, New York 10017
(212) 687-8181
balexander@kreindler.com
jgreen@kreindler.com
atarricone@kreindler.com
drose@kreindler.com
vlesch@kreindler.com
ekatinborland@kreindler.com
eapplebaum@kreindler.com

rac@cliffordlaw.com
kpd@cliffordlaw.com
tab@cliffordlaw.com
jvk@cliffordlaw.com

**SPEISER KRAUSE, P.C.**

By: *\/s/ Douglas A. Latto*
Douglas A. Latto (Bar ID: NY0672)
Kenneth P. Nolan (Applicant *pro hac vice*)
Jeanne M. O'Grady (Bar ID: NY0673)
Frank H. Granito, III (Applicant *pro hac vice*)
800 Westchester Avenue, Suite S-608
Rye Brook, New York 10573
(914) 220-5333
dal@speiserkrause.com
f3g@speiserkrause.com
jog@speiserkrause.com
kpn@speiserkrause.com

***Plaintiffs Steering Committee***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of January 2026, the foregoing document was served by electronic filing on all counsel of record through the Court's ECF system.

/s/ *Vincent C. Lesch*
Vincent C. Lesch