**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE: MID-AIR COLLISION IN WASHINGTON, D.C., JAN. 29, 2025** | Lead Case No: 1:25-cv-03382-ACR |
| *This Filing Relates to:* *All Cases* | |

**PSA AIRLINES, INC.'S AMENDED ANSWER TO FIRST AMENDED MASTER COMPLAINT**

Defendant PSA Airlines, Inc. ("PSA" or "Defendant"), by and through its attorneys, hereby answers Plaintiffs' First Amended Master Complaint. ECF No. 109. To the extent not specifically admitted herein, PSA denies all allegations in the First Amended Master Complaint.

**PSA'S INTRODUCTION**

The collision of PAT25 with Flight 5342 on January 29, 2025 was a tragedy. PSA is deeply sympathetic to the losses suffered by the families and survivors of the passengers, crew members, and servicemembers. But neither American Airlines nor PSA Airlines caused the collision.

Such tragedies are, fortunately, rare. Commercial aviation in the United States is incredibly safe. This is due in large part to the FAA's pervasive (and exclusive) oversight of air traffic, which Congress established after a series of similarly tragic collisions between military and civilian aircraft almost 70 years ago. Under the FAA's regime, pilots and air traffic controllers have defined roles and follow rules designed to ensure that aircraft can safely operate, especially in the airspace that surrounds some of the busiest airports in the world.

Commercial airlines rely on this comprehensive airspace regulation, which keeps the skies safe. In 2025 alone, commercial air carriers in the United States flew almost 10 million flights,

carrying more than 1.1 billion passengers safely to their destinations.[1]  This makes commercial air transportation safer than all other ways to travel.[2]

On the night of January 29, 2025, the crew of Flight 5342 positioned their aircraft precisely where it was supposed to be.  They complied with every relevant regulation and appropriately followed every request and instruction given to them by the air traffic controller.  At every point on January 29, 2025, Flight 5342 was exactly where it was supposed to be, when it was supposed to be there.  DCA ATC requested Flight 5342 to execute a routine circling approach and land on Runway 33.  Flight 5342's experienced pilots reasonably accepted that request and effectively executed the required circling approach.  Under the regulatory framework that governs DCA airspace, Flight 5342 had the right of way, it was stabilized and descending along the precision glidepath to Runway 33, and the pilots were aware that ATC had directed PAT25 to "pass behind" them.  The plane was at the correct altitude and descending steadily in the final moments of its approach.  When the air traffic controller was asked why he did not warn the crew of Flight 5342 of the approaching PAT25 just before the collision, he explained that Flight 5342 "was in a critical phase of flight."  In sum, Flight 5342's pilots did not cause the collision—indeed, they did everything right, and were seconds away from safely landing.  On these facts, and under settled law, PSA and American cannot be liable for this tragedy.

Flight 5342's crew complied with federal law and federal direction.  Plaintiffs' claims, which inherently suggest that Flight 5342's pilots or the airlines should have acted differently than what federal law requires or allows, are preempted.  And just as fundamentally, the pilots and

---

[1]  Bureau of Transportation Statistics, "Departures by Year," accessed June 6, 2026, https://perma.cc/9JPM-U895; Bureau of Transportation Statistics, "Passengers by Year," accessed June 6, 2026, https://perma.cc/788P-M9Q2. Meanwhile, the National Highway Traffic Safety Administration (NHTSA) recently celebrated that 2025 had the "second-lowest traffic fatality rate in recorded history"; by NHTSA's estimate, approximately 36,640 individuals died, in one year alone, from traffic accidents.

[2]  *Compare* Bureau of Transportation Statistics, "Transportation fatalities by mode," accessed June 4, 2026, https://perma.cc/JCF6-SMSM *with* Bureau of Transportation Statistics, U.S. passenger miles traveled, accessed June 4, 2026, https://perma.cc/V8KV-KQ3Q.  *See also, e.g.*, Mihhail Berezovski, Comparative Risk Metrics for U.S. Commercial Aviation (May 2026), https://perma.cc/A5RY-9HXG (based on federal government data sources, reporting that the fatality rate per passenger mile is hundreds of times lower for commercial aviation than for motor vehicle travel or even railway travel); Arnold Barnett & Jan Reig Torra, Airline Safety: Still Getting Better?, 119 J. Air Transp. Mgmt. 1 (Aug. 2024); Ian Savage, Comparing the fatality risks in United States transportation across modes and over time, 43 Res. in Transp. Econ. 9 (2013).

airlines did nothing to cause this accident.  Because Flight 5342 was where it was supposed to be, when it was supposed to be there, Plaintiffs cannot show that any conduct by the pilots or any airline proximately caused this collision.

### [PLAINTIFFS'] PRELIMINARY STATEMENT[3]

1.    On January 29, 2025, American Eagle Flight 5342 ("AE 5342"), from Wichita Dwight D. Eisenhower National Airport to Ronald Reagan Washington National Airport, was on final approach to land when it collided with a United States Army Black Hawk helicopter over the Potomac River.  This wholly avoidable tragedy took 67 lives.  This Amended Master Complaint asserts wrongful death and survival claims, jointly and severally, against Defendants AMERICAN AIRLINES, INC., and PSA AIRLINES, INC., (sometimes referred to collectively as the "Airline Defendants") for their acts and omissions in operating AE 5342, and against Defendant the UNITED STATES OF AMERICA, for the acts and omissions of the Federal Aviation Administration and United States Army.

**ANSWER**: PSA admits only that on January 29, 2025, a United States Army Black Hawk helicopter designated as PAT25 collided in mid-air with American Eagle Flight 5342 ("Flight 5342") and that 67 individuals onboard both aircraft died, that the collision was a tragedy, and that the First Amended Master Complaint purports to assert wrongful death and survival claims, jointly and severally, against Defendants American Airlines, Inc., PSA Airlines, Inc., and the United States.  PSA denies any liability for the collision and denies any and all remaining allegations as to PSA that may be construed or inferred in Paragraph 1.

2.    As detailed herein, the Defendants' collective failures caused the mid-air collision that resulted in the senseless and tragic deaths of 67 individuals. Prior to, and on the night of the

---

[3]    The topic headings from the First Amended Master Complaint are repeated herein for ease of reference.  To the extent that this, or any other, topic heading is an allegation, PSA denies any and all such allegations.

mid-air collision, the Defendants knew, or should have known, that AE 5342 was transiting one of busiest airspaces in the United States, and they knew, or should have known, that the airport approaches, and the airspace in the vicinity of Washington D.C.'s Reagan National Airport ("DCA"), presented certain safety risks, specifically including the possibility of a mid-air collision. This knowledge includes, but is not limited to, that there have been a substantial number of "near miss" events in and around DCA, which were required to be analyzed to ensure that a mid-air collision did not occur and required Defendants to exercise vigilance when operating and/or controlling aircraft in the vicinity of DCA. Because of Defendants' collective failure to analyze the data and information at their disposal, and due to their failure to operate and/or control aircraft with the highest degree of safety, this mid-air collision was, tragically, an accident waiting to happen.

**ANSWER**: To the extent the allegations in Paragraph 2 are directed to PSA, PSA denies all allegations as to PSA in Paragraph 2.

3.      These Defendants utterly failed in their responsibilities to the travelling public, specifically including the passengers on board AE 5342, in that, amongst other things, each aircraft flight crew failed to see and avoid the other despite each having the obligation to do so; that the Airline Defendants failed to implement policies and procedures specifically designed to mitigate the risks associated with a mid-air collision; that the Airline Defendants failed to provide their flight crews with the necessary training and familiarization to evaluate whether to accept, during the final stages of flight, a request by air traffic control to switch to land on Runway 33 (a much shorter and far-less-frequently used runway at DCA), including, but not limited to, their failure to advise their flight crews as to the existence of helicopter routes in the immediate vicinity of DCA; that the flight crew of AE 5342 violated numerous policies and procedures requiring them to discuss, evaluate and/or consider the alerts coming from their on-board collision-avoidance technology approximately 19 seconds prior to the collision, including their failure to look for

4

intruding traffic or take corrective (or any) action until it was too late; that the United States Army flight crew failed to properly and adequately operate the Black Hawk helicopter, including their failure to see and avoid AE 5342 and their failure to properly transit the helicopter route, including failing to abide by a mandatory altitude restriction and improperly flying towards the center of the Potomac River instead of along its eastern bank as required; that the Black Hawk flight crew critically failed to resolve a known and discussed altitude discrepancy despite transiting airspace that the Black Hawk flight crew knew, or should have known, had a mandatory altitude restriction; that the Black Hawk flight crew failed to adjust their flight path to the eastern bank of the Potomac River, despite recognition that they were further west than the charted route; and that the Federal Aviation Administration's air traffic controllers failed in their two most important priorities, namely to separate aircraft in airspace and issue Safety Alerts when aircraft are in an unsafe proximity to one another; that the air traffic controllers on duty failed to abide by numerous other policies and procedures, including that air traffic control failed to provide traffic advisories to both aircraft and air traffic control failed to resolve an aural and visual Conflict Alert that advised air traffic control that the two aircraft were on an unsafe and converging collision course; and that the air traffic controllers failed in their duties concerning the "tower team concept" within an air traffic control facility so that all controllers assist each other to prevent, amongst other things, a mid-air collision. The Defendants' collective failures (for which they are jointly and severally liable) caused and/or contributed to this senseless and entirely avoidable tragedy.

**ANSWER**: To the extent the allegations in Paragraph 3 are directed to PSA, PSA denies all allegations as to PSA in Paragraph 3, including that PSA is liable to Plaintiffs at all or that PSA is jointly and severally liable with any other defendant.

## PARTIES

**A.    Plaintiffs**

4.    DECEDENTS were passengers and cabin crew on board AE 5342 when it collided with the Black Hawk helicopter and crashed on January 29, 2025.  Plaintiffs are the personal representatives, special representatives, executors, and/or administrators of DECEDENTS' estates, as well as the next of kin, heirs, beneficiaries and survivors of DECEDENTS.  Plaintiffs bring this action for their own injuries as well as the injuries of DECEDENTS which accrued and existed before death.

**ANSWER**: PSA admits an Army Black Hawk helicopter collided with AE 5342, on January 29, 2025.  PSA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 4, and therefore denies those allegations.

**B.    Defendants**

5.    At all times relevant to this action, AMERICAN AIRLINES, INC. ("American") was a corporation formed under the law of the state of Delaware with its principal place of business in Fort Worth, Texas.

**ANSWER**: The allegations in Paragraph 5 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 5.

6.    At all times prior to this Action, PSA AIRLINES, INC. ("PSA") was a corporation formed under the law of the state of Pennsylvania with its principal place of business in Dayton, Ohio.  On January 29, 2025, PSA announced that, effective January of 2026, PSA's principal place of business will be located in Charlotte, North Carolina.

**ANSWER**: PSA admits that PSA is a corporation formed under the laws of the Commonwealth of Pennsylvania, admits that as of January 29, 2025, PSA had its principal place of business in Dayton, Ohio, and admits that, today, PSA's principal place of business is located in Charlotte, North Carolina.  PSA denies all remaining allegations in Paragraph 6.

7.      At all times relevant to this Action, American and PSA were both wholly owned subsidiaries of American Airlines Group, Inc., and both doing business as American Airlines – with PSA operating flights for American under the brand name "American Eagle."

**ANSWER**: PSA admits that American and PSA are both wholly owned subsidiaries of American Airlines Group, Inc.  PSA further admits that PSA operates flights under the brand name "American Eagle."  PSA denies all remaining allegations in Paragraph 7.

8.      At all times relevant to this action, the air traffic control personnel Plaintiffs allege to have been negligent were employees of the UNITED STATES OF AMERICA ("USA") under the authority and control of the Federal Aviation Administration ("FAA") acting in their official capacity and within the course and scope of their employment.

**ANSWER**: The allegations in Paragraph 8 are not directed to PSA.

9.      At all times relevant to this action, the United States Army personnel Plaintiffs allege to have been negligent were employees of the USA under the authority and control of the United States Army acting in their official capacity and within the course and scope of their employment.

**ANSWER**: The allegations in Paragraph 9 are not directed to PSA.

**JURISDICTION AND VENUE**

10.      This Court has Subject Matter Jurisdiction over American and PSA based on complete diversity pursuant to 28 U.S.C. § 1332.

**ANSWER**: The allegations in Paragraph 10 state legal conclusions to which no response is required.  To the extent a response is required, PSA admits that this Court has subject matter jurisdiction and denies all remaining allegations in Paragraph 10.

11.      This Court also has Subject Matter Jurisdiction over American and PSA pursuant to 28 U.S.C. § 1367(a) which provides that the District Court has supplemental jurisdiction over said defendants as the claims against these defendants are related to, intertwined with, and are part

of the same claims against Defendant USA, as all claims arise from the mid-air collision in which the DECEDENTS were killed.

**ANSWER**: The allegations in Paragraph 11 state legal conclusions to which no response is required.  To the extent a response is required, PSA admits this Court has subject matter jurisdiction and denies all remaining allegations in Paragraph 11.

12.    Plaintiffs allege damages greater than the jurisdictional amount of $75,000.

**ANSWER**: PSA admits that the First Amended Master Complaint purports to allege damages greater than $75,000, but denies Plaintiffs' entitlement to damages from PSA and denies all remaining allegations in Paragraph 12.

13.    Venue in this District as to American and PSA satisfies the requirements of 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to the claim occurred in this District.  The subject crash and resulting deaths occurred in this District as a result of negligence that occurred in the airspace of this District.

**ANSWER**: The allegations in Paragraph 13 state legal conclusions to which no response is required.  To the extent a response is required, PSA admits venue is proper in this Court and that the collision occurred in the airspace of the District of Columbia, and denies all remaining allegations in Paragraph 13.

14.    American and PSA are subject to personal jurisdiction in this District because they conduct longstanding and continuous business in the District and operate flights in the District's airspace.  Both American and PSA operate regular, daily flights into and from DCA, including AE 5342 from Wichita Dwight D. Eisenhower National Airport ("ICT") to DCA on January 29, 2025.

**ANSWER**: The allegations in Paragraph 14 state legal conclusions to which no response is required.  To the extent a response is required, PSA admits this Court has specific personal jurisdiction over PSA in connection with this action.  PSA further admits that it operates regular, daily flights into and from DCA, but denies all remaining allegations in Paragraph 14.

15.     American and PSA are also subject to personal jurisdiction in this District because they operated AE 5342 in the airspace over this District for the purpose of serving the community in this District, which, as a result of the negligence of American and PSA, culminated in the crash and resulting deaths in the District of Columbia.

**ANSWER**: The allegations in Paragraph 15 state legal conclusions to which no response is required.  To the extent a response is required, PSA admits this Court has specific personal jurisdiction over PSA in connection with this action.  PSA denies all remaining allegations in Paragraph 15.

16.     This Court has Subject Matter Jurisdiction over Defendant USA pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and § 2671 *et seq.*, because the United States is a defendant in this civil action to recover monetary damages, and because Plaintiffs, individually, as personal representatives of DECEDENTS, and on behalf of all wrongful death beneficiaries, have complied with all conditions precedent to the filing of this action under the Federal Tort Claims Act ("FTCA").

**ANSWER**: The allegations in Paragraph 16 are not directed to PSA.  To the extent the allegations in Paragraph 16 are construed as directed to PSA, the allegations in Paragraph 16 state legal conclusions to which no response is required.  To the extent a response is required, PSA admits that the Court has subject matter jurisdiction over the United States and denies all remaining allegations in Paragraph 16.

17.     The FAA advised that it is the lead agency to investigate and decide the merits of these claims pursuant to 28 C.F.R. § 14.2(b)(2).

**ANSWER**: PSA admits the allegation in Paragraph 17.

18.     Each Plaintiff will individually allege the details of the submission and denial of their administrative claims to the FAA and United States Army ("Army") in their Short Form Complaint and/or Notice of Adoption.

**ANSWER**: PSA lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 18, and therefore denies the same.

19.    Pursuant to 28 U.S.C. § 1402(b), venue of the claims against the USA is proper in the United States District Court for the District of Columbia because negligent acts and omissions of the FAA, the United States Army and the USA that are alleged to have caused, or contributed to, the mid-air collision of two aircraft, which is the subject of this action (the "Subject Crash" or "Subject mid-air collision"), occurred in this federal district.

**ANSWER**: The allegations in Paragraph 19 are not directed to PSA. To the extent the allegations in Paragraph 19 are construed as directed to PSA, the allegations in Paragraph 19 state legal conclusions to which no response is required. To the extent a response is required, PSA admits that venue is proper in this judicial district as to the United States because negligent acts and omissions of the United States that are alleged to have caused and contributed to the mid-air collision occurred in this federal district. PSA denies all remaining allegations in Paragraph 19.

FACTS

A.    **Ronald Reagan Washington National Airport – DCA**

20.    DCA has three (3) runways identified based on their compass orientation. When the airport is configured for "north operations" with aircraft approaching from the south, Runway 1 is the longest and primary runway for commercial airline traffic, and Runways 33 and 4 are shorter alternate runways. Figure 1 below is a pictorial diagram of the runways at DCA with Runways 1 and 33 highlighted in "red."

**ANSWER**: PSA admits that DCA has the following runways: Runway 1-19, Runway 15-33, and Runway 4-22, which are named numerically after their magnetic headings. PSA further admits that Runway 1 is the longest runway and may be used for commercial airline traffic, especially larger aircraft. PSA further admits that Runways 33 and 4 may be used for commercial airline traffic, especially smaller aircraft. PSA admits that Figure 1 purports to be a pictorial

10

diagram of DCA with Runways 1 and 33 indicated in overlayed red text and indicated with red lines.  PSA denies all remaining allegations in Paragraph 20.



*Figure 1 – Airport Diagram of DCA with Runway 1 and Runway 33 labeled*
(Source: FAA)

21.     DCA Runway 1 is the busiest runway in the United States and operates at full capacity for most of DCA's daily operating hours.  This is particularly true in the evening hours, when dozens of flights regularly depart from and arrive to Runway 1.

11

**ANSWER**: PSA admits that DCA Runway 1 is managed by the FAA, which approves all scheduling, and—like scores of other runways throughout the United States—sees hundreds of daily aircraft operations.  How busy Runway 1 is at any given time varies, and PSA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 21, and therefore denies the same.

22.     Runway 33 is used far less frequently than Runway 1 at DCA when the airport is configured for "north operations."

**ANSWER**: PSA admits that certain types of aircraft use Runway 1 at DCA more frequently than they use Runway 33 when the airport is configured for "north operations." PSA denies all remaining allegations in Paragraph 22.

23.     Runway 33 is used for less than five (5%) percent of DCA's flight operations.

**ANSWER**: PSA denies the allegations in Paragraph 23.

**B.      Traffic in the Airspace Surrounding DCA**

24.     In addition to commercial aviation traffic such as AE 5342, the airspace around DCA is used by government, military, law enforcement and emergency medical helicopters transiting the busy Washington, D.C., area airspace.

**ANSWER**: PSA admits that the airspace around DCA is used for commercial, government, military, law enforcement, and emergency medical helicopter traffic.  PSA denies all remaining allegations in Paragraph 24.

25.     There are multiple published low-level helicopter routes surrounding DCA that direct the flow of helicopter traffic near and around the airport (See Figure 2 below).

**ANSWER**: PSA admits that there are helicopter routes surrounding DCA to which helicopter traffic is expected to adhere.  PSA admits that Figure 2 purports to depict, according to its caption, "FAA Helicopter Route Chart for the Area Near DCA Effective Feb. 20, 2025."  PSA

denies that Figure 2 accurately depicts the current helicopter routes around DCA, and denies all remaining allegations in Paragraph 25.



*Figure 2 – FAA Helicopter Route Chart for the Area Near DCA Effective Feb. 20, 2025*
(Source: FAA)

26.     These helicopter routes set mean sea level ("MSL") maximum altitude limitations for helicopters operating on the routes.  Notably, along Helicopter Route 4 over the Washington Channel and Potomac River, the height above ground level ("AGL") is essentially the same (typically within 10-15 feet) as the MSL altitude.

**ANSWER**: PSA admits the allegations in Paragraph 26.

27.     These helicopter routes, including Helicopter Route 4, which follows the east bank Potomac River, transit the approach and takeoff corridors to DCA, including Runway 33.

13

**ANSWER**: PSA admits that on the date of the collision, Helicopter Route 4 generally followed the Potomac River from its confluence with the Anacostia River, and followed the east bank of the Potomac River.  PSA denies all remaining allegations in Paragraph 27.

28.     The FAA aeronautical chart of these helicopter routes provides that "ATC Authorization to operate along routes, or within zones, constitutes clearance to enter Class B Airspace Incidental to the Authorized Operation, at altitudes stated in the authorization or as depicted in the route specified."  This requires pilots cleared by air traffic control ("ATC") onto the helicopter routes to continue to see and avoid all air traffic in the corridor and accurately report traffic "in sight" to ATC as well as comply with the routes' restrictions, including, critically, the maximum altitude restrictions set forth in the helicopter chart.

**ANSWER**: The allegations in Paragraph 28 are not directed to PSA. To the extent they are construed as directed to PSA, PSA admits that the chart in Figure 2 provides that "ATC AUTHORIZATION TO OPERATE ALONG ROUTES, OR WITHIN ZONES, CONSTITUTES CLEARANCE TO ENTER CLASS B AIRSPACE INCIDENTAL TO THE AUTHORIZED OPERATION, AT ALTITUDES STATED IN THE AUTHORIZATION OR AS DEPICTED IN THE ROUTE SPECIFIED."  PSA admits that the quoted language indicates that helicopters cleared by ATC on those routes are required to comply with the routes' restrictions including not deviating from the altitudes indicated on the chart unless authorized to do so by ATC, and that helicopters on the helicopter routes have a duty to see and avoid all air traffic in the corridor and accurately report traffic "in sight" to ATC.  PSA denies all remaining allegations in Paragraph 28.

29.     Since the FAA began keeping records, there is a documented history of over 30 near miss events where aircraft landing at DCA came within less than 1,000 feet from colliding with a helicopter transiting the helicopter routes.

**ANSWER**: PSA lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29, and therefore denies the same.

14

30.    The National Transportation Safety Board ("NTSB") also identified 15,214 occurrences involving commercial airplanes and helicopters in the airspace surrounding DCA where there was a lateral separation distance of less than 1 nautical mile ("nm") and vertical separation of less than 400 feet between October 2021 and December 2024.  Among them were 85 events that involved lateral separation of less than 1,500 feet and/or vertical separation of less than 200 feet.

**ANSWER**: PSA admits that the NTSB Final Report speaks for itself, and denies any characterizations of the report except that it found no wrongdoing on the part of American, PSA, or the AE 5342 crew.  PSA denies all remaining allegations in Paragraph 30.

31.    All commercial passenger aircraft with over 30 seats are required by FAA regulation to be equipped with a Traffic Collision Avoidance System ("TCAS"), designed to provide automatic aural and/or visual alerts to pilots of dangerous proximity to and/or an impending collision with another aircraft. 14 C.F.R. § 121.356.

**ANSWER**: PSA admits that 14 C.F.R. § 121.356 speaks for itself and denies any characterizations of the same. PSA denies all remaining allegations in Paragraph 31.

32.    TCAS systems give two types of alerts: (1) Traffic Alerts ("TAs"), which are designed to alert pilots to aircraft that the system calculates will come within approximately 1.1 nm horizontally and 600 to 800 feet vertically of the aircraft, and (2) Resolution Advisories ("RAs"), which are designed to alert pilots to aircraft that will come even closer and direct pilots to take action to avoid those aircraft.

**ANSWER**: PSA admits that certain TCAS systems can give two types of alerts: Traffic Alerts (TAs), which involve an aural and visual cue when an aircraft is detected within a specified proximity of the aircraft on which TCAS is installed, and Resolution Advisories (RAs), which include proposed resolution instructions.  PSA admits that, according to NTSB Hearing Exhibit 9-AIR-G, TCAS can respond to aircraft in an area 0.2 to 1.1 nm laterally around, and 600 to 800 feet

above and below the pilot's aircraft, although the circumstances that may prompt an alert vary depending on a variety of factors. PSA further admits Figure 3 is depicted in NTSB Hearing Exhibit 9-AIR-G. PSA denies all remaining allegations in Paragraph 32 and Figure 3.



© 2025 Collins Aerospace. | This document does not contain any export-controlled technical data.

*Figure 3 – Depicting the TCAS TA (in purple) and RA (in green) alert envelopes*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

33.    TAs cause the system to issue an aural "TRAFFIC, TRAFFIC" alert and a yellow "TRAFFIC" notification on the cockpit's primary flight displays. (*See* Figure 4, below).

**ANSWER**: PSA admits that certain TAs involve an aural "traffic traffic" cue and may depict TRAFFIC in yellow text on a cockpit flight display. PSA admits that Figure 4 purports to be an "example," but does not admit that it is necessarily representative or accurate in all respects. PSA denies all remaining allegations in Paragraph 33 and Figure 4.



*Figure 4 – Example of how a TA appears to pilots on an aircraft primary flight display*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

34.     For a TA, the TCAS also visually depicts the other aircraft on another display screen (typically the multi-function displays or "MFDs") with a yellow dot indicating an aircraft for which a TA has issued and showing the other aircraft's relative location and relative altitude. (*See* Figure 5 below).

**ANSWER**: PSA admits that certain TCAS systems' TAs indicate other aircraft in the area on cockpit monitors.  PSA further admits that Figure 5 is depicted in NTSB Hearing Exhibit 9-AIR-G as an "example," but does not admit that it is necessarily representative or accurate in all respects, and further states that it has been altered to include the white rectangle and superimposed image and text depicted near the bottom of Figure 5.  PSA denies the remaining allegations in Paragraph 34 and Figure 5.



*Figure 5 - Showing an exemplar display of a TA on aircraft instruments*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

35.     Resolution Advisories ("RAs") cause the system to issue visual and aural alerts, including, an aural "TRAFFIC, TRAFFIC" alert and red "TRAFFIC" warning on the aircraft's primary flight displays. (*See* Figure 6, below).  The TCAS RA also aurally directs the flight crew to take a particular action (e.g., "DESCEND" or "INCREASE DESCENT") to avoid the traffic detected.

**ANSWER**: PSA admits that certain TCAS systems' RAs involve an aural "traffic traffic" cue, may depict a red TRAFFIC on a cockpit flight display, and may aurally recommend a particular action.  PSA admits that Figure 6 is depicted in NTSB Hearing Exhibit 9-AIR-G as an "example," but does not admit that it is necessarily representative or accurate in all respects. PSA denies all remaining allegations in Paragraph 35 and Figure 6.



*Figure 6 – Example of how an RA appears to pilots on an aircraft primary flight display*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

36.     For an RA, the TCAS also visually depicts the other aircraft on the MFDs with a red square indicating an aircraft for which an RA has issued and showing the other aircraft's relative location and relative altitude. (*See* Figure 7, below).  Pilots are generally required by the applicable flight manual to respond to a TCAS RA and follow the directions provided by the system.

**ANSWER**: PSA admits that certain TCAS systems' RAs may visually depict other aircraft in the area on cockpit monitors.  PSA further admits that Figure 7 is an "exemplar" depicted in NTSB Hearing Exhibit 9-AIR-G as an "example," but does not admit that it is necessarily representative or accurate in all respects, and further states it has been altered to include the white rectangle and superimposed image and text depicted near the bottom of Figure 7.  PSA lacks knowledge or information sufficient to form a belief as to how pilots are "generally" trained using

unspecified manuals, and therefore denies the same. PSA denies the remaining allegations in Paragraph 36 and Figure 7.



*Figure 7 - Showing an exemplar display of an RA on aircraft instruments*
(Source: TCAS Manufacturer Collins Aerospace through the NTSB)

37.    The design of the TCAS inhibits RAs when the aircraft is below 1000 feet above the ground where it is difficult to safely direct an airplane to avoid traffic without encountering another obstacle. This means that below 1000 feet above the ground, although the TCAS will aurally and visually alert the flight crew to "traffic" with a TA, it will not direct the flight crew to take a particular action to avoid the traffic as the TCAS does with an RA when the aircraft is more than 1000 feet above the ground.

**ANSWER**: PSA admits that according to NTSB Hearing Exhibit 9-AIR-G, certain TCAS systems may not offer RAs when an aircraft is at or below 1,000 feet (plus or minus 100 feet) above the ground, and in those circumstances, those TCAS systems may provide a TA. PSA

further admits that it may be difficult to safely maneuver when an aircraft is near the ground.  PSA denies all remaining allegations in Paragraph 37.

38. Under 1000 feet above the ground, such as when an aircraft is on final approach to landing and where most helicopters operate in the airspace around DCA, TAs provide the only TCAS safety notifications to a flight crew advising and/or warning that the system detects nearby conflicting traffic.

**ANSWER**: PSA admits that when an aircraft is at or below 1,000 feet (plus or minus 100 feet) above the ground, certain TCAS systems may provide a TA but not an RA.  PSA admits that an aircraft may be under 1,000 feet above the ground when they are on final approach to landing, and that some helicopters operate below 1,000 feet above the ground near DCA.  PSA denies all remaining allegations in Paragraph 38.

39. Under 400 feet above the ground, aural TAs are also inhibited, and the only TCAS alerts are the visual "TRAFFIC" textual alert on the primary flight displays and the depiction of the other aircraft's position as a yellow filled-in circle and relative altitude on the MFDs.

**ANSWER**: PSA admits that, according to NTSB Hearing Exhibit 9-AIR-G, some TCAS systems may not offer aural cues for TAs at or below 500 feet (plus or minus 100 feet) above the ground, but may continue to indicate traffic as admitted above in response to Paragraph 34.  PSA denies all remaining allegations in Paragraph 39.

40. Using information from voluntary safety reporting programs along with FAA data regarding encounters between helicopters and commercial aircraft near DCA, the NTSB found that at least one TCAS RA was triggered per month from 2011 to 2024 due to proximity to a helicopter.  In over half of these instances, the helicopter may have been above the published, mandatory helicopter route altitude restriction for that portion of the route that the helicopter was on. Two-thirds of the events occurred at night.

21

**ANSWER**: PSA admits that the NTSB Final Report speaks for itself, and denies any characterizations of the report except that it found no wrongdoing on the part of American, PSA, or the AE 5342 crew.  PSA denies all remaining allegations in Paragraph 40.

41.   Upon information and belief, American, PSA and the USA (by and through the FAA and U.S. Army) were on notice of the traffic issues surrounding DCA, including, but not limited to, the numerous near miss events, and that the airspace was heavily congested with both fixed and rotary wing aircraft.

**ANSWER**: PSA denies all allegations in Paragraph 41 to the extent they are directed at PSA.  To the extent allegations are directed at other defendants, PSA denies all allegations as to PSA that may be construed or inferred in Paragraph 41.

42.   The Performance Data Analysis and Reporting System ("PDARS") is an FAA system used to collect air traffic data to facilitate operational analysis to improve the function of the National Airspace System ("NAS"). The PDARS system consists of a dedicated network of computers located at FAA sites that use specialized software for collecting detailed air traffic management system data.

**ANSWER**: PSA admits that https://www.faa.gov/about/office_org/headquarters_

22

offices/ato/service_units/systemops/perf_analysis/perf_tools describes PDARS in part as an "FAA NAS System designed as an integrated performance measurement tool that facilitates operational analysis to improve the NAS," and states in part "[t]he system consists of a dedicated network of computers located at FAA sites that use specialized software for collecting detailed air traffic management system data." PSA denies all remaining allegations in Paragraph 42.

43.    Analysis of PDARS data for instances where commercial passenger aircraft arriving to or departing from DCA came within 500 feet vertically and 1000 feet horizontally of a helicopter transiting the area surrounding DCA showed "hotspots" at multiple locations along helicopter routes passing DCA from north-south (along the Potomac River), including particularly a hotspot indicating many encounters off the end of Runway 33. (*See* Figure 8, below).

**ANSWER**: PSA admits that, according to NTSB Hearing Exhibit 3-G, Figure 8 is an "Encounter Heat Map" depiction with PDARS data from a distance bin of "Arr\Dep 500'-1,000'," but states that Figure 8 speaks for itself and denies characterizations regarding the same. PSA denies all remaining allegations in Paragraph 43.



*Figure 8 – PDARS heatmap showing encounters between commercial passenger aircraft and helicopters in the airspace surrounding DCA*
(Source: FAA through NTSB)

## C.      Relationship Between American and PSA

44.      American is a large domestic and international airline that conducts flight operations throughout the world, including at DCA.  In addition, it conducts regional flights through smaller regional airlines that operate under the American Eagle brand name.

**ANSWER**: The allegations in Paragraph 44 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits that American is a domestic and international airline that conducts flight operations throughout the world, including at DCA.  PSA further admits that several regional carriers operate under the American Eagle brand name, but denies those flights are "conducted" by American.  PSA denies all remaining allegations in Paragraph 44.

45.      PSA is one of these smaller regional airlines and is a wholly owned subsidiary of American's parent company, American Airlines Group, Inc., which American uses to operate regional flights under the American Eagle brand name.

**ANSWER**: PSA admits that it is a wholly owned subsidiary of American Airlines Group, Inc., and is part of the American Eagle network, but denies that American "uses" PSA "to operate regional flights."  PSA further admits that American is a wholly owned subsidiary of American Airlines Group, Inc.  PSA denies all remaining allegations in Paragraph 45.

46.      American flights operated by PSA under the American Eagle brand are sold by American through its website separately or as part of an itinerary that combines American and American Eagle flights.  American advertises, markets, sells and issues tickets for flights operated by PSA as American flights.

24

**ANSWER**: PSA admits that American Eagle is a network of five regional carriers, and that travelers can book itineraries through American's website that may include both American and American Eagle flights.  PSA denies all remaining allegations in Paragraph 46.

47.    The flights PSA operates for American are regularly listed as American flights. Passengers are often unaware they purchased a ticket for an American Eagle flight operated by PSA and not a flight operated by American.

**ANSWER**: PSA denies the allegations in Paragraph 47.

48.    On January 29, 2025, American and PSA operated AE 5342 under the American Eagle brand name for the benefit of both, American and PSA.

**ANSWER**: PSA admits that on January 29, 2025, it operated AE 5342 under the American Eagle brand name.  PSA denies that American operated AE 5342. The remaining allegations in Paragraph 48 state a legal conclusion to which no response is required.  To the extent a response is required, PSA denies all remaining allegations in Paragraph 48.

49.    PSA operated AE 5342 in that it used the subject airplane for the purpose of transporting passengers with a right of legal control.

**ANSWER**: PSA admits that it operated AE 5342.  The remaining allegations in Paragraph 49 state a legal conclusion to which no response is required. To the extent a response is required, PSA denies all remaining allegations in Paragraph 49.

50.    American operated AE 5342 in that it caused PSA to use and/or authorized PSA to use the subject airplane for the purpose of transporting passengers including using the American Eagle brand name to specifically confer a right and benefit upon American as well as creating the public perception that AE 5342 was in fact a flight operated by American.

**ANSWER**: PSA denies the allegations in Paragraph 50.

51.     Pursuant to FAA Advisory Circular 120-12A, an entity is a common carrier when it holds itself out to the public as willing to transport individuals from one place to another for compensation.

**ANSWER**: The allegations contained in Paragraph 51 state legal conclusions to which no response is required.  To the extent a response is required, PSA states that FAA Advisory Circular 120-12A speaks for itself and denies any characterizations of the same.

52.     Under the law of the District of Columbia, a common carrier is an entity that offers public transportation for passengers.

**ANSWER**: The allegations contained in Paragraph 52 state legal conclusions to which no response is required.  To the extent a response is required, PSA denies all allegations in Paragraph 52.

53.     American was a common carrier for AE 5342.  It held itself out as offering to transport the passengers of AE 5342 from Wichita, Kansas to Washington, DC on January 29, 2025.

**ANSWER**: The allegations in Paragraph 53 are not directed to PSA.  To the extent they are construed as directed to PSA, the allegations contained in Paragraph 53 state legal conclusions to which no response is required.  To the extent a response is required, PSA denies all allegations in Paragraph 53.

54.     PSA was a common carrier for AE 5342.

**ANSWER**: The allegations contained in Paragraph 54 state legal conclusions to which no response is required.  To the extent a response is required, PSA denies all allegations in Paragraph 54.

55.     The aircraft used by PSA to operate AE 5342 as an American Eagle flight featured conspicuous American and/or American Eagle branding on it, including, but not limited to, the American and/or American Eagle logos.

**ANSWER**: PSA admits that the PSA aircraft operated as AE 5342 displayed American Eagle branding.  PSA denies all remaining allegations in Paragraph 55.

56.    The aircraft used by PSA to operate AE 5342 as an American Eagle flight was not conspicuously decorated with any PSA branding.

**ANSWER**: PSA denies all allegations in Paragraph 56.

57.    The ticketing area featured American Airlines branding, and ticketing agents employed by American provided services including checking bags and resolving ticketing issues for passengers of AE 5342 at the airport before going through security and wore American uniforms and/or American branded clothing.

**ANSWER**: PSA admits that the ticketing area featured American Airlines branding and otherwise denies the allegations in Paragraph 57.

58.    Gate agents employed by American wore American uniforms and/or American branded clothing, and serviced passengers on AE 5342, including by facilitating the boarding process.

**ANSWER**: PSA denies the allegations in Paragraph 58.

59.    The flight and cabin crew on AE 5342 wore American uniforms and/or American branded clothing that conspicuously featured American and/or American Eagle branding on them.

**ANSWER**: PSA admits the flight and cabin crew on AE 5342 wore American uniforms. PSA denies all remaining allegations in Paragraph 59.

60.    The flight and cabin crew on AE 5342 wore uniforms that did not conspicuously feature PSA branding on them.

**ANSWER**: PSA admits the allegations in Paragraph 60.

61.    The tickets for AE 5342 said American and/or American Eagle on them, even though they also stated that the flight is operated by PSA.

**ANSWER**: PSA admits the allegations in Paragraph 61.

62.     Passengers on board AE 5342 used services provided by American, including but not limited to checking into the flight using the American Airlines mobile phone application.

**ANSWER**: PSA denies that American provided transportation services to the passengers of AE 5342 but admits that, because passengers of AE 5342 were flying an American Eagle flight operated by an independent contractor, those passengers might use certain ancillary services like the American Airlines mobile phone application.  American denies all remaining allegations in Paragraph 62.

63.     Passengers on board AE 5324 would have earned miles for the flight as part of American's loyalty program, AAdvantage.

**ANSWER**: PSA admits the allegations in Paragraph 63 to the extent passengers on AE 5342 had AAdvantage accounts associated with their tickets.  PSA denies all remaining allegations in Paragraph 63.

64.     Based on all of the foregoing indicia that AE 5342 was an American flight, passengers who flew on AE 5342 reasonably believed, or would reasonably believe, that they were traveling on a flight operated by American and were unaware that they were traveling on a flight operated by PSA.

**ANSWER**: The allegations contained in Paragraph 64 state legal conclusions to which no response is required.  To the extent a response is required, PSA denies the allegations in Paragraph 64.

65.     Based on all the foregoing indicia that AE 5342 was an American flight, to the extent any passengers were aware of PSA's involvement in the operation of flight AE 5342, such passengers would have reasonably believed PSA operated flight AE 5342 on behalf of and at the direction of American.

**ANSWER**: The allegations contained in Paragraph 65 state legal conclusions to which no response is required.  To the extent a response is required, PSA denies the allegations in Paragraph 65.

66.     Passengers who flew on AE 5342 reasonably believed that American was responsible for the safe operation of AE 5342.

**ANSWER**: The allegations contained in Paragraph 66 state legal conclusions to which no response is required.  To the extent a response is required, PSA denies the allegations in Paragraph 66.

67.     Based on all the foregoing indicia that AE 5342 was an American flight, passengers who traveled on AE 5342 reasonably relied to their detriment that AE 5342 was an American flight.

**ANSWER**: The allegations contained in Paragraph 67 state legal conclusions to which no response is required.  To the extent a response is required, PSA denies the allegations in Paragraph 67.

68.     Based upon all the foregoing indicia that AE 5342 was an American flight, passengers who traveled on AE 5342 reasonably relied upon the impression created by American and/or PSA that the flight was being operated using the same safety standards as those used in a flight operated by American.

**ANSWER**: The allegations contained in Paragraph 68 state legal conclusions to which no response is required.  To the extent a response is required, PSA denies the allegations in Paragraph 68.

69.     Even if passengers traveling on AE 5342 were aware it was operated by PSA, they reasonably believed that PSA was acting on behalf of American in operating AE 5342 and that American was responsible for the safety of the flight.

29

**ANSWER**: The allegations contained in Paragraph 69 state legal conclusions to which no response is required.  To the extent a response is required, PSA denies the allegations in Paragraph 69.

**D.     American and PSA Operations at DCA**

70.     DCA is an important and profitable hub for American.

**ANSWER**: The allegations in Paragraph 70 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits that DCA is a hub for American and American Eagle flights, and denies all remaining allegations in Paragraph 70.

71.     American operates far more flights into and out of DCA than any other carrier, accounting for over 50% of flights and carrying over 25% of all passengers flying into and out of DCA.

**ANSWER**: The allegations in Paragraph 71 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 71.

72.     DCA is one of only five airports in the United States designated as a high-density traffic airport with a limited number of takeoffs and landings, as well as allocation of flight slots, due to the complex nature of air traffic in the area. 14 C.F.R. Subparts K and S; 14 C.F.R. § 93.123(a).

**ANSWER**: PSA admits that DCA is one of five airports in the United States designated as a high-density traffic airport under 14 C.F.R. § 93.123(a), and further admits that section, with exceptions, limits "the hourly number of allocated [Instrument Flight Rules] operations (takeoffs and landings) that may be reserved for the specified classes of users for" DCA.  PSA further admits that DCA uses flight slots under the supervision of the FAA and based on FAA's assignments. PSA denies all remaining allegations in Paragraph 72.

73.     Prior to this crash, American knew additional flights in and out of DCA would, and did, result in increased risk to safe flight operations.

**ANSWER**: The allegations in Paragraph 73 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 73.

74.     Despite this knowledge, American consistently accepted operations that would maintain and/or increase the number of American flights into DCA to maintain its market share.

**ANSWER**: The allegations in Paragraph 74 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 74.

75.     Because DCA is a high-density traffic airport, pursuant to 14 C.F.R. § 93.123, aircraft operations (takeoffs and arrivals) at DCA are restricted to a total of 60 per hour, and arrivals, when using the northbound Runway 1 and Runway 33 configuration, were limited to 36 per hour for each hour of the day (e.g., 8 a.m. to 9 a.m.) in visual meteorological conditions as existed at the time of the Subject mid-air collision.

**ANSWER**: PSA admits that DCA is designated as a high-density airport under 14 C.F.R. § 93.123(a), which, with exceptions, limits "the hourly number of allocated IFR operations (takeoffs and landings) that may be reserved for the specified classes of users for" DCA, and visual meteorological conditions prevailed at the time of the accident.  PSA denies all remaining allegations in Paragraph 75.

76.     To maximize the number of flights at in-demand times, American and PSA clustered more arrivals at DCA towards the end of one hour and the beginning of the next hour at peak travel times, allowing them to schedule more arrivals into a one-hour period across two different hours of the day (e.g., 8:30 a.m. to 9:30 a.m.), than are allowed in a single top to bottom one-hour period (e.g., 8:00 a.m. to 9:00 a.m.) by regulation and FAA policy.

**ANSWER**: To the extent the allegations in Paragraph 76 are directed to PSA, PSA denies the allegations in Paragraph 76.

31

77.     Upon information and belief, in 2023, air traffic controllers in the DC area asked their supervisors to reduce aircraft arrival rates into DCA because traffic was overloading controllers and reducing the safety margin.

**ANSWER**: PSA lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 77, and on that basis, denies same.

78.     As the Potomac TRACON ATC Manager stated:

there is a CFR, FAR, I'm not exactly sure which one it is.  I've seen it before, but you can only have I think it's 60 airplanes in an hour at DCA, right, as departures and arrivals. Have you heard about this? So what -- but in that document, it's by the hour, 8 to 9, 9 to 10, 9 to 10. So American, what do they do? They do -- everything happens from 8:30 to 9:30, 9:30 to 10:30. No one will stop them. So, I don't know how American has this much pull and how -- but it's a wink, wink, that people know what's going on.

*NTSB Interview Transcripts, Interview of Air Traffic Manager Potomac TRACON, p. 60:6-14.*

**ANSWER**: The allegations in Paragraph 78 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits that the cited NTSB Interview Transcript speaks for itself, and denies any characterizations of the same.  PSA denies the statements in the quotation and denies all remaining allegations in Paragraph 78.

79.     Upon information and belief, in 2023, the FAA contacted airlines, including American and advised them about the traffic overload and the request by DCA ATC to reduce aircraft arrival rates.  Rather than simply reducing arrival rates to alleviate the strain on controllers, the airlines, including American, offered and/or agreed that they and their subsidiaries and/or entities that operated American-branded aircraft, would increase their use of landings on Runway 33 during northbound operations and to train their pilots to use Runway 33 more often as a way to maintain traffic flow without needing to reduce the arrival rate at DCA.

**ANSWER**: The allegations in Paragraph 79 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 79.

32

80.    Despite the airlines' agreement to increase operations on Runway 33, as detailed below, the airlines did not provide their pilots with any specific training or information concerning the helicopter routes in the DCA airspace, specifically including the fact that Helicopter Route 4 intersects the approach path to Runway 33.

**ANSWER**: PSA denies the allegations in Paragraph 80.

81.    Prior to and on January 29, 2025, as airlines that regularly operated flights into DCA, American and PSA were, or should have been, aware of the published helicopter routes in the vicinity of DCA, particularly near the approach to Runway 33.

**ANSWER**: To the extent the allegations in Paragraph 81 are directed to PSA, PSA admits that prior to and on January 29, 2025, it regularly operated flights into and from DCA and that, to the extent that they are published, it has awareness of helicopter routes in the vicinity of DCA and the other airports it flies into across the country.  That is irrelevant here, however, because, while Flight 5342 was within the established glidepath for landing at Runway 33, PAT25 was not within any published helicopter route at the time of the collision.  PSA denies all remaining allegations in Paragraph 81.

82.    Prior to and on January 29, 2025, as airlines that regularly operated flights into and from DCA, American and PSA knew or should have known of numerous occurrences involving commercial airplanes and helicopters in the area around DCA in which there was lateral separation distance of less than 1 nm and vertical separation of less than 400 feet, and numerous other encounters classified as near midair, near collision or near miss events.

**ANSWER**: To the extent the allegations in Paragraph 82 are directed to PSA, PSA admits that prior to and on January 29, 2025, it regularly operated flights into and from DCA.  PSA denies all remaining allegations in Paragraph 82.

83.    Prior to and on January 29, 2025, as airlines that regularly operated flights into and from DCA, American and PSA knew or should have known of occurrences involving commercial

33

airplanes and helicopters in the area around DCA in which there was lateral separation of less than 1,500 feet and vertical separation of less than 200 feet.

**ANSWER**: To the extent the allegations in Paragraph 83 are directed to PSA, PSA admits that prior to and on January 29, 2025, it regularly operated flights into and from DCA.  PSA denies all remaining allegations in Paragraph 83.

84.    Analysis of publicly available data by CBS news revealed that PSA flights operated by PSA for American, in particular, experienced more "near miss" events where they came within 500 feet of helicopters in the airspace surrounding DCA than any other airline – as many as four a week in a single 52-month period leading up to the Subject Crash.

**ANSWER**: To the extent the allegations in Paragraph 84 are directed to PSA, PSA admits that the video available as of this Answer at the link referenced in Paragraph 84 is a video attributed to CBS news and the video speaks for itself. PSA denies any characterizations of the same.  PSA lacks knowledge or information sufficient to form a belief as to how any statistics or data were calculated or whether they are accurate, and therefore denies the same.  PSA denies all remaining allegations in Paragraph 84.

85.    Prior to and on January 29, 2025, as airlines that regularly operated flights into and from DCA, American and PSA knew or should have known of regular occurrences of TCAS alerts (RAs and/or TAs) in its own aircraft in the area surrounding DCA due to their aircraft's proximity to a helicopter between 2011 and 2024.

**ANSWER**: To the extent the allegations in Paragraph 85 are directed to PSA, PSA admits that prior to and on January 29, 2025, it regularly operated flights into and from DCA.  PSA denies all remaining allegations in Paragraph 85.

86.    Upon information and belief, prior to and on January 29, 2025, American's own pilots and/or their union, the Allied Pilots' Association ("APA"), had informed American of the

34

risks associated with the complex approaches to DCA, including the risks posed by helicopter traffic transiting the airspace surrounding DCA.

**ANSWER**: The allegations in Paragraph 86 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 86.

87.     Upon information and belief, prior to January 29, 2025, PSA's own pilots and/or their union, the Air Line Pilots' Association ("ALPA"), had informed PSA of the risks associated with the complex approaches to DCA, including the risks posed by helicopter traffic transiting the airspace surrounding DCA.

**ANSWER**: PSA admits that PSA was aware of instances of helicopter traffic in the airspace surrounding DCA but denies that it was aware of special or elevated "risks" associated with flights into DCA as compared to other airports into which PSA flies.  PSA denies all remaining allegations in Paragraph 87.

88.     Prior to January 29, 2025, American and PSA had the ability to monitor both publicly available and internal data regarding near misses and near collision events in the airspace surrounding DCA, and should have monitored and analyzed the data, which would have revealed the unreasonable and unacceptable risk to flight safety during certain operations and circumstances, including circling to land on Runway 33.

**ANSWER**: To the extent the allegations in Paragraph 88 are directed to PSA, PSA admits that it had access to ASIAS data, like every other air carrier, as well as internal data, that shows near mid-air collision events as defined by the FAA in the airspace surrounding DCA. PSA denies all remaining allegations in Paragraph 88.

89.     Prior to January 29, 2025, American and PSA's own monitoring and analysis of the data regarding near misses and near collision events in the airspace surrounding DCA should have revealed or did reveal multiple near miss events involving aircraft approaching DCA for landing and helicopters traveling along helicopter routes in the airspace surrounding DCA.

35

**ANSWER**: To the extent the allegations in Paragraph 89 are directed to PSA, PSA denies them, and denies all remaining allegations in Paragraph 89.

90.    PSA designated only TCAS RAs as events for which an operation report had to be submitted to the airline, and did not require their flight crews to report TCAS TAs.

**ANSWER**: PSA admits that PSA requires an operation report to be filed when a TCAS RA has occurred, as well as when other events occur, and admits that PSA does not require an operation report to be filed solely because a TCAS TA has occurred.  PSA denies the remaining allegations in Paragraph 90 and footnote 2.

91.    As a result, despite that PSA had the obligation to provide the highest level of safety to its passengers, PSA failed to systematically collect and analyze information relating to TCAS alerts below 1000 feet, when an aircraft is in the critical landing phase, as TCAS RAs are, by design, inhibited at those altitudes.

**ANSWER**: The allegations in Paragraph 91 state a legal conclusion to which no response is required.  To the extent a response is required, PSA denies the allegations in Paragraph 91.

92.    As a result, PSA's systems did not provide for any reporting and/or tracking of instances where the only potentially available TCAS alert, a TA, activated below 1000 feet of altitude, as occurred at DCA when AE 5342 encountered the subject helicopter prior to this mid-air collision.

**ANSWER**: The allegations in Paragraph 92 state a legal conclusion to which no response is required.  To the extent a response is required, PSA denies the allegations in Paragraph 92.

93.    As a result, PSA failed to identify, process and account for safety risks posed by its aircraft coming into close proximity with helicopters traveling on published helicopter routes below 1000 feet in the airspace surrounding DCA.

**ANSWER**: The allegations in Paragraph 93 state a legal conclusion to which no response is required.  To the extent a response is required, PSA denies the allegations in Paragraph 93.

94.     Despite the information available and/or known to PSA and American, neither PSA nor American warned, or even informed, PSA pilots of the presence of the heavily-traveled, published helicopter routes surrounding DCA, including, most critically, Helicopter Route 4.

**ANSWER**: To the extent the allegations in Paragraph 94 are directed to PSA, PSA denies that PSA pilots were not warned or informed regarding the presence of helicopters and other traffic in the DCA airspace, and denies all remaining allegations in Paragraph 94.

95.     Despite the information available and/or known to PSA and American, neither PSA nor American provided PSA pilots with training, or even informed flight crews, on the precise location of the heavily-traveled, published helicopter routes in the airspace surrounding DCA.

**ANSWER**: To the extent the allegations in Paragraph 95 are directed to PSA, PSA denies that PSA pilots were not warned or informed regarding the presence of helicopters and other traffic in the DCA airspace, and denies all remaining allegations in Paragraph 95.

96.     PSA also provided additional training, information and/or documentation to its pilots concerning DCA.  None of the documents, information, or training materials that PSA provided to its pilots relating to DCA, however, included information related to the published helicopter routes that passed close to DCA, including Helicopter Routes 1 and 4, the existence of any helicopter routes operating near DCA runways, and/or the pervasiveness of helicopter operations in DCA airspace.

**ANSWER**: PSA admits that the documents, information, and training materials that PSA provided to its pilots speak for themselves, denies all characterizations of the same, and denies all remaining allegations in Paragraph 96.

97.     The airport special qualification charts PSA provided to its pilots relating to DCA, including but not limited to 19-1 through 19-8 airport qualification charts, did not include any reference to or warning of the presence of helicopter traffic or published helicopter routes in the

area surrounding the airport. This is especially egregious since Helicopter Route 4 directly intersects the final approach path to Runway 33.

**ANSWER**: PSA admits that the airport special qualification charts PSA provided to its pilots speak for themselves, denies all characterizations of the same, and denies all remaining allegations in Paragraph 97.

98.    Despite the information available and/or known to PSA and American, PSA did not train or inform its pilots in any way relating to the published helicopter routes in the airspace surrounding DCA, including, most critically, Helicopter Route 4.

**ANSWER**: PSA denies the allegations in Paragraph 98.

99.    The airport charts and information PSA provided to its pilots relating to DCA, including but not limited to 10-7 airport information pages, 10-9 airport diagram, and/or 11-1 instrument approach procedure, did not include any reference to or warning of the presence of helicopter traffic or the published helicopter routes in the area surrounding the airport.

**ANSWER**: PSA admits that the airport charts and information PSA provided to its pilots speaks for itself, denies all characterizations of the same, and denies all remaining allegations in Paragraph 99.

100.    In contrast, PSA provided its pilots with documentation that alerted its pilots of the risk of encountering military and civilian air traffic, including but not limited to helicopter traffic, on approach and/or landing at numerous other airports around the country, but did not make similar warnings relating to helicopter traffic surrounding DCA notwithstanding that DCA has perhaps the most extensive helicopter traffic near any airport in the United States.

**ANSWER**: PSA admits that it provided its pilots with documentation, sourced from FAA Chart Supplement Data, that alerted its pilots of the risk of encountering military and civilian air traffic in the vicinity of numerous airports, including DCA. PSA further admits that PSA's ops advisory page for DCA did not specifically refer to military helicopters in the vicinity of the

airport, based on the fact that the FAA Chart Supplement source also did not specifically refer to military helicopters in the vicinity of the airport, while its ops advisory page for certain other airports did refer to military helicopters in the vicinity of the airport, again derived from the FAA Chart Supplement source.  PSA denies that it did not provide its pilots with documentation that alerted its pilots of the risk of encountering military and civilian air traffic, including but not limited to helicopter traffic, in the vicinity of DCA, and denies all remaining allegations in Paragraph 100.

101.    Two of four DCA-based PSA pilots interviewed by the NTSB said they were unaware that there were published helicopter routes at all, while another said he was aware that there were published routes, but did not know their lateral or vertical boundaries.  The only PSA pilot interviewed by the NTSB who was knowledgeable regarding the published helicopter routes happened to be a former military helicopter pilot in the DC region and his knowledge of the helicopter routes came from his prior military experience, not PSA.

**ANSWER**: PSA admits the NTSB Final Report speaks for itself, but denies all characterizations of the report except that it found no wrongdoing on the part of American, PSA, or the AE 5342 crew.  PSA denies all remaining allegations in Paragraph 101.

102.    Typically, when selecting an approach procedure to land on an airport runway, a straight-in approach, like the Mount Vernon visual approach to Runway 1, is desirable because, for the pilots flying the route, it is less demanding, more stable, and with minimal maneuvering, all of which reduces the risk to flight safety.

**ANSWER**: PSA denies the allegations in Paragraph 102.

103.    A circling approach, like the approach for Runway 33, means that an aircraft's flight crew deviates from the standard straight-in approach to one runway and turns, navigating visually, to line up and land on a different runway.

**ANSWER**: PSA denies the allegations in Paragraph 103.

104.    A circling approach significantly increases pilot workload, thereby reducing the margin for safety.

**ANSWER**: PSA denies the allegations in Paragraph 104.

105.    A circling approach is often used when landing on the straight-in approach runway is not possible or desirable for some reason, such as wind direction, weather conditions, or when the runway is closed for maintenance or otherwise.

**ANSWER**: PSA denies the allegations in Paragraph 105.

106.    In effect, the circling approach allows the aircraft to conduct a safe, straight-in approach to the airport using a route aligned with a more commonly used runaway (often one equipped with navigational aids like an instrument landing system ("ILS")) but then requires maneuvering to another runway for the actual landing, significantly increasing pilot workload.

**ANSWER**: PSA denies the allegations in Paragraph 106.

107.    According to the FAA, "[c]ircling approaches are one of the most challenging flight maneuvers conducted in the National Airspace System, especially for pilots of … turbine-powered, transport category airplanes", which includes CRJ700s, like AE 5342.  This is because circling approaches "are conducted at low altitude, day and night, and often with precipitation present affecting visibility, depth perception, and the ability to adequately assess the descent profile to the landing runway."

**ANSWER**: PSA admits that FAA-H-8083-16B, Instrument Procedures Handbook, Federal Aviation Administration, ch. 4, Approaches, at 4-8 (Sept. 14, 2017) speaks for itself in describing "circling approaches," but denies any characterizations of the same, and denies the assertions therein are relevant to Plaintiffs' claims.  PSA further admits that the CRJ700 is a turbine-powered, transport category airplane, and that the flight operated as AE 5342 was in a CRJ700.  PSA denies all remaining allegations in Paragraph 107.

108.    Air carriers are responsible for establishing their own policies and procedures defining the circumstances when its pilots may accept a circling approach.

**ANSWER**: PSA admits that air carriers can establish their own policies and procedures, including policies and procedures defining the circumstances in which pilots may accept a circling approach, but any such policies and procedures must be consistent with FAA regulations and other federal law, and air carrier manuals must be specifically approved by the FAA.  PSA denies all remaining allegations in Paragraph 108.

109.    Upon information and belief, for the reasons stated above, some airlines restrict their pilots from executing circling approaches under certain conditions, including night landings, marginal weather conditions, challenging airports and/or in high density airspace.

**ANSWER**: PSA lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109, and therefore denies the same.

110.    Upon information and belief, prior to January 29, 2025, other air carriers operating at DCA prohibited their pilots from accepting circling approaches into DCA at night.

**ANSWER**: PSA lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 110, and therefore denies the same.

111.    The charts, information, policies and procedures concerning DCA that PSA provided to pilots did not restrict circling approaches to Runway 33 under any conditions. The materials did, however, vest in their flight crews discretion as to whether to accept a circling approach to Runway 33, and further, required pilots to pre-brief the visual, circling approach procedure to land on Runway 33 before accepting an ATC request to land on Runway 33.

**ANSWER**: PSA admits that PSA policy allowed pilots to exercise their discretion, within applicable FAA regulations, as to whether to accept a circling approach to Runway 33 when asked to do so by air traffic control, but denies all remaining allegations in Paragraph 111.

112.    For instance, the written guidance PSA provided to its pilots on preparing to land on Runway 1 using the Mount Vernon visual approach procedure (which was the approach initially assigned to AE 5342 on the night of the collision) specifically instructed pilots to "[c]onsider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the maneuver," and states that "[l]ast minute runway or approach changes should only be accepted if pre-briefed." (*See* Figure 9 below).

ANSWER: PSA admits that TRACON assigned AE 5342 to Runway 1 using the Mount Vernon visual approach, although DCA air traffic control subsequently reassigned AE 5342.  PSA further admits that Figure 9 is an excerpt of NTSB Hearing Exhibit 2-AIR-A that has been edited to overlay a red rectangle over a particulars section of text, which speaks for itself.  PSA denies any characterizations of that text and denies all remaining allegations in Paragraph 112 and Figure 9.

**MT Vernon Visual Runway 01**

**FMS Setup:**

1. Select ILS 01 or LOC 01, as available, from the FMS database.
2. If arriving via the CAPSS STAR, move the KATRN waypoint from the ILS 01 up to the KATRN STAR waypoint to clear the discontinuity.
3. Verify "PLVIA" is in the FIX page with a 1 nm ring.
4. Select the appropriate minimums for the ILS/LOC 01 approach on the MDA selector.
5. Brief the ILS/LOC 01, MTV 01, and what actions the PM will take during a go around.
6. Select the ILS/LOC 01 missed approach altitude on the flight control panel upon glideslope intercept.

**Flight deck Setup:**

1. Brief the ILS 01 and MTV Runway 01 approach.

   **Note:** Briefing both approaches verifies flight deck setup and allows flexibility to switch to the ILS if needed.

2. Consider also briefing the approach to runway 33 and agreeing on what conditions you will accept a clearance for the maneuver.

   **Note:** Last minute runway or approach changes should only be accepted if pre-briefed.

**Flying the Procedure:**

1. Intercept and track the runway 01 LOC and/or GS inbound.
2. Approaching BADDN, maneuver to the center of the Potomac River as depicted on the Jeppesen 19-1 and follow the river to the airport.
3. In the event of an abandoned approach or go-around, continue toward the runway then northwest over the Potomac River. The pilot monitoring will advise ATC, then set the heading bug to 331° and altitude selector to 1,600' until other instructions can be received.

**Caution:** Do not enter P-56A and use caution for departing aircraft.

*Figure 9 – PSA Airlines Notes on the Mount Vernon Visual Approach to Runway 1 at DCA*
(Source: NTSB)

113.    PSA did not have any policies or procedures, nor any other guidance, addressing the factors flight crews should consider when deciding whether to accept a circling approach to Runway 33 at DCA, including, but not limited to, a reference to helicopter traffic, whether a helicopter was transiting Helicopter Route 4 at the time the decision is made to accept or reject a landing on Runway 33, or the risks of a circling approach in nighttime conditions.

**ANSWER**: PSA denies the allegations in Paragraph 113.

114.    On January 29, 2025, despite what it knew or should have known regarding near misses surrounding DCA, PSA lacked policies and procedures containing any rule and/or policy to mitigate the risks of near miss events associated with helicopter traffic around DCA, including

but not limited to, prohibiting its aircraft from executing a circling approach at DCA in nighttime conditions with helicopter traffic in the area.

**ANSWER**: PSA denies the allegations in Paragraph 114.

115.    PSA could have and, in the interest of flight safety, should have adopted policies and/or procedures that prohibited performing a circling approach when flying into DCA at night and/or when there was helicopter traffic operating on Helicopter Route 4, but it failed to do so.

**ANSWER**: The allegations in Paragraph 115 are legal conclusions requiring no response. To the extent a response is required, PSA denies the allegations in Paragraph 115.

116.    American, which booked and sold PSA flights as American flights operated under its American Eagle brand, could and should have required PSA to establish policies and/or procedures that prohibited a circling approach when flying into DCA at night and/or when there was helicopter traffic operating on Helicopter Route 4, but it failed to do so.

**ANSWER**: PSA admits that travelers can book American Eagle flights operated by PSA through American's website.  PSA denies all remaining allegations in Paragraph 116.

117.    The flying public, including DECEDENT, when purchasing American flights, could (and did) rightfully expect that all flights would be operated with the same and highest level of safety whether operated by American directly or by PSA as an American flight under the American Eagle brand name.

**ANSWER**: The allegations in Paragraph 117 state legal conclusions to which no response is required.  To the extent a response is required, PSA admits flights operated by American and flights operated under the American Eagle brand name are operated according to the same high standard of safety established by federal law.  PSA denies all remaining allegations in Paragraph 117.

**E.    DCA Air Traffic Control**

118.    The DCA tower had numerous positions to which air traffic controllers would be assigned to staff during each shift.  Pursuant to the Standard Operating Procedures ("SOP") for the DCA tower contained in FAA Order 7110.2L, effective 6/1/2024, these positions included:

a.    Local Control ("LC") position, whose responsibilities included, but were not limited to, separating arrivals and departures, and initiating corrective action when it was apparent that a loss of separation may occur;

b.    Assistant Local Controller ("ALC"), whose responsibilities included, but were not limited to alerting the LC of any unusual situations or traffic conflicts, maintaining surveillance of the local traffic pattern, assisting the LC with monitoring aircraft on final approach using the tower radar displays, and assisting with all other local controller duties, including but not limited to, being an extra set of eyes to maintain traffic separation and to identify converging traffic based on visual and/or radar observations and/or conflict alert notifications;

c.    Helicopter Control ("HC") position, whose responsibilities included, but were not limited to, separating Visual Flight Rules ("VFR") helicopter traffic from arrivals and departures, and clearing VFR helicopters on routes depicted in the published helicopter routes; and

d.    Operational    Supervisor/Controller-in-Charge    ("OS/CIC"),    whose responsibilities included, but were not limited to, providing operational supervision, and combining and de-combining positions following a process set forth in the SOP.

**ANSWER**: The allegations in Paragraph 118 are not directed to PSA. To the extent they are construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 118.

119.    The DCA tower SOP also required that the LC and HC positions normally be separate (i.e., de-combined) from Monday-Friday 1000-2130 local (10:00 a.m. to 9:30 p.m.). This provided that two air traffic controllers would be working to ensure airplanes and helicopters remain separated during peak traffic hours.

**ANSWER**: The allegations in Paragraph 119 are not directed to PSA. To the extent they are construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 119.

120.    After the crash, FAA air traffic control managers at DCA tower admitted that the LC and HC positions in the DCA tower were combined more often than they were de-combined, despite the SOP requirement that they normally be de-combined for the vast majority of DCA's operating hours.

**ANSWER**: The allegations in Paragraph 120 are not directed to PSA. To the extent they are construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 120.

121.    Numerous aviation entities and operators that frequently operated in DCA airspace also have Letters of Agreement ("LOAs") with the DCA tower outlining more specific procedures for their interactions with the DCA tower, including the United States Army 12th Aviation Battalion based at Davison Army Airfield.

**ANSWER**: The allegations in Paragraph 121 are not directed to PSA. To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 121.

46

F.    **United States Army Helicopter Operations**

122.    The 12ᵗʰ Aviation Battalion's LOA with the DCA tower stated that the "Routes and altitudes described in the Baltimore-Washington Helicopter Route Chart must apply unless otherwise authorized by ATC."

**ANSWER**: The allegations in Paragraph 122 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 122.

123.    The 12ᵗʰ Aviation Battalion's LOA with the DCA tower further stated that the DCA tower would, if appropriate, "issue clearances to helicopters to conduct flight via routes and zones described in the Baltimore-Washington Helicopter Route Chart."

**ANSWER**: The allegations in Paragraph 123 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 123.

124.    Despite its LOA and other requirements to abide by the maximum published altitudes set forth in the helicopter route charts, the United States Army admitted to NTSB investigators after the crash that their pilots were only required to maintain their altitude +/- 100 feet, meaning that an Army helicopter pilot would be within the Army's standard for maintaining a 200 feet altitude restriction even up to 300 feet.

**ANSWER**: The allegations in Paragraph 124 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA states that the testimony before the NTSB speaks for itself, but admits the allegations in Paragraph 124.

125.    This altitude deviation, however, in combination with the failure to maintain the charted path of Helicopter Route 4 over the east bank of the Potomac River and the failure to see and avoid the CRJ resulted in tragic consequences.

**ANSWER**: The allegations in Paragraph 125 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits that PAT25's failure to see and avoid AE 5342 resulted in tragic consequences.

47

126.    The Army and its 12th Aviation Battalion were also aware that their UH-60L helicopters, including the subject helicopter, were equipped with barometric altimeters that had a significant margin of error.

**ANSWER**: The allegations in Paragraph 126 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies that it was aware of these altimeter errors and denies the remaining allegations in Paragraph 126 and footnote 3.

127.    The Army and 12th Aviation Battalion conducted risk assessments before each mission but did not take into account commercial traffic at DCA, or whether Runway 33 would be in use when assessing risk for missions utilizing the published helicopter routes near DCA.

**ANSWER**: The allegations in Paragraph 127 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies that it was aware of the Army's practices and denies the remaining allegations in Paragraph 127.

128.    The Army and its 12th Aviation Battalion's helicopters almost never broadcast Automatic Dependent Surveillance Broadcast (ADS-B) out during their flights, including on routine training missions.  ADS-B is an aviation surveillance technology where an aircraft will broadcast its position and other data enabling it to be tracked by other aircraft.  ADS-B is an important technology in helping pilots avoid mid-air collisions.

**ANSWER**: The allegations in Paragraph 128 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies that it had awareness of the Army's practices and denies the remaining allegations in Paragraph 128.

129.    Despite routinely operating near DCA, including being one of the most frequent users of Helicopter Route 4, the Army and its 12th Aviation Battalion did not train or familiarize its pilots with the commercial flight approach paths into DCA nor with the approach to Runway 33.

**ANSWER**: The allegations in Paragraph 129 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits that several 12th Battalion pilots testified to their

familiarity regarding the circling approach to Runway 33, but otherwise lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 129, so denies the same.

130.    The 12th Aviation Battalion was on notice of near miss events between its Black Hawk helicopters and aircraft traffic transiting in and around Helicopter Routes 1 and 4.  For example, in 2017, a safety report involving a near miss between two 12th Aviation Battalion helicopters was filed and, in 2021, a member of the local Helicopter Working Group met with the FAA and the Battalion Commander to discuss near miss events involving 12th Aviation Battalion helicopters.

**ANSWER**: The allegations in Paragraph 130 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 130.

131.    The 12th Aviation Battalion was also on notice of near miss events involving its helicopters flying underneath other aircraft on approach to DCA.

**ANSWER**: The allegations in Paragraph 131 are not directed to PSA.  To the extent they are construed as directed to PSA, denies any and all allegations as to PSA that may be construed or inferred in Paragraph 131.

**G.    The Subject Flights**

132.    On January 29, 2025, a CRJ700 aircraft registered with the FAA as N709PS and operating as AE 5342 (sometimes referred to as "the subject airplane" herein) departed Wichita Dwight D. Eisenhower National Airport (ICT) at approximately 5:39 p.m. local time (6:39 p.m. Eastern Standard Time) bound for DCA.

**ANSWER**: PSA admits the allegations in Paragraph 132.

133.    There were 64 people on board AE 5342, consisting of 60 passengers and four crew members.

**ANSWER**: PSA admits the allegations in Paragraph 133.

134.    The subject airplane was equipped with TCAS to provide automatic aural and visual alerts to the crew of AE 5342 of dangerous proximity to and/or an impending collision with another aircraft, consisting of aural and visual TAs and RAs above 1000 feet AGL, only aural and visual TAs below 1000 feet AGL, and only visual TAs below approximately 400 feet.

**ANSWER**: PSA admits that AE 5342 was equipped with a TCAS system.  PSA denies all remaining allegations in Paragraph 134.

135.    The subject airplane was also equipped with a number of lights that were illuminated for landing, including landing lights, taxi/recognition lights, white and red anticollision lights, logo lights, navigation lights, and wing inspection lights.

**ANSWER**: PSA admits the allegations in Paragraph 135.

136.    On January 29, 2025, at approximately 6:45 p.m. local time, a U.S. Army 12th Aviation Battalion UH-60L Black Hawk helicopter designated as PAT25 (hereinafter referred to as "PAT25" or "the subject helicopter") departed Davison Army Airfield ("DAA") in Fort Belvoir, Virginia.  The helicopter filed a visual flight rules flight plan with DAA base operations.  The flight was a combined annual and Night Vision Goggle ("NVG") proficiency check ride for one of the pilots and the crew is believed to have been wearing NVGs throughout the flight.  In essence, this was a training flight.

**ANSWER**: The allegations in Paragraph 136 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 136 and footnote 4.

137.    At about 8:10 p.m., the cockpit voice recorder ("CVR") on board AE 5342 first captures the pilots' discussion of what approach procedure they would be assigned by air traffic control for landing at DCA.  The captain asked the first officer if they would be flying the ILS approach or the Mount Vernon visual approach, and the first officer confirmed "it's gonna be the Mount Vernon."

**ANSWER**: PSA admits that the NTSB CVR transcript speaks for itself, denies all characterizations of the same, and denies all remaining allegations in Paragraph 137 and footnote 5.

138.    The captain then responded, "Mount Vernon backed up by the uh ILS[.]  I'm not making the left [expletive deleted] turn."  Upon information and belief, the captain's reference to the "left [expletive deleted] turn" was a reference to the circling approach used to land on Runway 33.

**ANSWER**: PSA admits that the NTSB CVR transcript speaks for itself, denies all characterizations of the same, and denies all remaining allegations in Paragraph 138.

139.    Despite indicating that they would likely fly the Mount Vernon visual approach to Runway 1 at DCA, the captain briefed only the ILS approach to Runway 1 beginning at 8:10:22 p.m., as captured on the CVR:

AE 5342 Cpt: "um we got uhhh I-L-S runway one

AE 5342 Cpt: "* seventeen February twenty three effective twenty three of February eleven dash one localizer one oh nine nine zero zero seven sixteen hundred M-S-A around the D-C-A V-O-R is twenty six hundred all quadrants missed approach climb four twenty climbing left turn to ** outbound D-C-A V-O-R radial three twenty Georgetown N-D-B D-M-E five point nine DC and hold. highest obstacle * * * forty nine altitude PAPI on the right twenty two hundred is missed approach two twenty eighteen hundred half statute mile visibility uhhhh we got seven thousand one hundred and sixty nine feet of runway available left turn novemberrrr [sic] one into the ramp no specials any questions."

AE 5342 FO: "no questions."

*Cockpit Voice Recorder (Airplane) Factual Report, NTSB, at p. 31 of 61.*

**ANSWER**: PSA admits that the NTSB CVR transcript speaks for itself, denies all characterizations of the same, and denies all remaining allegations in Paragraph 139.

51

140. The entire approach brief was only 33 seconds and failed to address either the Mount Vernon visual approach to Runway 1, or the circling approach to Runway 33.

**ANSWER**: PSA denies the allegations in Paragraph 140.

141. At no point did the pilots of AE 5342 brief the Mount Vernon visual approach to Runway 1, which the pilots of AE 5342 eventually accepted.

**ANSWER**: PSA denies the allegations in Paragraph 141.

142. At no point did the pilots of AE 5342 brief the circling approach to Runway 33, which is required by PSA policies and procedures to later accept such an approach, as they did on the night of the collision.

**ANSWER**: PSA denies the allegations in Paragraph 142.

143. After maneuvering near Laytonsville, Maryland, PAT25 began travelling generally southbound at or about 8:30 p.m. At or about 8:33 p.m., PAT25 requested clearance from the DCA tower for Helicopter Route 1 to Route 4 and the DCA tower controller issued the clearance.

**ANSWER**: The allegations in Paragraph 143 are not directed to PSA. To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 143.

144. The controller's authorization to PAT25 did not state any restrictions – the clearance only stated that PAT25 was cleared to the helicopter routes, which had published flight paths and maximum altitudes. Thus, the subject helicopter was required to abide by the course and altitude restrictions set forth in the applicable helicopter route chart and to see and avoid all traffic on the routes.

**ANSWER**: The allegations in Paragraph 144 are not directed to PSA. To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 144.

145. The DCA tower LC and HC positions, contrary to DCA SOPs, had been improperly combined since 15:40 (3:40 p.m.) on January 29, 2025, and were therefore being worked by one air traffic controller when PAT25 checked in and at all relevant times herein.

52

**ANSWER**: The allegations in Paragraph 145 are not directed to PSA. To the extent they are construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 145.

146. PAT25 was equipped to broadcast ADS-B out but was not broadcasting ADS-B at any time during the flight.

**ANSWER**: The allegations in Paragraph 146 are not directed to PSA. To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 146.

147. At approximately 8:39:10 p.m., Potomac air traffic control cleared AE 5342 for the Mount Vernon visual approach to Runway 1 at DCA.

**ANSWER**: PSA admits the allegations in Paragraph 147.

148. At approximately 8:39:14 p.m., the pilots of AE 5342 acknowledged and accepted the Mount Vernon visual approach to Runway 1 at DCA without any further discussion, despite not having briefed the Mount Vernon visual approach, nor having considered or briefed the circling approach to Runway 33 as required by PSA policy and procedure if they were going to later accept the Runway 33 approach.

**ANSWER**: PSA admits that at approximately 8:39:14 p.m., the pilots of AE 5342 acknowledged and accepted the Mount Vernon visual approach to Runway 1 at DCA. PSA denies all remaining allegations in Paragraph 148.

149. At approximately 8:43:06 p.m., AE 5342 was flying the well-established straight-in Mount Vernon visual approach to Runway 1 when ATC at the DCA tower asked if AE 5342 could accept a switch to land on Runway 33 instead.

**ANSWER**: PSA admits that NTSB Hearing Exhibit 12-AIR-A states that at approximately 20:43:09, Washington ATC radioed "Bluestreak fifty three forty two Washington Tower winds are three two zero at one seven gusts two five can you take runway three three?", conveying that the wind was favorable for a landing on Runway 33 and asking if AE 5342 would accept a Runway

33 approach. PSA denies all remaining characterizations of the same and allegations in Paragraph 149.

150. Approaching to land on Runway 33 would require AE 5342 to bank/turn right over the Eastern shore of the Potomac River and then to bank/turn left back West/Northwest to line up with the centerline of Runway 33 and cross over the Potomac River to land.

**ANSWER**: PSA admits that landing on Runway 33 required AE 5342 to execute the well-established circling approach to Runway 33, but denies all characterizations regarding the same and all remaining allegations in Paragraph 150.

151. As referenced above, PSA did not prohibit its flight crews from accepting a circling approach to land on Runway 33 at DCA, and it allowed pilots to decide for themselves whether to accept such an approach if offered by ATC. Despite allowing its pilots to make this decision, PSA provided no training or guidance to pilots on when to accept a circling approach to Runway 33 at DCA, or criteria to use when considering whether to accept a Runway 33 approach. PSA, however, required flight crews to pre-brief the circling visual approach to Runway 33 at DCA before accepting a "last minute" request by ATC to change to Runway 33. (*See* Figure 9 above).

**ANSWER**: PSA admits that PSA policy allowed pilots to exercise their discretion as to whether to accept a circling approach to Runway 33 when requested to do so by air traffic control, but denies all remaining allegations in Paragraph 151 and Figure 9.

152. At no time prior to the crash did the pilots of AE 5342 pre-brief the circling approach to Runway 33 at DCA.

**ANSWER**: PSA denies the allegations in Paragraph 152.

153. PSA's guidance also recommended that flight crews agree "on what conditions you will accept a clearance" to do a circling approach to Runway 33 during pre-briefing. (*See* Figure 9 above).

**ANSWER**: PSA admits that the document excerpted in Figure 9 speaks for itself, but denies all characterizations of the same, including Plaintiffs' incomplete recitation of the document's language.  PSA denies all remaining allegations in Paragraph 153.

154.    Other than the captain indicating that he was not "making the left [expletive deleted] turn" earlier in the flight, the pilots of AE 5342, prior to being asked by ATC to land on Runway 33, never briefed or discussed whether they would accept the circling approach to Runway 33 or under what conditions they would accept it.

**ANSWER**: PSA denies the allegations in Paragraph 154.

155.    Only after receiving the request from ATC to take the circling approach to Runway 33 at approximately 8:43 p.m. did the pilots of AE 5342 have any discussion of whether they would accept the switch to Runway 33.

**ANSWER**: PSA denies the allegations in Paragraph 155.

156.    After confirming that it would be permissible to land on Runway 33 given the length of the runway, the captain expressed hesitation, echoing his earlier refusal to make the "left [expletive deleted] turn", but quickly and ultimately decided to accept the change of approach to the more difficult maneuver to Runway 33 that the pilots had not briefed:

> AE 5342 Cpt: "I really don't want to but I guess uhhh tell 'em—."
>
> AE 5342 FO: "I mean I can just tell 'em—."
>
> AE 5342 Cpt: "nah its fine we got the numbers for it yeah tell 'em we're fine we'll do three three we'll do it."
>
> *Cockpit Voice Recorders and Air Traffic Control Combined Transcript, NTSB, at p. 24-25.*

**ANSWER**: PSA admits that the NTSB CVR transcript speaks for itself, denies all characterizations of the same, and denies all remaining allegations in Paragraph 156.

55

157. Despite not having pre-briefed the circling approach to Runway 33 at DCA, not having discussed the conditions under which they would accept it, without any discussion of the captain's prior comments about not flying such an approach, and without any enumerated criteria or factors from PSA to consider, such as the nighttime conditions or potential helicopter traffic on Helicopter Route 4, AE 5342 accepted ATC's request that it execute a circling approach to Runway 33 at approximately 8:43:37 p.m.

> AE 5342: "yeah we can do uh three three for Bluestreak fifty three forty two."
>
> DCA Tower: "Bluestreak fifty three forty two at the Wilson Bridge change to cir— change to circ(le) runway three three. runway three three cleared to land."
>
> AE 5342: "change to runway three three uh runway three three cleared to land Bluestreak fifty three forty two."
>
> *Cockpit Voice Recorders and Air Traffic Control Combined Transcript, NTSB, at p. 24-25.*

**ANSWER**: PSA admits that the NTSB CVR transcript speaks for itself, denies all characterizations of the same, and denies all remaining allegations in Paragraph 157.

158. Upon information and belief, prior to AE 5342's attempted landing, the DCA controller requested other American Airlines aircraft, including a PSA CRJ landing directly ahead of AE 5342, to accept a circling approach to Runway 33, but those other aircraft rejected ATC's request, opting instead to land on the more commonly used Runway 1.

**ANSWER**: PSA admits that according to NTSB Hearing Exhibit 23-A, at 20:42:48.0, Bluestreak 5307 responded to the Washington Tower controller's question as to whether that aircraft would accept a Runway 33 approach with "unable tonight," and proceeded to land on Runway 1. PSA denies all characterizations regarding the same and denies all remaining allegations in Paragraph 158.

159.    At or about the same time AE 5342 was switching to Runway 33 (approximately 8:43:48 p.m.), PAT25 was traveling South on Helicopter Route 1 about 1.1 nm west of the Key Bridge.  At that time, the helicopter's CVR revealed that the pilot flying ("PF") said the helicopter was at an altitude of 300 feet, but the instructor pilot ("IP") responded that the helicopter was at 400 feet.  Despite this acknowledged altitude discrepancy, there was no discussion nor resolution by the PAT25 flight crew of why the PF and the IP perceived and commented on different altitudes.

ANSWER: PSA admits the allegations in Paragraph 159 and footnote 6.

160.    At approximately 8:44:27 p.m., as PAT25 approached the Key Bridge, the IP called out to the PF that PAT25 was at 300 feet descending to 200 feet.

ANSWER: The allegations in Paragraph 160 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 160.

161.    At approximately 8:45:11 p.m., only after performing the before-landing checklist, the pilots of AE 5342 began searching for the approach information for the circling approach to Runway 33 at DCA, information that surely would have been closer at hand had the approach been briefed before it was accepted, as required by PSA procedure to its pilots.

AE 5342 Cpt: "lets see... approaches... approaches... I dunno * *."

AE 5342 Cpt: "* * visual three three * *."

*Cockpit Voice Recorders and Air Traffic Control Combined Transcript, NTSB, at p. 24-25.*

ANSWER: PSA admits that the NTSB CVR transcript speaks for itself, denies all characterizations of the same, and denies all remaining allegations in Paragraph 161.

162.    At approximately 8:45:27 p.m., the captain of AE 5342 disconnected the autopilot and began hand-flying the aircraft.

ANSWER: PSA admits the allegations in Paragraph 162.

163.    At approximately 8:45:30 p.m., PAT25 passed over the Memorial Bridge.  The IP told the PF that they were at 300 feet and needed to descend to 200 feet.  The PF acknowledged, but again, there was no discussion or resolution of why the helicopter was still above the 200-foot mandatory maximum altitude restriction for the helicopter route.

**ANSWER**: The allegations in Paragraph 163 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 163.

164.    Upon information and belief, at approximately 8:45:42 p.m., the pilots of AE 5342 were likely deleting and/or replacing all of the previous navigational inputs they had set for the Mount Vernon visual approach to Runway 1, which caused even more increased pilot workload in the cockpit.

**ANSWER**: PSA denies the allegations in Paragraph 164.

165.    Upon information and belief, the flight crew of AE 5342 likely continued to be preoccupied with reconfiguring the aircraft's instrumentation, last-minute landing checks and working to catch up on procedures for the circling approach to Runway 33, which again, was not previously briefed.

**ANSWER**: PSA denies the allegations in Paragraph 165.

166.    At approximately 8:46:02 p.m., DCA air traffic control advised PAT25 that traffic just south of Wilson Bridge was a CRJ at 1,200 feet circling to Runway 33.  The CRJ was AE 5342.

**ANSWER**: PSA admits that according to NTSB Hearing Exhibit 23-A, at approximately 20:46:02, DCA air traffic control radioed PAT25: "PAT two five traffic just south of Wilson Bridge is a C-R-J at one thousand two hundred feet circling to runway three three."  PSA further admits that the CRJ in question was AE 5342.  PSA denies all remaining allegations in Paragraph 166 and Figure 10.



*Figure 10 Google Earth image with airplane and helicopter preliminary flight tracks overlaid and each aircraft's position shown at 8:46:02 p.m.*
(Source: NTSB)

167.    At approximately 8:46:02 p.m., the CVR inside AE 5342 recorded an audible radio transmission in which ATC informed PAT25 of traffic consisting of a CRJ at 1200 feet altitude crossing over the Wilson Bridge circling to land on Runway 33 at DCA.

**ANSWER**: PSA admits the allegations in Paragraph 167.

168.    Since this transmission was recorded by the AE 5342 CVR, the pilots of AE 5342 could hear this transmission, and thus, knew or should have known that the CRJ referenced by the controller was their aircraft, and that there was a helicopter along their route of flight that they needed to be aware of, and were required to see and avoid.  The pilots of AE 5342, however, said nothing to ATC or one another about this transmission.

**ANSWER**: PSA admits, that since the transmission was recorded by AE 5342 CVR, the pilots of AE 5342 could hear the transmission.  PSA denies all remaining allegations in Paragraph 168.

169.    The DCA air traffic controllers did not at this time or any time prior to the collision issue a traffic advisory informing AE 5342 of PAT25's position, type, direction and intentions.

**ANSWER**: The allegations in Paragraph 169 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 169.

170.    The pilots of AE 5342, however, should also have seen the presence of another aircraft as a turquoise diamond approaching their aircraft on their TCAS displays, including its relative position and relative altitude. (*See* Figure 11 below).

**ANSWER**: PSA denies all allegations in Paragraph 170 and Figure 11, and denies that Figure 11 is necessarily accurate or representative.



*Figure 11 – Simulated TCAS Display Showing a Display Similar to What Would have been Displayed in the Subject Airplane approximately 41 Seconds Before the Collision, Showing the Helicopter as well as its relative Position and Altitude Dead Ahead as a*

60

*Turquoise Diamond* (Source: NTSB Airplane TCAS Specialist Study, Inv. No. DCA25MA108)

171.    At approximately 8:46:08 p.m., PAT25 radioed the DCA tower that it had traffic in sight and requested "visual separation" from the CRJ.  The DCA tower approved the request.

**ANSWER**: The allegations in Paragraph 171 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits that according to NTSB Hearing Exhibit 23-A, at 20:46:08.0, the Instructor Pilot of PAT25 stated, "PAT two five has the traffic in sight request visual separation," and at 20:46:10.5, the Washington Tower local controller stated, "vis separation approved," reflecting that PAT25 had requested, and been granted, visual separation from AE 5342.  PSA denies all remaining allegations in Paragraph 171.

172.    Moments later, the DCA tower air traffic controller received a conflict alert ("CA") that AE 5342 and PAT25 were on converging and unsafe flight paths.

**ANSWER**: The allegations in Paragraph 172 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits that according to NTSB Hearing Exhibit 23A, at 20:47:39.1, the transcript states, "sounds of rapid beeping consistent with a conflict alert audible in [the] background," reflecting a conflict alert in the Washington ATC tower, and further admits that the conflict alert involved AE5342 and PAT25.  PSA denies all remaining allegations in Paragraph 172 and footnote 7.

173.    At approximately 8:47:39 p.m., the DCA tower air traffic controller radioed PAT25 questioning whether PAT25 had "the CRJ in sight."  A CA from the ATC equipment was audible in the background of this transmission from the DCA tower.

**ANSWER**: The allegations in Paragraph 173 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits that according to NTSB Hearing Exhibit 12-AIR-A, at 20:47:39.1, the Washington Tower controller asked, "PAT two five you got the C-R-J in sight," and the transcript states, "[sounds of rapid beeping consistent with a conflict alert audible

in background while tower is transmitting]," indicating a CA in the background. PSA denies all remaining allegations in Paragraph 173.

174.    At approximately 8:47:39 p.m., the CVR inside AE 5342 picked up an audible radio transmission in which ATC questioned whether PAT25 had "the CRJ in sight", effectively asking the subject helicopter if it saw AE 5342.

**ANSWER**: PSA admits that according to NTSB Hearing Exhibit 12-AIR-A, the NTSB transcript for AE 5342, the Washington Tower controller asked at 20:47:39.1, "PAT two five you got the C-R-J in sight," and the transcript states, "[sounds of rapid beeping consistent with a conflict alert audible in background while tower is transmitting]," indicating a CA in the background. PSA admits this was audible in AE 5342. PSA denies all remaining allegations in Paragraph 174.

175.    The pilots of AE 5342 could hear this transmission and thus knew, or should have known, that the CRJ referenced by ATC was their aircraft, and accordingly this should have served as a second warning that there was a helicopter in close proximity and alerted the AE 5342 flight crew to see and avoid the helicopter. The pilots of AE 5342, however, said nothing to ATC or one another about this transmission.

**ANSWER**: PSA admits that the Washington ATC tower transmission at 20:47:39.1 reflected in NTSB Hearing Exhibit 12-AIR-A was audible to the pilots of AE 5342, admits that the NTSB CVR transcript speaks for itself, denies all characterizations of the same, and denies all remaining allegations in Paragraph 175.

176.    At approximately 8:47:40 p.m., one second later, the TCAS onboard AE 5342 issued an aural TA alert stating "TRAFFIC, TRAFFIC", warning the pilots of AE 5342 that they were on a dangerous, potential collision course with PAT25. The TCAS also provided a visual alert of "Traffic" on the pilots' primary flight display.

**ANSWER**: PSA admits that the NTSB CVR transcript speaks for itself, denies all characterizations of the same, admits that the TCAS may have provided a statement of "TRAFFIC" on a portion of a cockpit display, and denies all remaining allegations in Paragraph 176.

177.    This aural and visual advisory issued by the airplane's TCAS to the flight crew of AE 5342 should have further alerted the crew that they were approaching traffic, almost certainly the helicopter with which ATC had been communicating, which they needed to see and avoid.  The pilots of AE 5342, however, did not acknowledge the TCAS traffic advisory.

**ANSWER**: PSA denies the allegations in Paragraph 177.

178.    After the TCAS aurally alerted the pilots of AE 5342 to "TRAFFIC TRAFFIC" at 8:47:40 p.m., a full 19 seconds prior to impact with PAT25, the TCAS system also continued to visually depict PAT25 on the pilots' MFD screens in bright yellow (*see* Figure 12 below) signifying it was a danger to AE 5342, but no evasive action was taken by AE 5342, nor did the AE 5342 flight crew even discuss the TCAS alert or any potentially unsafe traffic in the vicinity of the aircraft.

**ANSWER**: PSA denies all allegations in Paragraph 178 and Figures 12 and 13, and denies that Figure 12 is necessarily an accurate or representative depiction of the display.



*Figure 12 – Simulated TCAS Display Showing a Display Similar to What Would have been Displayed in the Subject Airplane approximately 20 Seconds Before the Collision, Showing the Helicopter as well as its relative Position and Altitude in Yellow*
(Source: NTSB Airplane TCAS Specialist Study, Inv. No. DCA25MA108)



*Figure 13 – Google Earth image showing the approximate positions of both aircraft at 8:47:40 p.m., approximately 19 seconds before the collision*
(Source: NTSB Preliminary Report - Figure 3)

179.    The TCAS did not provide an RA at any point between the initial TA and the Subject mid-air collision because AE 5342 was below 1,000 feet in altitude during this time and that function is disabled when the aircraft is below 1,000 feet in altitude.

**ANSWER**: PSA admits that the TCAS on AE 5342 did not provide an RA and that TCAS is not designed to provide RAs when an aircraft is at or below 1,000 feet (plus or minus 100 feet) above the ground.

180.    The TCAS visual TA depiction of the yellow circle on the MFD screens provided altitude, location and proximity information for the subject helicopter and would have continued un-inhibited until the collision.

**ANSWER**: PSA lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 180, and on that basis, denies same.

181.    Contrary to PSA policy and procedure, the AE 5342 flight crew did not even discuss the potential traffic that the TCAS had provided and was continuing to provide (either the aural or visual alert) at any time prior to the Subject mid-air collision complained of herein.

**ANSWER**: PSA denies the allegation in Paragraph 181.

182.    At approximately 8:47:42 p.m., the air traffic controller at the DCA tower radioed PAT25 instructing it to pass behind the CRJ.

**ANSWER**: The allegations in Paragraph 182 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits that according to NTSB Hearing Exhibit 12-AIR-A, at 20:47:42.0, the local controller stated, "PAT two five pass behind the C-R-J," instructing PAT25 to pass behind AE 5342.  PSA denies all remaining allegations in Paragraph 182.

183.    At approximately 8:47:42 p.m., two seconds after the aural "TRAFFIC, TRAFFIC" TCAS alert, the CVR inside AE 5342 picked up the audible radio transmission in which ATC directed PAT25 to "pass behind the CRJ", meaning pass behind AE 5342.

**ANSWER**: PSA admits that according to NTSB Hearing Exhibit 12-AIRA, at 20:47:40.3, the AE 5342 CVR transcript states, "traffic. traffic. [automated voice]," and at 20:47:42.0, the local controller stated, "PAT two five pass behind the C-R-J," instructing PAT25 to pass behind AE 5342.  PSA further admits that this was audible to AE 5342.  PSA denies all remaining allegations in Paragraph 183.

184.    PSA policies and procedures required the pilots upon receiving a TA to "[a]ttempt to see the reported traffic."  At no point does the AE 5342 CVR record any discussion between the captain and first officer of the TCAS TA alert, the need to check for the traffic being warned of, or any reason why they should or should not be concerned by the alert.

**ANSWER**: PSA admits that PSA's Flight Operations Manual speaks for itself and denies all characterizations of the same, including Plaintiffs' incomplete recitation of the document's language.  PSA further admits that the NTSB CVR transcript speaks for itself, denies all characterizations of the same, and denies all remaining allegations in Paragraph 184.

185.    In the context of the prior ATC communications asking PAT25 if the CRJ was in sight and AE 5342's TCAS alert, both only seconds earlier, this radio transmission, which was heard inside the cockpit, should have further warned AE 5342 that there was a helicopter in very close proximity that required the crew to immediately establish visual contact and maneuver to avoid the helicopter.  At a minimum, it required the flight crew to discuss and consider the potential traffic.

**ANSWER**: PSA denies the allegations in Paragraph 185.

186.    At approximately 8:47:44 p.m., PAT25 indicated that the traffic was in sight and again requested visual separation, which was approved by the DCA tower.  CVR data from PAT25

indicated that, following this transmission, the IP told the PF that the IP believed ATC was asking for the helicopter to move left toward the east bank of the Potomac River.

**ANSWER**: The allegations in Paragraph 186 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits that according to NTSB Hearing Exhibit 12-HELO-A, at 20:47:44.1, PAT25 responded to the Washington Tower controller, stating, "PAT two five has uh— aircraft in sight request visual separation," to which the Washington Tower controller responded, "vis sep," granting visual separation.  PSA further admits that the document states that at 20:47:52.5, the instructor pilot stated to the pilot flying "alright kinda come left for me ma'am I think that's why he's asking."  PSA denies all remaining allegations in Paragraph 186.

187.    At approximately 8:47:58, the CVR inside AE 5342 picked up "a verbal reaction" by the flight crew and the flight data recorder indicates that the aircraft increased its pitch.

**ANSWER**: PSA admits the allegations in Paragraph 187.

188.    This is the first indication that Flight AE 5342 saw PAT25 and that it was taking any action to avoid a collision, despite the prior radio communications between PAT25 and ATC, the TCAS "TRAFFIC, TRAFFIC" alerts that were clearly audible in the cockpit, the "TRAFFIC" TA text on their primary flight display, and the yellow TCAS target depicted on the flight crew's MFD screens.

**ANSWER**: PSA denies the allegations in Paragraph 188.

189.    PAT25 made no attempts to avoid hitting AE 5342.

**ANSWER**: The allegations in Paragraph 189 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 189.

190.    At approximately 8:47:58 p.m., the CVR inside AE 5342 recorded sounds of the impact with PAT25.

**ANSWER**: PSA admits that at approximately 8:47:59 p.m., PAT25 collided with AE 5342.

67

191.    Both aircraft fell into Potomac River, and all 67 individuals on board both aircraft were killed.

**ANSWER**: PSA admits that after the collision, both PAT25 and AE 5342 fell into the Potomac River.  PSA separately admits that, in the collision, all 67 individuals on board both aircraft were killed.  PSA denies all remaining allegations in Paragraph 191.

192.    This collision could have been avoided if: (1) the flight crew of AE 5342 had followed the PSA manuals, instructions and other guidance regarding approach briefing and accepting last minute runway changes, and declined to accept the circling approach to 33 which had not been pre-briefed; (2) the flight crew of AE 5342 had acknowledged and/or otherwise responded to the TCAS traffic warning prior to the collision and located the oncoming traffic; (3) the flight crew of AE 5342 executed a go-around or otherwise took evasive action 19 seconds earlier when they received the TCAS audible alert warning them of an impending collision with the Army helicopter; (4) the flight crew of PAT25 had maintained visual separation by seeing and avoiding AE 5342, and by staying on the charted course and within the charted altitude of Helicopter Route 4; and/or (5) ATC had maintained traffic separation and issued traffic and safety alerts as required.

**ANSWER**: To the extent the allegations in Paragraph 192 are directed to PSA, PSA admits that the collision could have been avoided had other parties or third parties whose actions or omissions were a proximate cause of the collision not acted with negligence, fault, or culpability, or otherwise acted differently.  PSA denies any and all remaining allegations as to PSA that may be construed or inferred in Paragraph 192.

193.    The last recorded radio altitude recorded for AE 5342 from 2 seconds before the collision was 313 feet according to the aircraft's Flight Data Recorder ("FDR").  PAT25's FDR indicated that its radio altitude (altitude above ground) at the time of collision was 278 feet and

68

had been steady for the previous 5 seconds.  Therefore, PAT25 violated the maximum published 200-foot altitude restriction for that section of Helicopter Route 4.

**ANSWER**: To the extent the allegations in Paragraph 193 are directed to PSA, denies any and all allegations as to PSA that may be construed or inferred in Paragraph 193.

194.    In executing its circling approach, AE 5342 turned on final with ample time to see and avoid PAT25, which it knew, or should have known, from the prior radio transmissions from ATC and the TCAS alerts was in potentially dangerous proximity and getting closer, but it failed to take any action to see or avoid the other aircraft.

**ANSWER**: PSA denies the allegations in Paragraph 194.

195.    AE 5342 had approximately 19 seconds between when the aircraft issued a TCAS "TRAFFIC TRAFFIC" alert and the eventual collision to take action to avoid an imminent collision, but it failed to take any such action until it was too late.  19 seconds before the collision, the aircraft were .95 nautical miles apart.  (Figure 13 above depicts the locations of PAT25 and AE 5342 when the AE 5342 pilots received the TCAS audible "TRAFFIC TRAFFIC" aural alert warning them of the impending collision with the Army helicopter.)

**ANSWER**: PSA denies the allegations in Paragraph 195.

196.    Even the 16-second interval between the last ATC communication heard by AE 5342 and the collision provided ample time for the crew of AE 5342 to see and avoid PAT25 and/or to have taken evasive action to avoid the collision with the helicopter.

**ANSWER**: PSA denies the allegations in Paragraph 196.

197.    Even when being positively controlled by ATC, pilots have a duty to see and avoid other traffic, particularly when navigating visually, as AE 5342 was at the time of this crash.

**ANSWER**: The allegations in Paragraph 197 are legal conclusions to which no response is required.  To the extent a response is required, PSA states that 14 C.F.R. § 91.113 speaks for

69

itself, and denies any characterizations regarding the same, and denies all remaining allegations in Paragraph 197.

198.    Upon information and belief, it was well known to commercial pilots flying into DCA, including the crew of AE 5342, that the airspace around the airport is busy, including helicopter traffic.

**ANSWER**: PSA lacks knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 198, and therefore denies the same.

199.    Upon information and belief, it is well known to pilots that conducting a circling approach where visual navigation is required is a dangerous maneuver that significantly increases pilot workload and that special care must be taken to ensure safe flight during this maneuver, including vigilantly checking nearby airspace for any air traffic that could intersect an aircraft's intended flight path.

**ANSWER**: PSA denies the allegations in Paragraph 199.

200.    As a result, the crew of AE 5342 was required to, and should have maintained situational awareness and continually checked for traffic along and/or intersecting with their intended flight path.

**ANSWER**: The allegations in Paragraph 200 are legal conclusions to which no response is required.  To the extent a response is required, PSA admits that the crew of AE 5342 complied with their duties and were not negligent, and denies all remaining allegations in Paragraph 200.

201.    The crew of AE 5342 was required to and should have maintained situational awareness to see and avoid PAT25 and realized they were in dangerous proximity to PAT25, and as result should have executed a go-around (a standard safety maneuver wherein pilots abort their landing and circle back around the airport's traffic pattern to attempt the landing again under safer conditions).

70

**ANSWER**: The allegations in Paragraph 201 are legal conclusions to which no response is required. To the extent a response is required, PSA admits that the crew of AE 5342 complied with their duties and were not negligent, and denies all remaining allegations in Paragraph 201.

202.    The crew of PAT25 was also required to and should have maintained situational awareness and continually checked for traffic along and/or intersecting with their intended flight path.

**ANSWER**: The allegations in Paragraph 202 are not directed to PSA. To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 202.

203.    The crew of PAT25 was further required to and should have remained below the 200-foot maximum altitude limitation of Helicopter Route 4 and remained within the lateral confines of Helicopter Route 4.

**ANSWER**: The allegations in Paragraph 203 are not directed to PSA. To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 203.

204.    The crew of PAT25 was also required to and should have maintained situational awareness to see and avoid AE 5342 and realized they were in dangerous proximity to Flight AE 5342, and as a result should have taken evasive maneuvers and/or were required to see and avoid AE 5342.

**ANSWER**: The allegations contained in Paragraph 204 are not directed to PSA. To the extent they are construed as directed to PSA, PSA admits the allegations in Paragraph 204.

205.    The air traffic controllers at DCA were required to and should have issued a traffic advisory informing AE 5342 of PAT25's position, type, direction and intentions, including PAT25's relative o'clock position, distance and altitude.

**ANSWER**: The allegations contained in Paragraph 205 are not directed to PSA. To the extent they are construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 205.

71

206.    Upon information and belief, the radar display screen that the DCA LC was using (referred to as a "Radar Video Map" or "RVM") depicted PAT25's altitude at 300 feet as it was transiting Helicopter Route 4.  Thus, the air traffic controllers at DCA were required to and should have notified PAT25 that it was violating the maximum altitude limitation of Helicopter Route 4 and issued positive control instructions to descend.

**ANSWER**: The allegations in Paragraph 206 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA lacks knowledge or information sufficient to form a belief as to the DCA tower's radar display screen, and so denies that allegation, and denies any and all allegations as to PSA that may be construed or inferred in Paragraph 206.

207.    The air traffic controllers at DCA were further required to and should have ensured adequate separation of aircraft and issued Safety Alerts and/or positive control instructions when the aircraft were in unsafe proximity to one another.

**ANSWER**: The allegations contained in Paragraph 207 are not directed to PSA.  To the extent they are construed as directed to PSA, denies any and all allegations as to PSA that may be construed or inferred in Paragraph 207.

208.    The air traffic controllers at DCA were also required to, and should have ensured that helicopter traffic, like PAT25, was held or otherwise not transiting Helicopter Route 4 while commercial traffic, like AE 5342, was cleared for and executing the visual circling approach to land on Runway 33.

**ANSWER**: The allegations contained in Paragraph 208 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 208.

209.    The negligent acts and omissions described herein proximately caused, or contributed to, the Subject mid-air collision of PAT25 and AE 5342 that then resulted in both aircraft crashing into the Potomac River and killing DECEDENT.

**ANSWER**: To the extent the allegations in Paragraph 209 are directed to PSA, PSA denies that it committed or is responsible for any negligent acts or omissions, and that any of its alleged acts or omissions caused or contributed to the mid-air collision between PAT25 and AE 5342. PSA maintains its affirmative defense that, in view of the conduct of other parties and third parties, PSA did not proximately cause the collision. The sole, new, superseding, or intervening causes of the collision was the conduct of other parties, including U.S. government personnel and entities. PSA denies all remaining allegations as to PSA that may be construed or inferred in Paragraph 209.

210.    As a result of the foregoing negligent actions and omissions that caused the conscious fear of impending death and subsequent death of DECEDENT, PLAINTIFF, in his/her capacity as personal representative, is entitled to recover compensation for DECEDENT's mental and physical pain and suffering, any past and future earning capacity of DECEDENT, and/or any other damage allowed under applicable law.

**ANSWER**: PSA denies that it committed or is responsible for any negligent acts or omissions, denies that any of its alleged acts or omissions caused any conscious fear of impending death and subsequent death of any decedent, and denies that any decedent or plaintiff is entitled to recover any compensation or damages against it. PSA admits that the United States is liable for appropriate damages and other compensation to decedents. PSA denies all remaining allegations in Paragraph 210.

211.    As a result of the foregoing negligent actions and omissions, PLAINTIFF, both individually and on behalf of DECEDENT's other wrongful death beneficiaries, is/are entitled to compensation for funeral expenses, loss of monetary support, loss of services, loss of society and comfort, and for profound emotional and psychological loss suffered as a result of DECEDENT's death, as well as all other damages allowed under applicable law.

**ANSWER**: PSA denies that it committed or is responsible for any negligent acts or omissions, denies that any of its alleged acts or omissions caused any conscious fear of impending death and subsequent death of any decedent, and denies that any decedent or plaintiff is entitled to recover any compensation or damages against it.  PSA admits that the United States is liable for appropriate damages and other compensation to decedents.  PSA denies all remaining allegations in Paragraph 211.

FIRST CAUSE OF ACTION

WRONGFUL DEATH BASED UPON NEGLIGENCE AGAINST AMERICAN

212.    PLAINTIFF hereby incorporates by reference as though set forth fully herein all the preceding Paragraphs.

**ANSWER**: The allegations in Paragraph 212 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA incorporates by reference as though set forth fully herein PSA's response to all preceding Paragraphs.

213.    At all relevant times, American, including but not limited to its officers, directors and employees, owed a duty as a common carrier to the flying public, particularly passengers like DECEDENT, to exercise the utmost care in adopting safe policies and procedures for those operating aircraft in the NAS, including in and around DCA, including those aircraft operating under the "American" banner such as under the American Eagle brand name; and/or in exercising oversight of the operations and procedures of its contracting carrier and/or holding company's fellow subsidiary, PSA, who operated American branded aircraft.

**ANSWER**: The allegations contained in Paragraph 213 are not directed to PSA.  To the extent they are construed as directed to PSA, they state legal conclusions to which no response is required.  To the extent a response is required, PSA states the law speaks for itself and otherwise denies the allegations in Paragraph 213.

74

214. At all relevant times, American, including but not limited to its officers, directors and employees, owed a duty to the flying public, particularly passengers like DECEDENT, to exercise reasonable care in adopting safe policies and procedures for those operating aircraft in the NAS, including in and around DCA, including those aircraft operating under the "American" banner such as under the American Eagle brand name; and/or in exercising oversight of the operations and procedures of its contracting carrier and holding company's fellow subsidiary PSA who operated American branded aircraft.

**ANSWER**: The allegations contained in Paragraph 214 are not directed to PSA.  To the extent they are construed as directed to PSA, they state legal conclusions to which no response is required.  To the extent a response is required, PSA states the law speaks for itself and otherwise denies the allegations in Paragraph 214.

215. American was negligent and breached the duties it owed to DECEDENT and Plaintiff as follows:

    a. by allowing PSA to maintain policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA and helicopter traffic reported in the area, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.135(a)(1);

    b. by failing to require PSA to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA and helicopter traffic reported in the area, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §

75

121.135(a)(1);

c.  by failing to require PSA to adequately evaluate the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, which crosses the approach path to Runway 33, and the known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.53, 5.57, 5.71 and 5.73;

d.  by failing to require PSA to adequately inform flight crews operating flights into DCA of the location, including lateral and vertical boundaries of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.57, 121.135(a)(1), 121.401(a)(1) and 121.443(b);

e.  by failing to require PSA to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.57, 121.135(a)(1), 121.401(a)(1) and 121.443(b);

f.  by failing to require PSA to train or inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes,

76

including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

g. by failing to require PSA to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

h. by failing to require PSA to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

i. by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could, and in fact did, occur, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.53, 5.57, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b), and 121.544;

j. by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject mid-air collision, in violation of its duty to exercise reasonable care

and in violation of 14 C.F.R. § 121.533(c);

k.  by failing to adequately supervise, monitor, and control PSA as American's contracting carrier and/or holding company's wholly-owned subsidiary, so as to prevent the aforementioned negligent acts and omissions which led to the subject mid-air collision, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.53, 5.57, 5.71, 5.73, 121.135(a)(1), 121.401(a)(1), 121.443(b), 121.533(c), and 121.544

l.  by failing to require PSA to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject mid-air collision, including but not limited to training and/or otherwise informing their employees regarding circling approaches and the circling approach into Runway 33 at DCA in particular after advising the FAA that it would alleviate the excessive workload on ATC at DCA caused by the clustering of flights by American and its regional partners, including PSA, by increasing the use of Runway 33 and training its pilots to use Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.401(a)(1);

m.  by failing to require PSA to adequately train or otherwise require its pilots to safely operate at DCA, including by failing to include in any documents or materials specific to DCA any reference to the existence of helicopter traffic at DCA (despite that it had done so at other airports) and/or train or advise pilots concerning any established helicopter routes near DCA runways, especially Helicopter Route 4, particularly after advising the FAA that it would alleviate the excessive workload on ATC at DCA caused by the clustering of flights by American and its regional partners, including PSA, by increasing the use of

Runway 33 and training its pilots to use Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

n.  by failing to perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or study through PSA's own internal safety program(s), in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.53, 5.57, 5.71 and 5.73;

o.  by failing to require PSA to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.401(a)(1);

p.  by failing to require PSA to adequately train and/or otherwise inform its flight crews how to properly react to a TCAS TA at or below 1000 feet, particularly when approaching to land in the airport traffic area, including but not limited to specifically immediately searching for and identifying the intruding traffic and if unable to acquire the target take all necessary actions to ensure collision avoidance, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1) and 121.401(a)(1);

q.  by otherwise failing to require PSA to abide by and/or allowing PSA to violate

79

FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or policies and procedures, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.53, 5.57, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b) and 121.544

r. by otherwise violating its duty to exercise reasonable care and violating FAA rules and/or regulations, including 14 C.F.R. §§ 5.25(b), 5.51, 5.53, 5.57, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b) and 121.544, and/or American's own SOPs, MOUs, LOAs, and/or policies and procedures; and

s. by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

**ANSWER**: The allegations in Paragraph 215 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 215 and each of its subparts.

216.    American is also liable for the negligence of PSA, including on the grounds that PSA was its apparent agent, which breached the duties it owed to DECEDENT and Plaintiff as follows:

a. by failing to see and avoid PAT25, including while on final approach to Runway 33 at DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b), 91.123 and 121.544;

b. by failing to maintain situational awareness of the operational environment in the airspace around DCA to avoid collision with another aircraft despite a known history of near miss events where commercial aircraft and helicopters or military aircraft almost collided at DCA, in violation of its duty to exercise

80

reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b) and 121.544;

c. by failing to adequately recognize, respond, and/or take any action upon hearing the TCAS aural "TRAFFIC TRAFFIC" alert, which the flight crew of AE 5342 received a full 19 seconds prior to impact, or observing the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which the flight crew of AE 5342 received continuously for 19 seconds prior to impact, including but not limited to by immediately executing a go-around to protect AE 5342 from collision with another aircraft, particularly in light of the additional audible radio transmissions between ATC and PAT25 that did not establish that PAT25 had AE 5342 in sight, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b), 91.123 and 121.544; FAA Advisory Circular 90-120 §§ 3.1 and 3.2;

d. by failing to take any other evasive action after the TCAS "TRAFFIC TRAFFIC" aural alert received a full 19 seconds prior to impact, and/or the visual yellow traffic depiction on the primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which was received continuously for 19 seconds prior to impact with PAT25, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b), 91.123 and 121.557(a); FAA Advisory Circular 90-120 §§ 3.1 and 3.2;

e. by failing to brief (properly or otherwise) the circling approach to Runway 33

81

before accepting clearance to land on Runway 33 from ATC, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a) and 121.544;

f.  by failing to adequately discuss the conditions under which the flight crew would accept a circling approach to Runway 33 prior to ATC's request that AE 5342 accept a circling approach to land at Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 91.13(a);

g.  by accepting a more difficult and dangerous circling approach to land at Runway 33 at DCA in nighttime conditions when it had not been pre-briefed, when there had been no discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a) and 121.544;

h.  by maintaining policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.135(a)(1);

i.  by failing to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or

82

nearby DCA, and helicopter traffic reported in the area, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.135(a)(1);

j.  by failing to evaluate (adequately or otherwise) the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby

k.  by failing to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.57, 121.135(a)(1), 121.401(a)(1) and 121.443(b);

l.  by failing to adequately inform flight crews operating flights into and out of DCA of the location, including lateral and vertical boundaries, of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1) and 121.443(b);

m.  by failing to train or otherwise inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral

boundaries of the published helicopter routes surrounding DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

n.  by failing to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic in the established helicopter routes in the vicinity of DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

o.  by failing to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4, which crosses the approach path to Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

p.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.57, 5.53, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b), 121.544 and 121.557;

q.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.533(c);

84

r.  by failing to adequately supervise, monitor, and control their employees, to prevent the aforementioned negligent acts and omissions which led to the subject crash;

s.  by failing to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training and/or properly informing their employees concerning circling approaches and the circling approach into Runway 33 at DCA in particular, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.401(a)(1);

t.  by failing to adequately train, qualify or otherwise inform its pilots to safely operate at DCA, including by failing to include in any of its training documents or materials any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

u.  by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a traffic study through PSA's internal safety program(s), in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.57, 5.53, 5.71 and 5.73;

v.  by failing to adequately train its flight crews or otherwise ensure flight crews

85

understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.401(a)(1);

w.  by failing to adequately train and/or otherwise inform its flight crews how to properly react to a TA at or below 1000 feet, particularly when approaching to land in the airport traffic area, including but not limited to specifically immediately searching for and identifying the intruding traffic and if unable to acquire the target take all necessary actions to ensure collision avoidance, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1) and 121.401(a)(1);

x.  by otherwise violating FAA rules and/or regulations, including 14 C.F.R. §§ 5.25(b), 5.51, 5.57, 5.53, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b), 121.544, 121.557, violating PSA's own SOPs, MOUs, LOAs, and/or policies and procedures, in violation of its duty to exercise reasonable care; and

y.  by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

**ANSWER**: The allegations in Paragraph 216 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 216 and each of its subparts.

217.  Through the aforementioned negligence, American directly and/or proximately, caused and/or contributed to the Subject Crash and thereby the injuries and death of Plaintiff's DECEDENT, and the resulting damages to Plaintiff herein.

86

**ANSWER**: The allegations in Paragraph 217 are not directed to PSA. To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 217.

218. In addition to being negligent, the acts and omissions set forth herein were made in willful disregard for the rights of the DECEDENT and was reckless toward the safety of the DECEDENT.

**ANSWER**: The allegations in Paragraph 218 are not directed to PSA. To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 218.

219. As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of American, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER**: The allegations in Paragraph 219 are not directed to PSA. To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 219.

220. As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by Plaintiff, seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and

suffering that the heirs, beneficiaries and distributees of the DECEDENT's Estate were caused to incur other; and necessary and reasonable expenses as a result of the DECEDENT's death.

**ANSWER**: The allegations in Paragraph 220 are not directed to PSA. To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 220.

## SECOND CAUSE OF ACTION

## SURVIVAL BASED UPON NEGLIGENCE AGAINST AMERICAN

221.    PLAINTIFF hereby incorporates by reference as though set forth fully herein all the preceding Paragraphs.

**ANSWER**: The allegations in Paragraph 221 are not directed to PSA. To the extent they are construed as directed to PSA, PSA incorporates by reference as though set forth fully herein PSA's response to all preceding Paragraphs.

222.    At all relevant times, American, including but not limited to its officers, directors and employees, owed a duty as a common carrier to the flying public, particularly passengers like DECEDENT, to exercise the utmost care in adopting safe policies and procedures for those operating aircraft in the NAS, including in and around DCA, including those aircraft operating under the "American" banner such as under the American Eagle brand name; and/or in exercising oversight of the operations and procedures of its contracting carrier and holding company's fellow subsidiary, PSA, who operated American branded aircraft.

**ANSWER**: The allegations in Paragraph 222 are not directed to PSA. To the extent they are construed as directed to PSA, they state legal conclusions to which no response is required. To the extent a response is required, PSA states the law speaks for itself and otherwise denies the allegations in Paragraph 222.

223.    At all relevant times, American, including but not limited to its officers, directors and employees, owed a duty to the flying public, particularly passengers like DECEDENT, to exercise reasonable care in adopting safe policies and procedures for operating its aircraft in the

national airspace, including in and around DCA, including those aircraft operating under the "American" banner such as under the American Eagle brand name; and/or in exercising oversight of the operations and procedures of its holding company's subsidiary PSA who operated American branded aircraft.

**ANSWER**: The allegations in Paragraph 223 are not directed to PSA.  To the extent they are construed as directed to PSA, they state legal conclusions to which no response is required.  To the extent a response is required, PSA states the law speaks for itself and otherwise denies the allegations in Paragraph 223.

224.    American was negligent and breached the duties it owed to DECEDENT and Plaintiff as follows:

   a.  by allowing PSA to maintain policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA and helicopter traffic reported in the area, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.135(a)(1);

   b.  by failing to require PSA to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA and helicopter traffic reported in the area, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.135(a)(1);

   c.  by failing to require PSA to adequately evaluate the safety of a circling approach to land on Runway 33 in light of the information available, including the

location of Helicopter Route 4, which crosses the approach path to Runway 33, and the known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.53, 5.57, 5.71 and 5.73;

d. by failing to require PSA to adequately inform flight crews operating flights into DCA of the location, including lateral and vertical boundaries of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.57, 121.135(a)(1), 121.401(a)(1) and 121.443(b);

e. by failing to require PSA to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.57, 121.135(a)(1), 121.401(a)(1) and 121.443(b);

f. by failing to require PSA to train or inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§

90

121.135(a)(1), 121.401(a)(1) and 121.443(b);

g. by failing to require PSA to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to maintain particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

h. by failing to require PSA to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

i. by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could, and in fact did, occur, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.53, 5.57, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b), and 121.544;

j. by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject mid-air collision, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.533(c);

k. by failing to adequately supervise, monitor, and control PSA as American's contracting carrier and/or holding company's wholly-owned subsidiary, so as

91

to prevent the aforementioned negligent acts and omissions which led to the subject mid-air collision, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.53, 5.57, 5.71, 5.73, 121.135(a)(1), 121.401(a)(1), 121.443(b), 121.533(c), and 121.544

l. by failing to require PSA to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject mid-air collision, including but not limited to training and/or otherwise informing their employees regarding circling approaches and the circling approach into Runway 33 at DCA in particular after advising the FAA that it would alleviate the excessive workload on ATC at DCA caused by the clustering of flights by American and its regional partners, including PSA, by increasing the use of Runway 33 and training its pilots to use Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.401(a)(1);

m. by failing to require PSA to adequately train or otherwise require its pilots to safely operate at DCA, including by failing to include in any documents or materials specific to DCA any reference to the existence of helicopter traffic at DCA (despite that it had done so at other airports) and/or train or advise pilots concerning any established helicopter routes near DCA runways, especially Helicopter Route 4, particularly after advising the FAA that it would alleviate the excessive workload on ATC at DCA caused by the clustering of flights by American and its regional partners, including PSA, by increasing the use of Runway 33 and training its pilots to use Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

n.  by failing to perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or study through PSA's own internal safety program(s), in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.53, 5.57, 5.71 and 5.73;

o.  by failing to require PSA to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.401(a)(1);

p.  by failing to require PSA to adequately train and/or otherwise inform its flight crews how to properly react to a TCAS TA at or below 1000 feet, particularly when approaching to land in the airport traffic area, including but not limited to specifically immediately searching for and identifying the intruding traffic and if unable to acquire the target take all necessary actions to ensure collision avoidance, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1) and 121.401(a)(1);

q.  by otherwise failing to require PSA to abide by and/or allowing PSA to violate FAA rules and/or regulations, and/or PSA's own SOPs, MOUs, LOAs, and/or policies and procedures, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.53, 5.57, 5.71, 5.73, 91.13(a),

91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b) and 121.544

r.  by otherwise violating its duty to exercise reasonable care and violating FAA rules and/or regulations, including 14 C.F.R. §§ 5.25(b), 5.51, 5.53, 5.57, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b) and 121.544, and/or American's own SOPs, MOUs, LOAs, and/or policies and procedures; and

s.  by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

**ANSWER**: The allegations in Paragraph 224 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 224 and each of its subparts.

225.  American is also liable for the negligence of PSA, including on the grounds that PSA was its apparent agent, which breached the duties it owed to DECEDENT and Plaintiff as follows:

a.  by failing to see and avoid PAT25, including while on final approach to Runway 33 at DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b), 91.123 and 121.544;

b.  by failing to maintain situational awareness of the operational environment in the airspace around DCA to avoid collision with another aircraft despite a known history of near miss events where commercial aircraft and helicopters or military aircraft almost collided at DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b) and 121.544;

c.  by failing to adequately recognize, respond, and/or take any action upon hearing

the TCAS aural "TRAFFIC TRAFFIC" alert, which the flight crew of AE 5342 received a full 19 seconds prior to impact, or observing the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which the flight crew of AE 5342 received continuously for 19 seconds prior to impact, including but not limited to by immediately executing a go-around to protect AE 5342 from collision with another aircraft, particularly in light of the additional audible radio transmissions between ATC and PAT25 that did not establish that PAT25 had AE 5342 in sight, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b), 91.123 and 121.544; FAA Advisory Circular 90-120 §§ 3.1 and 3.2;

d. by failing to take any other evasive action after the TCAS "TRAFFIC TRAFFIC" aural alert received a full 19 seconds prior to impact, and/or the visual yellow traffic depiction on the primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which was received continuously for 19 seconds prior to impact with PAT25, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b), 91.123 and 121.557(a); FAA Advisory Circular 90-120 §§ 3.1 and 3.2;

e. by failing to brief (properly or otherwise) the circling approach to Runway 33 before accepting clearance to land on Runway 33 from ATC, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a) and 121.544;

f.  by failing to adequately discuss the conditions under which the flight crew would accept a circling approach to Runway 33 prior to ATC's request that AE 5342 accept a circling approach to land at Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 91.13(a);

g.  by accepting a more difficult and dangerous circling approach to land at Runway 33 at DCA in nighttime conditions when it had not been pre-briefed, when there had been no discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a) and 121.544;

h.  by maintaining policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.135(a)(1);

i.  by failing to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.135(a)(1);

j.  by failing to evaluate (adequately or otherwise) the safety of a circling approach

to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby

k.  by failing to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.57, 121.135(a)(1), 121.401(a)(1) and 121.443(b);

l.  by failing to adequately inform flight crews operating flights into and out of DCA of the location, including lateral and vertical boundaries, of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1) and 121.443(b);

m.  by failing to train or otherwise inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

97

n.  by failing to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic in the established helicopter routes in the vicinity of DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

o.  by failing to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4, which crosses the approach path to Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

p.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.57, 5.53, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b), 121.544 and 121.557;

q.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.533(c);

r.  by failing to adequately supervise, monitor, and control their employees, to prevent the aforementioned negligent acts and omissions which led to the subject crash;

98

s. by failing to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training and/or properly informing their employees concerning circling approaches and the circling approach into Runway 33 at DCA in particular, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.401(a)(1);

t. by failing to adequately train, qualify or otherwise inform its pilots to safely operate at DCA, including by failing to include in any of its training documents or materials any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

u. by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a traffic study through PSA's internal safety program(s), in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.57, 5.53, 5.71 and 5.73;

v. by failing to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet, in violation of its duty to exercise reasonable care and

in violation of 14 C.F.R. § 121.401(a)(1);

w. by failing to adequately train and/or otherwise inform its flight crews how to properly react to a TA at or below 1000 feet, particularly when approaching to land in the airport traffic area, including but not limited to specifically immediately searching for and identifying the intruding traffic and if unable to acquire the target take all necessary actions to ensure collision avoidance, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1) and 121.401(a)(1);

x. by otherwise violating FAA rules and/or regulations, including 14 C.F.R. §§ 5.25(b), 5.51, 5.57, 5.53, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b), 121.544, 121.557, violating PSA's own SOPs, MOUs, LOAs, and/or policies and procedures, in violation of its duty to exercise reasonable care; and

y. by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

**ANSWER**: The allegations in Paragraph 225 are not directed to PSA. To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 225 and each of its subparts.

226. Through the aforementioned negligence, American is directly and proximately, caused and/or contributed to the Subject Crash and thereby the injuries and death of Plaintiff's DECEDENT, and the resulting damages to Plaintiff herein.

**ANSWER**: The allegations in Paragraph 226 are not directed to PSA. To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 226.

227.    In addition to being negligent, the acts and omissions set forth herein were made in willful disregard for the rights of the DECEDENT and was reckless toward the safety of the DECEDENT.

**ANSWER**: The allegations in Paragraph 227 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 227.

228.    As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of American, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER**: The allegations in Paragraph 228 are not directed to PSA.  To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 228.

229.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and suffering; and the heirs, beneficiaries and distributees of the DECEDENT's estate were caused to incur other necessary and

reasonable expenses as a result of the DECEDENT's death and are entitled to all such damages, and were otherwise damaged.

**ANSWER**: The allegations in Paragraph 229 are not directed to PSA. To the extent they are construed as directed to PSA, PSA denies the allegations in Paragraph 229.

### THIRD CAUSE OF ACTION

### WRONGFUL DEATH BASED UPON NEGLIGENCE AGAINST PSA

230.    PLAINTIFF hereby incorporates by reference as though set forth fully herein all the preceding Paragraphs.

**ANSWER**: PSA incorporates by reference as though set forth fully herein its responses to all preceding Paragraphs.

231.    At all relevant times, PSA, including but not limited to its officers, directors, employees and flight crews, owed a duty as a common carrier to the flying public, particularly passengers like DECEDENT, to exercise the utmost care and safely operate aircraft in the NAS, including in and around DCA, safely train its personnel including its pilots, and/or adopt safe policies and procedures for operating its aircraft in the NAS, including in and around DCA.

**ANSWER**: The allegations in Paragraph 231 state legal conclusions to which no response is required. To the extent a response is required, PSA states the law speaks for itself and otherwise denies the allegations in Paragraph 231.

232.    At all relevant times, PSA, including but not limited to its officers, directors, employees and flight crews, owed a duty to the flying public, particularly passengers like DECEDENT, to exercise reasonable care and safely operate aircraft in the NAS, including in and around DCA, safely train its personnel including its pilots, and/or adopt safe policies and procedures for operating its aircraft in the NAS, including in and around DCA.

**ANSWER**: The allegations in Paragraph 232 state legal conclusions to which no response is required.  To the extent a response is required, PSA states the law speaks for itself and otherwise denies the allegations in Paragraph 232.

233.   On January 29, 2025, PSA was negligent and breached the duties it owed to DECEDENT and Plaintiff as follows:

a.   by failing to see and avoid PAT25, including while on final approach to Runway 33 at DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b), 91.123 and 121.544;

b.   by failing to maintain situational awareness of the operational environment in the airspace around DCA to avoid collision with another aircraft despite a known history of near miss events where commercial aircraft and helicopters or military aircraft almost collided at DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b) and 121.544;

c.   by failing to adequately recognize, respond, and/or take any action upon hearing the TCAS aural "TRAFFIC TRAFFIC" alert, which the flight crew of AE 5342 received a full 19 seconds prior to impact, or observing the visual yellow traffic depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which the flight crew of AE 5342 received continuously for 19 seconds prior to impact, including but not limited to by immediately executing a go-around to protect AE 5342 from collision with another aircraft, particularly in light of the additional audible radio transmissions between ATC and PAT25 that did not establish that PAT25 had AE 5342 in sight, in violation of its duty to exercise reasonable care and in

violation of 14 C.F.R. §§ 91.13(a), 91.113(b), 91.123 and 121.544; FAA Advisory Circular 90-120 §§ 3.1 and 3.2;

d. by failing to take any other evasive action after the TCAS "TRAFFIC TRAFFIC" aural alert received a full 19 seconds prior to impact, and/or the visual yellow traffic depiction on the primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which was received continuously for 19 seconds prior to impact with PAT25, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b), 91.123 and 121.557(a); FAA Advisory Circular 90-120 §§ 3.1 and 3.2;

e. by failing to brief (properly or otherwise) the circling approach to Runway 33 before accepting clearance to land on Runway 33 from ATC, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a) and 121.544;

f. by failing to adequately discuss the conditions under which the flight crew would accept a circling approach to Runway 33 prior to ATC's request that AE 5342 accept a circling approach to land at Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 91.13(a);

g. by accepting a more difficult and dangerous circling approach to land at Runway 33 at DCA in nighttime conditions when it had not been pre-briefed, when there had been no discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial, in violation of its duty

104

to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a) and 121.544;

h. by maintaining policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.135(a)(1);

i. by failing to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.135(a)(1);

j. by failing to evaluate (adequately or otherwise) the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, and a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby

k. by failing to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.57, 121.135(a)(1), 121.401(a)(1) and 121.443(b);

l.  by failing to adequately inform flight crews operating flights into and out of DCA of the location, including lateral and vertical boundaries, of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1) and 121.443(b);

m.  by failing to train or otherwise inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

n.  by failing to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic in the established helicopter routes in the vicinity of DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

o.  by failing to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic

106

operating on Helicopter Route 4, which crosses the approach path to Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

p.  by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.57, 5.53, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b), 121.544 and 121.557;

q.  by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.533(c);

r.  by failing to adequately supervise, monitor, and control their employees, to prevent the aforementioned negligent acts and omissions which led to the subject crash;

s.  by failing to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and omissions which led to the subject crash, including but not limited to training and/or properly informing their employees concerning circling approaches and the circling approach into Runway 33 at DCA in particular, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.401(a)(1);

t.  by failing to adequately train, qualify or otherwise inform its pilots to safely operate at DCA, including by failing to include in any of its training documents or materials any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4, in violation of its duty to

107

exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

u. by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a traffic study through PSA's internal safety program(s), in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.57, 5.53, 5.71 and 5.73;

v. by failing to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.401(a)(1);

w. by failing to adequately train and/or otherwise inform its flight crews how to properly react to a TA at or below 1000 feet, particularly when approaching to land in the airport traffic area, including but not limited to specifically immediately searching for and identifying the intruding traffic and if unable to acquire the target take all necessary actions to ensure collision avoidance, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1) and 121.401(a)(1);

x. by otherwise violating FAA rules and/or regulations, including 14 C.F.R. §§ 5.25(b), 5.51, 5.57, 5.53, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1),

108

121.401(a)(1), 121.443(b), 121.544, 121.557, violating PSA's own SOPs, MOUs, LOAs, and/or policies and procedures, in violation of its duty to exercise reasonable care; and

y. by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

**ANSWER**: PSA denies the allegations in Paragraph 233 and all of its subparts.

234. Through the aforementioned negligence, PSA directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of DECEDENT, and the resulting damages to Plaintiff herein.

**ANSWER**: The allegations in Paragraph 234 state legal conclusions to which no response is required. To the extent a response is required, PSA denies the allegations in Paragraph 234.

235. In addition to being negligent, the acts and omissions set forth herein were made in willful disregard for the rights of the DECEDENT and was reckless toward the safety of the DECEDENT.

**ANSWER**: The allegations in Paragraph 235 state legal conclusions to which no response is required. To the extent a response is required, PSA denies the allegations in Paragraph 235.

236. As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of PSA, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER**: PSA denies the allegations in Paragraph 236.

237. As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or

109

the DECEDENT's Estate, all represented by Plaintiff, seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and suffering that the heirs, beneficiaries and distributees of the DECEDENT's Estate were caused to incur other; and necessary and reasonable expenses as a result of the DECEDENT's death.

**ANSWER**: PSA denies the allegations in Paragraph 237.

## FOURTH CAUSE OF ACTION

## SURVIVAL BASED UPON NEGLIGENCE AGAINST PSA

238.    PLAINTIFF hereby incorporates by reference as though set forth fully herein all the preceding Paragraphs.

**ANSWER**: PSA incorporates by reference as though set forth fully herein its responses to all preceding Paragraphs.

239.    At all relevant times, PSA, including but not limited to its officers, directors, employees and flight crews, owed a duty as a common carrier to the flying public, particularly passengers like DECEDENT, to exercise the utmost care and safely operate aircraft in the NAS, including in and around DCA, safely train its personnel including its pilots, and/or adopt safe policies and procedures for operating its aircraft in the NAS, including in and around DCA.

110

**ANSWER**: The allegations in Paragraph 239 state legal conclusions to which no response is required.  To the extent a response is required, PSA states the law speaks for itself and otherwise denies the allegations in Paragraph 239.

240.    At all relevant times, PSA, including but not limited to its officers, directors, employees and flight crews, owed a duty to the flying public, particularly passengers like DECEDENT, to exercise reasonable care and safely operate aircraft in the NAS, including in and around DCA, safely train its personnel including its pilots, and/or adopt safe policies and procedures for operating its aircraft in the NAS, including in and around DCA.

**ANSWER**: The allegations in Paragraph 240 state legal conclusions to which no response is required.  To the extent a response is required, PSA states the law speaks for itself and otherwise denies the allegations in Paragraph 240.

241.    On January 29, 2025, PSA was negligent and breached the duties it owed to DECEDENT and Plaintiff as follows:

  a. by failing to see and avoid PAT25, including while on final approach to Runway 33 at DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b), 91.123 and 121.544;

  b. by failing to maintain situational awareness of the operational environment in the airspace around DCA to avoid collision with another aircraft despite a known history of near miss events where commercial aircraft and helicopters or military aircraft almost collided at DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b) and 121.544;

  c. by failing to adequately recognize, respond, and/or take any action upon hearing the TCAS aural "TRAFFIC TRAFFIC" alert, which the flight crew of AE 5342 received a full 19 seconds prior to impact, or observing the visual yellow traffic

depiction on its primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which the flight crew of AE 5342 received continuously for 19 seconds prior to impact, including but not limited to by immediately executing a go-around to protect AE 5342 from collision with another aircraft, particularly in light of the additional audible radio transmissions between ATC and PAT25 that did not establish that PAT25 had AE 5342 in sight, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b), 91.123 and 121.544; FAA Advisory Circular 90-120 §§ 3.1 and 3.2;

d.  by failing to take any other evasive action after the TCAS "TRAFFIC TRAFFIC" aural alert received a full 19 seconds prior to impact, and/or the visual yellow traffic depiction on the primary flight display, and/or the yellow diamond indication on the multi-function display showing the relative direction and altitude of PAT25 and highlighting it as a potential danger, which was received continuously for 19 seconds prior to impact with PAT25, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a), 91.113(b), 91.123 and 121.557(a); FAA Advisory Circular 90-120 §§ 3.1 and 3.2;

e.  by failing to brief (properly or otherwise) the circling approach to Runway 33 before accepting clearance to land on Runway 33 from ATC, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a) and 121.544;

f.  by failing to adequately discuss the conditions under which the flight crew would accept a circling approach to Runway 33 prior to ATC's request that AE

5342 accept a circling approach to land at Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 91.13(a);

g.  by accepting a more difficult and dangerous circling approach to land at Runway 33 at DCA in nighttime conditions when it had not been pre-briefed, when there had been no discussion of the conditions under which such a maneuver would be accepted prior to being asked by ATC, and when doing so would greatly increase pilot workload during the critical approach and landing phases of the flight when situational awareness is crucial, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 91.13(a) and 121.544;

h.  by maintaining policies and procedures that allowed AE 5342 to conduct a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.135(a)(1);

i.  by failing to adopt policies and procedures that prohibited AE 5342 from conducting a dangerous circling approach to Runway 33 at DCA, despite nighttime conditions, a known history of near miss events where commercial aircraft and helicopters came within dangerous proximity of each other at or nearby DCA, and helicopter traffic reported in the area, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.135(a)(1);

j.  by failing to evaluate (adequately or otherwise) the safety of a circling approach to land on Runway 33 in light of the information available, including the location of Helicopter Route 4, and a known history of near miss events where

commercial aircraft and helicopters came within dangerous proximity of each other at or nearby

k.  by failing to provide adequate, sufficient and/or appropriate information to its flight crews regarding whether or not to accept a circling approach to Runway 33 at night, especially since PSA flight crews were vested with discretion as to whether to accept or reject ATC's request for landing on Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.57, 121.135(a)(1), 121.401(a)(1) and 121.443(b);

l.  by failing to adequately inform flight crews operating flights into and out of DCA of the location, including lateral and vertical boundaries, of published helicopter routes transiting the airspace surrounding DCA, to ensure that they were fully aware of the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic on the established helicopter routes in the vicinity of DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1) and 121.443(b);

m.  by failing to train or otherwise inform flight crews operating flights into DCA of how to respond to the risk of dangerous proximity to helicopters transiting the airspace surrounding DCA along published helicopter routes, including but not limited to by informing them of the location and vertical and lateral boundaries of the published helicopter routes surrounding DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

n.  by failing to adequately inform flight crews operating flights into DCA of the history of near misses at DCA in order to ensure that they were fully aware of

114

the risks associated with the complex approaches to DCA, and to ensure they maintained particular vigilance to see and avoid low level helicopter traffic in the established helicopter routes in the vicinity of DCA, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

o. by failing to adequately inform flight crews operating flights into DCA of the particular hazards associated with nighttime approaches to Runway 33 and to be particularly vigilant in exercising their duty to see and avoid helicopter traffic operating on Helicopter Route 4, which crosses the approach path to Runway 33, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

p. by otherwise acting and/or failing to act in such a manner as to create an environment in which a mid-air collision could occur, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.57, 5.53, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b), 121.544 and 121.557;

q. by failing to adequately oversee and/or monitor AE 5342 to prevent its crew from engaging in the aforementioned negligent acts and omissions which led to the subject crash, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.533(c);

r. by failing to adequately supervise, monitor, and control their employees, to prevent the aforementioned negligent acts and omissions which led to the subject crash;

s. by failing to adequately train, instruct and evaluate their employees, including their flight crews so as to prevent the aforementioned negligent acts and

omissions which led to the subject crash, including but not limited to training and/or properly informing their employees concerning circling approaches and the circling approach into Runway 33 at DCA in particular, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.401(a)(1);

t.  by failing to adequately train, qualify or otherwise inform its pilots to safely operate at DCA, including by failing to include in any of its training documents or materials any reference to the existence of any established helicopter routes near DCA runways, especially Helicopter Route 4, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1), 121.401(a)(1) and 121.443(b);

u.  by failing to properly perform comprehensive safety risk management ("SRM") and/or a safety review of DCA operations concerning the likelihood of a mid-air collision between commercial airplanes and helicopters prior to January 29, 2025, which would have revealed the deficient training, policies and procedures described above, including but not limited to a safety study through the ASIAS (Aviation Safety Information Analysis and Sharing) program, in which American and PSA were stakeholders, or a traffic study through PSA's internal safety program(s), in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 5.25(b), 5.51, 5.57, 5.53, 5.71 and 5.73;

v.  by failing to adequately train its flight crews or otherwise ensure flight crews understood the altitudes at which TCAS alerts are inhibited, including specifically that RAs were inhibited below 1000 feet and that aural TAs were inhibited below 400 feet, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. § 121.401(a)(1);

w.  by failing to adequately train and/or otherwise inform its flight crews how to

properly react to a TA at or below 1000 feet, particularly when approaching to land in the airport traffic area, including but not limited to specifically immediately searching for and identifying the intruding traffic and if unable to acquire the target take all necessary actions to ensure collision avoidance, in violation of its duty to exercise reasonable care and in violation of 14 C.F.R. §§ 121.135(a)(1) and 121.401(a)(1);

x. by otherwise violating FAA rules and/or regulations, including 14 C.F.R. §§ 5.25(b), 5.51, 5.57, 5.53, 5.71, 5.73, 91.13(a), 91.113(b), 91.123, 121.135(a)(1), 121.401(a)(1), 121.443(b), 121.544, 121.557, violating PSA's own SOPs, MOUs, LOAs, and/or policies and procedures, in violation of its duty to exercise reasonable care; and

y. by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

**ANSWER**: PSA denies the allegations in Paragraph 241 and each of its subparts.

242.    Through the aforementioned negligence, PSA directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of DECEDENTS, and the resulting damages to Plaintiff herein.

**ANSWER**: PSA denies the allegations in Paragraph 242.

243.    In addition to being negligent, the acts and omissions set forth herein were made in willful disregard for the rights of the DECEDENT and was reckless toward the safety of the DECEDENT.

**ANSWER**: PSA denies the allegations in Paragraph 243.

244.    As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of PSA, there was a measurable and significant period of time prior to the death of

DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER**: PSA denies the allegations in Paragraph 244.

245.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by Plaintiff, seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and suffering that the heirs, beneficiaries and distributees of the DECEDENT's Estate were caused to incur other; and necessary and reasonable expenses as a result of the DECEDENT's death.

**ANSWER**: PSA denies the allegations in Paragraph 245.

**FIFTH CAUSE OF ACTION**

**WRONGFUL DEATH BASED UPON NEGLIGENCE AGAINST THE UNITED STATES OF AMERICA**

246.    PLAINTIFF hereby incorporates by reference as though set forth fully herein all the preceding Paragraphs.

**ANSWER**: The allegations in Paragraph 246 are not directed to PSA.  To the extent the allegations in Paragraph 246 can be construed as directed to PSA, PSA incorporates by reference as though set forth fully herein its responses to all preceding Paragraphs.

247.    At all relevant times, air traffic control personnel employed by Defendant USA, under the immediate authority and control of the FAA, owed a duty to the Plaintiff's DECEDENT, and Plaintiff, and all others who were flying in the vicinity of DCA, to exercise reasonable care in maintaining a safe operational environment in the airspace at and around DCA, including but not limited to by taking all actions provided in the applicable Air Traffic Control Manual, FAA JO 7110.65, DCA's Standard Operating Procedures ("SOPs"), and Letters of Agreement ("LOAs") and/or Memoranda of Understanding ("MOUs") between DCA and operators.

**ANSWER**: The allegations in Paragraph 247 are not directed to PSA.  To the extent the allegations in Paragraph 247 can be construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 247.

248.    On January 29, 2025, Defendant USA, by and through the FAA and its air traffic control personnel, was negligent and breached the duties it owed Plaintiff's DECEDENT and Plaintiff as follows:

   a. The controller(s) negligently failed to give first priority to separating aircraft and issuing safety alerts in violation of FAA Order JO 7110.65AA, ¶ 2-1-2, instead prioritizing a departures push or other non-safety critical duties;

   b. The controller(s) negligently failed to establish proper and safe separation between AE 5342 and PAT25;

   c. The controller(s) negligently failed to monitor the course and altitude of PAT25 to ensure compliance with the published route and mandatory maximum published altitude for Helicopter Route 4;

   d. The controller(s) negligently failed to notify PAT25 that it was off course and

above the mandatory maximum altitude for Helicopter Route 4 and failed to instruct PAT25 to immediately turn left to and descend until it was at or below 200 feet and remain clear of AE 5342;

e.  The controllers negligently failed to notify AE 5342 of the presence of PAT25;

f.  The controller(s) negligently violated FAA Order JO 7110.65AA ¶ 7-2-1 by failing to follow the procedures for visual separation therein.  The controller(s) did not follow the mandatory procedures for Pilot-Applied Visual Separation. More particularly:

    i.  The controller(s) failed to inform PAT25 at numerous critical times of the position, direction, type and intentions of AE 5342 and failed to properly confirm that PAT25 had AE 5342 in sight as required by JO 7110.65AA ¶ 7-2-1 subsection a.2.(b)(1) and (2);

    ii.  The controller(s) failed to inform AE 5342 that it was on a converging course with PAT25 and that visual separation was being applied, as required by JO 7110.65AA subsection a.2.(d);

    iii.  The controller(s) failed to advise both pilots of the other aircraft and did not inform either pilot that targets were likely to merge as required by JO 7110.65AA ¶ 7-2-1 subsection a.2.(e);

    iv.  Additionally, the controller(s) failed to issue positive control instructions to either aircraft when vertical and/or lateral separation standards were not ensured, and failed to use proper, specified phraseology in communicating with the subject helicopter and aircraft. The controller(s) also never provided AE 5342 with PAT25's position, direction, type, and intentions;

g. The controller negligently failed to issue a safety or traffic alert to either PAT25 or AE 5342 despite having radar data available in real time that showed the flight tracks, altitudes and distance between PAT25 and AE 5342, and receiving a Conflict Alert (CA) when the aircraft were within approximately 1.5 miles of each other and on converging courses heading directly towards one another. This was in violation of FAA Orders:

    i. JO 7110.65AA, ¶ 2-1-6, Safety Alerts;

    ii. JO 7110.65AA ¶ 7-6-1, Basic Radar Service to VFR Aircraft Terminal and;

    iii. JO 7110.65AA ¶ 5-1-4, Merging Target Procedures;

h. The controller(s) negligently failed to issue traffic alerts to AE 5342 and/or PAT25 in violation of FAA Orders, including but not limited to JO 7110.65AA ¶ 2-1-21; JO 7110.65AA ¶ 3-1-6; and JO 7110.65AA ¶ 3-1-6, on at least three separate occasions, including:

    i. Failing to inform AE 5342 of the helicopter traffic after AE 5342 accepted the request to land on Runway 33 at approximately 8:43:06 p.m. The controller should have informed AE 5342 of PAT25's position, direction, type, and intentions;

    ii. Failing to provide AE 5342 specific and timely traffic alerts when it was about 2 miles southeast of the airport, on a left base to Runway 33, with the relative o'clock position, distance and altitude of PAT25 and informing AE 5342 that PAT25 would transit the airspace by crossing the final approach path to Runway 33;

    iii. Failing to provide specific traffic alerts to PAT25 concerning AE 5342 after receiving a "CA" at approximately 8:47:39 p.m., when the

controller should have advised PAT25 of AE 5342's "o'clock" position, distance and altitude, and informed PAT25 that its flight path was converging with AE 5342 and the radar targets of both aircraft would merge;

i. The controller(s) failed to exercise continuing vigilance to observe and recognize a situation of unsafe aircraft proximity as required by JO 7110.65AA, ¶¶ 2-1-2 & 2-1-6, as described in Note 1 of ¶ 2-1-6;

j. The controller(s) negligently failed to follow SOP and/or well-established custom and practice to hold PAT25 at Hains Point when other aircraft were landing on Runway 33 so as to prevent PAT25 from crossing the approach to Runway 33 as AE 5342 was landing on Runway 33;

k. The controller(s) negligently failed to advise either aircraft that their targets would likely merge;

l. The controllers failed to properly, timely and/or appropriately resolve the Conflict Alert that was depicted (both visually and aurally) on ATC's radar display;

m. The controller(s) negligently failed to warn either AE 5342 or PAT25 that they were on a collision course and that their Radar Targets would merge in accordance with FAA Order JO 7110.65AA ¶ 5-1-4 Merging Target Procedures;

n. The controller(s) negligently failed to follow merging target procedures in violation of FAA Orders JO 7110.65AA ¶ 5-1-4 and JO 7110.65AA ¶ 7-9-5. Once it was clear that PAT25 and AE 5342 were on converging courses, and vertical separation of more than 500 feet or lateral separation of more than 1.5 nm would not be maintained per FAA Order JO 7110.65AA ¶ 7-9-4, which was obvious from at least the time of the CA at approximately 8:47:39 p.m., the

122

controller(s) should have advised both aircraft that their targets were likely to merge and/or issue positive control instructions to turn or climb to one or both aircraft to avoid the mid-air collision;

o. The controller(s) negligently violated FAA Order JO 7110.65AA ¶ 5-6-1 by failing to vector either aircraft to ensure proper separation. The controller(s) failed to issue a vector so that PAT25 would avoid AE 5342 and failed to issue alerts or advise the aircraft of traffic;

p. The controller(s) negligently failed to visually scan their areas of responsibility in violation of FAA Order JO 711065AA ¶ 3-1-12, which should have further alerted them of the need to issue traffic and alerts to PAT25 and AE 5342;

q. The controller(s) providing services to AE 5342 and/or PAT25 failed to comply with air traffic controller duties and responsibilities in that the controller failed to consult with other controllers and personnel and utilize all available tools and personnel at their disposal, which violated the Air Traffic Control Manual, including but not limited to FAA Order JO 7110.65AA ¶ 2-10-3 Tower Team Position Responsibility;

r. The controller(s) failed to provide AE 5342 and PAT25 with appropriate services as required by the Air Traffic Control Manual, including but not limited to for the reasons set forth above;

s. The FAA controllers-in-charge and operations manager negligently supervised the controllers at the DCA tower and failed to timely take required corrective action to prevent the mid-air collision between PAT25 and AE 5342;

t. The controller(s) at the DCA tower were not properly trained or supervised in providing air traffic control services to AE 5342 and PAT25 concerning traffic practices and procedures for separation and issuing safety alerts for aircraft in

close proximity and at risk of collision;

u. The controller(s) at the DCA tower were not properly trained or supervised and/or failed to maintain positive control over helicopters operating on the Helicopter Routes near DCA by providing altitude, heading or such other instructions to ensure adequate separation and avoid a collision;

v. The FAA failed to ensure that the controllers monitoring AE 5342 and/or PAT25 were properly trained and supervised and to ensure that they properly executed their air traffic controller responsibilities;

w. The FAA negligently operated the helicopter route structure in and around DCA such that Helicopter Route 4 was allowed to be utilized at the same time as landings on Runway 33 and takeoffs from Runway 19;

x. The FAA negligently failed to establish SOP and/or train its controllers on the well-established custom and practice to hold PAT25 at Hains Point when other aircraft were landing on Runway 33;

y. The FAA, and its supervisors and/or managers at DCA negligently and/or improperly allowed controllers to leave shifts early, commonly known as an "early shove," leaving the DCA tower inadequately and unsafely under-staffed leading up to this mid-air collision, in violation of FAA rules, regulations, orders, SOPs and/or MOUs;

z. The FAA, and its supervisors and/or managers at DCA negligently and/or improperly allowed the helicopter control and local control positions to be combined at approximately 3:40 p.m. on January 29, 2025, and to remain combined throughout some of the busiest times of day for helicopter and commercial airliner traffic at DCA, in violation of FAA rules, regulations, orders, SOPs and/or MOUs;

aa. The FAA and its controllers, supervisors, and/or managers at DCA, negligently failed to analyze and respond to the thousands of reported occurrences of minimum separation violations at or near DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

bb. The FAA and its controllers, supervisors, and/or managers otherwise violated FAA rules, regulations, orders, SOPs, MOUs, LOAs, and/or policies and procedures; and

cc. The United States of America, its FAA agents, servants and employees were otherwise negligent in causing the mid-air collision between PAT25 and AE 5342 and/or by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

**ANSWER**: The allegations in Paragraph 248 and its subparts are not directed to PSA. To the extent the allegations in Paragraph 248 and its subparts can be construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 248 and its subparts. PSA maintains its affirmative defense that, in view of the conduct of other parties and third parties, PSA did not proximately cause the collision. The sole, new, superseding, or intervening causes of the collision was the conduct of other parties, including U.S. government personnel and entities.

249. On January 29, 2025, the crew of PAT25, including but not limited to the IP (as pilot-in-command) and the PF, employed by Defendant USA, under the immediate authority and control of the United States Army, owed a duty to Plaintiff's DECEDENT, and all others who were flying in the vicinity of DCA, to exercise reasonable care in safely and carefully operating PAT25, including but not limited to see and avoid other aircraft pursuant to 14 C.F.R. § 91.13(a) and

91.113, and to comply with all air traffic control clearances and instructions pursuant to 14 C.F.R. § 91.123, including flight routes and maximum altitude clearances in published helicopter route charts when cleared by air traffic control for said routes.

**ANSWER**: The allegations in Paragraph 249 are not directed to PSA.  To the extent the allegations in Paragraph 249 can be construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 249.

250.    On January 29, 2025, Defendant USA, by and through the United States Army, owed a duty to Plaintiff's DECEDENT, and all others who were flying in the vicinity of DCA, to exercise reasonable care in maintaining, repairing and inspecting Army aircraft, including but not limited to the UH-60L operating as PAT25 on January 29, 2025.

**ANSWER**: The allegations in Paragraph 250 are not directed to PSA.  To the extent the allegations in Paragraph 250 can be construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 250.

251.    On January 29, 2025, Defendant USA, by and through the crew of PAT25 and United States Army personnel, was negligent and breached the duties it owed Plaintiff's DECEDENT and Plaintiff as follows:

   a. The Army crew negligently failed to establish and maintain proper and safe visual separation with AE 5342;

   b. The Army crew negligently requested and accepted visual separation from air traffic control without actually having AE 5342 identified and in sight;

   c. The Army crew negligently failed to see and acquire AE 5342 when initially requesting and accepting visual separation from air traffic control, despite its altitude and location being provided by air traffic control at or about 8:46 p.m.;

   d. The Army crew negligently requested and accepted visual separation knowing that their ability to visually acquire traffic was compromised by their use of

126

Night Vision Goggles ("NVGs") and despite knowing that the helicopter was not transmitting ADS-B out;

e. The Army crew negligently requested and accepted visual separation instructions from air traffic control without receiving sufficient information and/or instructions from air traffic control, including but not limited to AE 5342's altitude, position, direction, type and intentions;

f. The Army crew negligently failed to maintain vigilant visual surveillance as required to maintain adequate and safe visual separation from aircraft along Helicopter Routes 1 and 4;

g. The Army crew negligently failed to establish and maintain communication with AE 5342, through ATC, to ensure visual separation;

h. The Army crew negligently utilized NVGs during the flight, which unreasonably distracted them, caused object obscuration/blending, and limited their field of vision, depth perception, color differentiation and/or their ability to distinguish oncoming traffic, in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-157;

i. The Army crew negligently failed to recognize that the cultural lighting and over saturated bright lights along Helicopter Routes 1 and 4 in the vicinity of DCA reduced the effectiveness of their NVGs and negligently failed to de-goggle or doff their NVGs when transiting Helicopter Routes 1 and 4 to improve their ability to identify AE 5342;

j. The Army crew negligently failed to de-goggle or doff their NVGs in the congested, urban environment around DCA in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-2;

k. The Army crew negligently failed to properly consider the effect NVGs could

have on their ability to perceive navigation lights and landing lights from other aircraft operating around DCA, in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-206;

l.   The Army crew negligently failed to properly coordinate amongst themselves and/or negligently failed to utilize proper and safe crew resource management, which is especially important at night, in violation of Army regulations, including but not limited to TC 3-04.4 ¶¶ 4-190 and 4-191.

m.   The Army crew negligently failed to see and avoid AE 5342, in violation of 14 CFR §§ 91.13(a) and 91.113;

n.   The Army crew negligently flew off the flight route towards the center of the Potomac River at too high an altitude, despite repeated altitude call outs from the IP to the PF, and violated the published standards and rules for operating within Helicopter Route 1 and Route 4, particularly that all operations in this section of Helicopter Route 1 and Route 4, between the Memorial Bridge and the Wilson Bridge, must remain above the east bank of the Potomac River at or below 200 feet MSL;

o.   Failed to stay on the charted route and adhere to the 200 feet mandatory altitude restriction was careless and reckless, in violation of 14 C.F.R. § 91.13(a).

p.   The failure to maintain the charted flight route and altitude beneath the maximum route altitude also violates 14 C.F.R. § 91.119(d)(1), the Army's own SOP, and other mandatory Army and FAA rules and regulations;

q.   The Army crew negligently failed to properly cross reference their instruments, including but not limited to their radar altimeters, and visual references along Helicopter Routes 1 and 4 to ensure they remained on the charted route and at or below the mandatory 200 feet altitude restriction;

128

r. The Army crew negligently failed to navigate sufficiently to the left (or towards the Eastern shore of the Potomac River) despite the IP telling the PF that he believed this was what ATC wanted from the helicopter and that flying in the middle of the river brought the helicopter dangerously closer to airplanes landing at DCA;

s. The Army crew negligently failed to follow Helicopter Route 4 as visually depicted by the lines set forth on the Baltimore-Washington Helicopter Route Chart;

t. The Army crew negligently failed to follow Helicopter Route 4 close to the Eastern shore of the Potomac as described in the Helicopter Route Chart;

u. The Army crew negligently failed to identify that AE 5342 and PAT25 were on a collision course and failed to take evasive action;

v. The Army crew failed to maintain course on the charted route, and failed to discuss, analyze, and/or resolve an altitude discrepancy when in the minutes prior to the collision, the IP stated that the aircraft was at 400 feet but the PF stated that the aircraft was at 300 feet and this failure was critical especially since they were transiting airspace that had a 200-foot altitude restriction;

w. The IP, who was the pilot in command of PAT25, negligently failed to take timely and appropriate action to correct the helicopter's altitude and course, despite knowing that the helicopter was too high and off course;

x. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, and/or Army regulations in approving and/or directing PAT25 to conduct a training mission transiting Helicopter Route 1 and Route 4 during one of the busiest times of day for arriving and/or departing flights at DCA;

y.  The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, and/or Army regulations, including but not limited to Army TC 3-04.4 ¶ 4-2, in approving or directing PAT25 to conduct a training mission using NVGs during one of the busiest times of day for arriving and/or departing flights at DCA;

z.  The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, Army regulations, including but not limited to AR 95-1, and/or FAA regulations in approving and/or directing PAT25 to conduct a training mission in the congested, Class B Airspace around DCA without their transponder broadcasting ADS-B out despite being equipped with a transponder capable of doing so;

aa. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to conduct adequate risk management in their mission planning and execution of this training flight, which violated SOPs, MOUs, and/or Army regulations, including but not limited to AR 95-1, ¶ 3-15, C 3–04.11, ADP 5–0, ATP 5–19, and DA Pam 385–30, by approving and/or directing PAT25 to conduct a training mission at the time and location, and under the circumstances of the subject flight, including but not limited to operating in the congested, Class B Airspace around DCA, using NVGs, during one of the busiest time periods for commercial traffic at DCA, and without broadcasting ADS-B out despite the subject helicopter being capable of doing so;

bb. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to establish adequate and safe

procedures in their SOP for flight operations along Helicopter Routes 1 and 4 near DCA when aircraft traffic is landing on Runway 33;

cc. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to train its helicopter crews to hold at Hains Point when aircraft traffic was landing on Runway 33;

dd. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to establish adequate and safe procedures in their SOP to prohibit the unsafe practice of allowing their helicopters to pass underneath other aircraft on approach to or departing from DCA, despite being on notice of such events in and around DCA;

ee. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to correct for, or warn flight crews about, known barometric altimeter errors and allowed its Black Hawk helicopters, including PAT25, to operate on Helicopter Routes 1 and 4, which require strict adherence to the 200 feet MSL maximum altitude, knowing that the helicopters' barometric altimeters were allowed to be operated with a +/- 70 feet variance and knowing that additional barometric altimeter errors, particularly for helicopters like PAT25 that are equipped with external stores (ESSS), could further increase the variance in flight when at or around 200 feet altitude;

ff. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to adopt appropriate barometric altimeter correction factors, especially for high drag configuration helicopters utilizing external stores (ESSS);

gg. The Army, including but not limited to the crew, their commanding officers

131

and/or other supervisors negligently failed to establish an SOP that pilots must cross check their barometric altimeters with their radar altimeters when over water on Helicopter Routes 1 and 4 near DCA, so that they can assure flying at or below 200 feet MSL as was required;

hh. The Army, including but not limited to its commanding officers, supervisors, and the crew of PAT25 negligently failed to analyze and respond to the thousands of reported occurrences of minimum separation violations at DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

ii. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to properly liaise with the FAA and other aviation entities and operators in the Washington Capital Region to analyze and respond to the thousands of reported occurrences of minimum separation violations at or near DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

jj. The Army crew was not properly trained in conducting night training missions at or near DCA;

kk. The Army crew was not properly trained in transiting Helicopter Route 1 and Route 4 near DCA;

ll. The Army crew was not properly trained in safely and properly utilizing NVGs, including but not limited to failing to consider and abide by the above referenced Army Training Circular provisions;

mm.    The Army crew negligently failed to comply with applicable FARs for the safe operations of aircraft, as well as any comparable U.S. Army and/or military regulations concerning the safe operations of aircraft, particularly those

procedures concerning VFR operations near commercial airports and/or in Class B Airspace;

nn. The Army, including but not limited to the crew, its commanders, supervisors, and the 12th Aviation Battalion operating PAT25 negligently failed to properly inspect and maintain the subject helicopter, including but not limited to the subject helicopter's transponder, the altimeter(s) and other sources of pressure altitude data, and/or other systems on board the aircraft;

oo. The Army crew negligently failed to employ ADS-B on the subject flight;

pp. The Army crew negligently failed to properly set their altimeter(s) and/or failed to use other tools at their disposal, including altimeter bugs which would have further assisted the Army crew in complying with the altitude restriction as it transited Helicopter Route 4;

qq. The Army crew negligently failed to resolve the inconsistent altitude readings being reported and/or perceived by the IP and the PF;

rr. The Department of the Army and its agents, servants and employees otherwise violated FAA and Army rules, regulations, including but not limited to AR 95-1, orders, Training Circulars ("TCs"), SOPs, MOUs, LOAs, and/or policies and procedures;

ss. The Defendant USA, its Department of the Army agents, servants and employees were otherwise negligent, and/or by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances, and all the foregoing were contributing causes to the mid-air collision complained of herein.

**ANSWER**: The allegations in Paragraph 251 and its subparts are not directed to PSA. To the extent the allegations in Paragraph 251 and its subparts can be construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 251 and its subparts. PSA maintains its affirmative defense that, in view of the conduct of other parties and third parties, PSA did not proximately cause the collision. The sole, new, superseding, or intervening causes of the collision was the conduct of other parties, including U.S. government personnel and entities.

252.    Through the aforementioned negligence, Defendant USA directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's DECEDENT, and the resulting damages to Plaintiff herein.

**ANSWER**: The allegations in Paragraph 252 are not directed to PSA. To the extent the allegations in Paragraph 252 can be construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 252. PSA maintains its affirmative defense that, in view of the conduct of other parties and third parties, PSA did not proximately cause the collision. The sole, new, superseding, or intervening causes of the collision was the conduct of other parties, including U.S. government personnel and entities.

253.    As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of the USA, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER**: The allegations in Paragraph 253 are not directed to PSA. To the extent the allegations in Paragraph 253 can be construed as directed to PSA, PSA denies the allegations in Paragraph 253.

254.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by Plaintiff, seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT; loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and suffering that the heirs, beneficiaries and distributees of the DECEDENT's Estate were caused to incur other; and necessary and reasonable expenses as a result of the DECEDENT's death.

**ANSWER**: The allegations in Paragraph 254 are not directed to PSA.  To the extent the allegations in Paragraph 254 can be construed as directed to PSA, PSA admits that Plaintiffs are entitled to recover any appropriate damages against the United States.

**SIXTH CAUSE OF ACTION**

**SURVIVAL BASED UPON NEGLIGENCE AGAINST THE UNITED STATES OF AMERICA**

255.    PLAINTIFF hereby incorporates by reference as though set forth fully herein all the preceding Paragraphs.

**ANSWER**: The allegations in Paragraph 255 are not directed to PSA.  To the extent the allegations in Paragraph 255 can be construed as directed to PSA, PSA incorporates by reference as though set forth fully herein its responses to all preceding Paragraphs.

256.    At all relevant times, air traffic control personnel employed by Defendant USA, under the immediate authority and control of the FAA owed a duty to the Plaintiff's DECEDENT, and Plaintiff, and all others who were flying the vicinity of DCA, to exercise reasonable care in maintaining a safe operational environment in the airspace at and around DCA, including but not limited to by taking all actions provided in the applicable Air Traffic Control Manual, FAA JO 7110.65, DCA's SOPs, LOAs and/or MOUs between DCA and operators.

**ANSWER**: The allegations in Paragraph 256 are not directed to PSA.  To the extent the allegations in Paragraph 256 can be construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 256.

257.    On January 29, 2025, Defendant USA, by and through the FAA and its air traffic control personnel, was negligent and breached the duties it owed Plaintiff's DECEDENT and Plaintiff as follows:

    a.  The controller(s) negligently failed to give first priority to separating aircraft and issuing safety alerts in violation of FAA Order JO 7110.65AA, ¶ 2-1-2, instead prioritizing a departures push or other non-safety critical duties;

    b.  The controller(s) negligently failed to establish proper and safe separation between AE 5342 and PAT25;

    c.  The controller(s) negligently failed to monitor the course and altitude of PAT25 to ensure compliance with the published route and mandatory maximum published altitude for Helicopter Route 4;

    d.  The controller(s) negligently failed to notify PAT25 that it was off course and above the mandatory maximum altitude for Helicopter Route 4 and failed to instruct PAT25 to immediately turn left to and descend until it was at or below 200 feet and remain clear of AE 5342;

    e.  The controllers negligently failed to notify AE 5342 of the presence of PAT25;

f.  The controller(s) negligently violated FAA Order JO 7110.65AA ¶ 7-2-1 by failing to follow the procedures for visual separation therein. The controller(s) did not follow the mandatory procedures for Pilot-Applied Visual Separation. More particularly:

   i.  The controller(s) failed to inform PAT25 at numerous critical times of the position, direction, type and intentions of AE 5342 and failed to properly confirm that PAT25 had AE 5342 in sight as required by JO 7110.65AA ¶ 7-2-1 subsection a.2.(b)(1) and (2);

   ii.  The controller(s) failed to inform AE 5342 that it was on a converging course with PAT25 and that visual separation was being applied, as required by JO 7110.65AA subsection a.2.(d);

   iii.  The controller(s) failed to advise both pilots of the other aircraft and did not inform either pilot that targets were likely to merge as required by JO 7110.65AA ¶ 7-2-1 subsection a.2.(e);

   iv.  Additionally, the controller(s) failed to issue positive control instructions to either aircraft when vertical and/or lateral separation standards were not ensured, and failed to use proper, specified phraseology in communicating with the subject helicopter and aircraft. The controller(s) also never provided AE 5342 with PAT25's position, direction, type, and intentions;

g.  The controller negligently failed to issue a safety or traffic alert to either PAT25 or AE 5342 despite having radar data available in real time that showed the flight tracks, altitudes and distance between PAT25 and AE 5342, and receiving a Conflict Alert (CA) when the aircraft were within approximately 1.5 miles of each other and on converging courses heading directly towards one another.

137

This was in violation of FAA Orders:

    i.   JO 7110.65AA, ¶ 2-1-6, Safety Alerts;

    ii.   JO 7110.65AA ¶ 7-6-1, Basic Radar Service to VFR Aircraft Terminal and;

    iii.   JO 7110.65AA ¶ 5-1-4, Merging Target Procedures;

h.  The controller(s) negligently failed to issue traffic alerts to AE 5342 and/or PAT25 in violation of FAA Orders, including but not limited to JO 7110.65AA ¶ 2-1-21; JO 7110.65AA ¶ 3-1-6; and JO 7110.65AA ¶ 3-1-6, on at least three separate occasions, including:

    i.   Failing to inform AE 5342 of the helicopter traffic after AE 5342 accepted the request to land on Runway 33 at approximately 8:43:06 p.m. The controller should have informed AE 5342 of PAT25's position, direction, type, and intentions;

    ii.   Failing to provide AE 5342 specific and timely traffic alerts when it was about 2 miles southeast of the airport, on a left base to Runway 33, with the relative o'clock position, distance and altitude of PAT25 and informing AE 5342 that PAT25 would transit the airspace by crossing the final approach path to Runway 33;

    iii.   Failing to provide specific traffic alerts to PAT25 concerning AE 5342 after receiving a "CA" at approximately 8:47:39 p.m., when the controller should have advised PAT25 of AE 5342's "o'clock" position, distance and altitude, and informed PAT25 that its flight path was converging with AE 5342 and the radar targets of both aircraft would merge;

i.  The controller(s) failed to exercise continuing vigilance to observe and

recognize a situation of unsafe aircraft proximity as required by JO 7110.65AA, ¶¶ 2-1-2 & 2-1-6, as described in Note 1 of ¶ 2-1-6;

j.  The controller(s) negligently failed to follow SOP and/or well-established custom and practice to hold PAT25 at Hains Point when other aircraft were landing on Runway 33 so as to prevent PAT25 from crossing the approach to Runway 33 as AE 5342 was landing on Runway 33;

k.  The controller(s) negligently failed to advise either aircraft that their targets would likely merge;

l.  The controllers failed to properly, timely and/or appropriately resolve the Conflict Alert that was depicted (both visually and aurally) on ATC's radar display;

m.  The controller(s) negligently failed to warn either AE 5342 or PAT25 that they were on a collision course and that their Radar Targets would merge in accordance with FAA Order JO 7110.65AA ¶ 5-1-4 Merging Target Procedures;

n.  The controller(s) negligently failed to follow merging target procedures in violation of FAA Orders JO 7110.65AA ¶ 5-1-4 and JO 7110.65AA ¶ 7-9-5. Once it was clear that PAT25 and AE 5342 were on converging courses, and vertical separation of more than 500 feet or lateral separation of more than 1.5 nm would not be maintained per FAA Order JO 7110.65AA ¶ 7-9-4, which was obvious from at least the time of the CA at approximately 8:47:39 p.m., the controller(s) should have advised both aircraft that their targets were likely to merge and/or issue positive control instructions to turn or climb to one or both aircraft to avoid the mid-air collision;

o.  The controller(s) negligently violated FAA Order JO 7110.65AA ¶ 5-6-1 by failing to vector either aircraft to ensure proper separation.  The controller(s)

failed to issue a vector so that PAT25 would avoid AE 5342 and failed to issue alerts or advise the aircraft of traffic;

p.  The controller(s) negligently failed to visually scan their areas of responsibility in violation of FAA Order JO 711065AA ¶ 3-1-12, which should have further alerted them of the need to issue traffic and alerts to PAT25 and AE 5342;

q.  The controller(s) providing services to AE 5342 and/or PAT25 failed to comply with air traffic controller duties and responsibilities in that the controller failed to consult with other controllers and personnel and utilize all available tools and personnel at their disposal, which violated the Air Traffic Control Manual, including but not limited to FAA Order JO 7110.65AA ¶ 2-10-3 Tower Team Position Responsibility;

r.  The controller(s) failed to provide AE 5342 and PAT25 with appropriate services as required by the Air Traffic Control Manual, including but not limited to for the reasons set forth above;

s.  The FAA controllers-in-charge and operations manager negligently supervised the controllers at the DCA tower and failed to timely take required corrective action to prevent the mid-air collision between PAT25 and AE 5342;

t.  The controller(s) at the DCA tower were not properly trained or supervised in providing air traffic control services to AE 5342 and PAT25 concerning traffic practices and procedures for separation and issuing safety alerts for aircraft in close proximity and at risk of collision;

u.  The controller(s) at the DCA tower were not properly trained or supervised and/or failed to maintain positive control over helicopters operating on the Helicopter Routes near DCA by providing altitude, heading or such other instructions to ensure adequate separation and avoid a collision;

v.  The FAA failed to ensure that the controllers monitoring AE 5342 and/or PAT25 were properly trained and supervised and to ensure that they properly executed their air traffic controller responsibilities;

w.  The FAA negligently operated the helicopter route structure in and around DCA such that Helicopter Route 4 was allowed to be utilized at the same time as landings on Runway 33 and takeoffs from Runway 19;

x.  The FAA negligently failed to establish SOP and/or train its controllers on the well-established custom and practice to hold PAT25 at Hains Point when other aircraft were landing on Runway 33;

y.  The FAA, and its supervisors and/or managers at DCA negligently and/or improperly allowed controllers to leave shifts early, commonly known as an "early shove," leaving the DCA tower inadequately and unsafely under-staffed leading up to this mid-air collision, in violation of FAA rules, regulations, orders, SOPs and/or MOUs;

z.  The FAA, and its supervisors and/or managers at DCA negligently and/or improperly allowed the helicopter control and local control positions to be combined at approximately 3:40 p.m. on January 29, 2025, and to remain combined throughout some of the busiest times of day for helicopter and commercial airliner traffic at DCA, in violation of FAA rules, regulations, orders, SOPs and/or MOUs;

aa. The FAA and its controllers, supervisors, and/or managers at DCA, negligently failed to analyze and respond to the thousands of reported occurrences of minimum separation violations at or near DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

141

bb. The FAA and its controllers, supervisors, and/or managers otherwise violated FAA rules, regulations, orders, SOPs, MOUs, LOAs, and/or policies and procedures; and

cc. The United States of America, its FAA agents, servants and employees were otherwise negligent in causing the mid-air collision between PAT25 and AE 5342 and/or by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances.

**ANSWER**: The allegations in Paragraph 257 and its subparts are not directed to PSA. To the extent the allegations in Paragraph 257 and its subparts can be construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 257 and its subparts. PSA maintains its affirmative defense that, in view of the conduct of other parties and third parties, PSA did not proximately cause the collision. The sole, new, superseding, or intervening causes of the collision was the conduct of other parties, including U.S. government personnel and entities.

258. On January 29, 2025, the crew of PAT25, including but not limited to the IP (as pilot-in-command) and the pilot flying, employed by Defendant USA, under the immediate authority and control of the United States Army, owed a duty to Plaintiff's DECEDENT, and all others who were flying in the vicinity of DCA, to exercise reasonable care in safely and carefully operating PAT25, including but not limited to see and avoid other aircraft pursuant to 14 C.F.R. § 91.13(a) and 91.113, and to comply with all air traffic control clearances and instructions pursuant to 14 C.F.R. § 91.123, including maximum altitude clearances in published helicopter route charts when cleared by air traffic control for said routes.

**ANSWER**: The allegations in Paragraph 258 are not directed to PSA.  To the extent the allegations in Paragraph 258 can be construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 258.

259.    On January 29, 2025, Defendant USA, by and through the United States Army, owed a duty to Plaintiff's DECEDENT, and all others who were flying in the vicinity of DCA, to exercise reasonable care in maintaining, repairing and inspecting Army aircraft, including but not limited to the UH-60L operating as PAT25 on January 29, 2025.

**ANSWER**: The allegations in Paragraph 259 are not directed to PSA.  To the extent the allegations in Paragraph 259 can be construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 259.

260.    On January 29, 2025, Defendant USA, by and through the crew of PAT25 and United States Army personnel, was negligent and breached the duties it owed Plaintiff's DECEDENT and Plaintiff as follows:

    a.  The Army crew negligently failed to establish and maintain proper and safe visual separation with AE 5342;

    b.  The Army crew negligently requested and accepted visual separation from air traffic control without actually having AE 5342 identified and in sight;

    c.  The Army crew negligently failed to see and acquire AE 5342 when initially requesting and accepting visual separation from air traffic control, despite its altitude and location being provided by air traffic control at or about 8:46 p.m.;

    d.  The Army crew negligently requested and accepted visual separation knowing that their ability to visually acquire traffic was compromised by their use of Night Vision Goggles ("NVGs") and despite knowing that the helicopter was not transmitting ADS-B out;

    e.  The Army crew negligently requested and accepted visual separation

143

instructions from air traffic control without receiving sufficient information and/or instructions from air traffic control, including but not limited to AE 5342's altitude, position, direction, type and intentions;

f.  The Army crew negligently failed to maintain vigilant visual surveillance as required to maintain adequate and safe visual separation from aircraft along Helicopter Routes 1 and 4;

g.  The Army crew negligently failed to establish and maintain communication with AE 5342, through ATC, to ensure visual separation;

h.  The Army crew negligently utilized NVGs during the flight, which unreasonably distracted them, caused object obscuration/blending, and limited their field of vision, depth perception, color differentiation and/or their ability to distinguish oncoming traffic, in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-157;

i.  The Army crew negligently failed to recognize that the cultural lighting and over saturated bright lights along Helicopter Routes 1 and 4 in the vicinity of DCA reduced the effectiveness of their NVGs and negligently failed to de-goggle or doff their NVGs when transiting Helicopter Routes 1 and 4 to improve their ability to identify AE 5342;

j.  The Army crew negligently failed to de-goggle or doff their NVGs in the congested, urban environment around DCA in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-2;

k.  The Army crew negligently failed to properly consider the effect NVGs could have on their ability to perceive navigation lights and landing lights from other aircraft operating around DCA, in violation of Army regulations, including but not limited to TC 3-04.4 ¶ 4-206;

144

l.   The Army crew negligently failed to properly coordinate amongst themselves and/or negligently failed to utilize proper and safe crew resource management, which is especially important at night, in violation of Army regulations, including but not limited to TC 3-04.4 ¶¶ 4-190 and 4-191.

m.   The Army crew negligently failed to see and avoid AE 5342, in violation of 14 CFR §§ 91.13(a) and 91.113;

n.   The Army crew negligently flew off the flight route towards the center of the Potomac River at too high an altitude, despite repeated altitude call outs from the IP to the PF, and violated the published standards and rules for operating within Helicopter Route 1 and Route 4, particularly that all operations in this section of Helicopter Route 1 and Route 4, between the Memorial Bridge and the Wilson Bridge, must remain above the east bank of the Potomac River at or below 200 feet MSL;

o.   Failed to stay on the charted route and adhere to the 200 feet mandatory altitude restriction was careless and reckless, in violation of 14 C.F.R. § 91.13(a).

p.   The failure to maintain the charted flight route and altitude beneath the maximum route altitude also violates 14 C.F.R. § 91.119(d)(1), the Army's own SOP, and other mandatory Army and FAA rules and regulations;

q.   The Army crew negligently failed to properly cross reference their instruments, including but not limited to their radar altimeters, and visual references along Helicopter Routes 1 and 4 to ensure they remained on the charted route and at or below the mandatory 200 feet altitude restriction;

r.   The Army crew negligently failed to navigate sufficiently to the left (or towards the Eastern shore of the Potomac River) despite the IP telling the PF that he believed this was what ATC wanted from the helicopter and that flying in the

middle of the river brought the helicopter dangerously closer to airplanes landing at DCA;

s. The Army crew negligently failed to follow Helicopter Route 4 as visually depicted by the lines set forth on the Baltimore-Washington Helicopter Route Chart;

t. The Army crew negligently failed to follow Helicopter Route 4 close to the Eastern shore of the Potomac as described in the Helicopter Route Chart;

u. The Army crew negligently failed to identify that AE 5342 and PAT25 were on a collision course and failed to take evasive action;

v. The Army crew failed to maintain course on the charted route, and failed to discuss, analyze, and/or resolve an altitude discrepancy when in the minutes prior to the collision, the IP stated that the aircraft was at 400 feet but the PF stated that the aircraft was at 300 feet and this failure was critical especially since they were transiting airspace that had a 200-foot altitude restriction;

w. The IP, who was the pilot in command of PAT25, negligently failed to take timely and appropriate action to correct the helicopter's altitude and course, despite knowing that the helicopter was too high and off course;

x. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, and/or Army regulations in approving and/or directing PAT25 to conduct a training mission transiting Helicopter Route 1 and Route 4 during one of the busiest times of day for arriving and/or departing flights at DCA;

y. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, and/or Army regulations, including but not limited to Army TC 3-04.4 ¶ 4-2, in approving or

146

directing PAT25 to conduct a training mission using NVGs during one of the busiest times of day for arriving and/or departing flights at DCA;

z.  The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to follow SOPs, MOUs, Army regulations, including but not limited to AR 95-1, and/or FAA regulations in approving and/or directing PAT25 to conduct a training mission in the congested, Class B Airspace around DCA without their transponder broadcasting ADS-B out despite being equipped with a transponder capable of doing so;

aa. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to conduct adequate risk management in their mission planning and execution of this training flight, which violated SOPs, MOUs, and/or Army regulations, including but not limited to AR 95-1, ¶ 3-15, C 3–04.11, ADP 5–0, ATP 5–19, and DA Pam 385–30, by approving and/or directing PAT25 to conduct a training mission at the time and location, and under the circumstances of the subject flight, including but not limited to operating in the congested, Class B Airspace around DCA, using NVGs, during one of the busiest time periods for commercial traffic at DCA, and without broadcasting ADS-B out despite the subject helicopter being capable of doing so;

bb. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to establish adequate and safe procedures in their SOP for flight operations along Helicopter Routes 1 and 4 near DCA when aircraft traffic is landing on Runway 33;

cc. The Army, including but not limited to the crew, their commanding officers

and/or other supervisors negligently failed to train its helicopter crews to hold at Hains Point when aircraft traffic was landing on Runway 33;

dd. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to establish adequate and safe procedures in their SOP to prohibit the unsafe practice of allowing their helicopters to pass underneath other aircraft on approach to or departing from DCA, despite being on notice of such events in and around DCA;

ee. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to correct for, or warn flight crews about, known barometric altimeter errors and allowed its Black Hawk helicopters, including PAT25, to operate on Helicopter Routes 1 and 4, which require strict adherence to the 200 feet MSL maximum altitude, knowing that the helicopters' barometric altimeters were allowed to be operated with a +/- 70 feet variance and knowing that additional barometric altimeter errors, particularly for helicopters like PAT25 that are equipped with external stores (ESSS), could further increase the variance in flight when at or around 200 feet altitude;

ff. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to adopt appropriate barometric altimeter correction factors, especially for high drag configuration helicopters utilizing external stores (ESSS);

gg. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to establish an SOP that pilots must cross check their barometric altimeters with their radar altimeters when over water on Helicopter Routes 1 and 4 near DCA, so that they can assure flying at

or below 200 feet MSL as was required;

hh. The Army, including but not limited to its commanding officers, supervisors, and the crew of PAT25 negligently failed to analyze and respond to the thousands of reported occurrences of minimum separation violations at DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

ii. The Army, including but not limited to the crew, their commanding officers and/or other supervisors negligently failed to properly liaise with the FAA and other aviation entities and operators in the Washington Capital Region to analyze and respond to the thousands of reported occurrences of minimum separation violations at or near DCA to address the obvious and imminent risk of a mid-air collision precisely like the one between PAT25 and AE 5342;

jj. The Army crew was not properly trained in conducting night training missions at or near DCA;

kk. The Army crew was not properly trained in transiting Helicopter Route 1 and Route 4 near DCA;

ll. The Army crew was not properly trained in safely and properly utilizing NVGs, including but not limited to failing to consider and abide by the above referenced Army Training Circular provisions;

mm.      The Army crew negligently failed to comply with applicable FARs for the safe operations of aircraft, as well as any comparable U.S. Army and/or military regulations concerning the safe operations of aircraft, particularly those procedures concerning VFR operations near commercial airports and/or in Class B Airspace;

nn. The Army, including but not limited to the crew, its commanders, supervisors,

and the 12th Aviation Battalion operating PAT25 negligently failed to properly inspect and maintain the subject helicopter, including but not limited to the subject helicopter's transponder, the altimeter(s) and other sources of pressure altitude data, and/or other systems on board the aircraft;

oo. The Army crew negligently failed to employ ADS-B on the subject flight;

pp. The Army crew negligently failed to properly set their altimeter(s) and/or failed to use other tools at their disposal, including altimeter bugs which would have further assisted the Army crew in complying with the altitude restriction as it transited Helicopter Route 4;

qq. The Army crew negligently failed to resolve the inconsistent altitude readings being reported and/or perceived by the IP and the PF;

rr. The Department of the Army and its agents, servants and employees otherwise violated FAA and Army rules, regulations, including but not limited to AR 95-1, orders, Training Circulars ("TCs"), SOPs, MOUs, LOAs, and/or policies and procedures;

ss. The Defendant USA, its Department of the Army agents, servants and employees were otherwise negligent, and/or by taking and/or failing to take other actions to be proven through discovery or at the trial in this matter, which were in contravention of the exercise of due care, and reasonable prudence under the circumstances, and all the foregoing were contributing causes to the mid-air collision complained of herein.

**ANSWER**: The allegations in Paragraph 260 and its subparts are not directed to PSA. To the extent the allegations in Paragraph 260 and its subparts can be construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 260 and its subparts.

261.    Through the aforementioned negligence, Defendant USA directly and proximately, caused and/or contributed to the subject crash and thereby the injuries and death of Plaintiff's DECEDENT, and the resulting damages to Plaintiff herein.

**ANSWER**: The allegations in Paragraph 261 are not directed to PSA.  To the extent the allegations in Paragraph 261 can be construed as directed to PSA, PSA denies any and all allegations as to PSA that may be construed or inferred in Paragraph 261.  PSA maintains its affirmative defense that, in view of the conduct of other parties and third parties, PSA did not proximately cause the collision.  The sole, new, superseding, or intervening causes of the collision was the conduct of other parties, including U.S. government personnel and entities.

262.    As a result of the foregoing and as a direct and proximate result of the acts and/or omissions of the USA, there was a measurable and significant period of time prior to the death of DECEDENT whereby he/she experienced unusual G-forces, physical injuries, conscious pain and suffering, mental anguish, emotional distress, fear of impending death, and other injuries and damages that ultimately caused his/her death.

**ANSWER**: The allegations in Paragraph 262 are not directed to PSA.  To the extent the allegations in Paragraph 262 can be construed as directed to PSA, PSA denies the allegations in Paragraph 262.

263.    As a direct and proximate result of the foregoing, the heirs, beneficiaries and distributees of DECEDENT, as well as anyone entitled to recover under the applicable law, and/or the DECEDENT's Estate, all represented by Plaintiff, seek all wrongful death and survival damages under applicable law, including, but not limited to, all economic and non-economic damages, including the loss of the gross earning power of the DECEDENT; the loss of the full value of the life of the DECEDENT; loss of the parental and/or familial relationship arising from the death of the DECEDENT; the loss of financial support and contribution of the DECEDENT; loss of services; loss of inheritance; loss of accumulations; full pecuniary loss of the DECEDENT;

151

loss of past and future income, support, society, love, grief, consortium, solatium, services, guidance, care, comfort, and companionship of the DECEDENT; loss of life's pleasures; loss of enjoyment of life of the DECEDENT; and damages for mental anguish and mental pain and suffering that the heirs, beneficiaries and distributees of the DECEDENT's Estate were caused to incur other; and necessary and reasonable expenses as a result of the DECEDENT's death.

**ANSWER**: The allegations in Paragraph 263 are not directed to PSA.  To the extent the allegations in Paragraph 263 can be construed as directed to PSA, PSA admits that Plaintiffs are entitled to recover any appropriate damages against the United States.

## PLAINTIFFS' PRAYER FOR RELIEF

PSA denies that Plaintiffs are entitled to any of the relief sought in the Prayer for Relief against PSA.

## AFFIRMATIVE DEFENSES

These affirmative defenses are pleaded in the alternative, as applicable, without waiving any rights, claims, or defenses available at law or in equity.  PSA reserves the right to add, amend, supplement, or withdraw any affirmative defense as discovery and further investigation may warrant.

## FIRST AFFIRMATIVE DEFENSE

### Preemption

Federal law expressly and/or impliedly preempts Plaintiffs' attempt to impose state-law duties of care against PSA. To the extent Plaintiffs premise their claims on state-law duties of care rather than a federal duty of care, those claims are thus barred, in whole or in part, by federal law, including, but not limited to, federal regulations, including the federal regulatory framework governing air carrier operations, air traffic control, and airspace management, and the regulations promulgated by the FAA, including but not limited to 14 C.F.R. Parts 5, 91, and 121; the Airline Deregulation Act, 49 U.S.C. § 41713; and the Federal Aviation Act, 49 U.S.C. §§ 40101-49105.

152

While state-law tort *remedies* are not preempted, the duties against which PSA's conduct must be assessed are supplied by federal law, not the common law of any state.  And to the extent that Plaintiffs' state-law claims seek to impose liability that regulates PSA's "services" or "routes," they are expressly preempted by the Airline Deregulation Act.

As Justice Jackson stated more than eight decades ago, Congress has established—and the nature of aviation requires—an exclusive federal scheme:

> Congress has recognized the national responsibility for regulating air commerce. ***Federal control is intensive and exclusive.*** Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxies onto a runway … [i]ts privileges, rights, and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government.

*Nw. Airlines v. State of Minnesota*, 322 U.S. 292, 303 (1944) (Jackson, J., concurring) (emphasis added).

Fourteen years later, in 1958, and as the result of a series of mid-air collisions and other tragic crashes involving military and civilian aircraft, Congress codified the rules for even more centralized control.  It enacted the Federal Aviation Act specifically "to provide for the safe and efficient use of the airspace by both civil and military aircraft," including, to establish uniform "rules for the prevention of collision between aircraft."  Pub. L. No. 85-726, 72 Stat. 731, 750.  The FAA Administrator oversees all aspects of aviation safety and may "prescribe air traffic rules and regulations governing the flight of aircraft, for the … protection … of aircraft, … and for the efficient utilization of the navigable airspace."  72 Stat. at 750, *codified as amended at* 49 U.S.C. § 40103(b); *see also* 49 U.S.C. § 44701(c).

In light of this history, under the Supremacy Clause of the U.S. Constitution, all state-law regulation of aviation (including, most relevant here, the imposition of common law standards of

care) is thus preempted for three separate reasons: (1) because Congress has occupied the field and made evident its intent to establish a uniform federal system of air travel regulation, (2) because subjecting airlines to additional state-law regulation would conflict with the governing federal rules, and (3) because, in the Airline Deregulation Act Congress *expressly* preempted all state law that regulates airline "routes" or "services." To the extent Plaintiffs' claims seek to impose on PSA any state common law duty of care with respect to air safety, those duties of care are barred. Only federal law can supply the relevant duty of care. And to the extent Plaintiffs' claims seek to impose liability that regulates PSA's "services" or "routes," they are expressly preempted by the Airline Deregulation Act.

The authorities, discussions, and examples provided here are not exhaustive, and should in no way be construed to limit the scope of the preemption defenses PSA asserts in this case.

**Field preemption** principles prevent plaintiffs from imposing on PSA state-law standards of care here. Rather, federal law supplies the applicable standard of care within the field of aviation safety, and Plaintiffs must establish a violation of that federal duty to establish liability. The all-encompassing statutory and regulatory scheme governing aviation establishes uniform federal standards covering each and every safety issue Plaintiffs discuss in their First Amended Master Complaint, from air traffic control by federal employees (14 C.F.R. § 91.101 *et seq.*) to instruments and safety equipment on commercial aircraft (*id.* §§ 121.301-359) to flight crew training (*id.* §§ 121.400-429) and certification (*e.g.*, *id.* § 61 *et seq.*) to airline safety risk management systems (*id.* §§ 5.1-5.97) to flight scheduling at high-density airports like DCA (*id.* §§ 93.121-133, 93.211-227).

To put a finer point on it: Federal regulations govern virtually all aspects of airline **training and flight policies**. *See* 14 C.F.R. Part 121 Subparts G & N. They require training programs to ensure crew members are adequately trained to perform their assigned duties (*id.* § 121.401) and flight manuals to "contain appropriate procedures for" the use of certain systems for alerts of

154

potential collision risks, as well as "[p]roper flight crew reaction" (*id.* § 121.354).  They also require FAA-designed training for flying in the Washington, DC area.  *Id.* § 91.161.  Likewise, federal regulations control airline **safety risk management**, dictating the contents of the safety policy (14 C.F.R. § 5.21), the processes required to collect data and monitor safety performance (*id.* § 5.71), and the required training to ensure individuals have the necessary competencies to perform relevant duties (*id.* § 5.91). And federal regulations govern **aircraft navigation**, particularly on a final approach to landing, where FAA designs appropriate approach routes.  *See, e.g.*, *id.* § 97.1 *et seq.* (prescribing standard instrument approach procedures, takeoff minimums, and obstacle departure procedures); *id.* § 97.20(c).  The regulations give an aircraft cleared for final approach "the right-of-way over other aircraft in flight or operating on the surface."  14 C.F.R. § 91.113(g).  Other aircraft must "give way" to an aircraft that has the right-of-way and "not pass over, under, or ahead of it unless well clear."  *Id.* § 91.113(b).  Federal regulations require an aircraft on final approach to maintain that approach absent exigent circumstances or an amended clearance from ATC.  *Id.* § 91.123.

In short, Congress left no room for state-law balkanization of the sky.  Plaintiffs cannot impose on PSA state-law standards of care instead of federal standards rooted in the extensive regulatory scheme.

**Conflict preemption** also preempts state-law standards of care regarding aviation safety that conflict with or stand as an obstacle to federal law or policy judgments. *See, e.g.*, *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) ("[S]tate law is … preempted to the extent it … is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.").

Plaintiffs' claims second-guess Congress's and the Executive's comprehensive system of safety regulation, seeking to interpose state-law duties in place of federal policy judgments.

155

For one thing, their claims aim to make PSA liable under state-law duties of care for the contents of a variety of materials that the FAA has already vetted and approved, including PSA trainings (14 C.F.R. § 121.401(a)(1)), flight manuals (*id.* §§ 121.141; 121.133) and safety risk management program (*id.* §§ 5.1, 5.7).  Indeed, PSA would *violate* federal standards if it unilaterally altered these materials to comply with state-law duties of care.  *See, e.g.*, 14 C.F.R. §§ 121.405; 121.141.

For another, Plaintiffs' claims undermine the federal government's careful choreography of the sky: Federal law prohibits operating an aircraft "in a careless or reckless manner so as to endanger the life or property of another" (14 C.F.R. § 91.13(a)), and the content of this duty is supplied by the surrounding comprehensive and detailed rules for operating an aircraft.  Holding an airline negligent under state law for complying with orders of air traffic control (14 C.F.R. § 91.123(b)), for following established "traffic patterns" (*id.* § 91.127), or for reasonably expecting that other aircraft will "give way" to an aircraft on its final approach (*id.* § 91.113(g)) plainly creates the sorts of federal-state conflicts the Supremacy Clause exists to preempt.

In addition to federalizing the standards for flight operations and aviation safety, Congress enacted the **Airline Deregulation Act of 1978** (Pub. L. No. 95-504, 92 Stat. 1705) (ADA) "to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services."  92 Stat. at 1705.  To "prevent the States from undoing what the Act was meant to accomplish" (*Nw., Inc. v. Ginsberg*, 572 U.S. 273, 283 (2014)), the ADA *expressly preempts* states from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation."  49 U.S.C. § 41713(b)(1).  That includes "state common law rules." *Nw., Inc.*, 572 U.S. at 281.

The First Amended Master Complaint invites state-law regulation of airline "service" and "routes."  49 U.S.C. § 41713(b)(1).  It attempts to suggest that PSA's liability is established by,

156

among other things, alleged "cluster[ing]" of "arrivals at DCA towards the end of one hour and the beginning of the next hour at peak travel times." FAMC ¶¶ 76-77. That is, plaintiffs would impose liability on PSA based on its "provision of air transportation to and from various markets *at various times*"—in other words, its service. *Charas v. Trans World Airlines, Inc*., 160 F.3d 1259, 1266 (9th Cir. 1998) (en banc) (emphasis added); *see also id.* at 1261 ("[T]he word 'service'" encompasses "schedules.").

Likewise, such allegations target PSA's routes. Using state law to superintend when and how often an airline's flights can arrive at DCA would require an airline to adjust or even to suspend the routes it provides, thereby impermissibly "operat[ing] as [a] limitation[] relating to routes." *Am. Airlines, Inc. v. Dep't of Transp*., 202 F.3d 788, 805-808 (5th Cir. 2000).

## SECOND AFFIRMATIVE DEFENSE

### Failure to State a Claim

The claims and allegations set forth in the First Amended Master Complaint fail to state a claim against PSA upon which relief can be granted, and Plaintiffs will fail to prove any cognizable claim against PSA prior to or at trial. This includes, but is not limited to, because Plaintiffs will fail to establish or prove, among other things: that PSA owed any duty as a common carrier; that PSA breached any duty; that any breach by PSA was a cause-in fact of any injury; that any breach by PSA was a proximate cause of any injury; and/or that any person for whose conduct PSA is responsible acted unreasonably under the circumstances.

## THIRD AFFIRMATIVE DEFENSE

### Facts to Be Proven With Particularity or to Other Standards

The claims and allegations set forth in the First Amended Master Complaint fail to state a claim against PSA upon which relief can be granted, and Plaintiffs will fail to prove any cognizable claim against PSA prior to or at trial, including because plaintiffs have not adequately alleged with particularity any facts or elements of their claims that must be alleged with particularity (including

157

but not limited to fraud, mistake, or certain damages elements) and will fail to prove any such elements to the requisite standard of proof at or before trial.

## FOURTH AFFIRMATIVE DEFENSE

### Standing and Capacity

Plaintiffs have failed to establish, or will fail to establish prior to or at trial, the requisite standing and/or legal capacity to bring the claims asserted in the First Amended Master Complaint by demonstrating that they are duly appointed and qualified personal representatives, administrators, executors, or otherwise authorized representatives under applicable law.

## FIFTH AFFIRMATIVE DEFENSE

### Fault, Comparative Fault, and/or Contributory Negligence

The negligence, fault, and/or culpable conduct of other parties or third parties was a proximate and substantial cause of the collision that is the subject of this litigation that bars, in whole or in part, the claims asserted against PSA. Any damages assessed against PSA must be reduced by the percentage of fault attributable to other parties or third parties, consistent with principles of comparative fault, equitable apportionment, contribution, and/or equitable or common-law indemnity to the extent permitted or required under applicable law. Further, punitive damages are unavailable against PSA in view of the negligence, fault, and/or culpable conduct of other parties or third parties, which was the proximate and substantial cause of the collision.

## SIXTH AFFIRMATIVE DEFENSE

### Lack of Causation

The injuries or damages alleged herein, if any, were not caused by any act or omission of PSA, nor by any act or omission for which PSA is or can be legally held responsible under applicable law. None of PSA's acts or omissions alleged in this case, even if proven, were either causes in fact or proximate causes of Plaintiffs' alleged injury or damages. Furthermore, as

separately asserted, other actors' negligence or other conduct were new, intervening, or superseding causes of any alleged injury or damages.

## SEVENTH AFFIRMATIVE DEFENSE

### New, Superseding, and/or Intervening Cause

The injuries or damages alleged herein, if any, were proximately caused by the negligence or other conduct of persons or entities other than PSA and over whom PSA had no control.  These acts and omissions constituted new, superseding, and/or intervening causes that were not reasonably foreseeable by PSA and that broke any alleged chain of causation between any alleged conduct of PSA and the collision.  Plaintiffs are therefore barred from obtaining a recovery herein against PSA, or, alternatively, any such recovery must be reduced in proportion to the negligence and other conduct of other parties or applicable third parties under applicable law.

## EIGHTH AFFIRMATIVE DEFENSE

### Sudden Emergency or Unavoidable Accident

PSA is not liable to Plaintiffs because any person for whose conduct PSA is responsible responded in an emergency situation as a person of ordinary prudence would have acted under the same or similar circumstances, or otherwise discharged their applicable duty under law in response to an emergency.  Furthermore, the circumstances giving rise to Plaintiffs' injuries and alleged damages were outside the control of PSA and/or constituted an unavoidable accident.

## NINTH AFFIRMATIVE DEFENSE

### Regulatory Compliance

PSA is not liable because it complied with all applicable government regulations in effect at all times relevant to this action.

## TENTH AFFIRMATIVE DEFENSE

### Reliance on Government Orders

PSA is not liable to Plaintiffs because it and any other for whom PSA is responsible reasonably obeyed and relied upon directives from government authorities in connection with the events described in the First Amended Master Complaint.

## ELEVENTH AFFIRMATIVE DEFENSE

### Performance of Duties

PSA appropriately, completely, and fully performed and discharged any and all obligations and legal duties arising out of the matters alleged in the First Amended Master Complaint.

## TWELFTH AFFIRMATIVE DEFENSE

### Substance of Duties

To the extent Plaintiff relies on FAA guidance or other nonbinding guidance to establish PSA's duties, such informal guidance cannot enlarge PSA's regulatory duties in the absence of compliance by FAA or the appropriate government agency with the requirements of the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*  Imposing such duties would contravene the process required by statute, as well as PSA's rights to due process and fair notice.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**Contract**

Plaintiffs (including their heirs, representatives, and assignees) are bound by a contract with American as to certain legal issues in this case, including choice-of-law.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**Failure to Prove Damages**

Plaintiffs have failed, or will fail prior to or at trial, to prove their entitlement to damages and/or prove the amount of any damages to reasonable certainty, or any other standard required by applicable law.

**FIFTEENTH AFFIRMATIVE DEFENSE**

**Limits on Recoverable Damages**

Plaintiffs' recovery of damages is barred, in whole or in part or as to certain categories and types of damages, by applicable law, including statutory caps or other statutory or nonstatutory caps, limitations, or restrictions on the measure or types of damages recoverable.  Plaintiffs are also limited in their ability to recover damages by contract.  Furthermore, applicable law may limit Plaintiffs' ability to recover pre- and/or post-judgment interest, or may set or restrict the interest rate applicable to such recovery.

**SIXTEENTH AFFIRMATIVE DEFENSE**

**No Punitive Damages**

PSA's alleged conduct does not rise to the level of willfulness, wantonness, recklessness, malice, evil motive, gross fraud, gross negligence, or any other standard required to support an award of punitive damages under applicable law.

161

**SEVENTEENTH AFFIRMATIVE DEFENSE**

**Limitations on Punitive Damages**

Plaintiffs' punitive damages claim contravenes PSA's constitutional rights as reserved for a defendant by the United States Constitution, including the Fifth, Eighth and Fourteenth Amendments, any applicable State Constitutions, and any other applicable law, in that, among other things, punitive damages are penal in nature and tantamount to the imposition of a criminal fine, and such claims are barred or limited by proscriptions against excessive fines and provisions assuring due process of law.  Plaintiffs' punitive damages claim contravenes any applicable caps, reductions, or other restrictions or limitations under applicable law, and must be reduced accordingly.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

**Collateral Source Recovery**

Upon information and belief, some Plaintiffs' economic losses and/or special damages, if any, were or will be replaced or indemnified, in whole or in part, from collateral sources, and PSA is entitled to have the Court consider the same in determining and reducing any such damages under applicable law.

**NINETEENTH AFFIRMATIVE DEFENSE**

**No Attorneys' Fees**

Plaintiffs have failed to establish that attorneys' fees are recoverable by statute, contract, or other source of applicable law.

**TWENTIETH AFFIRMATIVE DEFENSE**

**No Joint and Several Liability**

PSA is not jointly and severally liable for the entirety of Plaintiffs' alleged damages under applicable law.  Each defendant is liable only for that portion of damages that reflects its several liability and/or its proportionate share of fault, if any.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

**No Agency or Other Liability for American's Actions**

To the extent American may be found liable in this case, PSA is not liable for American's actions or omissions under any theory of vicarious liability or any means of recovery whatsoever, and Plaintiffs will fail as a matter of fact to establish the requisite elements of any such theories of vicarious liability or means of recovery.

**Reservation of Affirmative Defenses**

PSA reserves the right to assert additional affirmative defenses as they become known through the course of discovery and further investigation, consistent with the Federal Rules of Civil Procedure.

**Defendant's Prayer for Relief as to Plaintiffs' Complaint**

**WHEREFORE**, Defendant prays that:

a) Plaintiffs take nothing on their claims against PSA in the First Amended Master Complaint;

b) Judgment be entered in favor of PSA on all claims;

c) PSA be awarded its costs of suit and attorneys' fees to the extent permitted by law; and

d) The Court grant such other and further relief as it deems just and proper.

Dated: August 10, 2026

Respectfully submitted,

/s/ *Robert J. Burns*
William F. Gould (Bar No. 428468)
HOLLAND & KNIGHT LLP
800 17th Street, NW
Washington, DC 20006
(202) 955-3000
william.gould@hklaw.com

Steven Raffaele (Bar No. NY0685)
Robert J. Burns (Bar No. NY0682)
Sarah Korapaty (Bar No. NY0684)
Qian (Sheila) Shen (Bar No. NY0693)
HOLLAND & KNIGHT LLP
787 Seventh Avenue
New York, NY 10019
(212) 513-3200
steven.raffaele@hklaw.com
robert.burns@hklaw.com
sarah.korapaty@hklaw.com
qian.shen@hklaw.com

/s/ *Paul W. Hughes*
Margaret H. Warner (Bar No. 359009)
Paul W. Hughes (Bar No. 997235)
Jennifer B. Routh (Bar No. D0044)
Mary H. Schnoor (Bar No. 1740370)
Michael J. Mestitz (Bar No. 1047260)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mcdermottlaw.com
mwarner@mcdermottlaw.com
jrouth@mcdermottlaw.com
mschnoor@mcdermottlaw.com
mmestitz@mcdermottlaw.com

*Attorneys for Defendants American Airlines, Inc. and PSA Airlines, Inc.*